IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona, | ) ) ) ) | CV. NO. 10-00290 DAE-MHB |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, a political subdivision of the State of Arizona; et al., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER: (1) GRANTING HONEYWELL'S MOTION TO DISQUALIFY; (2) GRANTING CORNING'S MOTION TO DISQUALIFY; (3) GRANTING UNIVAR'S MOTION TO DISQUALIFY; (4) GRANTING SRP'S MOTION TO DISQUALIFY; (5) GRANTING DOLPHIN'S MOTION TO DISQUALIFY; (6) DENYING ARVIN AND COOPER'S MOTION TO DISQUALIFY

On May 2, 2011, the Court heard Defendant Honeywell International,

Inc.'s Motion to Disqualify Gallagher & Kennedy as Counsel for Roosevelt

Irrigation District ("Honeywell's Motion to Disqualify") (Doc. # 120); Defendant

Corning Incorporated's Motion to Disqualify Counsel for Plaintiff ("Corning's

Motion to Disqualify") (Doc. # 129); Defendant Univar USA Inc.'s Motion to

Disqualify Gallagher & Kennedy as Counsel for Roosevelt Irrigation District

("Univar's Motion to Disqualify") (Doc. # 131); Defendant Salt River Project

Agricultural Improvement and Power District's Motion to Disqualify Plaintiff's

Counsel Gallagher & Kennedy ("SRP's Motion to Disqualify") (Doc. # 132);

Defendant Dolphin, Incorporated's Motion for Disqualification ("Dolphin's

Motion to Disqualify") (Doc. # 133); and Defendants ArvinMeritor, Inc. and

Cooper Industries, LLC's Motion to Disqualify Gallagher & Kennedy, P.A. as

Counsel for Roosevelt Irrigation District ("Arvin and Cooper's Motion to

Disqualify") (Doc. # 423) (collectively, "Motions to Disqualify").

Michael K. Kennedy, Esq., Bradley Joseph Glass, Esq., and David

DePippo, Esq., appeared at the hearing on behalf of Plaintiff Roosevelt Irrigation

District ("RID"); Sean Morris, Esq., appeared at the hearing on behalf of

Defendant Honeywell International, Inc. ("Honeywell"); Shane R. Swindle, Esq.,

appeared at the hearing on behalf of Defendant Corning Incorporated ("Corning");

Joseph Allen Drazek, Esq., appeared at the hearing on behalf of Defendant Univar

USA Inc. ("Univar"); David John Armstrong, Esq., appeared at the hearing on

behalf of Defendant Salt River Project Agricultural Improvement and Power

District ("SRP"); Troy Blinn Froderman, Esq., appeared at the hearing on behalf of

Defendant Dolphin, Incorporated ("Dolphin"); Jerry Doyle Worsham, II, Esq.,

appeared at the hearing on behalf of Defendants ArvinMeritor, Inc. ("Arvin") and Cooper Industries, LLC ("Cooper") (collectively, "Moving Defendants").

After reviewing the motions and the supporting and opposing memoranda, and after considering Moving Defendants' in camera filings, the Court GRANTS Honeywell's Motion to Disqualify; GRANTS Corning's Motion to Disqualify; GRANTS Univar's Motion to Disqualify; GRANTS SRP's Motion to Disqualify; GRANTS Dolphin's Motion to Disqualify; and DENIES Arvin and Cooper's Motion to Disqualify.

<u>BACKGROUND</u>

This is a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA") among other laws, whereby Plaintiff Roosevelt Irrigation District ("RID") seeks to recuperate the costs it has or will incur in responding to the contamination of its wells and to recover for damages to RID property.  RID is a political subdivision of the State of Arizona, and it owns approximately 100 groundwater wells in the western portion of Maricopa County, Arizona.  (FAC ¶¶ 7, 9, 89.)  RID operates and maintains the groundwater wells for the purpose of providing water to public and private entities and individuals for industrial, agricultural, and residential uses.  (Id. ¶¶ 9, 89.)  More than twenty of

3

RID's groundwater wells in the West Van Buren Area ("WVBA") Water Quality
Assurance Revolving Fund ("WQARF") Site have purportedly been contaminated
by hazardous substances, and an additional eleven wells are allegedly threatened.
(Id. ¶¶ 11, 90.)  RID asserts that the contamination of its wells stems from three
regional sites identified by the Arizona Department of Environmental Quality
("ADEQ") and the United States Environmental Protection Agency (the "EPA").
(Id. ¶ 91.)  Those three sites include: (1) the Motorola 52nd Street Superfund Site
(the "M-52 Site"); (2) the WVBA WQARF Site; and (3) the West Central Phoenix
("WCP") WQARF Site.  (Id.)  According to RID, the contaminated groundwater
underlying each of these sites is "moving in a southwesterly or westerly direction
toward RID's groundwater wells" has "infiltrated and impacted" RID's wells.  (Id.
¶¶ 92–93.)

        In October 2008, RID hired Gallagher & Kennedy, P.A. ("G&K") to
provide investigatory and legal services regarding, and to assist in resolving the
issues associated with, the contamination of RID's wells.  (Consolidated Opp'n Ex.
3, Declaration of David P. Kimball, III ("Kimball Decl. I") ¶ 2.)  The members of
G&K's litigation team performing work on RID's behalf include: Michael
Kennedy, David P. Kimball, III, Bradley J. Glass, David DePippo, Lindsi Weber,
Stuart Kimball, Andrew Dudley, and Christine Goldberg.  (Id. ¶ 37.)  On February

4

9, 2010, RID, represented by G&K, filed a Complaint in the United States District Court for the District of Arizona against dozens of defendants.  (Doc. # 1.)  RID filed a First Amended Complaint on July 23, 2010.  ("FAC," Doc. # 10.)  Although RID primarily seeks to recover under CERCLA (id. ¶¶ 1, 106–16), it also asserts causes of action for Quasi Contract, Unjust Enrichment, Restitution; Nuisance; and Trespass (id. ¶¶ 117–32).

Shortly after RID filed its First Amended Complaint, several defendants filed motions to disqualify G&K as counsel for RID.  These motions can be separated into two groups: (1) the former client motions to disqualify; and (2) the joint defense group motions to disqualify.  Due to the complexity underlying these motions, the Court will first describe their factual underpinnings.

I.      Former Client Motions to Disqualify

Defendants Honeywell International, Inc. ("Honeywell") and Corning Incorporated ("Corning") both seek to disqualify G&K on the basis that they are former clients of current G&K attorneys (collectively, "Former Client Motions to Disqualify").

A.      Honeywell's Motion to Disqualify

Honeywell's facilities, located immediately north of the Phoenix Sky Harbor Airport, (the "Honeywell Facilities") are on the southern boundary of

Operable Unit 2 ("OU-2") of the M-52 Site.[1]  (Declaration of Troy J. Kennedy, ("Troy Kennedy Decl. I") ¶ 2, Doc. # 126.)  In 1992, the EPA notified Honeywell that it and other potentially responsible parties ("PRPs") might be liable for contamination originating from the M-52 Site.  (Id.)  Since that time, Honeywell "negotiated extensively" with the EPA, ADEQ, and other PRPs regarding the investigation of the Honeywell Facilities as well as the remedies and clean up costs associated with the alleged releases, which became commingled with another plume of contamination from other sources.  (Id. ¶ 3.)

      1.    <u>James G. Derouin</u>

For several years in the 1990s, Honeywell engaged James G. Derouin ("Derouin"), now employed by G&K, to represent its interests in connection with the contamination that allegedly emanated from the Honeywell Facilities in OU-2 of the M-52 Site.[2]  (Id. ¶ 4; Berke Decl. ¶ 2.)  Derouin continued to represent

---

[1] AlliedSignal Inc. acquired and merged with Honeywell in 1999, and the newly formed company adopted Honeywell's name.  (Declaration of Kenneth J. Berke ("Berke Decl.") ¶ 1, Doc. # 124.)  For simplicity, the Court will refer to both AlliedSignal Inc. and Honeywell as "Honeywell."

[2] Prior to his employment at G&K, Derouin was a partner at Steptoe & Johnson, LLP ("Steptoe") for approximately fifteen years.  (Consolidated Opp'n Ex. 2, Declaration of James. G. Derouin ("Derouin Decl. I") ¶ 3.)  Before that, Derouin was a partner at Meyer, Hendricks, Victor, Osborn & Maledon, which dissolved in 1995.  (Id. ¶¶ 4, 7.)

Honeywell in this manner until approximately 1996.  (Berke Decl. ¶ 11; Derouin Decl. I ¶¶ 10–12.)

In 2005, the EPA issued a special notice letter to Honeywell and other PRPs regarding issues arising in Operable Unit 3 ("OU-3") of the M-52 Site, which resulted from the same commingled plume the parties had been addressing since 1992.  (Troy Kennedy Decl. I ¶ 7.)  Honeywell retained Derouin in 2007 to represent its interests in this matter.  (Id.; Derouin Decl. I ¶ 14.)

In May 2009, David P. Kimball, III ("Kimball"), a G&K shareholder and counsel for RID, contacted Derouin, as counsel for Honeywell, to discuss technical issues related to groundwater contamination associated with RID's wells.  (Derouin Decl. I ¶ 15; Kimball Decl. I ¶ 11.)  On two separate occasions, Kimball met with Derouin to discuss these matters.  (Derouin Decl. I ¶¶ 16–18; Kimball Decl. I ¶¶ 12–15.)  Kimball informed Derouin that RID intended to bring a cost recovery action if settlement discussions proved unsuccessful.  (Kimball Decl. I ¶ 15; Derouin Decl. I ¶ 19.)  In his capacity as counsel for Honeywell, Derouin received two copies of RID's draft complaint.  (Troy Kennedy Decl. I ¶ 19; Derouin Decl. I ¶ 23; Kimball Decl. I ¶ 17; Supplemental Declaration of Troy J. Kennedy ("Troy Kennedy Decl. II") ¶ 2, Ex. A, Doc. # 331.)

On December 9, 2009, Derouin contacted Tom Byrne, Associate General Counsel/Chief Environmental Counsel for Honeywell, to inform him that he planned to leave Steptoe to join G&K.  (Derouin Decl. I ¶¶ 28–29; Declaration of Tom Byrne ("Byrne Decl.") ¶ 2, Doc. # 125.)  Derouin was hired by G&K in January 2010, and he attests that he did not "transfer or take any files, documents, or materials" related to his representation of Honeywell to G&K.  (Derouin Decl. I ¶¶ 27, 31.)  Derouin states that since his arrival at G&K, he has been screened from the RID matter.  (Id. ¶¶ 32–35; see also Kimball Decl. I ¶¶ 30–31; Consolidated Opp'n Ex. 9, Declaration of Michael K. Kennedy ("Michael Kennedy Decl.") ¶¶ 5–9.)

    2.   Glen Hallman

Glen Hallman ("Hallman"), now employed by G&K, served as Honeywell's in-house litigation counsel from 1987 to 1999.  (Consolidated Opp'n Ex. 6, Declaration of Glen Hallman ("Hallman Decl.") ¶ 5; Troy Kennedy Decl. I ¶ 21.)  According to Honeywell's files, Hallman represented Honeywell with regard to the alleged contamination from the Honeywell Facilities and the resulting commingled plume.  (Troy Kennedy Decl. I ¶¶ 21–41.)

Hallman has been a shareholder at G&K since 1999, and he is a member of the firm's Litigation Department.  (Hallman Decl. ¶¶ 2–3.)  Hallman

8

attests that when he joined G&K, he did not bring "any written or electronic files or documents that constituted work product or confidential information relating to the [M-52 Site]."  (Id. ¶ 6.)  Hallman has been screened from the RID matter since June 2010.  (Id. ¶ 5; see also Kimball Decl. I ¶¶ 40–41; Michael Kennedy Decl. ¶¶ 15–17.)

On September 15, 2010, Honeywell filed a Motion to Disqualify Gallagher & Kennedy as Counsel for Roosevelt Irrigation District as well as a Memorandum in Support of its Motion ("Honeywell's Motion to Disqualify"), contending that Derouin's and Hallman's employment by G&K creates impermissible conflicts of interest.  ("Honeywell's Mot.," Docs. ## 120, 123.)  On October 25, 2010 RID, with permission of the Court (Docs. ## 252, 292), filed a Consolidated Opposition to the Honeywell, Corning, Univar, SRP, and Dolphin Motions to Disqualify.  ("RID's Consolidated Opp'n," Doc. # 289.)  Honeywell filed a Reply on November 19, 2010.  ("Honeywell's Reply," Doc. # 330.)

B.    Corning's Motion to Disqualify

Corning is a past "own[er] and/or operat[or]" of a former electronics manufacturing facili7ty located at 35th Avenue and Osborn Road in Phoenix, Arizona ("West Osborn Complex"), within the WCP WQARF Site.  (FAC ¶ 33.) ADEQ began investigating groundwater contamination at and in the vicinity of the

West Osborn Complex as early as 1990.  (Corning's Mot. Ex. A, Declaration of Richard D. Geiger ("Geiger Decl.") ¶ 2.)

From 1990 to 1995, Derouin represented Corning with regard to the alleged groundwater contamination attributed to the West Osborn Complex. (Derouin Decl. I ¶¶ 6–7; Geiger Decl. ¶¶ 3, 5, 9.)  In that capacity, Derouin negotiated extensively with ADEQ and assisted with lawsuits involving either Corning or its subsidiary, Components, Incorporated ("Components").  (See Geiger Decl. ¶¶ 5–8.)

Derouin attests that he has not performed any work for Corning since 1995.  (Derouin Decl. I ¶ 7.)  As noted, Derouin was hired by G&K in January 2010, and he states that he did not "bring any written or electronic documents" related to his representation of Corning to G&K.  (Id. ¶ 9.)  Derouin represents that he has been screened from the RID matter since his arrival at G&K.  (Id. ¶¶ 32–35; see also Kimball Decl. I ¶¶ 30–31; Michael Kennedy Decl. ¶¶ 5–9.)

On September 15, 2010, Corning filed a Motion to Disqualify Counsel for Plaintiff ("Corning's Motion to Disqualify"), on the basis that Derouin's employment by G&K creates an impermissible conflict of interest.  ("Corning's Mot.," Doc. # 129.)  On October 25, 2010, RID filed its Consolidated Opposition. Corning filed a Reply on November 19, 2010.  ("Corning's Reply," Doc. # 332.)

10

II.     Joint Defense Group Motions to Disqualify

Defendants Univar USA, Inc. ("Univar"), Salt River Project Agricultural Improvement and Power District ("SRP"), Dolphin, Incorporated ("Dolphin"), and ArvinMeritor, Inc. ("Arvin") and Cooper Industries, LLC ("Cooper") all move to disqualify G&K on the basis that various current and former G&K attorneys obtained privileged and confidential information relevant to the instant dispute by virtue of their participation in myriad joint defense groups (collectively, "Joint Defense Group Motions to Disqualify").  Honeywell and Corning also assert that G&K's participation in certain joint defense groups provides an alternative basis for granting their motions.  The joint defense groups at issue are: (1) the West Van Buren Group; (2) the M-52 Group; and (3) the AdobeAir-Arvin and Arvin-Cooper Groups.[3]

_____

[3] In the early 1990s, Honeywell, Corning, United Industrial Corp., which was represented by G&K, and others participated in a joint defense group (the "Baker/Lofgren Group") to coordinate their defense of three lawsuits: (1) State v. United Industrial Corp. et al. (the "United Industrial Action"); (2) Baker v. Motorola et al. (the "Baker Action"); (3) and Lofgren v. Motorola, Inc. et al. (the "Lofgren Action").  (See Moving Defs.' Closing Arg. Br. at 23–26.)  Because Honeywell's and Corning's Motions to Disqualify can be granted solely on the alleged former client conflicts, the Court need not address their alternative argument that G&K should be disqualified by virtue of its participation in the Baker/Lofgren Group.

11

A.     <u>The West Van Buren Group—Univar and Dolphin</u>

Univar's facilities, located at 50 S. 45th Avenue, Phoenix, Arizona ("Univar's Facilities"), and Dolphin's facilities, located at 740 South 59th Avenue, Phoenix, Arizona ("Dolphin's Facilities") are within the WVBA WQARF Site.[4] (FAC ¶¶ 36, 79; Univar's Mot. Ex. A, Declaration of Wayne Grotheer ("Grotheer Decl.") ¶ 2.)

In 1992, ADEQ notified Univar, Dolphin, and several other PRPs that they might be liable for groundwater contamination originating from the WVBA WQARF Site.  (Grotheer Decl. ¶ 2; Declaration of Philip J. Lagas ("Lagas Decl.") ¶ 3, Doc. # 134.)  In response, Univar, Dolphin, Reynolds Metals ("Reynolds"), Maricopa County, and American Linen Supply Company[5] formed a joint defense group (the "WVB Group"), whose primary purpose was to jointly negotiate a consent decree with ADEQ for performance of a Remedial Investigation/Feasibility Study ("RI/FS") in the WVBA Site.  (Grotheer Decl. ¶¶ 3–4; Lagas Decl. ¶ 4.)  The parties executed the joint defense agreement in 1993, and the group met regularly until approximately June 1996, when the group

---

[4] Univar was previously known as Van Waters & Rogers, Inc.

[5] American Linen Supply Co. was previously known as Maryatt Industries.

12

suspended negotiations with ADEQ.  (Grotheer Decl. ¶¶ 4–5, 8; Lagas Decl. ¶¶ 5, 21.)

During the WVB Group's existence, Reynolds was represented by current G&K attorneys David L. Wallis ("Wallis"), J. Stanton Curry ("Curry"), and Dalva L. Moellenberg ("Moellenberg").[6]  (Grotheer Decl. ¶ 6; Lagas Decl. ¶¶ 13–14.)  Wallis, Curry, and Moellenberg all attest that they were screened from the RID matter "shortly" after RID engaged G&K in October 2008.  (Consolidated Opp'n Ex. 4, Declaration of David L. Wallis ("Wallis Decl.") ¶¶ 4–5; Consolidated Opp'n Ex. 5, Declaration of J. Stanton Curry ("Curry Decl.") ¶¶ 4–5; Consolidated Opp'n Ex. 7, Declaration of Dalva L. Moellenberg ("Moellenberg Decl.") ¶¶ 4–5; see also Kimball Decl. I ¶ 7.)

On September 15, 2010, Univar filed a Motion to Disqualify Gallagher & Kennedy as Counsel for Roosevelt Irrigation District ("Univar's Motion to Disqualify"), asserting that G&K's participation in the WVB Group on Reynolds's behalf created an implied attorney-client relationship with Univar.[7]

---

[6] Cameron Chandler also participated in the WVB Group's meetings, but he is no longer employed by G&K.

[7] Univar filed an Errata on September 16, 2010, clarifying that it filed its motion to disqualify only on behalf of Univar, rather than all nine of the defendants represented by Quarles & Brady LLP in this matter.  (Doc. # 139.)

13

("Univar's Mot.," Doc. # 131.)  On the same day, Dolphin filed a Motion for

Disqualification ("Dolphin's Motion to Disqualify") on the same grounds.

("Dolphin's Mot.," Doc. # 133.)  On October 25, 2010, RID filed its Consolidated

Opposition.  Univar filed a Reply on November 19, 2010.  ("Univar's Reply," Doc.

# 328.)  Dolphin filed a Reply on the same day.  ("Dolphin's Reply," Doc. # 324.)

       B.    The M-52 Group—SRP and Honeywell

       SRP's facilities are located at 1616 East Lincoln Street, Phoenix,

Arizona ("SRP's Facilities").  (FAC ¶ 66.)  In 2003, the EPA identified SRP and

Arizona Public Service ("APS") as PRPs in connection with alleged contamination

in OU-3 of the M-52 Site.  (SRP's Mot. Ex. A, Declaration of Kevin Wanttaja

("Wanttaja Decl.") ¶ 5.)  The EPA had already identified Honeywell as a PRP for

this contamination.  (Id. ¶ 6.)

       Thereafter, SRP, Honeywell, and APS (the "M-52 Group") executed a

joint defense agreement effective March 1, 2008.  (Id. ¶ 9.)  Derouin participated in

the M-52 Group meetings on behalf of Honeywell, and Curry participated on

behalf of APS, who was represented by G&K in the matter.[8]  (Id. ¶¶ 11, 13;

––––––––––––––––

[8] James Hamula and Jefferson Reynolds also participated in the M-52
Group's meetings, but they are no longer employed by G&K.

Derouin Decl. I ¶ 21.)  SRP withdrew from participation in the M-52 Group in December 2008.  (SRP's Mot. at 6.)

