1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

   **Roosevelt Irrigation District,**
5  **a political subdivision of**      )
   **the State of Arizona,**           )
6                                      )    No. **CV 10-0290-DAE (BGM)**
                 Plaintiff,            )
7                                      )
            vs.                        )    Phoenix, Arizona
8                                      )    March 3, 2016
   **Salt River Project**             )    1:39 p.m.
9  **Agricultural Improvement and**   )
   **Power District, et al.,**        )
10                                     )
                 Defendants.           )
   _____)
11

12

13   **BEFORE:   THE HONORABLE BRUCE G. MACDONALD, MAGISTRATE JUDGE**

14                **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15                    **(*Motion Hearing*)**

16

17

18

19

20
   Official Court Reporter:
21 Laurie A. Adams, RMR, CRR
   Sandra Day O'Connor U.S. Courthouse, Suite 312
22 401 West Washington Street, Spc 43
   Phoenix, Arizona 85003-2151
23 (602) 322-7256

24 Proceedings Reported by Stenographic Court Reporter
   Transcript Prepared by Computer-Aided Transcription
25

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3            BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
              By:  Jerry C. Bonnett, Esq.
 4            By:  Kendall K. Wilson, Esq.
              2325 E. Camelback Road, Suite 300
 5            Phoenix, Arizona 85016

 6    For the Defendant Salt River Project (Telephonically):
              BALLARD SPAHR LLP - Phoenix
 7            By:  David J. Armstrong, Esq.
              By:  Craig C. Hoffman, Esq.
 8            1 E. Washington Street, Suite 2300
              Phoenix, AZ 85001-0400
 9
      For the Defendant Honeywell International (Telephonically):
10            ARNOLD & PORTER LLP
              By:  Eric Mason, Esq.
11            777 S. Figueroa Street, Suite 4400
              Los Angeles, CA 90017
12
      For the Defendant City of Phoenix:
13            PHOENIX CITY ATTORNEY'S OFFICE
              CIVIL DIVISION
14            By:  Stephen Wetherell, Esq.
              200 W. Washington Street, Suite 1300
15            Phoenix, AZ 85003

16            SQUIRE PATTON BOGGS
              By:  Christopher D. Thomas, Esq.
17            1 E. Washington Street, Suite 2700
              Phoenix, AZ 85004
18
      For the Defendant Univar USA (Telephonically):
19            VERIS LAW GROUP PLLC
              By:  Gregory T. Hixson, Esq.
20            1809 7th Avenue, Suite 1400
              Seattle, WA 98101
21
      For the Defendant Kinder Morgan:
22            FENNEMORE CRAIG PC - Phoenix, AZ
              By:  Scott Ames, Esq.
23            2394 E. Camelback Road
              Suite 600
24            Phoenix, AZ 85016

25
```

```
 1    APPEARANCES (Cont'd):
 2
 3    For the Defendant Chevron (Telephonically):
              PILLSBURY WINTHROP SHAW PITTMAN LLP
 4            By:  Amy E. Gaylord, Esq.
              50 Fremont Street
 5            San Francisco, CA 94105

 6    For the Defendant Dolphin, Inc.:

 7            POLSINELLI PC - Phoenix, AZ
              By:  Jonathan Brinson, Esq.
 8            By:  Troy Froderman, Esq.
              1 E. Washington Street
 9            Suite 1200
              Phoenix, AZ 85004
10
      For the Defendant Arizona Public Service, Dolphin, ITT:
11            SNELL & WILMER LLP - Phoenix, AZ
              By:  Mitchell J. Klein, Esq.
12            1 Arizona Center
              400 E. Van Buren
13            Phoenix, AZ 85004

14    For the Defendant Maricopa County:

15            MARICOPA COUNTY ATTORNEY'S OFFICE
              By:  Kenneth Mangum, Esq.
16            222 N. Central Avenue, Suite 1100
              Phoenix, AZ 85004
17
      For the Defendant Corning:
18            PERKINS COIE LLP - Phoenix, AZ
              By:  P. Derek Petersen, Esq.
19            P.O. Box 400
              Phoenix, AZ 85001-0400
20
      For the Defendant Meritor, Inc.
21            CAVANAGH LAW FIRM PA
              By:  Jerry D. Worsham, II, Esq.
22            1850 N. Central Avenue, Suite 2400
              Phoenix, AZ 85004
23

