**INDEX OF EXHIBITS TO STATEMENT OF FACTS
IN SUPPORT OF DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
RE: PLAINTIFF'S REMAINING CLAIMED COSTS**

| Exhibit No. | Description |
|---|---|
| 1 | Excerpts of 11/4/15 Plaintiff's Second Supplemental Rule 26(a) Disclosure Statement |
| 2 | 7/8/16 Plaintiff Roosevelt Irrigation District's Answers and Objections to United States Department of Energy's Second Set of Interrogatories Directed to Roosevelt Irrigation District |
| 3 | 7/8/16 Plaintiff Roosevelt Irrigation District's Responses and Objections to United States Department of Energy's First Set of Requests for Production |
| 4 | Tables reflecting RID's claimed recoverable costs (RID111197-202) |
| 5 | 1/9/13 Letter to ADEQ |
| 6 | 8/7/13 Letter from ADEQ (ADEQ_MER000138) |
| 7 | 2/28/14 Letter to ADEQ (ADEQ_MER000180-82) |
| 8 | 6/18/14 ADEQ Reimbursement Application (ADEQ_MER000145-58) |
| 9 | 4/30/15 Letter to ADEQ |
| 10 | 2/12/16 Letter from RID's counsel (Guy Hanson) |
| 11 | 4/19/16 Deposition Transcript excerpts of Donovan Neese |
| 12 | 3/16/16, 4/5/16 Deposition Transcript excerpts of Joel Peterson |
| 13 | 4/21/16 Deposition Transcript excerpts of Stanley Ashby |
| 14 | 2/25/16 Deposition Transcript excerpts of Dennis Shirley |
| 15 | 12/16/10 Letter from ADEQ (M&A008963-64) |
| 16 | 3/30/16 Plaintiff's Fifth Supplemental Rule 26(a) Disclosure Statement |

| Exhibit No. | Description |
|:---:|:---|
| 17 | Synergy Invoices (SYN056736-92) |
| 18 | Synergy, et al. Invoices |
| 19 | Stan Ashby Remediation Reimbursable Hours (RID110574) |
| 20 | 3/31/16 Deposition Transcript excerpts of Jim Madole |
| 21 | Stantec Invoice (RID110361-65) |
| 22 | Donovan Neese Remediation Reimbursable Hours (RID110562-69) |
| 23 | Ryley Carlock, et al. Invoices |
| 24 | EUSI Invoices |
| 25 | EUSI Invoices |
| 26 | Ryley Carlock Invoices |
| 27 | Burch & Cracchiolo Invoices |

# EXHIBIT 1

1   Jerry C. Bonnett (AZ 003381)
Andrew S. Friedman (AZ 005425)
2   Francis J. Balint, Jr. (AZ 007669)
Andrew Q. Everroad (AZ 016477)
3   Andrew M. Evans (AZ 024917)
**BONNETT, FAIRBOURN, FRIEDMAN**
4   **& BALINT, P.C.**
2325 East Camelback Road, Suite 300
5   Phoenix, Arizona  85016
P:  (602) 274-1100
6   F:  (602) 274-1199
7   jbonnett@bffb.com
afriedman@bffb.com
8   fbalint@bffb.com
aeverroad@bffb.com
9   aevans@bffb.com

10   *Attorneys for Plaintiff Roosevelt Irrigation District*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona,<br><br>                Plaintiff,<br><br>v.<br><br>SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, *et al.*<br><br>                Defendants. | No.    2:10-CV-00290-DAE (BGM)<br><br>**PLAINTIFF'S SECOND SUPPLEMENTAL RULE 26(a) DISCLOSURE STATEMENT**<br><br>**(Cumulative Format, Supplementation in Bold)** |

      Pursuant to Rule 26(a)(1), FED. R. CIV. P., Plaintiff Roosevelt Irrigation District ("RID" or "the District") by and through its undersigned counsel, hereby supplements its Initial Disclosure Statement.   The District's Supplemental Disclosures, including the listing of a witness or a document, are made based upon information presently known to the District and are made without waiver of, or prejudice to, any objections it may have. The District expressly reserves all objections including, but not limited to: (a) relevance; (b) attorney-client privilege; (c) work product doctrine; (d) privacy; (e) any other

1   *Corp. v. U.S.*, 511 U.S. 809, 114 S.Ct. 1960 (1994) (attorneys' fees may be recovered in
2   certain circumstances under CERCLA); *Wickland Oil Terminals v. Asarco, Inc.,* 792
3   F.2d 887, 892 (9th Cir.1986) (certain testing expenses may be recovered under
4   CERCLA). Such costs can be voluntarily incurred even though they were incurred, in
5   part, while negotiating with ADEQ for adopting a final remedy. *See, e.g., LWD PRP*
6   *Group v. ACF Industries*, No. 5:12-CV-00127-JHM, 2014 WL 901648 (W.D. Ky.
7   February 7, 2014).

8   The District incurred, and continues to incur, substantial costs to address the
9   groundwater contamination impacting and threatening its wells. From June 2008 through
10  June 2015, the District incurred at least ~~$16,292,316.93~~**$17,563,494.80** in unrecovered
11  technical response costs associated with the planning, development, implementation and
12  management of the District's remedial actions to address the impact or threatened impact
13  of hazardous substances released at or from the Defendants' facilities on the District's
14  wells and water supply.

15  A summary of the nature of the work conducted by the District and computation
16  of the costs incurred by the District through June 201**5**~~4~~ is provided in the attached
17  **Exhibit A**. None of the costs set forth therein includes a premium or "success fee." All
18  participants used their normal hourly rates in calculating their charges. The District
19  incurred the costs described in Exhibit A as a consequence of the protracted and
20  prolonged refusal of the Defendants to address the pollution impacting the District's
21  wells.

22  The District **has** continued to incur costs throughout ~~the remainder of 2014 and~~
23  ~~middle of~~ 2015 and will continue to incur costs to remediate the releases and threatened
24  releases of hazardous substances in the WVBA WQARF Site. The District will
25  supplement its computation of damages in accordance with Rule 26, FED. R. CIV. P.

26  **IV.    INSURANCE AGREEMENTS**

27  Some of the Defendants have insurance agreements that may render certain insurance
28  businesses liable to satisfy part or all of any judgment rendered in the District's favor.

1  Defendants having such insurance agreements either identified those insurance
2  agreements generally or alluded to them in their Initial Rule 26(a) Disclosure Statements.
3  Each Defendant having an applicable insurance agreement that has not already identified
4  said insurance agreement with specificity will, presumably, pursuant to its obligation
5  under Rule 26, FED. R. CIV. P., disclose the existence of the agreement and location
6  where such agreement may be copied in a supplement(s) to its Rule 26(a) disclosure
7  statements.

8       Dated this 4th day of November, 2015.

9                              **BONNETT, FAIRBOURN, FRIEDMAN &**
10                             **BALINT, P.C.**

11
                                   By: /s/ Jerry C. Bonnett
12                                      Jerry C. Bonnett
                                        Andrew S. Friedman
13                                      Francis J. Balint, Jr.
                                        Andrew Q. Everroad
14                                      Andrew M. Evans
                                        *Attorneys for Roosevelt Irrigation*
15                                     *District*
16

17

18

19

20

21

22

23

24

25

26

27
   Emailed/mailed same day to:
28

# Exhibit A

The following is a summary of the nature of the work conducted by or at the direction of the District and a computation of the costs incurred by the District:

<u>Activity 1</u>: Technical and legal services to investigate releases or the threat of releases of hazardous substances, evaluate the nature and extent of environmental contamination, sample and analyze water quality in District wells and canals, review remedial options, and conduct response action to address public health risks.

Includes the following costs:

1. Gallagher & Kennedy and Montgomery & Associates response costs through September 2009.
2. The District's costs to install a pipeline along 27th Avenue.
3. The District's costs to monitor water quality in the District's wells and canals.

| Year | Remediation Project Consulting Costs | | | The District's Capital Costs | RID Water Quality Monitoring Costs | Total |
|------|---------------------|--------------------------|---------|---|---|---|
| | Gallagher & Kennedy | Montgomery & Associates | Synergy | | | |
| 2008 | $39,266.50 | $42,705.00 | | | | $81,971.50 |
| 2009 | ~~$676,245.10~~ **$675,982.60** | $227,960.00 | | | | ~~$904,205.10~~ **$903,942.60** |
| 2010 | | | | $27,682.37 | $8,121.32 | $35,803.69 |
| 2011 | | | | | $9,420.69 | $9,420.69 |
| 2012 | | | | | $4,763.29 | $4,763.29 |
| 2013 | | | ~~$94,050.58~~ **$0** | | $10,159.37 | ~~$104,209.95~~ **$10,159.37** |
| 2014* | | | ~~$73,493.52~~ **$0** | | $5,006.27 | ~~$78,499.79~~ **$5,006.27** |
| 2015* | | | ~~$37,579.10~~ **$0** | | $5,307.24 | ~~$42,886.34~~ **$5,307.24** |

| Total | ~~$715,511.60~~ $715,249.10 | $270,665.00 | ~~$205,123.20~~ $0 | $27,682.37 | $42,778.18 | ~~$1,261,760.35~~ $1,056,374.65 |
|---|---|---|---|---|---|---|

Activity 2: Technical and legal services to conduct work required by ADEQ pursuant to the October 2009 Agreement to Conduct Work, including evaluate remedial measures and applicable technologies to address releases or the threat of releases of hazardous substances that have occurred, prepare early response action work plans and wellhead treatment proposal, conduct ADEQ-required tasks, and respond to ADEQ and stakeholders in public participation process.

Includes the following costs:

1. All HDR Costs
2. 75% of Gallagher & Kennedy remediation costs from October 2009 – June 2013.
3. 75% of Synergy #802.01 costs from February 2010 – June 2013.
4. Synergy costs to conduct work required by ADEQ.
5. The District's costs associated with Task 2 well investigations.

| Year | G&K Costs | Synergy 802.01 Costs | G&K and Synergy Totals | 75% of G&K and Synergy Costs | HDR Costs | Synergy 802.10 Costs | Synergy 802.20 Costs | Synergy 802.30 Costs | RID Task 2 Costs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | | | | | | | | | | |
| 2009 | $256,998.98 | | $256,998.98 | $192,749.24 | | | | | | $192,749.24 |
| 2010 | $953,250.78 | $363,877.04 | $1,317,127.82 | $865,057.67 | $82,102.00 | $11,073.52 | $52,534.40 | | | $1,010,767.60 |
| 2011 | $475,129.47 | $196,413.47 | $671,542.94 | $503,657.21 | | $86,246.84 | $199,778.62 | $65,946.86 | $262,953.00 | $1,118,582.52 |
| 2012 | $561,885.23 | $335,311.27 | $897,196.50 | $672,897.37 | | $1,487.54 | $87,774.94 | $19,054.54 | $267,435.07 | $1,048,649.45 |
| 2013 | $349,293.33 | $173,213.24 | $522,506.57 | $391,879.93 | | | $41,849.99 | | | $433,729.92 |
| 2014 | | | | | | | $11,541.87 | | | $11,541.87 |
| Total | $2,596,557.79 | $1,068,815.02 | $3,665,372.81 | $2,626,241.42 | $82,102.00 | $98,807.90 | $393,479.82 | $85,001.39 | $530,388.07 | $3,816,020.60 |

Activity 4: Technical and legal services to conduct Work required by ADEQ pursuant to the October 2009 Agreement to Conduct Work, including to assess site conditions, develop and analyze remedial alternatives, prepare and submit Feasibility Study and Proposed Remedial Action Plan to address regional groundwater contamination, and respond to ADEQ and stakeholders in public participation process.

Includes the following costs:

1. 75% of Gallagher & Kennedy remediation costs from July 2013 to present.
2. Synergy Project #804 and #805 costs.

| Year | G&K Costs (July 2013 on) | 75% of G&K Costs | Synergy FS Costs (#804) | Synergy PRAP Costs (#805) | Total |
|------|------|------|------|------|------|
| 2008 | | | | | |
| 2009 | | | | | |
| 2010 | | | | | |
| 2011 | | | | | |
| 2012 | | | $39,357.84 | | $39,357.84 |
| 2013 | $367,460.34 | $275,595.26 | $140,938.26 | | $416,533.52 |
| 2014 | $982,066.27 | $736,549.70 | $631,295.29 | | $1,367,844.99 |
| 2015* | $505,506.84 | $379,130.13 | $42,019.23 | $32,729.63 | $453,878.99 |
| Total | $1,855,033.45 | $1,391,275.09 | $853,610.62 | $32,729.63 | $2,277,615.34 |

Activity 3: Technical and legal services to conduct Work, including prepare conceptual and detailed engineering plans and oversee design, construction, operation and maintenance of water treatment facilities authorized by the ADEQ-approved Early Response Action Work Plan, RID-95 Wellhead Treatment Systems Proposal, and Modified Early Response Action Work Plan.

Includes the following costs:

1. All Spinnaker costs (capital expenditures through June 2012, operation and maintenance thereafter)
2. All Synergy #802.40 costs.

| Year | Synergy 802.40 | Spinnaker Capital Costs | Spinnaker O&M Costs | Total |
|---|---|---|---|---|
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| 2011 | $209,096.53 | $4,536,006.42 | | $4,745,102.95 |
| 2012 | $210,737.64 | $294,155.51 | $268,168.26 | $773,061.41 |
| 2013 | $113,660.82 | | $452,574.40 | $566,235.22 |
| 2014 | $67,018.29 | | ~~$191,016.92~~ $202,290.81 | ~~$258,035.21~~ $269,309.10 |
| 2015* | ~~$79,027.31~~ $79,721.21 | | $38,499.84 | ~~$79,027.31~~ $118,221.05 |
| Total | ~~$679,540.59~~ $680,234.49 | $4,830,161.93 | ~~$911,759.57~~ $961,533.30 | ~~$6,421,462.00~~ $6,471,929.72 |

Activity 5: Project management and administration of remedial activities and support services, including coordinating work with agencies, contractors and external stakeholders, documenting project status and advising the District's elected representatives, procuring funding, participating in community involvement activities, and responding to comments.

**Includes the following costs:**

1. **All ADEQ oversight costs**
2. **All other RID general response costs except those listed in Activity 1 and 2**
3. **25% of G&K costs from September 2009 to present**
4. **25% of Synergy #802.01 costs from February 2010 to June 2013**

**5.  100% of Synergy #802.01 and #802.02 from July 2013 to present**

| Year | ADEQ Oversight Costs | District General Response Costs | G&K[a] | Synergy 802.01 | TOTALS G&K + Synergy | 25% of G&K + Synergy Costs | 100% of Synergy[b] Costs | Total |
|---|---|---|---|---|---|---|---|---|
| 2008 | | | | | | | | |
| 2009 | | $17,167.63 | $256,998.98 | | $256,998.98 | $64,249.75 | | $81,417.37 |
| 2010 | | $20,694.51 | $953,250.78 | $363,877.04 | $1,317,127.82 | $329,281.96 | | $349,976.47 |
| 2011 | $46,069.80 | $109,237.00 | $475,129.47 | $196,413.47 | $671,542.94 | $167,885.74 | | $323,192.54 |
| 2012 | $14,881.87 | $201,699.22 | $561,885.23 | $335,311.27 | $897,196.50 | $224,299.12 | | $440,880.21 |
| 2013 | $9,767.28 | $98,375.42 | $716,753.67 | $289,650.56 | $889,966.91 | $222,491.73 | $116,437.32 | $447,071.75 |
| 2014 | $8,317.44 | $77,239.68 | $982,066.27 | $136,162.45 | $982,066.27 | $245,516.57 | $136,162.45 | $467,236.13 |
| 2015* | $1,193.60 | $121,855.42 | $505,506.84 | $96,977.78 | $505,506.84 | $126,376.71 | ~~$156,468.36~~ $96,977.78 | ~~$405,594.09~~ $346,403.51 |
| Total | $80,229.99 | ~~$581,360.23~~ $646,268.88 | $4,451,591.24 | $1,418,392.56 | $5,520,406.26 | $1,380,101.57 | ~~$408,768.12~~ $349,577.54 | ~~$2,515,368.56~~ $2,456,177.98 |

a – Gallagher & Kennedy costs include subcontractor charges (e.g. Montgomery & Associates and Lawrence Moore & Associates)

b – Synergy Environmental Costs from July 2013 on, includes Projects 802.01 and 802.02

A computation of the District's costs incurred through June 2015 is provided below.

A-5

| 2008 | Activity | | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | | |
| January | | | | | | | | | |
| February | | | | | | | | | |
| March | | | | | | | | | |
| April | | | | | | | | | |

Case ...CAE-B... Document 131...5-1 Filed 08/19/16 Page 12 of 115

| Month | 1 | 2 | 3 | 4 | 5 | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| May | $5,794.00 | | | | | $5,794.00 | $5,794.00 | | $5,794.00 |
| June | $ - | | | | | $ - | | | $5,794.00 |
| July | $ - | | | | | $ - | | | $5,794.00 |
| August | $ - | | | | | $ - | | | $5,794.00 |
| September | $7,395.50 | | | | | $7,395.50 | $13,189.50 | | $13,189.50 |
| October | $8,322.50 | | | | | $8,322.50 | $21,512.00 | | $21,512.00 |
| November | $19,190.00 | | | | | $19,190.00 | $40,702.00 | | $40,702.00 |
| December | $41,269.50 | | | | | $41,269.50 | $81,971.50 | | $81,971.50 |
| **Total** | $81,971.50 | | | | | $81,971.50 | | | $81,971.50 |

| 2009 | Activity | | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
| | 1 | 2 | 3 | 4 | 5 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| January | $13,390.00 | | | | | $13,390.00 | $95,361.50 | | $95,361.50 |
| February | $35,685.00 | | | | | $35,685.00 | $131,046.50 | | $131,046.50 |
| March | ~~$175,479.00~~ $175,216.50 | | | | | ~~$175,479.00~~ $175,216.50 | ~~$306,525.50~~ $306,263.00 | | $306,263.00 |
| April | $30,652.50 | | | | | $30,652.50 | ~~$337,178.00~~ $336,915.50 | | $336,915.50 |
| May | $40,845.00 | | | | | $40,845.00 | ~~$378,023.00~~ $377,760.50 | | $377,760.50 |
| June | $218,685.50 | | | | $17,167.63 | $235,853.13 | ~~$613,876.13~~ $613,613.63 | | $613,613.63 |
| July | $ - | | | | $ - | $ - | ~~$613,876.13~~ $613,613.63 | | $613,613.63 |
| August | $ - | | | | $ - | $ - | ~~$613,876.13~~ $613,613.63 | | $613,613.63 |
| September | $389,468.10 | | | | $ - | $389,468.10 | ~~$1,003,344.23~~ $1,003,081.73 | | $1,003,081.73 |
| October | $ - | | | | $ - | $ - | ~~$1,003,344.23~~ $1,003,081.73 | | $1,003,081.73 |
| November | $ - | | | | $ - | $ - | ~~$1,003,344.23~~ $1,003,081.73 | | $1,003,081.73 |
| December | $ - | $192,749.24 | | | $64,249.75 | $256,998.98 | ~~$1,260,343.21~~ $1,260,080.71 | | $1,260,080.71 |
| **Total** | ~~$904,205.10~~ | $192,749.24 | | | $81,417.37 | $1,178,371.71 | ~~$1,260,343.21~~ $1,260,080.71 | | $1,260,080.71 |

| 2010 | | Activity | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
| | 1 | 2 | 3 | 4 | 5 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | $1,260,080.71 | | $903,942.60 |
| January | $ - | $ - | | | $ - | $ - | ~~$1,260,343.21~~ $1,260,080.71 | | $1,260,080. |
| February | $ - | $83,189.33 | | | $4,309.28 | $87,498.60 | ~~$1,347,841.81~~ $1,347,579.31 | $3,126.60 | $1,350,705. |
| March | $ - | $287,584.06 | | | $91,914.52 | $379,498.58 | ~~$1,727,340.39~~ $1,727,077.89 | $4,014.36 | $1,734,218. |
| April | $ - | $24,815.08 | | | $8,271.69 | $33,086.77 | ~~$1,760,427.16~~ $1,760,164.66 | $4,100.44 | $1,771,406. |
| May | $ - | $27,388.18 | | | $9,129.39 | $36,517.57 | ~~$1,796,944.73~~ $1,796,682.23 | $4,194.68 | $1,812,118. |
| June | $35,803.69 | $210,777.87 | | | $90,953.80 | $337,535.36 | ~~$2,134,480.09~~ $2,134,217.59 | $4,987.55 | $2,154,641. |
| July | $ - | $32,386.28 | | | $10,795.43 | $43,181.71 | ~~$2,177,661.80~~ $2,177,399.30 | $5,099.31 | $2,202,922. |
| August | $ - | $49,049.21 | | | $16,349.74 | $65,398.94 | ~~$2,243,060.74~~ $2,242,798.24 | $5,262.87 | $2,273,584. |
| September | $ - | $181,105.53 | | | $60,368.51 | $241,474.04 | ~~$2,484,534.78~~ $2,484,272.28 | $5,835.34 | $2,520,893. |
| October | $ - | $49,948.96 | | | $11,343.36 | $61,292.32 | ~~$2,545,827.10~~ $2,545,564.60 | $5,991.09 | $2,588,176. |
| November | $ - | $38,231.33 | | | $5,611.36 | $43,842.69 | ~~$2,589,669.79~~ $2,589,407.29 | $6,106.71 | $2,638,126. |
| December | $ - | $26,291.78 | | | $40,929.40 | $67,221.17 | ~~$2,656,890.96~~ $2,656,628.46 | $6,276.85 | $2,711,624. |
| Total | $35,803.69 | $1,010,767.60 | $ - | $ - | $349,976.47 | $1,396,547.75 | ~~$2,656,890.96~~ $2,656,628.46 | $54,995.79 | $2,711,624. |

| 2011 | | Activity | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
| | 1 | 2 | 3 | 4 | 5 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| January | $ - | $65,821.19 | $8,315.07 | | $5,149.81 | $79,286.08 | ~~$2,736,177.03~~ $2,735,914.53 | $6,475.37 | $2,797,385. |
| February | $ - | $34,122.56 | $5,917.34 | | $3,480.63 | $43,520.52 | ~~$2,779,697.56~~ $2,779,697.56 | $6,591.36 | $2,847,497. |

