1  G. Van Velsor Wolf Jr. (#07530)
   Michael K. Foy (#032736)
2  **SALMON, LEWIS, & WELDON,**
   **P.L.C.**
3  2850 East Camelback Road, Suite 200
   Phoenix, Arizona 85016
4  Telephone: 602-801-9075
   Facsimile: 602-801-9070
5  Email: vvw@slwplc.com

6  *Attorneys for Defendant Air Liquide*
7  *America Specialty Gases, L.L.C.*

8  Christopher D. Thomas (#010482)
   Matthew L. Rojas (#025030)
9  **SQUIRE PATTON BOGGS (US) LLP**
   One East Washington Street, Suite 2700
10 Phoenix, Arizona 85004
   Telephone: 602-548-4000
11 Facsimile: 602-253-8129
   Email: Chris.thomas@squirepb.com
12 Email: Matthew.rojas@squirepb.com

13 *Attorneys for Defendant City of Phoenix*

14 (Additional counsel listed on next
   pages)

Mitchell J. Klein (#007430)
**SNELL & WILMER LLP**
One Arizona Center
400 East Van Buren Street, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602-382-6000
Facsimile: 602-382-6070
Email: mjklein@swlaw.com
Email: mderstine@swlaw.com
Email: tsabo@swlaw.com

*Attorneys for Defendants Arizona Public*
*Service Company, Dolphin Incorporated, and*
*ITT Corporation*

15                UNITED STATES DISTRICT COURT

16                   DISTRICT OF ARIZONA

17

18 Roosevelt Irrigation District, a political    No. 2:10-CV-00290-PHX-DAE (BGM)
   subdivision of the State of Arizona,
19                                                **DEFENDANTS' MOTION FOR**
                   Plaintiff,                     **SUMMARY JUDGMENT**
20                                                **RE: NCP COMPLIANCE**
         v.
21                                                **—AND—**
22 Salt River Project Agricultural
   Improvement and Power District, et al.,        **MEMORANDUM IN SUPPORT**
23
                   Defendants.                    **(Oral Argument Requested)**
24

25

26

27

28

| | |
|---|---|
| Stephen L. Wetherell (#015353)<br>Phoenix City Attorney's Office<br>Civil Division<br>200 West Washington Street, Suite 1300<br>Phoenix, Arizona 85003-1611<br>Telephone: 602-262-6761<br>Facsimile: 602-534-2476<br>Email: Stephen.wetherell@phoenix.gov<br><br>*Attorneys for Defendant City of Phoenix* | Shane R. Swindle (#011738)<br>Michael P. Berman (#005861)<br>P. Derek Petersen (#025683)<br>**PERKINS COIE LLP**<br>2901 North Central Avenue, Suite 2000<br>Phoenix, Arizona 85012-2788<br>Telephone:  602-351-8000<br>Facsimile:  602-648-7000<br>Email: SSwindle@perkinscoie.com<br>Email: MBerman@perkinscoie.com<br>Email: PDPetersen@perkinscoie.com<br><br>*Attorneys for Defendant Corning Incorporated* |
| Troy B. Froderman (#012717)<br>Jonathan G. Brinson (#025045)<br>**POLSINELLI PC**<br>One East Washington Street, Suite 1200<br>Phoenix, Arizona 85004<br>Telephone: 602-650-2000<br>Facsimile: 602-264-7033<br>Email: tfroderman@polsinelli.com<br>Email: jbrinson@polsinelli.com<br><br>*Attorneys for Defendant Dolphin Incorporated* | John M. Barkett (FL #197548)<br>**SHOOK, HARDY & BACON LLP**<br>201 South Biscayne Boulevard, Suite 3200<br>Miami, Florida 33131-4332<br>Telephone: 305-358-5171<br>Facsimile: 305-358-7470<br>Email:  jbarkett@shb.com<br><br>*Attorneys for Defendant Freescale Semiconductor, Inc.* |
| Karen S. Gaylord (#010621)<br>**JENNINGS, HAUG & CUNNINGHAM LLP**<br>2800 North Central Avenue, Suite 1800<br>Phoenix, Arizona 85004-1049<br>Telephone: 602-234-7800<br>Facsimile: 602-277-5595<br>Email: ksg@jhc-law.com<br><br>*Attorneys for Defendant Honeywell International Inc.* | Sean Morris (*Pro Hac Vice*)<br>Eric D. Mason (*Pro Hac Vice*)<br>Sean A. McCormick (*Pro Hac Vice*)<br>**ARNOLD & PORTER LLP**<br>777 South Figueroa Street, 44th Floor<br>Los Angeles, California 90017-5844<br>Telephone: 213-243-4000<br>Facsimile: 213-243-4199<br>Email: sean.morris@aporter.com<br>Email: eric.mason@aporter.com<br>Email: sean.mccormick@aporter.com<br><br>*Attorneys for Defendant Honeywell International Inc.* |

| | |
|---|---|
| John M. Pearce (#012300)<br>Scott K. Ames (#014943)<br>**FENNEMORE CRAIG PC**<br>2394 East Camelback Road, Suite 600<br>Phoenix, Arizona 85016-3429<br>Telephone: 602-916-5000<br>Facsimile: 602-916-5510<br>Email: jpearce@fclaw.com<br>Email: sames@fclaw.com<br><br>*Attorneys for Defendant Kinder Morgan*<br>*Energy Partners, LP* | J. Kenneth Mangum (#003077)<br>Ann Thompson Uglietta (#013696)<br>Deputy County Attorneys<br>Civil Services Division<br>Maricopa County Attorney's Office<br>222 North Central Avenue, Suite 1100<br>Phoenix, Arizona 85004<br>Telephone: 602-506-8541<br>Facsimile: 602-506-8567<br>Email: mangumk@mcao.maricopa.gov<br>Email: Uglietta@mcao.maricopa.gov<br><br>*Attorneys for Defendant Maricopa County* |
| Jerry D. Worsham II (#015594)<br>**THE CAVANAGH LAW FIRM, P.A.**<br>1850 North Central Avenue, Suite 2400<br>Phoenix, Arizona 85004<br>Telephone: 602-322-4040<br>Facsimile: 602-322-4105<br>Email: jworsham@cavanaghlaw.com<br><br>*Attorneys for Defendant Meritor, Inc.* | Christopher L. Callahan (#009635)<br>Phillip F. Fargotstein (#006679)<br>Scott K. Ames (#014943)<br>**FENNEMORE CRAIG PC**<br>2394 East Camelback Road, Suite 600<br>Phoenix, Arizona 85016-3429<br>Telephone: 602-916-5000<br>Facsimile: 602-916-5510<br>Email: ccallaha@fclaw.com<br>Email: pfargots@fclaw.com<br>Email: sames@fclaw.com<br><br>*Attorneys for Defendant Nucor Corporation* |
| Carla A. Consoli (#013798)<br>Stanley B. Lutz (#021195)<br>Marla Hudgens (#032295)<br>**LEWIS ROCA ROTHGERBER**<br>**CHRISTIE LLP**<br>201 East Washington Street, Suite 1200<br>Phoenix, Arizona 85004-2595<br>Telephone: 602-262-5311<br>Fax: 602-262-5747<br>Email: cconsoli@lrrc.com<br>Email: sblutz@lrrc.com<br>Email: mhudgens@lrrc.com<br><br>*Attorneys for Defendant Prudential Overall*<br>*Supply* | Matthew G. Ball (CA #208881)<br>Jason N. Haycock (CA #278983)<br>**K&L GATES, LLP**<br>Four Embarcadero Center, Suite 1200<br>San Francisco, California 94111<br>Telephone: 415-882-8200<br>Facsimile: 415-882-8220<br>Email: Matthew.ball@klgates.com<br>Email: Jason.haycock@klgates.com<br><br>*Attorneys for Defendant Reynolds Metals*<br>*Company* |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**