On September 15, 2010, SRP filed a Motion to Disqualify Plaintiff's Counsel Gallagher & Kennedy ("SRP's Motion to Disqualify"), arguing that

As noted, Derouin was hired by G&K in January 2010, and he states that he did not "transfer or take any files, documents, or materials" related to his representation of Honeywell to G&K.  (Derouin Decl. I ¶¶ 27, 31.)  Derouin attests that he has been screened from the RID matter since his arrival at G&K.  (Id. ¶¶ 32–35; see also Kimball Decl. I ¶¶ 30–31; Michael Kennedy Decl. ¶¶ 5–9.) Additionally, Curry represents that he was screened from the RID matter "shortly" after RID engaged G&K in October 2008.  (Consolidated Opp'n Ex. 5, Declaration of J. Stanton Curry ("Curry Decl.") ¶¶ 4–5; see also Kimball Decl. I ¶ 7.)

On September 15, 2010, SRP filed a Motion to Disqualify Plaintiff's Counsel Gallagher & Kennedy ("SRP's Motion to Disqualify"), arguing that G&K's participation in the M-52 Group creates an impermissible conflict of interest.  ("SRP's Mot.," Doc. # 132.)  On October 25, 2010, RID filed its Consolidated Opposition.  SRP filed a Reply on November 19, 2010.  ("SRP's Reply," Doc. # 334.)

C.    The AdobeAir-Arvin and Arvin-Cooper Groups

Arvin and Cooper are former successive owners of a facility located at 500 South 15th Street, Phoenix, Arizona (the "South 15th Street Facility").  (FAC

¶¶ 20, 32.)  This facility is within OU-3 of the M-52 Site.  (A&C's SOF Ex. 1,

Affidavit of Jerry D. Worsham, II ("Worsham Aff.") ¶ 9.)  In May 1987, the EPA

placed the South 15th Street Facility on the Comprehensive Environmental

Response, Compensation and Liability Information System ("CERCLIS").

(A&C's SOF Ex. 2, Affidavit of Linda S. Furlough ("Furlough Aff.") ¶ 5.)

        During his employment at Steptoe, Derouin was the partner primarily

responsible for the legal services rendered to AdobeAir, Inc. ("AdobeAir"),

another former owner of the South 15th Street Facility.  (Id. ¶ 2; Opp'n to A&C's

Mot. Ex. B, Declaration of James G. Derouin ("Derouin Decl. II") ¶ 3.)[9]  In

connection with this matter, AdobeAir entered into a joint defense agreement with

Arvin in October 2002 (the "AdobeAir-Arvin Group").  (Derouin Decl. II ¶ 3;

Furlough Aff. ¶ 7.)  Effective November 25, 2002, Arvin and Cooper entered into a

Tolling, Standstill and Cooperation Agreement (the "Arvin-Cooper Group").

(A&C's SOF Ex. 3, Affidavit of Keith H. Odenweller ("Odenweller Aff.") ¶ 7.)

Jerry D. Worsham, II ("Worsham") was counsel for Arvin and was common

counsel under the joint defense agreements.  (Worsham Aff. ¶ 3.)  In September

_____

    [9] RID named AdobeAir as a defendant in the Complaint, but not in the First
Amended Complaint.  Kimball attests that RID removed AdobeAir "out of an
abundance of precaution pertaining to potential conflicts, and because it was
discovered that Adobe[Air] was defunct and insolvent."  (Opp'n to A&C's Mot.
Ex. C, Declaration of David P. Kimball, III ("Kimball Decl. II") ¶ 17.)

2004, representatives from AdobeAir, Arvin, and Cooper signed an Administrative Order on Consent ("AOC") titled "In the Matter of: Motorola 52nd Street Superfund Site, U.S. EPA Docket No. 2004-18," which was negotiated with the EPA and prescribed that an RI/FS was to be performed on the South 15th Street Facility.  (Id. ¶ 10; Furlough Aff. ¶¶ 8–11; Derouin Decl. II ¶ 3.)

Derouin withdrew from representing AdobeAir in April 2009 because it sold its assets and ceased doing business.  (Derouin Decl. II ¶ 5.)  As noted, Derouin was hired by G&K in January 2010, and he states that he did not bring any of AdobeAir's files with him to the firm.  (Id. ¶¶ 7, 11.)  Derouin attests that he has been screened from the RID matter since his arrival at G&K.  (Id. ¶ 12; see also Kimball Decl. II ¶ 11.)

On August 17, 2010, Arvin and Cooper filed a Motion to Disqualify Gallagher & Kennedy, P.A. as Counsel for RID (Doc. # 88) as well as a Statement of Facts in support of its motion (Doc. # 89).  On September 10, 2010, RID filed an Opposition ("RID's Opp'n to A&C's Mot.," Doc. # 114) as well as a Controverting Statement of Facts (Doc. # 115).  Arvin and Cooper filed a Reply on September 24, 2010.  ("A&C's Reply," Doc. # 156.)

17

On March 29, 2011, the Court heard via videoconference Arvin and Cooper's Motion to Disqualify.[10]  At the hearing, the Court expressed concern that the parties did not provide sufficient information for the Court to properly analyze either this motion or the other five motions to disqualify.  Accordingly, on March 30, 2011, the Court denied without prejudice Arvin and Cooper's Motion to Disqualify with leave to refile it with supplemental briefing as to the applicability and effect of Arizona Ethical Rule 1.10.  (Doc. # 418.)  Because this issue could potentially impact each of the motions to disqualify, the Court directed Honeywell, Corning, Univar, SRP, Dolphin, and Arvin and Cooper (collectively, "Moving Defendants") to file a single, combined supplemental brief.  (Id.)

On April 5, 2011, Moving Defendants filed a Joint Supplemental Brief in Support of the Motions for Disqualification ("Supplemental Brief"). ("Moving Defs.' Supp. Br.," Doc. # 421.)  RID filed a Supplemental Brief in Opposition to the Motions for Disqualification on April 12, 2011 ("Opposition to the Supplemental Brief").  ("RID's Opp'n to Supp. Br.," Doc. # 425.)  Moving Defendants filed a Supplemental Reply Brief in Support of the Motions for

---

[10] Michael K. Kennedy, Esq., Bradley Joseph Glass, Esq., and David DePippo, Esq., appeared at the hearing on behalf of RID; Jerry D. Worsham, II, Esq., appeared at the hearing on behalf of Arvin and Cooper.  Myriad additional attorneys were present either by videoconference or by telephone.

Disqualification on April 15, 2011 ("Supplemental Brief Reply").  ("Moving Defs.' Supp. Br. Reply," Doc. # 427.)

Pursuant to the Court's March 30, 2011 Order, on April 11, 2011, Arvin and Cooper refiled their Motion to Disqualify Gallagher & Kennedy, P.A. as Counsel for RID ("Arvin and Cooper's Motion to Disqualify") ("A&C's Mot.," Doc. # 423) as well as their Statement of Facts in support of the motion ("A&C's SOF," Doc. # 424).  RID filed a Renewed Response to Arvin and Cooper's Motion to Disqualify on April 27, 2011.  (Doc. # 432.)  Arvin and Cooper filed a Renewed Reply on April 28, 2011.  (Doc. # 433.)

The Court heard the Motions to Disqualify on May 2, 2011.  On May 6, 2011, the Court issued an Order Directing Moving Defendants to File <u>In Camera</u> Documents.  (Doc. # 443.)  To the extent that the Motions to Disqualify were premised upon participation in a joint defense group, the Court directed the parties to submit the following: (1) a copy of the joint defense agreement at issue; (2) a list of the parties and attorneys who participated in the joint defense group; (3) information regarding the frequency of joint defense group meetings, the regularity with which the attorneys in question attended those meetings, and the duration of the joint defense group; and (4) a detailed description of the topics discussed and the information exchanged in connection with the joint defense group.  (<u>Id.</u> at 3.)

19

The Court also ordered Moving Defendants to provide G&K with copies of the joint defense agreements at issue, but clarified that they could redact any privileged or confidential information contained therein.  (Id. at 5.)  Finally, the Court directed the parties to submit any additional documents and information they believed would assist the Court in its review of the Motions to Disqualify.  (Id. at 3–4.)

On May 16, 2011, Corning filed a Notice of Filing of Amended Exhibits to its Motion to Disqualify.  (Doc. # 445.)  On the same day, Corning, Arvin and Cooper, SRP, Honeywell, and Dolphin and Univar filed notices to indicate that they had complied with the May 6, 2011 Order.  (Docs. ## 446–448, 450–451.)  SRP also filed a Notice of Service of Redacted Joint Defense Agreement.  (Doc. # 449.)  On July 26, 2011, RID filed a Notice of Receipt of Redacted Joint Defense Agreements to Complete the Record Re: Disqualification. (Doc. # 463.)

On July 29, 2011, in accordance with the Court's directive (Doc. # 462), Moving Defendants filed a Closing Argument Brief in support of the Motions to Disqualify ("Moving Defs.' Closing Arg. Br.," Doc. # 465).  RID filed a Closing Argument Brief on the same day.  ("RID's Closing Arg. Br.," Doc. # 466.)

## STANDARD OF REVIEW

The United States District Court for the District of Arizona has adopted the Arizona Rules of Professional Conduct as its ethical standards. LR Civ 83.2(e); Research Corp. Techs., Inc. v. Hewlett-Packard Co., 936 F. Supp. 697, 700 (D. Ariz. 1996). Accordingly, this Court applies the Arizona ethical rules when evaluating motions to disqualify counsel. See In re Cnty. of L.A., 223 F.3d 990, 995 (9th Cir. 2000) (stating that federal courts "apply state law in determining matters of disqualification" and that they "follow the reasoned view of the state supreme court when it has spoken on the issue"); Christiansen v. U.S. Dist. Court, 844 F.2d 694, 697 n.6 (9th Cir. 1988) (finding that when a district court has adopted a state's ethical rules, the district court must apply those rules to a motion to disqualify); Unified Sewerage Agency v. Jelco, Inc., 646 F.2d 1339, 1342 n.1 (9th Cir. 1981) (same); see also Paul E. Iacono Structural Eng'r, Inc. v. Humphrey, 722 F.2d 435, 439–40 (9th Cir. 1983) (analyzing whether the district court, which had adopted the California ethical rules, properly applied California law to the motion to disqualify).

The Preamble to the Arizona Rules of Professional Conduct cautions that a violation of an ethical rule "does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation,"

and warns that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."  Pmbl. ¶ 20, Ariz. R. Prof'l Conduct. Arizona law reiterates that "[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent."  Alexander v. Superior Court, 685 P.2d 1309, 1313 (Ariz. 1984); see also Gomez v. Superior Court, 717 P.2d 902, 905 (Ariz. 1986) (stating that Arizona courts "view with suspicion" motions to disqualify opposing counsel based on a conflict of interest or appearance of impropriety); Villalpando v. Reagan, 121 P.3d 172, 175 (Ariz. Ct. App. 2005) (same); Amparano v. ASARCO, Inc., 93 P.3d 1086, 1092 (Ariz. Ct. App. 2004) ("[T]he rules of professional responsibility are for ethical enforcement and are not designed to be used as a means to disqualify counsel.  The courts have, of course, looked to the ethical rules for guidance on disqualification issues.") (citation omitted).  As the Ninth Circuit has noted, disqualification motions should be subjected to "particularly strict scrutiny" because of their potential for abuse.  Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd., 760 F.2d 1045, 1050 (9th Cir. 1985); see also Cnty. of L.A., 223 F.3d at 996 ("A motion to disqualify a law firm can be a powerful litigation tactic to deny an opposing party's counsel of choice.").  "However, close or doubtful cases are resolved in favor of disqualification in order to preserve the

22

integrity of the judicial system." Richards v. Holsum Bakery, Inc., 2009 WL 3740725, at *6 (D. Ariz. Nov. 5, 2009); see also Kaiser v. AT&T, 2002 WL 1362054, at *5 (D. Ariz. Apr. 5, 2002) (same) (quoting Palmer v. The Pioneer Hotel & Casino, 19 F. Supp. 2d 1157, 1162 (D. Nev. 1998)).  The moving parties have the burden of sufficiently showing why the Court should disqualify an attorney from representing its client.  Alexander, 685 P.2d at 1313; Amparano, 93 P.3d at 1093; see also Research Corp., 936 F. Supp. at 701.

DISCUSSION

For the reasons set forth below, the Court concludes that G&K should be disqualified from representing RID against Honeywell, Corning, Univar, SRP, and Dolphin.  G&K may represent RID against Arvin and Cooper, provided that G&K continues to comply with the screening provisions of Ethical Rule 1.10(d).

I.      Former Client Motions to Disqualify

Honeywell and Corning both argue that their former representation by current G&K attorneys creates an impermissible conflict of interest that is imputed to G&K by virtue of Ethical Rule 1.10 and is not subject to screening.  The Court agrees.

A.   <u>Former Client Conflict of Interest—Ethical Rule 1.9</u>

Ethical Rule 1.9(a) states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  ER 1.9(a).  For a conflict to exist pursuant to this provision, the moving party must show: (1) the existence of an attorney-client relationship; (2) that the former representation was "the same or substantially related" to the current litigation; and (3) that the current client's interests are "materially adverse" to the former client's interests.  <u>Foulke v. Knuck</u>, 784 P.2d 723, 726–27 (Ariz. Ct. App. 1989).  Matters are substantially related "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  ER 1.9 cmt. 3; <u>see also</u> <u>Trone v. Smith</u>, 621 F.2d 994, 998–99 (9th Cir. 1980) (concluding that a "substantial relationship" exists if the factual contexts of the two representations are similar or related); <u>Amparano</u>, 93 P.3d at 1093; <u>Foulke</u>, 784 P.2d at 726–27 (finding that an Ethical Rule 1.9(a) conflict of interest existed when the general subject matter of the prior representation was

24

substantially related to the issues that would necessarily be resolved in the subsequent action); cf. In re Ockrassa, 799 P.2d 1350, 1352 (Ariz. 1990) (stating that one of the aims of Ethical Rule 1.9 is to "avoid a public perception of 'switching sides'"). Determining the scope of a matter requires an examination of the facts of a particular situation or transaction and the nature and degree of the lawyers' involvement. ER 1.9 cmt. 2. Additionally, information that has been disclosed to the public ordinarily will not be disqualifying. ER 1.9 cmt. 3.

B.   Vicarious Disqualification and Screening—Ethical Rule 1.10

Ethical Rule 1.10(a) states that no lawyer in a firm "shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by [Ethical Rules] 1.7 or 1.9." ER 1.10(a). Until recently, this rule was absolute.[11] Arizona amended Ethical Rule 1.10 in 2003, and added the following provision:

> (d)   When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under [Ethical Rule] 1.9 unless:

---

[11] According to Former Ethical Rule 1.10, when a lawyer, who had acquired protected information about a matter, changed firms, the receiving firm would be automatically disqualified from the matter unless the lawyer's former client waived or consented to the conflict. See Towne Dev. of Chandler, Inc. v. Superior Court, 842 P.2d 1377, 1381 (Ariz. Ct. App. 1992).

> (1)   the matter does not involve a proceeding before a tribunal in which the personally disqualified lawyer had a substantial role;
>
> (2)   the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (3)   written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

ER 1.10(d).  This provision is "unique and was not taken from ABA proposals or rules adopted in other states."  <u>Eberle Design, Inc. v. Reno A & E</u>, 354 F. Supp. 2d 1093, 1095 (D. Ariz. 2005).

According to its unambiguous terms, Ethical Rule 1.10(d)'s screening mechanism is only available in circumstances in which the lawyer who represented the former client joins a new firm.  ER 1.10(d) ("When a lawyer <u>becomes</u> associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under [Ethical Rule] 1.9." (emphasis added)); <u>see also</u> <u>Eberle</u>, 354 F. Supp. 2d at 1095 ("By its terms, [Ethical Rule 1.10(d)] applies only when the lawyer joining the new firm is personally disqualified under [Ethical Rule] 1.9."); Ariz. Ethics Op. 04-04 ("[T]he intent of [Ethical Rule 1.10(d)] was to address the situation of a lawyer moving laterally between firms to promote lawyer mobility.").  Once this threshold

requirement is met, however, for screening to be available, the terms of subsections (d)(1)–(3) must also be satisfied.

      1.    <u>Ethical Rule 1.10(d)(1)</u>

Ethical Rule 1.10(d)(1) provides: "When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under ER 1.9 unless: (1) the matter does not involve a proceeding before a tribunal in which the personally disqualified lawyer had a substantial role."  ER 1.10(d)(1).

There is a paucity of authority on this provision, and thus far, no court has interpreted it in its entirety.  The comments provide some insight into this rule, however.  For instance, the comments define "tribunal" as "a court, an arbitrator in an arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity."  ER 1.0(m).  They further provide that "[a] legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a legal judgment directly affecting a party's interests in a particular matter."  <u>Id.</u>

In <u>Eberle</u>, the only case to touch upon Ethical Rule 1.10(d), the court concluded that to be considered "substantial" within the meaning of this rule, the

affected lawyer's role in the former client's representation must have been "material and weighty." Eberle, 354 F. Supp. 2d at 1097 (citing ER 1.0(*l*)). Whether the lawyer had such a role depends on "the nature and amount of work he performed, the responsibility he assumed, the degree to which the client relied on him for managing the case, and similar considerations." Id. (concluding that an attorney who billed 9.2 hours to a case over a period of 9 days for drafting voir dire questions did not play a "substantial" role in the former client's representation).

With respect to the remainder of Ethical Rule 1.10(d)(1), the comments do not provide any insight into how it should be construed, and courts have not yet interpreted its requirements.[12]  The Court therefore applies its plain terms.  See Janson v. Christensen, 808 P.2d 1222, 1223 (Ariz. 1991) ("[T]he best and most reliable index of a statute's meaning is its language."); W. Corr. Grp., Inc. v. Tierney, 96 P.3d 1070, 1074 (Ariz. Ct. App. 2004) (stating that courts refer to established and widely used dictionaries to determine the plain meaning of a

---

[12] In the absence of controlling statutory authority or case law, Arizona courts follow the Restatement of the Law.  Wetherill v. Basham, 3 P.3d 1118, 1123 (Ariz. Ct. App. 2000); see also Paradigm Ins. Co. v. Langerman Law Offices, P.A., 24 P.3d 593, 595–96 (Ariz. 2001) (referencing the Restatement (Third) of the Law Governing Lawyers in determining whether an express agreement is required to form an attorney-client relationship).  The Restatement is not helpful here, however, because its provision regarding the applicability of screening materially differs from Ethical Rule 1.10(d)(1).  See Restatement (Third) of the Law Government Lawyers § 124.

term in a statute); Herberman v. Bergstrom, 816 P.2d 244, 246 (Ariz. Ct. App. 1991) (providing that clear statutory language is given its usual meaning unless impossible or absurd consequences result); see also United States v. Nader, 542 F.3d 713, 717 (9th Cir. 2008) (stating that courts first consider the plain meaning of a statute's text).

      According to the plain terms of this provision, "matter" refers to the representation that Ethical Rule 1.9 disqualifies the lawyer from undertaking, i.e. the current representation.  Therefore, pursuant to Ethical Rule 1.10(d)(1), for screening to be available, the current representation must not "involve a proceeding before a tribunal in which the personally disqualified lawyer had a substantial role."  ER 1.10(d)(1) (emphasis added).  The word "involve" means "to have within or as part of itself" or "to require as a necessary accompaniment." Webster's Third New International Dictionary 1191 (2002); see also 8 Oxford English Dictionary 57 (2d ed. 1989) (defining "involve" as "to enfold, envelop, entangle, include"); United States v. Awan, 607 F.3d 306, 315 (2d Cir. 2010) (defining "involve" as "to have within or as part of itself" or "to include"); Valansi v. Ashcroft, 278 F.3d 203, 209–10 (3d Cir. 2002) (defining "involve" as "to have within or as part of itself" or "to require as a necessary accompaniment").  Thus, the current representation "involve[s] a proceeding before a tribunal in which the

personally disqualified lawyer had a substantial role" when it necessarily includes such a proceeding.

At its minimum, this provision allows screening unless the disqualified lawyer switched sides in the current representation, provided that it was a proceeding before a tribunal and the disqualified lawyer had a substantial role. This provision can also be interpreted to provide that screening may be used unless the current representation <u>necessarily requires</u> relitigating some aspect of a prior proceeding before a tribunal, in which the potentially disqualified lawyer had a substantial role. A helpful example of this interpretation would be: A lawyer represents the plaintiff in a personal injury tort lawsuit. After conclusion of this representation, the lawyer is hired by the defendant's law firm. Thereafter, the defendant's law firm seeks to represent the defendant in asserting that there was fraud on the court in the personal injury tort lawsuit. Because the fraud on the court claim, <u>i.e.</u> the current representation, would necessarily require relitigating certain aspects of the personal injury tort lawsuit, <u>i.e.</u> the prior proceeding, screening would not be available, and the lawyer's disqualification would be imputed to the entire law firm.