24

25
```

APPEARANCES (Con'td):

For the Defendant Air Liquide and others:

       SALMON LEWIS & WELDON PLC
       By:  **G. Van Welsor Wolf, Jr., Esq.**
       2850 E. Camelback Road
       Suite 200
       Phoenix, AZ 85016

For the Defendant Union Pacific Railroad:
       PEARSON LAW GROUP LLC
       By:  **William W. Pearson, Esq.**
       1221 E. Osborn Road
       Suite 101
       Phoenix, AZ 85014

For the United States Department of Energy (Telephonically):
       US DEPARTMENT OF JUSTICE
       By:  **Samara M. Spence, Esq.**
       601 D. Street NW
       Washington, DC 20011

For the Defendant Freescale Semiconductor (Telephonically):
       SHOOK HARDY & BACON LLP - Miami, FL
       By:  **Sergio E. Pagliery, Esq.**
       2400 Miami Center
       201 S. Biscayne Blvd.
       Miami, FL 33131

For the Defendant Prudential Overall Supply:
       LEWIS ROCA ROTHGERBER LLP - Phoenix, AZ
       By:  **Stanley B. Lutz, Esq.**
       201 E. Washington Street
       Suite 1200
       Phoenix, AZ 85004

For the Defendant Alcoa, Inc. (Telephonically):
       K&L GATES LLP - San Francisco, CA
       By:  **Matthew G. Ball, Esq.**
       4 Embarcadero Center, 12th Floor
       San Francisco, CA 94111

For the Defendant Textron, Inc. (Telephonically):
       BOOTH LLP
       By:  **Joshua N. Levine, Esq.**
       1849 Sawtelle Blvd., Suite 500
       Los Angeles, CA 90025

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  Civil Case 10-290, Roosevelt

3    Irrigation District versus Salt River Project Agricultural

4    Improvement and Power District and others.  This is the time

5    set for a discovery hearing.                                    13:39:33

6          THE COURT:  Thank you, Lisa.

7          And good afternoon to counsel.  Let me remind you, I

8    know you have all been through the drill and you have all done

9    a great job before.  Let me just remind you, when you come to

10   the podium to speak, or when you are on the phone speaking,     13:39:47

11   make sure that you identify yourself for Laurie, our court

12   reporter.

13         And Mr. Bonnett, it is your motion for protective

14   order, so please.

15         MR. BONNETT:  Thank you, Your Honor.                      13:40:03

16         THE COURT:  And I'm sorry, Mr. Bonnett.

17         For the record, I should have noted for the record

18   that all of the individuals in the courtroom and on the

19   telephone have previously checked in.  So thank you, Mr.

20   Bonnett.                                                        13:40:15

21         MR. BONNETT:  Yes.  Judge, we gave you a series of

22   documents up there that I'm going to be referring to in my

23   argument.  And we will also have a copy for Mr. Thomas.

24         We're here on a motion pursuant to Rule 30(d)(3)(A)

25   which provides that at any time during a deposition the        13:40:38

deponent or a party be moved to terminate or limited on the

ground that it is being conducted in bad faith or in a manner

that unreasonably annoys, embarrasses, or oppresses a deponent

or party.

          Your Honor recently ruled in the -- when you quashed

the subpoena to Montgomery & Associates in Document 1163 at

Pages 4 through 6, that discovery Rule 26(b)(1) allows for

broad discovery but not unlimited discovery; that it doesn't

permit -- that district courts will not permit or condone

discovery to engage in fishing expeditions.  The Court has

inherent power to control discovery as it deems necessary, and

that whenever a burden whatsoever imposed upon a party would

be, by definition -- excuse me.  Whenever the discovery is not

relevant then the burden whatsoever imposed upon a non-party

would be by definition undue, which is another word for

oppressive.

          On the December 1, 2015 amendments to the Federal

Rules of Civil Procedure, intended to curtail abuse of

discovery demands and to encourage the courts to take more

control over the discovery process which had become -- which

had been much criticized among the bench and bar.  One of the

comments to that rule says, and I quote, The objective is to

guard against redundant or disproportionate discovery by giving

the Court the authority to reduce the amount of discovery that

may be directed to matters that would otherwise be proper

1    subjects of inquiry."

2           The new sentence, it goes on to say, is intended to

3    encourage judges to be more aggressive in identifying and

4    discouraging discovery over use.  Chief Justice Roberts also

5    said in his year-end report, as you know, that specifically,          13:42:53

6    the pretrial process must provide parties with efficient access

7    to what is needed to prove a claim or defense but eliminate

8    unnecessary or wasteful discovery.  The key is careful and

9    realistic assessment of actual need.

10          On Page 3 of their response, defendants cite the           13:43:16

11   *Oppenheimer Funds* case for the proposition -- it's a 1978

12   Supreme Court case, Your Honor -- for the proposition that

13   relevance for purposes of discovery is to be broadly construed.

14   But in a recent article that you may be aware of in the federal

15   courts law journal, the authors, one of whom is a distinguished   13:43:39

16   United States magistrate judge for the District of Northern

17   California, they say at Page 65 of that article, "The revised

18   rules and accompanying comments from the advisory committee

19   make clear that the scope of discovery is not, and for years

20   has not been, intended to be defined by the phrase, quote,        13:44:07

21   'reasonably calculated to lead to admissible -- discovery of

22   admissible evidence' unquote.  Thus, reliance on older cases to

23   frame the scope of discovery is suspect even today.  In

24   practice, this means no longer citing to *Oppenheimer Funds* and

25   the many other cases that follow its discussion regarding the     13:44:30

1    scope of allowed discovery under the civil rules."

2         So we need to focus on what are the issues that will

3    be tried in this case and what is this discovery, how is this

4    discovery relevant to that.  Judge Ezra has already adopted, in

5    his opinion in this case at 39 Fed Supp. 3d 1059, he said the          13:44:53

6    following:  "CERCLA imposes strict liability on owners and

7    operators of facilities at which hazardous substances are

8    disposed.  In order to recover their response costs, RID must

9    establish that one, the VOC contaminants are hazardous

10   substances; two, there's been a release of VOC contaminants at         13:45:22

11   defendants' respective facilities; three, the release or

12   threatened release caused RID to incur necessary response costs

13   consistent with the national contingency plan; and four, the

14   defendants are within one of four classes of persons subject to

15   CERCLA's liability provisions."                                        13:45:45

16        CERCLA is a strict liability statute limited -- and

17   there are only a limited number of defenses, statutory defined

18   defenses.  One is an act of God; the other is an act of war;

19   and the third is a so-called third party defense.  And none of

20   those apply in this case.                                              13:46:08

21        The elements of defendants' counterclaim under CERCLA

22   Section 113(f)(1) are, and this is from the statute as well as

23   case law, any person may seek contribution from any other

24   person who is liable under Section 9701(a) of this title, in

25   resolving contribution claims courts may allocate response             13:46:30

1    costs among the liable parties, using such equitable factors as

2    the Court determines are appropriate.

3        So, of course, the first element of that is that they