A-7

| Month | Activity 1 | Activity 2 | Activity 3 | Activity 4 | Activity 5 | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| March | $ - | $89,163.59 | $7,807.45 | | $24,228.73 | $121,199.77 | $2,779,435.06 ~~$2,900,897.33~~ $2,900,634.83 | $6,887.86 | $2,975,585.51 |
| April | $4,369.00 | $41,524.47 | $816.00 | | $4,921.73 | $51,631.19 | ~~$2,952,528.52~~ $2,952,266.02 | $7,023.63 | $3,034,240.03 |
| May | $ - | $33,086.28 | $5,788.50 | | $4,696.23 | $43,571.00 | ~~$2,996,099.52~~ $2,995,837.02 | $7,141.02 | $3,084,952.06 |
| June | $ - | $377,309.42 | $12,630.77 | | $140,672.48 | $530,612.66 | ~~$3,526,712.19~~ $3,526,449.69 | $8,388.70 | $3,623,953.50 |
| July | $ - | $61,672.15 | $19,523.55 | | $3,730.36 | $84,926.07 | ~~$3,611,638.25~~ $3,611,375.75 | $8,605.20 | $3,717,484.56 |
| August | $ - | $30,740.11 | $40,162.13 | | $2,371.16 | $73,273.39 | ~~$3,684,911.65~~ $3,684,649.15 | $8,795.17 | $3,799,553.20 |
| September | $5,051.69 | $208,387.28 | $1,699,622.61 | | $49,170.64 | $1,962,232.21 | ~~$5,647,143.86~~ $5,646,881.36 | $13,368.28 | $5,775,153.75 |
| October | $ - | $38,805.77 | $68,078.17 | | $49,995.48 | $156,879.42 | ~~$5,804,023.28~~ $5,803,760.78 | $13,763.28 | $5,945,796.45 |
| November | $ - | $35,377.09 | $1,157,504.71 | | $3,988.25 | $1,196,870.06 | ~~$7,000,893.34~~ $7,000,630.84 | $16,572.15 | $7,159,238.63 |
| December | $ - | $102,572.62 | $1,718,936.65 | | $30,787.05 | $1,852,296.32 | ~~$8,853,189.66~~ $8,852,927.16 | $20,908.23 | $9,032,443.20 |
| **Total** | $9,420.69 | $1,118,582.52 | $4,745,102.95 | $ - | $323,192.54 | $6,196,298.70 | ~~$8,853,189.66~~ $8,852,927.16 | $124,520.25 | $9,032,443.20 |
| **2012** | **1** | **2** | **3** | **4** | **5** | **Total Costs** | **Cumulative Costs** | **Accrued Interest @ 2.82%[a]** | **Total Balance** |
| January | $ - | $32,831.15 | $75,661.14 | | $5,893.95 | $114,386.24 | ~~$8,967,575.90~~ $8,967,313.40 | $21,222.13 | $9,168,051.53 |
| February | $ - | $32,022.66 | $37,779.96 | | $6,637.80 | $76,440.42 | ~~$9,044,016.32~~ $9,043,753.82 | $21,448.72 | $9,265,940.79 |
| March | $ - | $108,606.66 | $135,759.79 | | $33,537.28 | $277,903.73 | ~~$9,321,920.05~~ $9,321,657.55 | $22,143.27 | $9,565,987.71 |
| April | $ - | $27,600.66 | $74,043.52 | | $4,351.28 | $105,995.47 | ~~$9,427,915.52~~ $9,427,653.02 | $22,440.57 | $9,694,423.45 |
| May | $ - | $25,334.34 | $50,402.01 | | $6,214.63 | $81,950.99 | ~~$9,509,866.54~~ $9,509,604.01 | $22,682.78 | $9,799,057.52 |

| | 1 | 2 | 3 | 4 | 5 | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | Activity | | | | | | |
| June | $    - | $407,684.98 | $61,669.73 | | $246,759.56 | $716,114.27 | ~~$10,225,980.78~~ $10,225,718.28 | $24,396.91 | $10,539,568... |
| July | $    - | $21,575.42 | $104,189.74 | $1,942.88 | $6,733.93 | $134,441.97 | ~~$10,360,422.75~~ $10,360,160.25 | $24,765.44 | $10,698,776.17 |
| August | $    - | $39,091.24 | $63,132.12 | $4,947.00 | $5,957.57 | $113,127.93 | ~~$10,473,550.68~~ $10,473,288.18 | $25,085.37 | $10,836,989.47 |
| September | $4,763.29 | $144,040.75 | $43,644.33 | $17,797.71 | $45,330.63 | $255,576.72 | ~~$10,729,127.40~~ $10,728,864.90 | $25,736.56 | $11,118,302.20 |
| October | $    - | $45,723.19 | $68,838.81 | $9,213.25 | $20,603.58 | $144,378.83 | ~~$10,873,506.22~~ $10,873,243.72 | $26,131.25 | $11,288,812.? |
| November | $    - | $17,550.10 | $35,593.46 | $5,457.00 | $5,800.03 | $64,400.60 | ~~$10,937,906.82~~ $10,937,644.32 | $26,341.30 | $11,379,554.? |
| December | $    - | $146,588.29 | $22,346.79 | $    - | $53,059.96 | $221,995.04 | ~~$11,159,901.86~~ $11,159,639.36 | $26,917.48 | $11,628,467.? |
| Total | $4,763.29 | $1,048,649.45 | $773,061.41 | $39,357.84 | $440,880.21 | $2,306,712.20 | ~~$11,159,901.86~~ $11,159,639.36 | $289,311.78 | $11,628,467.? |
| **2013** | **1** | **2** | **3** | **4** | **5** | **Total Costs** | **Cumulative Costs** | **Accrued Interest @ 2.82%[a]** | **Total Balance** |
| January | $    - | $34,440.24 | $29,383.37 | $    - | $10,945.58 | $74,769.18 | ~~$11,234,671.05~~ $11,234,408.55 | $27,153.41 | $11,730,389.? |
| February | $    - | $26,624.90 | $31,712.17 | $2,133.29 | $7,391.27 | $67,861.63 | ~~$11,302,532.67~~ $11,302,270.17 | $27,373.86 | $11,825,625.? |
| March | $    - | $136,725.06 | $48,240.59 | $    - | $47,155.52 | $232,121.17 | ~~$11,534,653.84~~ $11,534,391.34 | $27,975.93 | $12,085,722.? |
| April | $5,417.21 | $29,620.47 | $83,131.37 | $7,803.00 | $8,483.78 | $134,455.83 | ~~$11,669,109.67~~ $11,668,847.17 | $28,352.80 | $12,248,531.? |
| May | $    - | $40,069.63 | $91,729.85 | $4,590.00 | $6,562.91 | $142,952.39 | ~~$11,812,062.07~~ $11,811,799.57 | $28,750.25 | $12,420,233.? |
| June | ~~$29,656.22~~ $0 | $166,249.62 | $48,394.54 | $    - | $154,535.21 | ~~$398,835.59~~ $369,179.37 | ~~$12,210,897.65~~ $12,180,978.93 | $29,673.52 | $12,819,086.? |
| July | ~~$29,373.11~~ $0 | $    - | $97,035.68 | $46,706.25 | $41,483.58 | ~~$214,598.62~~ $185,225.51 | ~~$12,425,496.27~~ $12,366,204.44 | $30,172.12 | $13,034,484.? |
| August | ~~$2,331.62~~ $0 | $    - | $21,907.90 | $108,045.64 | $44,760.21 | ~~$177,045.37~~ $174,713.75 | ~~$12,602,541.64~~ $12,540,918.19 | $30,647.49 | $13,239,845.? |
| September | ~~$6,038.06~~ $0 | $    - | $36,003.02 | $56,912.37 | $37,346.02 | ~~$136,299.47~~ $136,299.47 | ~~$12,738,841.11~~ | $31,031.82 | |

| | 1 | 2 | Activity 3 | 4 | 5 | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| | $4,742.16 | | | | | $135,003.57 | $12,675,921.76 | | $13,405,880.78 |
| October | ~~$3,264.00~~ $0 | $ - | $13,799.31 | $65,543.38 | $38,302.48 | ~~$120,909.16~~ $117,645.16 | ~~$12,850,750.27~~ $12,793,566.92 | $31,376.78 | $13,554,902.72 |
| November | ~~$10,802.48~~ $0 | $ - | $5,510.97 | $49,651.18 | $28,063.71 | ~~$94,028.33~~ $83,225.85 | ~~$12,953,778.64~~ $12,876,792.78 | $31,642.67 | $13,669,771.24 |
| December | ~~$17,327.25~~ $0 | $ - | $59,386.46 | $75,148.42 | $22,041.48 | ~~$172,903.60~~ $156,576.35 | ~~$13,127,682.24~~ $13,033,369.13 | $32,079.37 | ~~$13,858,426.21~~ $13,858,426.21 |
| Total | ~~$104,209.95~~ $10,159.37 | $433,729.92 | $566,235.22 | $416,533.52 | $447,071.75 | ~~$1,967,780.35~~ $1,873,729.77 | ~~$13,127,682.24~~ $13,033,369.13 | $356,230.02 | ~~$13,858,426.21~~ $13,858,426.21 |

| 2014 | 1 | 2 | Activity 3 | 4 | 5 | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| January | ~~$3,850.50~~ $0 | $2,482.77 | ~~$2,432.16~~ $21,748.45 | $90,204.30 | $26,906.95 | ~~$125,874.68~~ $141,342.47 | ~~$13,253,558.89~~ $13,174,711.60 | $32,481.74 | $14,032,251.74 |
| February | $ - | $7,490.85 | ~~$2,231.73~~ $21,661.54 | $85,222.92 | $39,285.71 | ~~$134,231.20~~ $153,661.02 | $13,328,372.61 | $32,913.62 | $14,218,825.02 |
| March | ~~$10,284.77~~ $5,006.27 | $1,415.25 | ~~$2,850.54~~ $21,968.78 | $108,911.16 | $28,666.51 | ~~$152,128.22~~ $165,967.96 | ~~$13,539,918.31~~ $13,494,340.58 | $33,375.06 | $14,418,168.03 |
| April | ~~$14,615.52~~ $0 | $153.00 | ~~$864.00~~ $20,095.09 | $159,591.29 | $37,945.87 | ~~$213,166.68~~ $217,785.25 | ~~$13,753,084.99~~ $13,712,125.82 | $33,957.79 | $14,669,911.35 |
| May | ~~$1,955.08~~ $0 | $ - | ~~$5,788.51~~ $25,038.43 | $223,211.51 | $36,041.05 | ~~$266,996.15~~ $284,290.99 | ~~$14,020,081.14~~ $13,996,416.81 | $34,696.18 | $14,988,899.05 |
| June | $ - | $ - | ~~$27,198.90~~ $46,448.82 | $143,436.19 | $112,283.02 | ~~$282,918.11~~ $302,168.03 | ~~$14,302,999.25~~ $14,298,584.84 | $35,477.76 | $15,326,544.83 |
| July | ~~$6,702.65~~ $0 | $ - | ~~$84,802.98~~ $8,832.66 | $125,793.54 | $40,630.56 | ~~$258,019.73~~ $175,256.76 | ~~$14,561,018.98~~ $14,473,841.60 | $35,966.70 | $15,537,768.31 |
| August | ~~$4,245.75~~ $0 | $ - | ~~$62,874.87~~ $5,862.55 | $98,850.30 | $33,730.96 | ~~$199,701.88~~ $138,443.81 | ~~$14,760,720.86~~ $14,612,285.41 | $36,371.36 | $15,712,583.60 |
| September | ~~$27,937.49~~ $0 | $ - | ~~$31,963.16~~ $13,046.84 | $62,260.25 | $28,898.83 | ~~$151,059.73~~ $104,205.92 | ~~$14,911,780.59~~ $14,716,491.34 | $36,697.52 | $15,853,486.03 |
| October | ~~$8,908.03~~ $0 | $ - | ~~$30,539.51~~ $39,704.24 | $56,427.43 | $30,025.32 | ~~$125,900.29~~ $126,156.99 | ~~$15,037,680.88~~ $14,842,648.33 | $37,075.37 | $16,016,719.15 |
| November | $ - | $ - | ~~$2,182.36~~ $21,432.28 | $104,847.70 | $26,058.19 | ~~$133,088.24~~ $152,338.16 | ~~$15,170,769.12~~ $14,994,986.49 | $37,514.84 | $16,206,572.27 |
| December | $ - | $ - | ~~$4,219.49~~ | $109,088.42 | $26,763.17 | ~~$140,071.08~~ | ~~$15,310,840.20~~ | $37,971.53 | |

| | | Activity | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | | | | |
| **Total** | | $11,541.87 | ~~$258,035.21~~ $269,309.10 | $1,367,844.99 | $467,236.13 | ~~$2,183,157.99~~ $2,120,938.36 | ~~$15,310,840.20~~ $15,154,307.49 | $424,499.47 | $16,403,864.80 |
| **2015*** | | | | | | | | | |
| January | ~~$3,018.30~~ $0 | | ~~$6,765.58~~ $7,142.53 | $77,503.98 | $24,635.11 | ~~$111,922.97~~ $109,281.62 | ~~$15,422,763.16~~ $15,263,589.10 | $38,313.18 | $16,551,459.xx |
| February | $ - | | $10,692.03 | $68,261.79 | $30,856.72 | $109,810.54 | ~~$15,532,573.70~~ $15,373,399.65 | $38,656.85 | $16,699,927.xx |
| March | ~~$12,221.54~~ $5,307.24 | | ~~$8,358.02~~ $8,674.97 | $39,823.96 | ~~$39,666.54~~ $38,716.54 | ~~$100,070.06~~ $92,522.71 | ~~$15,632,643.76~~ $15,465,922.35 | $38,961.21 | $16,831,410.5x |
| April | ~~$16,990.85~~ $0 | | $9,742.68 | $79,695.94 | ~~$80,102.90~~ $47,523.67 | ~~$186,532.37~~ $136,962.29 | ~~$15,819,176.13~~ $15,602,884.64 | $39,369.38 | $17,007,742.8x |
| May | ~~$2,763.29~~ $0 | | ~~$17,822.51~~ $37,072.43 | $96,195.72 | ~~$60,462.56~~ $40,001.90 | ~~$177,244.08~~ $173,270.05 | ~~$15,996,420.21~~ $15,776,154.69 | $39,862.74 | $17,220,875.3x |
| June | ~~$7,982.36~~ $0 | | ~~$25,646.50~~ $44,896.42 | $92,397.60 | ~~$469,879.26~~ $164,669.57 | ~~$295,896.72~~ $301,963.59 | ~~$16,292,316.93~~ $16,078,118.28 | $40,655.83 | $17,563,494.8x |
| **Total** | ~~$42,976.34~~ $0 | $ - | ~~$79,027.31~~ $118,221.05 | $453,878.99 | ~~$405,594.09~~ $346,403.51 | ~~$981,476.73~~ $923,810.80 | | $235,819.20 | |

| | | Activity | | | | Total Costs | Cumulative Costs | Accrued Interest @ 2.82%[a] | Total Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Year** | **1** | **2** | **3** | **4** | **5** | | | | |
| 2008 | $81,971.50 | $ - | $ - | $ - | $ - | $81,971.50 | $81,971.50 | | |
| 2009 | ~~$904,205.10~~ $903,942.60 | $192,749.24 | $ - | $ - | $81,417.37 | ~~$1,178,371.71~~ $1,178,109.21 | ~~$1,260,343.21~~ $1,260,080.71 | | |
| 2010 | $35,803.69 | $1,010,767.60 | $ - | $ - | $349,976.47 | $1,396,547.75 | ~~$2,656,890.96~~ $2,656,628.46 | $54,995.79 | $2,711,624.25 |
| 2011 | $9,420.69 | $1,118,582.52 | $4,745,102.95 | $ - | $323,192.54 | $6,196,298.70 | ~~$8,853,189.66~~ $8,852,927.16 | $124,520.25 | $9,032,443.3x |
| 2012 | $4,763.29 | $1,048,649.45 | $773,061.41 | $39,357.84 | $440,880.21 | $2,306,712.20 | ~~$11,159,901.86~~ $11,159,639.36 | $289,311.78 | $11,628,467.6x |
| 2013 | ~~$104,209.95~~ $10,159.37 | $433,729.92 | $566,235.22 | $416,533.52 | $447,071.75 | ~~$1,967,780.35~~ $1,873,729.77 | ~~$13,127,682.21~~ $13,033,369.13 | $356,230.02 | $13,858,426.9x |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2014** | ~~$78,499.79~~ $5,006.27 | ~~$258,025.21~~ $269,309.10 | $11,541.87 | $1,367,844.99 | $467,236.13 | ~~$2,183,157.99~~ $2,120,938.36 | ~~$15,310,840.20~~ $15,154,307.49 | $424,499.47 | ~~$16,403,864.80~~ |
| **2015\*** | ~~$42,976.34~~ $5,307.24 | ~~$79,027.31~~ $118,221.05 | $ - | $453,878.99 | ~~$405,594.09~~ $346,403.51 | ~~$981,476.73~~ $923,810.80 | ~~$16,292,316.93~~ $16,078,118.28 | $235,819.20 | ~~$17,563,494.80~~ |
| **Total** | ~~$1,261,850.35~~ $1,056,374.65 | ~~$6,421,462.09~~ $6,471,929.73 | $3,816,020.59 | $2,277,615.34 | ~~$2,515,368.56~~ $2,456,177.98 | ~~$16,292,316.93~~ $16,078,118.28 | | $1,485,376.52 | |

**a** – Interest charges have been applied to the incurred response costs beginning in February 2010, the time at which RID's initial Complaint was filed in this civil action. 42 U.S.C. § 9607(a)(4). "The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26." *Id.* Interest is determined by the Secretary of the Treasury (as of the close of the calendar month preceding the month in which the advance is made) to be equal to the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the anticipated period during which the advance will be outstanding and shall be compounded annually. 26 U.S.C. § 9507(d). Here, interest accrues at a rate of 2.82 percent, compounded annually, which corresponds to applicable Federal rates for the average annual yield on intermediate term (3- to 9-year) obligations of the U.S. Government as of February 2010.

\*Through June 2015.