| David J. Armstrong (#017111)<br>Craig C. Hoffman (#026017)<br>Lea A. Phillips (#029006)<br>**BALLARD SPAHR LLP**<br>1 East Washington Street, Suite 2300<br>Phoenix, Arizona 85004-2555<br>Telephone: 602.798.5400<br>Facsimile: 602.798.5595<br>Email: armstrongd@ballardspahr.com<br>Email: hoffmanc@ballardspahr.com<br>Email: phillipsla@ballardspahr.com<br><br>*Attorneys for Defendant Salt River Project*<br>*Agricultural Improvement and Power*<br>*District* | Joshua Levine (CA #171840)<br>**BOOTH LLP**<br>1849 Sawtelle Boulevard, Suite 500<br>Los Angeles, California 90025<br>Telephone: 310-641-1800<br>Facsimile: 310-641-1818<br>Email: JLevine@boothllp.com<br><br>*Attorneys for Defendant Textron, Inc.* |
| William W. Pearson (#012845)<br>**PEARSON LAW GROUP LLC**<br>1221 East Osborn Road, Suite 101<br>Phoenix, Arizona 85014<br>Telephone: 602-237-5405<br>Facsimile: 602-688-5488<br>Email: Wink@pearsonlg.com<br><br>*Attorneys for Defendant Union Pacific*<br>*Railroad Company* | Michelle Ulick Rosenthal (WSBA #35439)<br>Gregory T. Hixson (WSBA #39223)<br>Denver R. Gant (WSBA #38552)<br>Attorneys *Pro Hac Vice*<br>**VERIS LAW GROUP PLLC**<br>1809 Seventh Avenue, Suite 1400<br>Seattle, Washington 98101<br>Telephone: 206-829-9590<br>Facsimile: 206-829-9245<br>Email: Michelle@verislawgroup.com<br>Email: Greg@verislawgroup.com<br>Email: Denver@verislawgroup.com<br><br>*Attorneys for Defendant Univar USA Inc.* |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

MOTION ................................................................................................................. 1

MEMORANDUM .................................................................................................... 2

Preliminary Statement ........................................................................................... 2

Relevant Facts ......................................................................................................... 3

    A.    Background and Context ..................................................................... 3

    B.    Undisputed Material Facts For Motion ............................................. 4

        1.    *The Implementation Plan* ..................................................... 4

        2.    *The Early Response Action ("ERA") Work Plan* ............... 5

        3.    *The Public Health Exposure Assessment and Mitigation Summary Report* ................................................................. 6

        4.    *The Modified Early Response Action ("MERA") Work Plan* ............ 8

        5.    *The Absence of a Timely or Complete Feasibility Study* .................... 9

Argument ............................................................................................................... 10

    A.    Applicable Regulatory Framework For NCP Compliance .......................... 10

    B.    Failure To Substantially Comply With The Applicable NCP Regulations Requires Dismissal Of Plaintiff's CERCLA Action ................ 13

    C.    RID's Remedial Action Does Not Satisfy Key Requirements of the NCP ......................................................................................................... 15

Conclusion ............................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Angus Chem. Co. v. Mallinckrodt Grp.,*
    1997 U.S. Dist. LEXIS 5242 (W.D. La. Feb. 10, 1997) ................................. 12, 17

*Ascon Properties, Inc. v. Mobil Oil Co.,*
    866 F.2d 1149 (9th Cir. 1989) ................................................................. 10

*Carson Harbor Vill., Ltd. v. Cty. of L.A.,*
    433 F.3d 1260 (9th Cir. 2006) ........................................... 1, 10, 13, 15

*Carson Harbor Vill. Ltd. v. Unocal Corp.,*
    287 F. Supp. 2d 1118 (C.D. Cal. 2003) ................................................ 1, 14

*K.V.L. Corp. v. Holson Co.,*
    2000 U.S. Dist. LEXIS 22955 (D. Conn. Aug. 3, 2000) .................................. 12, 17

*Raytheon Constructors, Inc. v. ASARCO Inc.,*
    2000 WL 1635482 (D. Colo. Mar. 31, 2000) ........................................... 14

*Sealy Connecticut, Inc. v. Litton Industries, Inc.,*
    93 F. Supp. 2d 177 (D. Conn. 2000) ......................................... 12, 13, 14

*Sherwin-Williams Co. v. City of Hamtramck,*
    840 F. Supp. 470 (E.D. Mich. 1993) ........................................................ 14

*Union Pac. R.R. Co. v. Reilly Indus., Inc.,*
    981 F. Supp. 1229 (D. Minn. 1997), *vacated in part on other grounds,*
    1998 WL 1768404 (D. Minn. Jan. 12, 1998),
    *aff'd*, 215 F.3d 830 (8th Cir. 2000) ........................................................ 14

*Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.,*
    59 F.3d 793 (9th Cir. 1995) ......................................................... 10, 15

**STATUTES, RULES, AND REGULATIONS**

40 C.F.R. § 300.430 .................................................................................. 10, 12
            § 300.430(a)(2) .................................................................. 10
            § 300.430(d)(1)-(4) ......................................................... 13, 17
            § 300.430(e) ................................................................... 17
            § 300.430(e)(2) ............................................................... 11
            § 300.430(e)(2)(i)(A)(1) and (2) .................................... 12
            § 300.430(e)(2)-(6) ......................................................... 13
            § 300.430(e)(7) ............................................................... 13

- ii -

§ 300.430(e)(9) ............................................................................... 13
§ 300.430(e)(9)(iii) ..................................................................... 11, 14

40 C.F.R. § 300.700 ................................................................................ 10
§ 300.700(c)(3)(i) ........................................................................ 10
§ 300.700(c)(5) and (6) ................................................................. 1

42 U.S.C. § 9607(a)(4)(B) ................................................................... 1, 10

42 U.S.C. § 9605 .................................................................................... 10

A.R.S. §§ 45-802.01(c)(i), 45-454.01 ................................................... 4

A.R.S. § 48-2901 ..................................................................................... 3

A.R.S. § 49-287.01 .................................................................................. 3

A.R.S. § 49-287.03 .................................................................................. 3

**OTHER AUTHORITIES**

EPA CERCLA/Superfund Orientation Manual (1992),
    p. XII-1, currently available at
    https://semspub.epa.gov/work/HQ/174484.pdf ...................................... 11

Arizona Laws 1997, Chapter 287, Sections 51, 52
    (codified in the Arizona Department of Water Resources
    ("ADWR") administrative rules at A.A.C. R12-15-729) ........................... 4

*Public Health Exposure Assessment and Mitigation Summary Report,*
    September 16, 2011 ........................................................................ 7, 15

## MOTION

Defendants[1] move for summary judgment on the ground that Plaintiff Roosevelt Irrigation District ("RID") has failed to comply with the National Contingency Plan ("NCP").   In this action, RID seeks recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which requires a plaintiff to comply with the NCP, 40 CFR Part 300.   42 U.S.C § 9607(a)(4)(B).   RID has failed to comply with the NCP in several material ways.   This Motion, however, focuses on only three of those failures, which are apparent without the need for expert testimony or further discovery: (1) RID's failure to properly analyze alternative remedial actions, and specifically the "no-action" alternative; (2) RID's failure to conduct a Human Health Risk Assessment; and (3) RID's failure to identify and consider site-specific applicable or relevant and appropriate requirements ("ARARs").[2]

RID's failure to comply with the NCP is fatal to its claims to recover its past and future response costs under CERCLA.   *See* 40 C.F.R. § 300.700(c)(5) and (6); *Carson Harbor Vill. Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1175-76 (C.D. Cal. 2003), *aff'd*, 433 F.3d 1260 (9th Cir. 2006) (affirming summary judgment for a defendant in a CERCLA Section 107 action for response costs based upon plaintiff's failure to consider the no-action alternative and failure to conduct detailed analysis of alternatives).