In any event, Ethical Rule 1.10(d)(1) cannot be interpreted so as to preclude screening if the prior representation is merely substantially related to the

30

current representation.  This would contradict the plain meaning of "involve" because if two matters are substantially related, one does not "include" the other or "require [the other] as a necessary accompaniment."  Additionally, Ethical Rule 1.10(d)(1) does not use the words "substantially related."  This phrase appears in several other provisions of the Ethical Rules, and if the drafters intended Ethical Rule 1.10(d)(1) to preclude screening when the two representations are substantially related, then they would have specified as such.  The Court cannot adopt a reading of the rule that belies its plain terms.

Eberle is not to the contrary.  In that case, an attorney billed 9.2 hours to a matter while employed by the plaintiff's law firm, then the attorney joined the law firm representing the defendant in the same action, while the lawsuit was ongoing.  Eberle, 354 F. Supp. 2d at 1096–97.  The lawyer unquestionably switched sides in a lawsuit that was before a tribunal, and therefore, the focus of the Eberle court's inquiry was whether the attorney had undertaken a "substantial role" in the lawsuit while he was employed by the plaintiff's firm.  Id. at 1096.  The Court agrees with Eberle, in that had this attorney undertaken a substantial role in the lawsuit, his conflict of interest would have been imputed to the defendant's firm and screening would not have been available.  The question of whether screening is available when the Ethical Rule 1.9 conflict of interest falls short of

31

sideswitching, however, was not presented in Eberle.  That decision, therefore, provides no guidance into the meaning of "involve" because it only addressed what constitutes a "substantial role" within the meaning of Ethical Rule 1.10(d)(1).

Accordingly, the Court concludes that Ethical Rule 1.10(d)(1) precludes screening when: (1) the disqualified lawyer either switched sides in the current representation or the current representation necessarily requires relitigating a particular aspect of a prior representation; (2) the prior representation was a proceeding before a tribunal; and (3) the disqualified lawyer played a substantial role in that prior proceeding.

### 2.    Ethical Rule 1.10(d)(2)

Ethical Rule 1.10(d)(2) provides as follows: "When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under ER 1.9 unless: (2) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom."  ER 1.10(d)(2).

"'Screened' denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the

isolated lawyer is obligated to protect under these Rules or other law."[13]  ER

1.0(k).  The comments to Ethical Rule 1.0 elaborate on what the screen should

entail:

> The purpose of screening is to assure the affected parties that
> confidential information known by the personally disqualified lawyer
> remains protected.  The personally disqualified lawyer should
> acknowledge the obligation not to communicate with any of the other
> lawyers in the firm with respect to the matter.  Similarly, other
> lawyers in the firm who are working on the matter should be informed
> that the screening is in place and that they may not communicate with
> the personally disqualified lawyer with respect to the matter.
> Additional screening measures that are appropriate for the particular
> matter will depend on the circumstances.  To implement, reinforce and
> remind all affected lawyers of the presence of the screening, it may be
> appropriate for the firm to undertake such procedures as a written
> undertaking by the screened lawyer to avoid any communication with
> other firm personnel and any contact with any firm files or other
> materials relating to the matter, written notice and instructions to all
> other firm personnel forbidding any communication with the screened
> lawyer relating to the matter, denial of access by the screened lawyer
> to firm files or other materials relating to the matter and periodic
> reminders of the screen to the screened lawyer and all other firm
> personnel.

ER 1.0 cmt. 9; see also State ex rel. Romley v. Superior Court, 908 P.2d 37, 43

(Ariz. Ct. App. 1995) (finding that for purposes of Ethical Rule 1.11, the screening

───────────────

[13] The comments indicate that this definition of screened "applies to
situations where screening of a personally disqualified lawyer is permitted to
remove imputation of a conflict of interest under [Ethical Rules] 1.11, 1.12 or
1.18."  ER 1.0 cmt. 8.  The Court nonetheless utilizes this definition because it is
instructive here and there is no reason to adopt a different definition of the term.

mechanism "must be designed both to eliminate opportunities for inadvertent disclosure and to provide a genuine appearance of a security wall around the subject attorney"); Restatement (Third) of the Law Governing Lawyers § 124(d)(ii) (describing the requirements of an effective screen).

Additionally, "to be effective, screening measures must be implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening."  ER 1.0 cmt. 10; <u>see also</u> Restatement (Third) of the Law Governing Lawyers § 124 cmt. d(i) ("The required screening measures must be imposed in the subsequent representation at the time the conflict is discovered or reasonably should have been discovered, and they must be of sufficient scope, continuity, and duration to assure that there will be no substantial risk to confidential client information.").  Ethical Rule 1.0(f) defines "knows" as "actual knowledge of the fact in question."  ER 1.0(f).  Knowledge may also be inferred from circumstances.  <u>Id.</u>  The term "reasonably should know" means that "a lawyer of reasonable prudence and competence would ascertain the matter in question."  ER 1.0(j).

3.    <u>Ethical Rule 1.10(d)(3)</u>

Ethical Rule 1.10(d)(3) provides as follows: "When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a

person in a matter in which that lawyer is disqualified under ER 1.9 unless: (3)

written notice is promptly given to any affected former client to enable it to

ascertain compliance with the provisions of this Rule."  ER 1.10(d)(3).

Although the comments to Ethical Rule 1.10 do not specify what

information should be included in this notice, the following explanation appears in

the comments to Ethical Rules 1.11, 1.12, and 1.18, the other three provisions that

permit screening: "Notice, including a description of the screened lawyer's prior

representation and of the screening procedures employed, generally should be

given as soon as practicable after the need for screening becomes apparent."  ER

1.11 cmt. 6; ER 1.12 cmt. 5; ER 1.18 cmt. 9; see also Restatement (Third) of the

Law Governing Lawyers § 124 cmt. d(iii) ("Timely and adequate notice of the

screening must . . . be given to the affected clients, including description of the

screening measures reasonably sufficient to inform the affected client of their

adequacy. . . . Notice should ordinarily be given as soon as practical after the

lawyer or firm realizes or should realize the need for screening."); Romley, 908

P.2d at 43 (finding that for purposes of Ethical Rule 1.11, "the details of the

[screening] mechanism must be communicated to the defendant and his counsel").

C.    Honeywell's Motion to Disqualify

Honeywell argues that Derouin's and Hallman's employment by G&K create impermissible former client conflicts of interest.

1.    Derouin

Honeywell asserts that Derouin is personally disqualified from representing RID, pursuant to Ethical Rule 1.9, and that this disqualification is imputed to G&K, in accordance with Ethical Rule 1.10.  The Court agrees.

a.    Ethical Rule 1.9

As noted, for an Ethical Rule 1.9(a) conflict to exist, the moving party must show: (1) the existence of an attorney-client relationship; (2) that the former representation was "the same or substantially related" to the current litigation; and (3) that the current client's interests are "materially adverse" to the former client's interests.  Foulke, 784 P.2d at 726–27.  It is undisputed here that Honeywell is Derouin's former client and that Derouin represented Honeywell regarding the M-52 Site for several years in the early 1990s and from 2007 to December 2009. (Berke Decl. ¶¶ 2, 11; Troy Kennedy Decl. I ¶¶ 4, 7, 20; Derouin Decl. I ¶¶ 10–14.)  Additionally, the current representation—the RID matter—is materially adverse to Honeywell's interests because RID has named Honeywell as a defendant in the instant action.  The parties sharply disagree, however, as to

36

whether the RID matter is the same or substantially related to Derouin's prior

representation of Honeywell.

Derouin first represented Honeywell in the early 1990s, and in that

capacity, he developed legal strategy and settlement positions, and assessed

confidential information, related to Honeywell's potential liability for the

contamination that allegedly emanated from its facilities and purportedly moved

westward to commingle with a separate plume of contamination.  (Berke Decl.

¶¶ 2–4; Troy Kennedy Decl. I ¶¶ 4–5.)  The in camera materials reflect that

Derouin was intimately involved in analyzing the available information regarding

the alleged contamination, representing Honeywell's interests at meetings and

negotiations with other potential PRPs, and providing Honeywell with detailed

legal advice as to these issues.  As the Berke Declaration suggests, included within

the in camera materials are memoranda authored by Derouin: (1) containing

analysis and advice regarding government agency findings about the sources of

contamination in the commingled plume; (2) concerning the development of

Honeywell's case strategy for issues arising from the commingled plume; (3)

regarding the alleged releases of contamination from the Honeywell Facilities and

potential liability for the entire commingled plume; and (4) summarizing meetings

with other PRPs concerning the commingled plume and providing analysis as to

this issue.  (See Berke Decl. ¶¶ 6–10.)  Derouin continued to represent Honeywell in this manner until approximately 1996.  (Id. ¶ 11; Derouin Decl. I ¶¶ 10–12.)

Honeywell retained Derouin again in 2007 to represent its interests regarding "the same commingled plume the parties had been addressing since the early 1990s."  (See Troy Kennedy Decl. I ¶ 7.)  During the course of this representation, Derouin reviewed additional confidential technical analyses of Honeywell's potential contribution to the commingled plume and assessed Honeywell's potential liability.  (Id. ¶ 8.)  In May 2009, David Kimball, III, a member of G&K's litigation team handling the RID matter, contacted Derouin, as counsel for Honeywell, to discuss issues related to the groundwater contamination of RID's wells.  (Id. ¶ 9; Derouin Decl. I ¶ 15; Kimball Decl. I ¶¶ 11–12.)  Derouin, on Honeywell's behalf, subsequently met with Kimball and RID's technical representative on two separate occasions, for a technical and factual presentation about the groundwater contamination impacts to RID's wells.  (Troy Kennedy Decl. I ¶ 10; Derouin Decl. I ¶¶ 16–18; Kimball Decl. I ¶¶ 12–15.)  During these meetings, Kimball informed Derouin that RID planned to bring a cost recovery action if settlement discussions proved unsuccessful.  (Troy Kennedy Decl. I ¶ 9; Derouin Decl. I ¶ 19; Kimball Decl. I ¶¶ 13, 15.)  Kimball also e-

38

mailed Derouin a copy of RID's draft complaint.  (Troy Kennedy Decl. II ¶ 2, Ex.

A.)

Honeywell asserts that Derouin played an important role in

developing legal strategy and analysis for RID's threatened lawsuit and that he

assisted Honeywell in weighing the options available to it, including potential

settlement.  (Troy Kennedy Decl. I ¶¶ 12–13.)  The in camera materials are in

accord.  Included within them are numerous e-mail communications from Derouin

to Honeywell, which: (1) summarize Derouin's meetings with Kimball and assess

the implications for Honeywell; (2) discuss Derouin's meeting with Honeywell's

outside environmental consultant to review RID's allegations; and (3) analyze

Derouin's communications with other potential defendants in RID's contemplated

lawsuit.  (See id. ¶¶ 15–17.)  Additionally, in August 2009, Kimball gave Derouin,

as counsel for Honeywell, another copy of RID's draft complaint for the instant

action.  (Id. ¶ 19; Derouin Decl. I ¶ 23; see Kimball Decl. I ¶ 17.)  Derouin

subsequently sent Honeywell an e-mail, contained in the in camera materials,

which provides his analysis of the complaint and RID's proposal.  (See Troy

Kennedy Decl. I ¶ 19.)

Derouin ceased representing Honeywell in December 2009.  (Id. ¶ 20;

Byrne Decl. ¶¶ 2–5; Derouin Decl. I ¶¶ 28–29.)  Derouin was hired by G&K in

January 2010, and he has been screened from the RID matter since his arrival at the firm.  (Derouin Decl. I ¶¶ 32–35; Kimball Decl. I ¶¶ 30–31; Michael Kennedy Decl. ¶¶ 5–9.)

On these facts, the Court can only conclude that Derouin's prior representation of Honeywell is the same or substantially related to the instant matter, particularly because Derouin represented Honeywell in the initial stages of this lawsuit and analyzed two of RID's draft complaints in his capacity as counsel for Honeywell.  Moreover, when Honeywell engaged Derouin in the early 1990s, Derouin was charged with developing legal strategy and analyzing liability for the contamination that purportedly emanated from the Honeywell Facilities and allegedly became part of a commingled plume.  In this lawsuit, RID asserts that hazardous substances used and disposed of at the Honeywell Facilities contributed to the groundwater contamination of its wells.  (FAC ¶ 41.)  The instant action therefore involves the same contamination from the same facilities and the same commingled plume as were at issue in Derouin's prior representation of Honeywell.  There is undoubtedly a "substantial risk" that confidential factual information as would normally have been obtained in Derouin's representation of Honeywell would "materially advance" RID's position in the instant matter.  See ER 1.9 cmt. 3; see also Trone, 621 F.2d at 998–99.

40

RID emphasizes that Honeywell told Derouin he should not open a file for the RID matter and that Karen Gaylord of Salmon, Lewis & Weldon, P.L.C. would represent Honeywell in this litigation. (RID's Consolidated Opp'n at 34; see Derouin Decl. I ¶¶ 20, 25.) RID focuses on the wrong inquiry. It does not matter that Honeywell hired another law firm to spearhead the defense of this action; the relevant inquiry is whether Derouin's prior representation of Honeywell is substantially related to the instant action. After conducting a careful review of the declarations and the in camera materials, the Court determines that it is so related. Accordingly, based on his prior representation of Honeywell, Ethical Rule 1.9(a) would bar Derouin from representing RID in the instant action.

### b.   Ethical Rule 1.10

Derouin's Ethical Rule 1.9(a) conflict of interest will be imputed to G&K, in accordance with Ethical Rule 1.10(a), unless the screening provisions of Ethical Rule 1.10(d) apply. As noted, Ethical Rule 1.10(d) only applies when a lawyer becomes associated with a firm.[14] See Eberle, 354 F. Supp. 2d at 1095; Ariz. Ethics Op. 04-04. According to Ethical Rule 1.10(d)(1), screening is available unless: (1) the disqualified lawyer either switched sides in the current

---

[14] This threshold requirement is satisfied because it is undisputed that Derouin is a lateral attorney at G&K.

41

representation or the current representation necessarily requires relitigating a

particular aspect of a prior representation; (2) the prior representation was a

proceeding before a tribunal; and (3) the disqualified lawyer played a substantial

role in that prior proceeding.

Ethical Rule 1.10(d)(1) forecloses screening as a means of curing

Derouin's conflict.  Derouin represented Honeywell in the initial stages of this very

case, and in this capacity, Derouin met with counsel for RID on Honeywell's

behalf, analyzed two of RID's draft complaints for Honeywell, conferred with

Honeywell's experts to review RID's proposal, and communicated with other

defendants named in RID's draft complaint.  Accordingly, Derouin plainly

represented Honeywell in connection with the instant action, and by joining G&K,

Derouin switched sides in this lawsuit.  RID stresses, however, that because it did

not file the complaint in this suit until after Derouin's representation of Honeywell

had ended, there was no proceeding before a tribunal for purposes of Ethical Rule

1.10(d)(1).[15]  (RID's Consolidated Opp'n at 37–38.)  In making this argument, RID

overlooks that Derouin switched sides in the instant action, which is currently a

---

[15] On December 9, 2009, Derouin gave Honeywell notice that he was joining
G&K.  (Derouin Decl. I ¶¶ 28–29; Byrne Decl. ¶ 2.)  Derouin was employed by
G&K effective January 2010 (Derouin Decl. I ¶ 27; Kimball Decl. I ¶ 30), and RID
filed its Complaint in this action in February 2010 (Doc. # 1).

proceeding before a tribunal.  It does not matter that RID had not yet filed its

complaint when Derouin's representation of Honeywell ended because the current

representation "involves" Derouin's prior representation of Honeywell.

Derouin also had a substantial role in this proceeding.  The Court has

reviewed Derouin's billing records for the RID matter, submitted in camera (see

Troy Kennedy Decl. II ¶¶ 3–5), as well as the documents and communications he

generated during the course of this representation, and concludes that Derouin had

a "material and weighty" role in this proceeding.  See Eberle, 354 F. Supp. 2d at

1097 (citing Ethical Rule 1.0($l$)).  Unlike in Eberle, where the court determined that

the lawyer in question, who billed 9.2 hours to a case over a period of 9 days for

drafting voir dire questions, did not play a "substantial" role in the former client's

representation, here, Derouin was actively involved in analyzing RID's allegations

and developing a strategy for Honeywell to defend the instant lawsuit.

Accordingly, because Derouin switched sides in the RID matter, which is before a

tribunal, and in which Derouin played a substantial role, G&K cannot avail itself of

the screening provision in Ethical Rule 1.10(d).  Derouin's Ethical Rule 1.9(a)

conflict of interest is therefore imputed to G&K.

43

2.    <u>Hallman</u>

As with Derouin, Honeywell asserts that Hallman is personally disqualified from representing RID and that this disqualification is imputed to G&K.  Because of its conclusion that Derouin's Ethical Rule 1.9(a) conflict of interest is imputed to G&K pursuant to Ethical Rule 1.10, the Court need not address this argument.  The Court nonetheless analyzes whether Hallman's purported conflict can provide an independent basis for G&K's disqualification, and concludes that it does.

a.    <u>Ethical Rule 1.9</u>

It is undisputed that Honeywell is Hallman's former client and that Hallman served as Honeywell's in house litigation counsel from 1987 to 1999, when he joined G&K.  (Hallman Decl. ¶ 5; Troy Kennedy Decl. I ¶ 21.) Additionally, the current representation—the RID matter—is materially adverse to Honeywell's interests because RID has named Honeywell as a defendant in the instant lawsuit.  As with Derouin, the third prong of the Ethical Rule 1.9(a) analysis—whether the RID matter is the same or substantially related to Hallman's prior representation of Honeywell—is the most contentious.

In his capacity as in house litigation counsel for Honeywell, Hallman represented Honeywell's interests in the <u>Baker</u> Action and <u>United States v.</u>

44

Motorola (the "Motorola Action"), which both involved alleged contamination from the Honeywell Facilities and the resulting commingled plume.  (Troy Kennedy Decl. I ¶ 21.)  The Baker Action was a private toxic tort suit, which arose from, inter alia, the plaintiffs' exposure to past groundwater contamination from the commingled plume in the M-52 Site.  (Id. ¶¶ 21–22; Corning's Mot. Ex. J.) Honeywell contends, and the in camera materials confirm, that Hallman was directly involved in the litigation strategy and analysis of the commingled plume for the Baker Action.  (Troy Kennedy Decl. I ¶¶ 22–27.)  By virtue of his participation in this action, Hallman was also privy to confidential technical information regarding, and discussions relating to potential liability for, the alleged commingled plume.  (See id.)

Additionally, in the mid-1990s, Hallman negotiated with other PRPs, on behalf of Honeywell, to resolve contribution allocation issues relating to the remedial actions and other costs associated with clean up of the past contamination.  (Id. ¶ 28.)  When the parties could not resolve the dispute, the United States filed the Motorola Action against Motorola, Honeywell, and the City of Phoenix, seeking to require contribution by those parties.  (Id. ¶ 29.)  The in camera materials demonstrate that, during his work on the Motorola Action, Hallman sent and received correspondence: (1) regarding confidential technical

45

information and legal strategies relating to contribution for the commingled plume and PRP relationships; (2) discussing meetings between Honeywell, government agencies, and PRPs regarding the commingled plume; and (3) developing legal strategy concerning the commingled plume.  (See id. ¶¶ 30–40.)  Hallman worked on the Motorola Action until he left Honeywell in 1999 to join G&K.  (Id. ¶ 41; Hallman Decl. ¶ 6.)  Hallman has been screened from the RID matter since June 2010.  (Hallman Decl. ¶ 5; see also Kimball Decl. I ¶¶ 40–41; Michael Kennedy Decl. ¶¶ 15–17.)

On these facts, the Court concludes that Hallman's prior representation of Honeywell is the same or substantially related to the instant matter.  As with Derouin, Hallman received confidential information regarding potential liability for the commingled plume, participated in negotiations with other PRPs and governmental agencies, and was instrumental in developing legal strategy for the Baker and Motorola Actions, which both involved the same contamination and commingled plume at issue here.  There is undoubtedly a "substantial risk" that confidential factual information as would normally have been obtained in Hallman's representation of Honeywell would "materially advance" RID's position in the instant matter.  See ER 1.9 cmt. 3; see also Trone, 621 F.2d at 998–99.  The in camera materials reaffirm this determination.

46

Accordingly, based on his prior representation of Honeywell, Ethical Rule 1.9(a) would bar Hallman from representing RID in the instant action.