4    must prove that RID is a liable party.  And this is the *HLP*

5    *Properties* case cited by them.  Says there are two elements to          13:46:54

6    a contribution claim:  One, the defendant must be liable; and

7    two, proof of equitable factors fairly to allocate -- to allow

8    the court fairly to allocate response costs.  The proof that

9    RID is a liable party requires a showing that hazardous

10   substances were affirmatively introduced into the environment.          13:47:19

11   That's the *Carson Harbor* case where the Ninth Circuit said that

12   at 270 F.3d at Page 869.

13       ADEQ has not identified RID as a PRP, despite more

14   than 20 years of studying the West Van Buren area site and

15   identifying the probable sources of contamination.  It issued          13:47:44

16   its draft RI report, that's remedial investigation report, in

17   2008 and took another four years to finalize the RI report.

18       According to ADEQ regulations, the purpose of an IR

19   report is, quote, "To establish the nature and extent of

20   contamination and the sources thereof," unquote.          13:48:07

21       The subjects that RID asks the Court to preclude

22   because they are not relevant, not discoverable given the

23   proportionality test set out in our motion, basically concern

24   RID's plans to sell remediated water to municipalities in the

25   West Van Buren area, including solicitation of investors for          13:48:33

1    that plan, or that project, its applications for WQARF funds to

2    reimburse it for costs incurred, and attempts to invade the

3    attorney/client privilege or work product doctrine.

4        RID's position is that given the new proportionality

5    discovery requirements, none of these subjects is discoverable,    13:48:56

6    and here's why.  The costs and timing of RID's construction of

7    a pipeline to deliver remediated water are irrelevant.  The

8    costs are not recoverable as response costs and will not be a

9    part of RID's claim.  And the timing of the pipeline is

10   likewise irrelevant to whether RID's response costs are    13:49:14

11   necessary under CERCLA.

12       Defendants are misusing the discovery process in this

13   case to disrupt RID's efforts both with the ADEQ to reimburse

14   RID's response costs, and with potential investors to fund the

15   sale of drinking water project because they want to keep RID    13:49:36

16   out of the Phoenix drinking water market, which two of them

17   dominate.  And they see the sale of drinking water as a means

18   of funding remediation costs as well, which it is.  They think

19   that if they can prevent the remediation, these costs will

20   never be incurred and they will not have to pay them.    13:49:56

21       They contend that selling of the information about

22   RID's plans to sell drinking water are relevant to whether

23   RID's response costs are necessary.  But RID's motive for the

24   remediation, even if it is to become a drinking water provider,

25   is completely irrelevant to the question of whether its    13:50:23

1    response costs are necessary.

2           And that question was addressed by the Ninth Circuit

3    in *Carson Harbor*.  And the court there said at Page 872, quote,

4    "In determining whether response costs are necessary, we focus

5    not on whether the party has a business or other motive in          13:50:47

6    cleaning up the property, but on whether there is a threat to

7    human health or the environment and whether the response action

8    is addressed to that threat.  It is unrealistic to believe that

9    cleanup is necessarily motivated by eleemosynary factors.

10   Although a private plaintiff will almost always have a business    13:51:08

11   or other financial motive for cleaning up a site, such

12   subjective intent is simply not part of the calculus.  Even

13   self-serving economic reasons are irrelevant.

14          The district court opinion that was reversed by *Carson*

15   *Harbor* relied on *GJ Leasing*, the Seventh Circuit case quoted at  13:51:31

16   length at Pages 6 and 7 of the defendant's response for the

17   proposition that plaintiff's profit motive could be considered

18   in CERCLA Section 107 cases.

19          And that's *Carson Harbor Village versus Unocal* at 990

20   F Supp. 1188.  I think we handed you a copy of *Santa Clara*         13:52:03

21   *Water District versus Olin Corporation*, 655 Fed Supp. 2d 1048.

22   And that court recognized that Carson Harbor reversed the

23   district court because it had improperly followed the ulterior

24   motive theory.  The key inquiries as to whether response costs

25   are necessary is whether there is a, quote, "threat to human       13:52:38

 1    health or the environment and whether the response cost is

 2    addressed to that threat."

 3              In the -- on the remand from the Ninth Circuit, *Carson*

 4    *Harbor* back to the district court, the Court distinguished

 5    between removal actions and remedial actions, which this is, by    13:53:03

 6    the lack of any, quote, immediate threat to public health or

 7    environment in remedial actions.  Immediate threat is not

 8    required.

 9              Also, I think we gave you a Washington State

10    Department of Transportation versus Washington National Gas    13:53:24

11    Co., a Ninth Circuit case, 59 F. 3d 793 at 806, where there is

12    the quote, "remedial actions under the NCP do not require a

13    showing of immediate risk."

14              CERCLA does not provide for an unclean hands defense,

15    and therefore, motives of the party attempting to recoup    13:53:53

16    response costs are irrelevant.  RID's public health exposure

17    assessment, Exhibit 6 to defendants' response, does not say

18    there is no risk to human health or environment.  It says, and

19    I quote, "The results of this assessment suggest that there is

20    not an imminent or acute risk to the public from contamination    13:54:15

21    being released from the RID water system."

22              I very much doubt that the local minority population

23    in the West Van Buren area would willingly accept the risk of

24    prolonged or chronic exposure to these highly toxic

25    carcinogens.  Defendants' argument completely ignores a threat    13:54:40

1    to the environment which is an equally adequate reason to

2    support the necessity. A.R.S. Section 49-224(b) says, "All

3    aquifers in this state shall be classified for drinking water

4    protected use." So when RID may actually sell remediated water

5    for drinking water uses is completely irrelevant to this issue   13:55:09

6    of necessity.

7          The defendant's argument that it makes no sense to

8    treat contaminated water from RID's wells to drinking water

9    standards and then convey it to the, quote, "scenic headwaters

10   of the RID main canal," unquote, where it is mixed with treated   13:55:27

11   effluent from the City of Phoenix sewer plant ignores past

12   practices in Phoenix Superfund sites. There are at least six

13   Superfund sites in the Phoenix area in which the EPA and ADEQ

14   have approved just this practice. They are the Phoenix

15   Goodyear Airport -- well, they are listed on another document   13:55:52

16   that we have provided to you, a letter to ADEQ from Synergy

17   dated September 4, 2015, at Page 10. And I can recite them if

18   you want to hear them. But there are six of them.

19         THE COURT: I see them.

20         MR. BONNETT: Defendants contend that RID's potential   13:56:19

21   profits from the sale of remediated water are relevant to their

22   counterclaims for contribution also. The Section 113(f)

23   counterclaims are based on allegations that RID introduced

24   hazardous substances into its wells, on the ground surface