The following chart identifies the amounts deducted from the total amounts set forth in the invoices from Gallagher & Kennedy, which are bates-numbered RID108500-109133. The below amounts represent costs that may not be recoverable as costs incurred by it in performing the remediation of the groundwater in the WVBA. Accordingly, they have not been included in the figures noted in the tables above.

| Invoice Period | Amount Excluded from Damages Computation |
|---|---|
| | |

| | |
|---|---|
| 2008 | $0 |
| January – March 2009 | $262.50 |
| April – June 2009 | $0 |
| July – September 2009 | $0 |
| October – December 2009 | $0 |
| January – March 2010 | $0 |
| April – June 2010 | $880.00 |
| July – September 2010 | $0 |
| October – December 2010 | $0 |
| January – March 2011 | $0 |
| April – June 2011 | $0 |
| July – September 2011 | $0 |
| October – December 2011 | $977.50 |
| January – March 2012 | $0 |
| April – June 2012 | $360.00 |
| July – September 2012 | $2,725.00 |
| October – December 2012 | $1,500.00 |
| January – March 2013 | $187.50 |
| April – June 2013 | $1,125.00 |
| July 2013 | $0 |
| August 2013 | $14,430.00 |
| September 2013 | $18,533.00 |
| October 2013 | $54,716.50 |
| November 2013 | $17,425.50 |
| December 2013 | $11,426.50 |
| January 2014 | $6,138.00 |
| February 2014 | $5,075.00 |
| March 2014 | $1,707.50 |
| April 2014 | $11,242.50 |
| May 2014 | $14,048.50 |

A-13

| | |
|---|---|
| June 2014 | $6,567.50 |
| July 2014 | $10,562.00 |
| August 2014 | $6,591.50 |
| September 2014 | $22,252.50 |
| October 2014 | $16,515.00 |
| November 2014 | $598.00 |
| December 2014 | $3,208.50 |
| January 2015 | $13,782.50 |
| February 2015 | $18,194.00 |
| March 2015 | $385.00 |
| April 2015 | $10,932.00 |
| May 2015 | $0 |
| June 2015 | $625.00 |
| Total | $272,974.00 |

A-14

# EXHIBIT 2

1  Jerry C. Bonnett (AZ 003381)
Andrew S. Friedman (AZ 005425)
2  Francis J. Balint, Jr. (AZ 007669)
Guy A. Hanson (AZ 013549)
3  Andrew M. Evans (AZ 024917)
**BONNETT, FAIRBOURN, FRIEDMAN**
4  **& BALINT, P.C.**
2325 East Camelback Road, Suite 300
5  Phoenix, Arizona  85016
P:  (602) 274-1100
6  F:  (602) 274-1199
jbonnett@bffb.com
7  afriedman@bffb.com
fbalint@bffb.com
8  ghanson@bffb.com
aevans@bffb.com
9
10  *Attorneys for Plaintiff Roosevelt Irrigation District*
11
12  **IN THE UNITED STATES DISTRICT COURT**
13  **FOR THE DISTRICT OF ARIZONA**
14  Roosevelt Irrigation District, a political       No.    2:10-CV-00290-DAE (BGM)
15  subdivision of the State of Arizona,
       **PLAINTIFF ROOSEVELT**
16               Plaintiff,                           **IRRIGATION DISTRICT'S**
                                                      **ANSWERS AND OBJECTIONS TO**
17  v.                                                **UNITED STATES DEPARTMENT**
                                                      **OF ENERGY'S SECOND SET OF**
18  Salt River Project Agricultural                   **INTERROGATORIES DIRECTED**
19  Improvement And Power District, *et al.*          **TO ROOSEVELT IRRIGATION**
                                                      **DISTRICT**
20               Defendants.
21
22
23  PROPOUNDING PARTY: UNITED STATES DEPARTMENT OF ENERGY
24  RESPONDING PARTY:   ROOSEVELT IRRIGATION DISTRICT
25  SET NO.:   TWO
26
27
28                                          1

1

2       Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Case Management

3 Order No. 2 dated February 3, 2015 (Dkt No. 918), and Amended Case Management

4 Order No. 1 dated February 25, 2013 (Dkt No. 712), Plaintiff Roosevelt Irrigation

5 District ("RID") hereby Answers and Objects to the United States Department of

6 Energy's Second Set of Interrogatories Directed to Roosevelt Irrigation District as

7 follows:

8                       **GENERAL OBJECTIONS**

9       Plaintiff makes the following objections applicable to Defendant United States

10 Department of Energy's ("DOE") interrogatories and requests for production.

11       A.    Plaintiff objects to the Requests to the extent they fail to describe with

12 reasonable particularity the information sought.

13       B.    Plaintiff objects to the Requests because they fail to specify a reasonable

14 time, place, and manner for the inspection and for performing related acts.

15       C.    Plaintiff objects to the Requests to the extent they expose Plaintiff to

16 undue burden or expense.

17       D.    Plaintiff objects to producing documents that are as readily available to

18 the DOE from public sources as they are to Plaintiff and to producing documents

19 already produced to Defendants, including Defendant DOE, pursuant to Rule

20 26(a)(1)(A)(ii), Federal Rules of Civil Procedure.

21                     **INTERROGATORIES**

22 **INTERROGATORY NO. 12:**

23       Please describe how Plaintiff complied with the documentation of cost

24 requirements of 40 C.F.R. Section 300.160.00 *et seq*.

25 **ANSWER**:

26       Response actions taken by Roosevelt Irrigation District were conducted under a

27 working agreement with the Arizona Department of Environmental Quality based on

28

1   ADEQ's determination that "releases or threatened releases of hazardous substances have
2   occurred … resulting in groundwater contamination that has impacted multiple RID
3   water supply wells which may present an imminent and substantial endangerment to the
4   public health, welfare or the environment within the West Van Buren WQARF Site"
5   (Agreement to Conduct Work entered into by ADEQ and RID on October 8, 2009).  In
6   this regard, all work was conducted under work plans approved by ADEQ and performed
7   in accordance with rules adopted under Arizona statutes governing the Water Quality
8   Assurance Revolving Fund (WQARF) program, including all requirements for
9   community involvement in WQARF remedial actions.  The response actions taken by
10  RID include work conducted to investigate, monitor, assess, and evaluate the release of
11  hazardous substances, and to remediate such releases, pursuant to WQARF program
12  requirements which are consistent with remedial actions identified in the Comprehensive
13  Environmental Response, Compensation, and Liability Act that governs the federal
14  Superfund program. 42 U.S.C. §§ 9601(23)-(25).

15       From the outset, RID had endeavored to compile and maintain detailed records of
16  the costs incurred in remediating the contaminated groundwater that has impacted its
17  wells.  RID has compiled and maintains invoices by technical consultants and contractors
18  that have performed services in connection with the remediation.  RID has compiled and
19  maintained documentation that supports its internal administrative expenses in carrying
20  out the remediation.  RID has used the services of a certified public accountant to track
21  the costs related to the remediation, and maintain accounting records documenting the
22  costs.  Finally, RID has compiled and maintained invoices from attorneys who have
23  rendered services in connection with the remediation, and have endeavored to exclude
24  legal charges for services that are not closely tied to the actual cleanup of the
25  contaminated groundwater plume.

26       RID actions and claims for recoverable response costs are in substantial
27  compliance with requirements for a private party response action, as defined in Subpart

28

3

1  H of the National Contingency Plan (Participation by Others), including 40 C.F.R. §
2  300.70(c)(5)(ii) and to the extent Section 300.160 is applicable to RID.

3  **INTERROGATORY NO. 13:**

4  Please identify the exact dollar amount of Plaintiff's costs as of May 1, 2016 that
5  Plaintiff seeks to recover in this litigation under Count One of its Third Amended
6  Complaint.

7  **OBJECTION**:  Plaintiff objects to this interrogatory to the extent that it seeks "the exact
8  dollar amount" of the response costs for which it seeks recovery in this action.

9  **ANSWER**:

10  RID estimates that, as of May 1, 2016, its costs incurred in remediating the
11  contaminated groundwater plume and for which it seeks recovery to be: $17,760,000.

12  RID has previously provided detailed cost estimate figures in a document titled
13  "Exhibit A," which accompanied its disclosures.  The most recent version of Exhibit A
14  accompanied RID's Second Supplemental Disclosure, served on November 4, 2015.
15  This document contains Plaintiff's estimated recoverable costs through June 2015.

16  Exhibit A segregates RID's total recoverable costs into five categories, each called
17  an "Activity."  Each Activity lists certain of RID's incurred costs, broken out by tasks
18  and by year.

19  The $17,760,000 figure above differs from the total figure ($16,078,118.18) in the
20  most recent version of Exhibit A (p. A-12) for the following reasons:

21  A.  The current figure includes costs incurred between July 1, 2015 and April
22  30, 2016.  These costs are documented by invoices being produced in response to the
23  DOE's First Set of Requests for Production.

24  B.  RID has reviewed certain billings that were included in the "District
25  General Response Costs" (outlined in Exhibit A as part of Activity 5, p. A-5).  This
26  review included invoices submitted by EUSI, Burch & Cracchiolo and Ryley Carlock
27  Applewhite.  The result of this review is a reduction in the amount of the total billings

28

4

1  from each entity.  The amount of the reductions can be discerned in copies of the billings

2  themselves, which are being re-produced in response to the DOE's First RFP.

3  **INTERROGATORY NO. 14:**

4      For each cost that comprises Plaintiff's total costs computation identified in

5  response to Interrogatory No. 13, please identify the source documents, including, but not

6  limited to, invoices, purchase order, billing statements, proof of payment records, copies

7  of checks, credit card statements, bank statements, *et cetera*, that Plaintiff contends will

8  support the recoverability of the cost under Count One of its Third Amended Complaint.

9  **OBJECTION**:  RID objects on the grounds that it has previously identified the "source

10  documents," and the documents have been produced either with RID disclosures or by

11  RID technical consultants pursuant to subpoena.

12  **ANSWER**:

13      In Exhibit A, RID identifies the source documents for the costs in each activity in

14  previous disclosures.  They are:

15  ACTIVITY 1

16      Gallagher & Kennedy invoices (2008-2009) (previously produced);

17      Montgomery & Associates invoices (2008-2009) (previously produced);

18
19      RID Capital Costs – invoices, labor costs and material costs relating to the
    enclosure of the 27th Ave./Durango lateral canal (2010) (previously produced);
20

21      RID water quality monitoring costs – invoices submitted by Montgomery &
22      Associates, who performed the work in 2010 and Synergy Environmental in 2011
23      through 2015 (previously produced);

24  ACTIVITY 2

25      Gallagher & Kennedy invoices (2009-2013) (previously produced);

26      HDR invoices for consulting services (2010);
27

28

1   Synergy invoices for services performed (2010-2013) (previously produced); and

2   RID Task 2 – invoices for contractors' work instilling Well 111R, which replaced

3   original RID Well 111 (previously produced).

4

5   ACTIVITY 3

6   Synergy invoices 2011-June 2015 (previously produced);

7   Documents related to the cost of the well treatment systems developed and

8   installed by Spinnaker Holdings (previously produced by Spinnaker); and

9   Documents related to the operation and maintenance costs incurred by Spinnaker

10  Holdings (previously produced by Spinnaker)

11

12  ACTIVITY 4

13  Gallagher & Kennedy invoices (2013-June 2015) (previously produced); and

14  Synergy invoices (2012-June 2015) (previously produced).

15  ACTIVITY 5

16  Invoices and proof of payment by RID of ADEQ's oversight charges (2011-June

17  2015) (previously produced);

18  Invoices documenting RID's general costs (and proof of payment of same) (2009-

19  June 2015) (previously produced);

20

21  Gallagher & Kennedy invoices (2009-June 2015) (previously produced); and

22  Synergy invoices (2009-June 2015) (previously produced).

23  In response to the DOE's First RFP, RID is producing invoices and documents

24  relating to claimed recoverable costs from June 2015 through April 2016.

25

26

27

28

1  **INTERROGATORY NO. 15:**

2         Please identify the total dollar amount of all funds received as of May 1, 2016 by

3  Plaintiff from the Arizona Department of Environmental Quality pursuant to A.R.S. § 49-

4  282(E)(11).

5  **ANSWER**:

6  8/16/2013          $250,000.00

7  7/21/2014          $178,635.77

8  7/21/2015          $195,459.00

9  TOTAL:             $624,094.77

10

11         RESPECTFULLY SUBMITTED, July 8, 2016.

12                                    BONNETT, FAIRBOURN, FRIEDMAN
                                      & BALINT, P.C.
13

14
                                      By:    /s/ Guy A. Hanson
15                                           Jerry C. Bonnett
                                             Andrew S. Friedman
16                                           Francis J. Balint, Jr.
                                             Guy A. Hanson
17                                           Andrew Q. Everroad
                                             2325 East Camelback Road, Suite 300
18                                           Phoenix, Arizona  85016
                                             *Attorneys for Plaintiff Roosevelt*
19                                           *Irrigation District*

20

21

22

23

24

25

26

27

28                                        7

1

2

**CERTIFICATE OF SERVICE**

3

     I hereby certify that on July 8, 2016, I served a copy of Plaintiff Roosevelt Irrigation District's Answers And Objections To United States Department Of Energy's Second Set Of Interrogatories Directed To Roosevelt Irrigation District on all parties by email transmission.

4

5

6

                                    */s/ Karen Vanderbilt*
                                     Karen Vanderbilt

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

## VERIFICATION

STATE OF ARIZONA        )
                        ) ss.
County of Maricopa      )

Guy A. Hanson, being first duly sworn upon his oath, deposes and says:

That he is an attorney for and agent of Roosevelt Irrigation District, and is authorized to make this Verification on behalf of Roosevelt Irrigation District.

That he has read the foregoing answers to interrogatories in the matter of *Roosevelt Irrigation District v. Salt River Agricultural Improvement and Power District, et al.*, Case No. 2:20-cv-00290-DAE (BGM), and knows the contents thereof; and that the responses and amendments are true to the best of his knowledge except as to those statements made therein upon information and belief and, as to those, he believes them to be true.

_____
Guy A. Hanson

SUBSCRIBED AND SWORN to before me this 8th day of July , 2016, by Guy A. Hanson, as attorney for Roosevelt Irrigation District.

_____
Notary Public

My commission expires:

April 30, 2019

KAREN M. VANDERBILT
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 30, 2019

# EXHIBIT 3

Jerry C. Bonnett (AZ 003381)
Andrew S. Friedman (AZ 005425)
Francis J. Balint, Jr. (AZ 007669)
Guy A. Hanson (AZ 013549)
Andrew M. Evans (AZ 024917)
**BONNETT, FAIRBOURN, FRIEDMAN**
**& BALINT, P.C.**
2325 East Camelback Road, Suite 300
Phoenix, Arizona  85016
P:  (602) 274-1100
F:  (602) 274-1199
jbonnett@bffb.com
afriedman@bffb.com
fbalint@bffb.com
ghanson@bffb.com
aevans@bffb.com

*Attorneys for Plaintiff Roosevelt Irrigation District*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roosevelt Irrigation District, a political subdivision of the State of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>Salt River Project Agricultural Improvement And Power District, *et al.*<br><br>Defendants. | No.    2:10-CV-00290-DAE (BGM)<br><br>**PLAINTIFF ROOSEVELT IRRIGATION DISTRICT'S RESPONSES AND OBJECTIONS TO UNITED STATES DEPARTMENT OF ENERGY'S FIRST SET OF REQUESTS FOR PRODUCTION** |

PROPOUNDING PARTY: UNITED STATES DEPARTMENT OF ENERGY

RESPONDING PARTY:   ROOSEVELT IRRIGATION DISTRICT

SET NO.:     ONE

1

PLAINTIFF'S RESPONSES AND OBJECTIONS TO UNITED STATES DEPARTMENT OF ENERGY'S FIRST
SET OF REQUESTS FOR PRODUCTION DIRECTED TO ROOSEVELT IRRIGATION DISTRICT

1

2   Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Case Management

3   Order No. 2 dated February 3, 2015 (Dkt No. 918), and Amended Case Management

4   Order No. 1 dated February 25, 2013 (Dkt No. 712), Plaintiff Roosevelt Irrigation

5   District ("RID") hereby Responds and Objects to the United States Department of

6   Energy's First Set of Requests for Production Directed to Roosevelt Irrigation District as

7   follows:

8                                    **GENERAL OBJECTIONS**

9         Plaintiff makes the following objections applicable to Defendant Department of

10  Energy's ("DOE") requests for production.

11        A.      Plaintiff objects to the Requests to the extent that they fail to describe

12  with reasonable particularity each item or category of items to be inspected.

13        B.      Plaintiff objects to the Requests because they fail to specify a reasonable

14  time, place, and manner for the inspection and for performing related acts.

15        C.      Plaintiff objects to the Requests to the extent that they expose Plaintiff to

16  undue burden or expense.

17        D.      Plaintiff objects to producing documents that are as readily available to

18  the DOE from public sources as they are to Plaintiff and to producing documents

19  already produced to Defendants, including Defendant DOE, pursuant to Rule

20  26(a)(1)(A)(ii), Federal Rules of Civil Procedure.

21                                **REQUESTS FOR PRODUCTION**

    **REQUEST FOR PRODUCTION NO.  1:**

22
23        Please produce the documents and electronically stored information that support

24  Plaintiff's response to the United States Department Energy's Interrogatory No. 12.

25  **RESPONSE**: *See* Responses to Request No. 3 below.

26

27

28                                            2

1

**REQUEST FOR PRODUCTION NO. 2:**

2

3

Please produce the documents and electronically stored information that support Plaintiff's response to the United States Department Energy's Interrogatory No. 13.

4

**RESPONSE**:  *See* Response to Request No. 3 below.

5

6

**REQUEST FOR PRODUCTION NO. 3:**

7

8

Please produce the documents and electronically stored information that support Plaintiff's response to the United States Department Energy's Interrogatory No. 14.

9

10

**OBJECTION:**  Plaintiff objects on the grounds that it has previously produced the vast majority of documents referenced in its answer to Interrogatory No. 14.

11

12

**RESPONSE**:

13

In response to Request No. 3, RID produces the following:

14

15

A.     Copies of EUSI Invoices March 2010 through June 2015 showing reductions following review (RID110939-111062);

16

17

B.     Copies of Burch & Cracchiolo billings September 2011 through June 2015 showing reductions following review (RID111063-111134);

18

19

20

C.     Copies of Ryley Carlock & Applewhite billings August 2011 through January 2015 showing reductions following review (RID111135-111175);

21

22

D.     Copies of Ryley Carlock & Applewhite billings October 2008 through February 2010 showing reductions following review;

23

24

E.     EUSI billings August 2015 through June 2016 showing reductions following review (RID110852-110885);

25

26

F.     Burch & Cracchiolo billings August 2015 through March 2016 showing reductions following review (RID110886-110908);

27

28

3

G.     Young CPA Solutions billings July 2015 through April 2016 (Ms. Young's earlier billings are included in RID's General Response Costs (Activity 5) and have been previously produced with RID disclosures);

G.     Goldman & Zwillinger billings February 2016 through May 2016 showing reductions following review (RID 110922-110932);

H.     West Valley View August 2015 (RID110933-110938); and

I.     Tables showing amounts of reductions in the billings listed above and the claimed recoverable amounts following review (RID111197-111202).

Plaintiff has obtained itemized billings from Gallagher & Kennedy and is in the process of reviewing them.  Copies of the itemized Gallagher & Kennedy billings will be produced immediately upon completion of the review.

**REQUEST FOR PRODUCTION NO. 4:**

Please produce the documents and electronically stored information that support Plaintiff's response to the United States Department Energy's Interrogatory No. 15.

**RESPONSE**:  Previously produced.

RESPECTFULLY SUBMITTED, July 8, 2016.

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.


By:  __/s/ Guy A. Hanson__
     Jerry C. Bonnett
     Andrew S. Friedman
     Francis J. Balint, Jr.
     Guy A. Hanson
     Andrew Q. Everroad
     2325 East Camelback Road, Suite 300
     Phoenix, Arizona  85016
     *Attorneys for Plaintiff Roosevelt*
     *Irrigation District*

4

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on July 8, 2016, I served a copy of Plaintiff Roosevelt

3

Irrigation District's Answers And Objections To United States Department Of Energy's First Set of Requests for Production Directed To Roosevelt Irrigation District on all

4

parties by email transmission,:

5

                              ___/s/ Karen Vanderbilt_____

6

                              Karen Vanderbilt

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RESPONSES AND OBJECTIONS TO UNITED STATES DEPARTMENT OF ENERGY'S FIRST SET OF REQUESTS FOR PRODUCTION DIRECTED TO ROOSEVELT IRRIGATION DISTRICT

# *Exhibit 4*
# *(Filed Under Seal)*

# EXHIBIT 5

# ROOSEVELT IRRIGATION DISTRICT

**DIRECTORS**
W. BRUCE HEIDEN, PRESIDENT
DWIGHT B. LEISTER
K.C. GINGG

103 WEST BASELINE ROAD
BUCKEYE, ARIZONA 85326
TELEPHONE (623) 386-2046
FAX (623) 386-4360

**SUPERINTENDENT**
DONOVAN L. NEESE

January 9, 2013


RECEIVED
302768
JAN 23 2013
BY: M. Hart

Mr. Henry Darwin
Director
ARIZONA DEPARTMENT OF ENVIRONMENTAL QUALITY
1110 West Washington Street
Phoenix, Arizona 85007

Re: Reimbursement of RID for Remedial Action Costs Pursuant to ARS 49-282.E.11

Dear Mr. Darwin:

On behalf of the Roosevelt Irrigation District ("RID"), a political subdivision of the State of Arizona, we are requesting a reimbursement of two hundred fifty thousand dollars ($250,000) from the water quality assurance revolving fund ("WQARF") budget for fiscal year 2012/2013 pursuant to Arizona Revised Statutes ("ARS") 49-282.E.11. These WQARF funds will reimburse RID for the reasonable and necessary costs RID has incurred in responding to the releases or threatened releases of hazardous substances from facilities located within the West Van Buren Area ("WVBA") and West Central Phoenix WQARF Sites that have impacted RID's water supply wells located within the WVBA WQARF Site.