This Motion is supported by the below Memorandum, the accompanying Statement of Facts ("SOF"), and the materials contained in the docketed record with this Court.

---

[1] As used in this Motion, and unless the context requires otherwise, "Defendants" refers to the following parties on whose behalf this Motion for Summary Judgment is filed:   Air Liquide America Specialty Gases, L.L.C.; Arizona Public Service Company; City of Phoenix; Corning Incorporated; Dolphin Incorporated; Freescale Semiconductor, Inc.; Honeywell International Inc.; ITT Corporation; Kinder Morgan Energy Partners, LP; Maricopa County; Meritor, Inc.; Nucor Corporation; Prudential Overall Supply; Reynolds Metals Company; Salt River Project Agricultural Improvement and Power District; Textron, Inc.; Union Pacific Railroad Company; and Univar USA Inc.

[2] This Motion for Summary Judgment re NCP Compliance is limited to the grounds set forth herein, and does not address every ground on which RID has failed to comply with the NCP.   Accordingly, Defendants reserve their right to challenge additional failures to comply with the NCP should the need arise.

# MEMORANDUM

## Preliminary Statement

Plaintiff, Roosevelt Irrigation District ("RID"), has been conducting remedial action at four agricultural irrigation wells it operates.  It has been treating water to drinking water standards at these four wells and then transporting that water through a system of canals to agricultural users for application to crops.[3]  Before the treated water reaches the irrigation users, it is mixed with treated sewage effluent.  RID has sued the Defendants under CERCLA seeking to recover approximately $17 million in alleged response costs, plus future response costs.  To prevail on its claim, RID must prove that its actions have substantially complied with the NCP, CERCLA's cleanup blueprint.

As the Court knows, Defendants already have pending their Motion for Summary Judgment on the bulk (all but about $1.3 million) of RID's alleged response costs because there is no dispute that RID has not paid any of these costs and has no current, non-contingent obligation to pay them.  (ECF No. 1110)  Subsequent additional discovery has demonstrated that RID's remaining response costs also are not recoverable, and Defendants thus also recently filed a further motion for summary judgment regarding these alleged costs as well.  Together, those two motions show that RID cannot recover *any* of its alleged past "costs."

But RID has an even more fundamental problem that defeats this entire action:  RID has failed to comply with the NCP.  Although RID's failures were numerous, this motion focuses on three dispositive failures that do not require further evidence or expert testimony.  Specifically, (1) RID failed to properly analyze alternative remedial actions, including a no-action alternative; (2) RID failed to conduct a Human Health Risk Assessment; and (3) RID failed to identify and consider site-specific ARARs.  Any one of these failures is fatal to RID's cause of action as a matter of law.

---

[3] Short-handed references to "RID wells," "RID canals," or "RID laterals" and the like should not be interpreted to be a concession by Defendants as to the ownership issues contested in the separate quiet title lawsuit.  [*See* concurrently filed Statement of Facts ("SOF") at 1 n.3]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Relevant Facts**

**A.   Background and Context[4]**

RID was formed under A.R.S. § 48-2901 as an *irrigation* district and municipal corporation on June 4, 1923. [SOF ¶ 1]  Since 1923, RID has pumped water for *irrigation* purposes in the western portion of the Phoenix metropolitan area. [*Id.* ¶¶ 2-3, 10]

In 2008, RID engaged the law firm of Gallagher & Kennedy ("G&K") in connection with its joint scheme to become a provider of drinking water.  [*Id.* ¶ 17]  RID contracted with G&K on a contingent fee basis: G&K would be paid a significant percentage of the revenue from potential future drinking water sales, should G&K prove successful in converting RID into a provider/broker of drinking water. [*Id.* ¶¶ 9, 17][5]

Central to RID and G&K's plan to transition RID into a provider of drinking water is the unique nature of Arizona's environmental protection laws. [*Id.* ¶¶ 4, 13-16]  In Arizona, the Department of Environmental Quality ("ADEQ") administers the Water Quality Assurance Revolving Fund ("WQARF").   Under the WQARF program, areas within Arizona that potentially require environmental remediation are listed on a Registry and designated as "Sites."  A.R.S. § 49-287.01.  A site investigation is conducted to determine the extent of the contamination and what remedial strategies and measures will be implemented to address it.  A.R.S. § 49-287.03.  Under the WQARF program, the ADEQ has listed what it calls the West Van Buren Site ("WVB Site"), which encompasses the area in which irrigation wells used by RID are located.  [SOF ¶ 4]

Independently, Arizona's groundwater code imposes numerous restrictions on groundwater pumping, while allowing parties that otherwise have no legal right to pump to

[4] While these facts are not necessary for the determination of this Motion and the Court is already aware of them from the various memoranda on the motion for complete disqualification of Gallagher & Kennedy, Defendants include them as background to provide reasons why RID's failure to comply with necessary elements of the NCP was a calculated decision.  RID picked the remedy it needed to become a potable water broker, and then prepared documents to support that outcome, rather than following the NCP, which puts remedy selection at the end of a remedial alternatives evaluation that considers risk.

[5] As noted in Defendants' Response to Motion for Protective Order (ECF No. 1196), the payoff to G&K and the technical consultants it engaged to pursue this scheme could provide them with a windfall in the hundreds of millions of dollars. *Id.* at 1-2 and footnotes 1-3.

do so for the purpose of implementing a WQARF (or federal Superfund) remedy. [*Id.* ¶¶ 13-15]  *See also* A.R.S. §§ 45-802.01(c)(i), 45-454.01.  As a temporary incentive, but only until 2025, Arizona law also allows eligible users of *remediated groundwater* to account for such water in the same manner as *surface water*, which produces significant legal and economic benefits (such as for municipal purchasers of that water).  [SOF ¶¶ 14 n.5, 15]  *See* Arizona Laws 1997, Chapter 287, Sections 51, 52 (codified in the Arizona Department of Water Resources ("ADWR") administrative rules at A.A.C. R12-15-729).  In other words, drinking water that is considered "remediated" groundwater can be considerably more valuable than other sources of water.

RID and G&K have attempted to take advantage of this confluence of circumstances through the following plan: (1) convince ADEQ that groundwater pumped by RID for irrigation purposes should be treated to drinking water standards immediately; (2) persuade the agency that adding wellhead treatment at a few of RID's existing irrigation wells is the best way to accomplish that objective, thereby producing a large volume of remediated drinking water under RID's control; (3) use this lawsuit to seek recovery of these unnecessary costs; and (4) try to sell the remediated groundwater to municipal buyers for potable use.[6]  [SOF ¶ 16]  Or, as Joel Peterson (the RID consultant who designed RID's remedial action) testified, RID's remedial action was intended "from the beginning" to facilitate the sale of water pumped by RID for drinking water purposes. [*Id.* ¶¶ 16, 22]

Against this backdrop, we explain key components of the NCP that RID failed to satisfy in its drive to succeed in this scheme.