> b.  Ethical Rule 1.10

RID contends that even if Hallman has an Ethical Rule 1.9(a) conflict of interest, screening applies and the conflict cannot be imputed to G&K.  The Court is not persuaded.

At the outset, the Court has grave concerns as to whether screening is even available for Hallman's conflict of interest.  Ethical Rule 1.10(d) states that screening may be utilized "[w]hen a lawyer becomes associated with a firm," the plain terms of which indicate that screening is available if it is effectuated at the time that a lawyer joins a law firm.  See ER 1.10(d) (emphasis added).  This interpretation is corroborated by Arizona Ethics Opinion 04-04, which makes clear that screening "is only appropriate in circumstances in which a new or lateral hire has represented a former client, and may not be employed in circumstances involving a former client when the lawyer was already a member of the 'firm.'" Ariz. Ethics Op. 04-04 (emphasis added); see also Eberle, 354 F. Supp. 2d at 1096–97 (discussing Ethical Rule 1.10(d) in the context of a lawyer "joining" a law firm).  Here, Hallman became a shareholder at G&K in 1999, and the Ethical Rule 1.9(a) conflict at issue did not arise when Hallman joined G&K.  To the

contrary, Hallman already had been a shareholder at G&K for nearly ten years when RID engaged the firm.  Because Hallman was associated with G&K for such a lengthy period of time prior to the existence of the conflict at hand, it is unclear whether screening is available here.  The Court need not resolve this issue, however, because even if screening is available in this scenario, G&K cannot satisfy the requirements of Ethical Rule 1.10(d).

Honeywell's primary argument against the efficacy of G&K's screen is that it was not timely implemented in accordance with Ethical Rule 1.10(d)(2). (Honeywell's Mot. at 14.)  As noted, Ethical Rule 1.10(d)(2) requires that the "personally disqualified lawyer [be] timely screened from any participation in the matter."  ER 1.10(d)(2).  The comments elaborate that "to be effective, screening measures must be implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening."  ER 1.0 cmt. 10.  Here, although Hallman became a shareholder at G&K in 1999, and RID engaged G&K in October 2008, G&K did not screen Hallman from the RID matter until June 2010.  G&K explains that it did not enter Hallman's prior employment and experience at Honeywell into its conflicts database when Hallman joined the firm.  (Michael Kennedy Decl. ¶ 15.)  Hallman's name therefore did not appear when G&K ran its conflicts check for Honeywell in July 2009.  (Id. ¶ 16; see

48

Kimball Decl. I ¶ 18; RID's Consolidated Opp'n at 39.)  Honeywell notified G&K of the conflict with a letter dated May 18, 2010 (Michael Kennedy Decl. ¶ 11, Ex. A), and G&K screened Hallman in June 2010 (Hallman Decl. ¶ 5).  G&K therefore did not screen Hallman until nearly one year after it performed its initial conflict check for Honeywell and nearly two years after RID retained the firm for this matter.  Such a delay in implementing an ethical screen is not reasonable.  G&K implicitly admits that but for its error in not properly entering Hallman's prior representation of Honeywell into its conflicts database, it would have recognized the conflict in July 2009 when it ran its initial conflicts check.  Thus, G&K should have known of the conflict when it ran this initial check, and Hallman should have been screened at least from this point in time onward.  G&K's assertion that it "had no reason to know of [Hallman's] potential conflict until it learned of it in May 2010" (see RID's Consolidated Opp'n at 40), is simply incorrect.[16]

_____

[16] In February 2009, G&K circulated the RID matter in one of its weekly conflict notices (Michael Kennedy Decl. ¶ 2), but Honeywell had not yet been identified as a PRP when G&K distributed this notice (RID's Consolidated Opp'n at 40 n.34).  When G&K identified Honeywell as a PRP a few months later, it rechecked its conflicts database, but it did not circulate a firm-wide conflicts notice.  (Id.; see Michael Kennedy Decl. ¶¶ 15–17.)  Had G&K taken this step, and distributed a conflicts notice for Honeywell when it was identified as a PRP, it likely would have learned of the conflict.  It is unclear why G&K did not take this

(continued...)

49

RID emphasizes that Hallman works in a different department on a different floor from the attorneys handling the RID matter, that Hallman did not discuss the RID matter with anyone before G&K imposed the screen, and that Hallman did not bring any relevant environmental files from Honeywell to G&K. (Id. at 39; see also Hallman Decl. ¶¶ 6, 11–12; Michael Kennedy Decl. ¶ 18.)  The Court's current focus, however, is on whether implementation of the ethical screen was timely.  Although these facts may pertain to the effectiveness of the screen, they do not relate to the timeliness of that screen.  An untimely screen cannot be cured by the affected attorney's assurances that, in the absence of the screen, he did not reveal any confidential information.  Similarly, the Arizona Court of Appeals has found that a failure to fully comply with the ethical rules cannot be cured by an affected attorney's attestations that he maintained the former client's confidences. In Towne, decided before Ethical Rule 1.10 permitted screening, an attorney who represented one party in a lawsuit left his law firm to join the firm representing the opposing side.  Towne, 842 P.2d at 1378.  Although the court credited the trial court's determination that the affected attorney and his new firm had "scrupulously maintained" the ethical screen, it nonetheless concluded that screening would not

---

[16](...continued)
step in July 2009 when it rechecked its conflicts database.

suffice because Ethical Rule 1.10(d) at the time did not permit its use.  Id. at

1381–82.  In another analogous case, the defendant moved to disqualify the

plaintiff's counsel after the defendant's legal secretary began working for the

plaintiff's law firm sixty days before trial.  Smart Indus. Corp. Mfg. v. Superior

Court, 876 P.2d 1176, 1177–79 (Ariz. Ct. App. 1994).  The court "accept[ed] as

true" that the plaintiff's attorney had insulated himself from any possible

disclosure of confidences, but it still determined that, because the legal secretary

had not complied with the applicable screening requirements, plaintiffs' counsel

must be disqualified.[17]  Id. at 1184–86.  Likewise, here, Ethical Rule 1.10(d)(2)

requires that, for screening to be available, the screen must be timely implemented.

---

[17] In Smart Industries, the Arizona Court of Appeals cited with approval the
Seventh Circuit's decision in LaSalle National Bank v. County of Lake, 703 F.2d
252 (7th Cir. 1983).  See Smart Indus., 876 P.2d at 1185.  In LaSalle, the attorney
in question joined a law firm four months before that firm filed suit against the
affected attorney's former client, but the attorney was not screened until six
months after he joined the firm.  LaSalle, 703 F.2d at 253–54, 259.  Upon review,
the Seventh Circuit affirmed the district court's order imputing the attorney's
conflict of interest to the entire law firm on the basis that the ethical screen had not
been timely implemented.  Id. at 259.  The Seventh Circuit found unpersuasive the
affected attorney's affidavit stating that he did not disclose any information to his
new law firm.  Id. (emphasizing that "no specific institutional mechanisms were in
place to insure that . . . information was not shared, even if inadvertently," in the
six months between when the affected attorney joined the firm and the time he was
screened).  The Seventh Circuit's reasoning is persuasive, particularly because
Hallman was a shareholder at G&K for more than a decade before G&K
implemented the ethical screen.

G&K cannot circumvent this requirement by baldly asserting that, even without a

screen, Honeywell's confidences have been maintained.  G&K's argument to the

contrary is inapposite.[18]

_____

[18] Moreover, RID's reliance on Lutron Electronics Co., Inc. v. Creston
Electronics, Inc., 2010 WL 4720693 (D. Utah Nov. 12, 2010) is misplaced.  (See
RID's Opp'n to Supp. Br. at 11.)  Not only is Lutron mere persuasive authority
entitled to little weight, but it is also readily distinguishable.  In that case, which
applied the Utah Ethical Rules, an attorney engaged in document review for Lutron
for eight months as a first year associate at a large law firm.  Lutron, 2010 WL
4720693, at *1.  A couple years later, Lutron filed suit against Creston.  Id.  The
affected attorney, however, switched law firms at roughly the same time and joined
the firm that Creston ultimately hired to perform its defense.  Id.  Less than one
month after this firm entered its notice of appearance on behalf of Creston, Lutron
sent a letter alerting the firm of the conflict, and the firm "immediately" screened
the affected attorney.  Id. at *1–*2.  Lutron subsequently filed a motion to
disqualify counsel, which the district court denied, concluding that any violation of
Utah's Ethical Rule 1.10 was not egregious and that there was no prejudice to
Lutron.  Id. at *5–*6.  In reaching this determination, however, the district court
emphasized that the affected attorney was only a first year associate when he
performed work for Lutron and that he was not involved in litigation strategy.  Id.
at *6.  Moreover, the court found that the affected attorney's new law firm did not
have actual knowledge of the conflict until it received the letter from opposing
counsel.  Id. at *5.  Because Utah's Ethical Rule 1.10 prohibits "knowingly"
undertaking a representation subject to a conflict, where "knowingly" means actual
knowledge, the district court determined that if there was any violation of Utah's
Ethical Rule 1.10, it was not egregious.  Id.  Conversely, here, Hallman was
intimately involved with Honeywell's legal strategies regarding the alleged
contamination for several years.  Moreover, G&K did not screen Hallman until
nearly two years after RID engaged G&K, but in Lutron, the attorney was screened
within six months of the firm undertaking the representation.  See id. at *1.
Finally, unlike Utah's ethical rules, Arizona's ethical rules make clear that
knowledge can be inferred from circumstances and that the screen must be
implemented as soon as practical after a lawyer or law firm knows or reasonably

(continued...)

In sum, G&K erred when it failed to input Hallman's prior work for Honeywell into its conflicts database. Hallman was not timely screened from the RID matter, in accordance with Ethical Rule 1.10(d)(2), and screening is therefore unavailable.[19] Accordingly, Hallman's Ethical Rule 1.9(a) conflict of interest is imputed to G&K.

### 3.    Honeywell's Conflict Waiver

RID contends that it obtained a waiver from Honeywell that precludes Honeywell from seeking disqualification of G&K in the instant matter. (RID's Consolidated Opp'n at 34–35.) The Court is not persuaded.

G&K shareholder James Busby represented Honeywell in a tax matter from 2008 to 2009. (Kimball Decl. I ¶ 19.) The tax matter was opened on May 8,

---

[18](...continued)
should know that there is a need for screening. See ER 1.0(f) & cmt. 10. Here, as discussed, G&K should have known of Hallman's conflict at least by July 2009 when it performed its initial conflicts check for Honeywell, yet G&K did not implement its ethical screen until June 2010. Lutron is therefore factually and legally distinguishable, and RID's reliance on this case is inapposite.

[19] The Court also has serious doubts as to whether Ethical Rule 1.10(d)(1) could be satisfied in this scenario because the RID matter necessarily requires relitigating aspects of the Baker and Motorola Actions, which were proceedings before tribunals, and Hallman played a substantial role in those lawsuits during his representation of Honeywell. The Court need not resolve this issue, however, due to its determination that G&K did not timely screen Hallman from the RID matter.

2008, the final bill was sent and paid in February 2009, and the matter was
formally closed in December 2009.  (Id.)

On July 17, 2009, G&K provided written notice to Honeywell that
G&K was representing RID in the instant matter and that it could create a current
conflict with Honeywell.  (Id. ¶ 18; see also Kimball Decl. I Ex. A ("Waiver
Letter").)  G&K's letter itself was addressed to "Mr. Paul H. Brownstein, Associate
General Tax Counsel, Honeywell International Inc."  (Waiver Letter at 1.)  The
letter explained that G&K's environmental practice group had undertaken
representation of RID in connection with remedial actions for certain RID wells.
(Id.)  The letter sought waiver from Honeywell, stating as follows:

> [U]nder the ethical rules governing lawyers, G&K and its attorneys
> may not oppose a current client (such as Honeywell), even on an
> unrelated matter, without full disclosure and consent. . . .  At this time,
> G&K is seeking Honeywell's waiver and approval to allow G&K to
> pursue settlement negotiations with Honeywell on behalf of RID in
> this matter.  If litigation becomes necessary, RID would engage
> separate counsel to pursue the litigation, unless G&K's conflict is
> waived by Honeywell at that time.
>
> . . . .
>
> G&K appreciates the current work it performs on behalf of
> Honeywell.  However, our current legal services are limited to an
> unrelated tax issue. . . . Unless companies are willing to be flexible
> about waiving conflicts, it would be difficult for any company to
> obtain legal counsel and for law firms to comply with the rules of
> ethics.

(Id. at 1–2.)  Honeywell conditionally waived this conflict on July 20, 2009.  (Id. at 2; Kimball Decl. I ¶ 20.)

Ethical Rule 1.10(c) provides that "[a] disqualification prescribed by this Rule may be waived by the affected client under the conditions stated in [Ethical Rule] 1.7."  Ethical Rule 1.7 states that the affected client must give "informed consent, confirmed in writing" to waive a conflict of interest.  ER 1.7(b); see also ER 1.10 cmt. 6 ("The conditions stated in [Ethical] Rule 1.7 require the lawyer to determine that the representation is not prohibited by [Ethical Rule] 1.7(b) and that each affected client or former client has given informed consent to the representation, confirmed in writing.").  Informed consent "denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  ER 1.0(e).  The comments elaborate as follows:

> The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision.  Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.  In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the

> advice of other counsel.  <u>A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid</u>.  In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent.

ER 1.0 cmt. 6 (emphasis added); <u>see also</u> ER 1.7 cmt. 18 ("Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client.").

　　　　　RID's argument fails for multiple reasons.  First, the waiver, by its plain terms, was limited to the "unrelated tax issue."  (<u>See</u> Waiver Letter at 2.) Indeed, the letter stated that "G&K and its attorneys may not oppose a current client (such as Honeywell), <u>even on an unrelated matter</u>, without full disclosure and consent."  (<u>Id.</u> at 1 (emphasis added).)  The understanding was plainly that G&K sought waiver with respect to the tax matter only.  This conclusion is bolstered by the fact that the letter was addressed to "Associate General Tax Counsel" at Honeywell.  (<u>Id.</u>)

Second, the plain terms of the letter make clear that G&K sought Honeywell's waiver and approval "to allow G&K to pursue settlement negotiations with Honeywell on behalf of RID in this matter."  (Id.)  It specifically provided that "[i]f litigation becomes necessary, RID would engage separate counsel to pursue the litigation, unless G&K's conflict is waived by Honeywell at that time."[20]  (Id.)  Accordingly, the waiver was only applicable to the extent that G&K sought to settle with Honeywell on RID's behalf.  The agreement explicitly did not contemplate the waiver's continued effectiveness through the litigation stage of the proceedings.[21]

Finally, even assuming G&K intended that the waiver would apply beyond the tax matter, Honeywell simply never gave its informed consent.  As discussed, informed consent "denotes the agreement by a person to a proposed

---

[20] RID argues that this statement "was included to account for a potential [Ethical Rule] 1.7 conflict because Honeywell was a current client at the time the letter was drafted."  (RID's Consolidated Opp'n at 35 n.28.)  Even assuming this is true, the Court nonetheless cannot conclude that Honeywell gave its informed consent to the conflicts with Derouin and Hallman.

[21] RID implicitly acknowledges as much in it's Consolidated Opposition. (See RID's Consolidated Opp'n at 8 ("As a current client (on the tax matter), G&K sought, and Honeywell provided, its consent to G&K's representation of RID in so much as it involved developing RID's remedy and engaging in discussions with Honeywell regarding RID's remedy, including any settlement discussions related thereto.").)

course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." ER 1.0(e). Here, the letter only states that "Jim Derouin of Steptoe & Johnson has been representing Honeywell on the groundwater contamination issue for years." (Waiver Letter at 1.) There is no discussion about Hallman or the possibility that Derouin would leave Steptoe and join G&K. Nor is there evidence that G&K made "reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision." See ER 1.0 cmt. 6. In short, G&K never obtained informed consent from Honeywell sufficient for the Court to find that Honeywell waived its conflicts with respect to either Derouin or Hallman.

> D.   <u>Corning's Motion to Disqualify</u>

Corning asserts that because Derouin represented it for several years in the 1990s with regard to the alleged contamination that emanated from the West Osborn Complex, which is at issue here, Derouin's presence at G&K creates an impermissible conflict of interest that cannot be cured by screening.

> 1.   <u>Ethical Rule 1.9</u>

As discussed, for an Ethical Rule 1.9(a) conflict to exist, the moving party must show: (1) the existence of an attorney-client relationship; (2) that the

former representation was "the same or substantially related" to the current litigation; and (3) that the current client's interests are "materially adverse" to the former client's interests.  <u>Foulke</u>, 784 P.2d at 726–27.  Once again, the parties do not dispute that Corning is Derouin's former client (Derouin Decl. I ¶¶ 5–8; Geiger Decl. ¶¶ 3, 5, 9), and it is readily apparent that G&K's representation of RID is materially adverse to Corning because Corning is a defendant in the instant action. The Court therefore focuses on whether the RID matter is the same or substantially related to Derouin's representation of Corning.

Derouin represented Corning from 1990 to 1995 with regard to the alleged groundwater contamination attributed to the West Osborn Complex. (Derouin Decl. I ¶¶ 5–8; Geiger Decl. ¶¶ 3, 5, 9.)  The Geiger Declaration asserts, and the <u>in camera</u> materials confirm, that Derouin played a leadership role in the West Osborn Complex matter, and that in this capacity, he: (1) consulted with in house engineering experts at Corning and retained outside experts on Corning's behalf to investigate and analyze current and historical conditions at the West Osborn Complex; (2) participated in a steering committee with other PRPs to coordinate site investigations and negotiations with ADEQ; and (3) interacted with ADEQ on Corning's behalf.  (<u>See</u> Geiger Decl. ¶ 6.)  The <u>in camera</u> materials reflect that Derouin was essential in formulating strategy, analyzing potential

59

liability, and developing settlement positions for the West Osborn Complex matter as well as meeting and negotiating with other PRPs and generating strategies for cleanup.

When negotiations with ADEQ and the other PRPs proved unsuccessful, the matter moved into litigation and Corning engaged Derouin to assist with several lawsuits involving either Corning or its subsidiary, Components. (Id. ¶¶ 7–8.)  In 1991, Components moved to intervene in a lawsuit entitled State v. Nucor, to block ADEQ's approval of a consent decree with Nucor, another prior owner of the West Osborn Complex.  (See id. ¶ 7.)  The in camera materials demonstrate that Derouin reviewed the legal issues presented by Components' attempt to intervene, assisted in developing the legal strategy for the case, and participated in a subsequent appeal of the district judge's order.  (See id.)

Derouin subsequently assisted with the United Industrial and Baker Actions.[22]  (Id. ¶ 8.)  The United Industrial Action was a CERCLA cost recovery action, concerning alleged contamination from the West Osborn Complex, filed by the State of Arizona against United Industrial, Corning, and Components. (Corning's Mot. Ex. B.)  As discussed, the Baker Action was a private toxic tort

―――――――――――

[22] Corning and Components were also involved in the Lofgren Action, which asserted similar claims.  (Corning's Mot. Ex. I.)

suit alleging, with regard to Corning and Components, that the plaintiffs had been injured by groundwater contamination attributable in part to the West Osborn Complex.  (Id. Ex. J.)  In this capacity, as confirmed by the in camera materials, Derouin participated in discussions concerning case management and litigation strategy as well as potential apportionment and liability.  Richard D. Geiger, a consultant for Corning, also attests that Derouin assisted in selecting the litigation team to defend these lawsuits and that he advised Corning on strategic questions in the lawsuits and regarding its relationship with ADEQ.  (Geiger Decl. ¶ 8.)

After reviewing the in camera materials, the Court determines that Derouin's prior representation of Corning is the same or substantially related to the instant matter.  In this lawsuit, RID asserts that hazardous substances used and disposed of at the West Osborn Complex—the same facility and the same contamination at issue during Derouin's representation of Corning—contributed to the groundwater contamination of its wells.  (FAC ¶ 33.)  Moreover, as counsel for Corning, Derouin spearheaded the investigation into the possible sources of the potential groundwater contamination, analyzed information generated by technical experts, negotiated extensively with ADEQ regarding potential settlement, and formulated litigation strategy.  Indeed, Derouin either produced himself or was copied on a voluminous number of documents relating to the West Osborn

61

Complex and the contamination that allegedly emanated therefrom.  There is

undoubtedly a "substantial risk" that confidential factual information as would

normally have been obtained in Derouin's representation of Corning would

"materially advance" RID's position in the instant matter.  See ER 1.9 cmt. 3; see

also Trone, 621 F.2d at 998–99.  Accordingly, based on his prior representation of

Corning, Ethical Rule 1.9(a) would bar Derouin from representing RID in this

lawsuit.