25   adjacent to its wells, into its irrigation canals in performing   13:56:40

maintenance activities.  These allegations were made on

information and belief.  There's not one shred of evidence,

however, that this -- to this effect.  Indeed, RID is the

victim of defendants' pollution, not the perpetrator.  In

December 2010 at the behest of a group called the Phoenix

Design Build, ADEQ conducted a surprise inspection of RID's

wells for just such releases.  The report that ADEQ issued on

December 22 of 2010 concluded that RID's wells, quote, "were

found to be in compliance with ADEQ's solid waste regulations

at the time of the inspection.  No ADEQ action will result from

this inspection."  And we have provided you a copy of that

report.

And even if there were some evidence to support the

counterclaims, the Court has discretion to postpone discovery

on matters that will only become relevant once the defendants

prove RID is, in fact, liable and a proper subject of the

contribution counterclaim.  That's based on 8A, Wright &

Miller, Section 2040, where they say when one issue may be

determinative, the Court may -- the Court has discretion to

stay discovery on other issues until the critical issue has

been determined.  This discovery is not being conducted for use

in this civil action but for use in ADEQ proceedings and to

discourage potential investors from financing the sale of the

drinking water project.  And according to Wright & Miller the

same section, quote, "The courts are alert to preventing

1  discovery in federal civil actions from being employed merely

2  as a device to obtain evidence for use in some other proceeding

3  in which discovery is less extensive."

4      The defendants contend that the profits from the sale

5  of remediated water are relevant to the equitable apportionment    13:58:58

6  of liability under their contribution counterclaim because RID

7  will have benefitted from the remediation of the groundwater

8  these defendants polluted.  That simply is not true in this

9  circuit.  You can see *Pentair Thermal Management, LLC, versus*

10 *Rowe Industries*, a copy of which you have also been provided,    13:59:23

11 where -- and that was a contribution action.  And the Court

12 there said based on *Carson Harbor* that, quote, "as long as

13 there was a threat to human health and safety in plaintiff's

14 motive for cleaning up their property, a plaintiff's motive for

15 cleaning up their property is irrelevant."  The Court therefore   13:59:44

16 rejects this basis for contribution.

17      All the cases defendants cite are distinguishable from

18 this one.  For example, the *HLP Properties* case, the plaintiffs

19 purchased a known contaminated site for 3.9 million, cleaned it

20 up, and sold it for 870 million.  In the *Farmland Industries*    14:00:04

21 case, the value of plaintiff's property, which they knew was

22 contaminated when they purchased it, it was adjacent to a

23 Superfund site, was cleaned up and its value went from zero

24 dollars to $630,000.  In the *BCW Associates* case, plaintiff's

25 contaminated warehouse increased in value from 3 million when    14:00:27

1   it was purchased to more than 15 million after the cleanup.  As

2   the Court observed, quote, "BCW purchased a dusty warehouse

3   from Occidental at a discounted price and now has a clean,

4   valuable, industrial property.  And that's at Page 11 of that

5   opinion.                                                    14:00:50

6          In contrast, RID will not benefit from the remediation

7   of its wells.  RID acquired its wells in the early 1920s from

8   SRP.  RID did not acquire wells at a discount in view of their

9   contaminated state.  The wells were not then known to be

10  contaminated nor, so as far as we know, were they.  Rather, the  14:01:16

11  contamination caused by defendants damaged RID's ability to

12  sell its water for municipal use within its district.  RID's

13  wells would have been developed into drinking water supply

14  wells but for the contamination caused by these defendants.

15  RID's efforts to remediate the groundwater merely restores this  14:01:36

16  water to its former condition.  There is no betterment as a

17  result of this cleanup.

18         The representations made by RID to ADEQ in connection

19  with RID's applications for WQARF money to reimburse its

20  response costs are completely irrelevant as well.  Only the   14:01:57

21  amount of the reimbursement is relevant.  A.R.S. 49-282(E)(11)

22  only requires that funds be used to reimburse, not that the

23  funds reimbursed to RID would be used for any purpose.  In

24  fact, they were all used for remediation costs.

25         Defendants have admitted that RID did incur costs of   14:02:23

UNITED STATES DISTRICT COURT

at least 1.26 million which far exceeds the total WQARF funds

RID received of about 625 million -- 625,000. See Footnote 10

on Page 9 of our motion. CERCLA may well preclude recovery of

damages, but this only relates to the amount reimbursed, which

is clearly less than the defendants have admitted RID incurred

in its remediation efforts.

        Defendants also argue that RID does not address the

defendants' need to reconcile incomplete and inconsistent

record of which particular costs were paid by ADEQ. They claim

they are entitled to discovery to determine which costs were

reimbursed and which were not and why. They don't explain why

that's important or relevant, it's just lawyer say-so and it

makes no sense. As Abraham Lincoln said to an Illinois jury,

if you call a dog's tail a leg, how many legs will it have?

And then he answered it, only four. Calling a tail a leg

doesn't make it one.

        Potential witness's financial interest in litigation

could be relevant to their credibility. Evidence of their

financial interest in RID's sale of drinking water project is

not the same as an interest in this litigation. Defendants

have conflated these two concepts. The sale of drinking water

project is a means of financing the remediation not relevant to

any issue in this CERCLA case such as actions taken by RID to

remediate the contaminated groundwater and the costs incurred

in doing so. Necessity, as we have said, is a response cost,

1    depends on whether they were incurred to address some threat,

2    not an immediate threat, to human health or the environment.

3    Consistency with the NCP depends on whether the proper

4    procedures were followed.

5           In short, the fact that witnesses may have a financial    14:04:36

6    interest in the project does not equate to an interest in the

7    litigation.  And it is only a personal interest in the outcome

8    of the case that is proper subject of impeachment.  And that's

9    McCormick on Evidence, Section 39, 81 Am Jur 2d.  A witness's

10   interest in witnesses, Section 791, a witness's interest in the   14:05:00

11   action may be shown for purposes of affecting his or her

12   credibility.

13          Defendants already have the contracts that call for

14   deferred compensation of several participants in RID's

15   remediation project.  Both Dennis Shirley and Joel Peterson     14:05:20

16   have so testified, and we have given you copies of the

17   transcript, have admitted that Synergy has an interest in the

18   drinking water sale project.  They have not admitted a

19   contingent interest in the outcome of this case, nor do they

20   have one.                                                        14:05:39

21          Defendants can show, if the Court allows it, through

22   contract provisions that consultants stand to gain if RID

23   profits from the sale of drinking water in the future.  They

24   will be paid compensation.  They will be paid their deferred

25   compensation, and they might be paid some residual amount.      14:05:57