According to the written agreement between RID and ADEQ, dated October 8, 2009, and as required by ARS 49-282.E.11, "ADEQ has determined that releases or threatened releases of hazardous substances have occurred … resulting in groundwater contamination that has impacted multiple RID water supply wells which may present an imminent and substantial endangerment to the public health, welfare or the environment within the West Van Buren WQARF Site." The remedial actions that RID has performed under this agreement have been found by ADEQ to be reasonable, necessary and cost-effective pursuant to ADEQ's approval of RID's Early Response Action on June 24, 2010. To date, RID has incurred remedial action costs far in excess of the requested $250,000 and is prepared to provide ADEQ with appropriate documentation to substantiate its remedial action costs.

RID is eligible for reimbursement because it has taken reasonable efforts to obtain reimbursement from the parties responsible for the releases and threatened releases that present an immediate and substantial endangerment to public health and the environment. Specifically, for the past three years, RID has been pursuing reimbursement of its remedial action costs from the parties identified in ADEQ and EPA records and that RID has identified as "potentially responsible parties" ("PRPs"), under the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), including the federal government. Identification of the PRPs has been based on the data and information contained in ADEQ and federal agency files that document releases or threatened releases of hazardous substances from the PRPs' facilities, which are the same hazardous substances that have impacted RID's wells and water supply in the WVBA WQARF Site. Unfortunately, a majority of the PRPs, including the federal government, have refused to reimburse RID for its remediation costs. These refusals have compelled RID to pursue reimbursement via a cost recovery action against the PRPs in federal court under Section 107 of CERCLA. Nevertheless, reimbursement of RID's costs has not yet been achieved. Accordingly, RID is seeking reimbursement of the annual statutory limit of $250,000 pursuant to ARS 49-282.E.11 for the costs expended during the 2011-2012 fiscal year.

Ex. No. 41 (2 p.
Witness: Shirley
Date: 12.11.15
mgreporting.com
L. Marin-Garcia #50541

Page 1 of 2

MERINT000003

In addition to its $250,000 reimbursement request under ARS 49-282.E.11, RID would like to discuss with you whether the WQARF fund can be used by RID to fund its remedial actions at the WVBA WQARF Site pursuant to ARS 49-282.E.3 and 14 and ARS 49-282.F.

We are prepared to meet at your earliest convenience to discuss the procedural details for the WQARF reimbursement.

Very truly yours,

ROOSEVELT IRRIGATION DISTRICT

By: _____

Donovan L. Neese
Superintendent

cc:    Laura Malone, ADEQ
       David Kimball, G&K
       Jerry Bonnett, BFFB

MERINT000004

# EXHIBIT 6



ARIZONA DEPARTMENT
OF
ENVIRONMENTAL QUALITY
1110 West Washington Street • Phoenix, Arizona 85007
(602) 771-2300 • www.azdeq.gov





Janice K. Brewer
Governor

Henry R. Darwin
Director

August 7, 2013

Mr. Donovan Neese
Roosevelt Irrigation District
103 West Baseline Road
Buckeye, Arizona 85326

Re: Request for Reimbursement

Dear Mr. Neese:

In accordance with A.R.S. §49-282.E.11, Roosevelt Irrigation District (RID) requested reimbursement from the Water Quality Assurance Revolving Fund (WQARF) for remedial actions undertaken in response to a release or a threat of a release of hazardous substances or pollutants that presents an imminent and substantial endangerment to the public health or the environment. A.R.S. §49-282.E.11 allows the Arizona Department of Environmental Quality (ADEQ) to reimburse up to $250,000 in any given year.

RID provided ADEQ with substantial documentation to support their claim. RID's documentation totaled incurred costs of $359,895.00. ADEQ has reviewed the information provided and has determined that the documentation supports the work performed at the site in response to contamination that has impacted RID's well field.

In accordance with §49-282.E.11, ADEQ has determined the following:

- RID is a political subdivision
- Remedial costs were reasonable, necessary and cost-effective.
- Actions were taken in response to a release or threat of a release of a hazardous substance or pollutant and that release or threat of a release presents an imminent and substantial endangerment to the public health or environment
- RID has taken all reasonable efforts to obtain reimbursement from responsible parties and the federal government

Therefore, ADEQ has included a reimbursement check in the amount of $250,000. As a condition of reimbursement, ADEQ is requesting that should RID recover monies in excess of $250,000 from responsible parties via litigation, for incurred costs that were the basis of ADEQ's reimbursement, that RID will in turn reimburse WQARF the full $250,000. By co-signing this letter, RID is agreeing to this provision.

Sincerely,

Laura L. Malone, Director
Waste Programs Division

Donovan L. Neese, Superintendent
Roosevelt Irrigation District

Enc.: Reimbursement Check

Southern Regional Office
400 West Congress Street • Suite 433 • Tucson, AZ 85701
(520) 628-6733
Printed on recycled paper

ADEQ_MER000138

# EXHIBIT 7

**SYNERGY**
ENVIRONMENTAL, LLC

February 28, 2014



Ms. Laura Malone
Director, Waste Programs Division
Arizona Department of Environmental Quality
1011 W. Washington Street
Phoenix, Arizona, 85007

Re:    **Roosevelt Irrigation District Early Response Action
       Partial Cost Accounting for Fiscal Year 2013-2014**

Dear Ms. Malone:

This letter provides information to substantiate expenditures of the Roosevelt Irrigation
District (RID) in the conduct of the remedial actions approved and otherwise authorized by
the Arizona Department of Environmental Quality (ADEQ) in the West Van Buren Area
(WVBA) Water Quality Assurance Revolving Fund (WQARF) Site. The documentation
accompanying this letter provides back up for a portion of the project costs expended
during the ADEQ fiscal year 2013-2014 (FY 13/14) and substantiates the $250,000 cost
reimbursement requested by RID.

This submittal only includes documentation of part of the expenditures that were incurred
in FY 13/14 and does not reflect the total costs incurred by RID for even these specific
support services in that fiscal year. Documentation provided includes a monthly cost
accounting of the following:

- costs for granular activated carbon (GAC) replacement (consumables);
- costs for analytical services associated with water quality monitoring;
- costs for a portion of the consulting engineering/operational support and
  compliance services; and,
- costs for a portion of the environmental consulting services for preparation of the
  WVBA WQARF Site Feasibility Study

The $288,815 of expenditures included in this submittal were incurred through remedial
actions authorized and approved by ADEQ through the RID-95 Wellhead Pilot Treatment
System Proposal dated August 18, 2011, the Modified Early Response Action (ERA) Work
Plan dated October 19, 2012, and the Feasibility Study Work Plan dated June 21, 2013. The
work conducted in these remedial actions was performed in accordance with these work
plans and pursuant to the Agreement to Conduct Work that was executed between RID and
ADEQ on October 8, 2009. These costs are summarized on a month-by-month basis and
attached.

10645 North Tatum Boulevard, Suite 200-437, Phoenix, Arizona  85028-3053

ADEQ_MER000180

**SYNERGY**
ENVIRONMENTAL, LLC

Additional substantiation of these costs associated with the RID wellhead treatment system operation and maintenance is provided in the attached Monthly Progress Reports. These Monthly Progress Reports include analytical results and lab reports that document the performance of the individual treatment trains at each of the four (4) treatment sites, demonstrate the need for GAC replacement, and substantiate the associated project work conducted.

Included with this transmittal are two (2) electronic copies and two (2) hard copies of the assembled documentation for cost recovery. Copies of other relevant work products governing the remedial actions, such as the Modified ERA Work Plan, ERA Operation and Maintenance Plan, and Feasibility Study Work Plan were previously provided to ADEQ in both hard- and electronic-copy and are not included in this submittal. Therefore, this submittal includes the following documents:

- Month-by-Month Summary of FY 13/14 Costs (through 12/2013, incl., and FS activities included through 01/2014)
- 2013 Monthly Progress Reports (3 Reports - July through September 2013, incl.)
- 2 Copies of All Documents on Compact Disc and 2 Hard Copies of All Documents

In sum, we have compiled and are submitting a request for $250,000 reimbursement from the FY 13/14 WQARF Program to reimburse RID for certain qualified response actions costs that have been incurred since July 2013. Again, we emphasize the cost accounting generated for this submittal is for only a portion, in fact a relatively small portion, of the total costs that RID has incurred in relation to these remedial actions. RID will pursue full cost recovery from the parties that are potentially responsible for the releases of hazardous substances, for recovery of all of the RID response cost that have been and will be incurred for remedial actions associated with the WVBA WQARF Site. Any recovery that RID receives for response costs that have previously been reimbursed by WQARF will be remitted to the ADEQ.

If you would like additional hard-copies of these documents, we would be pleased to provide them as well as additional information supporting the remainder of the costs incurred by RID in the historical and ongoing implementation, operation and maintenance of the Modified ERA.

We appreciate your continued support of RID's voluntary actions to address the groundwater contamination in the WVBA WQARF Site.

Best Regards,

SYNERGY Environmental, LLC

Dennis H. Shirley, PG

10645 North Tatum Boulevard, Suite 200-437, Phoenix, Arizona  85028-3053

ADEQ_MER000181

**SYNERGY**
ENVIRONMENTAL, LLC

Attachments:  2 Sets of Hard-Copy Documents (as Noted Above)
                    2 Compact Discs of Documents

Transmittal Letter and CD Copy of Documentation:
cc:     Donovan Neese, RID
          David Kimball, G&K
          Joel Peterson, Synergy

Transmittal Letter Only:
cc:     Henry Darwin, ADEQ

ADEQ_MER000182

# EXHIBIT 8



| WATER QUALITY ASSURANCE REVOLVING FUND (WQARF) POLITICAL SUBDIVISION REIMBURSEMENT CHECKLIST | APPLICANT: | ROOSEVELT IRRIGATION DISTRICT |
|---|---|---|
| | SUBMITTAL DATE: | 5/30/2014 |
| | REVIEW DATE: | 6/18- 7/11/2014 |
| | REVIEWED BY: | T. LE PAGE |

### BASED UPON INFORMATION PROVIDED BY APPLICANT, HAS THE FOLLOWING CRITERA BEEN MET?

| | YES | NO |
|---|---|---|
| Is applicant a political subdivision? | ■ YES | ☐ NO |
| Has applicant taken all reasonable efforts to obtain reimbursement from the responsible party? | ■ YES | ☐ NO |
| Has applicant taken all reasonable efforts to obtain reimbursement from the federal government? | ■ YES | ☐ NO |
| Are the remedial actions reasonable, necessary and cost effective [A.R.S. 282.06(A)(3)]? | ■ YES | ☐ NO |
| Does the release or threatened release of the hazardous substance or pollutant present an immediate and substantial endangerment to the public health or the environment? | ■ YES | ☐ NO |
| Were claimed remedial actions cost incurred within current fiscal year? | ■ YES | ☐ NO |

**IF ANY OF THE ABOVE QUESTIONS HAVE BEEN ANSWERED WITH "NO" – NECESSARY CRITERIA FOR REIMBURSEMENT HAS NOT BEEN MET – STOP REVIEW OF PACKET**

### REIMBURSEMENT APPLICATION:

| yes | Completed Application (Signed and Notarized) |
|---|---|
| yes | Costs Incurred Invoices Attached |
| yes | Adequate Invoice Backup Attached |
| yes | Reimbursement of Remedial Action Costs Spreadsheet Completed (attached) |
| yes | Additional Information Needed to Complete Submittal (see attached email) – only able to reimburse documented labor from email dated 6/23/2014 for T. Blood.  Warranty costs not reimbursed (see Remedial Action Costs Spreadsheet). |

| YES | Applicant Notified of Submittal Deficiencies? | Date:6/18/2014 |
|---|---|---|

### REIMBURSEMENT AMOUNT:

| Total Amount Submitted for Reimbursement: | Amount Approved for Reimbursement: |
|---|---|
| $288,814.57 | $232,535.49 |

*Pay amount Remaining on Purchase Order*

= $178,635.77

T.LePage

ADEQ_MER000145

# Check Inquiry Summary



Account Number: ▮▮▮▮▮▮▮▮
Account Name: STATE OF ARIZONA STATE GENERAL ACCOUNT
Bank ID: ▮▮▮▮▮▮

**Bank of America Merrill Lynch**



1067840

## Check Details

Check Number: 6625966
Account Number: ▮▮▮▮▮▮▮
Account Name: STATE OF
ARIZONA STATE
GENERAL
ACCOUNT
Bank ID: ▮▮▮▮▮▮

Amount: 178,635.77
Posted Date: 07/22/2014
Paid Date: 07/22/2014

1

ADEQ_MER000146

## Check Inquiry Summary

Account Number: ▮▮▮▮▮▮

Account Name:   STATE OF ARIZONA STATE GENERAL ACCOUNT

Bank ID: ▮▮▮▮▮

 **Bank of America**
**Merrill Lynch**

### Electronic Endorsement Information

#### BOFD - Bank Of First Deposit

**Bank Name:** JPMORGAN CHASE BANK, NA (BOFD)
**Date:** 07/21/2014
**R/T:** 111901331
**Sequence Number:** 3680548769

**Bank Name:** FEDERAL RES BANK OF ATLANTA
**Date:** 07/22/2014
**R/T:** 61000146
**Sequence Number:** 892698223

**Bank Name:** THE STATE AUDITOR
**Date:** 07/22/2014
**R/T:** 122101133
**Sequence Number:** 005992358439

2

ADEQ_MER000147

ADEQ REIMBURSEMENT OF REMEDIAL ACTION COSTS - FISCAL YEAR 2014

| APPLICANT NAME: | ROOSEVELT IRRIGATION DISTRICT |
| --- | --- |
| REQUESTED AMOUNT: | $288,814.57 |
| APPROVED AMOUNT: | $232,535.49 |

| MONTH | CONTRACTOR | INVOICE NUMBER | SERVICE DATE | INVOICE AMOUNT | AMOUNT APPROVED | JUSTIFICATION |
| --- | --- | --- | --- | --- | --- | --- |
| JULY 2013 | SIEMENS | 901324828 | 22-Jul-13 | $16,000.00 | $16,000.00 | Site 92; TCE > MCL at POC |
| | AIRTECH | 13191 | 1-Jul-13 | $840.00 | $840.00 | laboratory analytical results |
| | AIRTECH | 13195 | 8-Jul-13 | $840.00 | $840.00 | laboratory analytical results |
| | AIRTECH | 13208 | 15-Jul-13 | $1,080.00 | $1,080.00 | laboratory analytical results |
| | AIRTECH | 13217 | 22-Jul-13 | $840.00 | $840.00 | laboratory analytical results |
| | AIRTECH | 13221 | 29-Jul-13 | $840.00 | $840.00 | laboratory analytical results |

| CONTRACTOR | STAFF | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
| --- | --- | --- | --- | --- | --- |
| SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | $4,429.34 | Backup only provided for 74 hrs @$59.86/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86) |
| SYNERGY | JOEL PETERSON, PE | 13.25 | $2,650.00 | $2,650.00 | Engineering Design, O&M: weekly O&M activities; treatment system inspections; O&M Plan; Engineering Design, O&M: prepare and conduct weekly system sampling; update O&M Plan; submit samples to Airtech; |
| SYNERGY | ANDREW MACHUGH, PE | 32.50 | $4,875.00 | $4,875.00 | O&M activities; June 2013 report preparation. |
| SYNERGY | DENNIS SHIRLEY, PG | 3.50 | $700.00 | $700.00 | Project Management & Coordination: ADEQ web-site review; FSWP related time |
| SYNERGY | JOEL PETERSON, PE | 1.00 | $200.00 | $200.00 | Project Management & Coordination: review draft FS schedule; ADEQ meeting prep |
| SYNERGY | ANDREW MACHUGH, PE | 1.25 | $187.50 | $187.50 | Preparation of FS Work Plan: produce work plan combined w/PDF stamp |
| | | | $39,428.90 | $33,482.14 | |

| MONTH | CONTRACTOR | INVOICE NUMBER | SERVICE DATE | INVOICE AMOUNT | AMOUNT APPROVED | JUSTIFICATION |
| --- | --- | --- | --- | --- | --- | --- |
| AUGUST 2013 | AIRTECH | 13229 | 5-Aug-13 | $300.00 | $300.00 | laboratory analytical results |
| | AIRTECH | 13235 | 12-Aug-13 | $420.00 | $420.00 | laboratory analytical results |
| | AIRTECH | 13242 | 19-Aug-13 | $420.00 | $420.00 | laboratory analytical results |
| | AIRTECH | 13251 | 26-Aug-13 | $660.00 | $660.00 | laboratory analytical results |

| CONTRACTOR | STAFF | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
| --- | --- | --- | --- | --- | --- |
| SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | $3,232.44 | Backup only provided for 68 hrs @$59.86/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86) RID-89 and 95 placed in bypass due to line failure.  14 hrs not reimbursed due to warranty work |
| SYNERGY | DENNIS SHIRLEY, PG | 0.25 | $50.00 | $50.00 | Engineering Design, O&M: Discussion of treatment system |
| SYNERGY | JOEL PETERSON, PE | 36.75 | $7,350.00 | $6,050.00 | Engineering Design, O&M: weekly O&M activities; treatment system inspections; O&M Plan. 6.5 hrs not reimbursed due to warranty work |
| SYNERGY | ANDREW MACHUGH, PE | 25.00 | $3,750.00 | $3,750.00 | Engineering Design, O&M: prepare and conduct weekly system sampling; update analytical data; submit samples to Airtech; prepare analytical data summaries; O&M activities; July 2013 report preparation. |
| SYNERGY | DENNIS SHIRLEY, PG | 30.75 | $6,150.00 | $6,150.00 | Project Management & Coordination: FS planning; ADEQ meeting preparation; coordinate w/Synergy and M&A |
| SYNERGY | JOEL PETERSON, PE | 38.75 | $7,750.00 | $7,750.00 | Project Management & Coordination: FS planning and scoping; ADEQ meeting preparation |
| SYNERGY | ANDREW MACHUGH, PE | 2.50 | $375.00 | $375.00 | Project Management & Coordination: project support; prepare historical data summary |
| SYNERGY | DENNIS SHIRLEY, PG | 5.00 | $1,000.00 | $1,000.00 | FS Conceptual Model Development: OU3 and WOC FS report review; plume map generation |
| SYNERGY | DENNIS SHIRLEY, PG | 16.50 | $3,300.00 | $3,300.00 | FS Scoping of Remedial Actions:  develop remedial action screening methodology; WOC report review |
| SYNERGY | JOEL PETERSON, PE | 24.75 | $4,950.00 | $4,950.00 | FS Scoping of Remedial Actions:  remedial action strategies and measures pre-screening; data compilation |
| SYNERGY | ANDREW MACHUGH, PE | 1.00 | $150.00 | $150.00 | FS Scoping of Remedial Actions: remedial action scoping |
| MONTGOMERY & ASSOC. | TIMOTHY LEO | 14.50 | $2,421.50 | $2,421.50 | Travel to/from Phoenix meeting w/ADEQ; prepare FS presentation; FS planning |
| MONTGOMERY & ASSOC. | EXPENSES | | $122.00 | $122.00 | mileage |
| | | | $49,544.90 | $41,100.94 | |