## B.   Undisputed Material Facts For Motion

### 1.   *The Implementation Plan*

In 2008, RID contracted with the G&K law firm to act not only as its lawyers, but also as the project manager for its potential remedial action – all on a contingency fee basis. [*Id.* ¶¶ 17, 18]  In turn, G&K secured the services of Dennis Shirley and Joel Peterson as

---

[6] For purposes of this Motion and SOF, with reference to water pumped by RID, "groundwater" means water pumped from underground.  Defendants do not concede that all water pumped from RID's wells is percolating groundwater rather than subflow of the Salt and/or Agua Fria Rivers.

1  environmental consultants. [*Id.* ¶ 19]  Initially, Messrs. Shirley and Peterson worked for

2  Montgomery & Associates ("M&A"), but they later left M&A to form their own company,

3  Synergy Environmental. [*Id.*]

4       While at M&A, Shirley and Peterson drafted an "Implementation Plan, Roosevelt

5  Irrigation District Groundwater Response Action," dated September 25, 2009

6  ("Implementation Plan"). [*Id.* ¶ 23]  The Implementation Plan acknowledged that RID

7  already used the water it pumped for irrigation purposes with no need for any remediation.

8  [*Id.* ¶ 25]  Nonetheless, because the goal was for RID to become a provider of drinking

9  water and broker deals for such water with local municipalities, G&K, M&A, and RID pro-

10  posed implementation of an "early response action" that pumped groundwater from existing

11  irrigation wells used by RID, conveyed the pumped groundwater in existing irrigation

12  canals, and treated it to drinking water standards at a central treatment plant. [*Id.* ¶ 24]

13       The Implementation Plan expressly states that it does not include an evaluation of

14  any approach other than this groundwater pump-and-treat. [*Id.* ¶ 26 (SOF Ex. 5 at 27)

15  ("Alternative remedies that rely solely on 'no action' or 'monitoring' strategies . . . were not

16  considered in this evaluation.")]  Instead, the Implementation Plan states only that a

17  "comparative analysis [of remedial alternatives] will be conducted" in the future. [*Id.* (SOF

18  Ex. 5 at 34)]  Thus, a no-action alternative was not considered by RID at this stage. [*Id.*]

19  **2.    *The Early Response Action ("ERA") Work Plan***

20       G&K and M&A carried out the Implementation Plan by submitting to ADEQ an

21  Early Response Action Work Plan dated February 3, 2010 ("ERA Work Plan"). [*Id.* ¶ 27]

22  Like the Implementation Plan, the ERA Work Plan proposed to treat water withdrawn from

23  the RID wells located in the WVB Site in a centralized treatment system. [*Id.* ¶ 28]  The

24  treated water would be mixed with treated wastewater from the City of Phoenix 23rd

25  Avenue Wastewater Treatment Plant for delivery to agricultural land in Goodyear and

26  Buckeye, AZ. [*Id.*]

27       There were eight alternatives considered in the ERA Work Plan:

28       1.  Drilling of new extraction wells outside of the WVBA Site to
           replace the impacted water supply;

- 5 -

2. Modifying existing impacted wells to exclude contaminated zones;

3. Modifying existing impacted wells to only pump from contaminated zones;

4. Acquiring a surface water supply and abandoning existing impacted RID wells;

5. Implementing wellhead treatment using air stripping ("AS");

6. Implementing wellhead treatment using liquid-phase granular activated carbon ("GAC");

7. Implementing centralized treatment using AS; and,

8. Implementing centralized treatment using GAC.

[*Id.* ¶ 29]  As is plain from this list and was the case with the Implementation Plan, a "no action alternative" was not considered in the ERA Work Plan.  [*Id.* ¶ 32]

Moreover, the eight alternatives were evaluated only "conceptually" in a mere four-page analysis that considered five factors: "effectiveness in contaminant removal and control, practicability and ease of near-term implementation, regulatory acceptance, capital cost, and ongoing operation and maintenance ("O&M") costs."  [*Id.* ¶ 30]  After this conceptual analysis, the ERA Work Plan proposed centralized treatment using GAC as the "most practicable alternative" to meet the goals set in the ERA.  [*Id.* ¶ 31]

### 3. *The Public Health Exposure Assessment and Mitigation Summary Report*

By letter dated June 24, 2010, the ADEQ gave *conditional* approval of the ERA Work Plan with the express caveat that, "ADEQ has not reviewed whether the ERA Work Plan is consistent with any federal laws or regulations."  [*Id.* ¶¶ 33-35 (emphasis added)]

The letter also noted that RID had not provided ADEQ with information about human health risk.  In an attachment to ADEQ's letter setting forth the conditions "that must be met within the time periods identified below" before approval would be granted, the first entry entitled "Public Health Threat" read in full:

> The RID work plan states there is a current risk to the public health from exposure to VOCs (from both air and water) within the West Van Buren Area (WVBA), however, specific documentation about the risks and how the risks will be mitigated during the ERA implementation has not yet been provided.  [*Id.* at ¶¶ 56-57 & Ex. 7 (emphasis added)]

- 6 -

The "Completion/Submittal Date" then had this text:

> Within 30 days of ERA approval, RID shall submit a risk analysis work plan to ADEQ documenting the risks and demonstrating to ADEQ how and when the ERA will mitigate the risks. [*Id.*]

RID never commissioned a human health risk assessment; rather, it submitted only a "limited" report entitled *Public Health Exposure Assessment and Mitigation Summary Report*, dated September 16, 2011 ("Public Health Exposure Assessment"). [SOF ¶¶ 58, 60-61] That document was prepared by Synergy's Mr. Shirley and Mr. Peterson, both of whom acknowledge they are not experts in either risk assessment or toxicology. [*Id.* ¶¶ 59-60] As the document itself emphasizes, "this assessment does <u>not</u> constitute a quantitative risk assessment, but rather a <u>screening-level</u> assessment of potential exposure." [*Id.* ¶ 61 (emphasis in original)]

At his deposition, Mr. Shirley conceded that this was not a risk assessment:

> Q.   Okay. Did you do and did you complete the four components of a site-specific human health risk assessment in the report you submitted to ADEQ?
>
> A.   In the end, we were not asked to.
>
> …
>
> Q.   Okay. So you had an approved work plan, but you did not do a site-specific human health risk assessment; is that correct?
>
> A.   As I already said, we were not asked to do a site-specific human health risk assessment.
>
> Q.   But you did not do one? Is that yes or no?
>
> A.   That's true.
>
> Q.   Okay. The answer is, no, you didn't do one?
>
> A.   No, we didn't do one. We weren't asked to do one.