### 2.    Ethical Rule 1.10

Derouin's Ethical Rule 1.9(a) conflict of interest will be imputed to

G&K, in accordance with Ethical Rule 1.10(a), unless the screening provisions of

Ethical Rule 1.10(d) apply.  As noted, Ethical Rule 1.10(d) only applies when a

lawyer becomes associated with a firm.[23]  See Eberle, 354 F. Supp. 2d at 1095;

Ariz. Ethics Op. 04-04.  According to Ethical Rule 1.10(d)(1), screening is

available unless: (1) the disqualified lawyer either switched sides in the current

representation or the current representation necessarily requires relitigating a

particular aspect of a prior representation; (2) the prior representation was a

---

[23] As with Honeywell, this threshold requirement is satisfied because it is
undisputed that Derouin is a lateral attorney at G&K.

proceeding before a tribunal; and (3) the disqualified lawyer played a substantial role in that prior proceeding.

Ethical Rule 1.10(d)(1) forecloses screening as a means of curing Derouin's conflict.  As already discussed, this lawsuit and the United Industrial and Baker Actions all concern potential liability for the same alleged contamination emanating from the West Osborn Complex.  As in the United Industrial Action, here RID seeks to establish CERCLA liability and recover response and clean up costs for the contamination allegedly generated by the West Osborn Complex.  (See FAC ¶¶ 106–16; Corning's Mot. Ex. B ¶¶ 33–38.) Similarly, the plaintiffs in the Baker Action asserted nuisance and trespass claims for the purported contamination from the West Osborn Complex, and here, RID asserts nuisance and trespass claims for the same alleged contamination that purportedly emanated from the West Osborn Complex.  (See FAC ¶¶ 122–32; Corning's Mot. Ex. J ¶¶ 113–21.)  The current lawsuit will therefore require relitigating certain aspects of the United Industrial and Baker Actions, particularly due to the considerable overlap in the factual and legal issues presented.

Additionally, the United Industrial and Baker Actions were both proceedings before a tribunal in which Derouin—the personally disqualified lawyer—had a substantial role.  Unlike in Eberle, where the affected attorney

63

"assumed no client responsibility and . . . never communicated with the client or opposing counsel," Eberle, 354 F. Supp. 2d at 1097, here Derouin's role in the United Industrial and Baker Actions can only be described as "material and weighty," id. (citing ER 1.0(*l*)).  Derouin was the lead force in negotiating with ADEQ and once litigation started, he continued to participate in strategy, discussions, and receipt of confidential information.  This is more than sufficient to constitute a substantial role.  Accordingly, Derouin's Ethical Rule 1.9(a) conflict of interest, which arose from his representation of Corning, is imputed to G&K in accordance with Ethical Rule 1.10(a).  Ethical Rule 1.10(d) does not change this result.[24]

III.    Joint Defense Group Motions to Disqualify

Univar, SRP, Dolphin, and Arvin and Cooper all argue that they have implied attorney-client relationships with current G&K attorneys by virtue of their participation in myriad joint defense groups.

---

[24] Because the former client conflicts asserted by Honeywell and Corning are imputed to G&K, the Court need not consider their alternative argument that G&K must be disqualified because of its participation in the Baker/Lofgren Group on behalf of United Industrial.  (See Honeywell's Mot. at 10 n.7; Corning's Mot. at 4, 10–14; Corning's Reply at 9–11.)

A.    Joint Defense Agreements and Conflicts of Interest

Courts have carefully considered the extent to which an attorney owes

a duty to a former client's co-defendant when the former client and the co-

defendant executed a joint defense agreement.[25]  "A joint defense agreement

---

[25] RID and Moving Defendants spend much of their briefing addressing whether federal or state law governs resolution of this matter.  (See, e.g., Moving Defs.' Supp. Br. at 8–12; RID's Opp'n to Supp. Br. at 2–4; Moving Defs.' Supp. Br. Reply at 7–8.)  "It is inherently the duty of the district court to control and supervise the conduct of the attorneys who appear before it."  Erikson v. Newmar Corp., 87 F.3d 298, 303 (9th Cir. 1996).  The District of Arizona has adopted the Arizona Ethical Rules, see Research Corp., 936 F. Supp. at 700, and to the extent that they are involved, the Court will plainly apply them.  As discussed infra, however, the privileges and protections associated with execution of a joint defense agreement, and participation in a joint defense group, do not stem from the ethical rules.  It is therefore unclear whether federal or state law governs.  The Court need not resolve this issue, however, because even assuming that Arizona law applies in totality, there is a complete dearth of authority in Arizona determining whether a joint defense agreement, or participation in a joint defense group, creates an implied attorney-client relationship.  Indeed, RID's primary Arizona "authority" is dicta that is only tangentially related to the issue at hand.  See Towne, 842 P.2d at 1380 ("We are reluctant to hold that a privileged relationship arises between one party and counsel for a co-party merely through discussions of common strategy.").  Not only was this finding wholly irrelevant for the decision in Towne, but at issue in that case was the existence of a common defense privilege, which purportedly arose from a "lunchtime strategy session."  Id.  The parties here allege much more than discussions of mere common strategy and they assert more than just the joint defense privilege; rather, they contend that they are protected by an implied attorney-client relationship that arose from their participation in various joint defense groups.  RID's other piece of Arizona authority is even less relevant because it concerns whether the common interest doctrine shielded from disclosure the communications at issue in that case.  See Ariz. Indep. Redistricting Comm'n v. Fields, 75 P.3d 1088, 1099–1101 (Ariz. Ct. App. 2003).  Accordingly, because

(continued...)

65

establishes an implied attorney-client relationship with the co-defendant." <u>United States v. Henke</u>, 222 F.3d 633, 637 (9th Cir. 2000) (per curiam) (citing <u>United States v. McPartlin</u>, 595 F.2d 1321, 1337 (7th Cir. 1979); <u>Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.</u>, 559 F.2d 250, 253 (5th Cir. 1977) (per curiam)).  Generally, courts agree that a traditional attorney-client relationship is not established between an attorney and his client's former co-defendant via a joint defense agreement, but the attorney may nonetheless owe a duty of confidentiality to the former co-defendant.  <u>See United States v. Stepney</u>, 246 F. Supp. 2d 1069, 1080 (N.D. Cal. 2003) ("Courts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships."); <u>see also In re Gabapentin Patent Litig.</u>, 407 F. Supp. 2d 607, 612 (D.N.J. 2005) (concluding that working together pursuant to a joint defense agreement "could create implied attorney-client or fiduciary obligations under certain circumstances"); <u>GTE North, Inc. v. Apache Prods. Co.</u>, 914 F. Supp. 1575, 1579–80 (N.D. Ill. 1996) (describing the duty).  To determine whether such a duty

_____

[25](...continued)
there is no Arizona authority on point, even assuming that Arizona law applies, it is appropriate to rely on "non-Arizona cases" to resolve this matter.  <u>See In re Kirkland</u>, 915 F.2d 1236, 1238 (9th Cir. 1990) ("In the absence of [a state decision on point], a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guides.").

exists, a court must consider whether there was an <u>actual</u> exchange of confidential information; courts do not presume that this exchange occurred.  <u>See, e.g.</u>, <u>Wilson P. Abraham</u>, 559 F.2d at 253 ("[T]here is no presumption that confidential information was exchanged as there was no direct attorney-client relationship."); <u>Stepney</u>, 246 F. Supp. 2d at 1080 ("[Per a joint defense agreement,] no conflict of interest arises unless the attorney actually obtained relevant confidential information."); <u>GTE North</u>, 914 F. Supp. at 1580 ("[T]here must actually have been an exchange of confidential information.").

If confidential information has been obtained by an attorney pursuant to a joint defense agreement, the attorney must maintain that confidence.  <u>See</u> <u>Wilson P. Abraham</u>, 559 F.2d at 253 ("[A]n attorney who is the recipient of [confidential information pursuant to a joint defense agreement] breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants.").  As a result, an attorney may be disqualified from a proceeding if the attorney is both in actual possession of confidential information, and by virtue of having this information, is either incapable of adequately representing the new client or will breach the duty of confidentiality owed to the former co-defendant.  <u>See</u> <u>id.</u>; <u>Henke</u>, 222 F.3d at 637 ("This privilege can also create a disqualifying conflict <u>where</u> information

gained in confidence by an attorney becomes an issue." (emphasis added)); <u>Henke</u>, 222 F.3d at 638 ("There may be cases in which defense counsel's possession of information about a former co-defendant/government witness will not impair defense counsel's ability to represent the defendant or breach the duty of confidentiality to the former co-defendant.").

In <u>Henke</u>, for instance, the Ninth Circuit held that the district court erred by not allowing defense counsel to withdraw when the government produced a witness with whom defense counsel had previously executed a joint defense agreement.  <u>Henke</u>, 222 F.3d at 638.  There, three defendants, Desaigoudar, Henke, and Gupta, were indicted on charges of conspiracy, making false statements, securities fraud, and insider trading.  <u>Id.</u> at 636.  Central to the prosecution's theory of the case was whether the defendants had advance knowledge of a false revenue reporting scheme and whether they traded stock because of it.  <u>Id.</u>

Desaigoudar, Henke, and Gupta had participated in joint defense meetings during which confidential information was exchanged and discussed among their counsel.  <u>Id.</u>  "Communications made during these pre-trial meetings were protected by the lawyers' duty of confidentiality imposed by a joint defense privilege agreement."  <u>Id.</u>  Shortly before trial, Gupta accepted a plea agreement and agreed to testify for the government against Desaigoudar and Henke.  <u>Id.</u>

68

Counsel for Desaigoudar and Henke moved for a mistrial and filed motions to withdraw, arguing that their duties of confidentiality owed to Gupta precluded them from effectively cross-examining him.  Id.  The district court disagreed.  At trial, counsel for Desaigoudar and Henke "conducted no cross examination [of Gupta] for fear that the examination would lead to inquiries into material covered by the joint defense privilege."  Id.

On appeal, the Ninth Circuit reversed.  The Ninth Circuit found that "a joint defense agreement establishes an implied attorney-client relationship with [co-defendants]" and that "[t]his privilege can also create a disqualifying conflict where information gained in confidence by an attorney becomes an issue."  Id. at 637.  The court continued:

> "Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense."

Id. (quoting Wilson P. Abraham, 559 F.2d at 253).  Importantly, the Ninth Circuit did not rely on the any ethical rules governing attorney's conduct in reaching this decision.

Applying these principles to the facts before it, the Ninth Circuit easily concluded that the district court erred.  Counsel for Desaigoudar and Henke claimed there was a discrepancy between what Gupta stated at the joint defense meetings and his testimony at trial.  Id.  This put the attorneys in an impossible position.  "Had they pursued the material discrepancy . . . , a discrepancy they learned about in confidence, they could have been charged with using it against their one-time client Gupta."  Id.  Indeed, Gupta's attorneys sent a letter threatening Desaigoudar's and Henke's attorneys with legal action if they failed to protect Gupta's confidences.  Id. at 638.

The Ninth Circuit, however, carefully qualified its holding as follows:

> Nothing in our holding today is intended to suggest . . . that joint defense meetings are in and of themselves disqualifying. . . . There may be cases in which defense counsel's possession of information about a former co-defendant/government witness learned through joint defense meetings will not impair defense counsel's ability to represent the defendant or breach the duty of confidentiality to the former co-defendant.

Id.

The district court in Stepney subsequently explored the boundaries of this qualification.  In Stepney, the government charged nearly thirty defendants with over seventy substantive counts relating to the operation of a gang over a period of several years.  Stepney, 246 F. Supp. 2d at 1072.  In an effort to prepare

70

coherent defenses, various defense counsel sought to enter into a joint defense

agreement that would allow the defendants to share factual investigations and legal

work product.  Id.  The court in Stepney required that the proposed joint defense

agreement be submitted for in camera review, and it ultimately rejected it for

creating "a general duty of loyalty to all participating defendants."  Id. at 1072,

1079.  The Stepney court explained that "[s]uch a duty has no foundation in law

and, if recognized, would offer little chance of a trial unmarred by conflict of

interest and disqualification."  Id. at 1079.

    In reaching this conclusion, the court observed that "[j]oint defense

agreements are not contracts which create whatever rights the signatories chose,

but are written notice of defendants' invocation of privileges set forth in common

law.  Joint defense agreements therefore cannot extend greater [or fewer]

protections than the legal privileges on which they rest."  Id. at 1079–80 (footnote

omitted).  The court continued:

> Courts have consistently viewed the obligations created by joint
> defense agreements as distinct from those created by actual attorney-
> client relationships. . . . As discussed above, courts have also
> consistently ruled that where an attorney represents a client whose
> interests diverge from a party with whom the attorney has previously
> participated in a joint defense agreement, no conflict of interest arises
> unless the attorney actually obtained relevant confidential
> information.  This position is inconsistent with a general duty of
> loyalty owed to former clients, which would automatically preclude

an attorney from subsequently representing a client with an adverse
interest.

Id. at 1080 (emphasis added) (footnote and citations omitted).  Accordingly, the

duty of confidentiality imposed by a joint defense agreement "is limited in that the

showing required to establish a conflict of interest arising from prior participation

in a joint defense agreement is significantly higher than required to make out a

conflict based on former representation of a client."  Id. at 1076.

"[D]isqualification is [therefore] proper where a party seeking disqualification can

show that an attorney for another defendant actually obtained relevant confidential

information through a joint defense agreement."  Id. at 1082; see id. at 1082 n.7

(characterizing Henke and Wilson P. Abraham as embracing the rule that "the law

does not trust an attorney who actually possesses relevant confidences to proceed

without using or disclosing them").  "[J]oint defense meetings in and of

themselves[, however] are not [automatically] disqualifying."  Id. at 1082 (citing

Henke, 222 F.3d at 638).[26]  Again, Stepney did not rely on any ethical rules or

statutes governing lawyers conduct in reaching this conclusion.

_____

[26] District Courts within the Ninth Circuit have subsequently found the
Henke court's holding applicable in civil cases as well.  See, e.g., All Am.
Semiconductor, Inc. v. Hynix Semiconductor, Inc., 2008 WL 5484552 (N.D. Cal.
Dec. 18, 2008) (disqualifying plaintiffs' counsel when a partner at that law firm
obtained relevant confidential information from a former client's co-defendant in
accordance with a joint defense agreement).

72

RID asserts that because "the [ethical rules] make[] no mention of joint defense arrangements or conflicts or obligations related thereto," a client must establish that an actual attorney-client relationship exists before the ethical rules can apply.  (RID's Consolidated Opp'n at 17–22.)  The Court is not here suggesting that ethical rules are the source pursuant to which privileges and protections associated with joint defense agreements attach.  Rather, the duty of confidentiality imposed by joint defense agreements, and associated with participation in joint defense groups, stems from the case law surrounding joint defense agreement jurisprudence.  See, e.g., Henke, 222 F.3d at 637 ("A joint defense agreement establishes an implied attorney-client relationship with the co-defendant."); Stepney, 246 F. Supp. 2d at 1079–80 ("Joint defense agreements are not contracts which create whatever rights the signatories chose, but are written notice of defendants' invocation of privileges set forth in common law." (emphasis added)).

RID's reliance on various out of district ethics opinions is similarly unpersuasive.  As RID points out, the thrust of D.C. Ethics Opinion 349 is that "[b]y its own terms, Rule 1.9 creates no obligations with respect to a person or entity who was never a client."  D.C. Ethics Op. 349, at 5 (Sept. 2009).  According to this ethics opinion, as a result, there is nothing to impute to the firm pursuant to

73

D.C.'s Ethical Rule 1.10.  Id.  This same ethics opinion recognizes, however, that

participation in joint defense groups may give rise to obligations arising under

some law other than the ethical rules.  Id. at 2 ("[O]ne must distinguish between

obligations imposed by the [Ethical] Rules and obligations arising under other

law.").  RID's reliance on ABA Formal Opinion 95-395 is also misplaced.  In that

opinion, as RID points out, the American Bar Association concludes that "[a]

lawyer who has represented one, but only one, of the parties in a joint defense

consortium does not thereby acquire an obligation to the other parties to the

consortium that poses an ethical bar to the lawyer thereafter taking on a related

representation adverse to any of the other parties."  ABA Formal Op. 95-395, at 1.

The opinion clarifies, however, that an attorney who participated in a joint defense

consortium, and received confidential information from the other members, "would

almost surely have a fiduciary obligation to the other members of the consortium,

which might lead to [the attorney's] disqualification."  Id. at 3 (citing Wilson P.

Abraham, 559 F.2d at 253).  These ethics opinions therefore support the conclusion

that participation in a joint defense group can give rise to duties and obligations

that arise outside of the ethical rules.  Accordingly, and contrary to RID's

assertion, the ethical rules need not specifically mention joint defense agreements

74

for a disqualifying conflict of interest to arise from such an agreement or

participation in a joint defense group.[27]

   Accordingly, the Court finds that joint defense agreements do give

rise to an implied attorney-client relationship, which may include a duty of

confidentiality.  This relationship can lead to a disqualifying conflict of interest

where information gained in confidence by an attorney "becomes an

issue"—specifically when the former representation was "the same or substantially

related" to the current litigation and when the current client's interests are

"materially adverse" to the interests of the party asserting the conflict of interest.[28]

See Henke, 222 F.3d at 636; Stepney, 246 F. Supp. 2d at 1080; see also

Restatement (Third) of the Law Governing Lawyers § 132 cmt. g(ii) ("A lawyer

---

[27] Indeed, as RID asserts throughout its briefing, the obligations created by the ethical rules are generally only applicable to a traditional attorney-client relationship.  What RID overlooks, however, is that an implied attorney-client relationship, which imposes similar ethical duties may arise from a source other than the ethical rules.  As RID states in its briefing, "courts 'have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships.'"  (RID's Consolidated Opp'n at 19 (quoting Stepney, 246 F. Supp. 2d at 1080).)  RID's insistence that the totality of its ethical obligations arise from Arizona's ethical rules is therefore unpersuasive.

[28] This is nearly identical to an Ethical Rule 1.9 analysis.  However, rather than demonstrate the existence of an attorney-client relationship as under Ethical Rule 1.9, see Foulke, 784 P.2d at 726–27, the moving party must instead demonstrate the actual transfer of relevant confidential information.

who learns confidential information from a person represented by another lawyer

pursuant to a common interest sharing arrangement is precluded from a later

representation adverse to the former sharing person when the information actually

shared by that person with the lawyer or the lawyer's client is material and relevant

to the matter.").  Unlike an actual attorney-client relationship, however, courts do

not presume the exchange of confidential information.  Instead, there must be an

<u>actual</u> transfer of relevant confidential information to create a disqualifying

conflict.[29]

B.      <u>Imputation to a Law Firm</u>

Once the court determines that a disqualifying conflict of interest

exists by virtue of an attorney's participation in a joint defense group, the court

---

[29] Despite RID's protestations, this conclusion is actually quite consistent with <u>Towne</u>, which was concerned with imputing a privileged relationship where mere "common strategy" was discussed.  <u>See</u> <u>Towne</u>, 842 P.2d at 1380 ("We are reluctant to hold that a privileged relationship arises between one party and counsel for a co-party <u>merely</u> through discussions of common strategy." (emphasis added)).  Under the test outlined by the Court, a much greater showing than that discussed in <u>Towne</u> is required.  Moreover, RID seemingly concedes the propriety of the Court's test by noting that "RID's position is consistent with, and not undermined by [<u>Henke</u>]."  (RID's Closing Arg. Br. at 22.)  RID goes on to quote <u>Henke</u> and concludes that "it was the lawyer's unique position in that case that generated the conflict."  (<u>Id.</u> at 23.)  The Court agrees with this conclusion.  RID, however, goes on to assert that the conflict was generated by contract.  (<u>Id.</u>)  For the reasons already discussed, this assertion is not persuasive.

must determine whether that conflict can be imputed to an entire law firm.  Courts have carefully considered this question and answered in the affirmative.

In Gabapentin, two attorneys represented a defendant in a patent infringement case.  Gabapentin, 407 F. Supp. 2d at 608–09.  During that representation, they executed a joint defense agreement on behalf of the defendant and participated regularly in joint defense meetings, wherein they were privy to confidential work product and privileged information relating to all of the defendants who participated in the joint defense group.  Id. at 609.  The attorneys then joined a different law firm, and shortly thereafter, that firm became lead plaintiffs' counsel against the attorneys' former client in the same patent litigation.  Id. at 609–12.  The attorneys were timely screened and obtained waivers from their former client sufficient to prohibit imputation of a conflict between the law firm and the former client.  Id. at 610.  The attorneys, however, failed to obtain waivers from their former client's co-defendants, who were involved in the joint defense group.  Id.  The co-defendants subsequently filed a motion to disqualify plaintiffs' counsel, premised upon the two lateral attorneys' participation in the joint defense group.  Id. at 611.