```
 1    What defendants are after is revealed by their questioning.

 2    They want to present evidence of purely speculative guesses

 3    about RID's potential profits to inflate so-called bias of

 4    these witnesses.  And that's in their response at Page 15 and

 5    16.                                                              14:06:18

 6              Joel Peterson testified, quote, "I am not aware of the

 7    origin of that spreadsheet, but I can tell you that it is a

 8    product of imagination and never came to pass.  So I do not

 9    know where the numbers came from."  That's in his transcript at

10    178, Lines 14 through 17.                                        14:06:37

11              Given the unlikelihood that Judge Ezra would permit

12    this kind of evidence under Rule of Evidence 403, Your Honor

13    should exercise your discretion under Rule 26(b)(1) to conclude

14    that it is just too remote to be worth the cost of pursuing, at

15    least at this time.                                              14:07:01

16              The last category of our motion covers communications

17    and other documents exchanged among RID, RID's consultants, and

18    RID's attorneys that are protected from attorney/client

19    privilege and/or the work product doctrine.  Defendants did not

20    respond to this request, so we need not linger long on this      14:07:20

21    topic.

22              THE COURT:  Right.  I did not see a response as well.

23              MR. BONNETT:  Yeah.  And the final matter is when we

24    filed this motion, we asked the Court to modify the case

25    management order, Paragraph 2.D.3, that limited the -- or that   14:07:36
```

1   refused to limit the depositions to seven hours.  And in light

2   of Your Honor's recent ruling on that issue, we will not urge

3   it at this time, but we may raise it at the next status

4   conference.

5          Thank you.  Any questions?                          14:07:57

6          THE COURT:  Thank you very much.  No.  Thank you very

7   much.  I guess I just have -- my one question I have on this,

8   Mr. Bonnett, and I know I will ask the defendants, but they did

9   not address the attorney/client or the work product, and I'm

10  presuming goes without saying they are not attempting to the    14:08:11

11  extent they are getting into that.  If, in fact, we were to

12  enter the proposed protective order, how would it be enforced?

13  I mean, that is a concern.  I mean, how would it be enforced?

14  We have potentially 22 individuals potentially asking questions

15  of various witnesses, potentially with separate interests on    14:08:31

16  the defendants' part, potentially.  I guess I'm wondering how

17  do you enforce it?

18         MR. BONNETT:  Well, that portion is what you are

19  talking about?

20         THE COURT:  If I enter this order, how is it going to   14:08:48

21  be enforced?  Am I going to be at every deposition?  If they

22  get into it are you going to call me?  I mean, I'm wondering

23  because it's relatively broad, I think.  Perhaps maybe you

24  don't.  How would you enforce it?  If you were me, how am I

25  going to enforce it?                                            14:09:03

 1          MR. BONNETT:  Well, hopefully we wouldn't have to

 2   enforce it.  Your comment on the record would be enough to -- I

 3   mean your entry of the order would be enough to send a message

 4   to these defendants that if they want to get into these subject

 5   areas, they are going to be sanctioned for it.          14:09:21

 6          And the same is true of the privilege issues.  We will

 7   object and instruct not to answer, and if they wish to bring it

 8   to your attention, which I doubt they will, you can sanction

 9   them.

10          THE COURT:  Okay.  Thank you very much.  I appreciate    14:09:44

11   it.

12          Chris Thomas, Mr. Thomas, I'm presuming you will be

13   the first to speak here?

14          MR. THOMAS:  Yes, Your Honor.  Chris Thomas, outside

15   counsel for the City of Phoenix.  And I will take the first     14:09:58

16   crack at speaking for the non-governmental defendants.  And I

17   believe Samara Spence from the Department of Justice is on the

18   phone would like to be heard for DOJ as well.

19          THE COURT:  Right.

20          MR. THOMAS:  Let me start with the privilege and work    14:10:12

21   product issue last.  And the reason we didn't respond to that

22   in our brief is that there were no instructions not to answer

23   in the Shirley or Peterson or Leo depositions based upon

24   privilege grounds.  The occasions on which Mr. Hanson, on

25   behalf of RID, instructed the witnesses not to answer, all were  14:10:34

1    on the grounds of relevance.  Mostly they pertained to the

2    timing of any future actual use of the extracted groundwater

3    for drinking water purposes.  Certainly, I would agree that

4    defendants should not improperly delve into privileged and work

5    product matters, but that issue really isn't joined yet since          14:10:58

6    we haven't done so to date.

7          I think down the road there probably is a looming work

8    product issue that will need to be addressed.  Today is not the

9    day for that.  But briefly, as you know, the Gallagher and

10   Kennedy firm carried on as administrative counsel after                14:11:18

11   dropping out of the litigation.  They have co-written, with the

12   Synergy environmental team, all of the technical documents and

13   numerous letters, some of which have been sent to DEQ under

14   Synergy's name; some of which under Mr. Kimball's name.  We

15   have not gotten to the point of the depositions of the Synergy         14:11:43

16   witnesses where we have kind of gotten into the depth of the

17   arguments made.  But many of them are purely legal and, of

18   course, would not have been prepared by Synergy.

19         The reason I say that I don't think the work product

20   issue is ripe for decision in the near term is that defendants         14:12:05

21   are confused about whether RID intends to introduce evidence of

22   DEQ approvals as part of its prima facie case or not.  During

23   the hearing on January 22nd, 2015, Mr. Bonnett reassured the

24   Court that RID would not introduce RID approval documents, if

25   any, as evidence of the NCP consistency element on which they         14:12:36

1    bear the burden of proof.  However, there are references to

2    purported DEQ approvals that remain in the Third Amended

3    Complaint and the recently filed and then withdrawn Motion for

4    Summary Judgment likewise reference certain DEQ approvals.

5         So once we understand whether RID intends to introduce          14:13:01

6    evidence of DEQ approvals of documents co-authored by G&K then

7    I think we'll be in a position to bring before Your Honor the

8    issue of whether in light of that we have grounds to seek

9    production of otherwise work product privileged materials.

10        Let me get back to the other issues.  First off, with           14:13:22

11   regard to the subpoenas, we have received and produced to all

12   parties, including RID, documents requested from DEQ.  Mr.

13   Worsham worked with DEQ to narrow the scope of his request and

14   DEQ had no objection to it.  We have received documents from

15   the Town of Buckeye which have been produced.  And I understand        14:13:52

16   from counsel for Corning that he anticipates receiving

17   documents from the City of Goodyear in short order and, of

18   course, we'll produce those promptly upon receipt as well.  So

19   with regard to subpoenas that basically leaves the subpoenas

20   issued to RID and G&K related entities.                                14:14:16

21        Let me turn back to a couple issues.  And I think

22   first off, you know, this is a hearing on a motion to limit

23   discovery brought by RID.  It's not a hearing on a Motion for

24   Summary Judgment on whether RID is a liable party or not as