ADEQ_MER000148

| MONTH | CONTRACTOR | INVOICE NUMBER | SERVICE DATE | INVOICE AMOUNT | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| SEPTEMBER 2013 | AIRTECH | 13272 | 9-Sep-13 | $360.00 | $360.00 | laboratory analytical results |

| | CONTRACTOR | STAFF | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| | SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | $838.04 | Backup only provided for 55 hrs @$59.86/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86). RID-89/92/95 operational 0 days; RID-114 only operational @9.5/14 = 14 hrs charged = $838.04 |
| | SYNERGY | JOEL PETERSON, PE | 16.25 | $3,250.00 | $2,050.00 | Engineering Design, O&M; RID-92, -95, and -114 site work; O&M plan; O&M meetings. 3 hrs @ $200/hr not reimbursed due to warranty work |
| | SYNERGY | ANDREW MACHUGH, PE | 34.25 | $5,137.50 | $5,137.50 | Engineering Design, O&M; prepare and conduct weekly system sampling; update analytical data; submit samples to Airtech; prepare analytical data summaries; August 2013 report preparation; O&M Plan revisions. |
| | SYNERGY | DENNIS SHIRLEY, PG | 12.25 | $2,450.00 | $2,450.00 | Project Management and Coordination: M&A contract; ADEQ meeting and preparation; invoicing |
| | SYNERGY | JOEL PETERSON, PE | 10.50 | $2,100.00 | $2,100.00 | Project Management and Coordination: ADEQ meeting and preparation; presentation preparation |
| | SYNERGY | ANDREW MACHUGH, PE | 8.25 | $1,237.50 | $1,237.50 | Project Management and Coordination: ADEQ meeting and preparation; historical pumping data summary |
| | SYNERGY | DENNIS SHIRLEY, PG | 2.75 | $550.00 | $550.00 | FS Groundwater Model Development: review, revise provide comments on model work plan |
| | SYNERGY | JOEL PETERSON, PE | 2.50 | $500.00 | $500.00 | FS Groundwater Model Development: review, provide comments on model work plan |
| | SYNERGY | DENNIS SHIRLEY, PG | 20.50 | $4,100.00 | $4,100.00 | FS Scoping of Remedial Actions: prepare for ADEQ meeting; screening process for remedial actions |
| | SYNERGY | JOEL PETERSON, PE | 28.50 | $5,700.00 | $5,700.00 | FS Scoping of Remedial Actions: FS scoping meetings; draft outline FS; end use alternatives; prep for H&A meeting |
| | SYNERGY | ANDREW MACHUGH, PG | 1.75 | $262.50 | $262.50 | FS Scoping of Remedial Actions: project support and coordination |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 4.50 | $751.50 | $751.20 | Review FS planning materials; review model presentation prepare for ADEQ meeting |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 6.00 | $1,002.00 | $1,002.00 | Draft and revise FS modeling Work Plan |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 7.00 | $1,169.00 | $1,169.00 | Travel to/from Phoenix meeting w/ADEQ |
| | MONTGOMERY & ASSOC. | EXPENSES | | $122.00 | $122.00 | mileage |
| | | | | $39,068.40 | $28,929.74 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| OCTOBER 2013 | | | | | | WELLHEAD TREATMENT SYSTEMS OFFLINE ENTIRE MONTH |
| | SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | 50.00 | Backup only provided for 0.0 hrs @$59.86/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86). RID-89/92/95/114 operational 0 days |
| | SYNERGY | JOEL PETERSON, PE | 10.25 | $2,050.00 | $1,700.00 | Engineering Design, O&M; weekly O&M activities; coordinate with Siemens. 1.75 hrs not reimbursed due to warranty work |
| | SYNERGY | ANDREW MACHUGH, PE | 10.75 | $1,612.50 | $1,612.00 | Engineering Design, O&M; O&M Plan revisions; September 2013 report preparation; coordinate with Siemens. |
| | SYNERGY | DENNIS SHIRLEY, PG | 23.00 | $4,600.00 | $4,600.00 | Project Management and Coordination: management duties; H&A questionnaire and meeting; invoicing |
| | SYNERGY | JOEL PETERSON, PE | 33.50 | $6,700.00 | $6,700.00 | Project Management and Coordination: response and meet w/H&A; FS planning; FS reporting |
| | SYNERGY | ANDREW MACHUGH, PE | 14.50 | $2,175.00 | $2,175.00 | Project Management and Coordination: production well summary; H&A questionnaire |
| | SYNERGY | DENNIS SHIRLEY, PG | 8.00 | $1,600.00 | $1,600.00 | FS Groundwater Model Development: ADEQ meeting and preparation; review revised model work plan |
| | SYNERGY | JOEL PETERSON, PE | 6.25 | $1,250.00 | $1,250.00 | FS Groundwater Model Development: ADEQ meeting; review model work plan |
| | SYNERGY | DENNIS SHIRLEY, PG | 13.75 | $2,750.00 | $2,750.00 | FS Scoping of Remedial Actions: review VOC reports; prepare questions for water providers |
| | SYNERGY | JOEL PETERSON, PE | 13.25 | $2,650.00 | $2,650.00 | FS Scoping of Remedial Actions: H&A meeting; draft FS report |
| | SYNERGY | ANDREW MACHUGH, PE | 0.50 | $75.00 | $75.00 | FS Report Preparation: prepare evaluation of treatment technologies |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 1.50 | $250.50 | $250.50 | Coordinate and schedule FS modeling meeting |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 29.50 | $4,926.50 | $4,926.50 | ADEQ meeting; revise modeling work plan; travel to/from ADEQ; meeting preparation |
| | MONTGOMERY & ASSOC. | DEREK BLAZER | 1.50 | $193.50 | $193.50 | meet w/staff to review model calibration strategies |
| | MONTGOMERY & ASSOC. | JONATHAN WHITTIER | 3.50 | $465.50 | $465.50 | model work plan review; review results |
| | MONTGOMERY & ASSOC. | CYNTHIA HERLETH | 0.50 | $40.00 | $40.00 | edit work plan |
| | MONTGOMERY & ASSOC. | ANNE BROWN | 0.50 | $22.00 | $22.00 | format FS work plan; format prepare PDF |
| | MONTGOMERY & ASSOC. | TRACIE JAEGER | 3.50 | $154.00 | $154.00 | format FS work plan; format prepare PDF |
| | MONTGOMERY & ASSOC. | EXPENSES | | $122.00 | $122.00 | mileage |
| | | | | $42,018.90 | $31,292.00 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| NOVEMBER 2013 | | | | | | WELLHEAD TREATMENT SYSTEMS OFFLINE ENTIRE MONTH |
| | SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | $0.00 | Backup only provided for 32 hrs @$xxx.80/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86). RIO-89/92/95/114 operational 0 days |
| | SYNERGY | JOEL PETERSON, PE | 3.00 | $600.00 | $600.00 | travel/from 95; meeting discussion start-up work for next season |
| | SYNERGY | ANDREW MACHUGH, PE | 0.25 | $37.50 | $37.50 | project coordination |
| | SYNERGY | DENNIS SHIRLEY, PG | 8.75 | $1,750.00 | $1,750.00 | FS: project management; coordination and planning |
| | SYNERGY | JOEL PETERSON, PE | 6.00 | $1,200.00 | $1,200.00 | FS: project planning; review analytical data |
| | SYNERGY | ANDREW MACHUGH, PE | 2.25 | $337.50 | $337.50 | FS: project planning and coordination; review water provider questionnaires |
| | SYNERGY | ANDREW MACHUGH, PE | 1.25 | $187.50 | $187.50 | FS: conference call |
| | SYNERGY | JOEL PETERSON, PE | 2.00 | $400.00 | $400.00 | FS: revised FS modeling workplan; conference call |
| | SYNERGY | DENNIS SHIRLEY, PG | 2.50 | $500.00 | $500.00 | FS: revised FS modeling workplan; conference call |
| | SYNERGY | JOEL PETERSON, PE | 14.50 | $2,900.00 | $2,900.00 | FS: FS report sections; water provider questionnaire |
| | SYNERGY | DENNIS SHIRLEY, PG | 11.00 | $2,200.00 | $2,200.00 | FS: review HDDs and PRAPs at adjacent sites; remedial measures |
| | SYNERGY | ANDREW MACHUGH, PE | 1.00 | $150.00 | $150.00 | FS: prepare section 5 text |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 1.00 | $167.00 | $167.00 | review modeling and water quality data for maps |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 10.50 | $1,753.50 | $1,753.50 | review modeling workplan; coordinate with ADEQ; compile modeling data |
| | MONTGOMERY & ASSOC. | JONATHAN WHITTIER | 0.50 | $66.50 | $66.50 | evaluate data for model update |
| | MONTGOMERY & ASSOC. | MARLA ODOM | 6.50 | $1,130.50 | $1,130.50 | prepare pumping data; review model notebook; gather water level data |
| | MONTGOMERY & ASSOC. | NINA PIRMM | 10.00 | $1,000.00 | $1,000.00 | compile water level and pumping data |
| | MONTGOMERY & ASSOC. | CLARE STIELSTRA | 0.50 | $42.00 | $42.00 | meet with staff to discuss project |
| | MONTGOMERY & ASSOC. | ANNE BROWN | 1.00 | $44.00 | $44.00 | report production |
| | MONTGOMERY & ASSOC. | TRACIE JAEGER | 3.00 | $132.00 | $132.00 | format and prepare report |
| | | | | $24,974.40 | $14,598.30 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| DECEMBER 2013 | | | | | | WELLHEAD TREATMENT SYSTEMS OFFLINE ENTIRE MONTH |
| | SPINNAKER HOLDINGS | TERRY BLOOD | UNK | $10,376.40 | $0.00 | Backup only provided for 39 hrs @$59.86/hr ($10,376.40 x 12 months = $124,516.80/yr; /2080 hrs = $59.86). RIO-89/92/95/114 operational 0 days |
| | SYNERGY | JOEL PETERSON, PE | 5.00 | $1,000.00 | $1,000.00 | travel to and attend meeting; site for inspection |
| | SYNERGY | ANDREW MACHUGH, PE | 3.50 | $525.00 | $525.00 | update pumping data; project management and coordination |
| | SYNERGY | DENNIS SHIRLEY, PG | 15.00 | $3,000.00 | $3,000.00 | FS: project planning and management; meetings |
| | SYNERGY | JOEL PETERSON, PE | 9.50 | $1,900.00 | $1,900.00 | FS: project planning and management; meetings |
| | SYNERGY | ANDREW MACHUGH, PE | 14.50 | $2,175.00 | $2,175.00 | FS: water provider questionnaire; prepare for ADEQ meeting; project planning and coordination |
| | SYNERGY | DENNIS SHIRLEY, PG | 1.00 | $200.00 | $200.00 | FS: conference call on modeling work plan |
| | SYNERGY | JOEL PETERSON, PE | 1.00 | $200.00 | $200.00 | FS: conference call on modeling work plan |
| | SYNERGY | ANDREW MACHUGH, PE | 1.00 | $150.00 | $150.00 | FS: conference call on modeling work plan |
| | SYNERGY | DENNIS SHIRLEY, PG | 32.75 | $6,550.00 | $6,550.00 | FS: water provider questionnaire; prepare for ADEQ meeting; project planning and coordination; remedial alternatives |
| | SYNERGY | JOEL PETERSON, PE | 19.25 | $3,850.00 | $3,850.00 | FS: draft FS report; water provider information |
| | SYNERGY | ANDREW MACHUGH, PE | 16.00 | $2,400.00 | $2,400.00 | FS: prepare Section 5 text; project planning and coordination; convert report formats |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 1.00 | $167.00 | $167.00 | FS: prepare for meeting; modeling work plan; discuss meeting objectives |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 20.00 | $3,340.00 | $3,340.00 | FS: prepare for meeting; modeling work plan; compile/organize modeling data |
| | MONTGOMERY & ASSOC. | JONATHAN WHITTIER | 54.00 | $7,182.00 | $7,182.00 | FS: review/evaluate water level data; review model setup |
| | MONTGOMERY & ASSOC. | EXPENSES | | $128.10 | $128.10 | FS: mileage |
| | | | | $43,143.50 | $32,497.10 | |

ADEQ_MER000150

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| JANUARY 2014 | | | | | | WELLHEAD TREATMENT SYSTEMS OFFLINE ENTIRE MONTH |
| | SYNERGY | DENNIS SHIRLEY, PG | 27.50 | $6,500.00 | $6,500.00 | FS: project planning and management; meetings; remedial alternatives |
| | SYNERGY | JOEL PETERSON, PE | 23.25 | $4,650.00 | $4,650.00 | FS: project planning and management; meetings |
| | SYNERGY | ANDREW MACHUGH, PE | 10.00 | $1,500.00 | $1,500.00 | FS: project planning and coordination; meetings; invoicing |
| | SYNERGY | DENNIS SHIRLEY, PG | 0.50 | $100.00 | $100.00 | FS: conference call on modeling progress |
| | SYNERGY | ANDREW MACHUGH, PE | 0.25 | $37.50 | $37.50 | FS: provide pumping data |
| | SYNERGY | DENNIS SHIRLEY, PG | 38.75 | $7,750.00 | $7,750.00 | FS: project planning and management; meetings; prepare CSM; water provider information; remedial alternatives |
| | SYNERGY | JOEL PETERSON, PE | 4.50 | $900.00 | $900.00 | FS: screening and scoping of remedial alternatives; meeting |
| | SYNERGY | ANDREW MACHUGH, PE | 2.00 | $300.00 | $300.00 | FS: conference call |
| | SYNERGY | JOEL PETERSON, PE | 49.25 | $9,850.00 | $9,850.00 | FS: draft FS report; remedial alternatives cost estimates |
| | SYNERGY | ANDREW MACHUGH, PE | 25.25 | $3,787.50 | $3,787.50 | FS: prepare FS text; project planning and coordination |
| | MONTGOMERY & ASSOC. | DENNIS HALL | 4.50 | $760.50 | $760.50 | FS: coordinate/prepare meeting with ADEQ |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 1.00 | $169.00 | $169.00 | FS: review remedial alternatives presentation |
| | MONTGOMERY & ASSOC. | EXPENSES | 37.00 | $22.57 | $22.57 | FS: mileage |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 7.50 | $1,267.50 | $1,267.50 | FS: review budget, modeling plan, schedule; meetings |
| | MONTGOMERY & ASSOC. | JONATHAN WHITTIER | 101.00 | $13,534.00 | $13,534.00 | FS: review/evaluate data; prepare tables; import input tables |
| | MONTGOMERY & ASSOC. | TIMOTHY LEO | 3.00 | $507.00 | $507.00 | FS: review remedial alternatives; teleconference |
| | | | | $50,635.57 | $50,635.57 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| FEBRUARY 2014 | | | | | | NC COSTS INCLUDED |
| | | | | $0.00 | $0.00 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| MARCH 2014 | | | | | | NC COSTS INCLUDED |
| | | | | $0.00 | $0.00 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| APRIL 2014 | | | | | | NC COSTS INCLUDED |
| | | | | $0.00 | $0.00 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| MAY 2014 | | | | | | NC COSTS INCLUDED |
| | | | | $0.00 | $0.00 | |

| MONTH | CONTRACTOR | MONTHLY STAFFING | HOURS | LABOR CHARGE | AMOUNT APPROVED | JUSTIFICATION |
|---|---|---|---|---|---|---|
| JUNE 2014 | | | | | | NC COSTS INCLUDED |
| | | | | $0.00 | $0.00 | |

| | | | | $288,814.57 | $232,535.49 | |



# WATER QUALITY ASSURANCE REVOLVING FUND (WQARF) POLITICAL SUBDIVISION REIMBURSEMENT APPLICATION

WHEN TO USE: This Reimbursement Application is the required format for a Political Subdivision (Applicant) to submit remedial action costs incurred in response to a release or threat of a release of a hazardous substance or pollutants that presented an immediate and substantial endangerment to the public health or the environment.

In addition to the content specified within, use of black or dark blue print on white 8.5" by 11" paper is required for the application form. Additional information provided to document claimed remedial actions (i.e. drawings, blue prints, site plans, etc.) may be presented in other formats.

Mail or hand-deliver one original and one copy of this completed application form and all attachments to the address below:

Remedial Projects Section Manager
Waste Programs Division
Arizona Department of Environmental Quality
1110 West Washington Street
Phoenix, AZ 85007

CRITERIA FOR WQARF REIMBURSEMENT:
- WQARF can be used to reimburse a political subdivision of Arizona for its reasonable, necessary and cost-effective remedial action costs incurred in response to a release or threat of a release of a hazardous substance or pollutants that presents an immediate and substantial endangerment to the public health or the environment [A.R.S. § 49-282(E)(11)].

- The political subdivision is not eligible for reimbursement until it has taken all reasonable efforts to obtain reimbursement from the responsible party and the federal government.

- No more than $250,000 may be spent from the fund for this purpose in any fiscal year.

- Reimbursement applications will be accepted before the submittal deadline but will not be evaluated until after the submittal deadline.

- The deadline for submitting the reimbursement request and supporting documentation is May 1st of each year. The agency may extend the May 1st submittal deadline for good cause to no later than June 15th. Requests for an extension may be submitted in writing to the address above.

DEFINITIONS
"WQARF" refers to the Water Quality Assurance Revolving Fund established pursuant to A.R.S. § 49-282.

MAY 2014
RECEIVED
ADEQ WPD
RPS

ADEQ_MER000152

"Political Subdivision" refers to a county, city, town or other taxing district other than the state that is authorized to take property by eminent domain (A.R.S. § 49-1001).

"Fiscal Year" refers to Arizona's fiscal year, July 1st to June 30th of each year.

"Hazardous substance" has the same meaning prescribed in section 49-201 but does not include petroleum as defined in section 49-1001, except to the extent that a constituent of petroleum is subject to the provisions of section 49-283.02 (A.R.S. § 49-281.8).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment but excludes:
(a) Any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons.
(b) Emissions from the engine exhaust of any motor vehicle, rolling stock, aircraft, vessel or pipeline pumping station engine.
(c) Release of source, by-product or special nuclear material, as those terms are defined in section 30-651, resulting from the operation of a production or utilization facility as defined in the atomic energy act of 1954 (68 Stat. 919; 42 United States Code sections 2011 through 2297), which is subject to the regulatory authority of the United States nuclear regulatory commission as specified in that act, and the agreement, dated March 30, 1967, entered into between the governor of this state and the United States atomic energy commission pursuant to section 30-656 and section 274 of the atomic energy act of 1954, as amended.
(d) The normal application of fertilizer (A.R.S. § 49-281.11).

ADEQ_MER000153

ARIZONA DEPARTMENT OF ENVIRONMENTAL QUALITY
WATER QUALITY ASSURANCE REVOLVING FUND

## REIMBURSEMENT APPLICATION

ADEQ received stamp:



Fiscal Year _____

## Section I: Political Subdivision (Applicant) Information:

A. Name of Applicant: _____ Roosevelt Irrigation District _____

B. Mailing address: _____ 103 West Baseline Road, Buckeye, Arizona 85326 _____
                              (street, city, state, zip code)

C. Telephone No.: ___ (623) 386-2046 _____

D. Applicant contact person:

1. Name: ___ Donovan Neese _____

2. Title: _____ Superintendent _____

3. Telephone No.: (623) 386-7359  Fax No.:  (623) 386-4360 E-Mail: dneese@rooseveltirrigation.org

4. Mailing address: _ 103 West Baseline Road, Buckeye, Arizona 85326 _____
                              (street, city, state, zip code)

4/2014                                                    Page R-3

ADEQ_MER000154

## Section II: Site Information

**A.    Location and Boundaries of the Site or Portion of the Site for Which Remediation Costs Were Incurred**

Site Name ____West Van Buren Area (WQARF) Site_____

Address ____Approximately 7th Avenue west to 75th Avenue and from Buckeye Road north to Interstate 10_____

City _Phoenix_____     County _Maricopa County_____Zip Code _85009_____

Approximate Center of the Property: (Information provided for well RID-110)

Latitude ___33 °_____27 ´____4.34"N        Longitude ___112 °_____9 ´___17.26"W

Site Size (acres or sq. feet) _7,680 Acres_____        Parcel Number(s) _____

Township _1N_____        Range _2E_____

Section ____9_____ of the ___NE¼ of the _NE¼ of the _NE¼___

Legal description of the Property (attach a map showing the site):       See Attachment 1 for site map and approximate

extent of groundwater plume

**B.    Property Owner**

Name ___The enclosed properties where RID production wells are located within the WVBA Site are owned by RID__

Address ___103 West Baseline Road_____     City _Buckeye_____     State ___Arizona_____

Zip Code _85326____ Phone (623) 386-2046 ____ Fax (623) 386-4360  E-mail  dneese@rooseveltirrigation.org

**C.    Investigation Information**

To the best of your knowledge, is the property (or any activity conducted on the property) **currently** the subject of an administrative, civil, or criminal investigation related to protection of the environment? (Yes)/No **[circle one]**

If yes, please describe:   The WVBA Site is being investigated by ADEQ, which is currently engaging in the feasibility study process to protect public health, welfare or the environment.  See Attachment 2, for the civil complaint that has been filed in Federal court by RID against some of the potentially responsible parties for the contamination impacting and threatening to impact RID's wells in the WVBA WQARF (Roosevelt Irrigation District v. Salt River Project Agricultural Improvement and Power District, et al (Second Amended Complaint) in the United States District Court for the District of Arizona, CV-10-0290-DAE (BGM).