[*Id.* ¶ 62 (SOF Ex. 1 at 472:24-473:2; 473:23-474-6][7]

---

[7] Mr. Peterson also testified that without treatment, groundwater pumped from RID's wells meets Arizona's surface water quality standards for agricultural irrigation. [SOF ¶ 51] This is consistent with ADEQ's own assessment. As part of its own Remedial Investigation, ADEQ's retained expert concluded that, while RID's irrigation wells did pump water containing volatile organic compounds, the water reached drinking water standards within 125 feet after discharge into the RID Main Canal. [*Id.* ¶ 12]

- 7 -

To the extent there were *any* exposure considerations (even "screening-level" assessments) reflected in Synergy's Public Health Exposure Assessment, the conclusions were that there was no imminent risk to public health *even without treatment of the groundwater* (*Id.* ¶ 63):

- "The results of this assessment suggest that there is not an imminent (acute) risk to the public from the contamination being released from the RID water systems." [*Id.* (SOF Ex. 15 at 2)]

- "[W]ater sampling results show that many points in the RID water system exceed screening-level guidelines for ingestion, however, the contaminated water is not expected to lead to an unacceptable public exposure based on the limited and transient potential use of this water as a source of drinking water." [*Id.* ¶ 64]

- As to adsorption risk, there was no adsorption risk from "acute" exposure to water in RID's canals. [*Id.*] Instead, "there appears to be no imminent (acute) risk to public health from exposure to COCs [contaminants of concern] in RID's waterways." [*Id.* ¶ 65]

- As to inhalation risk, "emissions of COCs currently associated with the pumping and conveyance of contaminated groundwater do not pose an imminent air inhalation hazard to public health." [*Id.* ¶ 66][8]

### 4. *The Modified Early Response Action ("MERA") Work Plan*

After the conditional approval of the ERA, RID abandoned the centralized treatment plant concept. [*Id.* ¶ 36]  Instead, RID (through G&K and Synergy) advocated for "wellhead treatment" in a document entitled the "Modified Early Response Action (MERA) Work Plan," dated October 22, 2012 ("MERA"). [*Id.*]

The same eight remedial alternatives contained in the ERA (and *only* those eight) also were listed in the MERA. [*Id.* ¶ 37]  Thus, as with the ERA (and all other reports that preceded it), the MERA did not consider the no-action alternative. [*Id.* ¶ 40]

As in the ERA, the eight remedial alternatives were "conceptually evaluated" applying the same five factors set forth in the ERA. [*Id.* ¶ 38]  In a mere three-page analysis, Synergy concluded that wellhead treatment using GAC, as opposed to centralized

---

[8] At a hearing on March 3, 2016, RID's counsel acknowledged to the Court, consistent with its duty of candor, that there was no "immediate threat to public health or the environment." [*Id.* ¶ 70]

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT

1    treatment using GAC as was recommended in the ERA, was "the most practicable and cost

2    effective alternative to meet the ERA objectives." [*Id.* ¶ 39]

3          The ADEQ gave *conditional* approval of the MERA by letter dated February 1,

4    2013. [*Id.* ¶¶ 41-42]  Once again, ADEQ disclaimed any application of federal law: "ADEQ

5    has not reviewed whether the Modified ERA Work Plan is consistent with any federal laws

6    or regulations."  [*Id.* ¶ 41]   Notably, RID's contractors had begun treatment using the

7    proposed wellhead treatment system nearly a year earlier.  [*Id.* ¶ 43 (wellhead treatment had

8    begun at least as of February 6, 2012)]

9              **5.     *The Absence of a Timely or Complete Feasibility Study***

10          The NCP, as explained below, imposes a number of requirements that must be met

11   before a plaintiff may recover alleged response costs under CERCLA, including the

12   preparation of a proper Feasibility Study ("FS").   RID (and its consultants G&K and

13   Synergy) did not prepare any FS before initiating remedial action.  [*Id.* ¶ 44]   Rather,

14   Synergy prepared an FS *after* remedial action already had begun. [*Id.*]  Synergy submitted a

15   Draft FS to the ADEQ in July 2014, and a Revised Draft FS dated November 26, 2014, both

16   dates well after contractors had begun wellhead treatment.  [*Id.* ¶¶ 44-45 (again, wellhead

17   treatment had begun at least as of February 6, 2012)]

18          The Synergy FS purported to evaluate four alternatives, all calling for immediate

19   treatment to drinking water standards of groundwater pumped by RID, regardless of its end

20   use.  [*Id.* ¶ 47; *see also id.* ¶ 46]   In other words, even this untimely FS evaluated only

21   alternatives that would make it possible for RID to sell the pumped water for non-irrigation

22   purposes.  [*Id.* ¶ 48; *see also id.* ¶ 55]   Thus, as was the case with the Implementation Plan,

23   the ERA Work Plan, and the MERA Work Plan, the FS did not properly consider a no-

24   action alternative.  [*Id.* ¶ 49]

25          Mr. Peterson also admitted that he was not familiar with the NCP and acknowledged

26   that the Synergy FS contains no analysis of ARARs.  [*Id.* ¶¶ 52, 54; *see also id.* ¶ 53]

27   Neither the MERA nor the ERA contain any discussion of site-specific ARARs. [*Id.* ¶ 21]

28

1                                     **<u>Argument</u>**

2     **A.**     **Applicable Regulatory Framework For NCP Compliance**

3         To establish a prima facie case under CERCLA Section 107, a plaintiff must show

4 (among other things) that the "release" or "threatened release" of contamination at issue has

5 caused the plaintiff to incur response costs that were "necessary" and "consistent with the

6 national contingency plan." *Carson Harbor Vill., Ltd. v. Cty. of L.A.*, 433 F.3d 1260, 1265

7 (9th Cir. 2006) (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th

8 Cir. 1989)).   Private parties, like RID here, have the burden of proving that cleanup costs

9 associated with remedial actions are consistent with the NCP to recover those costs.   42

10 U.S.C. § 9607(a)(4)(B); *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.*, 59 F.3d 793,

11 800 (9th Cir. 1995).

12         The NCP is promulgated by the Environmental Protection Agency pursuant to

13 CERCLA.   42 U.S.C. § 9605; *see generally* 40 C.F.R. Part 300.   The NCP outlines

14 specific steps parties must take in choosing a remedial action plan, and it is "designed to

15 make the party seeking response costs choose a cost-effective course of action to protect

16 public health and the environment." *Wash. State*, 59 F.3d at 802.

17         Under the NCP, a private party response action is considered "consistent with the

18 NCP" only if the action, when evaluated as a whole, is in substantial compliance with the

19 applicable requirements in sub-paragraphs (c)(5) and (c)(6) of 40 C.F.R. § 300.700, and

20 results in a CERCLA-quality cleanup.   40 C.F.R. § 300.700(c)(3)(i).   Importantly, under

21 Section 300.700(c)(5)(viii), a plaintiff must conduct a remedial investigation and feasibility

22 study (RI/FS) <u>before</u> a remedy is selected.

23         The requirements of an RI/FS are set forth in 40 C.F.R. § 300.430.   As that section

24 explains, the purpose of such RI/FS is to "assess site conditions and evaluate alternatives to

25 the extent necessary to select a remedy." 40 C.F.R. § 300.430(a)(2).   An RI/FS "generally

26 includes the following activities: project scoping, data collection, risk assessment,

27 treatability studies, and analysis of alternatives." *Id.*

28         One of the required components of an FS is an evaluation of the no-action

alternative, as well as an alternative that involves little or no treatment but utilizes institutional controls. *Id.* at § 300.430(e)(3)(ii), (e)(6) ("The no-action alternative . . . shall be developed."). In addition to developing the "no-action alternative," an FS must include remediation goals for acceptable levels of exposure that protect human health and the environment. 40 C.F.R. § 300.430(e)(2).