The court first found that because relevant confidential information was exchanged in the joint defense meetings, and because the joint defense

agreement "clearly established the intent that shared information would remain confidential and protected under the attorney-client privilege," the attorneys had an implied attorney-client relationship with the co-defendants of their former client. Id. at 613–15 (analyzing Wilson P. Abraham and GTE North).  The court next determined that, despite the screen, the lateral attorneys' conflict was imputed to the entire law firm, pursuant to New Jersey's Ethical Rule 1.10.  Id. at 615–16.  As a result, the entire law firm was disqualified from continuing to represent the plaintiffs in the litigation.  Id.

In GTE North, the court reached a similar result.  In that case, the EPA gave notification of PRP status to various companies, resulting from the cleanup of a superfund site.  GTE North, 914 F. Supp. at 1577.  GTE North, Chrysler, and other PRPs subsequently formed a committee and executed a joint remedial cost sharing agreement, the purpose of which was to "allocate each member's share of shared response cost, cooperate in investigating and identifying additional PRPs, and to pursue cost recovery activities against any additional PRPs."  Id. (footnote omitted).  The agreement also included confidentiality provisions, which provided that "all shared information between the members and their counsel shall 'be held in strict confidence by the receiving member and by all persons to whom such confidential information is revealed by the receiving

78

member.'"  Id.  The members of this committee who had elected to pursue cost recovery, including Chrysler and GTE North, entered into a separate agreement implementing a joint investigation of additional PRPs who had not participated in the cleanup of the superfund site.  Id. at 1577–78.  This agreement also contained several confidentiality provisions.  Id. at 1578.  At the time of these agreements, Chrysler was represented by Jon S. Faletto and the law firm Howard & Howard. Id. at 1577–78.

Thereafter, counsel for each member, including Faletto, jointly met on several occasions to discuss strategy for conducting the investigation, the investigation results themselves, the relative legal merit of proceeding against certain defendants, and the legal strategy for bringing the cost recovery action.  Id. at 1578.  GTE North ultimately brought a CERCLA cost recovery action against Dean Foods and other PRPs.  Id.  Faletto, who was still with Howard & Howard, appeared on behalf of Dean Foods to defend it in this cost recovery action.  Id. Although Faletto obtained Chrysler's informed consent to represent Dean Foods in the matter, GTE North moved to disqualify Faletto and his law firm on the basis that his participation in the joint presuit investigation had given rise to an implied attorney-client relationship.  Id.

79

Faletto, for his part, did not contest that the matters were "the same or substantially related" nor that the position was "materially adverse." Id. at 1579. Instead, Faletto argued that because GTE North was not a former client, there could not be a disqualifying conflict of interest. Id. The court disagreed. First, the court acknowledged that because there was no express attorney-client relationship, there was no presumption that confidential information had been exchanged. Id. at 1580 ("[T]here must actually have been an exchange of confidential information. Thus, GTE's assertion that there is a presumption that confidential information was exchanged is in error, as this presumption exists only where there is an express attorney-client relationship and the matters are substantially related." (citing Wilson P. Abraham, 559 F.2d at 253)). The court therefore reviewed the record and concluded that an exchange of confidential information took place between GTE North and Chrysler and their respective counsel. Id. at 1580–81. Next, the court considered the circumstances under which these exchanges occurred, and determined that "[t]he disclosures by GTE via its counsel to Faletto, Chrysler's counsel, were made with the expectation that they would not be disclosed to the targets of the investigation." Id. at 1581. The court ruled that receipt of such disclosures obligated Faletto to refrain from appearing on the opposite side of the same litigation to which such information was highly pertinent. Id. Accordingly,

the court disqualified Faletto from appearing on behalf of Dean Foods in GTE

North's CERCLA cost recovery action.  Id.  Because Faletto was at all relevant

times a member of Howard & Howard, the court found that this was "not a

situation of imputed disqualification where an attorney has changed firms" and

could have been screened in accordance with the applicable Ethical Rule 1.10.  Id.

The GTE North court therefore imputed Faletto's conflict of interest to Howard &

Howard and disqualified the entire firm from representing Dean Foods.[30]  Id.

These cases make clear that conflicts of interest arising from joint

defense agreements, and participation in joint defense groups, can be imputed to an

entire law firm in accordance with the applicable ethical rules.  See Gabapentin,

407 F. Supp. 2d at 615; GTE North, 914 F. Supp. at 1581.[31]

---

[30] In City of Kalamazoo v. Michigan Disposal Service Corp., a case that
involved a motion to disqualify plaintiff's counsel in a CERCLA contribution
action, the court found GTE North to be significant for several reasons: "First, it
demonstrates that . . . an attorney in a joint defense situation may find an
attorney-client relationship arise with co-defendants as the result of sharing
confidential information.  Second, the case demonstrates that the confidential
information may consist of thoughts, mental impressions and strategies regarding a
claim against another party.  Finally, the confidential information may be conveyed
by the attorney for the co-defendant, rather than the client itself."  City of
Kalamazoo v. Mich. Disposal Serv. Corp., 125 F. Supp. 2d 219, 235 (W.D. Mich.
2000) (internal citations omitted).

[31] RID argues that the Restatement prohibits imputation of a nontraditional
attorney-client relationship to an entire law firm.  (RID's Consolidated Opp'n at
(continued...)

81

C.    The WVB Group—Univar and Dolphin

Univar and Dolphin contend that G&K should be disqualified from

representing RID in the instant action because current G&K attorneys Wallis,

Curry, and Mollenberg represented Reynolds in the WVB Group, creating an

---

[31](...continued)

21; RID's Closing Arg. Br. at 19–20.)  The Restatement comment upon which RID relies provides as follows:

> (g)(ii) Duties to a person about whom a lawyer learned confidential information while representing a former client.  A lawyer might have obligations to persons who were not the lawyer's clients but about whom information was revealed to the lawyer under circumstances obligating the lawyer not to use or disclose the information.  Those obligations arise under other law, particularly under the law of agency. . . .  An important difference between general agency law and the law governing lawyers is that general agency law does not normally impute restriction to other persons.  Thus, when a lawyer's relationship to a non-client is not that of lawyer-client but that, for example of sub-agent-principal, imputation might not be required under the law governing subagents.

See Restatement (Third) of the Law Governing Lawyers § 132 cmt g(ii) (emphases added).  The Court is not persuaded.  First, this comment only states that "imputation might not be required," which suggests that there may be times when it is so required.  Further, the comment is plainly considering agency law when discussing nonimputation, not an implied attorney-client relationship, which a joint defense agreement establishes.  Finally, the weight of authority outlined supra suggests that the privileges associated with an implied attorney-client relationship stemming from a joint defense agreement are imputed to an entire law firm.  The Court therefore does not find this comment persuasive.

implied attorney-client relationship with Univar and Dolphin, who also participated in the WVB Group.

In 1992, ADEQ notified Univar, Dolphin, and several other PRPs that they might be liable for groundwater contamination originating from the WVBA WQARF Site.  (Grotheer Decl. ¶ 2; Lagas Decl. ¶ 3.)  In response, Univar, Dolphin, Reynolds, Maricopa County, and American Linen Supply Company formed a joint defense group, the WVB Group, whose primary purpose was to jointly negotiate a consent decree with ADEQ for performance of a RI/FS in the WVBA Site.  (Grotheer Decl. ¶¶ 3–4; Lagas Decl. ¶ 4.)  During the WVB Group's existence, Reynolds was represented by current G&K attorneys Wallis, Curry, and Moellenberg.  (Grotheer Decl. ¶ 6; Lagas Decl. ¶¶ 13–14.)

The parties executed the joint defense agreement in 1993, and the in camera materials demonstrate that the group met on a near weekly basis from 1993 until approximately June 1996, when the group suspended negotiations with ADEQ.  During this time, G&K attorneys received communications regarding committee and subcommittee meetings on an average of five to six times per month.

Univar represents that, during the WVB Group meetings, the group members "openly and routinely discussed issues related to [their] technical and

83

legal defenses to the scope and nature of liability." (Grotheer Decl. ¶ 6.) These discussions also included the members' "frank assessments of the strengths and weaknesses of the various defenses" (id.), as well as legal strategies and possible settlement terms (Lagas Decl. ¶ 12). The in camera materials are in accord.

Dolphin also asserts that the WVB Group specifically discussed RID and its agricultural irrigation wells, evaluated the effects of RID's pumping of those wells, and had discussions about the potential of RID asserting claims against members of the WVB Group. (Id. ¶¶ 8–9, 17–18.) The in camera materials substantiate these claims. Myriad committee reports, subcommittee reports, and confidential group communications took place on all of these topics. Indeed, from 1993 until 1996 no fewer than seven documents submitted for in camera review mentioned RID and potential theories of liability relating to RID, particularly in 1994. The WVB Group also considered potential EPA liability in these meetings as well as ADEQ liability, and it discussed models of groundwater flow and contamination, defenses and legal strategies, possible settlement terms, and otherwise prepared for contingencies relating to the alleged groundwater contamination. Strategic discussions took place regularly, and technical details relating to the spread of potential contaminants were exchanged freely between and among the WVB Group participants.

84

A large portion of the in camera documents relate to developing a groundwater flow model.  In June 1993, the WVB Group presented to ADEQ a good faith offer for phased performance of the RI/FS.  (Grotheer Decl. ¶ 7.) Univar asserts that an important element in performance of the RI/FS was the use of a groundwater flow model (the "model"), developed by Univar through its consultant, Harding Lawson & Associates ("Harding Lawson").  (Id.)  The in camera materials confirm that both Univar and Harding Lawson made detailed presentations regarding the model to the WVB Group, addressing the underlying assumptions and judgments that form the technical foundation for the model.  As suggested by the Grotheer Declaration, the group members questioned these assumptions and judgments in an effort to evaluate the model's strengths and weaknesses, and in response, Univar and its consultants answered these questions "honestly and candidly."  (Id.)

ADEQ purchased the model from Univar in 1999, and in October 2006, Univar and Reynolds entered into an agreement that ultimately led to Reynolds purchasing the model from Univar.  (Id. ¶¶ 9–11.)  Univar states that, although it sold the model, it did not disclose to ADEQ the WVB Group's prior discussions regarding the model's strengths and weaknesses.  (Id.)  Univar claims that it plans to use the updated model in connection with the instant action and that

85

"most, if not all, of the underlying assumptions and judgments that formed the technical foundation of the initial model remain the same." (Univar's Mot. Ex. D, Declaration of Edward Nemecek ("Nemecek Decl.") ¶ 3.)

Wallis, Curry, and Moellenberg, the three G&K attorneys who represented Reynolds in the WVB Group, all attest that they were screened from the RID matter "shortly" after RID engaged G&K in October 2008. (Wallis Decl. ¶¶ 4–5; Curry Decl. ¶¶ 4–5; Moellenberg Decl. ¶¶ 4–5; see also Kimball Decl. I ¶ 7.)

### 1.   Implied Attorney-Client Relationship

As noted, for a potentially disqualifying conflict stemming from a duty of confidentiality created by a joint defense agreement to exist, the moving party must show: (1) the actual exchange of relevant confidential information; (2) the former representation was "the same or substantially related" to the current litigation; and (3) the current client's interests are "materially adverse" to interests of the party claiming to be protected by the joint defense agreement. See Henke, 222 F.3d at 636; Stepney, 246 F. Supp. 2d at 1080.

As a preliminary matter, it is undisputed that RID's interests are materially adverse to Univar and Dolphin—the parties claiming to be protected by

participation in the WVB Group—because RID has named them as defendants in the instant action.

The matters are also substantially related.  Matters are substantially related "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."[32]  ER 1.9 cmt. 3; see also Trone v. Smith, 621 F.2d 994, 998–99 (9th Cir. 1980).  At issue in the former representation was Univar and Dolphin's potential liability for groundwater contamination existing within the WVBA WQARF Site.  (Grotheer Decl. ¶ 2; Lagas Decl. ¶ 3.)  Similarly, here, RID alleges that Univar's Facilities and Dolphin's Facilities contributed to the groundwater contamination of its wells, located in the WVBA WQARF Site.  (FAC ¶¶ 36, 79.)  The underlying nucleus of facts that give rise to the former matter and the instant matter are therefore nearly identical.  The in camera documentation submitted to the Court substantiates this conclusion.  The operative

---

[32] As discussed, the analysis for determining whether an implied attorney-client relationship arises from participation in a joint defense group is nearly identical to the analysis for deciding whether there is a violation of Ethical Rule 1.9.  Because both tests require the Court to determine whether the prior matter and the current matter are substantially related, the comments and case law related to Ethical Rule 1.9 are instructive here.

facts so overlap that the WVB Group candidly discussed RID and potential

theories of liability relating to RID.  The Court can only conclude that the former

matter and the instant matter are substantially related because there is undoubtedly

a "substantial risk" that confidential factual information as would normally have

been obtained from participation in the WVB Group would "materially advance"

RID's position in the instant matter."  <u>See</u> ER 1.9 cmt. 3.

      Not only was there a substantial risk that confidential information,

which materially advances RID's position would be exchanged, but that

information was in fact exchanged.  The Court therefore finds that the third and

final prong of the test has been satisfied.  As outlined above, the WVB Group

recognized and assessed potential impacts to RID and discussed RID and its

pumping in confidential and privileged communications transmitted between and

among the group members.  Both Univar and Dolphin also engaged in frank

discussions regarding their individual liabilities as well as the group's collective

liabilities.  Indeed, a 1993 memorandum was drafted, which discussed both

Univar's and Dolphin's potential liabilities and was circulated to current G&K

attorneys.  The memorandum discussed specifically what the WVB Group could

argue to avoid liability and the potential impact of a CERCLA lawsuit.  The Group

analyzed relevant case law and suggested different arguments that could be made

before a court.  Similarly, the WVB Group exchanged documentation that involved

site-specific groundwater investigations on the WVB Group members' sites, and

the parties also discussed flow model information.

The relevance of this material cannot be understated.  The in camera

documentation makes plain that Univar and Dolphin operated under the

assumption that they were sharing information in confidence, and Paragraph 20 of

the joint defense agreement contains a confidentiality provision.  The discussions

in which the WVB Group engaged go the heart of the instant litigation.  Theories

of liability discussed by the group are now being asserted against Univar and

Dolphin.  With respect to the model that Univar sold to ADEQ and Reynolds, the

underlying assumptions and judgments that formed the technical foundation of the

initial model were not sold and are nonpublic in nature.  As the in camera

documents make clear, however, Univar discussed these assumptions candidly

with the WVB Group.  The Court therefore finds that all three prongs of the

implied attorney-client relationship test outlined supra have been satisfied with

respect to Univar and Dolphin.  Accordingly, Wallis, Curry, and Moellenberg, the

three G&K attorneys who represented Reynolds in the WVB Group, have a duty of confidence that must be maintained with respect to Univar and Dolphin.[33]

    2.    <u>Imputation to G&K</u>

This duty of confidence owed by Wallis, Curry, and Moellenberg is imputed to G&K.  As <u>Gabapentin</u> and <u>GTE North</u> make clear, duties established by a joint defense agreement can be imputed to an entire law firm via the applicable ethical rules.  See <u>Gabapentin</u>, 407 F. Supp. 2d at 615; <u>GTE North</u>, 914 F. Supp. at 1581.  Although RID asserts that Wallis, Curry, and Moellenberg were all screened shortly after RID retained G&K, the screening mechanism set forth in Ethical Rule 1.10(d) is only available when the personally disqualified lawyer joins a new law firm.  See <u>Eberle</u>, 354 F. Supp. 2d at 1095; Ariz. Ethics Op. 04-04.  Here, Wallis,

---

[33] RID also relies upon Paragraph 11(b) and (c) of the WVB Group's joint defense agreement to argue that it contracted away any attorney-client relationship that may have stemmed from the agreement.  (RID's Consolidated Opp'n at 13–14; RID's Closing Arg. Br. at 16–17.)  The Court is not persuaded.  Paragraph 11(b) is an attestation that no party entering the agreement was represented by another party's counsel.  Paragraph 11(c) states that "no attorney-client relationship is intended to be created between representatives on any Committee or subcommittee and the Members."  Neither provision speaks to whether the agreement generally imposes a duty of confidentiality on the attorneys representing the various parties. In any event, as the court in <u>Stepney</u> discussed, the rights created by joint defense agreements are not established by contract.  <u>Stepney</u>, 246 F. Supp. 2d at 1079–80 ("Joint defense agreements are not contracts which create whatever rights the signatories chose, but are written notice of a defendants' invocation of privileges set forth in common law.").

Curry, and Moellenberg all worked for G&K at the time of the former

representation and still work for G&K. Screening therefore offers G&K no

refuge—G&K owes Univar and Dolphin a duty of confidence that must be

maintained.

      D.     <u>The M-52 Group—SRP and Honeywell</u>

      SRP contends that G&K should be disqualified from representing RID

because current G&K attorneys Derouin and Curry participated in the M-52 Group,

in which SRP was also involved, on behalf of Honeywell and APS, respectively.[34]

      By 2003, the EPA had identified SRP, APS, and Honeywell as PRPs

in connection with alleged contamination in OU-3 of the M-52 Site. (Wanttaja

Decl. ¶¶ 5–6.) These parties subsequently formed the M-52 Group and executed a

joint defense agreement effective March 1, 2008. (<u>Id.</u> ¶ 9.) Derouin participated in

the M-52 Group meetings on behalf of Honeywell, and Curry participated on

behalf of APS, who was represented by G&K in the matter. (<u>Id.</u> ¶¶ 11, 13; Derouin

Decl. I ¶ 21.) SRP withdrew from participation in the M-52 Group in December

2008. (SRP's Mot. at 6.)

---

    [34] Honeywell also raised this argument as an alternative basis for G&K's
disqualification. (Honeywell's Mot. at 10 n.7.)

According to SRP, the M-52 Group engaged in confidential discussions regarding the potential contamination at OU-3, possible sources of the contamination, feasibility and costs of certain cleanup plans, and potential allocation of liability.  (Wanttaja Decl. ¶¶ 14, 18.)  SRP claims that it also disclosed to the other group members its position on its own alleged liability, including information regarding its alleged contribution to the OU-3 contamination.  (Id. ¶ 17.)

SRP's in camera documentation substantiates these assertions.  From June 2008 until November 2008, SRP's attorneys exchanged myriad information with G&K's attorneys who participated in the M-52 Group.  As asserted in the Wanttaja Declaration, discussions between SRP representatives and current G&K attorneys Derouin and Curry touched on a potential AOC with the EPA related to the OU-3.  In discussing this, SRP revealed information regarding its liability, its views on the scope of the contamination in OU-3, and the feasibility and costs of cleanup plans.  The parties also discussed the potential retention of a common consultant and proposed investigations.  In the process, SRP again revealed its views regarding its potential contribution to the contamination in OU-3, the source of the alleged contamination, the potential costs and feasability of the cleanup plan, and any potential allocation of liability for the alleged contamination.

92

Succinctly stated, the <u>in camera</u> documentation entirely supports the declaration that SRP provided to the Court.  (<u>See</u> Wanttaja Decl. ¶ 18 (asserting that the records reflect "discussions between SRP and G&K attorneys . . . regarding, among other things: 1) SRP's position on participating in a potential AOC with EPA related to the OU-3 site, 2) SRP's confidential position on critical provisions of the AOC with EPA, 3) SRP's position with regard to certain agreements, including a site participation agreement, a confidentiality agreement and consulting agreement, 4) the retention of a common consultant and proposed investigations to be performed by that consultant, 5) allocation of SRP's alleged liability, 6) concerns of SRP's Board on certain issues and 7) other sensitive and confidential information").)

Honeywell's <u>in camera</u> documentation also makes clear that it shared information with SRP and APS.[35]  In connection with the same topics outline above, Honeywell provided documentation that suggests it revealed theories relating to the potential contamination at OU-3, the sources of the contamination,

---

[35] Honeywell only submitted invoice summaries from Derouin in connection with its participation in the M-52 Group.  In conjunction with SRP's <u>in camera</u> documentation, however, it is plain that Honeywell shared confidential information with the M-52 Group as summarized in the invoices.

Honeywell's potential liability for the contamination, discussions surrounding investigations, and Honeywell's positions on participating in the AOC.

In sum, the in camera documents make clear that Honeywell, SRP, and APS, consistent with the terms of their joint defense agreement, exchanged an abundance of information relating to alleged contamination in OU-3 of the M-52 Site.