25   numerous counterclaims allege, nor is it a hearing on a Motion         14:14:43

1    in Limine directed to whether certain evidence obtained in

2    discovery should be allowed at trial.

3          So RID, of course, has a substantial burden in trying

4    to cut off evidence relevant to its own claims and

5    counterclaims.  Now, first with regard to the timing of any          14:15:03

6    future drinking water use, putting aside whether some day RID

7    can obtain summary judgment on counterclaims, there is no doubt

8    that one of the elements of the case that RID must prove is

9    that its costs were reasonable, necessary, and consistent with

10   the National Contingency Plan the Superfund cleanup blueprint.       14:15:26

11         We have referenced in the body of our motion and in

12   some of the attachments a lot of EPA groundwater guidance, all

13   of which basically says you should pick something that is cost

14   effective, reasonable, and necessary, and the factors that go

15   into that analysis are, A, is there some short-term or acute         14:15:48

16   exposure that requires a certain level of treatment to be

17   implemented immediately.  If not, and if drinking water is not

18   being used at present, you may have the luxury of a remedy of

19   longer duration that would be more cost effective.

20         On Page 14 of our brief, for instance, we quoted the           14:16:15

21   EPA guidance policy that says where the contaminated

22   groundwater is not currently used or an alternate water source

23   is readily available and there is no near term future need for

24   the resource, it will likely be appropriate to consider a

25   longer time frame for achieving restoration cleanup levels.          14:16:38

1   There's no dispute here that the groundwater extracted by RID

2   is perfectly fit for its current use, namely, irrigation,

3   without treatment whatsoever.  And, in fact, one of the Synergy

4   witnesses testified that the water dumped into the canal

5   actually achieves drinking water standards by the time it gets          14:17:04

6   to the west valley.  In any event, EPA guidance policy makes it

7   clear that it is entirely relevant to know when actual drinking

8   water use will be made of the water extracted by RID.

9           RID's feasibility study costs out the projected cost

10  of its remedy.  RID has estimated that operating the six                14:17:29

11  wellhead treatment units that it proposes will cost $1.45

12  million per year.  In today's dollars, that's seven-tenths or

13  70 percent of the annual costs that they estimate are

14  necessary.  The net present value that Synergy calculated for

15  its remedy over the next 50 years is $63 million.  So whatever         14:17:59

16  63 times 7 equals is the net present value of treating to

17  drinking water standards water that today is being used for

18  irrigation.

19          I think it goes without saying that to the extent that

20  RID needs to prove that spending that money is necessary              14:18:26

21  annually, it's entirely relevant for defendants to seek

22  discovery into when use may be converted to drinking rather

23  than irrigation.  The -- among the other issues relevant to

24  that is the anticipated date of a pipeline to convey treated

25  water to a drinking water user.  Both Synergy witnesses have          14:18:51

1    acknowledged, as do the Synergy documents including the

2    feasibility study, that it will -- that it's illegal under

3    Arizona law for water conveyed by the canal to be used for a

4    drinking water purpose even if it's treated to drinking water

5    standards.  That's in part because that same canal also gets          14:19:14

6    treated effluent from the Phoenix 23rd Avenue Wastewater

7    Treatment Plant.

8         We did hear from Synergy that under one scenario they

9    would construct a pipeline that would facilitate service of

10   drinking water in the west valley.  What they objected to on          14:19:38

11   relevance grounds was when that might be happening.  And again,

12   pipeline appears to be a relevant precondition to actual

13   drinking water use of the groundwater pumped by RID, and we

14   think that since it's $1.45 million per year to treat

15   irrigation water to drinking water standards, it's highly            14:20:07

16   relevant to know if that pipeline is coming next year or 10

17   years from now or never.

18        Mr. Bonnett also has, I think, misread *Carson Harbor*.

19   We tried to point this out in our brief and apparently didn't

20   do a very good job.  But the issue in *Carson Harbor* was whether     14:20:30

21   profit motive by itself was sufficient to preclude a finding

22   that response costs could also be necessary.  In that case, the

23   district court decided not to admit evidence about public

24   health threat and the link between that and the response costs

25   because it got stuck on the fact that the party that had             14:20:59

1  incurred the response costs would enjoy some enhanced property

2  value.

3        That's why it was remanded.  The mistake was not

4  admitting -- this is coming in out garbled.  So the Ninth

5  Circuit did not find fault with the fact that the district      14:21:22

6  court had admitted evidence of the profit motive.  The Ninth

7  Circuit found fault with the fact that it did not admit

8  evidence as well of imminent threat to public health and the

9  environment.  So that case does not support the argument that

10  the information sought by defendants is irrelevant.              14:21:42

11        With regard to the reimbursement issues, as we noted

12  in our brief, there's a provision under CERCLA, Section 114(b)

13  that prohibits parties from getting double recovery of damages.

14  That unequivocally precludes RID from recovering in this

15  litigation the costs for any response items reimbursed by DEQ.  14:22:10

16  And this is now moot, at least as to the subpoena, because DEQ

17  has complied and produced documents.  But the testimony to date

18  and the records indicate that, at least in certain

19  circumstances, the reimbursements sought by DEQ for certain

20  costs and granted by DEQ were then used for other purposes.     14:22:43

21  The most notable example of that is there is a gentleman named

22  Jim Madole, who is the principal of Spinnaker Holdings, that is

23  the entity that is actually paid for the wellhead treatment

24  units and the carbon treatment.  I think it was the most recent

25  RID reimbursement request to DEQ asked to be reimbursed for his  14:23:09

1    costs of providing carbon treatment.  DEQ granted that request

2    and then it was decided within RID not to give any of that

3    reimbursement money to Mr. Madole, much to his chagrin, but

4    rather to use it to pay somebody else.

5           So we don't know today whether DEQ was aware that the        14:23:34

6    costs for which DEQ was seeking reimbursement actually had not

7    been paid by RID as opposed to, quote, incurred in an

8    accounting sense, nor do we know if DEQ is aware of the fact

9    that some of the reimbursements expressly made for one purpose

10   were diverted to another.                                            14:24:01

11          At the end of the day, all that is going to be

12   irrelevant because we have about $700,000, plus or minus, of

13   DEQ reimbursements.  It's impossible to tell right now what DEQ

14   thinks it reimbursed for -- RID for and whether it might change

15   its mind if it understood the full facts.  So we need to figure     14:24:26

16   out which costs were reimbursed so we can apply 114(b) to that

17   universe of costs.  And then we'll know, you know, whether

18   there's a defense on reasonable necessity consistency on the

19   other costs.

20          I'm sure you understand that the fact that 1.2 million       14:24:45

21   or so of those jumbled costs were not included in the past