To the best of your knowledge, has the property (or any activity conducted on the property) **ever been** the subject of an administrative, civil or criminal investigation related to protection of the environment? (Yes)/No **[circle one]** If yes, please describe (including the approximate date of the investigation and any known outcome of the investigation):

The WVBA WQARF Site has been investigated by ADEQ for more than 20 years.  ADEQ has conducted a remedial investigation at the WVBA Site, which was finalized in 2012.  There have been a number of specific facility investigations done throughout the WVBA WQARF Site, including early response actions, which are included in the Final RI Report (Remedial Investigation Report, West Van Buren Area WQARF Site, prepared for ADEQ by Terranext, dated August 2012).

## Section III: Site Characterization

**A.    Description**

Provide a general description of the results of any site characterization activities performed at the site or portion of the site (attach additional sheets if necessary):       Please see ADEQ's Final RI Report for the WVBA WQARF Site for the results of any site characterization activities.

4/2014                                                          Page R-4

ADEQ_MER000155

**B.    Endangerment**

Explain how the release or threatened release of the hazardous substances or pollutants described in part A presented an immediate and substantial endangerment to the public health or the environment (attach additional sheets if necessary):

Consistent with the Agreement to Conduct Work between ADEQ and RID, dated October 8, 2009, and ADEQ's approval of RID's Request for reimbursement under ARS 49-282(E)(11) last year, ADEQ has already "determined that releases or threatened releases of hazardous substances have occurred within the meaning of A.R. S. § 49-201, resulting in groundwater contamination that has impacted multiple RID water supply wells which may present an imminent and substantial endangerment to the public health, welfare or the environment within the West Van Buren WARF Site." Both the Final RI Report and the Second Amended Complaint in Attachment 2 further support ADEQ's endangerment determination.

## Section IV: Eligibility-Efforts for Other Reimbursement

**A.**    A.R.S. § 49-282(E)(11) provides that a political subdivision is not eligible for reimbursement until it has taken all reasonable efforts to obtain reimbursement from the responsible party and the federal government. Please describe the applicant's efforts in this regard (attach additional sheets if necessary):

RID sought to achieve settlement with responsible parties and the federal government to reimburse RID's past and future response Costs in September 2009. Unfortunately, RID was forced to file a civil action against the potentially responsible parties and the federal government in order to recover its incurred costs, and to fund future costs, to address the groundwater contamination impacting and threatening to impact RID's water supply wells in the WVBA WQARF Site. See Attachment 2 for the Second Amended Complaint.

## Section V: Remedial Actions/Reponse Actions

**A.    Remediation**

Indicate if the remediation is:          X   In progress          _____ Completed
Detail summary of work: describe the work already performed, and, if any, the work still to be performed (attach additional sheets if necessary):

The expenditures included in this year's submittal were incurred this fiscal year for remedial actions authorized by state law and approved or agreed upon by ADEQ through the RID-95 Wellhead Pilot Treatment System Proposal, dated August 18, 2001; the Modified Early Response Action Work Plan, dated October 19, 2012; and the Feasibility Study Work Plan, dated June 21, 2013. The work conducted in these remedial actions were performed in accordance with these work plans and pursuant to RID's obligations under the Agreement to Conduct Work between ADEQ and RID, dated October 8, 2009. All future work required by these work plans will also be performed pursuant to the Agreement to Conduct Work.

**B.    Costs**

On separate pages, list the costs, including subcontractor costs, for which the applicant is seeking reimbursement. Provide information demonstrating that the costs were reasonable, necessary and cost-effective as appropriate. Eligible costs may include laboratory analytical costs; costs associated with sample collection for well and/or remedial systems; maintenance of remedial systems and equipment; electrical charges; granular activated carbon (GAC) purchases, maintenance and change outs. Attach copies of unaltered invoices documenting total incurred costs for each of the eligible activities that were performed.

4/2014                                                                                          Page R-5

A summary of the costs/expenditures is included as Attachment 3. The costs/expenditures incurred were to perform the work required to implement the ADEQ-approved work plans, which were determined to be "reasonable, necessary and cost effective." This is consistent with ADEQ's finding last year that similar expenditures, incurred under the work plans, were "reasonable, necessary and cost-effective" to warrant reimbursement under ARS 49-282(E)(11). In addition to the work plans above, substantiation of the costs associated with the RID wellhead treatment systems operation and maintenance is provided in Monthly Progress Reports prepared for July, August and September 2013 activities. The Reports include analytical results and lab reports that document the performance of the individual treatment trains at each of the four (4) treatment sites and substantiate the associated project work conducted. Attachment 3 includes month by month cost summaries for: 1) GAC, analytical and monthly O&M staffing costs; 2) Modified ERA professional services by Synergy Environmental for O&M, engineering and compliance support; 3) WVBA Feasibility Study technical services by Synergy Environmental; and 4) copies of Monthly Progress Reports.

## Section VI: Remedial Action Service Provider Information

**A.      Remedial Action Service Provider:**

1.   Contact Person:   Dennis Shirley, PG (Synergy Environmental, LLC)

2.   Telephone No.: (602) 319-2977      Fax No.:      N/A      E-Mail: dennis.shirley@syn-env.com

3.   Mailing address: 10645 N. Tatum Blvd., Suite 200-437, Phoenix, Arizona 85028
                                   (street, city, state, zip code)

## Section VII: Applicable Insurance

**A.      Did Applicant have insurance or any other financial mechanism that covered any of the costs listed in this application?**

         Yes _____          No _____X_____

**B.      If yes, did Applicant submit a claim under this insurance or financial mechanism?**

         Yes _____          No _____

**C.      If Applicant submitted a claim under any insurance or another financial mechanism that covered any costs listed in this application, list the date submitted, the insurer or financial provider, and the costs for which the claim was submitted.**

N/A_____
_____
_____
_____
_____

ADEQ_MER000157

## Section VIII: Certification Statement: Applicant

**Instructions:** This certification statement must be signed by an authorized representative of the political subdivision. All signatures, including that of the notary, and the notary embossment or stamp must be original. No reproduced or copied signatures will be accepted. The entire certification, signatures and notarization, <u>unaltered</u> from the ADEQ form, must be on one page.

## CERTIFICATION STATEMENT: APPLICANT

I hereby certify that I have reviewed the attached invoices in the amount of $ <u>288,815.00</u> which is the total amount claimed on this Reimbursement Application.

I hereby certify that all costs claimed in this Reimbursement Application have been incurred by the named Applicant for work actually performed.

No costs claimed in this Reimbursement Application are costs that have been previously paid from WQARF.

I hereby certify that all insurance coverage that is available to cover the costs of the remedial action for the release or threatened release that is the subject of this Reimbursement Application has been disclosed to the Department.

Choose One:
_____ I hereby certify that I have received $ _____. of benefits or reimbursement from insurance or a financial mechanism that has been applied to the costs of the remedial action for the release that is the subject of this Reimbursement Application.

___X___ I hereby certify that no payment has been received from insurance or any other financial mechanism by the Applicant, Applicant's consultant, representative, or agent for the costs of remedial actions that are the subject of this Reimbursement Application.

Applicant will report and remit, within 30 days, to the Department any payment or reimbursement from insurance to Applicant or Applicant's consultant, representative or agent for remedial action costs that are contained in this Reimbursement Application which have been paid or approved for payment.

I hereby certify, under penalty of perjury, that all facts and statements set forth as part of this Reimbursement Application and all attachments are true, accurate and complete to the best of my information and belief.

**I direct ADEQ to make payment of all approved costs on this Reimbursement Application as follows:**

Name(s) to appear on the payment warrant: (please specify Political Subdivision, fund, or Department):
Roosevelt Irrigation District, Attention: Donovan Neese, Superintendent

Address where warrant is to be sent (street, city, state, zip code):
103 West Baseline Road, Buckeye, Arizona 85326

| | |
|---|---|
| Signature of Applicant | Sworn to and subscribed this; 30 day of MAY , 20 14 |
| Donovan Neese<br>Printed Name | Notary Public Signature KM MOORE<br><br>KM MOORE<br>Notary Public - State of Arizona<br>MARICOPA COUNTY<br>My Commission Expires<br>March 8, 2017 |
| Same<br>Relationship to Eligible Person | My commission expires March 8, 2017<br>County of MARICOPA State of AZ |

4/2014

Page R-7

ADEQ_MER000158

# EXHIBIT 9



Witness: **Shirley**
Date: **12.11.15**
mgreporting.com
L. Marin-Garcia #50541

 

April 30, 2015

Ms. Tina L. LePage, Manager
Waste Programs Division Remedial Projects Section
Arizona Department of Environmental Quality
1011 W. Washington Street
Phoenix, Arizona, 85007



APR 30 2015

Re:    **Roosevelt Irrigation District Request for Reimbursement of
       Remedial Action Costs Incurred in Fiscal Year 2014-2015**

Dear Ms. Malone:

On behalf of the Roosevelt Irrigation District (RID), a political subdivision of the State of
Arizona, we are requesting a reimbursement of two hundred and fifty thousand dollars
($250,000) from the Water Quality Assurance Revolving Fund (WQARF) budget for fiscal
year 2014-2015 (FY 14/15) pursuant to Arizona Revised Statutes (ARS) 49-282.E.11.
These WQARF funds will reimburse RID for the reasonable and necessary expenditures
incurred by RID in FY 14/15 in responding to releases and threatened releases of
hazardous substances that have impacted or threaten to impact RID's water supply wells
located within the West Van Buren Area (WVBA) WQARF Site.

According to the written Agreement to Conduct Work between RID and the Arizona
Department of Environmental Quality (ADEQ), dated October 8, 2009 and amended
February 27, 2014, and as required by ARS 49-282.E.11, "ADEQ has determined that
releases or threatened releases of hazardous substances have occurred ... resulting in
groundwater contamination that has impacted multiple RID water supply wells which may
present an imminent and substantial endangerment to the public health, welfare or the
environment within the West Van Buren WQARF Site." The expenditures included in this
submittal were all incurred in FY 14/15 pursuant to remedial actions authorized and
approved by ADEQ through the RID-95 Wellhead Pilot Treatment System Proposal dated
August 18, 2011, the Modified Early Response Action (ERA) Work Plan dated October 19,
2012, and the Feasibility Study Work Plan dated June 21, 2013.

This submittal includes documentation of $320,014 in RID incurred costs in FY 14/15 for
the following expenditures:

- costs for granular activated carbon (GAC) used in wellhead treatment systems at
  RID wells 89, 92, 95, and 114 that are included as part of the ADEQ-approved
  Modified Early Response Action (note, this is only a partial accounting of materials
  cost for the time period of interest); and

- costs for environmental consulting services for preparation of the Draft RID
  Feasibility Study (FS) Report for the WVBA WQARF Site and follow-up actions to
  finalize the FS Report and respond to stakeholder comments.





Documentation accompanying this submittal provides the necessary back up for these expenditures, which constitute only a small portion of the costs expended by RID during the ADEQ 2014/15 fiscal year. In the event that ADEQ deems any of these costs ineligible for full reimbursement, then RID reserves the right to supplement this cost recovery application with additional documentation of RID response costs incurred during this fiscal year.

RID is eligible for reimbursement because it has taken reasonable efforts to obtain reimbursement for the releases and threatened releases of hazardous substances that present an immediate and substantial endangerment to the public health, welfare, or the environment. Specifically, for the past five years, RID has been pursing reimbursement of its remedial action costs from the parties identified in ADEQ and Environmental Protection Agency (EPA) records that RID has identified as potentially responsible parties (PRPs) under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Identification of the PRPs has been based on the data and information contained in ADEQ and EPA files that document releases or threatened releases of hazardous substances from the PRP's facilities, which are the same hazardous substances that have impacted RID's wells and water supply in the WVBA Site. Unfortunately, a majority of the PRPs, including the federal government, have refused to reimburse RID for its remedial action costs. These refusals have compelled RID to pursue reimbursement via a cost recovery action against the PRPs in federal court under Section 107 of CERCLA. Nevertheless, reimbursement of RID's costs has not yet been achieved. Accordingly, RID is seeking reimbursement of the annual statutory limit of $250,000 pursuant to ARS 49-282.E.11 for the costs RID has expended in FY 14/15. Of course any recovery that RID receives for response costs that have been reimbursed by WQARF will be remitted to ADEQ.

Included with this transmittal are two (2) hard copies of the assembled documentation for this cost recovery application. If you would like additional hard-copies of these documents, we would be pleased to provide them as well as additional information supporting the remainder of the costs incurred by RID in the historical and ongoing implementation, operation and maintenance of the Modified ERA and finalization of the RID FS Report. In the event that ADEQ deems any of these costs ineligible for full reimbursement, then RID reserves the right to provide additional cost

We appreciate your continued support of RID's voluntary actions to address the groundwater contamination in the WVBA WQARF Site. We are also prepared to meet at your earliest convenience in support of this reimbursement request.

Best Regards,

SYNERGY Environmental, LLC

Dennis H. Shirley, PG

10645 North Tatum Boulevard, Suite 200-437, Phoenix, Arizona 85028-3053

Attachments: 2 Sets of Hard-Copy Documents (as Noted Above)

Transmittal Letter and Copy of Documentation:

cc:   Donovan Neese, Roosevelt Irrigation District
      David Kimball, Gallagher & Kennedy, PA

Transmittal Letter Only:

cc:   Henry Darwin, Arizona Department of Environmental Quality
      Laura Malone, Arizona Department of Environmental Quality
      Jerry Bonnett, Bonnett, Fairbourn, Friedman & Baling, PC
      Jake Curtis, Burch & Cracchiolo, PA

# EXHIBIT 10



WILLIAM G. FAIRBOURN
VAN BUNCH[6]
ELAINE A. RYAN[7]
JONATHAN S. WALLACK
CHRISTINA L. BANNON
TONNA K. FARRAR[5]
KEVIN R. HANGER
LAURA A. VAN BUREN

ANDREW S. FRIEDMAN
ROBERT J. SPURLOCK
ANDREW Q. EVERROAD
GUY A. HANSON
MANFRED P. MUECKE[4]
T. BRENT JORDAN[6]
ERIC D. ZARD
AUDRA E. PETROLLE[10]

FRANCIS J. BALINT, JR.[8]
C. KEVIN DYKSTRA
PATRICIA N. SYVERSON[2]
KIMBERLY C. PAGE[3]
WILLIAM F. KING
ANDREW M. EVANS
KENDALL K. WILSON
CARRIE A. LALIBERTE

JERRY C. BONNETT,[1] Of Counsel
MICHAEL N. WIDENER, Of Counsel

[1]Admitted Also in Colorado
[2]Admitted Also in California
[3]Admitted Also in Alabama and Georgia
[4]Admitted Only in California
[5]Admitted Only in California, Kansas, Missouri
 and Oregon (located in Oregon)
[6]Admitted Only in Pennsylvania
[7]Admitted Also in Colorado, Idaho, Illinois,
 Kansas, Missouri, Texas, Utah and
 Washington
[8]Admitted Also in Tennessee and West Virginia
[9]Admitted Also in Massachusetts and Virginia
[10]Admitted Also in New Jersey and New York

February 12, 2016

*Via Email Only*                                      PDPetersen@perkinscoie.com
P. Derek Petersen
2901 North Central Ave., Suite 2000
Phoenix, Arizona 85012-2788

> Re:   *Roosevelt Irrigation District v. Salt River Project Agricultural*
>       *Improvement and Power District, et al.*

Dear Derek:

This responds to your February 5, 2016 letter regarding RID's disclosures. We are not sure what you mean by "backup documents". Nevertheless, RID has already provided many of the documents upon which the computations in Exhibit A are based. These documents are identified below. We are gathering additional documents, and will produce them in the near future.

## ACTIVITY 1

### 27th Avenue & Durango Lateral Enclosure

In 2010, RID crews installed a pipeline to enclose the RID lateral canal at 27th Avenue and Durango. This was done to eliminate unauthorized public use of the canal and prevent exposure to contaminated water in the conveyance system.

The $27,682.37 total cost of this activity breaks down to $14,473.66 in RID labor and administrative costs and $13,208.71 in material costs. The labor was performed by RID employees; we are gathering the backup documents associated with those costs. The material costs are from two suppliers: Cemex Construction Materials South, LLC and John Hedges. Invoices from the suppliers have been disclosed. They are:

Cemex: SYN025636-44
John Hedges: SYN025654-62

P. Derek Petersen
February 12, 2016
Page 2

## RID Water Quality Monitoring Costs

Both Montgomery & Associates (2009-2010) and Synergy conducted water quality monitoring of water pumped from RID's wells and conveyed in its canals. These charges were invoiced separately, first by Montgomery & Associates in 2010, and subsequently by Synergy. We are in the process of locating the Montgomery & Associates invoice. The Synergy invoices are included as Attachment A to this letter.

## ACTIVITY 2

The RID Task 2 costs are associated with the installation of RID Well 111-R to replace RID Well 111. This project was part of RID's well investigation activities undertaken to characterize contamination impacts and hydraulic characteristics of RID wells within the WVBA Site, as required by ADEQ's conditions of approval of RID's ERA Work Plan.

The project was begun in 2011 and completed in 2012. It involved work by Weber Group, L.C., Arizona Public Service and Synergy. The total cost, $530,388.07, was incurred as follows:

| | |
|---|---|
| Arizona Public Service | $33,372.52 |
| Weber Group, L.C. | $487,017.92 |
| Synergy | $9997.95 |

We are gathering the invoices associated with these costs and will disclose them in in the near future.

## ACTIVITY 5

### District General Response Costs

We are in the process of gathering the backup documents associated with this category, and will disclose them in the near future.

### ADEQ Oversight Costs

RID has already disclosed most of the documents associated with the ADEQ oversight costs. The table below lists the Bates numbers.

P. Derek Petersen
February 12, 2016
Page 3

| ADEQ INVOICE DATE | BATES NUMBER |
|---|---|
| 10/09/2009-10/09/2011 | RID105112; RDAZ00057153 |
| 10/10/2011-06/30/2012 | RID105111; RDAZ00057155 |
| 07/01/2012-09/30/2012 | RID105110; RDAZ00057156 |
| 09/30/2012-10/30/2012 | RID105109; RDAZ00057157 |
| 10/01/2012-12/31/2012 | RID105108; RDAZ00057159 |
| 01/01/2013-03/31/2013 | RDAZ00057165 |
| 04/01/2013-06/30/2013 | RDAZ00057163 |
| 07/01/2013-09/30/2013 | RDAZ00057167 |
| 01/01/2014-03/31/2014 | RID109134; RDAZ00057169 |
| 04/01/2014-06/30/2014 | RDAZ00057174 |
| 07/01/2014-09/30/2014 | RID109166 |
| 10/01/2014-12/31/2014 | SYN056726 |
| 01/31/2015-03/31/2015 | SYN056708 |
| 04/01/2015-06/30/2015 | SYN056700 |
| 07/01/2015-12/31/2015 | SYN056718 |

The last four ADEQ invoices are included with this letter as Attachment B. Please note that the ADEQ invoices bates numbered SYN056700 and SYN056718 were not included in the $80,229.99 figure listed in Exhibit A to RID's Second Supplemental Disclosure. With these two recent charges, the total ADEQ oversight costs are now $83,810.08.

Please give me a call if you have any questions.

Very truly yours,

Guy A. Hanson

GAH/kmv
Enclosures

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


ROOSEVELT IRRIGATION DISTRICT, a     )
political subdivision of the State )
of Arizona,                          )
                                     )
                  Plaintiff,         )
                                     )   Case No.
              vs.                    )   CV2010-00290-DAE-BGM
                                     )
SALT RIVER PROJECT AGRICULTURAL      )
IMPROVEMENT AND POWER DISTRICT, a    )
political subdivision of the State )
of Arizona; et al.,                  )
                                     )
                  Defendants.        )
_____)



VIDEOTAPED DEPOSITION OF DONOVAN L. NEESE
VOLUME I
(Pages 1 through 202)


Phoenix, Arizona
April 19, 2016
9:11 a.m.




Prepared By:
LORENA MARIN-GARCIA, RPR, RMR, CRR
Arizona CR No. 50541
mg reporting - Court Reporters
Arizona Registered Reporting Firm R1006
2415 East Camelback Road, Suite 700
Phoenix, AZ  85016
602.512.1300(t)  888.515.8661(f)
mgreporting.com

1   River Project.

2        Q    The first case, was that RID -- well, if I say --

3   if I use the term RID, will you understand that I mean

4   Roosevelt Irrigation District?

5        A    Yes.

6        Q    Was the first case RID versus Rovey?

7        A    It was.

8        Q    And the second case you said was RID versus SRP?

9        A    Yes.

10       Q    And were you deposed in both cases as the

11  superintendent of the RID?

12       A    To my remembrance, yes.

13       Q    What did the first lawsuit, RID versus Rovey, what

14  was the subject matter?

15       A    It was over the destruction of some of our

16  facilities.

17       Q    Can you explain further?

18       A    Some of our facilities were destroyed on

19  Mr. Rovey's property.

20       Q    What facilities were destroyed?

21       A    Some of our conveyance channels and delivery

22  points, where we deliver our water.