These remediation goals must be established by considering ARARs, *i.e.*, the "*[a]pplicable or relevant and appropriate requirements* under federal environmental or state environmental or facility siting laws, if available." *Id.* at § 300.430(e)(2)(i)(A) (emphasis added). Compliance with ARARs "of other environmental laws is a cornerstone of CERCLA." EPA CERCLA/Superfund Orientation Manual (1992), p. XII-1, currently available at https://semspub.epa.gov/work/HQ/174484.pdf. "[I]dentification of ARARs is the major prerequisite for setting cleanup goals, selecting the remedy, and determining how to implement the remedy while assuring protection of human health and the environment. However, the diverse characteristics of CERCLA sites preclude the development of prescribed ARARs, so that, by necessity, identification of ARARs is conducted on a site-by-site basis." *Id.*

The NCP requires more in the FS than just mere inclusion or invocation of the "no-action" alternative, or inclusion of ARARs. The NCP (40 C.F.R. § 300.430(e)(9)(iii)) requires that each remedial alternative being considered (including the "no-action" alternative) be evaluated using nine factors before selecting a remedial action:

1. Overall protection of human health and the environment;

2. Compliance with ARARs ("The alternatives shall be assessed to determine whether they attain applicable or relevant and appropriate requirements under federal environmental laws and state environmental or facility siting laws");

3. Long-term effectiveness and permanence;

4. Reduction of toxicity, mobility or volume;

5. Short-term effectiveness;

- 11 -

6.  Implementability;

7.  Cost;

8.  State acceptance; and

9.  Community acceptance.

As this list reflects, it is not enough to provide a passing reference to a remedial alternative.  Among other things, the NCP requires consideration of these nine factors, including compliance with ARARs, as part of the initial development of remediation goals and eventual inclusion in the FS.

Moreover, risk assessments are critical in the creation of an FS because each alternative is measured against the risk it eliminates.  40 C.F.R. § 300.430(e)(2)(i)(A)(1) and (2).  Consequently, the absence of a risk assessment (as is the case here) is fatal to a CERCLA claim for the costs of a remedial action.  *K.V.L. Corp. v. Holson Co.*, 2000 U.S. Dist. LEXIS 22955, at *122 (D. Conn. Aug. 3, 2000) (risk assessment conducted after report evaluating remedial action options does not satisfy the NCP:  "Thus the NCP's goal that site characterization activities be fully integrated with the development and evaluation of the remedial action options could not have been accomplished in this case."); *see also Angus Chem. Co. v. Mallinckrodt Grp.*, 1997 U.S. Dist. LEXIS 5242, at *32-33 (W.D. La. Feb. 10, 1997) (plaintiff's actions "throughout the remedial activities demonstrated . . . a failure to evaluate and consider different treatment technologies, 40 C.F.R. 300.430, a failure to weigh the cost and effectiveness of different alternatives, *id.* and a failure to conduct a risk assessment analysis, *id.*" such that, at best, "the consideration of these alternatives was limited, and no risk assessment analyses or cost/effectiveness studies were completed").[9]

---

[9] Consistent with the duty of candor, movants bring to the attention of the Court the decision in *Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 93 F. Supp. 2d 177 (D. Conn. 2000).  The Sealy court concluded that plaintiff "reversed the proverbial cart and horse by selecting its remedy before this site was fully investigated and then used a post hoc supporting rationale." *Id.* at 185.  The court nevertheless held that plaintiff "substantially complied" with the NCP.  *Id.* at 187.  This case is easily distinguishable.
Footnote continued on next page

- 12 -

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**

**B.      Failure To Substantially Comply With The Applicable NCP Regulations Requires Dismissal Of Plaintiff's CERCLA Action**

In *Carson Harbor Village, Ltd. v. County of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006), the Ninth Circuit affirmed summary judgment entered for a defendant in a CERCLA Section 107 action for response costs because of the plaintiff's failure to comply with the NCP.  It began its analysis by explaining the purpose and requirements of the FS:

> The remedial investigation requires the party conducting the cleanup to assess threats to human health or the environment, consider the physical characteristics of the site, the type of pollution involved, the extent to which the source of the pollution can be identified, potential pathways for exposure to the pollution, and various other factors potentially relevant to the analysis of remedial measures.  40 C.F.R. § 300.430(d)(1)(4).  The feasibility study is prepared using data collected during the remedial investigation.  In developing a remedial plan, both the purpose of the plan and the potential methods for achieving that objective must be considered. 40 C.F.R. § 300.430(e)(2)-(6).  Each potential plan must be assessed for effectiveness in achieving the stated objective, ease of implementation, and cost.  40 C.F.R. § 300.430(e)(7).  Finally, the feasibility study must include "a detailed analysis . . . on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage."  40 C.F.R. § 300.430(e)(9).

*Id.* at 1267-68.

The plaintiff in *Carson Harbor* considered one remedial action alternative—removal of tar-like and slag materials—and did so with only a cursory analysis.  The district court in *Carson Harbor* explained that even this alternative was not subjected to the "thorough analysis" of alternatives required by the NCP in a Feasibility Study:

> The remedial action plan, therefore, d[id] not demonstrate that Carson Harbor considered remedial alternatives, or subjected them to the kind of thorough analysis that is required by the NCP.  Indeed, it does not even demonstrate that Carson Harbor evaluated its chosen option—removal—in terms of the criteria set forth in the NCP.

---

Footnote continued from previous page

The plaintiff in *Sealy* considered the no-action alternative.  *Id.* at 184.   RID did not.  Plaintiff in *Sealy* considered ARARs. *Id.* at 187.  RID did not.  The only element of the NCP the *Sealy* plaintiff failed to satisfy was a formal feasibility study.  Here, there was no risk assessment in addition to an improper FS.  In *Sealy* there was a failure to comply with the FS requirement, but there was agreement by the *Sealy* parties that one of two actions had to be conducted.  On these facts, the court in *Sealy* distinguished case law on NCP consistency by saying that all of these cases -- as is the case here -- involved non-compliance with NCP consistency and other NCP requirements.  In *Sealy*, the defendants did not dispute that Sealy had properly identified ARARs and properly developed alternative remedial measures.  *Id.  Sealy*'s only application here is its rejection of many of the plaintiff's response costs; on NCP consistency, it supports Defendants' position.

- 13 -

287 F. Supp. 2d at 1175-76.[10]

As RID here, the plaintiff in *Carson Harbor* failed to consider the no-action alternative.   While plaintiff argued that it had "informally discussed" the no-action alternative with the regulatory body involved (the regional water quality control board), there was no mention of this option in the plaintiff's work plan.   That was fatal to the plaintiff's claim in *Carson Harbor*:

> Carson Harbor asserts that a no-action option was informally discussed with the RWQCB [Regional Water Quality Control Board].   There is no mention of such an option in the plan, however, and no indication why it was rejected in favor of removal.   *See Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 93 F. Supp. 2d 177, 184 (D. Conn. 2000) ("While Sealy's failure to produce a formal document identified as a feasibility study might be overlooked if there were evidence that Sealy otherwise identified and considered other remedial options under the criteria established by the NCP, such is not the case. . . . While the April 1996 RAP identifies two remedial alternatives and at least superficially addresses some of the criteria set forth in the NCP, it does not reflect how or why the 'no action' alternative was ultimately rejected and the Winchester Building was demolished").

*Id.* at 1176.