Of the attorneys who participated in the M-52 Group, Derouin and Curry are the only two currently employed by G&K. As noted, Derouin was hired by G&K in January 2010, and he states that he did not "transfer or take any files, documents, or materials" related to his representation of Honeywell to G&K. (Derouin Decl. I ¶¶ 27, 31.) Derouin attests that he has been screened from the RID matter since his arrival at G&K. (Id. ¶¶ 32–35; see also Kimball Decl. I ¶¶ 30–31; Michael Kennedy Decl. ¶¶ 5–9.) Additionally, Curry represents that he was screened from the RID matter "shortly" after RID engaged G&K in October 2008. (Curry Decl. ¶¶ 4–5; see also Kimball Decl. I ¶ 7.)

### 1.   Implied Attorney-Client Relationship

As noted, for a potentially disqualifying conflict stemming from a duty of confidentiality created by a joint defense agreement to exist, the moving party must show: (1) the actual exchange of relevant confidential information; (2)

94

the former representation was "the same or substantially related" to the current litigation; and (3) the current client's interests are "materially adverse" to interests of the party claiming to be protected by the joint defense agreement.  See Henke, 222 F.3d at 636; Stepney, 246 F. Supp. 2d at 1080.

As a preliminary matter, it is undisputed that RID's interests are materially adverse to SRP and Honeywell—the parties claiming to be protected by participation in the WVB Group—because RID has named them as defendants in the instant action.

The matters are also substantially related.  At issue in the former representation was SRP's and Honeywell's potential liability for alleged groundwater contamination in OU-3 of the M-52 Site.  (See Wanttaja Decl. ¶¶ 7–8.)  At issue in the instant litigation is also SRP's and Honeywell's potential liability for alleged groundwater contamination in OU-3 of the M-52 Site.  Specifically, RID alleges that alleged contamination from SRP's Facilities and Honeywell's Facilities contributed to the groundwater contamination of its wells.  (FAC ¶¶ 41, 66.)  As with Univar and Dolphin, the underlying nucleus of facts that gave rise to the former matter and the instant matter are nearly identical.  The in camera documentation, as discussed, substantiates this determination.  Therefore, the Court can only conclude that the former matter and the instant matter are

substantially related because there is undoubtedly a "substantial risk" that confidential factual information as would normally have been obtained from participation in the M-52 Group would "materially advance" RID's position in the instant matter."  See ER 1.9 cmt. 3.

Not only was there a substantial risk that confidential information, which materially advances RID's position would be exchanged, but that information was in fact exchanged.  Accordingly, the Court finds that the third and final prong of the test has been satisfied.  As outlined above, relevant confidential information was exchanged between and among all members of the M-52 Group. Indeed, the M-52 Group engaged in numerous phone conversations, meetings, and e-mail exchanges.  Topics of these discussions included negotiations surrounding the terms of the joint defense agreement, the potential AOC, litigation strategies, and potential claims against other parties.  During these discussions, the in camera documentation makes clear that SRP and Honeywell engaged in frank conversations regarding their potential liability and strategies for circumventing it.

The relevance of this material cannot be understated.  The in camera materials demonstrate that SRP and Honeywell operated under the assumption that they were sharing information in confidence, and the joint defense agreement itself

plainly states as much.[36]  Moreover, the M-52 Group's discussions relate directly to the instant litigation—potential liabilities discussed between and among the M-52 Group members now form, in part, the underpinning of RID's claims against SRP and Honeywell, and the same strategies that the M-52 Group discussed for avoiding liability could be at play here as well.  This material is plainly relevant and advantageous to RID.  The Court therefore finds that all three prongs of the joint defense group test outlined <u>supra</u> have been satisfied with respect to SRP and Honeywell.  Curry and Derouin, the two remaining G&K attorneys which represented APS and Honeywell, respectively, in the M-52 Group, have a duty of confidence that must be maintained with respect to SRP and Honeywell.

  2. <u>Imputation to G&K</u>

   This duty of confidence owed by Curry to Honeywell and SRP is imputed to the entire G&K law firm.[37]  As <u>Gabapentin</u> and <u>GTE North</u> make clear,

---

  [36] RID complains that it was provided with only a redacted version of the M-52 Group's joint defense agreement.  (RID's Closing Arg. Br. at 15–16 & n.17.)  This is not grounds for denying either SRP's or Honeywell's motion.  The Court has reviewed the unredacted agreement in its entirety and is satisfied with its terms and conditions.

  [37] Because Curry's duty of confidence is imputed to G&K the Court need not consider the efficacy of G&K's screen with respect to Derouin.  The Court also need not consider SRP's argument that Ethical Rule 1.7(a)(2) compels G&K's disqualification (SRP's Mot. at 15; SRP's Reply at 5–7) or its argument that the

(continued...)

duties established by a joint defense agreement are imputed to an entire law firm via the applicable ethical rules.  See Gabapentin, 407 F. Supp. 2d at 615; GTE North, 914 F. Supp. at 1581.  As with Univar and Dolphin, it does not matter that Curry was screened shortly after RID retained G&K because, pursuant to Ethical Rule 1.10(d), screening is only available when the personally disqualified lawyer joins a new firm.  See Eberle, 354 F. Supp. 2d at 1095; Ariz. Ethics Op. 04-04. Here, Curry worked for G&K at the time of the former representation and still works for G&K.  Screening therefore offers G&K no help and Curry's conflict is imputed to the entire firm.

      E.    The AdobeAir-Arvin and Arvin-Cooper Groups

      Finally, Arvin and Cooper contend that Derouin's employment by G&K creates an impermissible conflict of interest that is not subject to screening. The Court disagrees.

      AdobeAir, Arvin, and Cooper are all former successive owners of the South 15th Street Facility.  (Furlough Aff. ¶ 2.)  In May 1987, the EPA placed the South 15th Street Facility on CERCLIS.  (Id. ¶ 5.)  In connection with this matter,

---

[37](...continued)
joint defense agreement by its terms creates a duty of confidence as to the entire G&K firm, rather than just the attorneys who participated in the M-52 Group (SRP's Mot. at 14; SRP's Reply at 8).

AdobeAir entered into a joint defense agreement with Arvin in October 2002. (Furlough Aff. ¶ 7; Derouin Decl. II ¶ 3.)  The in camera documentation reveals that the AdobeAir-Arvin Group agreement has specific provisions relating to joint and cooperative defenses between Arvin and AdobeAir concerning the South 15th Street Facility as well as provisions concerning the confidentiality of the joint defense materials and protection of all correspondence, documents, and technical documents.  Derouin, who was at the time a partner at Steptoe, represented AdobeAir and was the partner primarily responsible for this matter.  (Derouin Decl. II ¶ 3.)

Effective November 25, 2002, Arvin and Cooper entered into a Tolling, Standstill and Cooperation Agreement.  (Odenweller Aff. ¶ 7.)  The in camera documentation reveals that the Arvin-Cooper Group agreement has specific provisions relating to joint and cooperative defenses between Arvin and Cooper concerning the South 15th Street Facility as well as provisions concerning the confidentiality of the joint defense materials and protection of all correspondence, documents, and technical documents.  AdobeAir was not a party to the Arvin-Cooper Group agreement.

In September 2004, representatives from AdobeAir, Arvin, and Cooper signed the AOC titled "In the Matter of: Motorola 52nd Street Superfund

99

Site, U.S. EPA Docket No. 2004-18," which was negotiated with the EPA and prescribed that an RI/FS was to be performed of the South 15th Street Facility. (Furlough Aff. ¶¶ 8–11; Derouin Decl. II ¶ 3.)  AdobeAir, Arvin, and Cooper have been cooperating in the technical investigation on the South 15th Street Facility by an environmental consultant, Arcadis U.S., Inc., which is being reviewed by the EPA.  (Furlough Aff. ¶ 13.)  The AOC is still in effect to date.  (Id.)

Derouin withdrew from representing AdobeAir in April 2009, before the RI/FS had been completed.  (Derouin Decl. II ¶ 5.)  Derouin attests that after his withdrawal, he had no involvement in AdobeAir's matters, including those related to the AOC, the RI/FS, and the AdobeAir-Arvin Group.  (Id.)  Prior to his employment at G&K, Derouin was advised of G&K's representation of RID, and arrangements were made for him to be screened "immediately and completely" from this matter upon his arrival at the firm.  (Id.; Kimball Decl. II ¶ 11.)  Derouin attests that he does not have physical or electronic access to the files and communications related to the RID matter, and that he has not received any direct compensation from this matter.  (Derouin Decl.  I ¶¶ 8–9, 12; see also Kimball Decl. II ¶ 11.)  Additionally, when Derouin left Steptoe, he did not retain any files pertaining to his representation of AdobeAir.  (Derouin Decl. II ¶ 11.)

1.     Arvin and Cooper's Preliminary Arguments

Arvin and Cooper make three preliminary arguments, none of which are persuasive.

a.     Ethical Rule 1.7

First, Arvin and Cooper claim that Ethical Rule 1.7 bars G&K from representing RID.  (A&C's Mot. at 11–13.)  Ethical Rule 1.7(a) provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."  ER 1.7(a).  A concurrent conflict of interest exists when "the representation of one client will be directly adverse to another client."  ER 1.7(a)(1).  Pursuant to Ethical Rule 1.7(a)(2), a concurrent conflict of interest also exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  ER 1.7(a)(2).  Under certain circumstances, the affected clients may waive the conflict if they give informed consent, confirmed in writing.  ER 1.7(b).

Ethical Rule 1.7(a)(1) is not implicated here.  As the comments explain, "[l]oyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent."  ER 1.7 cmt. 6.  Thus, absent consent, "[a] lawyer may not act as an advocate in one matter against

101

a person the lawyer represents in some other matter, even when the matters are

wholly unrelated." Id. Even if Arvin and Cooper did have an express attorney-

client relationship with Derouin by virtue of the joint defense agreements, which

they did not, that relationship ended when Derouin withdrew from representing

AdobeAir in April 2009.  Furthermore, G&K does not currently, and has not

formerly, represented either Arvin or Cooper as clients.  (Kimball Decl. II ¶ 16.)

Because Arvin and Cooper are not Derouin's current clients, and because Derouin

is not presently representing RID, there does not exist a concurrent conflict of

interest as defined by Ethical Rule 1.7(a)(1).  Indeed, this is not a situation where

Derouin currently represents both Arvin and Cooper and RID.

Arvin and Cooper also argue that Ethical Rule 1.7(a)(2) disqualifies

Derouin from representing RID.  (Mot. at 11–13.)  The purpose of this rule,

however, is to protect a current client from material limitation in its representation,

caused by its lawyer's responsibilities to another client, a former client, or a third

person.  See E.E.O.C. v. Luby's, Inc., 347 F. Supp. 2d 743, 746 (D. Ariz. 2004);

see also ER 1.7 cmt. 8 ("[A] conflict of interest exists if there is a significant risk

that a lawyer's ability to consider, recommend or carry out an appropriate course of

action for the client will be materially limited as a result of the lawyer's other

responsibilities or interests." (emphasis added)).  Arvin and Cooper are not

Derouin's current clients, and therefore they simply are not the parties meant to be protected by this rule.  RID is the only current client in this matter, but even then, Ethical Rule 1.7(a)(2) is not implicated because Derouin is not representing RID. In fact, Derouin has been completely screened from this matter.  On these facts, there is simply no violation of Ethical Rule 1.7.

                b.    <u>Ethical Rule 1.9</u>

Second, Arvin and Cooper contend that they are Derouin's former clients, pursuant to Ethical Rule 1.9.  As outlined <u>supra</u>, joint defense agreements do not create a traditional attorney-client relationship such that Ethical Rule 1.9 is applicable; instead, there exists a distinct implied attorney-client relationship.  <u>See</u> <u>Stepney</u>, 246 F. Supp. 2d at 1080 ("Courts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships."); <u>see also</u> <u>Gabapentin</u>, 407 F. Supp. 2d at 612 (concluding that when parties work together pursuant to a joint defense agreement, it "could create implied attorney-client or fiduciary obligations under certain circumstances"); <u>GTE North</u>, 914 F. Supp. at 1579–80.  Additionally, Derouin did not have a traditional attorney-client relationship with either Arvin or Cooper;

103

rather Derouin only had an actual attorney-client relationship with AdobeAir.[38]

(Derouin Decl. II ¶¶ 3, 13.)  Arvin and Cooper's claim that they are Derouin's

former clients pursuant to Ethical Rule 1.9 is therefore unpersuasive.

c.    <u>Appearance of Impropriety</u>

Third, Arvin and Cooper contend that G&K's representation of RID

creates a general impermissible appearance of impropriety.  (Mot. at 12–13.)  The

Arizona Supreme Court has held that an appearance of impropriety, which was

previously prohibited by Canon 9 of the Code of Professional Responsibility,

"should be enough to cause an attorney to closely scrutinize his conduct."  <u>Gomez</u>,

717 P.2d at 904.  However, it is "simply too slender a reed on which to rest a

disqualification order except in the rarest of cases."  <u>Sellers v. Superior Court</u>, 742

P.2d 292, 300 (Ariz. Ct. App. 1987); <u>Romley</u>, 891 P.2d at 251.  Any conflict of

interest in this case, as to Arvin and Cooper, is too remote to create an appearance

of impropriety that would require disqualification of G&K.  <u>See</u> <u>Amparano</u>, 93

P.3d at 1094.

---

[38] Arvin and Cooper's argument to the contrary (<u>see, e.g.</u>, A&C's Reply at 3–4) is unpersuasive for the reasons already discussed.  However, even if Derouin had a traditional attorney-client relationship with Arvin and Cooper, the Court would nonetheless deny their motion because this conflict is subject to screening pursuant to Ethical Rule 1.10(d), as analyzed <u>infra</u>.

2.      The AdobeAir-Arvin and Arvin-Cooper Groups

Arvin and Cooper next assert that G&K should be disqualified because of Derouin's affiliation with the certain joint defense groups.

a.      Implied Attorney-Client Relationship

As discussed, for a potentially disqualifying conflict stemming from a duty of confidentiality created by a joint defense agreement to exist, the moving party must show: (1) the actual exchange of relevant confidential information; (2) the former representation was "the same or substantially related" to the current litigation; and (3) the current client's interests are "materially adverse" to interests of the party claiming to be protected by the joint defense agreement.  See Henke, 222 F.3d at 636; Stepney, 246 F. Supp. 2d at 1080.  The Court has carefully reviewed the in camera materials submitted by Arvin and Cooper and concludes that they have failed to demonstrate that there was an actual exchange of relevant confidential information.

Courts do not presume an exchange of confidential information when parties collaborate pursuant to a joint defense agreement.  See, e.g., Henke, 222 F.3d at 637 ("This privilege can also create a disqualifying conflict where information gained in confidence by an attorney becomes an issue." (emphasis added)); Wilson P. Abraham, 559 F.2d at 253 ("[T]here is no presumption that

105

confidential information was exchanged as there was no direct attorney-client relationship."); Stepney, 246 F. Supp. 2d at 1080 ("[Per a joint defense agreement,] no conflict of interest arises unless the attorney actually obtained relevant confidential information."); GTE North, 914 F. Supp. at 1580 ("[T]here must actually have been an exchange of confidential information."). For the Court's in camera review, Arvin and Cooper submitted copies of the two joint defense agreements, one declaration, one affidavit, and five other documents. The joint defense agreements do not themselves demonstrate that an actual exchange of relevant confidential information took place. Of the remaining documents, none illustrate that there was an exchange of confidential information in connection with the prior matter. The first document is Derouin's letter advising the EPA that he no longer represents AdobeAir. The second document is a recent e-mail exchange between Worsham and G&K, in which the parties discuss Derouin's potential conflict and G&K's decision to remove AdobeAir as a defendant in the instant proceedings. The third is a letter written by Worsham, addressed to an attorney at G&K, explaining why Worsham believes there is a conflict. None of these three documents directly relate to Derouin's representation of AdobeAir. Moreover, none of these documents demonstrate that either Arvin or Cooper actually provided relevant confidential information to Derouin while he represented AdobeAir.

106

The two remaining documents are similarly unpersuasive.  One is entitled "Roosevelt Irrigation District Potentially Responsible Party Fact Sheet." This document contains a discussion of RID's strategies for dealing with the contamination in its wells.  At first blush, this seems to be confidential and relevant, however, this document was an attachment to Worsham's letter to G&K and is widely available to the public on a website.  It therefore cannot be considered evidence of confidential information that Derouin learned from either Arvin or Cooper.  The final document, a letter to Worsham from the EPA with a copy of the AOC attached, is also unpersuasive and not probative of an actual exchange of confidential information between Arvin, Cooper, and Derouin.

The Court is then left with Worsham's self-serving affidavit and declaration, submitted in camera, to establish that an actual exchange of confidential information took place.  These documents alone do not suffice to show an exchange of confidential information.  In his in camera affidavit, Worsham asserts nothing that has not already been asserted in the four affidavits attached to Arvin and Cooper's Motion to Disqualify.  For example, Worsham claims that he and Derouin together negotiated the terms and conditions of the AOC with EPA counsel, but this does not in and of itself suggest that Derouin was privy to confidential information about either Arvin or Cooper.  Worsham also states that

107

Derouin, as counsel for AdobeAir, was privy to both technical and legal

confidential information for the joint defense of the South 15th Street Facility and

the AOC, but Worsham does not provide a single example of such confidential

information being exchanged.

Similarly, in his declaration, Worsham is insufficiently specific for the

Court to conclude that there was an actual exchange of confidential information.

Worsham's declaration, in substance, provides that the topics discussed include

activities, facts, and legal issues associated with each party's operation of the South

15th Street Facility, the legal documents and contacts that are applicable between

the parties, legal strategy regarding the decision to enter into the AOC, regular

updates on the EPA's developments and filings, and the sharing of legal

memorandums of counsel related to liability.  The declaration also asserts that the

parties shared legal strategy concerning the submission of documents to the EPA

and that they discussed legal strategy prior to any meetings with the EPA.[39]

Worsham does not, however, elaborate or expand upon any of these assertions and

he provides the Court with no specific examples or documentation to substantiate

_____

[39]Although submitted in camera, there is plainly nothing confidential about
these assertions because they mirror earlier declarations submitted by Arvin and
Cooper to this Court.  (See Furlough Aff. ¶¶ 7–8; Odenweller Aff. ¶¶ 7–8;
Mongrain Aff. ¶ 11.)

these claims.  Without any evidence or documentary support, the Court cannot

accept that an actual exchange of confidential information took place.  The purpose

behind the in camera submission was to give Moving Defendants the opportunity

to substantiate their claims that an actual exchange of relevant confidential

information took place.  Aside from this blurb in Worsham's in camera declaration,

Arvin and Cooper have failed to make any such showing.  Moreover, in its

Controverting Statement of Facts, RID disputed the veracity of similar claims

submitted by Arvin and Cooper.  (Doc. # 115 at 7 ("It is unclear what alleged

confidential information was shared under the joint defense agreements, and

whether that information, if any, remains confidential based on its disclosure to

EPA, ADEQ, and the public as part of the work performed under the AOC.").); cf.

GTE North, 914 F. Supp. at 1580 (concluding that because the parties did not

contest each other's statement of facts, the court could determine whether there

was an exchange of confidential information based on the undisputed facts in the

parties' memorandums).  Arvin and Cooper have therefore failed to carry their

burden in demonstrating that an actual exchange of confidential information took

place.

b.     Screening

Even assuming Derouin had  received relevant confidential

information, G&K timely and appropriately screened him.

As noted, Ethical Rule 1.10(d) only applies when a lawyer becomes

associated with a firm.[40]  See Eberle, 354 F. Supp. 2d at 1095; Ariz. Ethics Op. 04-

04.  According to Ethical Rule 1.10(d)(1), screening is available unless: (1) the

disqualified lawyer either switched sides in the current representation or the current

representation necessarily requires relitigating a particular aspect of a prior

representation; (2) the prior representation was a proceeding before a tribunal; and

(3) the disqualified lawyer played a substantial role in that prior proceeding.  As

discussed, to be considered "substantial" within the meaning of this rule, the

affected lawyer's role in the former client's representation must have been

"material and weighty."  Eberle, 354 F. Supp. 2d at 1097 (citing Ethical Rule

1.0(*l*)).  Whether the lawyer had such a role depends on "the nature and amount of

work he performed, the responsibility he assumed, the degree to which the client

relied on him for managing the case, and similar considerations."  Id. (concluding

that an attorney who billed 9.2 hours to a case over a period of 9 days for drafting

---

[40] As with Honeywell, this threshold requirement is satisfied because it is undisputed that Derouin is a lateral attorney at G&K.

voir dire questions did not play a "substantial" role in the former client's representation).