22   costs motion is not an indication, as Mr. Bonnett suggests,

23   that we don't contest those costs have been properly incurred.

24          I don't think the *Santa Clara* case says anything

25   different than what *Carson Harbor* says.  And again, that's an     14:25:16

1    issue of whether the ulterior motive is, by itself, dispositive

2    and precludes a finding of necessity.  It's not a case that

3    stands for the proposition that discovery into the ulterior

4    motive is impermissible at the outset.

5           I do note on Page 5 of the *Santa Clara* opinion that      14:25:41

6    part of the remedy at issue in that case was a monitored

7    natural attenuation remedy for groundwater, which is

8    essentially the argument that defendants are making here.  I

9    don't think today is the day to litigate necessity and the

10   history of monitored natural attenuation remedies in Arizona.    14:26:07

11   But just off the top of my head, I can tell you that sites in

12   Arizona, federal and state, that have incorporated a monitored

13   natural attenuation remedy, namely a remedy that does not call

14   for immediate active treatment remedy for groundwater to

15   drinking water standards, including the 19th Avenue landfill     14:26:29

16   which is a federal Superfund site that I handled at the

17   beginning of 1989.  And EPA thought it was crazy to require the

18   city or anybody else to treat groundwater beneath a landfill to

19   drinking water standards at great expense unless and until that

20   water was actually needed for a drinking water purpose.          14:26:52

21          The same is true of the Estes landfill, 40th Street

22   and Salt Riverbed or so.  That's a state Superfund site where

23   DEQ commissioned a feasibility study which similarly concluded,

24   yes, there are solvents beneath the landfill property that are

25   above drinking water standards, but nobody is drinking that      14:27:14

water.  We can use institutional controls to ensure that some

idiot doesn't sink a drinking water supply well in the middle

of a landfill while we're waiting for nature to clean up the

solvents by themselves.

Among others, there's another site in St. David,

Apache Parasite, actually a Gallagher & Kennedy client, where

the groundwater remedy includes natural attenuation.  Same is

true for the Phelps Dodge Sahuarita site near Tucson, which

another Gallagher & Kennedy client that is implementing at

least a partial attenuation remedy.

In any event, that's probably more of a diversion than

I should have gone on, but I think it suffices to show that by

no means is it clear that discovery into the timing of any

future drinking water use is, per se, irrelevant as Mr. Bonnett

suggests.

I could go on ad naseam about the history of Arizona

Superfund litigation, but you don't want that.  I would,

however, be happy to entertain any questions you may have.

THE COURT:  I guess I want -- you addressed it in your

brief, but I don't know if you want to address the issue

regarding potential investors, possible investors as well as

financial interest that some of the individuals may or may not

have.  It's in your brief, I know, but. . .

MR. THOMAS:  I will only address it real briefly then,

Your Honor.  As I understand Mr. Bonnett's argument, it is that

14:27:34

14:27:59

14:28:19

14:28:37

14:28:55

UNITED STATES DISTRICT COURT

1    the financial interests of RID, sort of the windfall factor,

2    are not relevant under *Carson Harbor.*  And I think I have

3    explained that that's not correct.  Some day perhaps he can

4    file a motion in limine and try to exclude evidence of the

5    extraordinary lucrative profits that at least the lawyers and          14:29:23

6    consultants stand to gain.  But that's not what we're here for

7    today.

8           Secondly, with regard to the overall equitable factor

9    issue, I think, of course, the Court should follow *Atlantic*

10   *Research* Supreme Court opinion rather than a straight district        14:29:44

11   court ruling, if there is one that I haven't read today that

12   they brought.  And clearly the Court in *Atlantic Research* said

13   putting aside whether the plaintiff can label its claim as one

14   for cost recovery under Section 107 or is limited to seeking

15   contribution expressly under 113(b), at the end of the day,            14:30:07

16   we're going to have an equitable allocation of costs.  And the

17   relative culpability of the plaintiff will come into play and

18   the full panoply of equitable factors available to the district

19   court to engage in that exercise will be considered.

20          And we think if RID makes more money on selling              14:30:32

21   groundwater than it costs to clean it up, that's a relevant

22   equitable factor.  Again, we'll certainly disagree with that,

23   but that's the subject for a motion in limine sometime down the

24   road.

25          THE COURT:  Okay.  Thank you very much, Mr. Thomas.           14:30:51

1  Thank you.

2          MR. THOMAS:  Thank you, Your Honor.

3          THE COURT:  Mr. Bonnett, I know there may be some

4  other individuals.  I know -- and it may be a moot point at

5  this time, but I know that Ms. Spence was on the phone for the        14:31:02

6  US Department of Energy.  So Ms. Spence?

7          MS. SPENCE:  Yes, Your Honor.  We are participating to

8  oppose RID's proposal to modify CMO Number 2.  In light of what

9  Mr. Bonnett had to say on that topic, if the Court is not

10  entertaining that at this time, we can delay that.        14:31:21

11          THE COURT:  Yeah.  And I'm not going to entertain it

12  at this time and I think -- so I'm not.  So I will, to the

13  extent the motion is seeking to modify the Case Management

14  Order Number 2 that we entered on February 4th, 2015,

15  specifically Section D.3 regarding the lengths of the        14:31:48

16  depositions, that -- I may have that date wrong.  In any event,

17  the length of dep, there's not going to be any limit on the

18  length of the depositions right now.

19          So given that, Ms. Spence, if you have anything else,

20  please.        14:32:08

21          MS. SPENCE:  I have nothing further.

22          THE COURT:  Okay.  Thank you.  Do we have anyone else

23  on behalf of the defendants?

24          Okay.  Hearing nothing but silence, thankfully, Mr.

25  Bonnett, please.        14:32:21

1          MR. BONNETT:  Thank you, Your Honor.

2          I would just encourage you to read *Carson Harbor,* and

3     I know you will, if you haven't already.

4          THE COURT:  I have.

5          MR. BONNETT:  Then you know that necessity is not          14:32:38

6     defined as broadly as Mr. Thomas defines its in his argument.

7          It is -- and the other point I just want to make is

8     it's clear from what he told you about reimbursements of costs

9     that, really, they are looking to take that discovery here for

10    use in the ADEQ proceeding because they want to convince ADEQ   14:33:06

11    not to do that again.  And it's still, I don't see the

12    relevance of making us telling them, or of somebody telling

13    them, what costs were reimbursed and why.  The statute does not

14    require that the reimbursed costs are used for any particular

15    purpose.  It just doesn't require that.                         14:33:36

16         THE COURT:  Okay.  Thank you.

17         I'm going to take this matter under advisement.

18         There's one other issue I would like to address, and

19    Mr. Bonnett, you had delivered a notebook with a letter dated

20    March 1st, 2016, on another discovery dispute.  What I'd like   14:33:52

21    to do, and I think this was probably an error on my part in

22    terms of how I would like to do these types of disputes.  My

23    idea was that if a discovery dispute arises that the lawyers

24    will talk telephonically, and then get me on the phone

25    telephonically and try to resolve the issue.  If we're not able 14:34:18