23       Q    And so were you suing the customer to reimburse

24  RID for the costs of replacing those facilities?

25       A    That is a possible summary, yeah.  Uh-huh.

1        Q    Can you give me a better summary?

2        A    We had a disagreement on how those facilities were

3   replaced, and so that was probably a closer crux of the

4   disagreement.

5        Q    All right.  And the second lawsuit, RID against

6   SRP, is that a lawsuit where RID had sued SRP, that is, did

7   RID initiate the lawsuit?

8        A    I don't think so.

9        Q    So was it SRP that sued RID, then?

10       A    I believe that to be the case, yeah.

11       Q    All right.  And what was the subject matter of

12   that lawsuit as you understand it?

13       A    It was a difference of contract interpretation.

14       Q    What contract?

15       A    We have a contract with SRP that -- over how we

16   get one of our sources of water from the 23rd Avenue

17   treatment plant, and so there was an issue over the

18   administration of those contracts.

19       Q    And is that lawsuit ongoing?

20       A    No.  That settled.

21       Q    And what was the resolution of that lawsuit?  How

22   did it settle?  What were the terms of the settlement?

23       A    We agreed on how the administration of that

24   contract should happen, and moving forward, we decided to

25   move forward under those administrative terms, I guess.

83

1  maintenance department.  Do you remember that?
2       A    Yes.
3       Q    Do RID's wells have to be maintained?
4       A    Yes.
5       Q    And do wells have a life span?  Do they eventually
6  wear out?
7            MR. HANSON:  Form.  Vague, ambiguous.
8            THE WITNESS:  The equipment wears out.
9  BY MR. SWINDLE
10      Q    And do wells sometimes become inoperable?  They
11 sometimes break down?
12      A    The equipment does.
13      Q    Do you sometimes have to redrill a well?
14      A    That happens, yes.
15      Q    And that's just part of normal operations?
16      A    It should be, yes.
17      Q    Sure.  Because you've got a certain level of
18 demand and you need to keep the water supply up, and if you
19 have wells that go down or go out of service, you may have
20 to drill a new one; right?
21      A    Yes.
22      Q    When you started with the District in 2011 as the
23 superintendent, was Well 111 in operation?
24      A    No.
25      Q    And why was it not in operation when you started

84

```
1    in 2011?
2         A    It was being -- it was being drilled at the time.
3         Q    I'm talking about Well 111, not Well 111R.
4         A    Okay.
5         Q    Can you distinguish between those two?
6         A    Sure.
7         Q    So let's go back and talk about Well 111.
8              When you started with the District as
9    superintendent in 2011, was Well 111 in operation?
10        A    No.
11        Q    Do you know how long it had been out of operation?
12        A    I do not.
13        Q    Do you know why Well 111 was not in operation?
14        A    I do not.
15        Q    And was Well 111R drilled to replace Well 111?
16        A    To my knowledge.
17        Q    The water from Well 111R is not treated at the
18   wellhead; correct?
19        A    That is correct.
20        Q    And the water from Well 111R is provided to RID's
21   irrigation customers, residential customers, municipal
22   customers, construction customers; correct?
23        A    Correct, as commingled as part of the rest of the
24   canal.
25        Q    Certainly.
```

```
 1                TELECONFERENCE RECORDING:  Joining the meeting.
 2                MR. WETHERELL:  Stephen Wetherell.
 3                THE WITNESS:  I don't know exactly where they end
 4      up distributed.  I don't have a file of them at my office.
 5      BY MR. SWINDLE
 6           Q    And do you -- do they come to you at all in the
 7      ordinary course?
 8           A    Yes, they come to me in my email.
 9           Q    Sent to you by Synergy?
10           A    I don't remember who they're sent to me by.
11           Q    Do you understand that RID is seeking to recover
12      certain costs from the defendants in this case?
13           A    Yes.
14           Q    Does the phrase "necessary costs of response" mean
15      anything to you?
16           A    I know that's a term that the lawyers have tossed
17      around.
18           Q    What does it mean to you?  What's your
19      understanding of that term?
20           A    Costs associated with this whole project.
21           Q    How broad do you think of the project when you
22      think about necessary costs of response?
23           A    All the costs associated with treating the
24      chemicals that ended up in our wells.
25           Q    Is attendance at a legal hearing in the lawsuit by
```

```
 1  you such a cost?

 2            MR. HANSON:  Object to the form.  Foundation.

 3  Calls for a legal conclusion.

 4  BY MR. SWINDLE

 5       Q    Do you think of it as a necessary cost of

 6  response?  That's what I'm trying to understand.

 7            MR. HANSON:  Same objection.

 8            THE WITNESS:  We have included that in our

 9  budget -- those kinds of meetings in our budget item.

10  BY MR. SWINDLE

11       Q    In your budget item.  What do you mean by budget

12  item?

13       A    We have a line item that you were just discussing

14  earlier for remediation costs.

15       Q    And you've included costs like attending legal

16  meetings or legal hearings in that line item?

17       A    I believe so.

18       Q    Okay.

19            (Deposition Exhibit 393 was marked for

20  identification.)

21  BY MR. SWINDLE

22       Q    Exhibit 393 is an email string between you and

23  Kelly Young and also Kelly Young and Dennis Shirley dated

24  March 20, 2012; is that right?

25       A    That's what it says here.
```

1    to replace that lost water?

2         A    First of all, Well 111 and 111R, I'm sorry, we

3    talk two different things about the same thing.  I consider

4    Well 111 -- Well 111R is something Dennis created.  I

5    don't -- they're all the same to me.  So that's fine.  Thank

6    you for the reminder.  They're two different things to you.

7              Well 111R was drilled so that we would be able to

8    replace the water that we were going to be losing from the

9    various activities that were involved in remediating this

10   water.

11        Q    But you don't use Well 111R in the remediation

12   process, do you?  You don't treat that water?

13        A    That is not treated.

14        Q    And you provide that water to your irrigation

15   customers?

16        A    Yes, we do.

17        Q    What water were you losing because of the

18   remediation process?

19        A    The installation of those treatment facilities and

20   the sampling and the testing that needed to be done was

21   going to result in a loss of some of our pumping when that

22   work was being done.  So we needed to replace that water so

23   that I would be able to continue to maintain the levels that

24   we had previously.

25        Q    How much water were you going to lose?

1   that was a group decision.

2        Q    By you and Stan, you mean?

3        A    Sure.  Following that, it was like a standing

4   decision that had already been decided, and I continued.

5        Q    So if you had a question about legal procedure in

6   this lawsuit that you called Ryley Carlock about, when they

7   sent you their bill, you would include that time in this

8   category that's shown on Exhibit 393; is that correct?

9             MR. HANSON:  Object to the form.  Misstates his

10  prior testimony.

11            THE WITNESS:  Generally we got counsel on legal

12  procedure from Burch & Cracchiolo.

13  BY MR. SWINDLE

14       Q    Okay.  Same question.

15       A    Yes, that was my decision.

16       Q    And you included it?

17       A    That's right.

18       Q    Okay.  And if you met with the Town of Buckeye

19  about selling them drinking water and one of these attorneys

20  attended or somebody from EUSI attended, you included those

21  costs too, didn't you?

22       A    If I met with folks on the sale of remediated

23  water, those costs are included in here.

24       Q    And the same for your own internal timekeeping?

25  If you were meeting with someone about end use of remediated

115

```
 1    add any costs into the -- let me rephrase that.
 2              I don't remember directing these folks to add any
 3    costs into this spreadsheet since I've been there.
 4        Q    All right.  And how about Mr. Ashby?
 5        A    Stan and Kelly figure out his hours.
 6        Q    You remember asking him to send you his hours,
 7    don't you?
 8        A    No.
 9        Q    Do you recall that Mr. Ashby didn't have any time
10    records?
11        A    Yes.
12        Q    So how were these -- how was the figure shown in
13    394 arrived at?
14        A    I believe those were an estimate of his hours.
15        Q    Who made the estimate?
16        A    Stan.
17        Q    You did not make the estimate?
18        A    I don't remember making that estimate.
19        Q    Do you remember having any involvement in making
20    or reviewing that estimate?
21        A    I remember talking with Kelly about how that was
22    done.
23        Q    What did Kelly tell you?
24        A    That she and Stan talked about estimating his time
25    for that.
```

157

```
 1      Q    I'll have you turn to RID109987.
 2           MR. HANSON:  What was it again?
 3           MR. SWINDLE:  '109987.
 4   BY MR. SWINDLE
 5      Q    It should be an invoice dated ████████████
 6   ██████████████████████████, and on the bottom, it
 7   references ██████████████████████████████████
 8   ████████; correct?
 9      A    Yes.
10      Q    If you'd turn to the next page, '88, is that a
11   copy of the ███████████████████████████████████████
12   ███████?
13           MR. HANSON:  Form, foundation.
14           THE WITNESS:  Sure appears to be.
15   BY MR. SWINDLE
16      Q    And can you tell from those references what work
17   EUSI was doing for the District?
18      A    They have it all labeled right here.
19      Q    Right.  ██████████████████████████.  Do you know
20   what that ██████████████████ was about?
21      A    Oh, no.
22      Q    It could have been about legal proceedings?
23      A    Could have been about anything.
24      Q    And the same is true of all of those references;
25   right?  They're so general that there's really no way for us
```

158

1  to tell what EUSI was doing.  Do you agree?

2          MR. HANSON:  Object to the form, foundation.

3  Argumentative.

4          THE WITNESS:  I can't identify specifically what

5  was discussed in any of these line items.

6  BY MR. SWINDLE

7      Q    You don't know; correct?

8      A    Right.

9      Q    But you approved this invoice?

10     A    I assume so.

11     Q    And it's included in the costs that your attorneys

12 have told us they're seeking to recover from the defendants

13 in the lawsuit.

14     A    Okay.

15     Q    How are we or the court, how is the judge supposed

16 to determine what it is that EUSI was doing and whether it

17 was necessary to the remediation project?

18         MR. HANSON:  Object to the form, foundation.

19 Argumentative.

20         THE WITNESS:  You'll have to ask these folks.

21 BY MR. SWINDLE

22     Q    You'd have to ask EUSI?

23     A    Yes.

24     Q    So Mr. Hendricks?

25     A    Correct.

170

1      ████████, do you recall the purpose of that ████████

2      ████████?

3          A    No.

4          Q    Do you recall what was discussed?

5          A    No.

6          Q    Next one, ████████████████████████████,

7      redacted.  Do you have any recollection of what was

8      discussed during that ████████████████████?

9          A    I do not.

10         Q    Is there anything you can tell me to shed light on

11     why these time entries might be associated with the

12     remediation project?

13              MR. HANSON:  Form, foundation.

14              THE WITNESS:  No.

15     BY MR. SWINDLE

16         Q    Is that true for all of the entries that have been

17     redacted on Exhibit 416?

18              MR. HANSON:  Object to the form.  Overbroad.  If

19     you want to look through them.

20              MR. SWINDLE:  I can go through each one if you'd

21     prefer.

22              MR. HANSON:  I just don't see how he can answer

23     all the questions unless we can figure out a shortcut.

24              THE WITNESS:  Well, if you'd like to go through

25     all of them against my notes, I might be able to shed some

1  light that way.

2  BY MR. SWINDLE

3      Q    Okay.  Start on page 1 of the exhibit, 1 of 8, so

4  it's RID110562.  The first redacted entry is

5          , redaction.  If you find an entry, can you tell us

6  the Bates number of the page you're looking at, please?

7      A    These notes begin on -- in 2013, so you might as

8  well just skip all of these until we get to 2013.

9      Q    So, again, do you have notes going back to 2011

10  and 2012?

11     A    I assume I do -- did, but I gave everything that I

12  had to Mr. Hanson.

13     Q    So for any of the redacted entries up through --

14         What did you say?  2013?

15     A    That's what I said.

16     Q    -- can you shed any light on what you were doing

17  for each of those redacted time entries and how it related

18  to the remediation project?

19     A    I think that would be quite difficult to do

20  without my notes.

21     Q    And that's because of the redactions?

22     A    Sure.

23     Q    In other words, if it says

24                          , redacted, if the -- what you discussed

25  wasn't redacted, then you'd probably be able to tell us what

Donovan L. Neese, Volume I - April 19, 2016

172

```
1    it was; right?
2         A    It would probably help.
3         Q    All right.  All right.  2013.
4              MR. HANSON:  What page are you on?
5    BY MR. SWINDLE
6         Q    Is it fiscal year 2013 or calendar year 2013?
7         A    This one starts on the 2nd of January of 2013.
8         Q    So I am on page RID110566, and there's an entry,
9    ██████████████████████████, redacted.
10        A    You said ███?
11        Q    ████████.
12             What page are you looking at?
13        A    I am on page RID109640.
14        Q    And is there something on that page of Exhibit 415
15   that refreshes your recollection as to what the ████████████
16   ███ was regarding?
17        A    Well, you can see that section has been redacted
18   as well, so that's not helpful.
19        Q    And so are you unable to tell us what the ████████
20   ████████████ was regarding on ██████████████████████?
21        A    Correct.
22        Q    Is there anyone you can think of who would be in a
23   better position than you to tell us what you ████████████████
24   ████████████████████?
25        A    Even the ██████████████████ is redacted.
```

Donovan L. Neese, Volume I - April 19, 2016

173

1    Q    So is the answer no, you can't think of anyone
2    who's in a better position than you?
3    A    No.
4    Q    The next entry is ███████████████████████
5    ███, redacted.
6    ███████████████████████████; is that right?
7    A    Yes.
8    Q    And is that similarly redacted in Exhibit 415?
9    A    No, it is not.  I am on Bates number RID109642.
10   It would appear that that is a ████████████████████
11   ██████████████████████████████████████████████.
12   Q    And the █████████████████████████████████
13   ████████████████████████████████████████████████
14   ███████████████████.
15        Do you recall the subjects of ████████████████
16   ████████████████████████████████?
17   A    This says here --
18   Q    Where is "here"?
19   A    I'm sorry.  On Bates stamp '109642 --
20   Q    In Exhibit --
21   A    -- in my notes.
22   Q    In Exhibit 415?
23   A    Correct.  ███████████████████████████████████
24   ████████████████████████████████████████████████
25   ███████████████████████████████████████.

174

1      Q    Can you enlighten us any further after reviewing

2   these documents?

3      A    No, I cannot.

4      Q    You have no further recollection of what was

5   discussed at ███████████?

6      A    I do not remember ████████████.

7      Q    Turning back to Exhibit 416, the next redacted

8   entry is ██████████████████████████, redacted.

9      A    I am on Bates number -- page number RID109648.

10     Q    Of Exhibit 415?

11     A    Yes.

12     Q    And what do you learn there?

13     A    ████████████████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████████

17     Q    Okay.  This is probably not a question you can

18  answer, but let me ask it anyway.

19          On Exhibit 416, do you have any idea why the

20  reference to ████████████████████ was redacted for

21  that date?

22     A    I do not.

23     Q    On ████████ from Exhibit 416, there's a ████████

24  ████████, redacted.  Does Exhibit 415 help you recall

25  what was discussed at that meeting?

1      A    It does not.

2      Q    Why is that?

3      A    It was also redacted.

4      Q    And you have no independent recollection of what

5  ███████████████████████████████████████████ how it may

6  have related to the remediation project; is that true?

7      A    That is true.

8      Q    Next entry, ██████████████████████████, redacted.

9      A    If you flip over to Bates number RID109651.

10     Q    '651 in Exhibit 415.

11     A    It looks to me like I had a █████████████████

12 ████████████████████████████████████████████████████████

13 ███████████████████████████████████████████.   I don't

14 remember.

15     Q  ████████████████████████████████████████████████████

16 █████████████████

17     A    I'm not sure.

18     Q    And are you looking at the entry that says

19 █████████████████████████?

20     A    Yes, I am.

21     Q    Do you recall anything more about █████████████████

22 █████████████████████████?

23     A    I do not.

24     Q    Were these ██████████████████████████?

25     A    I do not recall.

176

1              MR. HANSON:  No foundation.

2    BY MR. SWINDLE

3         Q    Did there come a point in time when you stopped

4    talking to Gallagher & Kennedy about the litigation?

5         A    I think what I could talk with Gallagher & Kennedy

6    about became very limited after the judge's order.

7         Q    After the judge's order disqualifying Gallagher &

8    Kennedy?  Is that what you're referring to?

9         A    There were a couple of them, so that's kind of

10   hard for me to say exactly.  But there was a series of

11   situations that ultimately Gallagher & Kennedy didn't

12   represent us in litigation, and then I began working with

13   Bonnett Fairbourn.

14        Q    All right.  And after that point, did you have any

15   discussions with Gallagher & Kennedy regarding the lawsuit?

16        A    I don't recall.

17        Q    Did you review any legal briefs or legal papers

18   that were going to be filed in the lawsuit with Gallagher &

19   Kennedy after that point?

20        A    I don't recall.

21        Q    But looking at Exhibit 415, the entry for

22   ██████████████████, where it says ████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████; is that right?

25              MR. HANSON:  Object to the form.  No foundation.

1        THE WITNESS: ████████████████████████

2    ████████████████████████

3    BY MR. SWINDLE

4        Q    Okay.  Can I have you turn back to Exhibit 414.

5    And if you would please turn to RID110552.

6        A    I don't have that one.

7        Q    What's the last number you have?

8        A    I have -- in Exhibit 414, the last number I have

9    is '110445.

10        MR. SWINDLE:  Okay.  Let me take a break while I

11    find it.

12        MR. HANSON:  Yeah.

13        THE WITNESS:  Okay.

14        THE VIDEOGRAPHER:  Off the record at 4:01 p.m.

15    This is the end of media 7.

16        (Recess at 4:01; resumed at 4:07.)

17        (Deposition Exhibit 417 was marked for

18    identification.)

19        THE VIDEOGRAPHER:  This begins media 8.  We're

20    back on the record at 4:07 p.m.

21    BY MR. SWINDLE

22        Q    Mr. Neese, Exhibit 417 are the additional invoices

23    we were looking for, and this one is labeled with a folder

24    cover labeled GL #7149 and is Bates-numbered RID110518

25    through '559.

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3           BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was duly
 4   sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of the
 5   proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
 6   thereafter reduced to print under my direction.

 7           I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
 8   outcome hereof.

 9           [X]  Review and signature was requested.

10           I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
11   7-206(J)(1)(g)(1) and (2).

12           DATED at Phoenix, Arizona, this 28th day of April,
     2016.
13

14

15           _____
             Lorena Marin-Garcia, RMR, CRR
16           Certified Reporter
             Arizona CR No. 50541
17

18                    *************

19       I CERTIFY that Marin-Garcia Reporting, Inc., dba mg
     reporting has complied with the ethical obligations set
20   forth in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23           _____
             Marin-Garcia Reporting, Inc., dba mg reporting
24           Registered Reporting Firm
             Arizona RRF No. R1006
25
```

# EXHIBIT 12

461

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ROOSEVELT IRRIGATION DISTRICT, a      )
political subdivision of the          )
State of Arizona,                     )
                                      )
        Plaintiff,                    )  No.
                                      )  CV2010-00290-
vs.                                   )  DAE-BGM
                                      )
SALT RIVER PROJECT AGRICULTURAL       )
IMPROVEMENT AND POWER DISTRICT, a     )
political subdivision of the          )
State of Arizona; et al.,             )
                                      )
        Defendants.                   )
_____)

VIDEOTAPED DEPOSITION OF JOEL PETERSON

(Volume 3 - pages 461 - 676)
Phoenix, Arizona
March 16, 2016
9:00 a.m.

Prepared By:
Robin L. B. Osterode, RPR, CSR
AZ CR No. 50695
mg reporting - Court Reporters
2415 East Camelback Road, Suite 700
Phoenix, AZ 85016
602.512.1300(t)  888.515.8661(f)
mgreporting.com

589

1   need to turn to the second page of the table.  So the
2   wells that are located in -- along and discharge into
3   the Salt Canal are Wells 105 through 114.  Correct?
4       A.    Correct.
5       Q.    And I seem to recall that there's -- that
6   Well 111 was inactive.  Right?
7       A.    The original 111 was inactive, yes.
8       Q.    Does that well still exist or has that been
9   abandoned?
10      A.    RID-111 still exists, but it is inoperable.
11  RID-111R, which is the replacement well, is
12  operational.
13      Q.    Why is the original 111 inoperable?
14      A.    Because the casing collapsed.
15      Q.    When did that occur, do you know?
16      A.    I do not.
17      Q.    Does this table, Table 4, tell us when the
18  replacement for the 111 well was drilled?  It looks
19  like April of 2012.
20      A.    111R, the year constructed -- this actually
21  has a date constructed, April 25th, 2012.
22      Q.    Okay.  And the fact that 111R is the well
23  that replaced the original 111 suggests to me that
24  the casing must have collapsed on the original 111
25  sometime prior to April 25th, 2012.  Correct?

592

1    will pinch that straw in, so you can't drop anything

2    down through it, or you can't have corrosion in

3    certain instances.  Or you can't fill your well.

4    What you have is you cannot go back down below that

5    point because it's squeezed off.  Is that adequate?

6              THE WITNESS:  Yes.

7              MR. HANSON:  We have more experts here than

8    we thought.

9              MR. THOMAS:  Well, thank you, Dr. Worsham.

10       Q.    Okay.  So what we know, based on Table 4

11   and Table 2 from the draft FS, is that sometime, at

12   least as of June of 2003, the casing in Well --

13   original Well 111 collapsed.  Correct?

14       A.    That's correct.

15       Q.    And so that well can't be pumped now at

16   all?

17       A.    Yes, 111 -- RID-111 is -- is no longer

18   functional or serviceable.

19       Q.    Does a collapsed casing allow for vertical

20   migration of groundwater from one alluvial unit to

21   another?

22       A.    In theory, it could.

23       Q.    Do you know whether that's the case with

24   respect to 111?

25              MR. HANSON:  Form, foundation.