In affirming, the Ninth Circuit elaborated on the FS requirement:

> One of the hallmarks of the feasibility study requirement is assessing a variety of possible alternatives and providing analysis of the costs,

---

[10] In its discussion of Carson Harbor's failure to properly consider remedial alternatives, the district court collected other cases in which failure to comply with the NCP required dismissal of the action.   *See Raytheon Constructors, Inc. v. ASARCO Inc.*, 2000 WL 1635482, at *26 (D. Colo. Mar. 31, 2000) ("ASARCO contends that the Initial Work Plan and subsequent documents are functionally equivalent to an RI/FS. . . . The Initial Work Plan does not evaluate alternative remedies 'at length' based upon these criteria. . . . *Instead, there are only two short paragraphs comparing the costs of in [sic] very general terms . . . . In addition, the Initial Work Plan devotes just over one page of double-spaced text to the comparison and selection of alternatives, which is hardly the type of detailed evaluation which the NCP contemplates.* . . . Finally, after the alternative screening process, the Initial Work Plan did not evaluate the alternatives and select a remedy based upon the nine evaluative criteria set forth in section 40 C.F.R. § 300.430(e)(9)(iii).") (emphasis added); *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 981 F. Supp. 1229, 1238 (D. Minn. 1997) ("Although Union Pacific submits notes and internal memoranda in support of its position that it satisfied the RI/FS requirement, the notes and memoranda are not a substitute for the detailed provisions of the federal regulations."), *vacated in part on other grounds*, 1998 WL 1768404 (D. Minn. Jan. 12, 1998), *aff'd*, 215 F.3d 830 (8th Cir. 2000); *Sherwin-Williams Co. v. City of Hamtramck*, 840 F. Supp. 470, 478 (E.D. Mich. 1993) ("The 1989 treatability proposal and the 1990 work plans submitted to the MDNR by the City do not substantially comply with NCP requirements.   The City has not demonstrated that it developed, in any detail, alternatives to the methods it chose.   The work plan merely established *the* method to be used.   Simple variations or adjustments to the same remedial procedure, as reflected in the amendments to the work plan, do not amount to alternatives.").

implementability, and effectiveness of each, and choosing the best alternative for the site at issue.  In this case, Carson Harbor failed to consider any option other than removal of the tar-like and slag materials. . . .

Carson Harbor also argues that removal was the only viable remediation alternative and that it was therefore not required to consider other alternatives.  We have previously rejected this argument in a factually similar case, *Washington State*, 59 F.3d 793.  In *Washington State*, we held insufficient for National Contingency Plan compliance "summary analysis [which] states that disposal of the tar at Arlington is the only 'feasible option' and does not indicate that other alternatives were even considered." 59 F.3d at 804. . . .  Carson Harbor has not shown that there are genuine issues of material fact remaining on the issue of whether it substantially complied with the feasibility study requirement of the National Contingency Plan.  Therefore, the district court correctly held that Unocal is entitled to summary judgment as a matter of law on this issue.

433 F.3d at 1268-69.

## C.   RID's Remedial Action Does Not Satisfy Key Requirements of the NCP

*Absence of No-Action Alternative and Other Required FS Analysis.*  The undisputed record establishes that RID has not complied with the NCP.  In fact, as shown above, RID's own consultants' work and admissions unequivocally demonstrate RID's failure to evaluate the no action alternative.  This court need not await future expert testimony to interpret RID's consultants' various discussions of the remedial alternatives, including the ERA Work Plan, MERA Work Plan, and FS discussions of remedial alternatives in order to reach the conclusion that RID did not evaluate the no action alternative.[11]

Nowhere in these documents (even the belated FS submitted only after remedial work had begun) does RID or its consultants evaluate a no-action alternative as required under the NCP.  [SOF ¶¶ 32, 40, 49]  The ERA and MERA Work Plans contain no reference to the no-action alternative at all, and the untimely FS has only one reference to it—to say it was not being considered in the analysis of alternatives.  [*Id.* ¶ 50 ("No action is not an appropriate strategy to address the impacts of the existing groundwater contaminant

---

[11] There is no dispute that RID contends this is a remedial action.  At a hearing on March 3, 2016, RID acknowledged that this is a remedial action because there is no "immediate threat to public health or the environment," as would be required for a removal action in the Ninth Circuit.  [SOF ¶ 70]  RID had to acknowledge that the MERA is a remedial action because Synergy's September 16, 2011, *Public Health Exposure Assessment and Mitigation Summary Report* concluded that there was no imminent risk to public health.

- 15 -

1  plume in the WVBA Site and will not be retained for further consideration in the
2  development of the reference and alternative remedies.")]

3  　　　While it is not incumbent on Defendant to establish *why* RID did not comply with the
4  NCP's requirement to evaluate the no-action alternative, Defendants can offer what appears
5  to be the explanation for this fatal shortcoming.  RID and its lawyers and consultants had no
6  interest in a no-action alternative because it would not result in remediated drinking water
7  under its control that could then be sold at a significant profit.  [*Id.* ¶ 16]

8  　　　They also had to know what an appropriate review of their remedial action would
9  have shown.  The ADEQ conducted such an independent review and it showed that RID's
10  remedial action is not cost-effective, necessary, or reasonable.  [*Id.* ¶ 68 (SOF Ex. 17)]
11  Indeed, even without any treatment, the water in the RID canal in fact meets drinking water
12  standards for volatile organic compounds ("VOCs") – which RID's wellhead treatment
13  units are designed to treat – within 125 feet of discharge into the canal.  [SOF ¶¶ 11, 12]

14  　　　CERCLA is, however, agnostic as to *why* a plaintiff might fail to comply with the
15  NCP.  Regardless of the reasons why RID failed to consider a no-action alternative, under
16  the NCP and *Carson Harbor*, the failure to do so ends this case.

17  　　　But there is more.  Even with respect to the remedial alternatives that are mentioned
18  in the various submittals, Synergy admits that those alternatives are based on no more than a
19  "conceptual" evaluation.  [*Id.* ¶¶ 30, 38]  Neither the ERA nor MERA Work Plans, for
20  example, include a detailed analysis of each alternative that is listed against the nine factors
21  required under the NCP.  [*Id.*]  Moreover, in the after-the-fact FS, there is no analysis
22  comparing the costs of each remedy against the risks to be mitigated.  There is only a
23  conceptual evaluation of alternatives considering five factors, only some of which overlap
24  with the NCP nine-factor requirements.  [*Id.* ¶ 47, 48, 53][12]

25  　

26  [12] For example, RID did not consider deferring the cost of treatment, despite the fact that
27  the pumped water can be used for irrigation purposes without treatment [*id.* ¶¶ 11, 51]; it
   would be illegal to use the treated water for drinking purposes because it is mixed with
   sewage effluent [*id.* ¶¶ 5-7]; and the pumped groundwater also contains natural solids that
28  make it unfit for drinking [*id.* ¶8].

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**

1    *Absence of Consideration of ARARs.*  Synergy also admitted that it did not consider

2    ARARs, as required by the NCP.  [*Id.* ¶ 54]  A cursory review of the ERA, MERA, and

3    even the post-remedial-action FS, confirms that that the acronym ARARs does not appear in

4    those documents, and there is no discussion of ARARs or any reference to the requirements

5    of the NCP and, specifically, the FS requirements set forth in 40 CFR § 300.430(e).  That is

6    not surprising because the ADEQ specifically disclaimed that it was following the NCP in

7    its review of RID's offer to remediate groundwater.  [*Id.* ¶¶ 35, 41]  ARARs were not

8    properly considered because they would be inconsistent with RID's primary motivation

9    here, *i.e.*, to make millions of dollars selling potable water that was previously used for

10   irrigation.

11       *Absence of a Risk Assessment.*   Importantly, Synergy has conceded that it never

12   conducted a human health risk assessment.  [*Id.* ¶ 58]  Nor did Synergy consider risk when

13   it proposed to implement the wellhead treatment remedial action. The reason again is

14   obvious: because there was no risk, the scheme would not work if a risk assessment had

15   been produced.  [*See, e.g.*, SOF ¶¶ 63-68]  Reason aside, the absence of a risk assessment is

16   fatal to RID's claims.  *See* 40 C.F.R. § 300.430(d)(1)-(4); *K.V.L. Corp.*, 2000 U.S. Dist.