Here, Arvin and Cooper have once more provided only self-serving declarations and affidavits, which do not demonstrate that Derouin played a substantial role in the prior matter.  For instance, Arvin and Cooper claim that Derouin participated in legal strategy with Worsham and received information from Arcadis concerning the ongoing South 15th Street Facility investigations and testing.  (Furlough Aff. ¶¶ 7–8, 13–14; Odenweller Aff. ¶¶ 8–14; Mongrain Aff. ¶¶ 7–11.)  These assertions no doubt establish that Derouin played some role in the negotiations surrounding the South 15th Street Facility, but they lack sufficient detail for the Court to conclude that Derouin's participation was "material and weighty" as in Eberle.

Moreover, in Eberle, the court based its decision on extensive in camera submissions.  Eberle, 354 F. Supp. 2d at 1094.  As reviewed supra, however, Arvin and Cooper's in camera submissions are devoid of any information concerning the extent of Derouin's participation; there are no billing records or submissions relating to whether Derouin participated in discovery, court preparation, hearings, briefing or argument, or preparation of the AOC submission, all of which were included in Eberle.  Id. at 1097 ("[The attorney in question]

recorded a total of 9.2 hours over a nine-day period drafting proposed voir dire questions.  He took no part in fact discovery, expert witness preparation or discovery, the <u>Markman</u> hearing, summary judgment briefing or argument, or preparation of the proposed pretrial order, motions in limine, or jury instructions. He assumed no client responsibility and, so far as the Court can determine, never communicated with the client or opposing counsel.  His name never appeared on a pleading and he never attended a hearing.").  Without this information, the Court, as above, simply cannot conclude that Derouin played a substantial role in the prior Arvin and Cooper matter.[41]

   Moreover, the record demonstrates that Derouin was timely screened, in accordance with Ethical Rule 1.10(d)(2).  Derouin was informed, prior to joining G&K, that the firm represented RID, and arrangements were made for him to be screened.  (Derouin Decl. II ¶ 11; Kimball Decl. II ¶ 11.)  Kimball attests that

---

[41] Nor can the Court conclude that the proceedings took place before a tribunal as required by the rule.  As explained <u>supra</u>, a "tribunal" includes proceedings before administrative agencies "acting in an adjudicative capacity." ER 1.0(m).  An administrative agency "acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a legal judgment directly affecting a party's interest in a particular matter."  <u>Id.</u>  The AOC was not the product of legal arguments or adjudication.  It was a negotiated settlement to conduct an RI/FS and did not adjudicate Arvin, Cooper, or AdobeAir's liability under CERCLA.  (<u>See</u> Kimball Decl. II Ex. A., AOC  ¶ 84 (stating that the AOC is not an admission of liability).)

Derouin has not received any compensation from the RID matter and that Derouin has not shared with anyone at G&K confidential information regarding AdobeAir, Arvin, or Cooper.  (Kimball Decl. II ¶¶ 10–11.)  Also, Derouin states that he has not received or viewed any communications or files pertaining to RID, aside from communications and files related to his screen and potential future conflicts. (Derouin Decl. II ¶ 8.)  Indeed, at G&K, access to RID workproduct "has been limited to members of the RID Litigation Team and their support staff."  (Kimball Decl. I ¶ 53.)  Electronic screens are in place and "[a]ll written work product and copies of documents and information relating to the [l]itigation are in a locked storage room."  (Id. ¶¶ 53–54.)  Moreover, all files related to the litigation have been appropriately labeled to ensure there is no confusion about the documentation.  (Id. ¶ 55.)  Because these steps were taken prior to Derouin's association with G&K, and because there is no evidence that the screen has in anyway been ineffective, the Court concludes that, assuming Derouin should be disqualified, G&K timely screened him from any participation in the matter.  ER 1.10(d)(2); see also ER 1.0 cmt. 9; Romley, 908 P.2d at 43.

Finally, G&K complied with the terms of Ethical Rule 1.10(d)(3), which provides that written notice must be promptly given "to any affected former client to enable it to ascertain compliance with the provisions of this Rule."  ER

113

1.10(d)(3).  Here, G&K's declaration submitted to the Court makes clear that

notice was provided to counsel for Arvin and Cooper, (see Kimball Decl. II ¶ 19),

and Arvin and Cooper do not contest that this sufficed as notice under Rule

10(d)(3).  Accordingly, this final prong has been satisfied.

In sum, the Court concludes that, even assuming Derouin had a

disqualifying conflict stemming from his representation of AdobeAir, which

participated in a joint defense agreement with Arvin,[42] Derouin was properly

screened as provided by Ethical Rule 1.10(d).[43]  Arvin and Cooper's Motion is

---

[42] One omission from Arvin and Cooper's papers, which this Court need not
reach, is how, precisely, AdobeAir's participation in a joint defense agreement
with Arvin results in Derouin owing Cooper a duty of confidentiality.  It is clear
from the record that AdobeAir and Cooper never entered into a joint defense
agreement.  Accordingly, Derouin never agreed to maintain any confidences on
Cooper's behalf.

[43] Arvin and Cooper rely on All American Semiconductor for the proposition
that "'where an attorney is disqualified from representing a client because that
attorney had previously represented a party with adverse interests in a substantially
related matter, that attorney's entire firm must be disqualified as well, regardless of
efforts to erect an ethical wall.'"  (A&C's Reply (quoting All Am. Semiconductor,
2008 WL 5484552, at *8).)  The All American Semiconductor court, however, was
clearly applying California's ethical rules, which reject ethical walls.  All Am.
Semiconductor, 2008 WL 5484552, at *8.  Here, as discussed, the District of
Arizona has adopted the Arizona Ethical Rules, and the Court must therefore apply
Arizona's Ethical Rule 1.10(d), which permits screening in certain situations.
Accordingly, Arvin and Cooper's reliance on All American Semiconductor is
misplaced.

therefore DENIED.[44]

IV.    RID's Additional Arguments

RID raises several additional arguments in opposition to the Motions to Disqualify.  The Court addresses each in turn.

A.    Allegation that the Former Matters Do Not Relate to RID or its Wells

RID asserts generally that "none of the matters in which the Defendants have been involved, or currently are involved, involve RID or its wells."  (RID's Consolidated Opp'n at 25–26.)  This assertion is belied by the record.  The in camera documentation submitted by Honeywell, Univar, SRP, and Dolphin all include confidential strategic discussions about RID and its wells.

RID also asserts that the earlier matters "address different claims for different liabilities between different parties . . . in different geographic areas."  (RID's Consolidated Opp'n at 25.)  This also is not persuasive.  First, the geographic argument creates a false dichotomy.  As RID makes clear in its closing argument brief:

> Unfortunately, RID's plight is not unique.  The releases of hazardous substances from facilities owned and/or operated by Defendants and other PRPs over the years have contaminated the soils and the

---

[44] Because the Court here concludes that Arvin and Cooper have not prevailed on their motion, the Court will no longer include Arvin and Cooper in its definition of Moving Defendants.

groundwater beneath a more than fifteen mile long stretch of the
Phoenix area that is several miles wide.  This groundwater plume is a
literal "toxic soup" of contamination, consisting primarily of the
aforementioned [volatile organic compounds], the exposure to which,
according to the [EPA], can in certain circumstances result in damage
to the nervous system, reproductive system, respiratory system, liver,
and kidneys, and result in cancer.  For over twenty years, [the] EPA
and [ADEQ] have engaged Defendants and other PRPs in separate
legal matters in an attempt to investigate and address distinct
geographical portions of this groundwater plume.

(RID's Closing Arg. Br. at 1–2 (footnote omitted).)  Thus, RID in its own briefing

admits the commonality of the toxic plume across a "fifteen mile long stretch of

the Phoenix area that is several miles wide."  (Id.)  Asking the Court to draw

distinctions with respect to geographic subdivisions within the plume is a

nonstarter.[45]

RID argues that the instant matter is distinct from the former matters

because they did not involve RID's wells.  This is not persuasive.  As a preliminary

matter, the WVB Group explicitly discussed potential liability relating to RID's

wells.  In any event, to establish liability, RID will have to demonstrate, in part,

contribution to the contamination of RID's wells based on the location of the

contamination found on Moving Defendants' properties, which was explicitly at

---

[45] Even if the Court were to acknowledge that differences among the
geographic subdivisions of the toxic plume could create distinct legal issues to be
litigated, the exact same subdivisions at issue in all of the prior matters are again at
issue in this matter.

116

issue in the prior matters.  RID's argument that these matters are not substantially related because the former matters did not involve potential liability relating to RID's wells is therefore unpersuasive.

To the extent RID argues that the difference in time between the prior matters and its instant lawsuit renders the confidential information obsolete, the Court remains unpersuaded.  (See RID's Closing Argument Br. at 9.)  Although the comments to the ethical rules provide that "[i]nformation acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related," here, the information remains relevant.  See ER 1.9 cmt. 3.  As discussed, the in camera documentation submitted by Moving Defendants relates to potential liability stemming from each Moving Defendant's respective properties.  Moving Defendants discussed potential strategy for avoiding this liability with current G&K attorneys, both in the context of joint defense agreements and former representation.  RID now seeks to establish liability once more based on contamination at Moving Defendants' respective properties.  The confidential information acquired by G&K's various attorneys can only be considered relevant, irrespective of the time that has lapsed.

Moreover, this is not an instance where parties polluted in the Phoenix area, cleaned, and then another spill took place at the same location. The prior matters do not involve separate instances of polluting. Instead, RID seeks recovery costs from Moving Defendants associated with the same pollutants related to the prior representations. Corning, for instance, continues to interview employees to determine how, where, and when materials were disposed. Simply stated, this litigation involves recovery costs for migration of polluted groundwater—the same contamination that gave rise to the prior representations. The former and present litigations are substantially related and involve necessarily relitigating the same matters.

B.    <u>CERCLA Liability with Public Information</u>

RID also contends that establishing Moving Defendants' liability will only involve the use of public information and therefore any confidential information will not materially advance RID's position as required by Ethical Rule 1.9 and the joint defense agreement test outlined <u>supra</u>. (RID's Consolidated Opp'n at 23–25.) RID contends:

> RID can easily establish . . . CERCLA liability for Defendants using public and non-privileged information. . . . Facts supporting [whether there has been a release of hazardous substances] for each of the Defendants are readily obtainable from EPA or ADEQ, among other non-privileged and/or public sources of information.

118

(Id. at 25.)

RID has oversimplified the showing it will have to make with respect to CERCLA liability. As RID suggests, to prevail in a CERCLA cost recovery action, a plaintiff must prove:

> (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term; (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendant is within one of the four classes of persons subject to the liability provisions of Section 107(a).

Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 870–71 (9th Cir. 2001) (quoting 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990)) (internal citations and quotation marks omitted). It is not yet clear to the Court, however, that Moving Defendants' liability under CERCLA is a "foregone conclusion." (See RID's Consolidated Opp'n at 42 n.3.) Nor is it apparent that RID will be able to establish liability from the public record alone.

In any event, RID's argument misses the larger picture. G&K attorneys, as outlined above, have knowledge relating to Moving Defendants' potential liability. In other words, G&K attorneys, in effect, already know to what extent and for what amount Moving Defendants believe themselves to be liable, if

119

at all.  The advantages associated with that knowledge are nearly countless.  From

directed discovery to strong-armed negotiations, G&K has the opportunity to use

this information in a materially advantageous way.  Moreover, G&K also has

knowledge of Moving Defendants strategies for arguing against liabilities.  This

information places RID "one step ahead" of Moving Defendants when it comes to

negotiating, trial strategy, and apportionment of liability.  In sum, RID's contention

that it may be possible to establish liability with nonconfidential information

simply does not preclude the Court from finding that the confidential information

G&K has is materially advantageous to RID's position in the litigation.[46]

 C. <u>Waiver by Delay</u>

  Finally, RID contends that disqualification can be waived when it is

sought after months or years of representation in a complicated litigation.  RID

argues that Moving Defendants first became aware of G&K's representation in

August 2009, but despite this knowledge, Moving Defendants "engaged in

communications with G&K on behalf of RID, participated in public meetings

before ADEQ with G&K representing RID, and provided comments on

---

 [46] Indeed, the instant case is remarkably close to <u>GTE North</u> where the
district court found that there was an exchange of confidential information relevant
for purposes of a motion to disqualify counsel in a CERCLA cost recovery action.
<u>See</u> <u>GTE North</u>, 914 F. Supp. at 1580–81.

submissions to ADEQ by G&K on behalf of RID from September 2009 to Spring 2010." (RID's Consolidated Opp'n at 43.) RID contends that, as a result, any allegation of a conflict has been waived. (Id. at 44.) The Court is not persuaded.

RID did not file suit in this matter until February 2010. (See Doc. # 1.) Even then, RID did not serve its original complaint, but rather sought an extension of time for service in May 2010. (Doc. # 8.) RID then filed a First Amended Complaint in July 2010 and served it on Moving Defendants in July and August 2010. (See Docs. ## 20, 28, 32, 53, 62, 79.) Six weeks later, on September 15, 2010, Moving Defendants filed the Motions to Disqualify. (See Docs. ## 120, 129, 131, 132, 133.) Even before then, Moving Defendants corresponded with G&K in an attempt to resolve the alleged conflicts of interest. (See Michael Kennedy Decl. Exs. A–M.) RID cannot claim to have suffered any prejudice by Moving Defendants' failure to raise the conflict earlier, particularly because this litigation is still only in the pleading stage. Indeed, it is hard to conceive of how, exactly, Moving Defendants could have raised their concerns with this Court any earlier. Accordingly, the Court cannot conclude that there has been waiver by delay. See, e.g., Iacono, 722 F.2d at 442–43 (concluding that "the district court did not err in finding six weeks a reasonable time in which to seek a disqualification order").

121

V.     Appropriate Remedy

        RID asserts that, even if there is a technical violation of the ethical

rules, the Court must engage in a balancing test to determine whether

disqualification is appropriate.  (RID's Consolidated Opp'n at 41–43.)  The Court

will assume without deciding that applying a balancing test is appropriate and

preferable to automatic disqualification for violation of the ethical rules.  See

Research Corp., 936 F. Supp. at 703 (examining cases and determining that

automatic disqualification for an ethical violation is not preferable).  Courts have

considered the following factors in such an analysis: (1) the nature of the ethical

violation; (2) the prejudice to the parties, including the extent of actual or potential

delay in the proceedings; (3) the effectiveness of counsel in light of the violations;

(4) the public's perception of the profession; and (5) whether a motion to

disqualify has been used as a tactical device or a means of harassment.[47]  Id.; see

_____

        [47] The Arizona Supreme Court identified the following four factors for a
court to consider when ruling on a motion to disqualify counsel: "(1) whether the
motion is being made for the purposes of harassing the defendant, (2) whether the
party bringing the motion will be damaged in some way if the motion is not
granted, (3) whether there are any alternative solutions, or is the proposed solution
the least damaging possible under the circumstances, and (4) whether the
possibility of public suspicion will outweigh any benefits that might accrue due to
continued representation."  Alexander, 685 P.2d at 1317.  Although this test
expressly applied only to motions to disqualify counsel based on an appearance of
impropriety, the Arizona Supreme Court subsequently expanded the application of
                                                          (continued...)

also Richards, 2009 WL 3740725, at *6 (stating that the district court should balance the following factors: "(1) the client's interest in being represented by counsel of its choice; (2) the opposing party's interest in a trial free from prejudice due to disclosures of confidential information; and (3) the public's interest in scrupulous administration of justice").

The first factor, the nature of the ethical violation, plainly supports disqualification.  RID and Moving Defendants are adverse parties.  G&K as a firm owes a duty of confidence to each of the moving defendants on precisely the question at issue in the instant litigation.  Moving Defendants have not waived any conflict, and G&K's screen, for the reasons discussed supra, does not prevent imputation of those conflicts to the entire firm.  There are no alternatives to G&K's disqualification.  Because the ethical violations at issue relate to, and could potentially have an impact on, the instant proceedings, the first factor favors disqualification.

---

[47](...continued)
these so-called Alexander factors to cover challenges to opposing counsel on other grounds, such as a conflict of interest.  See Gomez, 717 P.2d at 905; see also Turbin v. Superior Court, 797 P.2d 734, 738 (Ariz. Ct. App. 1990) (discussing the evolution of the Alexander test); Sellers, 742 P.2d at 301 (noting that the first three considerations in Alexander applied to discussion of disqualification based on other ethical rules).  The Court addresses these factors in its analysis of the five factors identified by Research Corp.

The second factor, prejudice to the parties, also favors

disqualification.  RID asserts that it will suffer prejudice if G&K is disqualified

because it has worked with G&K since October 2008 investigating the releases,

sources, and extent of contamination of RID's wells.  (RID's Closing Arg. Br. at

30.)  RID objects that by forcing it to find new counsel it will have to "begin

anew."  (Id. at 31.)  RID does not, however, explain how the investigative work

done by G&K to date would be undone.  Moreover, there are dozens of defendants

in this action, and G&K will only be disqualified from representing RID against

five of them.  RID also complains that it will "continue to lose revenues from its

users," "its cost recovery action will probably be set back," and its "ability to

develop legal solutions will be impaired."  (Id.)  Although resolution of this lawsuit

could be further delayed by forcing RID to obtain new counsel, any such prejudice

resulting from this delay pales in comparison to the prejudice that Moving

Defendants would suffer were the Court to allow G&K to proceed as counsel for

RID.  As discussed, the in camera materials make plain that G&K attorneys have

knowledge of Moving Defendants' potential theories of liability and trial

strategies.  G&K's attempts at screening are ineffective in light of Arizona's ethical

rules.  Knowledge of this confidential information gives G&K an unfair advantage

in this litigation. This prejudice outweighs any prejudice that RID would suffer from delay in obtaining new counsel.

The third factor, the effectiveness of counsel in light of the violation, also weighs in favor of disqualification. G&K will be unable to effectively represent RID while also maintaining its confidences to the prevailing Moving Defendants. G&K is therefore in an impossible position; it must chose between divulging Moving Defendants' confidential information and effectively representing RID. This scenario requires G&K's disqualification. See Henke, 222 F.3d at 637–38.

The fourth factor, the public's perception of the profession, also weighs in favor of disqualification. G&K has confidential information relating to Moving Defendants that is substantive and materially relevant, and G&K has a duty to maintain these confidences. The public's expectation is that attorneys and law firms will not divulge confidential information once obtained from former clients. The public's faith in the judicial process could be seriously undermined if G&K were allowed to represent RID against Honeywell, Corning, Univar, SRP, and Dolphin.

The final factor, whether the motions to disqualify have been used as a tactical device or a means of harassment, does not weigh against disqualification.

125

Moving Defendants filed their motions roughly one month after RID filed its complaint, and they also have a legitimate concern—they revealed to current G&K attorneys confidential information regarding the extent of their potential liability and strategies for dealing with that liability.  There is a very real risk that the confidential information at issue could be used against Moving Defendants in the instant proceedings.

In sum, "[d]isqualification does not depend upon proof of the abuse of confidential information.  Because of the sensitivity of client confidence and the profession's institutional need to avoid even the appearance of a breach of confidence, disqualification is required when lawyers change sides in factually related cases."  Trone, 621 F.2d at 1001.  After examining all the relevant factors, the Court finds that disqualification is warranted.  Accordingly, the Court GRANTS Honeywell's Motion to Disqualify, GRANTS Corning's Motion to Disqualify, GRANTS Univar's Motion to Disqualify; GRANTS SRP's Motion to Disqualify, and GRANTS Dolphin's Motion to Disqualify.  The Court further ORDERS that no confidential information of any kind regarding Honeywell, Corning, Univar, SRP, and Dolphin, as discussed in this Order, shall be shared between new counsel for RID and G&K.

126

CONCLUSION

For the reasons stated above, the Court GRANTS Honeywell's Motion to Disqualify (Doc. # 120); GRANTS Corning's Motion to Disqualify (Doc. # 129); GRANTS Univar's Motion to Disqualify (Doc. # 131); GRANTS SRP's Motion to Disqualify (Doc. # 132); GRANTS Dolphin's Motion to Disqualify (Doc. # 133); and DENIES Arvin and Cooper's Motion to Disqualify (Doc. # 423).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 26, 2011.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE


Roosevelt Irrigation District v. Salt River Project Agricultural Improvement and Power District et al., Cv. No. 10-00290 DAE-MHB; ORDER: (1) GRANTING HONEYWELL'S MOTION TO DISQUALIFY; (2) GRANTING CORNING'S MOTION TO DISQUALIFY; (3) GRANTING UNIVAR'S MOTION TO DISQUALIFY; (4) GRANTING SRP'S MOTION TO DISQUALIFY; (5) GRANTING DOLPHIN'S MOTION TO DISQUALIFY; (6) DENYING ARVIN AND COOPER'S MOTION TO DISQUALIFY