```
 1    to resolve it then you are more than welcome to file any

 2    discovery motions that are appropriate.  It was not my intent,

 3    and I think I probably mislead you, so my mistake, I think, Mr.

 4    Bonnett, that we do this type of thing informally.  Because I

 5    do think we need to make a record.  If there is going to be          14:34:38

 6    documents disclosed, if there is going to be information

 7    provided to the Court, it should get into the file.

 8            So what I am going to do, I'm going to keep your

 9    letter, actually, just for my benefit.  But I don't want you to

10    have to copy all of these exhibits again.  So I'm just going to     14:34:53

11    give you the notebook back with the exhibits and ask that you

12    file that in a motion.  So that way -- and I think, once again,

13    I'm not -- I think it was my not being clear on how I wanted to

14    handle these, so I apologize to everyone, including you, on

15    that.  But I do think the idea was to try to informally resolve     14:35:10

16    discovery disputes with a telephone call.  If that can't be

17    done, or if it requires the filing of documents, we will do

18    that in the record and give the defendants an opportunity to

19    respond.  So and once again, I think that was probably my

20    confusion that created and not yours, so I apologize for that.      14:35:30

21            So and I will give these back to you so you don't have

22    to recopy them again.  And other than, Mr. Bonnett, is there

23    anything else from the plaintiff's standpoint?

24            MR. BONNETT:  No.

25            THE COURT:  Okay.  You better come up and please            14:35:47
```

1    identify yourself, and we'll get you on the record.

2          Thank you.

3          MR. PEARSON:  Thank you, Your Honor.  William Pearson,

4    Pearson Law Group, representing Union Pacific.  Just in

5    reference to your last discussion about what Mr. Bonnett just          14:36:00

6    filed, we just received that late Tuesday night.  But if the

7    Court's planning on keeping the cover letter, which we do not

8    agree with --

9          THE COURT:  Let me -- the reason was because I wrote

10   on it.  So I started to write on it and I didn't want to give          14:36:13

11   it back to Mr. Bonnett.  It really doesn't say anything.  It

12   just says the date I received it and I made a note to file it

13   as a motion.  So I'm happy to give the letter back, so that's

14   fine.  I think I will give the letter back as well.

15         MR. PEARSON:  That's fine.          14:36:32

16         THE COURT:  Wasn't my intent.  It's just that I

17   started to write on the letter.  For the record, all it says,

18   it was sent to the clerk -- my writing, which I have tried to

19   cross out, sent to the clerk on March 1st, 2016; received by me

20   on March 2nd, 2016; and just a note to file as a motion.          14:36:47

21         But I will, given that now that that my writing is out

22   of the bag, I will give the letter back as well.  So we'll give

23   everything back to you.  So thank you.

24         MR. PEARSON:  We'll follow the procedures you just

25   described.          14:37:05

1              THE COURT:  Okay.  Thank you.  And we'll -- yeah.  So

2     Mr. Bonnett, we'll give that back to you.  Thank you.  And once

3     again, I apologize if I created any confusion on that.

4              MR. BONNETT:  I'm not going to let you take the blame

5     for that, Judge.                                                14:37:18

6              THE COURT:  I think I deserve it.

7              So other than that, once again, is there anyone else

8     from the defendants' standpoint?  And we will note by your

9     silence that you don't have anything.

10             Is there anyone on the phone who would like to make     14:37:30

11    any comments?

12             Okay.  Great.  Thank you very much.  I appreciate your

13    time.  I will get a decision out.  And once again, I appreciate

14    everyone's hard work in this case.  Thank you very much.

15             And I am going to clean up, so please, you are more     14:37:48

16    than welcome to please leave.  I'm going to clean up.  The

17    Court is recessed.  You don't need to stand or anything.  Let

18    me just clean up everything.  So thank you very much for your

19    time.

20             (Proceeding concluded at 2:38 p.m.)                     14:38:00

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6        I, LAURIE A. ADAMS, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9        I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14        DATED at Phoenix, Arizona, this 11th day of March,

15   2016.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25