```
 1    STATE OF ARIZONA   )
                         )ss.
 2    COUNTY OF MARICOPA)


 3
                BE IT KNOWN that the foregoing proceedings
 4    were taken before me; that the witness before
      testifying was duly sworn by me to testify to the
 5    whole truth; that the foregoing pages are a true and
      accurate record of the proceedings, all done to the
 6    best of my skill and ability; that the proceedings
      were taken down by me in shorthand and thereafter
 7    reduced to print under my direction.

 8              I CERTIFY that I am in no way related to any
      of the parties hereto nor am I in any way interested
 9    in the outcome hereof.

10              [X] Review and signature was requested.

11              I CERTIFY that I have complied with the
      ethical obligations set forth in ACJA 7-206(F)(3) and
12    ACJA 7-206(J)(1)(g)(1) and (2).

13              DATED at Phoenix, Arizona, this 29th day of
      March, 2016.
14

15

16                        Robin L. B. Osterode, CSR, RPR
                          Certified Reporter
17                        Arizona CR No. 50695

18

19                        * * * * * * * * * * * *

20

21              I CERTIFY that Marin-Garcia Reporting, Inc., dba
      mg reporting has complied with the ethical
22    obligations set forth in ACJA 7-206(J)(1)(g)(1)
      through (6).
23

24                        Marin-Garcia Reporting, Inc., dba mg reporting
                          Registered Reporting Firm
25                        Arizona RRF No. R1006
```

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ROOSEVELT IRRIGATION DISTRICT, a   )
political subdivision of the State )
of Arizona,                        )
                                   )
                Plaintiff,         )
                                   )  Case No.
                vs.                )  CV2010-00290-DAE-BGM
                                   )
SALT RIVER PROJECT AGRICULTURAL    )
IMPROVEMENT AND POWER DISTRICT, a  )
political subdivision of the State )
of Arizona; et al.,                )
                                   )
                Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF JOEL PETERSON, PE
VOLUME IV
(Pages 677 through 860)

Phoenix, Arizona
April 5, 2016
9:10 a.m.

Prepared By:
LORENA MARIN-GARCIA, RPR, RMR, CRR
Arizona CR No. 50541
mg reporting - Court Reporters
Arizona Registered Reporting Firm R1006
2415 East Camelback Road, Suite 700
Phoenix, AZ  85016
602.512.1300(t)  888.515.8661(f)
mgreporting.com

1      A    Yes.

2      Q    Okay.  Is there something unique about the

3  construction of existing Well 106 that produces half of the

4  volume you expect to get with the replacement well within

5  the 600-foot ADWR radius?

6      A    Intuitively, I'll answer yes, but I have no idea

7  what that difference is.

8      Q    What sort of studies have you done to lead you to

9  believe that you can double the capacity even if you're

10  within the same 600-foot radius?

11      A    We installed replacement Well 111R to the same

12  depth that we assume we'll complete 106 replacement, and it

13  produced at least 3,000 gallons a minute.

14      Q    At what depth is that?

15      A    Total depth is 428 feet below land surface.

16      Q    For 111R?

17      A    Yes.

18      Q    And, again, you're looking at Table 4 in

19  Exhibit 7?

20      A    Yes.

21      Q    Do you recall or does that table tell you what the

22  original depth was of 111?

23      A    111 was completed to a depth of 454 feet below

24  land surface.

25      Q    Okay.  So only a 26-foot difference in total

1    rust from the casing itself that is occluding the porosity
2    in the formation.
3         Q    When was 1- -- the original 111 constructed?  Does
4    that tell us?
5         A    In 1943.
6         Q    And then fouling in the screen would just be a
7    similar phenomenon in the screened interval, or what would
8    it be?
9         A    It would be rusting.  It could be encrustation
10   with carbonate minerals.  Those are the two likely
11   candidates.
12        Q    I have no idea what carbonate minerals are, but I
13   think I know what encrusting is.  Is there some way to fix
14   that, other than replacing the well?
15        A    There are treatments.  You can actually brush a
16   well, which is exactly like it sounds.  You send a great big
17   bristle brush or steel brush down the hole in order to try
18   and dislodge encrustations.  Obviously, it cannot get into
19   the perforations because it doesn't have the ability to go
20   beyond the annular diameter of the well.
21        Q    Okay.  So that would be of limited effectiveness?
22        A    Arguably, yes.
23        Q    Was that something you considered doing, rather
24   than replacing Well 111?
25        A    No.  111 -- the original 111 had a break in the --

```
 1   STATE OF ARIZONA      )
                           )ss.
 2   COUNTY OF MARICOPA    )

 3           BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was duly
 4   sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of the
 5   proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
 6   thereafter reduced to print under my direction.

 7           I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
 8   outcome hereof.

 9           [X]  Review and signature was requested.

10           I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
11   7-206(J)(1)(g)(1) and (2).

12           DATED at Phoenix, Arizona, this 18th day of April,
     2016.
13

14

15                     _____
                       Lorena Marin-Garcia, RMR, CRR
16                     Certified Reporter
                       Arizona CR No. 50541
17

18                         *************

19       I CERTIFY that Marin-Garcia Reporting, Inc., dba mg
     reporting has complied with the ethical obligations set
20   forth in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23                     _____
                       Marin-Garcia Reporting, Inc., dba mg reporting
24                     Registered Reporting Firm
                       Arizona RRF No. R1006
25
```

# EXHIBIT 13

1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

ROOSEVELT IRRIGATION DISTRICT, a       )
political subdivision of the           )
State of Arizona,                      )
                                       )
          Plaintiff,                   ) No.
                                       ) CV2010-00290-
vs.                                    ) DAE-BGM
                                       )
SALT RIVER PROJECT AGRICULTURAL        )
IMPROVEMENT AND POWER DISTRICT, a      )
political subdivision of the           )
State of Arizona; et al.,              )
                                       )
          Defendants.                  )
_____)

VIDEOTAPED DEPOSITION OF STANLEY H. ASHBY

(Volume 1 - pages 1 - 286)
Phoenix, Arizona
April 21, 2016
9:00 a.m.

Prepared By:
Robin L. B. Osterode, RPR, CSR
AZ CR No. 50695
mg reporting - Court Reporters
2415 East Camelback Road, Suite 700
Phoenix, AZ 85016
602.512.1300(t)  888.515.8661(f)
mgreporting.com

1          Q.    Do well casings have a lifespan similar to,

2     say, belowground storage tanks, you know, like gas

3     tanks, they put all those gas tanks in in the '40s,

4     and if gasoline tanks were for gas stations and --

5                MR. HANSON:  Object to --

6                THE WITNESS:  I have no way of comparing --

7                MR. HANSON:  Object to foundation.

8     BY MR. PEARSON:

9          Q.    All right.  I'm going to -- I'm going to

10    give you an example, and tell me if you ever heard of

11    this before, a lot of gasoline stations put in gas

12    tanks back in the '40s or '50s and did not have them

13    double-lined and various other protections, and so,

14    over time, they rusted out or deteriorated and

15    created holes in the tanks.  As a result of somebody

16    putting a stake in the tank to measure the gasoline.

17    But the point of it being a good number of them all

18    started leaking at the same time or near the same

19    time, because of the construction.  It's almost like

20    built-in obsolescence, something happens after a

21    certain period of time.  That's the concept I'm

22    driving at.  Okay?

23         A.    Okay.

24         Q.    All right.  Did the wells -- the RID wells

25    have a period of time in which a good number of them

1    started deteriorating or having problems

2    approximately at the same time?

3        A.    I don't think a large number of them

4    started at the same time, but as they age 50 years,

5    60 years, you start developing problems.

6        Q.    Okay.  And those problems being -- what

7    would you consider the major problems the wells

8    would, after 50, 60 years, what kind of problems

9    would they develop?

10       A.    There's a multitude of problems.  Some of

11   the wells can seal themselves off with salts, the

12   calcium buildup, that sort of thing.

13       Q.    They get encrusted?

14       A.    They get encrusted.  And scale and rust and

15   who knows what.  It doesn't necessarily mean that the

16   system has failed, but you do need to go down and

17   clean that up and scrub it and brush it and pull all

18   that stuff up to the top.  And then occasionally

19   sometimes you have to replace the lining.

20       Q.    The lining meaning the casing?

21       A.    The casing.

22       Q.    That's the term I'm using, but you'd have

23   to replace it?

24       A.    You'd have to -- you would have to replace

25   it, yes.

1      Q.    We were discussing the contracted vendors
2    that RID hired while you were superintendent, one of
3    them we discussed is Weber Group, who did various
4    work for you; is that right?
5      A.    That's correct.
6      Q.    And they, in fact, were the company that
7    drilled the new 111 Well; is that right?
8      A.    That's correct.
9      Q.    Were you involved in the contracting with
10   Weber in the drilling of -- redrilling of 111?
11     A.    I was.
12     Q.    Why did 111 get shut down or what caused it
13   to stop working?
14     A.    Oh, the original 111?
15     Q.    Uh-huh, right.
16     A.    It -- it collapsed.
17     Q.    Collapsed?
18     A.    I guess it just died of old age.
19     Q.    That's unfortunate.
20     A.    It is.  They were removing the pump and
21   something got caught, and they lifted the -- lifted
22   the foundation, and the -- and the casing, and so
23   they were, fortunately, able to maneuver the pump
24   around it in a location and get it up out of the
25   hole, but --

1      A.    That's correct.

2      Q.    But it -- if you were not having a

3  high-demand season, it wasn't the high-demand season,

4  the summer, but it was, say, the shoulder season,

5  when it was going up or going down, you could

6  continue to use some pumps longer or earlier to

7  compensate for the loss of 111; is that right?

8      A.    Certainly.  That's correct.

9      Q.    I think you said at some point you would

10 shut down the system to do repairs, like --

11     A.    Yes.

12     Q.    Did you ever shut down the RID canal itself

13 to stop flow to --

14     A.    The whole system, yes.

15     Q.    Oh, it could do that -- oh, you shut down

16 all the pumps?

17     A.    That's correct.

18     Q.    Did that make the canal essentially dry?

19     A.    That's correct.

20     Q.    And what happens to the City of Phoenix

21 wastewater treatment plant effluent?

22     A.    They would divert it into the Salt River.

23     Q.    While you had your canal shut down?

24     A.    That's correct.

25     Q.    So you had an agreement with them that they

1    would do that?

2         A.    Yes.

3         Q.    And when you did that, you would do that to

4    do repairs, maintenance on the canals; is that right?

5         A.    That's true.  And then it also allowed

6    other utilities to -- to install or repair, maintain,

7    you know, the City of Phoenix did a lot of bridge

8    maintenance during that period of time.

9         Q.    Oh, so they could get down in the canal

10   area to do their work?

11        A.    Yes.

12        Q.    So it had multiple purposes for -- for

13   shutting down the canal?

14        A.    That's correct.

15        Q.    What kind of maintenance would you do on

16   the canal itself when you shut down the canal?

17        A.    We might go in and maybe replace a segment

18   of the lining -- the liner oftentimes will crack

19   and/or bulge or split; we would go in and replace

20   those areas, and sometimes you would have to caulk

21   some cracks and joints and repair gates and just

22   maintain your equipment.

23        Q.    Well, I would assume you'd have to take out

24   the bicycles and shopping carts and the other things

25   that get down in the bottom of the canal?

1    STATE OF ARIZONA   )
                       )ss.
2    COUNTY OF MARICOPA)

3

4            BE IT KNOWN that the foregoing proceedings
     were taken before me; that the witness before
5    testifying was duly sworn by me to testify to the
     whole truth; that the foregoing pages are a true and
6    accurate record of the proceedings, all done to the
     best of my skill and ability; that the proceedings
7    were taken down by me in shorthand and thereafter
     reduced to print under my direction.

8            I CERTIFY that I am in no way related to any
     of the parties hereto nor am I in any way interested
9    in the outcome hereof.

10           [X] Review and signature was requested.

11           I CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206(F)(3) and
12   ACJA 7-206(J)(1)(g)(1) and (2).

13           DATED at Phoenix, Arizona, this 4th day of
     May, 2016.

14

15

16                           Robin L. B. Osterode, CSR, RPR
                             Certified Reporter
17                           Arizona CR No. 50695

18

19                           * * * * * * * * * * * * *

20                                      .

21        I CERTIFY that Marin-Garcia Reporting, Inc., dba
     mg reporting has complied with the ethical
22   obligations set forth in ACJA 7-206(J)(1)(g)(1)
     through (6).

23

24   Marin-Garcia Reporting, Inc., dba mg reporting
     Registered Reporting Firm
25   Arizona RRF No. R1006

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


ROOSEVELT IRRIGATION DISTRICT, a   )
political subdivision of the State )
of Arizona,                        )
                                   )
                Plaintiff,         )
                                   )  Case No.
              vs.                  )  CV2010-00290-DAE-BGM
                                   )
SALT RIVER PROJECT AGRICULTURAL    )
IMPROVEMENT AND POWER DISTRICT, a  )
political subdivision of the State )
of Arizona; et al.,                )
                                   )
                Defendants.        )
_____)


VIDEOTAPED DEPOSITION OF DENNIS SHIRLEY, PG
VOLUME IV
(Pages 691 through 899)


Phoenix, Arizona
February 25, 2016
9:03 a.m.

Prepared By:
LORENA MARIN-GARCIA, RPR, RMR, CRR
Arizona CR No. 50541
mg reporting - Court Reporters
Arizona Registered Reporting Firm R1006
2415 East Camelback Road, Suite 700
Phoenix, AZ  85016
602.512.1300(t) 888.515.8661(f)
mgreporting.com

836

1   past.

2       Q    Okay.  Was 111 anticipated to be one of the wells
3   subject to treatment?

4       A    It wasn't at the time of the ERA or Modified ERA.
5   But we didn't have any data from that site to really be
6   sure.

7       Q    Okay.  Did it later -- well, strike that.  Let me
8   ask you this.

9            We obviously have a lot of paper flying around,
10  and you had the Early Response Action.  Is it fair to say
11  that got superseded by the Modified Early Response Action?

12      A    Yes.

13      Q    And then we have the Feasibility Study and then
14  also the PRAP.  And I think last time we were together, you
15  said that the PRAP was -- is more or less the Reader's
16  Digest condensed version of the Feasibility Study; correct?

17      A    That would sound like something I might have
18  added.

19      Q    Okay.  So that's a fair statement?

20      A    Yes.

21      Q    Is there a difference between the remedial action
22  proposed in the PRAP versus the remedial action proposed in
23  the Feasibility Study?

24      A    No.

25      Q    Is there a difference -- and if you need to look

```
1   STATE OF ARIZONA      )
                          ) ss.
2   COUNTY OF MARICOPA    )

3           BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was duly
4   sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of the
5   proceedings, all done to the best of my skill and ability;
    that the proceedings were taken down by me in shorthand and
6   thereafter reduced to print under my direction.

7           I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
8   outcome hereof.

9           [X]  Review and signature was requested.

10          I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA
11  7-206(J)(1)(g)(1) and (2).

12          DATED at Phoenix, Arizona, this 5th day of March,
    2016.
13

14

15          X orena Marin
            Lorena Marin-Garcia, RMR, CRR
16          Certified Reporter
            Arizona CR No. 50541
17

18                     ************

19     I CERTIFY that Marin-Garcia Reporting, Inc., dba mg
    reporting has complied with the ethical obligations set
20  forth in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23          Xrena Marin
            Marin-Garcia Reporting, Inc., dba mg reporting
24          Registered Reporting Firm
            Arizona RRF No. R1006
25
```

# EXHIBIT 15



# ARIZONA DEPARTMENT
## OF
# ENVIRONMENTAL QUALITY

1110 West Washington Street • Phoenix, Arizona 85007
(602) 771-2300 • www.azdeq.gov



Janice K. Brewer
Governor

Henry R. Darwin
Acting Director

December 16, 2010

RPU11:068

Mr. Dennis Shirley
Synergy Environmental, LLC
10645 N. Tatum Blvd., Ste. 200-437
Phoenix, AZ 85028

Re:     Review of Well Investigation Work Plan
        Roosevelt Irrigation District, Early Response Action
        West Van Buren Area, Water Quality Assurance Revolving Fund Site

Dear Mr. Shirley:

The Remedial Projects Unit (RPU) of the Arizona Department of Environmental Quality
(ADEQ) has reviewed the above referenced Well Investigation Work Plan (work plan) dated
November 24, 2010. The work plan was prepared by Mongomery & Associates on behalf of
Gallagher & Kennedy, P.A. and the Roosevelt Irrigation District (RID). This work plan is an
abridged version of the Well Investigation Work Plan dated August 9, 2010.

ADEQ approves the abridged work plan submitted November 24, 2010 with the following
conditions:

**General Comments**

1.      ADEQ agrees that RID can begin testing at a deep well and then move on to the shallow
        wells, assuming that the same testing being conducted in the deep wells will also be
        completed in the shallow wells. ADEQ believes it would be beneficial to conduct all the
        testing at each well at the same time but will leave the exact timing of testing to RID's
        discretion. ADEQ understands the need for RID's flexibility concerning water supply
        demands.

2.      It should be noted that ADEQ is finalizing the comments on the overall Workplan
        submitted August 9, 2010. ADEQ's approval and RIDs execution of the abridged work
        plan does satisfy all conditions of the over all work plan for task 2 conditional approval
        of the Early Response Action (ERA). ADEQ is approving this abridged workplan to
        ensure that RID can conduct work during this time of operational shut down for the
        winter months.

**Specific Comments to the Abridged Work Plan Submitted November 24, 2010**

1.      Section 1.0, third bulleted paragraph – see item number 1 above.

Northern Regional Office
1801 W. Route 66 • Suite 117 • Flagstaff, AZ 86001
(928) 779-0313

Southern Regional Office
400 West Congress Street • Suite 433 • Tucson, AZ 85701
(520) 628-6733

*Printed on recycled paper*

M&A008963

2.   Section 2.0, first paragraph reason 5 – If conditions exist that all the RID wells are not needed to meet production demands in February, ADEQ requests that RID continue with this investigation until completed.

3.   Section 2.1, second paragraph, first sentence – ADEQ is not clear on how fill material will be determined.  ADEQ assumes geophysical logging will be used.

4.   Section 2.2.1, third paragraph - ADEQ requests that water levels be measured at nearby wells to identify possible pumping effects on adjacent wells and to provide data for aquifer characterization.  ADEQ will grant RID access to ADEQ wells located within the area.  Please provide ADEQ a list of wells RID would like to measure.

5.   Section 2.4, 5th bullet point – ADEQ requests that RID utilize EPA method 8260B.  This is the sampling method that ADEQ performs for volatiles in remediation actions.

6.   ADEQ requests a GANT Chart describing the work plan implementation schedule. The schedule does not have to be date specific but should give a relative idea of time frames expected for the process/work flow.  A schedule with specific dates can then be issued once contractor procurement has been completed.  This schedule will enable ADEQ personnel to be in the field to observe activities.

ADEQ looks forward to receipt of the GANT chart, ADEQ well locations for observation and the detailed schedule of field activities.  Please contact me at (602)771-4411 if you have any questions or comments regarding this correspondence.

Sincerely,

Julie Riemenschneider, Manager
Remedial Projects Section

cc:    Stan Ashby, RID
       David P. Kimball, III, Gallagher & Kennedy P.A.
       Henry Darwin, ADEQ
       Amanda Stone, ADEQ
       Jennifer Thies, ADEQ
       Kevin Snyder, ADEQ

M&A008964