17   LEXIS 22955, at *122; *Angus Chem. Co.*, 1997 U.S. Dist. LEXIS 5242, at *32-33.

18       Because RID did not consider the no-action alternative, did not conduct a detailed

19   analysis of alternatives, did not identify and consider site-specific ARARs, and did not

20   conduct a human health risk assessment, it cannot establish compliance with the NCP.

21                              **Conclusion**

22       For the foregoing reasons, Defendants are entitled to summary judgment on

23   plaintiff's claims.

24

25

26

27

28

- 17 -

1 | Dated:  August 22, 2016

2 | Respectfully submitted,

3 | **SALMON, LEWIS, & WELDON, P.L.C.**

4 |

5 | By: s/ G. Van Velsor Wolf Jr.

6 | G. Van Velsor Wolf Jr.
2850 East Camelback Road, Suite 200

7 | Phoenix, Arizona 85016

8 | *Attorneys for Defendant Air Liquide America*

9 | *Specialty Gases, L.L.C.*

10 | **SNELL & WILMER L.L.P.**

11 |

12 | By: s/ Mitchell J. Klein
Mitchell J. Klein

13 | 400 East Van Buren Street, Suite 1900
Phoenix, Arizona 85004

14 |

15 | *Attorneys for Defendants Arizona Public*
*Service Company, Dolphin Incorporated, and*

16 | *ITT Corporation*

17 | **SQUIRE PATTON BOGGS (US) LLP**

18 |

19 | By: s/ Christopher D. Thomas
Christopher D. Thomas

20 | Matthew L. Rojas

21 | One East Washington Street, Suite 2700
Phoenix, Arizona 85004

22 |

23 | Stephen L. Wetherell
Phoenix City Attorney's Office

24 | Civil Division
200 West Washington Street, Suite 1300

25 | Phoenix, Arizona 85003-1611

26 | *Attorneys for Defendant City of Phoenix*

27 |

28 |

- 18 -

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**

1

**PERKINS COIE LLP**

2

By: s/ Michael P. Berman

3

    Shane R. Swindle

4

    Michael P. Berman
    P. Derek Petersen

5

    2901 North Central Avenue, Suite 2000
    Phoenix, Arizona  85012-2788

6

7

*Attorneys for Defendant Corning Incorporated*

8

**POLSINELLI PC**

9

By: s/ Troy B. Froderman

10

    Troy B. Froderman

11

    Jonathan G. Brinson
    One East Washington Street, Suite 1200

12

    Phoenix, Arizona 85004

13

    Mitchell J. Klein

14

    **SNELL & WILMER L.L.P.**

15

    400 East Van Buren St., Suite 1900
    Phoenix, Arizona 85004

16

*Attorneys for Defendant Dolphin Incorporated*

17

**SHOOK, HARDY & BACON LLP**

18

19

By: s/ John M. Barkett

20

    John M. Barkett
    Suite 3200

21

    201 South Biscayne Boulevard
    Miami, Florida 33131-4332

22

23

*Attorneys for Defendant Freescale*
*Semiconductor, Inc.*

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT

1

2

JENNINGS, HAUG & CUNNINGHAM LLP

3

4

By: s/ Karen S. Gaylord
    Karen S. Gaylord
    2800 North Central Avenue, Suite 1800

5

    Phoenix, Arizona 85004-1049

6

7

    Sean Morris (*Pro Hac Vice*)
    Eric D. Mason (*Pro Hac Vice*)
    Sean A. McCormick (*Pro Hac Vice*)

8

    **ARNOLD & PORTER LLP**

9

    777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844

10

11

*Attorneys for Defendant Honeywell*

**FENNEMORE CRAIG PC**

12

13

By: s/ Scott K. Ames
    John M. Pearce

14

    Scott K. Ames

15

    2394 East Camelback Road, Suite 600
    Phoenix, Arizona 85016-3429

16

17

*Attorneys for Defendant Kinder Morgan Energy Partners, LP*

18

19

**WILLIAM G. MONTGOMERY**
**MARICOPA COUNTY ATTORNEY**

20

21

By: s/ Ann Thompson Uglietta
    Ann Thompson Uglietta
    J. Kenneth Mangum

22

    Deputy County Attorneys
    Civil Services Division

23

    222 North Central Avenue, Suite 1100
    Phoenix, Arizona 85004

24

25

*Attorneys for Defendant Maricopa County*

26

27

28

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**

**THE CAVANAGH LAW FIRM, P.A.**

By: s/ Jerry D. Worsham II
    Jerry D. Worsham II
    1850 North Central Avenue, Suite 2400
    Phoenix, Arizona 85004

*Attorneys for Defendant Meritor, Inc.*

**FENNEMORE CRAIG PC**

By: s/ Scott K. Ames
    Christopher L. Callahan
    Phillip F. Fargotstein
    Scott K. Ames
    2394 East Camelback Road, Suite 600
    Phoenix, Arizona 85016-3429

*Attorneys for Defendant Nucor Corporation*

**LEWIS ROCA ROTHGERBER LLP**

By: s/ Stanley B. Lutz
    Carla A. Consoli
    Stanley B. Lutz
    Marla Hudgens
    201 East Washington Street, Suite 1200
    Phoenix, Arizona 85004-2595

*Attorneys for Defendant Prudential Overall Supply*

**K&L GATES, LLP**

By: s/ Matthew G. Ball
    Matthew G. Ball
    Jason N. Haycock
    Four Embarcadero Center, Suite 1200
    San Francisco, California 94111

*Attorneys for Defendant Reynolds Metals Company*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT

**BALLARD SPAHR LLP**

By: s/ David J. Armstrong
    David J. Armstrong
    Craig C. Hoffman
    Lea A. Phillips
    1 East Washington Street, Suite 2300
    Phoenix, Arizona 85004-2555

*Attorneys for Defendant Salt River Project*
*Agricultural Improvement and Power District*

**BOOTH LLP**

By: s/ Joshua Levine
    Joshua Levine
    1849 Sawtelle Boulevard, Suite 500
    Los Angeles, California 90025

*Attorneys for Defendant Textron, Inc.*

**PEARSON LAW GROUP LLC**

By: s/ William W. Pearson
    William W. Pearson
    1221 East Osborn Road, Suite 101
    Phoenix, Arizona 85014

*Attorneys for Defendant Union Pacific*
*Railroad Company*

**VERIS LAW GROUP PLLC**

By: s/ Michelle Rosenthal
    Michelle U. Rosenthal
    Gregory T. Hixson
    Denver R. Gant
    1809 Seventh Avenue, Suite 1400
    Seattle, Washington 98101

*Attorneys for Defendant Univar USA Inc.*

- 22 -

# CERTIFICATE OF SERVICE

☒   I hereby certify that on August 22, 2016, I electronically transmitted the attached documents to the Clerk's Office and to the counsel of record who are CM/ECF registrants using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

☒   I hereby certify that on August 22, 2016, I served the attached document by first class mail on:

    Honorable David A. Ezra
    United States District Court
    John H. Wood, Jr. United States Courthouse
    655 East Cesar E. Chavez Blvd., 3rd Floor
    San Antonio, Texas  78206

☒   I hereby certify that on Agusut 22, 2016, I served the attached document by first class mail on the following, who are not registered participants of the CM/ECF System:

    Walker Power Systems, Inc.
    c/o Jeffrey R. Conover
    1301 East Jackson Street
    Phoenix, Arizona 85034

    *Pro Se*

                                   s/ David J. Armstrong
                                   _____

130154805.10

- 23 -

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE: NCP COMPLIANCE AND MEMORANDUM IN SUPPORT**