# EXHIBIT 1

**FEASIBILITY STUDY REPORT**
**WEST VAN BUREN WQARF SITE**
**PHOENIX, ARIZONA**

by

Haley & Aldrich, Inc.
Tucson, Arizona

for

The West Van Buren WQARF Site Working Group

File No. 37503-204
July 2014







Haley & Aldrich, Inc.
600 S. Meyer Avenue
Suite 100
Tucson, AZ 85701

Tel: 520.289.8600
Fax: 520.882.8178
HaleyAldrich.com

14 July 2014
File No. 37503-204

Ms. Danielle Taber, Project Manager
Voluntary Remediation Program and Remedial Projects Unit
Arizona Department of Environmental Quality
1110 West Washington Street Phoenix, AZ 85007

Subject:     Feasibility Study Report - West Van Buren WQARF Site

Dear Ms. Taber:

On behalf of the West Van Buren WQARF Site Working Group, Haley & Aldrich, Inc. prepared the
enclosed Feasibility Study Report for the West Van Buren Water Quality Assurance Revolving Fund
site in Phoenix, Arizona. The Feasibility Study was prepared consistent with the Feasibility Study Work
Plan - Final dated 1 July 2013 and approved by the ADEQ on 5 August 2013.

Please contact the undersigned if you have any questions regarding this report.

Sincerely yours,
HALEY & ALDRICH, INC.

*Eric Pigati:*

Eric M. Pigati, R.G.
Senior Hydrogeologist
Arizona Registered Geologist #46379

Scott P. Zachary
Vice President

Enclosures

cc:     Mr. Henry Darwin, ADEQ
        Ms. Laura Malone, ADEQ
        Ms. Tina LePage, ADEQ
        West Van Buren WQARF Site Working Group

**TABLE OF CONTENTS**

Page

**1.   INTRODUCTION**                                                                  1

   1.1   Feasibility Study Purpose                                             1
   1.2   Feasibility Study Objective                                           2
   1.3   Overall Feasibility Study Technical Approach                          2
   1.4   Feasibility Study Report Organization                                 4

**2.   BACKGROUND**                                                                    5

   2.1   Location                                                              5
   2.2   West Van Buren Area Facilities                                        5
   2.3   Adjacent Sites and Water Providers                                    6
   2.4   Site Conceptual Model                                                 6

**3.   REMEDIAL OBJECTIVES**                                                           8

   3.1   Current and Future Land Use                                           8
   3.2   Current and Reasonably Foreseeable Water Use                          9
      3.2.1   Current Water Use                                            9
      3.2.2   Reasonably Foreseeable Water Use                            12
   3.3   Remedial Objectives                                                  15
      3.3.1   Remedial Objectives for Land Use                            16
      3.3.2   Remedial Objectives for Groundwater Use                     16
      3.3.3   Remedial Objectives for Canal Water Use                     17
      3.3.4   Remedial Objectives for Surface Water Use                   18

**4.   CURRENT CONDITIONS AND FEASIBILITY STUDY ASSUMPTIONS**                          19

   4.1   Current Conditions                                                   19
   4.2   FS Assumptions                                                       20

**5.   IDENTIFICATION AND SCREENING OF REMEDIAL STRATEGIES AND**
**REMEDIAL MEASURES**                                                                  22

   5.1   General Background of Remedial Strategies and Measures                22
   5.2   Remedial Strategies                                                  23
   5.3   Screening of Remedial Strategies and Technologies                    24
      5.3.1   Groundwater Extraction                                      25
      5.3.2   Liquid-Phase Granular Activated Carbon Treatment            25
      5.3.3   End Use of Extracted and Treated Groundwater                26
      5.3.4   Groundwater Monitoring and Monitored Natural Attenuation    29
   5.4   Remedial Measures                                                    30
      5.4.1   Well Impairment                                             30
      5.4.2   Base Remedial Measures                                      31



**6.    REMEDIAL ALTERNATIVES DEVELOPMENT**                                                    **38**

    6.1    Baseline Site Conditions, Including Pumping, Relevant to All Remedial Alternatives   38
    6.2    Less Aggressive Remedy                                                               40
           6.2.1    Base Components of the Less Aggressive Remedy                                40
           6.2.2    Contingencies Associated With the Less Aggressive Remedy                     41
           6.2.3    Permits                                                                      46
           6.2.4    Advantages and Disadvantages of the Less Aggressive Remedy                   47
           6.2.5    Uncertainties Associated With the Less Aggressive Remedy                     47
    6.3    Reference Remedy                                                                     48
           6.3.1    Base Components of the Reference Remedy                                      48
           6.3.2    Contingencies Associated With the Reference Remedy                           50
           6.3.3    Permits                                                                      52
           6.3.4    Advantages and Disadvantages of the Reference Remedy                         53
           6.3.5    Uncertainties Associated With the Reference Remedy                           53
    6.4    More Aggressive Remedy                                                               53
           6.4.1    Base Components of the More Aggressive Remedy                                53
           6.4.2    Contingencies Associated with the More Aggressive Remedy                     55
           6.4.3    Permits                                                                      57
           6.4.4    Advantages and Disadvantages of the More Aggressive Remedy                   57
           6.4.5    Uncertainties Associated With the More Aggressive Remedy                     57

**7.    COMPARATIVE EVALUATION OF REMEDIAL ALTERNATIVES**                                        **58**

    7.1    Less Aggressive Remedy                                                               59
    7.2    Reference Remedy                                                                     62
    7.3    More Aggressive Remedy                                                               65
    7.4    Comparison of Remedial Alternatives                                                  68
    7.5    Proposed Remedy                                                                      70

**REFERENCES**                                                                                  **72**


**TABLES**
**FIGURES**
**APPENDIX A – Site Conceptual Model**
**APPENDIX B - Water Provider Meeting Information**
**APPENDIX C – FS Groundwater Flow Modeling**
**APPENDIX D – Human Health Risk Assessment**
**APPENDIX E – Costing Detail Worksheets**



**LIST OF TABLES**

| Table No. | Title |
|---|---|
| 1 | WVBA Facility Summary Matrix |
| 2 | Screening of Groundwater Remedial Strategies and Technologies |
| 3 | Semi-Annual Groundwater Monitoring Program |
| 4 | RID Blending Approach Mass Balance Calculations - Current Conditions |
| 5 | RID Blending Approach Mass Balance Calculations - RID-114 Replaced |
| 6 | Remedial Alternatives – Strategies, Measures, and Contingencies |
| 7 | VOC Mass Removal Calculations – Base Conditions |
| 8 | VOC Mass Removal Calculations – Reference Remedy |
| 9 | VOC Mass Removal Calculations – More Aggressive Remedy |
| 10 | Remedial Alternatives Cost Summary |

**LIST OF FIGURES**

| Figure No. | Title |
|---|---|
| 1 | Site Locus |
| 2 | West Van Buren Area WQARF Site and Adjacent Sites |
| 3 | Production Wells Within and Adjacent to the West Van Buren Area |
| 4 | Base Pumping Conditions – September 2015 |
| 5 | Base Pumping Conditions – September 2020 |
| 6 | Base Pumping Conditions – September 2025 |
| 7 | Less Aggressive Remedy Contingency – UAU1 September 2030 |
| 8 | Less Aggressive Remedy Contingency – UAU1 September 2035 |
| 9 | Less Aggressive Remedy Contingency – UAU1 September 2041 |



**LIST OF FIGURES (continued)**

| | |
|---|---|
| 10 | Less Aggressive Remedy Contingency – UAU2 September 2030 |
| 11 | Less Aggressive Remedy Contingency – UAU2 September 2035 |
| 12 | Less Aggressive Remedy Contingency – UAU2 September 2041 |
| 13 | Reference Remedy – EW-2 at 500 GPM - September 2015 |
| 14 | Reference Remedy – EW-2 at 500 GPM - September 2020 |
| 15 | Reference Remedy – EW-2 at 500 GPM - September 2025 |
| 16 | Reference Remedy – Extraction Well Location and Conveyance Piping |
| 17 | Reference Remedy Contingency – Expanded Sentinel Well Network |
| 18 | More Aggressive Remedy – EW-1 and EW-2 at 1,000 GPM Each - September 2015 |
| 19 | More Aggressive Remedy – EW-1 and EW-2 at 1,000 GPM Each - September 2020 |
| 20 | More Aggressive Remedy – EW-1 and EW-2 at 1,000 GPM Each - September 2025 |
| 21 | More Aggressive Remedy – Extraction Well Locations and Conveyance Piping |



## 1.   INTRODUCTION

Haley & Aldrich, Inc., (Haley & Aldrich) prepared this Feasibility Study Report for the West Van Buren Water Quality Assurance Revolving Fund (WQARF) Registry Site on behalf of the West Van Buren WQARF Site Working Group (Working Group), pursuant to Arizona Administrative Code, Title 18 – Environmental Quality, Chapter 16 – Department of Environmental Quality Water Quality Assurance Revolving Fund Program, Section R18-16-407, Feasibility Study. The West Van Buren WQARF Site Feasibility Study Work Plan, prepared by Haley & Aldrich on behalf of the Working Group and dated 1 July 2013 (Haley & Aldrich, 2013), was approved by the Arizona Department of Environmental Quality (ADEQ) in a letter dated 5 August 2013 (ADEQ, 2013).

The Working Group is an unincorporated association of parties that either had or have operating facilities within the West Van Buren Area (WVBA; the Site) or other key regional stakeholders. The Working Group includes: Air Liquide America Specialty Gases, LP; Arizona Public Service Company (APS); the City of Phoenix (COP); Dolphin, Incorporated; Freescale Semiconductor, Inc.; Holsum Bakery, Inc.; Honeywell International Inc.; ITT Corporation; Laundry & Cleaners Supply, Inc.; Maricopa Land and Cattle Co.; Milum Textile Services Co.; Prudential Overall Supply, Inc.; Salt River Project Agricultural Improvement and Power District; Schuff Steel Company; and Univar USA Inc. – formerly Van Waters & Rogers. Penn Racket Sports (HTM Sport GmbH/HEAD USA/HEAD Penn Racquet Sports) also participated in the early stages of the Working Group's effort.

The WVBA is located in the western portion of the COP, approximately bounded by W. McDowell Road to the north, 7th Avenue to the east, W. Buckeye Road to the south, and 75th Avenue to the west. The approximate boundary of the WVBA is presented on Figures 1 and 2. The approximate boundaries of the Motorola 52nd Street Superfund site (M52 Site) and the West Central Phoenix, West Osborn Complex (WOC) WQARF site are also shown on Figures 1 and 2.

### 1.1   Feasibility Study Purpose

This Feasibility Study (FS) addresses the WVBA regional groundwater plume contaminated by chlorinated volatile organic compounds (VOCs). The FS focuses on selection of a remedial alternative that satisfies WQARF remedial action criteria, addresses impaired wells, and ensures that water supplies are available when needed to meet foreseeable needs. Evaluating any vapor intrusion risk posed by a groundwater-to-indoor air pathway is outside the scope of this FS. Facility-specific source control, actions to address soil contamination, and actions to address ongoing contributions of contaminants from within or outside of the WVBA are also outside the scope of this FS. ADEQ will undertake or oversee additional actions designed to address those issues.

The purpose of the FS is to identify remedial alternatives that are capable of achieving the remedial objectives (ROs) established by ADEQ (ADEQ, 2012a) and are consistent with the Groundwater Management Act (Arizona Revised Statutes [A.R.S.] Title 49, Section §49-282-06 (F)) and the water management plans of local water providers. A proposed remedy was then selected that satisfies the following requirements of A.R.S. Title 49, Section §49-282-06, Remedial Action criteria:

- Assure the protection of public health and welfare and the environment;
- To the extent practicable, provide for the control, management or cleanup of the hazardous substances in order to allow the maximum beneficial use of the waters of the state;



- ■ Be reasonable, necessary, cost-effective and technically feasible; and

- ■ For remediation of waters of the state, the selected remedial action shall address, at a minimum, any well that at the time of selection of the remedial action either supplies water for municipal, domestic, industrial, irrigation or agricultural uses or is part of a public water supply system if the well would now or in the reasonably foreseeable future produce water that would not be fit for its current or reasonably foreseeable end uses without treatment due to the release of hazardous substances. The specific measures to address any such well shall not reduce the supply of water available to the owner of the well.

This FS identifies a reference remedy and two alternative remedies [R18-16-407(E) and (F)] that satisfy the remedial action criteria and are capable of achieving the ROs, considering the needs of well owners and water providers affected by the release or threatened release of hazardous substances [R18-16-407(G)]. The reference remedy and each alternative remedy consist of a package of remedial strategies, remedial measures, and contingencies to address impaired or potentially threatened wells.

Following development of these remedial alternatives, a comparative analysis of the reference remedy and the alternate remedies was performed to select the best alternative according to the prescribed comparison criteria [R18-16-407(H)]. The extent to which the amount of water available for beneficial use was preserved by a particular type of remedial action was given special consideration (A.R.S. §49-282.06 (C)(5)). A proposed remedy was then developed based on the evaluation and comparison of the remedial alternatives [R18-16-407(I)].

## 1.2    Feasibility Study Objective

The objective of this FS was to develop a reference remedy and at least two alternative remedies [R18-16-407(E) and (F)] capable of achieving the ROs and that consider the needs of well owners and water providers affected by the release or threatened release of a hazardous substance [R18-16-407(G)]. The FS Report describes the process and reason for selecting the proposed remedy and describes how the comparison criteria were applied, how the selected alternative meets the ROs, and how the proposed remedy is consistent with the applicable water management plans and general land use plans.

## 1.3    Overall Feasibility Study Technical Approach

The Remedial Investigation Report (RI Report) prepared by ADEQ (Terranext, 2012a) provides the underlying plume characterization data and source information used for this FS. The following additional work was also completed to prepare the FS.

- ■ A Site Conceptual Model (SCM) was prepared based on a review of the geology and hydrogeology, the nature and extent of VOC-impacted groundwater, VOC concentration trends in groundwater, and potential impacts from adjacent Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or "Superfund") and WQARF sites;

- ■ Groundwater quality trends were evaluated to identify areas of relatively elevated, persistent VOC concentrations in regional groundwater that may be indicative of potential continuing VOC source(s) to WVBA groundwater, from either within or outside of the WVBA;

- ■ Chromium in soil and groundwater originating from the source at the ChemResearch Co., Inc., facility, and possibly from other area sources, was evaluated and the potential impacts that could result from other source(s) on a regional groundwater remedy were assessed; and



- A groundwater flow model was constructed to better understand current groundwater flow conditions within the WVBA, groundwater flow conditions under reasonably foreseeable future groundwater use scenarios, and to simulate groundwater remedial alternatives that involve groundwater extraction.

The overall FS technical approach was to:

- Assess the influence of regional irrigation pumping on the plume under current conditions;
- Evaluate the influence of facility-specific source area remedial actions on VOC concentration trends in the vicinity of WVBA facilities and in regional WVBA groundwater;
- Identify locations within the regional plume that contain relatively elevated, persistent VOC concentrations that may indicate continuing VOC sources not yet identified;
- Evaluate areas within the regional WVBA plume that contain elevated dissolved-phase VOC concentrations in groundwater for potential focused remedial actions;
- Evaluate the VOC mass flux into the WVBA from adjacent sites such as the M52 Operable Unit 3 (OU3) area and the WOC WQARF site and the effect that remedial actions within these adjacent sites have had or will have on VOC mass flux into the WVBA over time;
- Assess the influence of regional pumping for remedial alternatives that include groundwater extraction;
- Evaluate and screen appropriate technologies that could be applied to remediate contaminants of concern (COCs) in groundwater[1]; and
- Evaluate remedial measures necessary to address any well that either supplies water or is part of a public supply system if the well would now or in the reasonably foreseeable future produce water that would be unfit for its end use without treatment due to its impairment by the COCs in groundwater.

This FS is focused on the regional groundwater plume and does not address ongoing contributions of contaminants to the regional groundwater plume. This FS is therefore not designed to address facility-specific sources. ADEQ has confirmed its intention to continue working to address any facility sources or other ongoing contributions to the regional plume. Some of those sources have already been addressed by the U.S. Environmental Protection Agency (EPA) or ADEQ via facility-specific consent orders or working agreements. Any on-going facility-specific sources should be addressed by the agencies.

The WVBA 2008 Draft RI Report (Terranext, 2008) identified 1,647 facilities that could have contributed to the plume. As of the date of that draft report, ADEQ had conducted some additional assessment of 136 of those facilities. ADEQ's search for Potentially Responsible Parties (PRPs), including orphan sites, is ongoing, and PRPs will be identified in the Proposed Remedial Action Plan (PRAP). Several WVBA facilities have either completed or are in the process of completing facility-specific remedial actions under the guidance of ADEQ[2].

---

[1] The primary COCs in WVBA groundwater are tetrachloroethylene (PCE), trichloroethylene (TCE), and to a lesser extent 1,1-dichloroethylene (1,1-DCE). A localized plume of dissolved chromium is also present within the southeast portion of the WVBA.

[2] Terranext, 2012a.

HALEY&
ALDRICH

## 1.4    Feasibility Study Report Organization

This FS report is organized into the following sections:

*Section 1: Introduction:* WVBA Working Group description; location of the WVBA; and the FS purpose, objective, and technical approach.

*Section 2: Background:* WVBA history and location; facilities within the WVBA and adjacent sites; water providers within and adjacent to the WVBA; and a brief description of the SCM, which is included as Appendix A.

*Section 3: Remedial Objectives:* Current and future land uses; current and reasonably foreseeable uses of groundwater within and adjacent to the WVBA; and final ROs for land and groundwater use.

*Section 4: Current Conditions and Feasibility Study Assumptions:* Current conditions and assumptions that were incorporated into the development of the remedial alternatives and proposed remedy.

*Section 5: Identification and Screening of Remedial Strategies and Remedial Measures:* Types of remedial strategies and remedial measures applicable to the WVBA and those retained for development of the remedial alternatives; evaluation and screening of remedial strategies and technologies such as groundwater monitoring, in-situ technologies such as soil vapor extraction/air sparging, dual-phase extraction, and reactive wall technologies, and groundwater extraction and treatment, and those retained for remedial alternatives development; discussion of potential end uses of extracted groundwater; description of the retained remedial strategies and measures, advantages/disadvantages, and unit costing assumptions.

*Section 6: Remedial Alternatives Development:* Remedial strategies, remedial measures, and contingencies used to develop the Reference Remedy, Less Aggressive Remedy, and More Aggressive Remedy; discussion of the groundwater model and modeling results used during remedial alternatives development; triggers for contingent remedial measures; permit requirements, advantages and disadvantages; and uncertainties.

*Section 7: Comparative Evaluation of Remedial Alternatives:* Evaluation of the ability to meet the ROs and consistency with water provider plans; practicability, cost, risk, benefit/value of the remedial alternatives; comparison of remedial alternatives; and the proposed remedy.

*References:* Provides the references used and relied upon during preparation of this FS Report.



4

## 2.     BACKGROUND

VOCs were first detected in groundwater within the WVBA in 1985, during a groundwater investigation conducted by Chevron USA Inc. at its facility located south of Van Buren Street between 51st Avenue and 55th Avenue (Dames & Moore, 1985). This discovery was the inception of the WVBA WQARF site. ADEQ's November 1987 Decision Record created the Van Buren Tank Farm WQARF Area and a December 1987 amended Decision Record changed the name to the West Van Buren Area WQARF Site (ADEQ, 2010a).

Beginning in 1988, several facilities within the WVBA conducted site investigations and remedial actions under the guidance of ADEQ (Terranext, 2012a). The WVBA was placed on the State of Arizona WQARF registry in 1998 (ADEQ, 1998) and a community advisory board was formed in 1999 (ADEQ, 2010a). The RI Report, which includes the Land and Water Use report, was prepared in August 2012 by Terranext on behalf of the ADEQ (Terranext, 2012a). The RI Report also includes the Remedial Objectives report prepared by ADEQ (ADEQ, 2012a).

### 2.1     Location

The WVBA is located in the western portion of the COP and is approximately bounded by W. McDowell Road to the north, 7th Avenue to the east, W. Buckeye Road to the south, and 75th Avenue to the west. The approximate boundary of the WVBA is presented on Figures 1 and 2.

### 2.2     West Van Buren Area Facilities

The RI Report discusses numerous WVBA facilities that may have contributed to the groundwater plume. WVBA facilities identified in the RI Report as having conducted site investigations and, in most cases, remedial activities are shown in Figure 2 and listed in Table 1, and include the following:

- ■ Air Liquide America Specialty Gases, LP;
- ■ American Linen Supply Company;
- ■ ChemResearch Co, Inc.;
- ■ Department of Energy;
- ■ Dolphin, Incorporated;
- ■ Maricopa County Materials Management;
- ■ Prudential Overall Supply;
- ■ Reynolds Metals Co.; and
- ■ Van Waters & Rogers (now Univar USA, Inc.).

Many more WVBA facilities identified in the RI Report and other potential sources have not yet conducted site investigations. ADEQ's PRP search for the WVBA, including orphan sites, is ongoing and PRPs will be identified in ADEQ's PRAP.



## 2.3     Adjacent Sites and Water Providers

The western portion of the M52 OU3 is located adjacent to the eastern WVBA boundary at 7th Avenue. The WOC WQARF Site is located to the north of the central portion of the WVBA (**Figure 2**). Further discussion of the WVBA facilities identified in the RI Report and adjacent CERCLA and WQARF sites is provided in the SCM (Appendix A).

Primary water providers for potable or agricultural use within and adjacent to the WVBA are the COP, the City of Tolleson (COT), the Salt River Project Valley Water Users Association (SRP), and the Roosevelt Irrigation District (RID). Figure 3 shows the location of production wells, including those associated with the water providers listed above, within and adjacent to the WVBA that were either active during the last five years of the WVBA groundwater flow model (2004 through 2009), and/or those COP and SRP wells with anticipated production during the next 30 years. Water providers within or adjacent to the WVBA are further discussed in Section 3.

## 2.4     Site Conceptual Model

A SCM report is provided in Appendix A. Much of the SCM was prepared using data and information from the RI Report, with updates using post-2008 data and information. The RI Report and the updated SCM form the basis of the remedial alternatives developed for this FS.

The SCM provides an overview of the geology and hydrogeology of the WVBA; surface waters and canals within the project area; a brief description of the facilities within the WVBA identified in the RI Report as having performed site investigations and, in most cases, facility-specific remedial activities; a summary of the nature and extent of groundwater contamination within and adjacent to the WVBA, including impacts to groundwater from inorganic constituents resulting from historical agricultural land use; and an evaluation of the overall WVBA plume stability and COC concentration trends in groundwater.

The main concepts of the WVBA SCM presented in Appendix A are provided below.

- The Upper Alluvial Unit 1 (UAU1) is the uppermost aquifer, consisting primarily of coarse grained sand and gravel with some silt and clay, including occasional thin interbedded silt and clay layers. UAU1 hydraulic conductivities used in the WVBA groundwater flow model ranged from 100 to 1,000 feet per day in the upper, more permeable UAU1 to 75 to 500 feet per day in the lower UAU1 (Brown and Caldwell, 2014).

- The underlying Upper Alluvial Unit 2 (UAU2) consists of sand and gravel with a higher percentage of silt and clay and interbedded fine-grained layers compared to the UAU1. UAU2 hydraulic conductivities used in the WVBA groundwater flow model ranged from 1 to 100 feet per day (Brown and Caldwell, 2014).

- The UAU saturated thickness is approximately 200 feet.

- The UAU aquifer is generally unconfined. The current depth to the water table is on the order of 100 to 150 feet below ground surface (bgs).

- Groundwater extracted from production wells within the WVBA is likely primarily derived from the UAU1, due to its prolific water-producing nature relative to the other alluvial units.



- Groundwater contamination within the WVBA is generally constrained to the UAU1 and the UAU2.

- UAU groundwater is also impacted by inorganic constituents, primarily total dissolved solids (TDS), resulting from extensive historical agricultural land use within the WVBA.

- Overall groundwater flow direction within the WVBA is from east to west at hydraulic gradients ranging from approximately 0.002 feet per foot (ft/ft) to 0.004 ft/ft in the eastern WVBA, generally flattening to 0.0005 ft/ft in the central and western WVBA. Should RID irrigation pumping within the WVBA cease, the overall groundwater flow direction would likely shift to the northwest, towards the regional pumping depression known as the Luke Sink, near the Luke Air Force Base.

- RID pumps approximately 75,000 acre-feet per year (AFY) for irrigation use on a seasonal basis, primarily March through September, from approximately 32 production wells located within and adjacent to the WVBA. The aggregate pumping of these irrigation wells creates a regional hydraulic trough or sink within the WVBA.

- Historical operations at some facilities within the WVBA have impacted groundwater. The primary COCs in WVBA groundwater are PCE, TCE, and to a lesser extent 1,1-DCE. A localized plume of dissolved chromium is also present within the southeast portion of the WVBA.

- Facility-specific source remediation at select WVBA facilities has reduced the VOC source input at these WVBA facilities to the regional WVBA plume. At several facilities, COC concentrations within facility-specific monitoring wells have declined significantly following source remediation work, in some cases by orders of magnitude.

- Some areas of persistent, relatively elevated VOC concentrations near and/or downgradient of other WVBA facilities indicate the potential for ongoing source inputs to the regional WVBA plume in these areas.

- According to the WVBA RI Report, "Groundwater contamination enters the WVBA from the east from the Motorola 52nd Street Federal Superfund Site OU3 area." TCE and 1,1-DCE, and to a lesser extent, PCE are the primary COCs in the M52 OU3 plume.

- While the M52 OU3 RI/FS is currently being completed, it is assumed that the M52 Site plume has commingled with the regional plume of groundwater contamination originating from historical WVBA facility operations. Although not fully defined, the downgradient extent of the WOC WQARF site plume, with TCE as the primary COC, also appears to have merged with the north-central portion of the WVBA.

- Operation of the M52 Operable Unit 2 (OU2) groundwater extraction system since 2001 has effectively cut off the dissolved-phase plume at the OU2/OU3 boundary, resulting in overall COC concentration declines in M52 OU3 monitoring wells and in UAU1 monitoring wells in the eastern and central portion of the WVBA.

- As a result of the WVBA facility-specific remedial work, the M52 OU2 groundwater extraction system, and irrigation pumping, the WVBA plume appears to be stable with generally declining concentration trends in the UAU1. Within the more fine-grained UAU2, VOC concentrations in UAU2 monitoring wells located along the axis of the WVBA plume have remained generally consistent over time.



## 3.    REMEDIAL OBJECTIVES

In 2012, ADEQ established WVBA ROs for impacted or threatened land and water in terms of current and reasonably foreseeable land use and current and reasonably foreseeable beneficial uses of the waters of the state [(R18-16-406(D) and (I)]. Reasonably foreseeable land uses are those uses of land likely to occur at the Site. Reasonably foreseeable water uses are those likely to occur within 100 years unless a longer time period is shown to be reasonable based on site-specific information.

ADEQ's ROs for the WBVA were based on the 2012 Land and Water Use Report that contains descriptions of current and reasonably foreseeable land use for the COP and COT, and current and reasonably foreseeable use of water for the COP, COT, SRP, RID, and private wells within the WVBA (Terranext, 2012b).

Sections 3.1 and 3.2 include a summary of current and reasonably foreseeable land and water use in the WVBA, referenced from the Land and Water Use Report (Terranext, 2012b), the COP's General Plan (COP, 2004), the 2011 update to the COP's Water Resources Plan (COP, 2011), information from the 2 October 2013 water provider meeting described below, and subsequent meetings. The ROs for land, groundwater, and surface water are provided in Section 3.3.

The Working Group consulted with the area water providers to obtain additional information to develop remedial measures. As part of a 2 October 2013 meeting between Haley & Aldrich and local water providers, COP, SRP, and RID provided additional information regarding their current and reasonably foreseeable future use of groundwater within and adjacent to the WVBA. Completed water provider meeting questionnaires and backup information provided by the COP, SRP, and RID are included in Appendix B. Information on the proposed, future COT production wells was provided by COT's Supervisor of Water Utilities (COT, 2014).

### 3.1    Current and Future Land Use

The WVBA is located within the COP and abuts the COT's eastern boundary at 75th Avenue. Current and future land use is provided in the COP's General Plan, which includes the goals, policies, and recommendations for land use development during the next 10 to 20+ years.

The COP is made up of 15 "urban villages"; the Central City and Estrella urban villages are located within the WVBA. While overall land use, employment, and population within Central City are not expected to change significantly over time, the COP has identified Estrella as a targeted growth area because of the amount of agricultural land available for residential and/or commercial development. Estrella is therefore expected to have significant increases in both employment and residential growth. The projected residential growth within Estrella is primarily outside of the WVBA, south of Lower Buckeye Road and west of 75th Avenue. Based on the COP General Plan, land use within the WVBA is projected to continue to be predominantly industrial.

The following table provides the actual 2002 and projected General Plan land uses in Central City and Estrella.



| Land Use Category | Central City | | Estrella | |
|---|---|---|---|---|
| | 2002 Land Use (% of total) | General Plan (% of total) | 2002 Land Use (% of total) | General Plan (% of total) |
| Large Lot Residential | 11% | 16% | 4% | 10% |
| Small Lot Residential | | | 4% | 27% |
| Medium Density Residential | 3% | 5% | 1% | 4% |
| High Density Residential | 2% | 1% | 1% | 0.2% |
| Commercial | 9% | 14% | 1% | 3% |
| Industrial | 16% | 23% | 18% | 35% |
| Commerce Park | 6% | 0.10% | 0.3% | 4% |
| Public/Quasi Public | 8% | 7% | 8% | 8% |
| Transportation/Airport | 28% | 21% | 1% | 1% |
| Parks -Open Space | 6% | 13% | 6% | 8% |
| Agriculture | 0.01% | --- | 49% | --- |
| Vacant | 9% | --- | 7% | --- |

Source: COP General Plan

By 2030, Central City and Estrella are projected to grow to the following numbers (the increase shown is from actual 2000 to projected 2030 numbers):

- Central City: Employment (116,000; 1.07X increase); population (164,000; 1.2X increase); and households (66,000; 1.11X increase).

- Estrella: Employment (148,000; 3.13X increase); population (146,000; 3.36X increase); and households (40,000; 4.2X increase).

In 2000, the highest percentages of land use for the COT were agriculture (46 percent); industrial/warehouse (24 percent); and residential (14 percent). Land use in eastern Tolleson, adjacent to the WVBA, is primarily agriculture and industrial (Terranext, 2012b).

## 3.2     Current and Reasonably Foreseeable Water Use

The following information on current and reasonably foreseeable water use within the WVBA is based on the Land and Water Use Report and completed questionnaires, the 2011 update to the COP's Water Resources Plan, information from the 2 October 2013 water providers meeting, and subsequent meetings.

### 3.2.1   Current Water Use

Groundwater within the WVBA is used for agricultural purposes and some industrial use, but not as a municipal drinking water supply. The COP and SRP do not currently have production wells located within the WVBA (COP, 2005; SRP, 2011; Figure 3). RID extracts the largest amount of groundwater from within and adjacent to the WVBA under agreements with SRP as noted below. RID produces approximately 75,000 AFY of groundwater from 32 irrigation wells located within or adjacent to the WVBA (Figure 3), primarily during the irrigation season from approximately March to September. There were also some private water wells identified within the WVBA during the Land and Water Use study.

*City of Phoenix*

The 2011 update to the COP's Water Resources Plan provides information on water acquisition, water management, and infrastructure needed to ensure a sustainable water supply for current customers and anticipated growth over the next 50 years. In a normal supply year, the COP water demand of approximately 302,000 AFY is currently met with the following sources:



- ■ SRP (50 percent);
- ■ Central Arizona Project ([CAP]; 44 percent);
- ■ Reclaimed Water (3 percent); and
- ■ Groundwater (3 percent).

In years with surface water shortfalls, a portion of the COP supply may consist of groundwater pumped from SRP wells. The COP also maintains a number of groundwater production wells for operational flexibility and use when CAP and/or SRP supplies are reduced (COP, 2011). As noted above, currently there are no COP or SRP production wells within the WVBA (Figure 3).

Historically, the COP developed or acquired more than 200 production wells, although the COP has removed a majority of these wells from service due to age, decreased efficiency, and/or degraded groundwater quality[3]. From 1981 to 2000, the total loss of COP well production due to degraded groundwater quality exceeded 90,000 AFY. While some COP production wells have been impacted by VOCs, many COP wells have been closed due to groundwater degradation from inorganic constituents such as chromium, arsenic, and nitrate (COP, 2011).

The COP currently has access to 25 groundwater production wells that can generate 28 million gallons of water per day, or 31,350 AFY. These wells are located one mile or more from the WVBA, mostly in the north-central portion of the COP, and are used for operational flexibility and during times of reduced CAP and/or SRP surface water supplies. The actual number of available production wells varies at any given time due to maintenance issues. Based on the current COP production well capacity and a 65 percent duty cycle, the COP can produce approximately 20,000 AFY from these wells (COP, 2011).

The current projected groundwater use for normal supply years and General Plan-based growth is 15,000 AFY, although withdrawals in recent years have been lower, averaging approximately 9,000 AFY. The COP is evaluating the expansion of their groundwater production well network to increase operational flexibility, manage water quality, and reduce the impacts of potential future surface water shortages.

*Salt River Project*

The SRP manages surface water and groundwater rights within the Salt River Reservoir District (SRRD) geographic region. The WVBA is within SRP "Member" lands and groundwater within the WVBA underlies the SRRD.

SRP has several groundwater production wells located in the vicinity of the WVBA that feed the SRP lateral system. There are no SRP wells currently located within the WVBA (Figure 3). Since SRP wells are used to supplement surface water supply on an as-needed basis, their annual groundwater use fluctuates depending upon the availability of surface water (SRP, 1996). From 2003 through 2013, total SRP pumping within five miles of the WVBA ranged from 13,500 AFY in 2008 to 72,300 AFY in 2003. The total depth of these wells range on the order of 500 to 1,500 feet deep, in most cases constructed with 16- to 20-inch casing, and are generally completed within the UAU and Middle Alluvial Unit (MAU), although some are completed in the MAU and Lower Alluvial Unit (LAU).

---

[3] COP Well #179, the only COP production well located within the WVBA, has been abandoned.



During 2012, approximately 64 percent of water delivered by SRP was for municipal/industrial use within the totality of the SRP service area, with 36 percent for agricultural use, turf irrigation, and recreational use. These percentages have been relatively consistent since 2007 (SRP, 2013).

To date, no SRP wells have been impaired by the WVBA plume (SRP, 2011).

*Roosevelt Irrigation District*

RID pumps the largest amount of groundwater within the WVBA under contracts with the SRP, all of it used to provide irrigation water to members in RID's service area west of the Agua Fria River, outside of the WVBA.

In the late 1910s, waterlogged land resulting from regional hydrogeologic conditions and irrigation return flows threatened local farming operations within the WVBA. In 1920, the SRP entered into an agreement with the Carrick and Mangham Agua Fria Lands and Irrigation Company (RID's predecessors) to withdraw a certain amount of groundwater to help alleviate the waterlogged conditions. According to the SRP, the 1920 agreement and subsequent supplemental agreements for water production with Carrick-Mangham and RID will expire no later than 2026 (SRP, 2009).

RID operates approximately 50 wells within the SRRD during the peak irrigation season, generally from March to September (Terranext, 2012a) and 32 of these wells are located within or adjacent to the WVBA (Figure 3). Total annual RID pumping within the SRRD is approximately 135,000 AFY (SRP, 2009), which is conveyed to the RID irrigation service area west of the Agua Fria River via a conveyance system of canals and pipelines. About 75,000 AFY is pumped from 32 RID wells within and adjacent to the WVBA and 60,000 AFY are pumped from the remaining 18 RID wells.

During 2008 and 2009, the average pumping rate of RID wells within the WVBA ranged from approximately 1,500 to 4,800 gallons per minute ([gpm]; Montgomery & Associates, 2009a). Total depths of RID wells located within and adjacent to the WVBA range from 284 to 1,800 feet deep. Most of the RID wells are screened across the UAU1, UAU2, and into the upper MAU, with some of the deeper wells screened across UAU1, UAU2, MAU, and into the LAU.

The COP 23rd Avenue wastewater treatment plant (WWTP) discharges approximately 30,000 AFY to the RID Main Canal on a year-round basis as part of a "3-way exchange" between the COP, RID, and SRP in which: (1) the COP delivers up to 30,000 AFY of reclaimed water to RID for irrigation use within RID's service area; (2) RID leases SRP wells to provide a like amount of water to the SRP canal system; and (3) the SRP then delivers up to 20,000 AFY of surface water to the COP water treatment plants and up to 10,000 AFY of surface water to the Salt River Pima-Maricopa Indian Community (COP, 2005).

*City of Tolleson*

The COP supplies the COT with municipal water through an Inter-Governmental Agreement. The COT also has four production wells located west of the WVBA that are mainly used in the summer months as a backup supply (COT, 2005). During 2009, the total production from COT wells was approximately 750 AFY.

HALEY&
ALDRICH

*APS Industrial Wells*

The APS West Phoenix Power Plant has several production wells used to supply cooling water during operations (see the 55-613XXX wells shown in Figure 3). Well #8 is the deepest APS production well at 1,809 feet deep, screened from approximately 1,100 feet to total depth, and completed in the LAU. During 2009, production from these wells ranged from approximately 200 AFY (125 gpm) to 725 AFY (450 gpm).

*Private Water Wells*

ADEQ sent outreach letters to 48 possible domestic well owners within the WVBA in 1995. Of the 18 responses received, three reported operational private domestic wells, 12 reported a municipal water supply, and three reported private wells not used for consumptive purposes. ADEQ followed up with a telephone call to the 18 respondents; 17 were contacted and nine allowed access to sample their well (Terranext, 2012b).

On 31 March 1995, ADEQ collected groundwater samples from each of the 10 domestic wells on the nine properties. Groundwater samples from two of the wells contained detectable TCE and PCE concentrations. A well registered to Southwest Trail Boss (345 S. 83rd Avenue) contained TCE and PCE at concentrations below the Aquifer Water Quality Standards (AWQS); according to the completed questionnaire, this well was not used for drinking water. A well registered to Greenwood Memory Lawn (2300 West Van Buren) contained TCE (6.9 micrograms per liter [$\mu$g/L]) and PCE (below the AWQS of 5 $\mu$g/L). The remainder of the domestic wells sampled did not contain TCE or PCE above their respective AWQS. Completed ADEQ Land and Water Use questionnaires also indicated the following private wells are located in the WVBA (Terranext, 2012b):

- Straight Arrow Enterprises (one well for domestic and landscaping use);
- 7300 W. Van Buren (domestic and livestock watering uses);
- 5727 W. Van Buren (domestic use for two residences);
- 6510 W. Buckeye (unidentified use); and
- U.S. Department of Energy (one irrigation well).

No private well owners responded to the solicitation for ROs (ADEQ, 2012a).

### 3.2.2   Reasonably Foreseeable Water Use

Reasonably foreseeable water use is that water use that is likely to occur within 100 years, unless a longer time period is shown to be reasonable based on site-specific information. As discussed above, groundwater within the WVBA is currently used for agricultural purposes and some industrial use but not as a municipal drinking water supply.

Land use within a portion of the WVBA and adjacent areas has been transitioning from irrigated agricultural lands to more urbanized municipal uses, and the associated groundwater uses will also likely transition from agricultural to municipal in the reasonably foreseeable future. Residential growth slowed temporarily during the recent economic downturn. As growth resumes, groundwater uses will continue to transition from agricultural to municipal. At some point in the next 100 years, these groundwater uses may include use of SRP groundwater production wells in the vicinity of the WVBA



for municipal drinking water supply and use of RID production wells in the vicinity of the WVBA for municipal drinking water supply, assuming the infrastructure is available to deliver drinking water and that RID or some other entity has the legal authorization to provide a municipal drinking water supply from one or more of these production wells.

Because there is considerable uncertainty regarding the exact timing of groundwater needs within the WVBA in the reasonably foreseeable future, groundwater end use, regional pumping, and the effects of ongoing drought conditions, contingency strategies and measures will be included in the FS to address reasonably foreseeable uses of groundwater with uncertain time frames. Such measures maximize the amount of water preserved within the aquifer and available for beneficial use in the future. These contingencies may include triggers resulting in implementing a pre-selected strategy or measure, or possibly a focused remedy selection process in which the water provider and stakeholders select the strategy or measure when the timing of water needs becomes certain.

### City of Phoenix

While the COP does not have specific plans for groundwater wells within the WVBA today, the COP states in its 2011 Groundwater Management Plan, *"With regard to remediation of contaminated groundwater within Phoenix's service area, it has been the City's stated intent to preserve that water for future service area use."* In correspondence and discussions with ADEQ, EPA, and the Working Group, the City has emphasized that the central Phoenix aquifer is an important future water supply that the City will need to be able to access. The COP currently holds more than two million acre-feet of groundwater allowance credits for use over a 100-year period. Additional credits are accrued by the COP each year to reflect the incidental recharge of local aquifers which results from service area usage. These credits are mostly intended to provide drought relief, and will be recovered for that purpose from the COP's future groundwater wells.

The COP has evaluated approaches for using its additional water supplies for which it has legal rights but currently lacks physical access, such as treatment or delivery infrastructure, including: (1) expanded local groundwater and recharged water supplies; and (2) reclaimed water from the COP's three wastewater treatment plants. Except for existing groundwater capacity, these sources will require significant capital investments (COP, 2011).

The COP's local production well network could be expanded to reduce drought impacts, meet peaking needs, and provide operational flexibility. The projected groundwater use for normal supply years and General Plan-based growth is 15,000 AFY, about one-half of the full-time groundwater capacity of 28 million gallons of water per day.

Expansion of the COP well capacity by rehabilitating older wells and developing new service area wells is described in the COP's Groundwater Management Plan, including the development of 15 new service area wells. Developing all identified well opportunities would yield approximately 70,000 AFY (COP, 2011). Four of these 15 new service area wells will be located along the Salt River between 35th Avenue and 68th Avenue (outside of the WVBA boundary) as part of the Western Canal Well Field. These new production wells will be screened in the LAU only and are anticipated to provide a total of 12,000 AFY[4] of production once they go on-line in approximately 2020.

---

[4] Equivalent to approximately 1,800 gpm per well assuming year-round pumping.



The COP provided Haley & Aldrich a list of COP production wells (completed within the UAU and located within the WVBA groundwater model boundary) and anticipated per-well pumping rates over the next 30 years, with aggregate pumping of a constant 7,500 AFY over this time period. None of these COP wells are located within the WVBA boundary (Figure 3).

## Salt River Project

The SRP has several groundwater production wells near the WVBA, although none of them are located within the WVBA boundaries. To date, SRP's use of these wells has not been impacted by the WVBA groundwater plume. As a result of changing land use in the area, SRP anticipates that some SRP wells will eventually transition to a drinking water use in the reasonably foreseeable future, either by directly connecting the wells to municipal distribution systems within the SRRD, or piping to municipal water treatment plants located on the SRP canal system as a drought supply (SRP, 2011).

While SRP does not have plans to drill new wells or replace existing wells within the next five years, they consider all land within the SRRD boundary potentially available for future well locations (SRP, 2013). The SRP provided Haley & Aldrich a list of SRP wells within the groundwater model boundary along with anticipated per-well pumping rates over the next 30 years (Figure 3). In aggregate, SRP pumping from these wells is anticipated to increase at a linear rate from 25,000 AFY in 2012 to 35,000 AFY in 2035 and then remain constant at 35,000 AFY from 2036 through 2041.

## Roosevelt Irrigation District

As discussed above, under agreements with the SRP, today RID operates approximately 50 wells within the SRRD, generally during the peak irrigation season from March to September (Terranext, 2012b); 32 of these wells are located within or adjacent to the WVBA. Approximately 135,000 AFY are extracted during RID operations within the SRRD and conveyed to the RID irrigation service area outside the WVBA, west of the Agua Fria River, via a system of canals and pipelines. According to the SRP, the 1920 agreement and subsequent supplemental agreements with Carrick-Mangham and RID will expire no later than 2026 (SRP, 2009). RID's groundwater pumping within or adjacent to the WVBA (for delivery of irrigation water to their service area located outside of the WVBA) is therefore anticipated to continue at approximately the same rates until no later than 2026.

Regarding reasonably foreseeable water uses, the 12 November 2007 Land and Water Use Report questionnaire completed by RID (RID, 2007) stated that RID's current water use is *"for non-potable purposes within the District's boundaries"* and RID's future water use of wells, canals, and laterals for the foreseeable future *"will continue to be used much as they are today."* The RID questionnaire also stated the future use (up to 100 years) for any RID well impacted by the WVBA plume would be *"Same as today."* RID submitted a revised questionnaire to ADEQ dated 12 January 2010 (RID, 2010a) which stated that *"Currently, the wells in the WVB site provide water supply for irrigation but the wells will transition to drinking water supply as residential and commercial development continues in the District."* The revised questionnaire did not explain the legal mechanism or timing of this proposed transition. RID clarified in its response to the water provider questionnaire that it does not intend to itself become a potable water provider or provide direct delivery of potable water to its own customers.

RID has proposed sale of its water supply to water providers outside the WVBA. RID proposed that the water would serve as a raw water supply for drinking water end uses by the purchasers' customers (RID, 2010a). Arizona Department of Water Resources (ADWR) has expressed concern about RID's authority to move groundwater from within the boundaries of a water provider that has obtained a



Designation of Assured Water Supply (in this case the COP) and the potential to negatively affect that Designation (ADWR, 2010). Others have raised additional concerns regarding RID's authority to move groundwater from within the WVBA in the future (SRP, 2011; West Van Buren Working Group, 2011). These legal issues have not yet been resolved.

The COP 23rd Avenue WWTP discharges approximately 30,000 AFY to the RID Main Canal on a year-round basis as part of a COP/RID/SRP "3-way exchange" described above. However, the 2005 update to the COP Water Resources Plan states, with regard to reclaimed water use, *"An additional factor to consider involves the diminishment of the "three way" exchange and the RID GSF* [groundwater storage facility] *over time due to urbanization of agricultural lands."* and that, in the future, excess reclaimed water from the COP 23rd Avenue WWTP may be stored at the Agua Fria Linear Recharge Project (COP, 2005). The water supply and demand modeling assumptions in the 2011 update to the COP's Water Resources Plan assumes that the COP/RID/SRP "3-way exchange" will phase out in 2031.

### City of Tolleson

While the Land and Water Use report (Terranext, 2012b) does not include information on reasonably foreseeable use of groundwater for the COT, the Inter-Governmental Agreement with the COP will likely continue into the future. The COT also intends to drill and construct five new production wells over the next three to 10 years (see COT-1 through COT-4 on Figure 3; COT-5 is located west of the figure boundary); three wells near I-10 and N. 83rd Avenue, one at 104th Avenue and Cowden, and one near 75th Avenue and W. Buckeye Rd. Each well is anticipated to be drilled to a total depth of 700 feet bgs, screened from 525 to 700 feet bgs, and are expected to each produce a minimum of one million gallons per day (approximately 700 gpm) (COT, 2014).

### APS Industrial Wells

There are no anticipated future changes to current groundwater use at the APS West Phoenix Power Plant (Terranext, 2012b).

### Private Water Wells

Based on the completed ADEQ Land and Water Use questionnaires, there are no known planned changes to the limited number of private water wells within the WVBA (Terranext, 2012b). Those uses include irrigation, industrial, livestock watering, and household domestic uses.

### 3.3    Remedial Objectives

Pursuant to R18-16-406(I), ADEQ established ROs for current and reasonably foreseeable land and water use based on the Land and Water Use Report (Terranext, 2012b) and public comments (ADEQ, 2012a). The FS evaluates remedial alternatives capable of achieving the final ROs, which are established for each listed use to:

■   Protect against loss or impairment of each listed use that is threatened to be lost or impaired as a result of a release of a hazardous substance;

■   Restore, replace, or otherwise provide for each listed use to the extent that it has been or will be lost or impacted as a result of a release of a hazardous substance;



- Provide time frames when action is needed to protect against or provide for the impairment or loss of the use; and

- Provide the projected duration of the action needed to protect or provide for the use.

As stated in the Arizona Administrative Register's March 2002 Notice of Exempt Rulemaking, Title 18 (Environmental Quality), Chapter 16 (WQARF Program), *"Remedial objectives described in this rule [R18-16-406] are based on uses determined by the community and are defined by the Department with significant community involvement. The objectives are designed to protect and provide for uses of land and water. This does not mean that the aquifer will always be cleaned up to drinking water standards or to a level suitable for the use. Instead, the rule requires different uses to be identified and a remedy is selected which will protect and provide for the uses."*

The following sections discuss the specific WVBA RO categories included in the FS.

### 3.3.1 Remedial Objectives for Land Use

The ROs for land use in the WVBA are:

- "Protect against possible exposure to hazardous substances in surface and subsurface soils that could occur during development of property based upon applicable zoning regulations";

- "Protect against possible leaching of hazardous substances in surface and subsurface soils to the groundwater"; and

- "Protect against the loss or impairment of current and all reasonably foreseeable future uses of land as provided in zoning regulations and the Land and Water Use report as a result of hazardous substances in surface and subsurface soils. Appropriate remedial actions will be implemented as an Early Response Action (ERA) or after the record of decision (ROD) is finalized, whichever is warranted and continued until hazardous substances causing the impairment or restriction to the land use are remediated."

### 3.3.2 Remedial Objectives for Groundwater Use

ADEQ's RO report included ROs for municipal, agricultural, and private uses of groundwater.

Municipal Groundwater Use: The ROs for current and reasonably foreseeable future municipal groundwater use in and near the WVBA are:

- "To protect, restore, replace or otherwise provide a water supply for municipal use by currently and reasonably foreseeable future municipal well owners within the WVBA WQARF site if the current and reasonably foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

- "To protect, restore, replace or otherwise provide a water supply for municipal groundwater use by currently and reasonably foreseeable future municipal well owners outside the current plume boundaries of the WVBA WQARF site if the current and reasonably foreseeable future



16

uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

Agricultural Groundwater Use: The ROs for current and reasonably foreseeable future agricultural groundwater use in and near the WVBA are:

- "To protect, restore, replace or otherwise provide for the current and reasonably foreseeable future supply of groundwater for agricultural/irrigation use and for the associated recharge capacity that is threatened by or lost due to contamination associated with the WVBA WQARF site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

Private Groundwater Use: The ROs for current and reasonably foreseeable future private groundwater use in and near the WVBA are:

- "To protect, restore, replace or otherwise provide a water supply for potable or non-potable use by currently impacted commercial, industrial, and domestic well owners within the WVBA WQARF site if the current and reasonably foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

- "To protect, restore, replace or otherwise provide a water supply for potable or non-potable use by commercial, industrial, and domestic well owners outside the current plume boundaries of the WVBA WQARF site if the current and reasonably foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

### 3.3.3   Remedial Objectives for Canal Water Use

The ROs for RID's current and reasonably foreseeable future canal water use in and near the WVBA are:

- "To protect, restore, replace or otherwise provide a water supply for potable or non-potable use by currently impacted RID wells within the WVBA WQARF site if the current and reasonably foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available



and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

■    "To protect, restore, replace or otherwise provide a water supply for potable or non-potable use by RID wells outside the current plume boundaries of the WVBA WQARF site if the current and reasonably foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."

### 3.3.4    Remedial Objectives for Surface Water Use

The ROs for the SRP's current and reasonably foreseeable future surface water use in and near the WVBA are:

■    "To protect, restore, replace or otherwise provide a water supply for potable or non-potable use by SRP wells outside the current plume boundaries of the WVBA WQARF site if the current and foreseeable future uses are impaired or lost due to contamination from the site. Remedial actions will be in place for as long as need for the water exists, the resource remains available and the contamination associated with the WVBA WQARF site prohibits or limits groundwater use. Remedial actions to meet ROs will be implemented upon issuance of the ROD. If there is an imminent risk to human health or the environment, then an ERA may be initiated prior to implementation of the ROD."



## 4.    CURRENT CONDITIONS AND FEASIBILITY STUDY ASSUMPTIONS

The remedial alternatives were developed within the framework of the current conditions within the WVBA, assuming continued pumping for irrigation use and considering the water quality improvements and source reductions resulting from facility-specific work performed to date, operating the M52 OU2 extraction system, and the COC concentration trends in WVBA groundwater. The aspects of the SCM described in Appendix A have been incorporated into the development of the FS alternatives, along with certain assumptions. This section provides an overview of the current conditions and assumptions that helped guide the development and formed the basis of the remedial alternatives.

### 4.1    Current Conditions

While a more detailed discussion is provided in the SCM in Appendix A, the primary current conditions that formed the basis of the development of the FS remedial alternatives include the following.

***Regional irrigation pumping has a significant influence on overall water levels, hydraulic gradients, and groundwater flow directions within the WVBA.*** Factoring this regional pumping and potential future changes to regional pumping into the FS remedial alternatives is necessary and critical. The aggregate effects of irrigation pumping is the formation of a regional hydraulic trough or sink within the WVBA, with capture zones of the regional irrigation wells extending over the WVBA plume footprint, resulting in hydraulic control of the overall WVBA plume under current conditions. Additional hydraulic control wells as part of a remedial alternative would therefore only serve to remove additional groundwater from storage beneath the WVBA.

Potential future changes in regional pumping would also need to be addressed with contingencies. For example, should RID irrigation pumping within the SRRD cease in the future, groundwater modeling indicates that static water levels in the central portion of WVBA may rise up to $80+$ feet over a period of 15 to 20 years, and the overall flow direction within the WVBA would likely shift from east to west to a more northwesterly direction over time. Production wells in this new downgradient direction may need to be addressed via remedial measures should they become impaired.

***Facility-specific remedial work within the WVBA has resulted in declining source inputs to the WVBA regional plume.*** Critical to addressing any regional VOC plume is mitigating or eliminating facility-specific source areas that contribute to the regional plume. Without addressing ongoing sources, the regional plume will likely persist. Some facilities within the WVBA have performed remedial work and as a result, VOC concentrations have declined in facility-specific monitoring wells, in some cases by orders of magnitude. The effect of this work is reduced VOC source inputs to the WVBA regional plume resulting, in part, in overall declining VOC concentration trends. Many other facilities within the WVBA have not yet performed the necessary source control measures and as a result, facility-specific sources continue to contribute to the regional plume. ADEQ is continuing to identify these facilities and for purposes of this FS, it is assumed that ADEQ will require the necessary source control measures to be implemented.

***The M52 OU2 groundwater extraction system has contained the VOC mass flux at the OU2/OU3 boundary.*** The result is significant declines in VOC concentrations in downgradient OU3 monitoring wells. Attenuation within OU3 has further reduced the ongoing VOC mass flux across the WVBA border, resulting in significant declines in VOC concentrations in UAU1 monitoring wells in the eastern



and central WVBA, along with an overall narrowing of the plume width in the eastern portion of the WVBA. Ongoing monitoring within OU3 and at the OU3/WVBA boundary will help determine whether concentrations continue to decline until the AWQS are met. The OU3 RI/FS is also being completed under EPA oversight and should be issued in the spring of 2015.

***VOC concentrations in UAU1 regional groundwater have generally been on the decline.*** As a result of the aggregate effect of facility-specific remedial work performed to date, the M52 OU2 extraction system, and groundwater extraction from regional irrigation pumping, VOC concentrations in the regional WVBA plume within UAU1 have generally been declining over time, in some cases by an order of magnitude or more.

***VOC concentrations in UAU2 groundwater along the plume axis have generally been stable.*** This may be the result of silt and clay layers within the UAU2 and the generally higher percentage of fine grained materials and lower large-scale hydraulic conductivity compared to UAU1. Less groundwater flux and less flushing of dissolved-phase VOC mass, along with possible sorption and desorption on fine grained materials may help explain the stable UAU2 VOC concentration trends. The possibility of unidentified ongoing sources also exists. UAU2 monitoring wells located off of the main axis of the plume, however, exhibit declining VOC concentration trends.

***The overall lateral extent of the WVBA plume has either decreased or remained stable, depending on the area.*** VOC concentrations over time in UAU1 monitoring wells along the perimeter of the current WVBA plume have been either non-detect or stable at concentrations below the AWQS, indicating that the lateral extent of the WVBA plume is currently stable. In some areas the lateral extent of the plume has diminished over time, particularly in the western and east-central WVBA. UAU2 monitoring wells along the perimeter of the UAU2 VOC plume have remained either non-detect or below AWQS over the last seven to 10 years or so, suggesting that the UAU2 plume extent is relatively stable.

## 4.2    FS Assumptions

Along with the current conditions described above, the following assumptions were also made during development of the remedial alternatives.

***Facility-specific source work will be completed under ADEQ guidance separate from this FS.*** Mitigating or eliminating ongoing facility-specific VOC source areas is critical to the success of any effort to address the regional WVBA plume and provide for reasonably foreseeable water uses. If sources are not addressed, they will continue to provide source input to the regional plume, causing COCs to persist for a long period of time. One FS assumption is that source control within the WVBA will be addressed by ADEQ independent of this FS.

***The M52 OU2 extraction system will continue to operate.*** The operation of this system since 2001 has reduced the VOC mass flux across the OU2/OU3 boundary as well as the downgradient OU3/WVBA boundary. As the mass flux has diminished, VOC concentrations in OU3 monitoring wells and within the eastern and central WVBA in UAU1 have declined over time. The development of the WVBA FS remedial alternatives assumes that the mass flux at the OU3/WVBA boundary will further decline as the OU2 extraction system continues to operate until VOC sources upgradient of the OU2/OU3 border have been mitigated to the extent practicable and operation of the OU2 system is no longer deemed necessary.



***The WOC implements its WQARF remedy that addresses continuing migration of VOCs into the north-central portion of the WVBA.*** The downgradient extent of the WOC WQARF site plume appears to have merged with the north-central portion of the WVBA (Terranext, 2012a). This FS assumes that ADEQ will ensure that the VOC mass flux across the WOC/WVBA boundary is addressed by the WOC remedy.

***RID irrigation pumping will continue at its current rates until at least 2026.*** The FS assumes that RID will continue seasonal pumping at its current rates[5]. The FS remedial alternatives, however, will provide for contingent remedial strategies and/or remedial measures to be triggered by a significant change in regional irrigation pumping. For example, according to the SRP, the 1920 agreement and subsequent supplemental agreements with Carrick-Mangham and RID will expire no later than 2026 (SRP, 2009) and RID may be required to cease pumping within the SRRD at this time. The remedial alternatives will need to include contingent remedial strategies and/or measures to address this potential scenario if levels of contaminants in the WVBA regional plume are still above AWQS at that time at concentrations that could impact then-current or reasonably foreseeable uses of groundwater.

---

[5] While RID's "Early Response Action Work Plan" dated 03 February 2010 includes proposed year-round pumping at select RID wells, during a 11 March 2014 meeting, an ADEQ representative said the agency had requested RID to continue pumping these wells on a seasonal basis.


HALEY&
ALDRICH

21

## 5.    IDENTIFICATION AND SCREENING OF REMEDIAL STRATEGIES AND REMEDIAL MEASURES

### 5.1    General Background of Remedial Strategies and Measures

The Reference Remedy and each alternative remedy consist of a package, or combination, of remedial strategies and measures. There are six listed remedial strategies and a wide variety of specific measures that can be used to build a complete remedy.

WQARF requires that one of the alternative remedies employ a strategy or combination of strategies that is more aggressive than the Reference Remedy, and one employ a strategy or combination of strategies that is less aggressive than the Reference Remedy. An alternative may be more aggressive if it requires fewer remedial measures to achieve ROs, achieves ROs permanently rather than temporarily, achieves ROs in a shorter time frame, or is more certain in the long-term.

Each remedy addresses impaired wells that either supply water for municipal, domestic, industrial, irrigation, or agricultural use, or are part of a public water system. A well is impaired if it is unfit for its intended use without treatment for COCs. If a well is likely to be impaired within the reasonably foreseeable future, the remedial alternative either provides for action to protect the well from impairment or provides for future measures to address the potential impairment. The remedies address the possibility of future impairment that could result from either plume migration or changes to water use.

The Reference Remedy and alternative remedies also include contingent strategies and measures to address:

■    Uncertainties regarding the time frames in which future water uses might occur;

■    Possible but uncertain future changes in regional pumping conditions that could affect plume migration, resulting in potential impairment of additional wells;

■    Uncertainties regarding the development of future technologies or future opportunities for replacing water supplies that would serve as the most effective well measures for impairments that occur in the more distant future; and

■    Other reasonable uncertainties regarding the achievement of ROs.

If future impairment is uncertain, a remedy might provide for a contingent strategy or contingent measure to address the well. For example, if future plume migration is uncertain, a contingent containment strategy might be provided to protect a well in the event that plume migration does become a threat. If a future change in water use is uncertain, an alternative may provide for a contingent measure to address the need when the change in use becomes more certain but before the change in use occurs.

In the case of future or contingent strategies or measures, consideration is given to the advance time needed to ensure that steps may be taken to address the threat or impact to a well before the intended use of the well is lost. Action must begin soon enough to allow time for all the steps necessary to ensure that water use is uninterrupted or that water is available at the quality and volume for the new uses at the time it is needed. Sentinel well monitoring is included where necessary to provide advance warning that action may be needed and trigger consultation with the water provider or well owner.



Significant changes in regional pumping or indications that water use changes are certain and upcoming may also trigger consultation with the water provider or well owner. That consultation may result in employing one of the remedial measures described below, specifically modified for the impaired well. The water provider may also suggest other measures specifically designed for the well at that time. Impairments that occur in the distant future will employ tools available at that time. Selecting the measures in consultation with the affected water provider or well owner ensures that the measure selected meets the needs of the water providers, well owners, and customers.

Not all of the identified contingent measures may necessarily need to be implemented. The specific contingent measures that are necessary would be identified based on monitoring future conditions.

## 5.2    Remedial Strategies

Remedial strategies are general remediation approaches designed to address contamination. In WQARF, unlike CERCLA, strategies are employed to achieve ROs. Instead of focusing on setting cleanup goals in the aquifer, strategies are used to protect or restore water supplies for current and future use or to protect existing wells from impairment. There are six listed WQARF strategies: (1) no action; (2) monitoring; (3) source control; (4) controlled migration; (5) physical containment; and (6) plume remediation.

### No Action

Because ADEQ has identified reasonably foreseeable future changes in water use and drinking water wells could be impaired in the future by plume migration that results from changes in pumping regimens, no action is inappropriate as a stand-alone strategy in the WVBA.

### Monitoring

Monitoring involves observing and evaluating contamination through data collection. Monitoring has been deployed for some time in the WVBA along with some facility-specific source control, with generally favorable COC concentration trends. It is an essential part of every package of strategies and measures. Monitoring could be appropriate as a stand-alone strategy in the WVBA under current pumping conditions and water use, provided contingencies are in place to protect current and future water provider uses.

### Source Control

Source control is generally defined as eliminating or mitigating a continuing source of contamination. Facility-specific source control is being separately overseen by ADEQ and is not being included as part of a remedy's package of remedial strategies and measures in this FS. Regional source control is not necessary in the WVBA, as water quality data does not indicate the presence of dense non-aqueous phase liquid or other ongoing regional sources. Continuing sources are only present in the WVBA on a facility- or location-specific scale.

### Controlled Migration

Controlled migration is generally defined as controlling the direction or rate of migration that stops short of containing migration. Controlled migration may be feasible in the WVBA to reduce the need for well measures by protecting select production wells. It is not necessary or feasible under the current



regional pumping regimens, as it would require very high pumping rates to overcome the influence of current irrigation well pumping. Controlled migration could be used as a contingent strategy to address specific impaired or threatened wells within the WVBA. It could also be effective as a contingent strategy for possible future changes in pumping regimens.

### Physical Containment

Physical containment is generally defined as containing COCs within definite boundaries. Containment is not necessary today, or for as long as current pumping regimens continue. Containing portions of the plume (or focused containment) may be effective in the WVBA as a contingent strategy triggered by reduced RID irrigation pumping to prevent downgradient wells or receptors from becoming impacted, thus eliminating the need for additional well measures. Focused containment could also mitigate any short-term impact of facility-specific contamination while ADEQ works with responsible parties to implement facility-specific source control. Containment may not be needed if ROs can be met using well measures and contingent well measures.

### Plume Remediation

Plume remediation is generally defined as achieving water quality standards for COCs in site-wide groundwater. The WVBA regional plume is too large, however, for full plume remediation within a reasonable time period, nor would it be technically practicable or cost-effective, though smaller scale plume remediation may be feasible in localized areas of the regional plume with relatively high concentrations to protect wells and reduce the need for well measures and contingent well measures. Site-wide plume remediation is not required in the WVBA to achieve ROs (i.e., provide for reasonably foreseeable water use). Contaminant concentrations are relatively low and there has been a general overall decline in VOC concentrations over time, in some cases by orders of magnitude. Irrigation ROs can be met today without measures, given current concentration levels. Future drinking water use for the SRP, COP, and COT, and RID should they become legally authorized to become a drinking water provider, can be provided for with a combination of other strategies and measures.

### 5.3    Screening of Remedial Strategies and Technologies

This section discusses the identification and screening of remedial strategies and provides detail on those technologies retained to develop the remedial alternatives. A summary of the screening process and technologies considered for this FS is provided in Table 2. Because of the regional scale of the WVBA, its densely populated and industrialized nature, current depth to groundwater of 100 to 150 feet bgs, and the regional approach of this FS (i.e., individual source areas will be addressed directly by ADEQ) the in-situ technologies such as soil vapor extraction/air sparging, chemical oxidation, enhanced biodegradation, and in-situ wall technologies such as permeable reactive barriers are considered infeasible and were not retained for further consideration.

Remedial strategies that were retained for detailed evaluation were:

■    Groundwater monitoring/monitored natural attenuation (MNA); and

■    Plume remediation on a localized basis.

Feasible remedial technologies that passed the screening process and were retained for further consideration include: (1) groundwater extraction for dissolved-phase VOC mass removal within targeted areas of the plume core; (2) treating extracted groundwater via liquid-phase granular activated



carbon (LGAC) due to the end use requirements as described below; and (3) groundwater monitoring (including long-term monitoring/MNA).

### 5.3.1   Groundwater Extraction

Groundwater extraction and treatment via one or more pumping wells is considered a feasible technology within the WVBA. Extraction wells placed within the core of the plume would remove dissolved-phase mass in higher VOC concentration areas and help expedite declining VOC concentration trends. Because of the high permeability of the UAU aquifer, extraction wells would need to be large diameter (16 to 20 inches) and equipped with either a vertical turbine or submersible pump of sufficient size and horsepower to pump on the order of 500 gpm to 1,000 gpm to induce a sufficient capture zone to affect an adequate area of interest within the plume.

New UAU extraction wells would be drilled by an Arizona-licensed drilling contractor using conventional drilling techniques. For costing purposes, a 28-inch diameter borehole would be advanced to 500 feet bgs and the well would be constructed using 20-inch diameter, high-strength, low alloy (HSLA) steel casing with HSLA steel louvered well screen from approximately 150 to 500 feet bgs. Annular materials consisting of a gravel filter pack placed around the well screen, a bentonite seal above the top of the screen, and a neat cement or cement grout seal to surface would be emplaced using a tremie pipe. During implementation, the extraction well(s) would be designed by an Arizona-Registered Geologist or Professional Engineer based on site-specific conditions.

For each end use scenario, extracted groundwater would need to be treated to meet AWQS for WVBA COCs prior to reinjection or discharge to an end user, as discussed in Section 5.3.3. Table 2 includes a listing and screening of potentially feasible groundwater treatment technologies for removing VOCs. Based on this water treatment technology screening, LGAC is the most feasible treatment technology and was selected as the presumptive remedy for well-head treatment. Each groundwater extraction well requiring LGAC well-head treatment would require the acquisition or leasing of land measuring approximately 200 feet by 200 feet to house the well, pump, associated piping, and well-head treatment system.

### 5.3.2   Liquid-Phase Granular Activated Carbon Treatment

LGAC is the selected water treatment technology for the WVBA VOCs based on the water treatment technology screening process from Table 2[6]. LGAC was also selected due to its proven performance, relative low-cost and low-maintenance, and treatment reliability. EPA considers LGAC the Best Available, Demonstrated Control Technology for treating groundwater containing VOCs (EPA, 2009). Further, the American Water Works Association recognizes LGAC as a primary VOC treatment technology for potable water systems when coupled with the appropriate post-treatment disinfection (American Water Works Association, 2003).

As groundwater influent containing VOCs moves through a LGAC system, the VOCs adsorb onto the carbon and are removed from the influent stream. Pre-engineered, industry standard, modular skid mounted systems are available through several vendors and have a relatively small footprint with high

---

[6] As discussed in Section 3.4 and 3.5 of Appendix A, for costing purposes, it was assumed that total and dissolved chromium and 1,4-dioxane treatment will not be required for those remedial alternatives that include groundwater extraction and treatment.



throughput capacity. A lead-lag configuration would allow for a level of redundancy and minimize contaminant breakthrough of the discharged effluent. A lead-lag configuration uses at least two vessels on line, in series, at all times. The lead vessel does most of the work by removing the majority of the VOCs in the influent. The second vessel polishes the influent from the first vessel and acts as a safeguard when VOC breakthrough occurs in the first vessel and it requires changeout. Following changeout, the flows are adjusted so that the lag vessel becomes the lead vessel, and the vessel with the newly replaced LGAC becomes the lag vessel.

The carbon bed life is a function of influent VOC concentrations, flow rate, and the adsorption capacity of each VOC within the influent. For example, 1,1-DCE does not adsorb as readily as TCE or PCE and usually has an earlier breakthrough time; in this case, 1,1-DCE would be the limiting VOC regarding carbon bed life. For costing purposes, LGAC changeout estimates were derived based on the proposed well location within the plume, using the 2013 data set.

Operation and maintenance (O&M) of LGAC systems generally include periodic replacement of carbon beds when the adsorption capacity is reached and breakthrough occurs, or when the carbon requires changeout due to entrapped sediment or scale within the carbon vessel. This can be mitigated by pre-treating for hardness if deemed necessary and filtering sediment out of the influent stream prior to the lead LGAC vessel.

Extracted groundwater would be pumped through filter bags to remove particulate matter and reduce turbidity. Following filtration, groundwater would be pumped through LGAC-vessels in series (lag-lead configuration). The conceptual design for this flow rate would include one skid consisting of two Siemens HP 1220 vessels (or equivalent) in a lag-lead configuration. Either coconut shell-based carbon such as Siemens AquaCarb 830C, or reactivated carbon consisting of an 80/20 mix of coconut shell- and coal-based carbon would likely be used.

Other design elements would include civil/site, mechanical, and electrical work such as grading, constructing reinforced concrete pads and containment structures, piping between vessels, pipe supports, valves to control and balance flow including standby mode, sampling ports, flow meters, low voltage power and signal controls, and high voltage power as needed.

Performance and/or compliance sampling would be conducted on a regular basis to evaluate the efficacy of the LGAC treatment and the need for carbon changeout, and would include sampling for WVBA COC analysis in the groundwater influent, between the lead and lag vessels, and the treated effluent prior to discharge to end use.

### 5.3.3   End Use of Extracted and Treated Groundwater

A critical component of groundwater extraction is finding a beneficial end use for the treated groundwater that allows for the maximum beneficial use of the waters of the state and is consistent with end user policies in the ADWR remediated groundwater use policy (ADWR, 1999). Consistent with the Management Plan for the Phoenix Active Management Area, the extracted and treated groundwater would be accounted for in a manner consistent with the accounting of surface water until 2025. As noted above, all end use scenarios would require treatment of WVBA COC AWQS prior to discharge.



### COP Storm/Sanitary Sewer

Discharging extracted, treated groundwater to the COP storm or sanitary sewer system was not retained for further evaluation for a number of reasons. First, this option would be the least preferred by ADWR, since it would reduce groundwater in storage and not put that groundwater to beneficial use (ADWR, 1999). Second, the SRP requires that any groundwater extracted within SRP Member lands be put to beneficial use within the SRRD. And third, the relatively large amount of treated groundwater requiring end use would result in challenges to the COP infrastructure, discharge logistics, and wastewater treatment. Discharge to the storm sewer would require an Arizona Pollutant Discharge Elimination System (AZPDES) permit with the required permit monitoring and reporting. The COP would also need to regulate the discharge to ensure compliance with its AZPDES Municipal Separate Storm System (MS4) permit.

But for these public policy and legal impediments to this option, it would have certain advantages, including the relatively short distances needed for conveyance piping from the extraction well to the discharge point, which would reduce capital and O&M costs and minimize the need for installing conveyance piping within heavily urbanized areas.

### COP Municipal Supply Distribution System

The COP currently does not allow direct discharge of treated groundwater into its municipal drinking water distribution system because of the potential for introducing contaminated groundwater into their municipal supply, should there be a well-head treatment system failure. This end use was therefore not retained for further evaluation.

### COP 35th Avenue Municipal Water Treatment Plant

Up to approximately 5,000 gpm of extracted and treated groundwater could be conveyed south to the COP's 35th Avenue treatment plant (located south of the Salt River at Broadway) anticipated to go online in 2021 (COP, personal communication, 2014). The extracted groundwater would need to be treated to meet AWQS for WVBA COCs prior to discharge to the plant. The COP would use the water from the treatment plant to meet potable water uses on Member lands within the SRRD under an agreement between the SRP and COP. This approach would also be in accordance with ADWR policy, since the extracted groundwater would replace groundwater that COP would have otherwise pumped within the area. While the conveyance piping would need to cross the Salt River, the pipe could be attached to the 35th Avenue bridge to avoid the need for jack-and-bore or micro-tunneling methods beneath the river bed.

### SRP Grand Canal and/or SRP Lateral

Groundwater extracted and treated within the WVBA could be conveyed north via high pressure piping to the SRP Grand Canal, where it would then be distributed by the SRP to its final beneficial end use. This option would be in accordance with ADWR policy, since treated groundwater discharged to the Grand Canal would replace groundwater that the SRP would otherwise have pumped.

Significant lengths of conveyance piping from proposed WVBA extraction wells to the Grand Canal would be required, including the need to install conveyance piping beneath Interstate-10. Extracted groundwater would also need to be pumped uphill from the WVBA to the Grand Canal, which has an elevation difference on the order of 45 feet.



Coordinating SRP operations with dry-up periods would be critical to maximize the potential for continuous, year-round pumping of WVBA extraction wells. SRP indicated that the anticipated discharge to the Grand Canal could be beneficially used on a near year-round basis (except for the short dry-up periods, canal operational emergencies, water quality conditions, and when there is very low or no demand on the canal), which would allow for nearly continuous pumping of WVBA extraction wells. The short dry-up periods would allow for preventative maintenance to be performed on the treatment system.

Extracted groundwater would need to be treated to AWQS for WVBA COCs before delivery to the canal. Discharge of treated groundwater to the SRP Grand Canal and/or laterals would also require:

- A license to access the canal right-of-way;
- A discharge agreement;
- SRP Board approval; and
- An AZPDES permit.

In addition to the AZPDES permit monitoring requirements, the SRP would require annual sampling of the discharge for inorganic constituents and monthly in-stream monitoring for WVBA COCs.

### RID Canal

Another potential temporary end use option is discharge to the RID irrigation system, which could significantly reduce the need for new conveyance piping, at least in the short-term. Year-round groundwater pumping of WVBA extraction wells may be limited due to seasonal operations, the timing and schedule of water delivery to RID end users, and RID's plan to reduce pumping from its wells east of the Agua Fria River in order to utilize more reclaimed water from the COP 23rd Avenue WWTP through its operation of a Groundwater Savings Facility. Once the contracts between the SRP and RID expire, any extracted and treated groundwater from WVBA extraction wells would need to be used on Member lands within the SRRD.

The end use option of providing RID remediated groundwater could replace groundwater that RID would otherwise have pumped and, under this scenario, would be in accordance with the ADWR policy. Based on RID's policy for accepting remediated groundwater, extracted groundwater would need to be treated to AWQS for WVBA COCs prior to discharge to the RID system (RID, 2010b).

Discharge to RID Salt Canal:  The east to west Salt Canal runs from 23[th] Avenue along Van Buren Street until it connects with the RID Main Canal at 83rd Avenue. The Salt Canal has been converted to an underground gravity pipeline, except for two segments (300 feet and 1,100 feet long) between 75th Avenue and 83rd Avenue.

The maximum capacity of the Salt Canal is approximately 20,000 gpm (Synergy Environmental, LLC. [Synergy], 2012). Since the current RID production along the Salt Canal from RID-105 through RID-114 totals approximately 20,000 gpm, there is no available capacity for discharge from an additional WVBA extraction well(s) under current RID operations.

Discharge to RID Main Canal:  The Main Canal is open, lined, and oriented towards the northwest beginning at 19th Avenue and extending beyond the WVBA boundary in western Phoenix. The Main



Canal presumably does not have the same capacity restrictions as the Salt Canal, and discharge of extracted groundwater could be feasible even under current RID operational conditions.

One end use option is to tie new WVBA extraction wells into the 35th Avenue and/or 47th Avenue SRP laterals, then south under gravity flow to the RID Main Canal under an agreement between the SRP and RID. The extracted groundwater could offset groundwater that RID would otherwise have pumped, and under this scenario would be neutral to aquifer storage.

### Reinjection of Treated Groundwater

Another end use option is to reinject the treated groundwater back into either the UAU or LAU. This option would conserve groundwater storage within the aquifer and comply with ADWR's Substantive Policy Statement on remediated groundwater end use, which states a preference for reinjection or recharge where practicable and cost effective (ADWR, 1999).

Some advantages to this approach include:

- Reinjecting into the LAU would minimize the amount of conveyance piping needed from the treatment system, as the LAU injection well could be located within the extraction well/treatment system compound;

- WVBA extraction wells could operate on a continuous, year-round basis; and

- Reinjection would not have the uncertainties associated with future SRP, COP, or RID operations that may influence the timing and amount of extracted groundwater they could accept in the future.

Other considerations include.

- Significant lengths of conveyance piping from the extraction wells to UAU reinjection wells would likely be necessary.

- Reinjection in the upgradient portion of the plume could potentially expand the lateral and/or vertical extent of the plume in the vicinity of the injection wells.

- If the well injection system is not properly designed and constructed, considerable maintenance of the reinjection wells will likely be needed if persistent clogging of both chemical and physical clogging agents occurs. Typical maintenance would include mechanical brushing of the well screen, disinfection, and air-lift well development as needed to maintain injection capacity.

- If the reinjection well(s) are along the downgradient extent of the plume, there is the possibility of forming a new downgradient plume. This circumstance could occur if an MCL is significantly reduced and the new MCL concentration has not been met in the treatment system effluent during historical operations, or if an as-yet-unknown emerging compound is discovered in WVBA groundwater that was not removed by LGAC and was reinjected back into the aquifer downgradient of the current WVBA footprint.

### 5.3.4   Groundwater Monitoring and Monitored Natural Attenuation

Groundwater monitoring and MNA were retained as a remedial technology and are components of all of the remedial alternatives. Long-term water level and water quality monitoring at existing WVBA monitoring wells would allow for the continued evaluation of hydraulic gradients and groundwater flow



directions within the WVBA, long-term water level trends, and changes in gradients and flow directions from potential changes in regional pumping. The groundwater sampling data at these wells would provide information on plume migration, plume expansion or reduction over time, COC concentration trends, the influence of remedial work over time, and the influence of natural attenuation processes.

The proposed monitoring program would be consistent with the current ADEQ semiannual monitoring program of existing WVBA monitoring wells, based on the well and analyte list from the 2013 monitoring event. The well network would consist of approximately 68 UAU1, 27 UAU2, and 6 MAU monitoring wells. The monitoring program is summarized in Table 3. The wells would be sampled using the no-purge Hydrasleeve™ method in order to reduce the need for purge water handling and disposal. Samples would be analyzed for VOCs using EPA Test Method 8260B, with 1,4-dioxane added to the 8260B list. Select monitoring wells would also be analyzed for total chromium and dissolved total chromium using EPA Test Method 6010B. Temperature, pH, and conductivity would also be measured in the field. For costing purposes, it was assumed that 25 monitoring wells would also be analyzed for select MNA parameters once per year. A full round of water levels from approximately 120 monitoring wells would also be included in each semiannual monitoring event.

Ongoing, facility-specific monitoring within the WVBA would also continue in accordance with their respective consent orders or working agreements.

## 5.4      Remedial Measures

Remedial measures are specific actions taken to address water uses to achieve ROs. Measures must be employed where necessary to address impaired wells and may include various actions to modify a well to render it fit for its intended use without treating for COCs. It may include replacing an impaired well or provisions for a replacement water supply equivalent to that lost due to COC contamination. It may also include installing treatment systems. The protection or restoration of any particular well or water source may be achieved through remedial measures alone.

### 5.4.1   Well Impairment

*Irrigation Wells*

RID operates 32 groundwater production wells within or adjacent to the WVBA (Figure 3). These wells are not impaired today, as they are currently fit for their current irrigation use without treating for COCs. Future impairment of RID wells is possible. The ROs establish future drinking water use as reasonably foreseeable. If changes of use occur before declining contaminant levels render the water fit for drinking water use without treating for COCs, and RID has legal authorization to deliver water to third party drinking water providers for potable use, strategies or measures will be needed to provide for the new use.

*City of Phoenix Wells*

The COP has no wells within the WVBA that are either supplying water or are part of the COP's water system (Figure 3), and no existing COP production wells with anticipated production within the next 30 years are located northwest of the WVBA, should regional irrigation pumping cease and the overall groundwater flow direction shift to a more northwest flow direction.



*SRP Wells*

The SRP has no wells within the WVBA plume boundary. However, there are numerous SRP wells northwest of the WVBA (Figure 3). Should regional pumping within and adjacent to the WVBA be significantly reduced or cease altogether, a rise in the water table and associated shift in groundwater flow direction from westerly to a more northwesterly direction is anticipated based on historical groundwater flow directions and modeling results.

*City of Tolleson*

The COT currently has no wells within the WVBA (Figure 3); however, the COT plans to construct five new wells west of 75th Avenue during the next 3 to 10 years. Three new wells are currently planned to be located in an east to west line along the southwest corner of 83rd Avenue and Interstate 10; the fourth and fifth new wells are currently planned to be located on the northwest corner of 75th Avenue and W. Buckeye Road and at 104th Avenue and Cowden Road, respectively. The anticipated total depth of each new well will be 700 feet bgs, and screened from 525 to 700 feet bgs, which is generally below the current contamination zone within the WVBA. Anticipated individual well production rates are a minimum of one million gallons per day (approximately 700 gpm) (COT, 2014).

*Private Water Wells*

Private wells identified within the WVBA during the Land and Water Use study (Terranext, 2012b) are discussed in Section 3.2.1. Should it become impaired, a private well would be replaced with potable water by connecting the property to the COP municipal distribution system.

**5.4.2   Base Remedial Measures**

This section provides a discussion of base remedial measures created for costing purposes and to provide a starting point for consultation with an affected water provider. These base measures will be modified as needed to address an affected well or provide a water source. Measures adopted in the short-term may require little modification. Measures adopted in the more distant future may be modified based on technologies and approaches available at that time.

For costing purposes only, a unit scope of work was assumed for remedial measures such as well deepening, well replacement, and well modification. For example, remedial measures may include:

- Replacing a UAU production well to outside the WVBA boundary;
- Replacing a UAU production well with a new, collocated LAU well;
- Deepening a UAU production well and completing it in the LAU; and
- Modifying an existing production well completed across the UAU, MAU, and LAU, and completing it in the LAU only.

For each scenario, one unit scope of work and cost was developed for use in the remedial alternatives. For simplicity, existing wells were assumed to be completed with 20-inch diameter casing, which is typical for irrigation wells in the area. The actual scope of work would be modified on a well-by-well basis, as needed, during implementation, and the wells would be designed and constructed to the water provider's specifications. The table below provides the assumptions used for each of these well measure scenarios for costing purposes only.



| Well Measures Scenario | Total Depth of Original UAU Well (feet bgs) | Casing Diameter of Original UAU Well (Inches) | Total Depth (feet bgs)[1] | Screen/Perforated Interval (feet bgs) | Sealed Interval (feet bgs) | Casing Information | Screen or Perforation Method |
|---|---|---|---|---|---|---|---|
| New replacement well in UAU | N/A | N/A | 500 | 150 - 500 | 0 - 150 | 20-inch diameter HSLA steel casing | HSLA louvered screen |
| New replacement well in LAU | N/A | N/A | 1500 | 1000 - 1500 | 0 - 1000 | 20-inch diameter HSLA steel casing | HSLA louvered screen |
| Deepen existing UAU well and convert to a LAU well | 500 | 20 | 1500 | 1000 - 1500 | 0 - 1000 | 14-inch diameter HSLA steel casing | HSLA louvered screen |
| Modify existing UAU/LAU well and convert to LAU well | 1500 | 20 | 1500 | 1000 - 1500 | 0 - 1000 | 14-inch diameter LCS steel casing | Mill slot perforated casing |

Notes:
(1): The assumed UAU well total depth of 500 feet is generally consistent with other UAU production wells in the vicinity of WVBA. The LAU total depth of 1,500 feet is consistent with APS production wells in the LAU and the proposed COP LAU production wells in the Western Canal Well Field.
N/A = Not applicable.
bgs = Below ground surface.
HSLA = High strength low alloy steel.
LSC = Low carbon steel.

Production capacity must be maintained for wells that are replaced, deepened, or modified. While the production capacity of a replacement LAU well can only be determined during drilling and subsequent testing of the completed well, for reference, the four proposed COP LAU production wells within the Western Canal Well Field, with a screened interval of 1,000 to 1,500 feet bgs, are anticipated to produce 3,000 AFY per well, or approximately 1,800 gpm per well assuming continuous year-round pumping.

While the conceptual well designs described below are anticipated to yield reasonable production, the actual well yields of new, deepened, or modified well(s) can only be determined by testing the completed well. Many of the existing irrigation wells in the vicinity of the WVBA are also relatively old and have not been upgraded. Potential excessive well casing corrosion, offset casing joints, or generally poor well conditions may not allow for well deepening or modification.

The following considerations apply to each of the remedial well measures described below:

- The water provider needs to be kept whole regarding both quantity and quality of water; and

- The scope of work, well design, and well construction details were prepared for costing purposes only. During implementation, the well will be designed and constructed in accordance with the water provider's specifications.

*New Replacement Well In UAU*

An impaired UAU production well could be replaced with a new UAU well located outside of the WVBA plume boundary if acceptable to the water provider and assuming land is available. The new



replacement well would need to be properly located adjacent to the water provider's existing conveyance system to minimize both the need for additional pipeline and operational disruptions, and would need to conform to ADWR well spacing requirements.

The impaired well would be properly abandoned using conventional techniques in accordance with ADWR regulations. Prior to abandonment, the existing pump and associated downhole piping would be removed and a video log of the well would be performed to assess the condition of the well casing and perforations prior to abandonment. Mechanical brushing to remove corrosion from well perforations would be performed, followed by pressure grouting from the bottom of the well to surface using a tremie pipe.

If the existing well lacks an annular seal, the original well casing will need to be perforated and pressure grouted to the surface. If the video-logging indicates that the original well casing is sufficiently sound, a mills-knife technique will be used to perforate the original casing and a rig-mounted tremie pipe used to emplace cement grout under pressure to form a seal between the casing and the formation from total depth to the surface. The top 10 feet of the casing would be removed and the remaining casing and borehole filled with a cement grout plug.

The new replacement well would be drilled by an Arizona-licensed drilling contractor using conventional drilling methods. A 28-inch diameter borehole would be advanced to approximately 500 feet bgs and the well constructed using 20-inch diameter HSLA steel casing with a HSLA louvered well screen from 150 to 500 feet bgs. Annular materials would be emplaced using a tremie pipe, and would consist of a gravel filter pack placed around the well screen, a bentonite seal above the top of the screen, and a neat cement or cement grout seal to surface.

*New Replacement Well In LAU*

An impaired UAU production well could be replaced with a new, collocated well completed in the LAU if acceptable to the water provider. The impaired well would be properly abandoned as described above. The new replacement well would be drilled by an Arizona-licensed drilling contractor using conventional drilling methods.

If the LAU replacement well is located within the WVBA, to eliminate the potential for cross-contamination during drilling, a minimum 36-inch diameter borehole would be drilled to a depth of 500 feet bgs and a minimum 30-inch diameter steel isolation casing grouted into place from the bottom of the borehole to surface. For costing purposes, a 28-inch diameter borehole would then be advanced from 500 feet to 1,500 feet bgs and the well built with 20-inch diameter, HSLA steel casing with a louvered well screen from 1,000 to 1,500 feet bgs. Annular materials would be emplaced using a tremie pipe, and would consist of a gravel filter pack placed around the well screen, a bentonite seal above the top of the screen, and a neat cement or cement grout seal to surface. The UAU isolation casing would not need to be installed for a UAU production well located outside of the WVBA and not yet impaired.

Vertical migration of impacted UAU groundwater resulting from operating a LAU production well is not anticipated, as the UAU and LAU aquifers appear to be isolated by the relatively thick, fine-grained MAU. The results of the Phase I groundwater modeling work[7] indicated that simulated pumping within

---

[7]  Described "West Van Buren Study Area: Univar Groundwater Flow Model Update" prepared by Brown and Caldwell on behalf of Univar USA Inc. and dated June 2014.



the LAU had little to no impact on heads within the UAU. Particle tracking was also used to further evaluate the effects of LAU pumping on the UAU. The Phase I model results showed that particles placed in the UAU showed no vertical migration over a period of 30 years for a simulation that included pumping only in the LAU. The lack of detected VOC concentrations in the APS Central Phoenix Power Plant LAU production wells following many years of operation also indicate the lack of vertical contaminant migration from the UAU to the LAU under these pumping conditions.

### Deepen Existing UAU Well and Convert to a LAU Well

An impaired UAU production well could be deepened and converted into a well screened solely within the LAU, in consultation with the water provider. Prior to the well deepening, the existing vertical turbine pump and associated downhole piping would be removed and a video log of the well performed to assess the condition of the well casing and perforations. If the existing well lacks an annular seal, the original well casing would need to be perforated and pressure grouted to form a seal between the casing and the formation. If the video-logging indicates that the original well casing is sufficiently sound, a mills-knife technique would be used to perforate the original casing and tremie pipe used to emplace a minimum 50 foot grout plug which would then be drilled through during the well deepening.

The existing UAU well would be deepened by an Arizona-licensed drilling contractor using conventional drilling methods. A nominal 18-inch diameter drill bit would be lowered into the existing well casing and a borehole advanced from the bottom of the well to 1,500 feet bgs. A 14-inch diameter, HSLA steel casing would be installed within the existing 20-inch well casing and borehole.

The bottom 500 feet of the casing would be louvered for a well screen interval of 1,000 to 1,500 feet bgs. Annular materials would be emplaced using a tremie pipe, and would consist of a gravel filter pack placed around the well perforations, a bentonite seal above the top of the perforations, and a neat cement or cement grout seal to surface.

### Modify an Existing Well Completed Across the UAU, MAU, and LAU and Covert to a LAU Well

An impaired production well with a long perforated interval completed across the UAU, MAU, and LAU could be modified and converted into a well completed solely within the LAU in consultation with the water provider. Prior to modifying the well, the existing vertical turbine pump and associated downhole piping would be removed and a video log of the well performed to assess the condition of the well casing and perforations.

The existing well would be modified by installing a 14-inch diameter, low carbon steel casing with mill slotted perforations within the existing 20-inch well casing. The screened interval would be 1,000 to 1,500 feet bgs. Annular materials would be emplaced between the 14- and 20-inch casings using a tremie pipe, and would consist of a gravel filter pack placed around the well perforations, a bentonite seal above the top of the perforations, and neat cement or cement grout seal to surface. If the existing well lacks an annular seal, the original well casing would need to be perforated and pressure grouted from 1,000 feet to the surface to form a seal between the casing and the formation, as necessary based on the original well construction and to isolate the modified well in the LAU.

### Well-Head Treatment

An impaired production well could be addressed with a well-head treatment system as described in Section 5.3.2 above, assuming sufficient land is available to house the treatment system. The system



would be designed around the anticipated production volumes and VOC concentrations in the extracted groundwater. Additional pump bowls or pump horsepower may also be required to off-set head losses through the treatment system and associated reduction in production capacity.

*Measures for RID Potable Water Deliveries*

If RID is authorized in the reasonably foreseeable future to deliver water to third party drinking water providers for potable use, measures may be needed to provide for that use. To determine whether measures may be needed, a mass balance approach was used to estimate TCE and PCE concentrations at the end of the Salt Canal, the end of the Main Canal, and the confluence of the two canals. To the extent reclaimed wastewater from the COP's 23rd Avenue WWTP is conveyed via the Main Canal, the Main Canal cannot be used for delivering drinking water. Any use of the Main Canal for deliveries of water to drinking water providers could only begin after effluent discharges cease.

Salt Canal: The Salt Canal is an enclosed, underground gravity pipeline for nearly its entire length, except for two segments (300 feet and 1,100 feet long) between 75th Avenue and 83rd Avenue. Groundwater from production wells RID-105 through RID-114 discharge to the Salt Canal. Using the proposed pumping rates in the RID Modified Early Response Action (MERA) Work Plan (Synergy, 2012) along with 2013 groundwater samples available from each well (or most recent if not sampled in 2013), an estimate of the TCE and PCE concentration at the end of the Salt Canal was calculated assuming no loss of mass through volatilization; see Table 4. Based on the mass balance, the TCE and PCE concentrations at the end of the Salt Canal were calculated at 9.5 $\mu$g/L and 5.1 $\mu$g/L, respectively. The 2011 Salt Canal sample[8] contained similar concentrations (TCE and PCE concentrations at 11.8 $\mu$g/L and 4.6 $\mu$g/L, respectively).

Water in the Salt Canal may meet AWQS and be suitable for delivery to third party drinking water providers at the time RID begins any such deliveries. If it does not, well RID-114 could be replaced as a contingent well measure as part of this FS should RID employ only wells on the Salt Canal for drinking water supply end use. The highest VOC concentrations in RID wells along the Salt Canal are observed in well RID-114. If this well were addressed with a remedial measure such as well replacement, and the VOC concentrations assumed to be non-detect in the replacement well, the blended TCE and PCE concentrations at the end of the Salt Canal would calculate to 3.9 $\mu$g/L and 4.9 $\mu$g/L, respectively (Table 5). Both of these concentrations are less than their respective AWQS.

The groundwater modeling results, and the water quality data at well RID-111R[9], indicate that a new well located between wells RID-110 and RID-111R would derive its groundwater primarily from an area north of the WVBA. A new replacement well could also potentially be located on the Salt Canal outside of the WVBA, east of well RID-105.

Main Canal: A similar evaluation was performed for the Main Canal, which is an open, lined canal beginning at 19th Avenue and extending beyond the WVBA boundary in western Phoenix. Groundwater from production wells RID-83 through RID-104 discharge to the Main Canal. Based on the mass balance, and conservatively assuming no VOC mass loss through volatilization, the TCE and PCE concentrations at the end of the Main Canal were calculated at 5.5 $\mu$g/L and 2.5 $\mu$g/L,

---

[8] This sample represents the most recent available surface water sample collected prior to RID well head treatment conditions.

[9] The 2013 sample from RID-111R contained trace concentrations of TCE and PCE (0.5 $\mu$g/L and 0.63 $\mu$g/L, respectively).


HALEY&
ALDRICH

respectively (Table 4). The 2011 Main Canal sample contained similar concentrations (TCE and PCE at 2.3 $\mu$g/L and 1.19 $\mu$g/L).

Downstream of the Salt Canal and Main Canal confluence: The calculated TCE and PCE concentrations downstream of the confluence of the Salt Canal and the Main Canal were 6.5 $\mu$g/L and 3.2 $\mu$g/L, respectively (Table 4). The 2011 Main Canal sample at 83rd Avenue (downstream of the confluence) contained TCE and PCE concentrations of 5.57 $\mu$g/L and 2.6 $\mu$g/L[10].

The results of this analysis indicate that water quality downstream of the confluence of the Salt Canal and Main Canal would be either slightly above or below the AWQS for TCE and PCE, respectively, without well head treatment or other well modifications, based on the most recent concentration data. The additional 60,000 AFY of discharge to the Main Canal from the 18 other RID wells within the SRRD would further reduce TCE and PCE concentrations within the Main Canal prior to delivery west of Phoenix. Continued VOC concentration declines over time within the WVBA would also result in lower blended VOC concentrations in the future. As stated above, any use of the Main Canal for deliveries of water to drinking water providers could only begin after effluent discharges from the COP's 23rd Avenue WWTP cease.

*Replacement of Water Supplies*

Replacement water supplies are currently difficult to secure. Water supplied by the Central Arizona Project (CAP) is fully allocated and excess CAP water is no longer available. In fact, shortages are currently being predicted for CAP. Although some Arizona Indian communities have CAP water available for lease, most of that water is only available for short duration. So for the near term, replacing impaired water supplies with these sources was not considered further as a potential remedial measure.

Treated wastewater supplies are also currently fully allocated. But if new wastewater treatment plants are constructed in this area, or current arrangements for reclaimed water expire, new reclaimed water supplies may become available. If impairments of water uses occur in the future, the availability of reclaimed water as a replacement water supply may be considered. Improved treatment technologies and changing legal restrictions may make use of reclaimed water viable for additional uses in the future.

Ongoing remediation projects in the Phoenix region require pumping of groundwater and treatment of that water to AWQS. It is uncertain whether any of those treated water supplies might serve as a replacement supply for impaired uses in the WVBA. In addition, it is uncertain whether there may be additional remediation projects in the future that would produce suitable treated water supplies.

Future impairments would employ tools available at that time. Because the availability of replacement water supplies will likely vary over time, the availability of suitable supplies will be considered as part of the consultation with each water provider at the time measures are selected.

The only water supply replacement measure retained for this FS was replacing a private water well supply by connecting the property to the COP municipal distribution system

---

[10] Although the 2011 sample data suggests it was not, it is unknown whether the COP 23rd Avenue WWTP was discharging to the Main Canal during the time of sample collection.



*Recommended Remedial Measures*

Because many of the existing production wells in the vicinity of the WVBA are relatively old, have not been upgraded, and may be in poor downhole condition, deepening or modifying an existing UAU production well as a remedial measure is not recommended. Replacing water supplies, except for impaired private water wells, was also not considered further as a potential remedial measure due to the reasons described above. Well-head treatment as a remedial measure for impaired, existing production wells is not recommended due to the need for costly long-term O&M of the treatment systems.

Remedial measures retained for developing the remedial alternatives include: (1) replacing an impaired UAU well with a UAU production well located outside of the plume boundary; (2) replacing an impaired UAU well with a collocated well screened in the LAU only; (3) a groundwater blending approach to meet AWQS at the point of use; and (4) for an impaired private water well, connecting the property to the COP municipal distribution system.



## 6.   REMEDIAL ALTERNATIVES DEVELOPMENT

Using the RI Report, the SCM, and the current conditions and assumptions described in Section 4, three remedial alternatives were developed. As provided under WQARF, these alternatives are identified as a Less Aggressive Remedy, a Reference Remedy, and a More Aggressive Remedy. Each remedial alternative is capable of achieving the ROs developed by ADEQ. Each alternative is also consistent with information submitted by drinking water and irrigation water providers regarding their current and reasonably foreseeable water uses. Given the planning horizon of the remedial alternatives, potential contingent remedial measures were developed for each remedial alternative to accommodate potential future changes in base conditions (for instance, changes in end use of impacted groundwater or alteration of local groundwater gradients). This section describes the overall remedial strategies, remedial measures, and contingencies used to develop the remedial alternatives. A summary of the remedial alternatives is provided in Table 6. The modeling work used to develop the three remedial alternatives is detailed in Appendix C.

### 6.1   Baseline Site Conditions, Including Pumping, Relevant to All Remedial Alternatives

As discussed in Section 3.2.1, groundwater within the WVBA is used primarily for agricultural purposes, with some industrial use. RID has approximately 32 irrigation wells located within or adjacent to the WVBA. Although those wells are presently used exclusively for irrigation, RID's water provider plan states that RID may seek to pump those wells to supply drinking water (assuming satisfaction of a variety of legal requirements that are outside the scope of this alternatives analysis). The SRP and COP also have wells adjacent to the WVBA. The COP's water plan envisions groundwater within the WVBA will someday be a necessary component of the COP's drought supply, and that the SRP is likely to serve a role in delivering the groundwater. To date, the COP has declined to pump the impacted aquifer, deferring its use until necessary treatment costs are mitigated or eliminated through natural attenuation of COCs.

The Land and Water Use study (Terranext, 2012b) also identified a number of private wells within the plume area. Most of these private wells are used for irrigation or livestock; two of the ten private wells sampled contained COCs above the AWQS. Although the private wells sampled have water quality suitable for the current uses according to ADEQ, for costing purposes, it was assumed that up to five private water wells could become impaired in the future and require well measures consisting of connecting the well(s) owners' property to the COP municipal water distribution system. The ROs also require the remedy to address any impaired private wells outside the WVBA. Although there are no currently impaired private wells outside the WVBA, for costing purposes it was assumed that up to five private wells outside the plume area could become impaired and require well measures. Again, those measures would consist of connecting the well(s) owners' property to the COP municipal water distribution system.

The current regional irrigation pumping conditions represent the primary hydraulic influence (base conditions) on groundwater within the WVBA, and accordingly, must be factored into the FS alternatives development. As discussed further below, it is appropriate to identify potential contingent remedial measures for future evaluation in the event that hydraulic conditions change. This section provides a discussion of these base conditions and a prediction of the potential change to those conditions based on the assumptions that: (1) RID will continue pumping at current rates through the year 2025; and (2) certain SRP production wells will increase in total aggregate production from 25,000 AFY in 2012 to 35,000 AFY in 2041.



Both groundwater elevation and water quality monitoring data plus the groundwater modeling results demonstrate that the existing pumping conditions result in overall hydraulic containment of the current WVBA plume. To evaluate whether hydraulic containment of the WVBA plume will continue to be the case in the future, the WVB 30-Year Future groundwater model described in Appendix C was used to evaluate the efficacy of hydraulic containment under base pumping conditions from model years 2012 through 2025. The model output shown in Figures 4 through 6 provides the following information:

- Modeled head contours for model layer 1 for September of model years 2015, 2020, and 2025 (i.e., just before the end of the irrigation season at each year); and

- Reverse particle tracks for particles placed 10 percent of the model layer thickness off the bottoms of model layers 2 and 3, representing 14 years of particle movement from model year 2012 through 2025.

The simulated heads indicate that the effect of simultaneously pumping regional irrigation wells within and adjacent to the WVBA creates a hydraulic trough, or sink. The hydraulic gradient depicted in the model output is relatively steep in the eastern WVBA, with an overall flattening of the gradient in the central WVBA. This is consistent with historical groundwater monitoring observations. The overall groundwater flow direction is primarily from east to west along the central axis of the WVBA plume. The effects of recharge along the Salt River and irrigation pumping result in northwesterly groundwater flow in the south-central and southeast WVBA. The southwesterly flow component along the north-central WVBA is the result of the hydraulic trough that forms across the WVBA during irrigation pumping. In general, the overall shape, location, and orientation of the WVBA plume are consistent with both the observed and simulated hydraulic gradients and groundwater flow directions.

The results indicate that under these model conditions, the capture zones of the RID irrigation wells encompass the current plume footprint. Although some gaps in interior capture zones exist within the model output, the groundwater monitoring data indicate that actual plume containment under current conditions is sufficient to control plume migration at concentrations above the AWQS, based on the historical data from UAU1 perimeter monitoring wells to the west-northwest of the WVBA. The modeling results also suggest that many of the southern row of RID wells[11] derive their water production primarily from the aquifer south of the WVBA, consistent with the historically trace or non-detect COC concentrations observed in these wells.

The ADEQ and facility-specific monitoring data support the results of the model simulations. Time-series graphs of COC concentrations for UAU1 perimeter monitoring wells demonstrate that the overall lateral extent of the plume is stable, and in some areas declining under current conditions. The stability of the plume footprint is likely primarily the result of hydraulic control from regional irrigation pumping, as the retardation capacity of the UAU1 is likely limited. Because the plume is already contained under current pumping conditions, remedial extraction wells were considered for the Reference Remedy and More Aggressive Remedy to provide for additional COC mass removal within the plume core, with the objective of reducing the potential future need to implement contingent remedial measures.

With ADEQ-directed source control measures and continued RID extraction, contaminant concentrations will continue to decrease over time and could potentially fall below the AWQS before future potable water uses become viable. Any extraction wells included in remedial alternatives should be evaluated to ensure that the remedial benefit of extraction is balanced with the value of the resource

---

[11] RID-85 through RID-88, RID-90, RID-91, RID-93, RID-94, RID-97, RID-98, RID-101, and RID-103.



(i.e., groundwater will be removed from storage only as necessary to achieve the ROs and the value of leaving groundwater in storage within the aquifer for potential future use will be considered).

As noted above, it was assumed that ADEQ will require the timely elimination or control of continuing sources of contamination to groundwater. COC source control, along with current base pumping conditions and other potential remedial pumping as part of this FS, will be determining factors for the size and concentration of the plume over time.

## 6.2     Less Aggressive Remedy

One remedial alternative evaluated in the FS, the Less Aggressive Remedy, proposes less aggressive initial groundwater remediation, relying on a groundwater monitoring program, MNA, and more contingent remedial measures in the event that wells (public or private) located within or outside of the WVBA are threatened to be rendered unfit for their current and reasonably foreseeable end uses as a result of migration of groundwater contamination within or from the WVBA. While the Less Aggressive Remedy appears capable of meeting ROs, it would do so over a longer period of time and may require more contingent measures.

### 6.2.1    Base Components of the Less Aggressive Remedy

*Groundwater Monitoring/MNA*

The major base component of the Less Aggressive Remedy would be groundwater monitoring within the WVBA, including MNA parameters. The monitoring program would take over the semiannual ADEQ sampling program for the existing network of 68 UAU1, 27 UAU2, and 6 MAU monitoring wells for COC analysis, and the total chromium and filtered total chromium analyses at select wells, using EPA Methods 8260B and 6010B, respectively. Table 3 provides details on the groundwater monitoring program. 1,4-Dioxane would also be included in the EPA Method 8260B list. A select subset of monitoring wells within the interior of the plume would also be analyzed for MNA parameters once per year. Groundwater would be sampled using the no-purge Hydrasleeve™ method to minimize the need to containerize and dispose of purged groundwater. Consistent with the current ADEQ monitoring program, water level measurements would be taken from approximately 120 monitoring wells semiannually.

The monitoring program would provide data on: (1) the nature and extent of the WVBA plume; (2) the overall stability of the plume's lateral and vertical extent; (3) COC concentration trends over time; and (4) intrinsic MNA processes within the UAU aquifer. Water level data would also be used to evaluate seasonal hydraulic gradients, long-term water level trends, and aquifer response to changes in regional pumping conditions. The overall stability of the UAU2 plume extent over time would also be further evaluated using data from UAU2 monitoring wells.

*Remedial Measures for Currently Impaired Private Wells, If Any*

A second component of the Less Aggressive Remedy would be replacement of the water supply to any impaired private wells that become unfit for their end use as a result of WVBA contamination. Such well properties would be connected to the COP municipal water distribution system at the appropriate time.



**6.2.2   Contingencies Associated With the Less Aggressive Remedy**

*Summary of Potential Contingent Measures*

The Less Aggressive Remedy would also establish timely contingent remedial measures, as necessary and appropriate based upon evolving site conditions. These potential contingent measures and the triggers for evaluating and/or implementing these potential contingent measures are described further below.

- **COP**: The impacted WVBA aquifer is identified by the COP as a potential future source of drinking water, although the COP does not pump the aquifer for such purposes at present. If the COP is required to pump the UAU aquifer in the WVBA in the future prior to the time COCs have been reduced to AWQS, then a contingent measure such as well-head treatment, well relocation, or special well design and construction features may be appropriate.

- **SRP**: The SRP maintains a number of wells near the WVBA, none of them presently impacted above AWQS. In the event that the SRP wells become impaired for their intended use as a result of WVBA contamination, then a contingent measure such as well replacement, or special well design and construction features may be appropriate.

- **RID**: To the extent RID constructs the necessary infrastructure and obtains the legal authority[12] to sell groundwater to other drinking water providers, contingent measures may be necessary to ensure that impacted groundwater meets AWQS at the point of delivery to third party potable water providers. One contingent measure would be use of a groundwater blending approach, as described in Section 5.4.2, assuming effluent is not conveyed in the Main Canal. If RID should only use wells along the Salt Canal for potable use, a second possible contingent measure would be the replacement of well RID-114, which contains relatively higher COC concentrations, prior to initiating a blending approach. These contingent well measures may be used if RID is permitted to deliver water to potable water providers before contaminant concentrations have declined below AWQS, and as a result RID wells are unsuitable for potable use without measures. While the ROs do not clarify that RID will not directly deliver potable water to lands currently served by them, RID explained in its response to the Water Provider Questionnaire that it has no plans to itself become a potable water provider. For that reason, it is not necessary to provide a contingency for that future use scenario.

- **Other Downgradient Wells**: Should any private wells become unfit for their end use in the future as a result of WVBA contamination, then a contingent measure such as connecting the property to the COP municipal water distribution system might be necessary and appropriate. Should other downgradient COP, SRP, or COT drinking water supply wells become unfit for use without treatment in the future, then a contingent measure such as well replacement might be necessary.

- **Modification of Existing Monitor Well Network**: If routine groundwater monitoring indicates a significant change in hydraulic and/or water quality conditions, as further described below, then the existing monitor well network may be modified.

Because the Less Aggressive Remedy involves less active treatment of currently impaired groundwater, a conservative approach, taking into account the trend analysis discussed in Section 3.7.4 of Appendix

---

[12] A.R.S. Title 48, Chapter 17 or 19; A.R.S. § 45-497, § 45-492 (C), § 45-497 (B), and § 45-1001.



A, was used to predict the WVBA plume footprint in 2026 (when RID is assumed to cease pumping within the SRRD). This approach was then followed by groundwater flow modeling to develop specific potential contingent measures, and which contingent measures would be more fully evaluated when trigger conditions (described below) are met.

The groundwater flow model was used to help determine where groundwater originating within the estimated 2026 plume boundary might migrate over time should RID cease pumping within the SRRD. It was also used to help identify which downgradient production wells could potentially become impaired and require remedial measures in the future.

Figures 7 through 9 show the changes in simulated water levels and hydraulic gradients over time post-2025. The modeling results indicate that should RID stop pumping within the SRRD, groundwater levels within the central portion of the WVBA (i.e., model target wells 202 and 203)[13] may rise on the order of 85 feet over a 16-year time period (see graph below). As water levels rise, the overall groundwater flow direction within the WVBA is predicted to shift more towards the west-northwest. These figures also show reverse particle tracks[14] with 16 years of particle movement (2026 through 2041) for select SRP and COT production wells.



---

[13] See Figure 1 of "West Van Buren Area Feasibility Study Alternatives Modeling" memo (**Appendix C**) for target well locations within the WVBA.
[14] Particles were placed 10 percent of the model layer thickness off the bottoms of model layers 2 and 3.



A groundwater tracer approach was also used to track groundwater that originates within the greater than 10 $\mu$g/L contours for the estimated combined PCE/TCE 2026 plume within the WVBA boundary. Within the model, the groundwater tracer, with a uniform, starting normalized value of one (1) within areas greater than 10 $\mu$g/L of the estimated 2026 plume footprint[15] was simulated as a solute using the modeling program MT3D. The model used the total variation diminishing scheme to simulate future groundwater movement by advection with dilution, but effectively no dispersion, sorption, or degradation; in essence, this modeling approach simulates as close as practical the movement of groundwater. The groundwater tracer is dissolved-phase only with no ongoing sources of tracer included in the simulations. Figures 7 through 9 show the post-2025 groundwater tracer distribution within the UAU1 from 2026 through the end of the model in 2041. The tracer distribution shown in the figures in light blue represents groundwater considered above an effective value of 5 $\mu$g/L. The tracer distribution over time indicates that SRP production wells 55-608388 and 55-608384, located northwest of the WVBA, have the potential to become impaired under this contingency scenario. The contingent sentinel well monitoring network described below would be used to evaluate the post-2025 plume extent over time to determine if or when contingent well measures may be needed.

Figures 10 through 12 show the post-2025 groundwater tracer distribution over time within the UAU2[16]. The results suggest that the groundwater tracer within the UAU2 plume footprint would not move a significant distance over time under these model conditions, even considering the conservative nature of the tracer, primarily due to the relatively low hydraulic conductivities within the UAU2 (compared to the UAU1 hydraulic conductivities). These results are consistent with observed data from the existing UAU2 monitoring well network, as the UAU2 plume does not appear to have moved a significant distance between 2008 and 2013, and UAU2 COC concentrations, at least along the main axis of the UAU plume, have been relatively stable over time despite regional irrigation pumping (see Figures A-18 and A-23 in Appendix A).

***Potential Remedial Measures for Impaired or Threatened Wells***

**RID Production Wells**

The results of the Human Health Risk Assessment (HHRA; Appendix D) indicate that water from RID production wells is currently safe for its current use without remedial measures. The trigger for a contingency to address groundwater pumped by RID would be the imminent delivery of water by RID to third party potable water providers.

To the extent reclaimed wastewater from the COP's 23rd Avenue WWTP is conveyed via the Main Canal, the Main Canal cannot be used for delivering drinking water. As described in Section 5, assuming there is no effluent being conveyed in the Main Canal, a blending approach could be employed, consisting of blending extracted groundwater from RID wells at current rates within and adjacent to the WVBA. Mass balance calculations indicate that, under current RID pumping conditions, and using the most recent available water quality data from RID wells, blended water at the confluence of the Salt Canal and Main Canal would be below the AWQS for PCE and slightly above the AWQS for TCE. Blending additional water from other RID wells located within the SRRD and RID wells west of the Aqua Fria River would serve to reduce concentrations to below regulatory thresholds in the

---

[15] Greater than 10 $\mu$g/L was used to only include those areas with starting concentrations high enough to potentially impair a downgradient production well. The small area above 10 $\mu$g/L PCE in the western portion of WVBA was also excluded, since this area is limited to only one well (AVB75-01).

[16] Because of the overall stable concentration trends within the UAU2 monitoring wells, the 2013 UAU2 plume footprint was used as the starting 2026 tracer distribution for illustrative purposes.


HALEY&
ALDRICH

blended water prior to delivery in the west valley. Continued COC concentration declines over time within the WVBA would also result in lower concentrations in the future.

Mass balance calculations also show that the AWQS would be met at the end of the Salt Canal if well RID-114 is replaced outside of the plume boundary (Table 5). Hence, if RID uses only the Salt Canal wells for delivery to potable water providers, as an additional remedial measure, well RID-114 could be replaced at another location along the Salt Canal, outside of the plume boundary. Modeling results and the water quality data set suggest that a replacement well located between wells RID-110 and RID-111R, or west of well RID-105, would likely produce suitable groundwater quality.

## SRP Production Wells

As noted above, the groundwater modeling results indicate that two SRP wells (55-608384 and 55-608388) may become at risk should RID cease pumping within the SRRD. To account for uncertainties within the model and in actual future hydrogeologic conditions, remedial measures at two additional SRP wells (for a total of four wells) were included for costing purposes under the Less Aggressive alternative.

Based on the discussion of remedial measures in Section 5, the most cost-effective and reliable contingent measure for these SRP wells is to replace them with a collocated production well of equivalent capacity completed solely in the LAU. This would eliminate the need for operating a long-term well-head treatment system at each well and avoid potential problems related to: (1) deepening or modifying the existing SRP wells due to their age and condition; and (2) operational and land access issues associated with relocating wells in some other area within the SRRD. Well-head treatment may not be feasible for another reason. The SRP has stated that some SRP production wells may be connected directly to a municipal distribution system within the SRRD in the reasonably foreseeable future (SRP, 2013) and COP does not allow treated groundwater to discharge directly to COP's distribution system.

If the SRP needs to install a production well within the WVBA in the reasonably foreseeable future and the water quality due to COC contamination is not fit for its intended use at that time, contingent remedial measures, evaluated in consultation with the SRP, would be assessed. Future planned production wells should be located and constructed to mitigate any possible future impact.

## COP Production Wells

The groundwater modeling results indicate that no existing COP production wells with anticipated production within the next 30 years would be impaired under the Less Aggressive contingency.

If the COP needs to install a production well within the WVBA in the reasonably foreseeable future and the water quality due to COC contamination is not fit for its intended use at that time, contingent remedial measures, evaluated in consultation with the COP would be assessed. Future planned production wells should be located and constructed to mitigate any possible future impact.

## COT Production Wells

Based on the groundwater modeling results, none of the existing or proposed future COT production wells would likely become impaired under the Less Aggressive contingency. However, to reduce uncertainty, consultation with the COT is proposed regarding the proposed location of future wells.



Future planned production wells COT-2, COT-3, and COT-4 should be located and constructed to mitigate any possible future impact, and locating these future wells further south-southwest to prevent potential future impairment should be considered.

**Private Water Wells**

For a private water well outside of the WVBA, the recommended contingent remedial measure is to connect the well owner's property to the COP municipal distribution system should the well become impaired. A private well inventory has been completed within the WVBA (Terranext, 2012b). This inventory would need to be expanded to the area west-northwest of the WVBA under the Less Aggressive contingency. For costing purposes, it was assumed that up to five private wells could become impaired and need remedial measures, consistent with the costing assumption for private wells within the WVBA.

*Triggers for Contingent Remedial Measures*

The need to replace downgradient current or future production wells, including SRP wells 55-608384 and 55-608388 (or other SRP wells as necessary), with LAU production wells would be triggered if an increasing COC concentration trend above the AWQS is observed in the upgradient sentinel wells or if COC concentrations in the SRP well are at levels unsuitable for use at the time. Determining an increasing COC concentration trend would be based upon a statistically significant hydrogeologic evaluation that would estimate the COC concentration in a sentinel well (constructed to monitor the entire UAU1 saturated interval) that would result in an exceedance of an AWQS in a downgradient production well sometime in the future. This evaluation would be conducted using a minimum of four consecutive monitoring events, and would calculate COC travel times from the sentinel well to the downgradient production well and the anticipated reduction in COC concentration that would occur as a result of dispersion, dilution, and degradation. The well construction of the downgradient production well will also be considered, including the screened intervals and the hydrologic units that supply water to the well. Mann-Kendall statistical tests would be conducted on the monitoring data set and professional judgment used to trigger contingent remedial measures in a timely manner to protect downgradient production wells.

*Contingent Sentinel Well Monitoring*

Under the Less Aggressive contingency, if the existing monitoring program was determined to be inadequate in the event that RID stops pumping in 2026 and groundwater flow direction in the WVBA system changes, the following seven existing UAU1 monitoring wells located along the northern and western perimeter of the WVBA, along with five new sentinel wells located to the west-northwest of the WVBA (drilled and constructed in 2026), would be monitored for COCs quarterly starting in 2026 for the first year and then an appropriate frequency thereafter. For costing purposes, quarterly monitoring is assumed for the sentinel wells; however, monitoring frequencies and duration may be adjusted based on observed results.

- AVB29-01;
- AVB74-01;
- AVB91-01;
- AVB96-01;



- AVB112-01;
- AVB129-01; and
- AVB138-01.

If operating, the following eleven SRP wells located west and northwest of the WVBA, would also be sampled for COCs during the sentinel monitoring events.

- 55-607727;
- 55-607728;
- 55-607735;
- 55-608358;
- 55-608384;
- 55-608388;
- 55-608389;
- 55-608393;
- 55-608407;
- 55-617100; and
- 55-617112.

The sentinel well locations are shown on Figures 7 through 9. The sentinel well network would be used to monitor COC concentration trends in the area west-northwest of the WVBA, between approximately 51st Avenue and 91st Avenue, to determine if SRP production wells might require remedial measures. The sentinel well locations were chosen to provide a balanced monitoring network that: (1) targets individual SRP production wells to the extent possible; (2) provides sufficient areal coverage west-northwest of the WVBA; and (3) are located within the right-of-way (ROW) of city streets.

### *Trigger for Potential Modification of Monitoring Well Network*

If routine groundwater monitoring indicates a significant change to hydraulic and/or water quality conditions (i.e., COC concentrations increase significantly, groundwater flow directions change, and/or plume migration is more rapid than predicted), a hydrogeologic evaluation and cost benefit analysis would be conducted to assess the need for changes to the existing monitoring well network. The hydrogeologic evaluation would include additional model simulations to determine if the changes in hydraulic and/or water quality conditions would have negative impacts on planned remedial actions and downgradient users, and if additional, unplanned remedial activities are warranted. Remedial activities that may be considered in this analysis include more frequent monitoring and installing an enhanced monitoring network. The cost-benefit analysis would consider whether the proposed actions are reasonable, necessary, cost effective, and technically feasible.

### 6.2.3  Permits

Permits required for the Less Aggressive Remedy are primarily related to drilling and constructing LAU production wells and new sentinel monitoring wells.

HALEY&
ALDRICH

***ADWR***

Each new well would require submittal of an ADWR Notice of Intent form prior to the initiation of drilling and driller's report following well completion. An Arizona-licensed driller would perform the monitoring well and production well installation work, and the new wells would comply with ADWR well construction standards found in A.R.S. §45-594, 45-595, 45-596, and 45-600 of the Groundwater Code.

***COP***

The COP Development Services Department (DSD) would require a Right-of-Way Building Permit for any new sentinel wells located within the COP ROW. This permit requires submittal of an application form, the well design specifications, and applicable fee payment. If drilling operations are sustained continuously for 24 hours a day, the drilling contractor must obtain a 30-day "After Hours Construction" permit through DSD.

### 6.2.4   Advantages and Disadvantages of the Less Aggressive Remedy

The main advantages of the Less Aggressive Remedy include the following:

■   No new extraction wells are included in the remedial alternative, therefore the Less Aggressive Remedy would not remove and/or export additional groundwater from the WVBA (exportation would be inconsistent with the COP's long-term water management plan). Groundwater would remain in storage within the aquifer for potential future use. With ADEQ-directed source control measures and continued irrigation pumping, contaminant concentrations will continue to decrease over time and could potentially fall below the AWQS before future potable water uses are needed under the COP's long-term groundwater management plan.

■   High, long-term power consumption, associated carbon footprint, and costs from new extraction wells, well maintenance, well-head treatment, and conveying extracted groundwater to end users would be avoided.

■   There would be no need to construct long lengths of conveyance piping through busy urban streets with heavy traffic and significant underground utilities, and no disruption to traffic, commerce, or pedestrians during implementation.

■   There would be no need for well-head treatment systems and long-term well-head treatment O&M.

The main disadvantage of the Less Aggressive Remedy is higher uncertainty regarding the scope of the contingent strategies and measures should RID cease pumping within the SRRD in 2026.

### 6.2.5   Uncertainties Associated With the Less Aggressive Remedy

Less Aggressive Remedy uncertainties include the following.

■   As discussed in Section 3.2.1, uncertainties exist regarding: (1) expiration of the 1920 agreement and subsequent supplemental agreements for water production with Carrick-Mangham and RID; (2) RID's authority to move groundwater from within the boundaries of a water provider that has obtained a Designation of Assured Water Supply (in this case the COP) and the potential to negatively affect that Designation; and (3) additional concerns regarding



RID's authority to move groundwater from within the WVBA in the future. These legal issues have not yet been resolved.

■   Production and water quality for a newly completed LAU production well would need to meet the AWQS. While available data indicate that the general mineral water quality in the LAU would likely be of higher quality than the UAU[17], the production capacity of the replacement LAU well can only be determined during drilling and subsequent testing of the completed well. Additional measures may be needed to keep the water provider whole regarding well capacity.

■   The timing and need of potential future COP and/or SRP wells located within the WVBA in the reasonably foreseeable future is uncertain, as is whether the water quality will be fit for its intended use at that time.

■   The fate of the remaining dissolved-phase WVBA plume after 2025 under the Less Aggressive contingency scenario would be an uncertainty. Hydraulic control would no longer be maintained if RID discontinued pumping, and, based on model results, the remaining plume in 2026 (if any) could migrate in a northwesterly direction under the new groundwater hydraulic conditions. The regional scale of the current plume suggests limited retardation of COCs in the UAU1, and while there will be some retardation, dilution, and dispersion that will reduce concentrations at the downgradient plume boundary, the center of the plume's mass may continue to move downgradient until a hydraulic sink such as a production well or well field is reached. COC concentrations above AWQS could migrate beyond the current model boundaries and potentially impair other production wells. The sentinel well monitoring network would be used to evaluate the extent of the post-2025 plume; additional contingent well measures may be needed based on the sentinel well monitoring results.

## 6.3     Reference Remedy

### 6.3.1   Base Components of the Reference Remedy

The Reference Remedy includes the components of the Less Aggressive Remedy, including the contingent measures except as modified below. The Reference Remedy would also include a focused remedial groundwater extraction well (assumed to be 500 gpm) within the core of the plume alongside RID irrigation pumping, with treatment of the extracted groundwater and delivery to RID from 2016 through 2025.

*Focused Plume Core Groundwater Extraction*

The Reference Remedy includes focused groundwater extraction to enhance COC mass removal and reduce COC mass flux at 35th Avenue with the goal of reducing the need for future contingent measures. The additional extraction well would remove additional COC mass from an area of relatively elevated COC concentrations in the UAU1, in addition to some mass removal from the UAU2.

Based on the modeling results, one new groundwater extraction well (EW-2) would be installed at 35th Avenue, north of well RID-95. This location was selected based upon the current concentrations within the plume and hydraulic modeling results. EW-2 would be screened across the UAU1 and UAU2 to

---

[17] For example, in 2013 TDS concentrations in APS West Phoenix Power Plant production wells completed in the LAU ranged from 790 milligrams per liter to 880 milligrams per liter, approximately one-half of those TDS concentrations generally observed in the UAU aquifer (USGS, 2010).



remove additional COC mass from both units (mostly from UAU1, with some COC removal coming from UAU2) during operation. EW-2 would pump at a rate of 500 gpm with pumping likely conducted on a seasonal basis given the proposed RID Main Canal end use, although year-round pumping may be possible under an agreement with RID[18]. Water would be discharged to the RID Main Canal for beneficial reuse. Due to RID's policy regarding third party discharges to its system, the water would require treatment for COCs prior to discharge to the canal despite the HHRA findings that the extracted water would be safe for irrigation use without treatment.

For base costing purposes, it was assumed EW-2 would cease operating at the end of 2025[19], at which time RID may be required to cease pumping within the SRRD. Locating the new extraction well within the higher concentration plume core would increase the efficiency of COC mass removal (relative to total pumping) compared to current conditions. Under current conditions, RID operates 32 irrigation wells within and adjacent to the WVBA at an aggregate pumping rate of about 84,600 gpm (Synergy, 2012). However, most of these wells extract groundwater with relatively low or no detectable COC concentrations, and approximately 75 percent of the TCE mass removed per year results from only four RID wells located within the plume core (RID-89, RID-92, RID-95, and RID-114), which pump a total of 8,600 gpm (Table 7). Operating EW-2 would increase the plume core extraction from 8,600 gpm to 9,100 gpm and remove an estimated additional 70 pounds of TCE and 4 pounds of PCE during the initial year of the remedy (Table 8).

Figures 13 through 15 provide the results of the Reference Remedy scenario modeling for model years 2015, 2020, and 2025. Modeling results indicate that simultaneously pumping EW-2 and RID-95 would effectively capture the COC mass flux at 35th Avenue (Figure 13). Reducing the COC mass flux in this area would likely result in a decline of COC concentrations (particularly TCE) west of 35th Avenue, thereby reducing the need for future contingent measures at downgradient production wells. A comparison of simulated hydraulic heads over time for scenarios with and without the new extraction well indicates that additional drawdown in the closest RID wells induced by EW-2 would be less than 10 feet during the first five years of operation. The modeling results therefore indicate that the EW-2 location would be in accordance with ADWR well spacing/well interference requirements.

The proposed location of EW-2, conveyance piping, and end use are shown on Figure 16. The proposed extraction well location is generally within an industrial area. While sufficient area for the extraction well and well-head treatment system appears to be available based on a review of Google Earth images, the exact well location may need to be adjusted based on availability of land for purchase or lease.

As noted previously, the findings of the HHRA indicate that the extracted water would be suitable for the intended irrigation end use without treatment. However, due to RID's policy regarding third party discharges to its system (RID, 2010b), a well-head LGAC treatment system capable of treating the anticipated 500 gpm would be required for the extraction well. Treated groundwater from EW-2 would be conveyed south in the existing SRP lateral at 35th Avenue and then discharged to the RID Main Canal for RID use through 2025. The discharge would require an agreement between the SRP and RID to cover operations and water transportation. This scenario would require minimal new conveyance piping to the Main Canal.

---

[18] Extraction well EW-2 was modeled using year-round pumping. The Reference Remedy costing discussed in Section 7 also assumes year-round pumping.

[19] This is based on the assumption that the efficacy of the new extraction well primarily depends on operating alongside the current RID pumping regime, with the goal of enhancing the current mass removal within the WVBA and further reducing COC mass flux at 35th Avenue.



To assure resource conservation, this end use option could replace groundwater that RID would otherwise have pumped, and under this scenario, would be in accordance with the ADWR remediated groundwater use policy (ADWR, 1999).

### 6.3.2   Contingencies Associated With the Reference Remedy

The Reference Remedy would include all of the contingencies associated with the Less Aggressive Remedial alternative. The Reference Remedy would also include the following additional contingencies:

- Continue operating EW-2 beyond the year 2025 and reinjection of the 500 gpm extracted groundwater into the LAU;

- Select additional contingency measure(s) in 2025 after evaluating the relative costs and benefits of installing an additional 1,000 gpm extraction well or replacing up to two SRP wells, and/or other technically feasible measures; and

- An expanded sentinel monitoring well network installed downgradient of the plume footprint that exists in 2026.

*Trigger for Continued Operation of EW-2 Beyond the Year 2025*

A hydrogeological evaluation and cost benefit analysis would be conducted at the end of 2025 to determine the benefits of continuing to pump the 500 gpm extraction well EW-2. The hydrogeologic evaluation would calculate projected COC mass removal based upon a trend analysis of the recent water quality data from that well and a groundwater model evaluation to determine if the continued pumping would have continued beneficial impacts on protecting current or future downgradient production wells. The cost-benefit analysis would consider whether the actions are reasonable, necessary, cost-effective, and technically feasible.

Under the assumption that RID discontinues production of groundwater from within the WVBA at the end of 2025, the end use of treated groundwater for this contingency would change from discharge to the RID Main Canal to reinjection into a LAU injection well collocated with the extraction well. Because the injection well would be located within the same extraction well/treatment system compound, conveyance piping would be minimal.

This revised end use contingency would require a pump-to-waste capability, where fines within the injection well are backwashed by pumping the injection well to an adjacent COP storm sewer for 2 to 3 hours per week. Backwashing would reduce the overall maintenance required to maintain injection capacity over time and extend the life of the injection well. Because there is no existing large-diameter COP storm sewer adjacent to EW-2, the injection well's actual location may need to be moved in the vicinity of the proposed location to be near a sufficiently-sized COP storm sewer.

For costing purposes, the LAU injection well was assumed to be a 16-inch diameter cased well at a total depth of 1,100 feet bgs, with 200 feet of well screen and an anticipated injection capacity capable of recharging 500 gpm into the LAU; continued operation was assumed from 2026 through 2044 (i.e., the end of the 30 year cost estimation time period).



*Trigger for Installing and Operating Contingent Remedial Actions Beyond the Year 2025*

A hydrogeologic evaluation and cost benefit analysis would be conducted at the end of 2025 to determine, based upon the 2025 water level and water quality conditions within the WVBA plume, if contingencies described in this FS or other technically feasible contingencies should be implemented to protect current or future downgradient production wells. The contingencies include replacing up to two SRP production wells that could be impacted by potential continued downgradient migration of the plume and/or implementing additional remedial measures within the remaining plume core. For costing purposes for this FS, it was assumed that the additional contingent remedial action would involve installing a new 1,000 gpm extraction well in an area most beneficial to removing the maximum remaining COC mass and protecting current and future downgradient production wells as best as possible. The primary goal of the contingent remedial action is to further reduce the potential future risk of impairing SRP, COP, and other production wells.

The detailed hydrogeological evaluation would assess alternative remedial technologies then available and potentially calculate projected COC mass removal by the 1,000 gpm extraction well based upon a trend analysis of recent water quality data from wells within the plume. A groundwater model will be used to evaluate if the extra pumping will have an additional beneficial impact on capture of upgradient COC impacted groundwater and protecting current or future downgradient extraction wells, and to evaluate the impact to current and future production wells if no additional contingent remedial actions are conducted. Finally, an estimate of the anticipated costs would be made for replacing current and future downgradient production wells likely impacted by plume migration. The cost-benefit analysis would consider whether the additional actions are reasonable, necessary, cost effective, and technically feasible. Replacing up to two SRP wells (with or without any additional groundwater pumping) and other appropriate alternative contingent actions should any be deemed necessary at the appropriate time would also be evaluated as part of the cost-benefit analysis.

Due to its intended end use, a well-head LGAC treatment system capable of treating the anticipated 1,000 gpm would be required for the extraction well. The proposed end use of treated groundwater would be reinjection into two LAU injection wells with recharge capacity of 500 gpm each, collocated with the extraction well. Because the injection well would be located within the same extraction well/treatment system compound, conveyance piping would be minimal. For costing purposes, LAU injection well construction was assumed to be the same as described above. This contingency would also require a pump-to-waste capability as described above; backwashing each of the two injection wells would need to be staggered to accommodate the COP storm sewer capacity of approximately 500 gpm.

*Expanded Sentinel Monitoring Well Network*

Under the Reference Remedy contingency, the same seven existing UAU1 monitoring wells and five new sentinel wells drilled and constructed in 2026 (listed in Section 6.2.2, Less Aggressive Remedy Contingencies) plus four additional new sentinel wells drilled and constructed in 2026, if necessary, would be monitored for COCs on a periodic basis starting in 2026. For costing purposes, quarterly monitoring is assumed; however, monitoring frequencies and duration may be adjusted based on observed results. If operating, the same 11 SRP wells listed in Section 6.2.2 would also be sampled for COCs during the sentinel monitoring events.

The sentinel well locations are shown on Figure 17. This expanded sentinel well network would reduce uncertainties regarding water quality downgradient of the WVBA, which production wells may become



impaired post-2025, and the estimated timing of the impairment. The method for sentinel well monitoring and triggering a remedial measure would be consistent with that discussed in Section 6.2.2.

### 6.3.3 Permits

Several permits would be necessary for the Reference Remedy. Permitting requirements, organized by regulatory agency, are described below.

#### *ADWR*

Each new groundwater extraction well, injection well, replacement production well, and monitoring well would require the submittal of an ADWR Notice of Intent form prior to the initiation of drilling and driller's report following well completion. An Arizona-licensed driller would need to perform the monitoring well and extraction well work and the new wells must comply with ADWR well construction standards found in A.R.S. §45-594, 45-595, 45-596, and 45-600 of the Groundwater Code.

In accordance with A.R.S. §45-516, a Poor Quality Groundwater Withdrawal Permit would be required by ADWR to pump a groundwater extraction well within the Phoenix Active Management Area. This process requires an application and an ADWR processing fee. Required information includes a description of the specific purpose for withdrawing the poor quality groundwater and an indication that it would be part of remedial action at the WVBA WQARF site.

The permit would specify the groundwater withdrawal monitoring requirements, such as extracted volumes and water quality sampling, and reporting requirements, such as annual reports to document measured total pumping volumes. If the extracted water is beneficially used, the annual fees are $3.00/acre-foot withdrawal fee plus a $2.12/acre-foot WQARF fee.

An Underground Storage Facility Permit, including a Groundwater Storage Facility Permit, would also need to be obtained from the ADWR for the reinjection contingency to inject treated groundwater into the LAU, pursuant to A.R.S. §45-811.01.

#### *COP*

The COP DSD would require construction permits related to the well-head treatment system. This would include design plans and specifications for civil, plumbing, mechanical, and electrical work submitted to the COP.

A Use Permit would also need to be obtained from the COP Zoning Department to construct and operate an environmental treatment facility (COP Zoning Ordinance Section 622056).

ROW permits would be required by the COP DSD prior to installing conveyance piping in the COP ROW, if needed, and a Revocable Permit from the COP Street Transportation Department would be needed to install conveyance piping and any other well-head system infrastructure located within the ROW (Phoenix City Code Sections 31.80 to 31.84).

The COP DSD would require a ROW Building Permit for any new sentinel wells located within the COP ROW. This permit requires an application form submittal, well design specifications, and



applicable fee payment. If drilling operations are sustained continuously for 24-hours a day, the drilling contractor must obtain a 30-day "After Hours Construction" permit through the COP DSD.

As long as the water quality meets or is lower than the AWQS, no permit would be required to discharge to the COP storm sewer during the injection well backwash cycles discussed above.

***ADEQ***

Certain Phoenix-area canals are listed in A.A.C. R18-11-Appendix B as Waters of the United States. The RID canals are not listed, and are not currently regulated as Waters of the United States. No AZPDES permit would be required from the ADEQ Surface Water Section to discharge treated groundwater to the RID Main Canal.

### 6.3.4   Advantages and Disadvantages of the Reference Remedy

Compared to the Less Aggressive Remedy, the Reference Remedy provides a reduced likelihood that contingent remedies will be needed through: (1) enhanced COC mass removal in an area of relatively elevated COC concentrations; (2) reduced COC mass flux at 35th Avenue and a reduction in downgradient COC concentrations; (3) additionally removed COC mass from the UAU2; and (4) an increased sentinel monitoring well network.

Compared to the Less Aggressive Remedy, the disadvantages of the Reference Remedy are primarily related to power consumption needs (and therefore a larger carbon footprint) for groundwater extraction and treatment, the need for long-term O&M of the well-head treatment systems, increased capital and long-term O&M costs, increased mining and exporting of groundwater out of the COP service area, and the relative cost of any potential additional benefit when compared to the other remedial alternatives.

### 6.3.5   Uncertainties Associated With the Reference Remedy

The Reference Remedy uncertainties are similar to the Less Aggressive Remedy, and include: (1) potential changes if RID obtains the legal authority to change its current irrigation end use to deliver water to third party drinking water providers for potable use; (2) the timing of potential changes in irrigation pumping within the WVBA; (3) the timing of potential future COP or SRP production wells located within the WVBA; (4) the production rates of replacement wells completed in the LAU; (5) the ability to obtain an agreement with RID to accept treated groundwater; and (6) the ultimate fate of the remaining dissolved-phase plume after 2025 should RID cease pumping within the SRRD in 2026. As mentioned above, the sentinel well monitoring network would be used to evaluate the post-2025 plume extent over time; additional contingent well measures would be triggered by sentinel well results as described in Section 6.2.2.

### 6.4   More Aggressive Remedy

### 6.4.1   Base Components of the More Aggressive Remedy

The More Aggressive Remedy includes the base components of the Less Aggressive Remedy, including the contingent measures, plus additional extraction and treatment of currently impacted groundwater beginning in 2016 and continuing through 2025. The More Aggressive Remedy reduces the likelihood that contingent remedial strategies or measures would be triggered and may achieve the ROs over a



shorter period of time compared to the other remedial alternatives, but at a greater cost and by potentially mining and exporting greater amounts of groundwater from the COP service area.

In addition to the base components of the Less Aggressive Remedy, the More Aggressive Remedy would include adding two extraction wells (EW-1 and EW-2) within the plume core at 1,000 gpm each, beginning in 2016 and continuing through 2025.

Proposed groundwater extraction wells EW-1 and EW-2 (see Figures 18 through 20) and associated well-head treatment systems would be located at 47th Avenue and 35th Avenue, respectively. Each well would pump at a rate of 1,000 gpm on a seasonal basis given the proposed RID Main Canal end use, although year-round pumping may be possible under an agreement with RID. For base costing purposes, it was assumed the new extraction wells would cease operating at the end of 2025[20].

Modeling was performed to determine the locations for the new extraction wells within the plume core for the More Aggressive Remedy. These extraction wells would be installed and operated at the start of the remedy to enhance the ongoing COC mass removal under current irrigation pumping conditions. The primary goal of the new extraction wells is to remove additional dissolved-phase mass from the plume core before 2025 and reduce COC mass flux downgradient of the new extraction well locations, which may expedite COC concentration declines within the central and west-central portion of the WVBA and reduce the potential future risk of impairing downgradient production wells.

The new extraction wells would be located along the east-west plume axis, approximately midway between West Van Buren St. and West Buckeye Rd. on 35th Avenue (EW-2) and 47th Avenue (EW-1). Because of the proposed end use of discharge to the RID Main Canal described below, operating the new extraction wells would be seasonal and consistent with the current RID production schedule, unless an agreement with RID is made for year-round pumping[21].

As discussed above, locating the new extraction wells within the higher concentration plume core would increase COC mass removal (relative to total pumping) compared to current conditions. Under current conditions, RID operates 32 irrigation wells within and adjacent to the WVBA at an aggregate pumping rate of about 84,600 gpm (Synergy, 2012). However, most of these wells extract groundwater with relatively low or no detectable COC concentrations, and approximately 75 percent of the TCE mass removed per year results from only four RID wells located within the plume core (RID-89, RID-92, RID-95, and RID-114), which pump a total of 8,600 gpm (Table 7). Adding two new plume core wells at 1,000 gpm each would increase the total plume core extraction volume by a factor of 1.23 (10,600 gpm/8,600 gpm). Based on the anticipated PCE and TCE concentrations at EW-1 and EW-2, a 2.5 percent increase in total aggregate pumping (from 84,600 gpm to 86,600 gpm) would result in an increase in PCE and TCE mass removal by a factor of about 1.05 and 1.13, respectively (Table 9). During the initial years of the remedy, additional TCE and PCE mass removal per year (based on current concentrations) would be on the order of approximately 50 pounds and 25 pounds (EW-1), and 140 and 9 pounds (EW-2), respectively.

---

[20] Similar to the Reference Remedy, this is based on the assumption that the efficacy of the two new extraction wells primarily depends on operating alongside the current RID pumping regime, with the goal of enhancing the current mass removal within the WVBA and further reducing COC mass flux downgradient of the extraction wells.

[21] Extraction wells EW-1 and EW-2 were modeled using year-round pumping; the More Aggressive costing discussed in Section 7 also assumes year-round pumping.



Figures 18 through 20 provide the results of the More Aggressive Remedy scenario modeling for model years 2015, 2020, and 2025. Modeling results indicate that the combined capture zone of extraction well EW-2 and RID-95 pumping simultaneously would effectively capture the COC mass flux at 35th Avenue, with a wider overall capture zone compared to the Reference Remedy. Reducing the COC mass flux in this area would likely result in declining COC concentrations, in particular TCE, downgradient (west) of 35th Avenue, and reduce the need for potential future contingent remedial measures. Increased pumping at EW-2, compared to the Reference Remedy, would also increase the hydraulic gradient and groundwater flow velocity in the upgradient central and eastern portion of WVBA and therefore help increase the flushing of dissolved-phase mass in this area. EW-1 would be located in an area of current PCE and TCE concentrations of approximately 10 $\mu$g/L and 20 $\mu$g/L, respectively, and would also enhance mass removal and reduce mass flux downgradient of 47th Avenue, thereby potentially reducing the need for future contingent remedial measures compared to current conditions.

A comparison of simulated hydraulic heads over time for scenarios with and without the two new extraction wells indicate that additional drawdown in the closest RID wells induced by EW-1 and EW-2 would be less than 10 feet during the first five years of operation. The modeling results therefore indicate that the locations of these new extraction wells would be in accordance with ADWR well spacing/interference requirements.

The proposed location of EW-1 and EW-2, conveyance piping, and end use are shown on Figure 21. The proposed extraction well locations are within industrial areas. While sufficient area for the extraction well and well-head treatment system appears to be available based on a review of Google Earth images, the exact well locations may need to be adjusted based on land available for purchase or lease.

As noted previously, the findings of the HHRA indicate that the extracted water would be suitable for the intended irrigation end use without treatment. However, due to RID's policy regarding third party discharges to its system, a well-head LGAC treatment system capable of treating the anticipated 1,000 gpm at each well would be required for both extraction wells. The proposed end use of treated groundwater would be discharge to the RID Main Canal. Treated groundwater from EW-1 and EW-2 would be conveyed south in the existing SRP laterals at 47th Avenue and 35th Avenue, respectively, and then discharged to the RID Main Canal, which would require an agreement between the SRP and RID. This scenario would require minimal new conveyance piping to the Main Canal.

This end use option could replace groundwater that RID would otherwise have pumped, and under this scenario, would be in accordance with ADWR policy.

### 6.4.2   Contingencies Associated with the More Aggressive Remedy

The More Aggressive Remedial Alternative would incorporate the potential contingent measures included within the Less Aggressive Remedy, and additionally include continued remedial groundwater extraction with treatment and reinjection from the two 1,000 gpm extraction wells from 2026 until 2044, or until no longer necessary.

#### *Continued Operation of EW-1 and EW-2 Beyond the Year 2025*

Similar to the Reference Remedy, a hydrogeological evaluation and cost benefit analysis would be conducted at the end of 2025 to determine, based upon the 2025 water level and water quality



conditions within the WVBA UAU1 plume, the benefits of continuing to pump the two extraction wells beyond 2025, or if contingencies described in this FS or other technically feasible contingencies should be implemented to protect current or future downgradient production wells. The contingencies include replacing up to two SRP production wells that could be impacted by potential continued downgradient plume migration and/or implementing additional remedial measures within the remaining plume core. For costing purposes, it was assumed that the additional contingent remedial action would continue operating EW-1 and EW-2 from 2026 through 2044, to protect current and future downgradient production wells.

The detailed hydrogeological evaluation would assess alternative remedial technologies then available and potentially calculate projected COC mass removal by the two extraction wells based upon a trend analysis of recent water quality data from wells within the plume. A groundwater model will also be used to determine if the continued pumping will have a beneficial impact on current or future downgradient extraction wells, and to determine the impact to current and future production wells if no additional contingent remedial pumping is conducted. An estimate of the costs will be made for replacing current and future downgradient production wells that likely would be impacted by plume migration. The cost-benefit analysis will consider whether the actions are reasonable, necessary, cost effective, and technically feasible.

If the hydrological evaluation determines it is reasonable, necessary, cost effective, and technically feasible to continue operating EW-1 and EW-2 beyond 2025, then the end use of the treated groundwater would change from discharge to the RID Main Canal to reinjection into LAU injection wells collocated with the extraction wells. Because the injection wells would be located within the same extraction well/treatment system compound, conveyance piping would be minimal. Two LAU injection wells with recharge capacity of 500 gpm each are anticipated for each 1,000 gpm extraction well (total of four LAU injection wells).

Similar to the Reference Remedy, this modified end use would require a pump-to-waste capability, where fines within each injection well are backwashed by pumping the injection well to an adjacent COP storm sewer for 2 to 3 hours per week. Backwashing each injection well would need to be staggered to accommodate the COP storm sewer capacity of approximately 500 gpm. Backwashing would reduce the overall maintenance required to maintain injection capacity over time and extend the life of the injection well. Because there is no existing large-diameter COP storm sewer adjacent to the anticipated location for EW-2, the injection well's actual location may need to be moved in the vicinity of the proposed location to be near a sufficiently-sized COP storm sewer.

For costing purposes, each LAU injection well was assumed to be a 16-inch diameter cased well at a total depth of 1,100 feet bgs, with 200 feet of well screen and an injection capacity capable of recharging 500 gpm into the LAU; continued operation was assumed from 2026 through 2044 (i.e., the end of the 30 year cost estimation time period).

### Remedial Measures for Impaired or Threatened Wells

Similar to the Reference Remedy remedial measures, as part of the cost-benefit analysis, replacing up to two SRP wells (with or without any additional groundwater pumping) and other appropriate alternative contingent actions should any be necessary at the appropriate time would also be evaluated as part of the cost-benefit analysis.



### 6.4.3   Permits

The permits necessary for the More Aggressive Remedy are the same as those described in the Reference Remedy.

### 6.4.4   Advantages and Disadvantages of the More Aggressive Remedy

The primary advantage of the More Aggressive Remedy is to increase COC mass removal from groundwater within the WVBA to reduce the extent and concentration of the remaining plume in 2026, thereby further reducing the need for contingent remedial measures compared to the other remedial alternatives.

The disadvantages of the More Aggressive Remedy are primarily related to large power consumption needs (and therefore a larger carbon footprint) for groundwater extraction and treatment, the need for long-term O&M of the well-head treatment systems, increased capital and long-term O&M costs, potentially increased mining and exporting of groundwater out of the COP service area, and the relative cost of any potential additional benefit when compared to the other remedial alternatives.

### 6.4.5   Uncertainties Associated With the More Aggressive Remedy

The More Aggressive Remedy uncertainties are similar to those described previously for the other remedial alternatives, including the potential for a change if RID obtains the legal authority to deliver water to third party drinking water providers for potable use, the timing of potential changes in irrigation pumping within the WVBA, and the timing of potential future COP or SRP production wells located within the WVBA.

Other uncertainties specific to the More Aggressive Remedy include: (1) the efficacy and potential additional benefit of additional plume core extraction over the Reference Remedy and how much it may reduce the overall plume extent and COC concentrations within the plume over time; (2) the ability to obtain an agreement with RID to accept treated groundwater; and (3) the ultimate fate of the remaining post-2025 dissolved-phase plume should RID cease pumping within the SRRD at that time. The contingent sentinel well monitoring network would be used to evaluate the post-2025 plume extent over time based on an evaluation of the results as described in Section 6.2.2. Additional contingent well measures may be needed based on the sentinel well monitoring results.



## 7.  COMPARATIVE EVALUATION OF REMEDIAL ALTERNATIVES

This FS was prepared to identify a Reference Remedy, Less Aggressive Remedy, and More Aggressive Remedy capable of meeting the ROs, evaluate each of the remedies based on the comparison criteria, and select a remedy that satisfies the following requirements of A.R.S. Title 49, Section §49-282-06, Remedial Action criteria:

- Assure the protection of public health and welfare and the environment;

- To the extent practicable, provide for the control, management, or cleanup of the hazardous substance in order to allow maximum beneficial use of the waters of the state;

- Be reasonable, necessary, cost-effective, and technically feasible; and

- For remediation of waters of the state, the selected remedial action shall address, at a minimum, any well that at the time of selection of the remedial action either supplies water for municipal, domestic, industrial, irrigation or agricultural uses or is part of a public water supply system if the well would now or in the reasonably foreseeable future produce water that would not be fit for its current or reasonably foreseeable end uses without treatment due to the release of hazardous substances. The specific measures to address any such well shall not reduce the supply of water available to the owner of the well.

This section provides a comparative evaluation of the remedial alternatives individually and in relation to each other, including:

- A demonstration that the remedial alternative will achieve the ROs;

- An analysis of consistency with the water management plans of the affected and potentially affected water providers and the general land use plans of local governments with land use jurisdiction; and

- An evaluation of the comparison criteria, which include practicability, risk, cost, and benefit or value [R18-16-407(H)(3)], as described below.

### *Practicability*

The practicability of the remedies includes their feasibility, short- and long-term effectiveness, and reliability [R18-16-407(H)(3)(a)], considering site-specific conditions, characteristics of the contamination resulting from the release(s), performance capabilities of available technologies, and institutional considerations such as site access issues, easements and ROW, and utilities.

### *Risk*

Risk includes overall protectiveness of public health and aquatic and terrestrial biota under reasonably foreseeable land use scenarios and end uses of water [R18-16-407(H)(3)(b)] and includes:

- Fate and transport of contaminants and contaminant concentrations and toxicity over the life of the remediation;

- Current and future land and resource use;



- Exposure pathways, duration of exposure, and changes in risk over the lifetime of the remediation;

- Protection of public health and aquatic and terrestrial biota while implementing the remedial action; and

- Residual risk in the aquifer at the end of remediation.

A HHRA was conducted for the WVBA following EPA and ADEQ risk assessment guidance and is provided in Appendix D. No human health risks were identified. Potential human receptors were identified based on current land use and hypothetical (but plausible) future land use within the WVBA. Estimated health risks were quantified for two receptor groups identified within the WVBA: (1) RID workers; and (2) residents. Ongoing exposures to COC concentrations were based on the last five years of data (2009 through 2013). Based on the results of the HHRA, the estimated health risks to receptors potentially exposed to COCs within the WVBA are acceptable.

*Cost*

Remedy costs include expenses and losses, including capital, operating, maintenance, and life cycle costs [R18-16-407(H)(3)(c)]. The cost analysis may also include uncertainties that may impact the cost of the remedial alternatives, projected water uses and costs associated with user-based treatment, other use impairment costs of water not remediated to water quality standards, and the cost of alternative water supply or treatment.

*Benefit or Value*

The benefit or value evaluation includes the following, consistent with R18-16-407(H)(3)(d):

- Lowered risk to human, aquatic and terrestrial species;
- Reduced concentration and reduced volume of contaminated water;
- Decreased liability and acceptance by the public;
- Aesthetics and preservation of existing uses;
- Enhancement of future uses; and
- Improvements to local economies.

Sustainability and water conservation were also included in the benefit or value evaluation.

### 7.1    Less Aggressive Remedy

A comparative evaluation of the Less Aggressive Remedy included the ability to meet the ROs, consistency with water management and land use plans, and an evaluation of the comparison criteria. The Less Aggressive Remedy components, described in Section 6.2, were developed using information provided by water providers (the COP, SRP, RID, and COT), water provider meetings, and a review of available water provider plans.

*Ability to Meet Remedial Objectives*

The Less Aggressive Remedy would be able to meet the ROs. Current groundwater quality within the WVBA is suitable for irrigation end use, and no SRP, COP, or COT production wells are currently



59

located within the WVBA. Private water wells within the WVBA that may become impaired will be addressed by connecting the property to the COP drinking water distribution system.

ROs for reasonably foreseeable water use would be met by implementing the contingent remedial strategies and measures described in Section 6.2.2. Should RID obtain legal authority to sell water to third party drinking water providers, RID could employ a blending approach (assuming reclaimed wastewater is not conveyed in the Main Canal and the Main Canal can be used for delivery of drinking water) similar to the one described in their MERA Work Plan that would provide groundwater that meets the AWQS at the point of use in RID's west valley service area. A remedial measure would replace well RID-114 at a location adjacent to the Salt Canal, outside of the plume extent, if RID uses only the Salt Canal as a drinking water supply end use.

*Consistency with Water and Land Use Plans*

If the SRP needs to drill and construct a production well within the WVBA in the reasonably foreseeable future and the well cannot reasonably be located in a particular area of the WVBA where the water produced by the well would be fit for its intended purposes without treatment, a contingent remedial measure would be selected in consultation with the water provider to modify the well design to deepen the well to produce only in the LAU. SRP production wells outside of the WVBA that may potentially become impaired under the post-2025 contingent scenario would be addressed by replacing the impaired UAU well with a collocated LAU production well.

Based on the modeling results, no existing COP production wells with anticipated production over the next 30 years would be impaired under the Less Aggressive Remedy. While the COP does not have specific plans for groundwater wells within the WVBA today, the COP states in their 2011 Groundwater Management Plan, *"With regard to remediation of contaminated groundwater within Phoenix's service area, it has been the City's stated intent to preserve that water for future service area use."* If the COP needs to install a production well within the WVBA in the reasonably foreseeable future and the water quality is not fit for its intended use at that time, a contingent remedial measure would be evaluated with consultation with the COP. The well would be located in an area where water quality is sufficient for its intended use or the well deepened to produce water only from the LAU.

The Less Aggressive Remedy is consistent with the land use and zoning changes described in the COP General Plan. Groundwater monitoring/MNA and the proposed remedial measures and contingencies would not interfere with the planned land use within the WVBA or entail additional extraction and exportation of groundwater from the COP service area.

Proposed future COT production wells COT-2, COT-3, and COT-4 would be addressed by working with the COT to possibly relocate these proposed wells south-southwest of their currently proposed locations to mitigate any possible future impact. Potential relocation of these wells would require discussions with the COT.

While the RID blending approach is consistent with the blending approach proposed in their MERA Work Plan, this approach, and possibly replacing well RID-114, would require discussions with RID should this contingent remedial measure become necessary.

Any private water wells downgradient of the WVBA that become impaired would be addressed by connecting the property to the COP drinking water distribution system.



*Practicability*

The Less Aggressive Remedy components are considered feasible and practicable, as groundwater monitoring, and production well and monitoring well drilling and construction are effective, use reliable industry-standard methods, and require limited access agreements to implement. Many of the proposed sentinel wells are already part of the current monitoring well network. Connecting an impaired private water well property to the COP drinking water distribution system is feasible and effective in both the short- and long-term, as it only requires routine plumbing and the water supply source would be the COP municipal supply. The Less Aggressive Remedy is also the least costly FS remedial alternative over the 30-year cost estimation time period.

Groundwater monitoring is effective and reliable in both the short- and long-term to further evaluate COC concentration trends within the WVBA, intrinsic MNA processes, changes in the lateral and vertical extent of the plume, and seasonal and long-term changes in water levels and hydraulic gradients. Replacing SRP production wells with new, collocated LAU wells is considered practicable, effective, and reliable in both the short- and long-term provided the replacement well is drilled and constructed with a sufficient well seal to isolate the LAU screened interval from the UAU and provided an equivalent capacity is obtained from the replacement well. Obtaining ROW permits from the COP for drilling and constructing sentinel monitoring wells should not present a significant challenge. Since an impaired SRP production well replacement would be collocated with the existing well, access issues with this contingent remedial measure are not anticipated.

The other contingent remedial strategies, such as moving or deepening potential future production wells and groundwater blending are also considered practicable and effective.

*Risk*

Based on the results of the HHRA provided in Appendix D, the estimated health risks to receptors potentially exposed to COCs within the WVBA are acceptable. While some COCs exceed the MCLs at select locations, groundwater beneath the WVBA is not currently used for drinking water purposes. The Land and Water Use Report identifies a few private wells in the area but does not describe them as used for potable purposes or reflect that users of these wells are receiving impacted groundwater. Any private wells that become impaired through contamination or change of use would be addressed by connecting the property to the COP drinking water distribution system. If RID end use changes from irrigation to drinking water, a blending approach, and replacing RID-114 if needed, would provide groundwater that meets the AWQS at the point of delivery to third party potable water providers in RID's west valley service area.

Should the COP or SRP need to drill and construct a production well within the WVBA in the reasonably foreseeable future and the water quality is not fit for its intended use at that time, the contingent remedial measures described above would mitigate the risk of potable water use of the well.

The COC concentration declines observed within the regional WVBA plume will likely continue under current regional pumping conditions; mitigating ongoing sources under the direction of ADEQ would expedite these declining trends.

If RID ceases pumping within the SRRD in 2026 and the remaining dissolved-phase plume contains concentrations high enough to impair downgradient SRP wells, impaired SRP production wells would be replaced with collocated LAU production wells, mitigating the risk of potable use of the well(s) and



the impact on water supply. The sentinel monitoring well network would provide advanced notice of potential production well impairment.

*Cost*

Table 10 summarizes estimated costs for the Less Aggressive Remedy base components and contingencies, including capital, O&M costs, and the assumed time period for each cost component within the 30-year cost estimation period (2014 through 2044). The costs were developed primarily using vendor quotes, recent contractor bids, communications with vendors and contractors, information and communication from water providers, and professional judgment. Detail costing sheets are provided in Appendix E. Not all of the identified contingent measures may necessarily need to be implemented; specific contingent measures would be identified based on monitoring future conditions as described in Section 6.2.2.

A discount rate of 6 percent was used to calculate the net-present value (NPV) for O&M and capital costs required some time beyond year one of the 30-year cost estimation period[22]. This discount rate was based on an interest rate of 9 percent and a 3 percent inflation escalation rate.

The Less Aggressive Remedy base components total NPV cost is estimated at $2.95M ($10.38M non-discounted with 3 percent inflation rate). The estimated NPV costs for the Less Aggressive Remedy contingencies listed in Table 10 range from $0.02M to $2.64M ($0.07M to $10.74M non-discounted with 3 percent inflation rate). The total NPV for all Less Aggressive Remedy contingencies included in Table 10 is approximately $3.81M.

*Benefit or Value*

Because the WVBA plume is already hydraulically contained under current pumping conditions, additional hydraulic control wells are not necessary and would only act to further remove groundwater storage from within the WVBA. Since no new extraction wells are included in the Less Aggressive Remedy, implementing the Less Aggressive Remedy would not further deplete the UAU aquifer within the WVBA. Groundwater within the WVBA would remain in storage within the aquifer for future beneficial use. Contaminant concentrations will continue to decrease over time and could potentially fall below AWQS before future potable water uses might be needed.

The Less Aggressive Remedy would not require long lengths of conveyance piping to be installed through urban streets with heavy traffic and significant underground utilities, and therefore not disrupt traffic, commerce, or pedestrians. Constructing well-head treatment systems, long-term well-head treatment O&M, and conveying treated groundwater to end users, with their associated high, long-term power consumption and carbon footprint, would not be necessary.

## 7.2    Reference Remedy

A similar comparative evaluation was performed for the Reference Remedy. The Reference Remedy components are provided in Section 6.3.

---

[22] This discount rate is lower than the discount rate of 7 percent used in the WOC FS reports, and is lower than the EPA recommended 7 percent discount rate for CERCLA FS cost estimating (EPA, 2000).



*Ability to Meet Remedial Objectives*

The Reference Remedy would also be able to meet the ROs. Current groundwater quality within the WVBA is suitable for irrigation end use, and no SRP, COP, or COT production wells are currently located within the WVBA. Wells that might be threatened or impaired in the future would be addressed using remedial measures and contingencies. Remedial measures for private water wells within the WVBA that may become impaired in the future would be addressed by connecting the properties to the COP drinking water distribution system.

The focused groundwater extraction and treatment proposed in the Reference Remedy would remove additional COC mass from within the WVBA compared to the Less Aggressive Remedy and help to reduce westward moving COC mass flux at 35th Avenue, which, along with source control under ADEQ oversight, and would help expedite COC concentration declines in WVBA groundwater over time. The reduced plume footprint and lower COC concentrations should result in less future contingencies needed to meet the ROs as compared to the Less Aggressive Remedy.

ROs for reasonably foreseeable water use will be met by implementing the contingencies as described in Section 6.3.2, above. Contingent remedial measures and an expanded sentinel monitoring well network would be employed as needed post-2025 to meet the ROs, based on the overall extent and concentrations within the plume at that time.

*Consistency with Water and Land Use Plans*

The Reference Remedy is consistent with Water and Land Use plans for the same reasons described in the Less Aggressive Remedy in Section 7.1 above. The remedial extraction well and well-head treatment compound would not interfere with planned land use.

*Practicability*

The Reference Remedy components are considered feasible and practicable. Groundwater extraction and treatment is considered a demonstrated and feasible technology, and installing and operating the new extraction well would be implemented using reliable industry-standard methods. LGAC treatment technology is considered practicable due to its proven performance and treatment reliability, relative low-cost and low-maintenance, and would be effective and reliable in both the short- and long-term as long as the well-head treatment system is properly operated, maintained, and monitored.

Sufficient area appears to be available for the extraction well and well-head treatment system based on a review of Google Earth images, although the exact well location may need to be adjusted based on the availability of land for purchasing or leasing.

Treated groundwater from new extraction well EW-2 would be conveyed to the south in the existing SRP laterals at 35th Avenue and discharged to the RID Main Canal prior to 2026. This scenario is considered practical because it would require minimal new conveyance piping to the end user. Year-round discharge of treated groundwater from the new extraction well could be possible under an agreement with RID.

While the COC concentrations would not require treatment given the absence of risk (see the HHRA in Appendix D) and the current end use, persons other than RID may not discharge to the RID Main Canal unless the water meets AWQS (RID, 2010b); extracted groundwater would therefore require



treatment prior to discharge. While this end use is considered feasible because RID would receive up to 500 gpm of treated groundwater for their use, it would require discussions with RID and an agreement between the SRP and RID.

The post-2025 contingency of continued focused groundwater extraction at EW-2 and possibly an additional 1,000 gpm extraction well, both with well-head treatment and reinjection end use, is also considered feasible because industry-standard methods would be employed; the COP has reliably reinjected water as part of aquifer recharge projects at various locations within the COP metropolitan area.

The remedial measure for any future impaired private water wells within the WVBA is considered feasible and effective in both the short- and long-term, as it only requires routine plumbing and the water supply source would be the COP municipal supply.

Groundwater monitoring is effective in both the short- and long-term to further evaluate COC concentration trends within the WVBA, intrinsic MNA processes, changes in the lateral and vertical extent of the plume, and seasonal and long-term changes in water levels and hydraulic gradients. The expanded sentinel monitoring well network would also be practicable.

If required, replacing SRP production wells with new, collocated LAU wells is considered practicable since industry-standard well installation methods would be used, and effective and reliable in both the short- and long-term provided the replacement well is drilled and constructed with the LAU screened interval fully isolated from the UAU. Access issues are not anticipated because the replacement well would be collocated with the existing well.

The other Reference Remedy contingencies, such as well replacement, groundwater blending, and connecting impaired downgradient private well properties to the COP municipal system are also considered to be practicable and effective.

*Risk*

The additional, focused groundwater extraction and treatment would further reduce the concentration, volume, mass, and toxicity of COCs over time. Along with source control by the ADEQ, this additional focused remedial measure is designed to reduce the likelihood of contingent remedial measures.

Risk from potable use of an impaired well either today or in the reasonably foreseeable future would be mitigated or eliminated using a combination of remedial measures and contingencies. LGAC as a treatment technology, properly operated, maintained, and monitored, will address the risk associated with potential changes to the end use of the extracted water. Groundwater monitoring would be used to evaluate declining COC concentrations within the WVBA resulting from the Reference Remedy and future source area mitigation under the direction of ADEQ. The expanded sentinel monitoring well network would provide a method for advanced notice of potential production well impairment under the post-2025 Reference Remedy contingency, thereby mitigating the potential risk of potable use in these wells.



*Cost*

Table 10 summarizes the estimated costs for the Reference Remedy base components and contingencies, including capital, O&M costs, and assumed time period for each cost component within the 30-year cost estimation period (2014 through 2044). Detail costing sheets are provided in Appendix E. Not all of the identified contingent measures may necessarily need to be implemented; specific contingent measures would be identified based on monitoring future conditions as described in Section 6.3.2.

A discount rate of 6 percent was used to calculate the NPV for O&M and capital costs required some time beyond year one of the 30-year period.

The Reference Remedy base components total NPV cost is estimated at $8.57M ($19.55M non-discounted with 3 percent inflation rate). The estimated NPV costs for the Reference Remedy contingencies listed in Table 10 range from $0.02M to $5.1M ($0.07M to $28.10M non-discounted with 3 percent inflation rate). The total NPV for all Reference Remedy contingencies included in Table 10 is approximately $14.58M.

*Benefit or Value*

The focused remedial groundwater extraction would help reduce the concentration, volume, mass, and toxicity of COCs within WVBA groundwater over time in an efficient manner because the 500 gpm plume core extraction well would be located in an area of relatively elevated COC concentrations. This should result in a lower likelihood of future contingencies to meet the ROs. At the proposed flow rate, the Reference Remedy could have a modest increased impact to storage within the aquifer compared to the Less Aggressive Remedy. The expanded sentinel monitoring well network would provide a means to identify and address potentially impaired wells under the post-2025 Reference Remedy contingency in a timely manner.

The Reference Remedy would also not require long lengths of conveyance piping to be installed through busy urban streets, and would therefore not disrupt traffic, commerce, or pedestrians. Given the proposed pumping rate, the power consumption and carbon footprint from operating the extraction well and well-head treatment system would also be relatively low in comparison to the More Aggressive Remedy.

The end use option could be net-neutral to the aquifer if it replaces groundwater that would otherwise have been pumped.

### 7.3    More Aggressive Remedy

A similar comparative evaluation was performed for the More Aggressive Remedy. The More Aggressive Remedy components are provided in Section 6.4.

*Ability to Meet Remedial Objectives*

The More Aggressive Remedy would be able to meet the ROs. Current groundwater quality within the WVBA is suitable for irrigation end use, and no SRP, COP, or COT production wells are currently located within the WVBA. Wells that might be threatened or impaired in the future would be addressed using remedial measures and contingencies. Remedial measures for private water wells within the



WVBA that may become impaired in the future would be addressed by connecting the well owner's property to the COP drinking water distribution system.

The additional focused groundwater extraction and treatment proposed in the More Aggressive Remedy would remove more COC mass from within the WVBA compared to the other remedial alternatives, which, along with source control under ADEQ oversight, would help further expedite COC concentration declines in WVBA groundwater over time. This should result in a lower likelihood of future contingencies needed to meet the ROs.

If necessary, ROs for reasonably foreseeable water use would be met by implementing the contingencies described in Section 6.4.2 above. Contingent remedial measures and a sentinel monitoring well network consistent with the Less Aggressive Remedy would be employed as needed post-2025 based on the overall extent and concentrations within the plume at that time, which should be reduced compared to the other remedial alternatives due to the additional focused remedial groundwater extraction.

### *Consistency with Water and Land Use Plans*

The More Aggressive Remedy is consistent with Water and Land Use plans for the same reasons described in Sections 7.1 and 7.2, above. However, the More Aggressive Remedy could export more groundwater out of the COP service area, which is inconsistent with the COP's long-term groundwater management plan. The treated groundwater end use under the More Aggressive Remedy would require discussions with RID to determine if this end use is acceptable and an agreement between the SRP and RID. The end use option would provide RID with up to 2,000 gpm of treated groundwater for use prior to 2026, and could replace groundwater that RID would otherwise have pumped.

### *Practicability*

The More Aggressive Remedy components are considered feasible and practicable. Groundwater extraction and treatment via multiple pumping wells is a demonstrated and feasible technology, and installing and operating extraction wells would be implemented using reliable industry-standard methods. The LGAC treatment technology is considered practicable due to its proven performance and treatment reliability and low-maintenance, and would be effective and reliable in both the short- and long-term as long as the well-head treatment systems are properly operated, maintained, and monitored.

Sufficient area for the extraction wells and well-head treatment systems appears to be available based on a review of Google Earth images, although the exact well locations may need to be adjusted based on the availability of land for purchasing or leasing.

Prior to 2026, treated groundwater from EW-1 and EW-2 would be conveyed to the south in the existing SRP laterals at 47th Avenue and 35th Avenue, respectively, and discharged to the RID Main Canal, which would require an agreement between the SRP and RID. While the COC concentrations would not require treatment given the absence of risk (see the HHRA in Appendix D) and the current end use, persons other than RID may not discharge to the RID Main Canal unless the water meets AWQS (RID, 2010b); the extracted groundwater would therefore require treatment prior to discharge.

While this end use is considered feasible because RID would receive up to 2,000 gpm of treated groundwater for their use, it would require discussions with RID and an agreement between the SRP and RID. This scenario is considered practical because it would require minimal new conveyance



piping to the end user. Year-round discharge of treated groundwater from the new extraction wells could also be possible under an agreement with RID.

The post-2025 contingency of continued groundwater extraction at EW-1 and EW-2 with well-head treatment and reinjection end use is also considered feasible, because industry-standard methods would be employed; as noted above, the COP has reliably reinjected water as part of aquifer recharge projects at various locations within the COP metropolitan area.

Groundwater monitoring would be effective in both the short- and long-term to further evaluate COC concentration trends within the WVBA, intrinsic MNA processes, changes in the lateral and vertical extent of the plume, and seasonal and long-term changes in water levels and hydraulic gradients. The sentinel monitoring well network would also be practicable.

Replacing SRP production wells with new, collocated LAU wells is considered practicable because industry-standard well drilling and construction methods would be used, and effective and reliable in both the short- and long-term, provided the replacement well is drilled and constructed with the LAU screened interval fully isolated from the UAU. Access issues are not anticipated because the replacement well would be collocated with the existing well.

The practicability of the other More Aggressive Remedy components is consistent with the other remedial alternatives described above.

*Risk*

Mitigating risk under the More Aggressive Remedy is consistent with that discussed in the other remedial alternatives above; the additional, focused groundwater extraction and treatment would further reduce the concentration, volume, mass, and toxicity of COCs over time compared to the other remedial alternatives. Along with source control by the ADEQ, this additional focused remedial measure is designed to reduce the likelihood of contingent remedial measures. LGAC as a treatment technology, properly operated, maintained, and monitored, would address the risk associated with potential changes to the end use of the extracted water.

As discussed above, risk from potable use of an impaired well in the future would be mitigated or eliminated using a combination of remedial measures and contingencies, including groundwater monitoring to evaluate the decrease in risk over time within the aquifer.

Because of the additional focused groundwater extraction and mass removal, the post-2025 plume extent and concentrations should be reduced compared to the other remedial alternatives. However, the More Aggressive Remedy contingency would still include a sentinel monitoring well network as needed based on the plume conditions at that time, which would provide advanced notice of potential production well impairment post-2025. The sentinel monitoring program would allow contingent remedial measures to be implemented prior to well impairment, thereby mitigating the potential risk of potable use in these wells.

*Cost*

Table 10 summarizes estimated costs for the More Aggressive Remedy base components and contingencies, including capital, O&M costs, and assumed time period for each cost component within the 30-year cost estimation period (2014 through 2044). Detail costing sheets are provided in Appendix


HALEY&
ALDRICH

E. Not all of the identified contingent measures may necessarily need to be implemented; specific contingent measures would be identified based on monitoring future conditions as described in Section 6.4.2.

A discount rate of 6 percent was used to calculate the NPV for O&M and also capital costs that would be required some time beyond year one of the 30-year period.

The More Aggressive Remedy is the highest cost alternative, for both capital and O&M costs, with base components total NPV cost estimated at $15.97M ($32.06M non-discounted with 3 percent inflation rate). The estimated NPV costs for the More Aggressive Remedy contingencies listed in Table 10 range from $0.02M to $7.03M ($0.07M to $44.90M non-discounted with 3 percent inflation rate). The total NPV for all More Aggressive Remedy contingencies included in Table 10 is approximately $14.48M.

### Benefit or Value

The additional focused groundwater extraction and treatment would provide additional reductions in the concentration, volume, mass, and toxicity, of COCs within WVBA groundwater over time, with the intent of further reducing the need for contingent remedial measures compared to the Reference Remedy. However, compared to the Reference Remedy, the More Aggressive Remedy could export more groundwater out of the COP service area.

Based on the proposed end use of treated groundwater, this remedy would require minimal new conveyance piping to the RID Main Canal, which would avoid installing new conveyance piping within heavily urbanized ROWs and the associated disruption of traffic, commerce, or pedestrians.

The end use option could be net-neutral to the aquifer if it replaces groundwater that would otherwise have been pumped.

### 7.4    Comparison of Remedial Alternatives

A comparison of the remedial alternatives to one another was also performed for practicability, risk, cost, and benefit or value.

### Practicability

Each remedial alternative is considered practicable and effective in both the short- and long-term. The remedial strategies and measures, including groundwater monitoring/MNA, focused remedial groundwater extraction, and private well measures are effective and reliable industry-standard methods and would require limited access agreements to implement.

The proposed end use of extracted groundwater for the Reference Remedy and More Aggressive Remedy would also minimize the need for installing conveyance piping along the ROW of busy urban streets, and sufficient area for the extraction wells and well-head treatment systems appears to be available. The contingencies for each remedial alternative, including installing sentinel monitoring wells, sentinel well monitoring, replacing existing production wells, moving or deepening potential future production wells, connecting downgradient private well properties to the COP municipal system, and potentially groundwater blending are also considered practicable and effective, because



implementation would employ industry-standard methods already reliably used in the vicinity of WVBA.

*Risk*

Since there are no current health risks to receptors, the Less Aggressive Remedy, Reference Remedy, and More Aggressive Remedy are comparable with respect to addressing current risks. While select COC concentrations in WVBA groundwater exceeded MCLs at some locations, groundwater beneath the WVBA is not currently used for drinking water purposes.

Future risk is a function of future groundwater use in the WVBA or cessation of hydraulic control currently created by RID's irrigation pumping. Each of the three remedial alternatives assumes that RID ceases pumping by 2026. Each also includes sufficient remedial measures and contingencies to mitigate or eliminate risks associated with potable water end use in the future.

Recognizing that each remedial alternative contains sufficient contingency measures to adequately address future risk, the question is whether any additional extraction of water should be implemented today to enhance reduction of the COC mass in the groundwater. Of the three remedies, the Reference Remedy includes groundwater extraction focused on enhanced COC removal in the plume core along 35th Avenue, and the More Aggressive Remedy includes a greater amount of groundwater extraction than the Reference Remedy. The enhanced groundwater extraction in the Reference Remedy and More Aggressive Remedy is intended to help expedite declining COC concentration trends observed in the WVBA, and the resulting smaller plume footprint and concentrations over time is intended to lessen the need for post-2025 contingencies assuming that site source investigation/remedial activity is implemented by ADEQ.

*Cost*

A summary of the base costs and contingency costs for each remedial alternative is provided in Table 10. The NPV is the best measure to compare remedial alternative costs due to the differing time periods for base costs and contingencies. A discount factor of 6 percent was used to calculate the NPV for each remedial alternative, including capital and O&M costs incurred within the 30-year cost estimation period (2014 through 2044).

The Less Aggressive Remedy is the least costly remedial alternative over the 30-year cost estimation period. The Less Aggressive Remedy base components total NPV cost is estimated at $2.95M ($10.38M non-discounted with 3 percent inflation rate). The estimated NPV costs for the Less Aggressive Remedy contingencies range from $0.02M to $2.64M ($0.07M to $10.74M non-discounted with 3 percent inflation rate).

The Reference Remedy has the next highest estimated costs, with a base components total NPV cost estimated at $8.57M ($19.55M non-discounted with 3 percent inflation rate). The estimated NPV costs for the Reference Remedy contingencies range from $0.02M to $5.10M ($0.07M to $28.10M non-discounted with 3 percent inflation rate).

The More Aggressive Remedy has the highest estimated costs of the remedial alternatives, with the base components total NPV cost estimated at $15.97M ($32.06M non-discounted with 3 percent inflation rate). The estimated NPV costs for the More Aggressive Remedy contingencies range from $0.02M to $7.03M ($0.07M to $44.90M non-discounted with 3 percent inflation rate).



69

The primary cost driver for both the Reference Remedy and the More Aggressive Remedy is the construction and long-term O&M of the remedial groundwater extraction systems.

*Benefit or Value*

All three remedial alternatives provide benefit and value by reducing the concentration and volume of contaminated water over time. For all three alternatives, the extracted water is acceptable for its current end use. For each remedial alternative, the risk of potable water use at an impaired well would be mitigated or eliminated using remedial measures and contingencies.

None of the remedial alternatives would require long lengths of conveyance piping to be installed through busy urban streets, and would therefore not disrupt traffic, commerce, or pedestrians.

For the Less Aggressive Remedy, no additional groundwater would be removed from storage within the aquifer, meaning that groundwater within the WVBA would remain in storage for future beneficial use. The focused groundwater extraction for the Reference Remedy and More Aggressive Remedy would result in an increase in COC mass removal over the current pumping conditions, with the intent of reducing the need for future contingent measures. Compared to the More Aggressive remedy, the Reference Remedy has a lower power consumption and associated carbon footprint and results in less water being exported from the COP service area.

### 7.5    Proposed Remedy

The Reference Remedy is recommended as the Proposed Remedy. Pumping at extraction well EW-2 would enhance COC removal within the east-west plume core and help mitigate COC mass flux at 35th Avenue. With the mass flux reduced, COC concentrations downgradient of 35th Avenue, particularly TCE, should decline over time. This remedial groundwater extraction is intended to result in a lower potential need for future contingencies to meet the ROs, assuming ADEQ site source investigation/remediation activity is effective.

*Achievement of Remedial Objectives*

The Reference Remedy would meet the ROs using the remedial strategies, remedial measures, and contingencies described above. Current groundwater quality within the WVBA is suitable for irrigation end use, and no SRP, COP, or COT production wells are currently located within the WVBA. Wells impaired in the reasonably foreseeable future would be addressed using remedial measures and contingencies. The focused groundwater extraction and treatment proposed in the Reference Remedy is intended to reduce the need for future contingencies to meet the ROs. If necessary, contingent remedial measures and the sentinel monitoring well network would be employed as needed post-2025 based on triggers described in Section 6.2.2.

*Consistency with Water Management Plans*

The Reference Remedy components were developed using information provided by water providers, water provider meetings, and a review of available water provider plans, and are consistent with land and water management plans as discussed in Section 7.2.



*Consideration of Comparison Criteria*

The Reference Remedy provides a balanced, cost-effective approach to meeting the ROs. The Reference Remedy components are considered practicable and effective in both the short- and long-term. The focused groundwater extraction and treatment would further reduce the concentration, volume, mass, and toxicity of COCs over time. Risk from potable use of an impaired well in the reasonably foreseeable future would be mitigated or eliminated using a combination of remedial measures and contingencies. The sentinel monitoring well network would provide a method for advanced notice of potential production well impairment under the post-2025 contingency.

The proposed end use of treated groundwater would not require conveyance piping to be installed through busy urban streets, and would therefore not disrupt traffic, commerce, or pedestrians. Given the proposed pumping rate, the power consumption and carbon footprint from operating the extraction well and well-head treatment system would be relatively low and there would only be a moderate increase in the amount of water exported from the COP service area. The end use option would also provide water for beneficial use and could be net-neutral to the aquifer if it replaces groundwater that would otherwise have been pumped.

*Requirements of A.R.S. §49-282-06*

The Proposed Remedy satisfies the requirements of A.R.S. Title 49, Section §49-282-06, Remedial Action Criteria. The Proposed Remedy would assure the protection of public health, welfare, and the environment. The focused remedial groundwater extraction would further reduce the concentration, volume, mass, and toxicity of COCs over time. Risk from potable use of an impaired well in the reasonably foreseeable future would be mitigated or eliminated using a combination of remedial measures and contingencies.

To the extent practicable, the Proposed Remedy would provide for the control, management, or cleanup of hazardous substance to allow for the maximum beneficial use of the waters of the state. The remedial groundwater extraction would help to control and remediate COCs in WVBA groundwater and potable water use in the reasonably foreseeable future would be managed using remedial measures and contingencies. The Proposed Remedy remedial strategies, measures, and contingencies would allow for beneficial use of groundwater within the WVBA.

The Proposed Remedy is reasonable, necessary, cost-effective, and technically feasible. The Proposed Remedy is a balanced, cost-effective approach to meeting the ROs and is reasonable and technically feasible because the remedy components would be implemented using industry-standard methods. The remedial measures and contingent measures would also address wells that may become impaired in the future.

Using remedial strategies, remedial measures, and contingencies, the Proposed Remedy would address, at a minimum, any well that at the time of selection of the remedial action either supplies water for municipal, domestic, industrial, irrigation or agricultural uses or is part of a public water supply system if the well would now or in the reasonably foreseeable future produce water that would not be fit for its current or reasonably foreseeable end uses without treatment due to the release of hazardous substances. The specific measures to address any such well would not reduce the supply of water available to the owner of the well.



**REFERENCES**

1.   American Water Works Association, 2003. *Disinfection of Wells*. C654-13.

2.   Arizona Administrative Code, 2002. *Title 18. Environmental Quality, Chapter 16. Department of Environmental Quality Water Quality Assurance Revolving Fund Program*. March 31, 2002.

3.   Arizona Administrative Register, 2002. *Notice of Exempt Rulemaking, Title 18. Environmental Quality, Chapter 16. Department of Environmental Quality Water Quality Assurance Revolving Fund Program, Volume 8, Issue 13*. March 29, 2002.

4.   Arizona Department of Environmental Quality, 1998. *West Van Buren Site Registry Report*. January 28, 1998.

5.   Arizona Department of Environmental Quality, 2006a. *West Van Buren Water Quality Revolving Fund (WQARF) Site Fact Sheet*. February 2006.

6.   Arizona Department of Environmental Quality, 2006b. *West Central Phoenix WQARF Sites Map*. November 2006.

7.   Arizona Department of Environmental Quality, 2010a. *West Van Buren Water Quality Revolving Fund (WQARF) Site Summary*. March 2010.

8.   Arizona Department of Environmental Quality, 2010b. *West Central Phoenix Water Quality Revolving Fund (WQARF) Site Summary*. March 2010.

9.   Arizona Department of Environmental Quality, 2011a. *Motorola 52nd Street Superfund Site Map*. 2011.

10.  Arizona Department of Environmental Quality, 2012a. *Remedial Objectives Report, West Van Buren Area WQARF Registry Site, Phoenix, Arizona*. August 8, 2012.

11.  Arizona Department of Environmental Quality, 2012b. West Van Buren WQARF Site Map. July 2012.

12.  Arizona Department of Environmental Quality, 2013. *Letter dated August 5, 2013 re: West Van Buren Working Group, Feasibility Study Work Plan.*

13.  Arizona Department of Water Resources, 1999. *Substantive Policy Statement, Remediated Groundwater Incentive for Conservation Requirement Accounting for the Second Management Plan*. June 14, 1999.

14.  Arizona Department of Water Resources, 2010. *Letter from ADWR to RID*. May 7, 2010.

15.  Arizona Revised Statutes. *Title 49 - The Environment. Section 49-282.06 - Remedial Action Criteria*.

16.  Brown & Caldwell, 2014. *West Van Buren Study Area: Univar Groundwater Flow Model Update*, June 2014.

HALEY&
ALDRICH

17.     City of Phoenix, 2004. *COP General Plan*.

18.     City of Phoenix, 2005. *Water Resources Plan, 2005 Update*.

19.     City of Phoenix, 2011. *Water Resources Plan, 2011 Update*.

20.     City of Phoenix, 2013. Water Provider Questionnaire dated October 18, 2013.

21.     City of Phoenix, 2014. *Email Communication from COP*. April 18, 2014.

22.     City of Tolleson, 2005. *COT General Plan*.

23.     City of Tolleson, 2014. *Email Communication from Supervisor of Water Utilities for City of Tolleson*. April 2, 2014

24.     Dames and Moore, 1985. *Final Report. Groundwater Monitoring Well Installation and Testing, Phoenix Terminal*.

25.     Haley & Aldrich, Inc. 2013. *Feasibility Study Work Plan – Final, West Van Buren WQARF Site, Phoenix Arizona*. July 1, 2013.

26.     Montgomery & Associates, 2009a. *Roosevelt Irrigation District Groundwater Response Action, West Van Buren Water Quality Assurance Revolving Fund Site*. September 24, 2009.

27.     Montgomery & Associates, 2009b. *Roosevelt Irrigation District Early Response Action, West Van Buren Water Quality Assurance Revolving Fund Site*. October 5, 2009.

28.     Montgomery & Associates, 2010. *Roosevelt Irrigation District Revised Early Response Action, West Van Buren Water Quality Assurance Revolving Fund Site*. February 3, 2010.

29.     Roosevelt Irrigation District. Water Quality Data, 1985 – 1989.

30.     Roosevelt Irrigation District, 2007. *Land and Water Use Questionnaire*. November 12, 2007.

31.     Roosevelt Irrigation District, 2010a. *Revised Land and Water Use Questionnaire*. January 12, 2010.

32.     Roosevelt Irrigation District, 2010b. *Board of Directors Statement of Policy Regarding Superfund Sites*. November 9, 2010.

33.     Roosevelt Irrigation District, 2013. Water Provider Questionnaire dated October 28, 2013.

34.     Salt River Project, 1996. *Assured Water Supply Study for Salt River Project Member Lands*.

35.     Salt River Project, 2009. *Letter to ADEQ re: West Van Buren WQARF Site, Roosevelt Irrigation District's Proposed Early Response Plan*. December 4, 2009.

36.     Salt River Project, 2011. *Letter to ADEQ re: Arizona Department of Environmental Quality Notice of the Availability of the Proposed Remedial Objectives Report for the West Van Buren WQARF Registry Site in Phoenix, Arizona*. June 30, 2011.

HALEY&
ALDRICH

37.     Salt River Project, 2013. Water Provider Questionnaire dated October 18, 2013.

38.     Synergy Environmental, LLC., 2012. *Modified Early Response Action Work Plan*. October 19, 2012.

39.     Terranext, 2008. *Draft Remedial Investigation Report, West Van Buren Area WQARF Registry Site, Phoenix, Arizona*. October 2008.

40.     Terranext, 2012a. *Remedial Investigation Report, West Van Buren Area WQARF Registry Site, Phoenix, Arizona*. August 2012.

41.     Terranext, 2012b. *Land and Water Use Report, West Van Buren Area WQARF Registry Site, Phoenix, Arizona*. March 2012.

42.     United States Environmental Protection Agency, 2000. *A Guide to Developing and Documenting Cost Estimates during the Feasibility Study* (EPA 540-R-00-002). July 2000.

43.     United States Environmental Protection Agency, 2009. *Water Treatment Technology Feasibility Support Document for Chemical Contaminants for the Second Six-Year Review of National Primary Drinking Water Regulations*. October 2009.

44.     United States Environmental Protection Agency, Region 9. 2010. *Motorola, Inc. (52 Street Site) Superfund Site Fact Sheet*. July 27, 2010.

45.     United States Geological Survey, 2010. *Conceptual Understanding and Groundwater Quality of Selected Basin-Fill Aquifers in the Southwestern United States*, Professional Paper 1781.

46.     West Van Buren Working Group, 2011. *Letter to ADEQ re: Proposed Remedial Objectives Report for the West Van Buren WQARF Registry Site*. June 30, 2011.



TABLE 1
WVBA FACILITY SUMMARY MATRIX
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

Page 1 of 1

| Facility | Historical Operations | Site Investigation Activities | Remedial Actions | Current Regulatory Status |
|---|---|---|---|---|
| Air Liquide America Specialty Gases, LLC | Industrial and medical gases - site operations began in 1963. TCA reportedly used to clean compressors, valves, and other equipment from 1973 to 1996. | Soil, soil gas, and groundwater investigations began in 1998. Air Liquide entered into Consent Order with ADEQ in 2007. In 2011, the Consent Order was amended to include additional vadose zone testing and semi-annual groundwater monitoring/reporting. | **SOIL** Air Liquide performed contaminant source removal in its former Air Separation Unit. Excavated and disposed of two grease traps, associated concrete, and surrounding soil; confirmation soil testing; performed soil-vapor extraction pilot test. On basis of test results, ADEQ determined that soil-vapor radus of influence testing was not necessary; vadose zone characterization completed. | Air Liquide completed approximately six years of quarterly and semi-annual groundwater quality sampling and monthly/quarterly water-level monitoring. ADEQ concurred with Air Liquide that it would be receptive to considering Air Liquide's request for a No Further Action determination on the vadose zone. Air Liquide now is preparing a formal NFA request. Air Liquide completed two-years of additional groundwater monitoring and reporting, as stipulated in the amended Consent Order. |
| American Linen Supply Company (ALSCo) | Dry cleaner - ceased operations in 1995. PCE reportedly used from 1958 to 1984. | Soil, soil gas, and groundwater investigations began in 1992. Settled with ADEQ in 1997. | 1995: Early Response Action conducted by ADEQ. **SOIL** 1999 to 2003: SVE performed. 2002: SVE system shutdown and rebound monitoring performed. **GROUNDWATER** 1999 to 2003: Air sparging and groundwater extraction. 2002: Air sparging system shutdown. 2003: Groundwater extraction system shutdown. | 2008: NFA for soil. |
| ChemResearch Co., Inc. | Electroplating, metal finishing and metal parts painting, chrome plating - site operations began in 1983. PCE vapor degreasing reportedly used during historical operations. | Soil, soil gas, and groundwater investigations began in 1990. | **SOIL** 1995: Excavated and removed chromium-impacted soil to 10.5 feet bgs in the chromium plating east bay area. To date, no VOC-impacted groundwater remediation has been conducted. | ADEQ-approved Remedial Action Plan to conduct additional soils investigation and remediation. Unknown whether the remediation is related to chromium or VOC impacts, or both. |
| Department of Energy | Electrical substation and operations and maintenance facility, including administration, maintenance, storage, and vehicle fueling areas - site constructed in 1941. Chlorinated solvents reportedly used during historical operations. | Soil, soil gas, and groundwater investigations began in 1992. | None to date – unclear whether remedial actions are required by ADEQ. | ADEQ-approved soil sampling plan related to five disposal structures, the installation of additional monitoring wells, and continued monitoring. |
| Dolphin, Inc. | Wax pattern preparation, silica shell preparation, casting, and cleaning and finishing - site operations began in 1986. PCE and TCA reportedly used during operations. PCE used in vapor degreasing; PCE use was discontinued in 1994. | Soil, soil gas, and groundwater investigations began in 1986. RCRA Consent Order was issued by ADEQ in 2000. | **SOIL** 1986 to 2002: SVE performed. 2002: SVE system shutdown and rebound sampling. **GROUNDWATER** 1998 to 2002: Air sparging performed. | 2006: Termination of ADEQ Consent Order. |
| Maricopa County Materials Management (MCMM) | 1984 - 1974: Southwest Solvents operated on property now owned by MCMM - solvent recycling operation; reclaimed solvents reportedly included PCE, TCE, TCA, and Freon. 1974: Printing operation by MCMM; use of multi-graphic blankwash cleaning solutions and SafetyKleen cleaning solution reportedly containing PCE. | Soil, soil gas, and groundwater investigations began in 1992. | **SOIL** 1995 to 1997: SVE. 1997: SVE system shut down due to asymptotic conditions; subsequent soil vapor samples were below Soil Remediation Levels (SRLs). | 2001: Maricopa County and Union Pacific Railroad settled with ADEQ to cover response and oversight costs. |
| Prudential Overall Supply | Commercial Laundry: Dry cleaner - began operations in 1982. PCE reportedly used from 1982 to 1991. | Soil and soil gas investigation activities began in 2004; four groundwater monitor wells have been installed and are monitored and sampled per ADEQ Consent Orders. Soil vapor extraction wells have been installed and tested. | **SOIL** A Remedial Action Plan was prepared and approved by ADEQ for remediation of Site soils. Installation and operation of a soil vapor extraction system to address soil impacts in operation since November 2012. | Working under the June 2010 amended Consent Order with ADEQ. |
| Reynolds Metals Co. | 1946 to 1983: Aluminum extrusion facility. Stoddard solvent reportedly used until early 1970s; vapor degreasing with TCA reportedly used until the facility closed in 1983. | Soil, soil gas, and groundwater investigations began in 1988. | **SOIL** 1989 to 1991: SVE. 1991: SVE system was shut down after asymptotic conditions were reached. Excavated and removed approximately 3,100 tons of contaminated soil (primarily impacted with petroleum hydrocarbons). | 2000: ADEQ issued NFA for soil at 14 target areas. |
| Van Waters & Rogers (Univar USA Inc.) | Industrial chemical warehousing, distribution, repackaging, and transport facility - site acquired in 1968; office and warehouse built in 1971. Wastewater pre-treatment system, RCRA Interim Status Storage unit, sewer interceptor, and a bulk solvent tank farm. | Soil, soil gas, and groundwater investigations began in 1988. 1996: Consent Order with ADEQ related to additional site investigations. | **SOIL** 1992 to 1998: SVE. 1998: SVE system shut down. | 2002: Termination of ADEQ Consent Order. 2002: NFA for soils. |

NOTES:
1. NFA = No further action
2. PCE = Tetrachloroethene
3. SVE = Soil vapor extraction
4. TCA = 1,1,1-Trichloroethane
5. TCE = Trichloroethene
6. VOCs = Volatile organic compounds
7. ADEQ = Arizona Department of Environmental Quality
8. RCRA = Resource Conservation and Recovery Act

HALEY & ALDRICH, INC.
Table 1_WVBASmmryMtrx_F1.xlsx

JULY 2014

TABLE 2
SCREENING OF GROUNDWATER REMEDIAL STRATEGIES AND TECHNOLOGIES
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| REMEDIAL STRATEGIES | REMEDIAL TECHNOLOGIES | REMEDIAL TECHNOLOGIES DESCRIPTION | PRACTICABILITY | SCREENING CRITERIA | | BENEFIT | SCREENING COMMENTS | RETAINED? |
|---|---|---|---|---|---|---|---|---|
| | | | | RISK | RELATIVE COST | | | |
| No Action | Not Applicable | No actions taken to address impacted groundwater or threatened or impacted municipal, agricultural, or private water wells. | - Poor: Although alternative is feasible, it has low short- and long-term effectiveness and practicability relative to other alternatives. | No action would not reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | - Very Good: No action would not incur additional costs. | - Fair: Concentrations of COC are degrading over time and therefore the No Action alternative would ultimately lower risk to human and aquatic and terrestrial biota but over a much longer timeframe relative to other alternatives. | Does not pass initial screening as Remedial Objectives will not be met. | NO |
| Monitoring | Routine Groundwater Monitoring | Natural processes result in the reduction of concentrations of VOCs in groundwater. | - Very Good: Alternative is feasible, is likely to have good long-term effectiveness. The technology to implement this alternative is well known and implementable. | Groundwater monitoring and MNA, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | - Good: Groundwater monitoring is relatively inexpensive to implement, requiring little equipment, low labor-hours, and low costs for analyses of groundwater samples. | - Good: Groundwater monitoring and MNA, in combination with other remedial technologies, would lower risk to public health or aquatic and terrestrial biota under reasonable use scenarios and end use of water. | Would provide long-term evaluation of plume morphology and concentrations of COC in groundwater. Will be retained as a component of the remedial alternatives for the site. | YES |
| | Monitored Natural Attenuation (MNA) | Natural physical, biological, and chemical processes attenuate dissolved-phase VOCs and limit migration of some contaminants. | | | - Good: MNA is relatively inexpensive to implement compared with other remedial alternatives. MNA requires monitoring of water quality parameters that are additional to those analyzed for routine groundwater monitoring, so MNA is slightly more expensive than routine groundwater monitoring. | Similar to monitoring, MNA would provide long-term evaluation of plume morphology and concentrations of COC in the plume. MNA also provides an evaluation of groundwater conditions (for example, to indicate whether groundwater is aerobic or anaerobic) to evaluate whether conditions in groundwater are conducive to degradation of COC. MNA will be retained as a component of the remedial alternatives for the site. | YES |
| Source Control | | | | Source control to be addressed separately by ADEQ | | | | YES - Not addressed by ADEQ |
| Controlled Migration | Groundwater Extraction | Groundwater is extracted by pumping from the subsurface, to influence the migration direction of a portion of the WVBA plume. | - Good: Infrastructure (extraction wells) to implement this alternative is in place or can be installed. Alternative is likely to have good long-term effectiveness. The technology for groundwater extraction is well-understood. Conveyance piping challenging and extensive given dense population/development and large plume. | Groundwater extraction, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | - Fair: Groundwater extraction and conveyance of treated groundwater to distant areas requires substantial infrastructure, treatment of water to water quality standards, high energy input and long-term operations & maintenance. | - Good: Groundwater extraction, in combination with other remedial technologies, would lower risk to public health or aquatic and terrestrial biota, which when combined with other extraction wells already exist, or may be installed nearby, this remedy would have limited change to aesthetics and local land use. | Groundwater extraction would provide a means of influencing migration of large areas of the plume. It is logistically possible and feasible to install and maintain groundwater extraction wells at the WVBA site. | YES |
| | Hydraulic Containment | Groundwater is contained by pumping from the subsurface to control the migration of groundwater and limit further migration of a portion of the WVBA plume. | - Good: Infrastructure (extraction wells) to implement this alternative is in place or may be readily installed, however extensive piping network for conveyance is needed in congested, densely populated area. Alternative is likely to have good long-term effectiveness. | Hydraulic containment, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | - Fair: Hydraulic containment via extraction and conveyance of treated groundwater to distant areas requires substantial infrastructure, treatment of water to water quality standards, high energy input and long-term operations & maintenance. | - Good: Hydraulic containment, in combination with other remedial technologies, would lower risk to public health or aquatic and terrestrial biota, and which when combined with other extraction wells already exist, or may be readily installed, this remedy would cause minimal change to aesthetics and local land use. | Groundwater extraction from strategic locations in the plume to create a barrier zool which groundwater flow is minimized. Hydraulic containment is logistically possible, and it is feasible to install and maintain groundwater extraction wells at the WVBA site. | YES |
| Physical Containment | Permeable Reactive Barrier (PRB) | Permeable treatment wells are installed using trenches, fracturing, boreholes or other means to create a barrier wall across the flow path of a contaminant plume. As groundwater migrates through the permeable vertical barrier, it is passively treated via zero-valent metals, zeolite, or other materials. | - Poor: Alternative is not considered feasible. It has low short- and long-term effectiveness and reliability relative to other alternatives. The performance capability of this technology would likely be low, given the scale of the plume and the depth to groundwater given capabilities of current construction methodologies. | Since this remedial technology is considered impractical to implement at the site, it would not reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | - Poor: Installing a permeable reactive barrier for a plume this large (and to a depth of ~100+ ft. bgs, at the groundwater barrier wall would be congested) this technology would be considered impractical and to other remedial technologies. | - Poor: Since this remedial technology is considered impractical to implement at the Site, it would not result in lowered risk or reduced concentrations of VOCs in groundwater. Installing a PRB for a plume of this size, and at a depth of ~100+ ft, below the water table would be greatly disruptive to aesthetics and local land use in the short term. | A permeable reactive barrier is impracticable due to the length and depth required for plume treatment. A permeable reactive barrier would also be impracticable due to access and logistical issues. | NO |

HALEY & ALDRICH, INC.
Table 2_WVBAScrngProof1chologs_F.xlsx

TABLE 2
SCREENING OF GROUNDWATER REMEDIAL STRATEGIES AND TECHNOLOGIES
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| REMEDIAL STRATEGIES | REMEDIAL TECHNOLOGIES | REMEDIAL TECHNOLOGIES DESCRIPTION | SCREENING CRITERIA | | | BENEFIT | SCREENING COMMENTS | RETAINED? |
|---|---|---|---|---|---|---|---|---|
| | | | PRACTICABILITY | RISK | RELATIVE COST | | | |
| Plume Remediation - In Situ | In Situ Air Sparging with Soil Vapor Extraction (SVE) | Dissolved-phase VOCs in groundwater are converted to the vapor phase by introducing air into the saturated zone. The VOCs in the vapor phase rise to the unsaturated zone, where they are captured by soil vapor extraction. | • Poor: Alternative is not considered feasible, given the scale of the plume and the depth to groundwater. Implementation would require a large number of injection points, which may be impractical/infeasible to install in a densely populated area. Therefore, it has low short- and long-term effectiveness and reliability relative to other alternatives. | Soil vapor extraction over a large area is considered infeasible. Therefore, VOCs that are partitioned into the air phase could result in increased risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | • Poor: Conducting air sparging and soil vapor extraction for a plume this large (and to a depth of ~100 ft. bgs, at the groundwater table) would be very expensive relative to other remedial technologies. | • Poor: Since this remedial technology is considered impractical to implement at the Site, it would not result in lowered risk or reduced concentrations of VOCs in groundwater. Air sparging for a plume of this size, and at a depth of ~100+ ft. bgs (to water table), would be greatly disruptive to aesthetics and local land use. | Thick unsaturated zone and large scale of WVBA plume problematic to adequate capture of sparged COCs, thus limiting the efficacy of air sparging with SVE. Complete plume remediation via air sparge/SVE is impracticable due to scale of WVBA. | NO |
| | In Situ Chemical Oxidation via Injection Points | A chemical oxidant is introduced into the saturated zone via injection points in order to aerobically degrade VOCs in groundwater. | • Poor: Alternative is not considered feasible, given the scale of the plume and the depth to groundwater. Implementation would require a large number of injection points, which may be impractical/infeasible to install in a densely populated area. Therefore, it has low short- and long-term effectiveness and reliability relative to other alternatives. | Since this remedial technology is considered impractical to implement at the Site, it would not reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | • Poor: The quantity of chemical oxidant required to be effective for a plume this size would be very expensive relative to other remedial technologies. | • Poor: Since this remedial technology is considered impractical to implement at the Site, it would not result in lowered risk or reduced concentrations of VOCs in groundwater. Chemical oxidation injection for a plume of this size would be greatly disruptive to aesthetics and local land use. | This technology requires handling of large volumes of oxidants requiring special safety considerations. Complete plume remediation via in-situ chemical oxidation is impracticable due to scale of WVBA. | NO |
| | In Situ Enhanced Bioremediation | Enhanced bioremediation amendments are introduced into the saturated zone in order to enhance the natural biodegradation of VOCs in groundwater by naturally-occurring microbes. | • Poor: Alternative is not considered feasible, given the scale of the plume and the depth to groundwater. Implementation would require a large number of injection points, which may be impractical/infeasible to install in a densely populated area. Therefore, it has low short- and long-term effectiveness and reliability relative to other alternatives. | Since this remedial technology is considered impractical to implement at the Site, it would not reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | • Poor: The quantity of bioremediation amendments required to be effective for a plume this size would be very expensive relative to other remedial technologies. | • Poor: Since this remedial technology is considered impractical to implement at the Site, it would not result in lowered risk or reduced concentrations of VOCs in groundwater. Installation of the number of injection points required for a plume of this size would be greatly disruptive to aesthetics and local land use. | Complete plume remediation via in-situ enhanced bioremediation is impracticable due to the scale of WVBA. | NO |

Page 3 of 3

TABLE 2
SCREENING OF GROUNDWATER REMEDIAL STRATEGIES AND TECHNOLOGIES
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| REMEDIAL STRATEGIES | REMEDIAL TECHNOLOGIES | DESCRIPTION | SCREENING CRITERIA | | | | SCREENING COMMENTS | RETAINED? |
|---|---|---|---|---|---|---|---|---|
| | | | PRACTICABILITY | RISK | RELATIVE COST | BENEFIT | | |
| Plume Remediation - Ex-Situ | Ex-Situ Advanced Oxidation | A strong oxidizer is added to extracted groundwater to chemically degrade VOCs. Extracted groundwater is also exposed to ultraviolet (UV) light which further breaks down the chemical bonds of the contaminants. | Fair- Alternative is considered feasible, in combination with groundwater extraction; alternative could be expected to have long-term effectiveness. | This alternative, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. Additionally, handling of oxidants may expose site workers to risk, thereby implementing remedy to risk. | Poor- The components of an advanced oxidation treatment train are expensive to install and replace, relative to granulated activated carbon treatment. | Good- Alternative would lower concentrations of COC; would reduce risk to public health or aquatic and terrestrial biota; and would enhance future uses. Installation of treatment trains would cause some change to aesthetics and local land use. | Technology requires handling of oxidants requiring special safety considerations. Ozone (often to ultraviolet lights) are expensive to install and replace, compounded for the high flow conditions associated with WVBA plume remedy. Thus, plume remediation via advanced oxidation is impracticable due to scale of WVBA. | NO |
| | Ex-Situ Ion Exchange (Resin) | Extracted groundwater is pumped through vessels containing resin. Ions from the aqueous phase are removed by exchange with ions in the exchange medium/resin, thereby converting or breaking down the contaminant of concern. | Fair- Alternative is considered feasible, in combination with groundwater extraction; alternative could be expected to have long-term effectiveness. However, resin requires specific expertise to regeneration/manage. | This alternative, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | Poor- The components of an ion exchange treatment train are expensive to install and replace, relative to granulated activated carbon treatment. Pretreatment may require additional steps (e.g., pH modification) relative to other treatment technologies. | Good- Alternative would lower concentrations of COC; would reduce risk to public health or aquatic and terrestrial biota; and would enhance future uses. Installation of treatment trains would cause some change to aesthetics and local land use. | Resin and the associated treatment train are expensive to install and maintain. Resins require periodic regeneration to remain effective; regeneration may require specific expertise. The ion exchange process generates wastewater that must be treated. As with other ex situ treatments, suspended solids could limit the effectiveness of the technology, requiring pretreatment via filtration. The treatment may require pH adjustment to optimize performance. Thus, plume remediation via ion exchange is impracticable due to scale of WVBA. | NO |
| | Ex-Situ Air Stripping with Air Emission Control | Extracted groundwater is passed (though) an air stripper to partition the VOCs from groundwater to air. Air containing VOCs may then be treated using emission control methods, such as activated carbon vessels or oxidizers. | Poor- In combination with groundwater extraction, alternative could be expected to have long-term effectiveness. However, air stripping requires treatment of groundwater, air, and wastewater generated by the process. Relative to other ex-situ technologies, this alternative is less practicable. | This alternative, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | Poor- Air stripping requires significant energy costs to install and maintain the system. | Good- Alternative would lower concentrations of COC; would reduce risk to public health or aquatic and terrestrial biota; and would enhance future uses. However, installation of treatment trains would cause some change to aesthetics and local land use. | As with other ex situ treatments, suspended solids in groundwater could limit the effectiveness of this technology due to scaling. Phase transfer of COCs to gas that also requires treatment (e.g. vapor phase GAC) results in added energy and equipment costs. An air stripping system would likely require significant ongoing maintenance due to potential fouling by suspended solids in groundwater, requiring pre-filtration. Thus, plume remediation via air stripping is impracticable due to scale of WVBA. | NO |
| | Ex-Situ Granulated Activated Carbon (Liquid Phase) | Extracted groundwater is pumped through pre-treatment filter bags (or similar) to remove solid-phase particulate, then pumped through vessels containing activated carbon. Dissolved-phase VOCs adsorb to the activated carbon, which is periodically changed/regenerated. | Very Good- In combination with groundwater extraction, alternative is expected to exhibit long-term effectiveness. Relative to other ex-situ technologies, this alternative is reliable and practical to implement, especially for relatively dilute plumes. | This alternative, in combination with other remedial technologies, would reduce risk to public health or aquatic and terrestrial biota under reasonably foreseeable use scenarios and end use of water. | Good- Alternative is less expensive than other ex-situ treatment technologies and much less expensive than in-situ treatment. | Good- Alternative would lower concentrations of COC; would reduce risk to public health or aquatic and terrestrial biota; and would enhance future uses. Installation of treatment trains would cause some change to aesthetics and local land use, but the wellhead treatment would be relatively small footprint and be located in an existing developed area. | Granulated activated carbon is a well-known remediation technology that is relatively inexpensive to implement and maintain. Carbon may be regenerated or replaced. Although complete plume restoration via groundwater extraction and treatment is impracticable within a reasonable time frame due to the scale of WVBA, localized remediation in areas of the plume with relatively elevated VOC concentrations could be used to reduce the need for additional remedial measures or contingency measures. Treated groundwater effluent could be reinjected into the aquifer, to a City of Phoenix treatment plant, the SRP Grand Canal, or the RID Main Canal. | YES - on a localized basis in combination with other strategies and measures. |

Abbreviations:
COC = contaminants of concern
GAC = granulated activated carbon
MNA = monitored natural attenuation
PRB = permeable reactive barrier
SVE = soil vapor extraction
VOC(s) = volatile organic compounds
WVBA = West Van Buren Area
PL = part feet below ground surface

Notes:
Alternatives were rated on a relative scale as:
- Very Good
- Good
- Fair
- Poor

HALEY & ALDRICH, INC.
Table 2_WVBAScrngRmdTchHqs_F.xlsx

JULY 2014

TABLE 3                                                                                    Page 1 of 3
SEMI-ANNUAL GROUNDWATER MONITORING PROGRAM
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| WVBA Well ID | Owner/Facility Name | Well Type | Alluvial Unit | Facility Well ID | ADWR # | Semiannual Sampling |
|---|---|---|---|---|---|---|
| AVB10-01 | ADEQ-ESTRELLA BUSINESS PARK | Monitoring | UAU1 | MW-1 | 55-532041 | 8260B; 6010B |
| AVB10-02 | ADEQ-ESTRELLA BUSINESS PARK | Monitoring | UAU2 | MW-2 | 55-532042 | 8260B; 6010B |
| AVB12-01 | ADEQ/MW-4-7TH AVE | Monitoring | UAU1 | MW-4 | 55-532767 | 8260B; 6010B |
| AVB14-01 | ADEQ 7TH AVE | Monitoring | UAU1 | MW-2 | 55-531086 | 8260B; 6010B |
| AVB15-01 | ROGERS SHELL | Monitoring | UAU1 | MW-2 | 55-520257 | 8260B; 6010B |
| AVB18-01 | ADEQ 7TH AVE | Monitoring | UAU1 | MW-1 | 55-531084 | 8260B |
| AVB20-03 | APS WEST PHOENIX | Monitoring | UAU1 | RB-3 | 55-590922 | 8260B; 6010B |
| AVB26-01 | ADOT 15TH/BUCKEYE | Monitoring | UAU1 | DW-2 | 55-504687 | 8260B |
| AVB38-04 | ADEQ-RID ROW | Monitoring | UAU1 | AVB38-04 | 55-535311 | 8260B |
| AVB40-05 | ADEQ - ALSCO | Monitoring | UAU1 | MW-3 | 55-536228 | 8260B |
| AVB40-06 | ADEQ - ALSCO | Monitoring | UAU1 | MW-1 | 55-536229 | 8260B |
| AVB40-07 | ADEQ - ALSCO | Monitoring | UAU1 | MW-2 | 55-536227 | 8260B |
| AVB40-08 | ADEQ - ALSCO | Monitoring | UAU1 | MW-4 | 55-536284 | 8260B; 6010B |
| AVB57-01 | ADEQ-WILCOX | Monitoring | UAU1 | APS-1 | 55-539219 | 8260B; 6010B |
| AVB60-01 | ADEQ NSW | Monitoring | MAU | AVB60-01 | 55-543717 | 8260B |
| AVB61-01 | ADEQ SSW | Monitoring | MAU | AVB61-01 | 55-546228 | 8260B; 6010B |
| AVB68-02 | ADEQ-MADISON | Monitoring | UAU1 | MW-2 | 55-561942 | 8260B |
| AVB68-04 | ADEQ-MADISON | Monitoring | UAU2 | MW-3 | 55-561940 | 8260B |
| AVB69-01 | ADEQ-19TH AVE/PIMA | Monitoring | UAU2 | MW-2 | 55-562052 | 8260B |
| AVB69-02 | ADEQ-19TH AVE/PIMA | Monitoring | UAU1 | MW-1 | 55-562053 | 8260B; 6010B |
| AVB70-01 | ADEQ-19TH AVE/LINCOLN | Monitoring | UAU1 | MW-I | 55-569883 | 8260B; 6010B |
| AVB71-01 | ADEQ-75TH AVE | Monitoring | UAU1 | MW-2 | 55-569741 | 8260B; 6010B |
| AVB72-01 | ADEQ-29TH AVE/VAN BUREN | Monitoring | UAU1 | MW-3 | 55-569882 | 8260B; 6010B |
| AVB73-01 | ADEQ-67TH AVE/BUCKEYE | Monitoring | UAU1 | MW-4 | 55-569880 | 8260B; 6010B |
| AVB74-01 | ADEQ-83RD AVE/VAN BUREN | Monitoring | UAU1 | MW-5 | 55-570051 | 8260B; 6010B |
| AVB75-01 | ADEQ-69TH AVE/WASHINGTON | Monitoring | UAU1 | MW-6 | 55-569881 | 8260B; 6010B |
| AVB76-01 | ADEQ-75TH AVE/MADISON | Monitoring | UAU1 | MW-7 | 55-570052 | 8260B; 6010B |
| AVB77-01 | ADEQ - ALSCO | Monitoring | UAU1 | MW-5S | 55-567445 | 8260B |
| AVB77-02 | ADEQ - ALSCO | Monitoring | UAU2 | MW-5D | 55-567443 | 8260B |
| AVB77-03 | ADEQ - ALSCO | Monitoring | UAU1 | MW-5M | 55-567444 | 8260B |
| AVB81-01 | ADEQ-7200 W SHERMAN | Monitoring | UAU2 | AVB81-01 | 55-584503 | 8260B |
| AVB81-02 | ADEQ-7200 W SHERMAN | Monitoring | UAU1 | AVB81-02 | 55-584500 | 8260B |
| AVB82-01 | ADEQ-6800 W VAN BUREN | Monitoring | MAU | AVB82-01 | 55-584504 | 8260B |
| AVB82-02 | ADEQ-6800 W VAN BUREN | Monitoring | MAU | AVB82-02 | 55-214608 | 8260B; 6010B |
| AVB83-01 | ADEQ-700 S 11TH AVE | Monitoring | UAU1 | AVB83-01 | 55-584501 | 8260B |
| AVB84-01 | ADEQ-1300 S 22ND AVE | Monitoring | UAU1 | AVB84-01 | 55-584497 | 8260B |
| AVB85-01 | ADEQ-500 S 16TH AVE | Monitoring | UAU1 | AVB85-01 | 55-584505 | 8260B |
| AVB88-01 | ADEQ-1900 S 25TH AVE | Monitoring | UAU1 | AVB88-01 | 55-584498 | 8260B; 6010B |

TABLE 3                                                                                          Page 2 of 3
SEMI-ANNUAL GROUNDWATER MONITORING PROGRAM
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| WVBA Well ID | Owner/Facility Name | Well Type | Alluvial Unit | Facility Well ID | ADWR # | Semiannual Sampling |
|---|---|---|---|---|---|---|
| AVB91-01 | ADEQ-73RD AVE/ROOSEVELT | Monitoring | UAU1 | AVB91-01 | 55-589635 | 8260B; 6010B |
| AVB91-02 | ADEQ-73RD AVE/ROOSEVELT | Monitoring | UAU2 | AVB91-02 | 55-589644 | 8260B |
| AVB91-03 | ADEQ-73RD AVE/ROOSEVELT | Monitoring | MAU | AVB91-03 | 55-214616 | 8260B; 6010B |
| AVB92-01 | ADEQ-53RD AVE/ROOSEVELT | Monitoring | UAU1 | AVB92-01 | 55-589637 | 8260B; 6010B |
| AVB92-02 | ADEQ-53RD AVE/ROOSEVELT | Monitoring | UAU1 | AVB92-02 | 55-589646 | 8260B |
| AVB93-01 | ADEQ-52ND AVE/MCKINLEY | Monitoring | UAU1 | AVB93-01 | 55-589638 | 8260B; 6010B |
| AVB94-01 | ADEQ-43RD AVE/ROOSEVELT | Monitoring | UAU1 | AVB94-01 | 55-589639 | 8260B; 6010B |
| AVB94-02 | ADEQ-43RD AVE/ROOSEVELT | Monitoring | UAU1 | AVB94-02 | 55-589642 | 8260B; 6010B |
| AVB95-01 | ADEQ-34TH AVE/ROOSEVELT | Monitoring | UAU1 | AVB95-01 | 55-589636 | 8260B; 6010B |
| AVB95-02 | ADEQ-34TH AVE/ROOSEVELT | Monitoring | UAU1 | AVB95-02 | 55-626533 | 8260B; 6010B |
| AVB96-01 | ADEQ-63RD AVE/GARFIELD | Monitoring | UAU1 | AVB96-01 | 55-589640 | 8260B; 6010B |
| AVB97-01 | ADEQ-25TH AVE/YAVAPAI | Monitoring | UAU1 | AVB97-01 | 55-589641 | 8260B; 6010B |
| AVB98-01 | ADEQ-75TH AVE/MADISON | Monitoring | UAU2 | AVB98-01 | 55-589645 | 8260B |
| AVB99-01 | ADEQ-11TH AVE/BUCKEYE | Monitoring | UAU1 | AVB99-01 | 55-589634 | 8260B |
| AVB103-02 | TRISTAR | Monitoring | UAU1 | MW-2 | 55-581001 | 8260B; 6010B |
| AVB106-01 | MCMM | Monitoring | UAU1 | MC-05 | 55-549619 | 8260B; 6010B |
| AVB106-02 | MCMM | Monitoring | UAU1 | MC-N06 #2 | 55-549233 | 8260B |
| AVB106-03 | MCMM | Monitoring | UAU2 | MC-N06 #3 | 55-549233 | 8260B |
| AVB107-01 | TRANSCON (TRNS03-01) | Monitoring | UAU1 | MW-2 | 55-525469 | 8260B |
| AVB108-01 | VAN WATERS & ROGERS INC/Univar | Monitoring | UAU1 | MW-6 | 55-531539 | 8260B; 6010B |
| AVB108-02 | VAN WATERS & ROGERS INC/Univar | Monitoring | UAU1 | MW-11 | 55-562746 | 8260B; 6010B |
| AVB112-05 | SEVEN ELEVEN INC | Monitoring | UAU1 | MW-5 | 55-200601 | 8260B; 6010B |
| AVB115-01 | ADEQ-12TH AVE/VAN BUREN | Monitoring | UAU1 | AVB115-01 | 55-596920 | 8260B |
| AVB116-01 | ADEQ-21ST AVE/JACKSON | Monitoring | UAU1 | AVB116-01 | 55-596916 | 8260B |
| AVB116-02 | ADEQ-21ST AVE/JACKSON | Monitoring | UAU2 | AVB116-02 | 55-202187 | 8260B |
| AVB117-01 | ADEQ-37TH LANE/MCKINLEY | Monitoring | UAU1 | AVB117-01 | 55-596917 | 8260B |
| AVB119-01 | ADEQ-50TH AVE/ROOSEVELT | Monitoring | UAU1 | AVB119-01 | 55-596918 | 8260B |
| AVB120-01 | ADEQ-40TH AVE/GRANT | Monitoring | UAU1 | AVB120-01 | 55-596919 | 8260B |
| AVB120-02 | ADEQ-40TH AVE/GRANT | Monitoring | UAU2 | AVB120-02 | 55-596922 | 8260B |
| AVB120-03 | ADEQ-40TH AVE/GRANT | Monitoring | MAU | AVB120-03 | 55-217205 | 8260B |
| AVB121-01 | ADEQ-41ST AVE/GIBSON | Monitoring | UAU1 | AVB121-01 | 55-596921 | 8260B |
| AVB121-02 | ADEQ-41ST AVE/GIBSON | Monitoring | UAU2 | AVB121-02 | 55-214615 | 8260B; 6010B |
| AVB122-01 | ADEQ-5STH AVE/BUCHANAN | Monitoring | UAU1 | AVB122-01 | 55-596931 | 8260B |
| AVB122-02 | ADEQ-5STH AVE/BUCHANAN | Monitoring | UAU1 | AVB122-02 | 55-596932 | 8260B |
| AVB122-03 | ADEQ-5STH AVE/BUCHANAN | Monitoring | UAU2 | AVB122-03 | 55-202186 | 8260B; 6010B |
| AVB123-01 | ADEQ-1STH AVE/FILLMORE | Monitoring | UAU1 | AVB123-01 | 55-202185 | 8260B |
| AVB124-01 | ADEQ-19TH AVE/MONROE | Monitoring | UAU2 | AVB124-01 | 55-202184 | 8260B |
| AVB124-02 | ADEQ-19TH AVE/MONROE | Monitoring | UAU2 | AVB124-02 | 55-207163 | 8260B; 6010B |

**TABLE 3**                                                                                              Page 3 of 3
SEMI-ANNUAL GROUNDWATER MONITORING PROGRAM
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| WVBA Well ID | Owner/Facility Name | Well Type | Alluvial Unit | Facility Well ID | ADWR # | Semiannual Sampling |
|---|---|---|---|---|---|---|
| AVB125-01 | ADEQ-19TH AVE/DURANGO | Monitoring | UAU1 | AVB125-01 | 55-202189 | 8260B; 6010B |
| AVB126-01 | ADEQ-25TH AVE/GRANT | Monitoring | UAU1 | AVB126-01 | 55-211115 | 8260B; 6010B |
| AVB126-02 | ADEQ-25TH AVE/GRANT | Monitoring | UAU2 | AVB126-02 | 55-211114 | 8260B; 6010B |
| AVB126-03 | ADEQ-25TH AVE/GRANT | Monitoring | UAU2 | AVB126-03 | 55-214611 | 8260B; 6010B |
| AVB127-01 | ADEQ-31ST AVE/WASHINGTON | Monitoring | UAU1 | AVB127-01 | 55-202279 | 8260B |
| AVB128-01 | ADEQ-31ST AVE/WASHINGTON | Monitoring | UAU2 | AVB128-01 | 55-202283 | 8260B |
| AVB129-01 | ADEQ-79TH AVE/ROOSEVELT | Monitoring | UAU1 | AVB129-01 | 55-202280 | 8260B |
| AVB129-02 | ADEQ-79TH AVE/ROOSEVELT | Monitoring | UAU2 | AVB129-02 | 55-202282 | 8260B |
| AVB130-01 | ADEQ-43RD AVE/MCDOWELL | Monitoring | UAU1 | AVB130-01 | 55-202188 | 8260B |
| AVB131-01 | ADEQ-18TH AVE/LINDEN | Monitoring | UAU2 | AVB131-01 | 55-207161 | 8260B; 6010B |
| AVB132-01 | ADEQ-HYDE PARK | Monitoring | UAU2 | AVB132-01 | 55-208664 | 8260B |
| AVB132-02 | ADEQ-HYDE PARK | Monitoring | UAU2 | AVB132-02 | 55-208663 | 8260B; 6010B |
| AVB133-01 | ADEQ-I7TH AVE/BUCKEYE | Monitoring | UAU1 | AVB133-01 | 55-207162 | 8260B; 6010B |
| AVB134-01 | ADEQ-31ST AVE/HARRISON | Monitoring | UAU1 | AVB134-01 | 55-211113 | 8260B |
| AVB134-02 | ADEQ-31ST AVE/HARRISON | Monitoring | UAU2 | AVB134-02 | 55-211112 | 8260B |
| AVB135-01 | ADEQ-63RD AVE/SHERMAN | Monitoring | UAU1 | AVB135-01 | 55-211111 | 8260B; 6010B |
| AVB136-01 | ADEQ-39TH AVE/MOHAVE | Monitoring | UAU2 | AVB136-01 | 55-211110 | 8260B; 6010B |
| AVB137-01 | ADEQ-5STH AVE/MOHAVE | Monitoring | UAU2 | AVB137-01 | 55-211109 | 8260B; 6010B |
| AVB139-01 | ADEQ | Monitoring | UAU2 | | 55-214809 | 8260B; 6010B |
| AVB140-01 | ADEQ | Monitoring | UAU1 | | 55-214610 | 8260B; 6010B |
| AVB141-01 | ADEQ | Monitoring | UAU2 | | 55-214609 | 8260B; 6010B |
| AVB142-01 | ADEQ | Monitoring | UAU2 | | 55-217206 | 8260B; 6010B |
| PS-6 | REYNOLDS | Monitoring | UAU1 | RMC-06 | 55-532037 | 8260B; 6010B |
| PS-7 | REYNOLDS | Monitoring | UAU1 | RMC-07 | 55-545676 | 8260B; 6010B |
| PS-9 | REYNOLDS | Monitoring | UAU1 | RMC-09 | 55-545678 | 8260B; 6010B |

**NOTES:**
1. 8260B = EPA Method 8260B for analysis of volatile organic compounds, including 1,4-dioxane.
2. 6010B = Analysis of total chromium and filtered total chromium.
3. Samples to be collected using no-purge Hydrasleeve™ method.

**TABLE 4**                                                                 Page 1 of 2
RID BLENDING APPROACH MASS BALANCE CALCULATIONS - CURRENT CONDITIONS
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| RID SALT CANAL | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-105 | 1900 | 8.7% | 0.55 | 0.05 | 2.56 | 0.22 |
| RID-106 | 1500 | 6.8% | 7.49 | 0.51 | 23.4 | 1.60 |
| RID-107 | 2100 | 9.6% | 7.82 | 0.75 | 4.43 | 0.42 |
| RID-108 | 1900 | 8.7% | 3.1 | 0.27 | 6.24 | 0.54 |
| RID-109 | 2400 | 11.0% | 6.92 | 0.76 | 6.65 | 0.73 |
| RID-110 | 2900 | 13.2% | 1.21 | 0.16 | 6.85 | 0.91 |
| RID-111R | 2700 | 12.3% | 0.5 | 0.06 | 0.63 | 0.08 |
| RID-112 | 1700 | 7.8% | 6.4 | 0.50 | 2.01 | 0.16 |
| RID-113 | 2300 | 10.5% | 8.14 | 0.85 | 1.92 | 0.20 |
| RID-114 | 2500 | 11.4% | 48.6 | 5.55 | 2.2 | 0.25 |
| Total | 21900 | Calc. Concentration at End of Canal | | 9.5 | | 5.1 |
| | | Salt Canal Sample (2011) | | 11.8 | | 4.6 |

| RID MAIN CANAL | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-83 | 2300 | 3.7% | 0 | 0.00 | 0 | 0.00 |
| RID-84 | 2400 | 3.8% | 1.09 | 0.04 | 6.91 | 0.26 |
| RID-85 | 2600 | 4.1% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-86 | 3600 | 5.7% | 0.5 | 0.03 | 0.5 | 0.03 |
| RID-87 | 2000 | 3.2% | 0 | 0.00 | 0 | 0.00 |
| RID-88 | 2000 | 3.2% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-89 | 3100 | 4.9% | 34.1 | 1.69 | 11 | 0.54 |
| RID-90 | 2500 | 4.0% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-91 | 3200 | 5.1% | 2.99 | 0.15 | 0.5 | 0.03 |
| RID-92 | 1300 | 2.1% | 73.5 | 1.52 | 14.7 | 0.30 |
| RID-93 | 4000 | 6.4% | 1.17 | 0.07 | 0.5 | 0.03 |
| RID-94 | 3300 | 5.3% | 0.88 | 0.05 | 0.59 | 0.03 |
| RID-95 | 1700 | 2.7% | 54.4 | 1.47 | 3.44 | 0.09 |
| RID-96 | 3000 | 4.8% | 0 | 0.00 | 0 | 0.00 |
| RID-97 | 3200 | 5.1% | 0 | 0.00 | 0 | 0.00 |
| RID-98 | 3800 | 6.1% | 0 | 0.00 | 0 | 0.00 |
| RID-99 | 2400 | 3.8% | 0.5 | 0.02 | 8.85 | 0.34 |
| RID-100 | 2100 | 3.3% | 9.38 | 0.31 | 4.72 | 0.16 |
| RID-101 | 4500 | 7.2% | 0.5 | 0.04 | 0.5 | 0.04 |
| RID-102 | 3900 | 6.2% | 0.5 | 0.03 | 5.36 | 0.33 |
| RID-103 | 2200 | 3.5% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-104 | 3600 | 5.7% | 0.5 | 0.03 | 4.2 | 0.24 |
| Total | 62700 | Calc. Concentration at End of Canal | | 5.5 | | 2.5 |
| | | Main Canal Sample - 67A - (2011) | | 2.3 | | 1.2 |

TABLE 4                                                                                      Page 2 of 2
RID BLENDING APPROACH MASS BALANCE CALCULATIONS - CURRENT CONDITIONS
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| COMBINED CANALS | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-105 | 1900 | 2.2% | 0.55 | 0.01 | 2.56 | 0.06 |
| RID-106 | 1500 | 1.8% | 7.49 | 0.13 | 23.4 | 0.41 |
| RID-107 | 2100 | 2.5% | 7.82 | 0.19 | 4.43 | 0.11 |
| RID-108 | 1900 | 2.2% | 3.1 | 0.07 | 6.24 | 0.14 |
| RID-109 | 2400 | 2.8% | 6.92 | 0.20 | 6.65 | 0.19 |
| RID-110 | 2900 | 3.4% | 1.21 | 0.04 | 6.85 | 0.23 |
| RID-111R | 2700 | 3.2% | 0.5 | 0.02 | 0.63 | 0.02 |
| RID-112 | 1700 | 2.0% | 6.4 | 0.13 | 2.01 | 0.04 |
| RID-113 | 2300 | 2.7% | 8.14 | 0.22 | 1.92 | 0.05 |
| RID-114 | 2500 | 3.0% | 48.6 | 1.44 | 2.2 | 0.07 |
| RID-83 | 2300 | 2.7% | 0 | 0.00 | 0 | 0.00 |
| RID-84 | 2400 | 2.8% | 1.09 | 0.03 | 6.91 | 0.20 |
| RID-85 | 2600 | 3.1% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-86 | 3600 | 4.3% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-87 | 2000 | 2.4% | 0 | 0.00 | 0 | 0.00 |
| RID-88 | 2000 | 2.4% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-89 | 3100 | 3.7% | 34.1 | 1.25 | 11 | 0.40 |
| RID-90 | 2500 | 3.0% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-91 | 3200 | 3.8% | 2.99 | 0.11 | 0.5 | 0.02 |
| RID-92 | 1300 | 1.5% | 73.5 | 1.13 | 14.7 | 0.23 |
| RID-93 | 4000 | 4.7% | 1.17 | 0.06 | 0.5 | 0.02 |
| RID-94 | 3300 | 3.9% | 0.88 | 0.03 | 0.59 | 0.02 |
| RID-95 | 1700 | 2.0% | 54.4 | 1.09 | 3.44 | 0.07 |
| RID-96 | 3000 | 3.5% | 0 | 0.00 | 0 | 0.00 |
| RID-97 | 3200 | 3.8% | 0 | 0.00 | 0 | 0.00 |
| RID-98 | 3800 | 4.5% | 0 | 0.00 | 0 | 0.00 |
| RID-99 | 2400 | 2.8% | 0.5 | 0.01 | 8.85 | 0.25 |
| RID-100 | 2100 | 2.5% | 9.38 | 0.23 | 4.72 | 0.12 |
| RID-101 | 4500 | 5.3% | 0.5 | 0.03 | 0.5 | 0.03 |
| RID-102 | 3900 | 4.6% | 0.5 | 0.02 | 5.36 | 0.25 |
| RID-103 | 2200 | 2.6% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-104 | 3600 | 4.3% | 0.5 | 0.02 | 4.2 | 0.18 |
| Total | 84600 | Calc. Concentration at End of Canal | | 6.5 | | 3.2 |
| | | Canal Sample Downstream of Confluence 83A - (2011) | | 5.57 | | 2.6 |

NOTES:
1. Pumping rates per the Modified Early Response Action Work Plan by Synergy Environmental, LLC, dated October 2012.
2. The 2011 surface water samples were used because they represent pre-RID well head treatment conditions.
3. TCE = Trichloroethylene.
4. PCE = Tetrachloroethylene.
5. µg/L = Micrograms per liter.
6. gpm = Gallons per minute.

**TABLE 5**                                                                                   Page 1 of 2
RID BLENDING APPROACH MASS BALANCE CALCULATIONS - RID-114 REPLACED
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| RID SALT CANAL | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-105 | 1900 | 8.7% | 0.55 | 0.05 | 2.56 | 0.22 |
| RID-106 | 1500 | 6.8% | 7.49 | 0.51 | 23.4 | 1.60 |
| RID-107 | 2100 | 9.6% | 7.82 | 0.75 | 4.43 | 0.42 |
| RID-108 | 1900 | 8.7% | 3.1 | 0.27 | 6.24 | 0.54 |
| RID-109 | 2400 | 11.0% | 6.92 | 0.76 | 6.65 | 0.73 |
| RID-110 | 2900 | 13.2% | 1.21 | 0.16 | 6.85 | 0.91 |
| RID-111R | 2700 | 12.3% | 0.5 | 0.06 | 0.63 | 0.08 |
| RID-112 | 1700 | 7.8% | 6.4 | 0.50 | 2.01 | 0.16 |
| RID-113 | 2300 | 10.5% | 8.14 | 0.85 | 1.92 | 0.20 |
| RID-114 | 2500 | 11.4% | 0 | 0.00 | 0 | 0.00 |
| Total | 21900 | Calc. Concentration at End of Canal | | 3.9 | | 4.9 |

| RID MAIN CANAL | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-83 | 2300 | 3.7% | 0 | 0.00 | 0 | 0.00 |
| RID-84 | 2400 | 3.8% | 1.09 | 0.04 | 6.91 | 0.26 |
| RID-85 | 2600 | 4.1% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-86 | 3600 | 5.7% | 0.5 | 0.03 | 0.5 | 0.03 |
| RID-87 | 2000 | 3.2% | 0 | 0.00 | 0 | 0.00 |
| RID-88 | 2000 | 3.2% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-89 | 3100 | 4.9% | 34.1 | 1.69 | 11 | 0.54 |
| RID-90 | 2500 | 4.0% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-91 | 3200 | 5.1% | 2.99 | 0.15 | 0.5 | 0.03 |
| RID-92 | 1300 | 2.1% | 73.5 | 1.52 | 14.7 | 0.30 |
| RID-93 | 4000 | 6.4% | 1.17 | 0.07 | 0.5 | 0.03 |
| RID-94 | 3300 | 5.3% | 0.88 | 0.05 | 0.59 | 0.03 |
| RID-95 | 1700 | 2.7% | 54.4 | 1.47 | 3.44 | 0.09 |
| RID-96 | 3000 | 4.8% | 0 | 0.00 | 0 | 0.00 |
| RID-97 | 3200 | 5.1% | 0 | 0.00 | 0 | 0.00 |
| RID-98 | 3800 | 6.1% | 0 | 0.00 | 0 | 0.00 |
| RID-99 | 2400 | 3.8% | 0.5 | 0.02 | 8.85 | 0.34 |
| RID-100 | 2100 | 3.3% | 9.38 | 0.31 | 4.72 | 0.16 |
| RID-101 | 4500 | 7.2% | 0.5 | 0.04 | 0.5 | 0.04 |
| RID-102 | 3900 | 6.2% | 0.5 | 0.03 | 5.36 | 0.33 |
| RID-103 | 2200 | 3.5% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-104 | 3600 | 5.7% | 0.5 | 0.03 | 4.2 | 0.24 |
| Total | 62700 | Calc. Concentration at End of Canal | | 5.5 | | 2.5 |

TABLE 5                                                                                  Page 2 of 2
RID BLENDING APPROACH MASS BALANCE CALCULATIONS - RID-114 REPLACED
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| COMBINED CANALS | | | 2013 or Most Recent Concentration (µg/L) | | | |
|---|---|---|---|---|---|---|
| Well | Pumping Rate (gpm) | Pumping Proportion | TCE | TCE Proportion | PCE | PCE Proportion |
| RID-105 | 1900 | 2.2% | 0.55 | 0.01 | 2.56 | 0.06 |
| RID-106 | 1500 | 1.8% | 7.49 | 0.13 | 23.4 | 0.41 |
| RID-107 | 2100 | 2.5% | 7.82 | 0.19 | 4.43 | 0.11 |
| RID-108 | 1900 | 2.2% | 3.1 | 0.07 | 6.24 | 0.14 |
| RID-109 | 2400 | 2.8% | 6.92 | 0.20 | 6.65 | 0.19 |
| RID-110 | 2900 | 3.4% | 1.21 | 0.04 | 6.85 | 0.23 |
| RID-111R | 2700 | 3.2% | 0.5 | 0.02 | 0.63 | 0.02 |
| RID-112 | 1700 | 2.0% | 6.4 | 0.13 | 2.01 | 0.04 |
| RID-113 | 2300 | 2.7% | 8.14 | 0.22 | 1.92 | 0.05 |
| RID-114 | 2500 | 3.0% | 0 | 0.00 | 0 | 0.00 |
| RID-83 | 2300 | 2.7% | 0 | 0.00 | 0 | 0.00 |
| RID-84 | 2400 | 2.8% | 1.09 | 0.03 | 6.91 | 0.20 |
| RID-85 | 2600 | 3.1% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-86 | 3600 | 4.3% | 0.5 | 0.02 | 0.5 | 0.02 |
| RID-87 | 2000 | 2.4% | 0 | 0.00 | 0 | 0.00 |
| RID-88 | 2000 | 2.4% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-89 | 3100 | 3.7% | 34.1 | 1.25 | 11 | 0.40 |
| RID-90 | 2500 | 3.0% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-91 | 3200 | 3.8% | 2.99 | 0.11 | 0.5 | 0.02 |
| RID-92 | 1300 | 1.5% | 73.5 | 1.13 | 14.7 | 0.23 |
| RID-93 | 4000 | 4.7% | 1.17 | 0.06 | 0.5 | 0.02 |
| RID-94 | 3300 | 3.9% | 0.88 | 0.03 | 0.59 | 0.02 |
| RID-95 | 1700 | 2.0% | 54.4 | 1.09 | 3.44 | 0.07 |
| RID-96 | 3000 | 3.5% | 0 | 0.00 | 0 | 0.00 |
| RID-97 | 3200 | 3.8% | 0 | 0.00 | 0 | 0.00 |
| RID-98 | 3800 | 4.5% | 0 | 0.00 | 0 | 0.00 |
| RID-99 | 2400 | 2.8% | 0.5 | 0.01 | 8.85 | 0.25 |
| RID-100 | 2100 | 2.5% | 9.38 | 0.23 | 4.72 | 0.12 |
| RID-101 | 4500 | 5.3% | 0.5 | 0.03 | 0.5 | 0.03 |
| RID-102 | 3900 | 4.6% | 0.5 | 0.02 | 5.36 | 0.25 |
| RID-103 | 2200 | 2.6% | 0.5 | 0.01 | 0.5 | 0.01 |
| RID-104 | 3600 | 4.3% | 0.5 | 0.02 | 4.2 | 0.18 |
| Total | 84600 | Calc. Concentration at End of Canal | | 5.1 | | 3.1 |

**NOTES:**
1. Pumping rates per the Modified Early Response Action Work Plan by Synergy Environmental, LLC, dated October 2012.
2. The 2011 surface water samples were used because they represent pre-RID well head treatment conditions.
3. TCE = Trichloroethylene.
4. PCE = Tetrachloroethylene.
5. µg/L = Micrograms per liter.
6. gpm = Gallons per minute.

TABLE 6
REMEDIAL ALTERNATIVES - STRATEGIES, MEASURES, AND CONTINGENCIES
WEST VAN BUREN WQARF SITE
PHOENIX, ARIZONA

| REMEDIAL ALTERNATIVE | REMEDIAL STRATEGIES | END USE OF EXTRACTED GROUNDWATER | REMEDIAL MEASURES | CONTINGENCIES | CONTINGENCY TRIGGER |
|---|---|---|---|---|---|
| Less Aggressive Remedy | MONITORED NATURAL ATTENUATION Monitored natural attenuation and groundwater monitoring. Semi-annual monitoring program - sampling of 68 UAU1, 27 UAU2, and six MAU monitoring wells for VOCs and 1,4-dioxane, with total and dissolved chromium analyses at select wells. A full round of water levels from approximately 120 monitoring wells would also be included in each semi-annual monitoring event. 25 select monitoring wells would also be analyzed for MNA parameters once per year. | Not applicable. | PRIVATE WELLS WITHIN WVBA Connect impaired private water well property to COP drinking water system. For costing purposes, assume five (5) wells will require measures. | RID WELLS WITHIN WVBA To the extent the RID constructs the necessary infrastructure and obtains the legal authority to sell groundwater to other drinking water providers, RID could employ a blending approach should end use change from irrigation to drinking water supply. If RID only uses wells along Salt Canal for drinking water supply, contingent well measure of replacing RID-114 with a UAU production well located along the Salt Canal outside of the plume. | Imminent change in end use from irrigation to drinking water supply, and the water quality is not fit for its intended use at that time. |
| | | | | FUTURE COP/SRP PRODUCTION WELLS WITHIN THE WVBA Either move the proposed well to an area where water quality is sufficient for its intended use, or deepen the well to produce only in the LAU. Only those additional costs above and beyond routine costs that would otherwise have been incurred would be applicable to the remedial measure. | Should COP or SRP drill and construct a production well within the WVBA in the reasonably foreseeable future, and the water quality is not fit for its intended use at that time. |
| | | | | SENTINEL MONITORING WELL NETWORK Seven (7) existing UAU1 monitoring wells located along the northern and western perimeter of the WVBA, along with five (5) new sentinel wells located west-northwest of the current WVBA, would be monitored for VOCs on a quarterly basis. In addition, if operating, the eleven (11) SRP wells would also be sampled for VOCs during the quarterly events. | Employed to the extent necessary should RID cease pumping in 2026 and COC concentrations in the regional WVBA plume at that time are still above AWQS at concentrations which could impair known or anticipated uses of groundwater. Drilling of new sentinel wells and start of sentinel well monitoring in 2026. |
| | | | | SRP PRODUCTION WELLS OUTSIDE OF WVBA Replacement of four (4) impaired SRP wells with co-located LAU production well should RID cease pumping within the SRRD and the remaining dissolved-phase plume at that time allowed to migrate downgradient under the new hydraulic conditions. | Based on sentinel well monitoring. |
| | | | | PRIVATE WELLS OUTSIDE OF WVBA Connect impaired private water wells to COP drinking water system. For costing purposes, assume five (5) wells will require measures. | |
| | | | | PLANNED, FUTURE COT PRODUCTION WELLS Work with City of Tolleson to move their proposed COT-2, COT-3, and COT-4 locations further south-southwest to prevent potential future impairment. | Prior to drilling and construction of planned, future wells. |

TABLE 6
REMEDIAL ALTERNATIVES - STRATEGIES, MEASURES, AND CONTINGENCIES
WEST VAN BUREN WQARF SITE
PHOENIX, ARIZONA

Page 2 of 2

| REMEDIAL ALTERNATIVE | REMEDIAL STRATEGIES | END USE OF EXTRACTED GROUNDWATER | REMEDIAL MEASURES | CONTINGENCIES | CONTINGENCY TRIGGER |
|---|---|---|---|---|---|
| Reference Remedy | MONITORED NATURAL ATTENUATION Same semi-annual monitoring program as described above. | Not applicable. | Same remedial measures as the Less Aggressive Remedy above. | RID, SRP, COT, PRIVATE WATER WELLS Same contingencies as above, except for replacement of two (2) SRP wells instead of four (4) for costing purposes, due to increased remedial pumping in Reference Remedy. | Same contingency triggers as above. |
| | FOCUSED REMEDIAL GROUNDWATER EXTRACTION One new extraction well (EW-2) screened across both the UAU1 and UAU2 pumping at 500 gpm alongside other RID pumping wells. Located north of RID-95 on 35th Avenue. Well-head treatment of consisting of LGAC for treatment of VOCs in extracted groundwater. For costing purposes, operation of the new extraction well assumed from 2016 to 2026. | 500 gpm of treated groundwater to SRP lateral on 35th Avenue, then discharged to the RID Main Canal under an agreement with SRP and RID. | | EXPANDED SENTINEL MONITORING WELL NETWORK To reduce uncertainties regarding water quality downgradient of WVBA, which production wells may become impaired post-2025, and the timing of the impairment, the sentinel monitoring well network would be expanded to include seven (7) existing UAU1 monitoring wells located along the northern and western perimeter of the WVBA, along with nine (9) new sentinel wells located west-northwest of the current WVBA, to be monitored for VOCs (assumed on a quarterly basis for costing purposes). In addition, if operating, the eleven (11) SRP wells would also be sampled for VOCs during the sentinel well monitoring events. | Same contingency triggers as above. |
| | | | | CONTINUED OPERATION OF EW-2 BEYOND 2025 Continue to operate EW-2 beyond 2025. For costing purposes, assume operation from 2026 through 2044. Assumes re-injection of treated groundwater into collocated LAU injection well. | If deemed necessary based on the plume extent and concentrations in 2026, and a cost-benefit analysis at that time. |
| | | | | OPERATION OF ADDITIONAL 1,000 GPM REMEDIAL EXTRACTION WELL STARTING IN 2026 Drilling, construction, and operating of an additional remedial extraction well at 1,000 gpm. For costing purposes, assume operation from 2026 through 2044. Assumes re-injection of treated groundwater into collocated LAU injection wells. | |
| More Aggressive Remedy | MONITORED NATURAL ATTENUATION Same semi-annual monitoring program as described above. | Not applicable. | Same remedial measures as the remedial alternatives above. | RID, SRP, COT, PRIVATE WATER WELLS Same contingencies as the Reference Remedy above. | Same contingency triggers as above. |
| | FOCUSED REMEDIAL GROUNDWATER EXTRACTION Two new extraction wells (EW-1 and EW-2) each pumping at 1,000 gpm alongside other RID pumping. EW-1 located on 47th Avenue and EW-2 located north of RID-95 on 35th Avenue. Well-head treatment at both extraction wells of consisting of LGAC for treatment of VOCs in extracted groundwater. For costing purposes, operation of the new extraction wells assumed from 2016 to 2026. | For EW-1 and EW-2, treated groundwater to SRP lateral on 47th Avenue and 35th Avenue, respectively, then discharged to the RID Main Canal under an agreement with SRP and RID. | | SENTINEL MONITORING WELL NETWORK Same sentinel monitoring well network as the Less Aggressive Remedy. | |
| | | | | CONTINUED OPERATION OF EW-1 AND EW-2 BEYOND 2025 Continue to operate EW-2 beyond 2025. For costing purposes, assume operation from 2026 through 2044. For each extraction well, assumes re-injection of treated groundwater into two, collocated LAU injection wells. | If deemed necessary based on the plume extent and concentrations in 2026, and a cost-benefit analysis at that time. |

HALEY & ALDRICH, INC.

TABLE 7                                                                                          Page 1 of 1
VOC MASS REMOVAL CALCULATIONS - BASE CONDITIONS
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| Well | Pumping Rate (gpm) | 2013 or Most Recent Concentration (ug/L) | | VOC Mass Removal (pounds/year) | | | |
|------|------|------|------|------|------|------|------|
| | | TCE | PCE | TCE | Percent of Total | PCE | Percent of Total |
| RID-83 | 2300 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-84 | 2400 | 1.09 | 6.91 | 6.7 | 0.5% | 42.6 | 6.2% |
| RID-85 | 2600 | 0.5 | 0.5 | 3.3 | 0.2% | 3.3 | 0.5% |
| RID-86 | 3600 | 0.5 | 0.5 | 4.6 | 0.3% | 4.6 | 0.7% |
| RID-87 | 2000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-88 | 2000 | 0.5 | 0.5 | 2.6 | 0.2% | 2.6 | 0.4% |
| RID-89 | 3100 | 34.1 | 11 | 271.3 | 19.1% | 87.5 | 12.7% |
| RID-90 | 2500 | 0.5 | 0.5 | 3.2 | 0.2% | 3.2 | 0.5% |
| RID-91 | 3200 | 2.99 | 0.5 | 24.6 | 1.7% | 4.1 | 0.6% |
| RID-92 | 1300 | 73.5 | 14.7 | 245.2 | 17.2% | 49.0 | 7.1% |
| RID-93 | 4000 | 1.17 | 0.5 | 12.0 | 0.8% | 5.1 | 0.7% |
| RID-94 | 3300 | 0.88 | 0.59 | 7.5 | 0.5% | 5.0 | 0.7% |
| RID-95 | 1700 | 54.4 | 3.44 | 237.4 | 16.7% | 15.0 | 2.2% |
| RID-96 | 3000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-97 | 3200 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-98 | 3800 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-99 | 2400 | 0.5 | 8.85 | 3.1 | 0.2% | 54.5 | 7.9% |
| RID-100 | 2100 | 9.38 | 4.72 | 50.6 | 3.6% | 25.4 | 3.7% |
| RID-101 | 4500 | 0.5 | 0.5 | 5.8 | 0.4% | 5.8 | 0.8% |
| RID-102 | 3900 | 0.5 | 5.36 | 5.0 | 0.4% | 53.7 | 7.8% |
| RID-103 | 2200 | 0.5 | 0.5 | 2.8 | 0.2% | 2.8 | 0.4% |
| RID-104 | 3600 | 0.5 | 4.2 | 4.6 | 0.3% | 38.8 | 5.6% |
| RID-105 | 1900 | 0.55 | 2.56 | 2.7 | 0.2% | 12.5 | 1.8% |
| RID-106 | 1500 | 7.49 | 23.4 | 28.8 | 2.0% | 90.1 | 13.0% |
| RID-107 | 2100 | 7.82 | 4.43 | 42.1 | 3.0% | 23.9 | 3.5% |
| RID-108 | 1900 | 3.1 | 6.24 | 15.1 | 1.1% | 30.4 | 4.4% |
| RID-109 | 2400 | 6.92 | 6.65 | 42.6 | 3.0% | 41.0 | 5.9% |
| RID-110 | 2900 | 1.21 | 6.85 | 9.0 | 0.6% | 51.0 | 7.4% |
| RID-111R | 2700 | 0.5 | 0.63 | 3.5 | 0.2% | 4.4 | 0.6% |
| RID-112 | 1700 | 6.4 | 2.01 | 27.9 | 2.0% | 8.8 | 1.3% |
| RID-113 | 2300 | 8.14 | 1.92 | 48.1 | 3.4% | 11.3 | 1.6% |
| RID-114 | 2500 | 48.6 | 2.2 | 311.9 | 21.9% | 14.1 | 2.0% |
| **TOTAL** | 84600 | | | 1422 | | 691 | |

**NOTES:**
1. Pumping rates per the Modified Early Response Action Work Plan by Synergy Environmental, LLC, dated October 2012.
2. Mass removal adjusted for pumping seven months of the year.
3. TCE = Trichloroethylene.
4. PCE = Tetrachloroethylene.
5. μg/L = Micrograms per liter.
6. gpm = Gallons per minute.

HALEY & ALDRICH, INC.
Tables 7 through 9_VOC Mass Removal Calculations_F.xlsx                                 JULY 2014

**TABLE 8**                                                                                          Page 1 of 1
VOC MASS REMOVAL CALCULATIONS - REFERENCE REMEDY
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| Well | Pumping Rate (gpm) | 2013 or Most Recent Concentration (ug/L) | | VOC Mass Removal (pounds/year) | | | |
|------|------|------|------|------|------|------|------|
| | | TCE | PCE | TCE | Percent of Total | PCE | Percent of Total |
| RID-83 | 2300 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-84 | 2400 | 1.09 | 6.91 | 6.7 | 0.5% | 42.6 | 6.1% |
| RID-85 | 2600 | 0.5 | 0.5 | 3.3 | 0.2% | 3.3 | 0.5% |
| RID-86 | 3600 | 0.5 | 0.5 | 4.6 | 0.3% | 4.6 | 0.7% |
| RID-87 | 2000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-88 | 2000 | 0.5 | 0.5 | 2.6 | 0.2% | 2.6 | 0.4% |
| RID-89 | 3100 | 34.1 | 11 | 271.3 | 18.2% | 87.5 | 12.6% |
| RID-90 | 2500 | 0.5 | 0.5 | 3.2 | 0.2% | 3.2 | 0.5% |
| RID-91 | 3200 | 2.99 | 0.5 | 24.6 | 1.6% | 4.1 | 0.6% |
| RID-92 | 1300 | 73.5 | 14.7 | 245.2 | 16.4% | 49.0 | 7.1% |
| RID-93 | 4000 | 1.17 | 0.5 | 12.0 | 0.8% | 5.1 | 0.7% |
| RID-94 | 3300 | 0.88 | 0.59 | 7.5 | 0.5% | 5.0 | 0.7% |
| RID-95 | 1700 | 54.4 | 3.44 | 237.4 | 15.9% | 15.0 | 2.2% |
| RID-96 | 3000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-97 | 3200 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-98 | 3800 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-99 | 2400 | 0.5 | 8.85 | 3.1 | 0.2% | 54.5 | 7.8% |
| RID-100 | 2100 | 9.38 | 4.72 | 50.6 | 3.4% | 25.4 | 3.7% |
| RID-101 | 4500 | 0.5 | 0.5 | 5.8 | 0.4% | 5.8 | 0.8% |
| RID-102 | 3900 | 0.5 | 5.36 | 5.0 | 0.3% | 53.7 | 7.7% |
| RID-103 | 2200 | 0.5 | 0.5 | 2.8 | 0.2% | 2.8 | 0.4% |
| RID-104 | 3600 | 0.5 | 4.2 | 4.6 | 0.3% | 38.8 | 5.6% |
| RID-105 | 1900 | 0.55 | 2.56 | 2.7 | 0.2% | 12.5 | 1.8% |
| RID-106 | 1500 | 7.49 | 23.4 | 28.8 | 1.9% | 90.1 | 13.0% |
| RID-107 | 2100 | 7.82 | 4.43 | 42.1 | 2.8% | 23.9 | 3.4% |
| RID-108 | 1900 | 3.1 | 6.24 | 15.1 | 1.0% | 30.4 | 4.4% |
| RID-109 | 2400 | 6.92 | 6.65 | 42.6 | 2.9% | 41.0 | 5.9% |
| RID-110 | 2900 | 1.21 | 6.85 | 9.0 | 0.6% | 51.0 | 7.3% |
| RID-111R | 2700 | 0.5 | 0.63 | 3.5 | 0.2% | 4.4 | 0.6% |
| RID-112 | 1700 | 6.4 | 2.01 | 27.9 | 1.9% | 8.8 | 1.3% |
| RID-113 | 2300 | 8.14 | 1.92 | 48.1 | 3.2% | 11.3 | 1.6% |
| RID-114 | 2500 | 48.6 | 2.2 | 311.9 | 20.9% | 14.1 | 2.0% |
| EW-2 | 500 | 54.4 | 3.44 | 69.8 | 4.7% | 4.4 | 0.6% |
| **TOTALS** | 85100 | | | 1492 | | 695 | |

**NOTES:**
1. Pumping rates per the Modified Early Response Action Work Plan by Synergy Environmental, LLC, dated October 2012.
2. Mass removal adjusted for pumping seven months of the year.
3. TCE = Trichloroethylene.
4. PCE = Tetrachloroethylene.
5. µg/L = Micrograms per liter.
6. gpm = Gallons per minute.

HALEY & ALDRICH, INC.
Tables 7 through 9_VOC Mass Removal Calculations_F.xlsx

JULY 2014

**TABLE 9**
VOC MASS REMOVAL CALCULATIONS - MORE AGGRESSIVE REMEDY
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

Page 1 of 1

| Well | Pumping Rate (gpm) | 2013 or Most Recent Concentration (ug/L) | | VOC Mass Removal (pounds/year) | | | |
|------|------|------|------|------|------|------|------|
| | | TCE | PCE | TCE | Percent of Total | PCE | Percent of Total |
| RID-83 | 2300 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-84 | 2400 | 1.09 | 6.91 | 6.7 | 0.4% | 42.6 | 5.9% |
| RID-85 | 2600 | 0.5 | 0.5 | 3.3 | 0.2% | 3.3 | 0.5% |
| RID-86 | 3600 | 0.5 | 0.5 | 4.6 | 0.3% | 4.6 | 0.6% |
| RID-87 | 2000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-88 | 2000 | 0.5 | 0.5 | 2.6 | 0.2% | 2.6 | 0.4% |
| RID-89 | 3100 | 34.1 | 11 | 271.3 | 16.8% | 87.5 | 12.1% |
| RID-90 | 2500 | 0.5 | 0.5 | 3.2 | 0.2% | 3.2 | 0.4% |
| RID-91 | 3200 | 2.99 | 0.5 | 24.6 | 1.5% | 4.1 | 0.6% |
| RID-92 | 1300 | 73.5 | 14.7 | 245.2 | 15.2% | 49.0 | 6.8% |
| RID-93 | 4000 | 1.17 | 0.5 | 12.0 | 0.7% | 5.1 | 0.7% |
| RID-94 | 3300 | 0.88 | 0.59 | 7.5 | 0.5% | 5.0 | 0.7% |
| RID-95 | 1700 | 54.4 | 3.44 | 237.4 | 14.7% | 15.0 | 2.1% |
| RID-96 | 3000 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-97 | 3200 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-98 | 3800 | 0 | 0 | 0.0 | 0.0% | 0.0 | 0.0% |
| RID-99 | 2400 | 0.5 | 8.85 | 3.1 | 0.2% | 54.5 | 7.5% |
| RID-100 | 2100 | 9.38 | 4.72 | 50.6 | 3.1% | 25.4 | 3.5% |
| RID-101 | 4500 | 0.5 | 0.5 | 5.8 | 0.4% | 5.8 | 0.8% |
| RID-102 | 3900 | 0.5 | 5.36 | 5.0 | 0.3% | 53.7 | 7.4% |
| RID-103 | 2200 | 0.5 | 0.5 | 2.8 | 0.2% | 2.8 | 0.4% |
| RID-104 | 3600 | 0.5 | 4.2 | 4.6 | 0.3% | 38.8 | 5.4% |
| RID-105 | 1900 | 0.55 | 2.56 | 2.7 | 0.2% | 12.5 | 1.7% |
| RID-106 | 1500 | 7.49 | 23.4 | 28.8 | 1.8% | 90.1 | 12.4% |
| RID-107 | 2100 | 7.82 | 4.43 | 42.1 | 2.6% | 23.9 | 3.3% |
| RID-108 | 1900 | 3.1 | 6.24 | 15.1 | 0.9% | 30.4 | 4.2% |
| RID-109 | 2400 | 6.92 | 6.65 | 42.6 | 2.6% | 41.0 | 5.6% |
| RID-110 | 2900 | 1.21 | 6.85 | 9.0 | 0.6% | 51.0 | 7.0% |
| RID-111R | 2700 | 0.5 | 0.63 | 3.5 | 0.2% | 4.4 | 0.6% |
| RID-112 | 1700 | 6.4 | 2.01 | 27.9 | 1.7% | 8.8 | 1.2% |
| RID-113 | 2300 | 8.14 | 1.92 | 48.1 | 3.0% | 11.3 | 1.6% |
| RID-114 | 2500 | 48.6 | 2.2 | 311.9 | 19.3% | 14.1 | 1.9% |
| EW-1 | 1000 | 20 | 10 | 51.3 | 3.2% | 25.7 | 3.5% |
| EW-2 | 1000 | 54.4 | 3.44 | 139.6 | 8.7% | 8.8 | 1.2% |
| **TOTALS** | 86600 | | | 1613 | | 725 | |

Total TCE Mass Removal
With EW-1 and EW-2      1613
Without EW-1 and EW-2   1422
Increase                1.134

Total PCE Mass Removal
With EW-1 and EW-2      725
Without EW-1 and EW-2   691
Increase                1.050

**NOTES:**
1. Pumping rates per the Modified Early Response Action Work Plan by Synergy Environmental, LLC, dated October 2012.
2. Mass removal adjusted for pumping seven months of the year.
3. TCE = Trichloroethylene.
4. PCE = Tetrachloroethylene.
5. µg/L = Micrograms per liter.
6. gpm = Gallons per minute.

**TABLE 10**
REMEDIAL ALTERNATIVE COST SUMMARY
WEST VAN BUREN AREA WQARF SITE
PHOENIX, ARIZONA

| | Investment Return Rate= 9% |
|---|---|
| | Inflation Rate= 3% |
| | Discount Rate= 6% |

| Remedy | Backup Reference | Year (Period) | Trigger | Non Disc., w/3% Inflation Capital | Total O&M | Total | NPV @ 6% Disc. Rate Capital | Total O&M | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Less Aggressive Remedy** | | | | | | | | | |
| **Base** | | | | | | | | | |
| 1 Groundwater Monitoring Program | Module A | 2014-2044 | N/A | $  - | $10.33 | $10.33 | $  - | $ 2.90 | $ 2.90 |
| 2 Connect five (5) impaired private wells within the WVBA to COP municipal system | Module B | 2014 | N/A | $ 0.05 | $  - | $ 0.05 | $ 0.05 | $  - | $ 0.05 |
| Base Total | | | | $ 0.05 | $10.33 | $10.38 | $ 0.05 | $ 2.90 | $ 2.95 |
| **Contingencies** | | | | | | | | | |
| 1 Drill and construct five (5) new sentinel monitoring wells | Module H | 2026 | As necessary based on post-2025 plume conditions | $ 0.36 | $  - | $ 0.36 | $ 0.13 | $  - | $ 0.13 |
| 2 Quarterly sentinel well monitoring at twelve (12) monitoring wells and eleven (11) SRP wells | Module J | 2026-2044 | As necessary based on post-2025 plume conditions | $  - | $ 1.49 | $ 1.49 | $  - | $ 0.23 | $ 0.23 |
| 3 Replace four (4) SRP wells with new, collocated LAU wells | Module F | 2030 | Based on quarterly sentinel well monitoring results | $10.74 | $  - | $10.74 | $ 2.64 | $  - | $ 2.64 |
| 4 Connect five (5) private wells outside of WVBA to COP municipal system | Module K | 2026 | Based on quarterly sentinel well monitoring results | $ 0.07 | $  - | $ 0.07 | $ 0.02 | $  - | $ 0.02 |
| 5 Replace RID-114 with a new UAU production well at different location | Module G | 2019 | Imminent change in end use to potable and water quality not fit for intended use at that time | $ 1.23 | $  - | $ 1.23 | $ 0.79 | $  - | $ 0.79 |
| **Reference Remedy** | | | | | | | | | |
| **Base** | | | | | | | | | |
| 1 Groundwater Monitoring Program | Module A | 2014-2044 | N/A | $  - | $10.33 | $10.33 | $  - | $ 2.90 | $ 2.90 |
| 2 Connect five (5) impaired private wells within the WVBA to COP municipal system | Module B | 2014 | N/A | $ 0.05 | $  - | $ 0.05 | $ 0.05 | $  - | $ 0.05 |
| 3 One (1) plume core extraction well at 500 gpm | Module E (500 gpm) | 2016-2026 | N/A | $ 2.60 | $ 6.57 | $ 9.17 | $ 2.18 | $ 3.44 | $ 5.62 |
| Base Total | | | | $ 2.65 | $16.90 | $19.55 | $ 2.23 | $ 6.34 | $ 8.57 |
| **Contingencies** | | | | | | | | | |
| 1 Drill and construct nine (9) new sentinel monitoring wells | Module H | 2026 | As necessary based on post-2025 plume conditions | $ 0.65 | $  - | $ 0.65 | $ 0.23 | $  - | $ 0.23 |
| 2 Quarterly sentinel well monitoring at sixteen (16) monitoring wells and eleven (11) SRP wells | Module L | 2026-2044 | As necessary based on post-2025 plume conditions | $  - | $ 1.81 | $ 1.81 | $  - | $ 0.28 | $ 0.28 |
| 3 Replace two (2) SRP wells with new, collocated LAU wells | Module F | 2030 | Based on quarterly sentinel well monitoring results | $ 5.37 | $  - | $ 5.37 | $ 1.32 | $  - | $ 1.32 |
| 4 Connect five (5) private wells outside of WVBA to COP municipal system | Module K | 2026 | Based on quarterly sentinel well monitoring results | $ 0.07 | $  - | $ 0.07 | $ 0.02 | $  - | $ 0.02 |
| 5 Replace RID-114 with a new UAU production well at different location | Module G | 2019 | Imminent change in end use to potable and water quality not fit for intended use at that time | $ 1.23 | $  - | $ 1.23 | $ 0.79 | $  - | $ 0.79 |
| 6 Continue operating one (1) plume core extraction well at 500 gpm | Module E (500 gpm) | 2026-2044 | If deemed necessary based on post-2025 plume conditions and cost-benefit analysis | $  - | $18.03 | $18.03 | $  - | $ 2.82 | $ 2.82 |
| 6a Reinject 500 gpm treated water | Module C (500 gpm) | 2026-2044 | | $ 3.75 | $ 1.50 | $ 5.26 | $ 1.31 | $ 0.24 | $ 1.54 |
| 7 Add one (1) plume core extraction well at 1,000 gpm | Module E (1 @ 1,000 gpm) | 2026-2044 | If deemed necessary based on post-2025 plume conditions and cost-benefit analysis | $ 3.67 | $24.43 | $28.10 | $ 1.28 | $ 3.82 | $ 5.10 |
| 7a Reinject 1,000 gpm treated water | Module C (1 @ 1,000 gpm) | 2026-2044 | | $ 5.98 | $ 2.53 | $ 8.51 | $ 2.08 | $ 0.40 | $ 2.48 |
| **More Aggressive Remedy** | | | | | | | | | |
| **Base** | | | | | | | | | |
| 1 Groundwater Monitoring Program | Module A | 2014-2044 | N/A | $  - | $10.33 | $10.33 | $  - | $ 2.90 | $ 2.90 |
| 2 Connect five (5) impaired private wells within the WVBA to COP municipal system | Module B | 2014 | N/A | $ 0.05 | $  - | $ 0.05 | $ 0.05 | $  - | $ 0.05 |
| 3 Two (2) plume core extraction wells at 1,000 gpm each | Module E (2 @ 1,000 gpm) | 2016-2026 | N/A | $ 5.32 | $16.36 | $21.68 | $ 4.46 | $ 8.55 | $13.02 |
| Base Total | | | | $ 5.37 | $26.69 | $32.06 | $ 4.51 | $11.45 | $16.97 |
| **Contingencies** | | | | | | | | | |
| 1 Drill and construct five (5) new sentinel monitoring wells | Module H | 2026 | As necessary based on post-2025 plume conditions | $ 0.36 | $  - | $ 0.36 | $ 0.13 | $  - | $ 0.13 |
| 2 Quarterly sentinel well monitoring at twelve (12) monitoring wells and eleven (11) SRP wells | Module J | 2026-2044 | As necessary based on post-2025 plume conditions | $  - | $ 1.49 | $ 1.49 | $  - | $ 0.23 | $ 0.23 |
| 3 Replace two (2) SRP wells with new, collocated LAU wells | Module F | 2030 | Based on quarterly sentinel well monitoring results | $ 5.37 | $  - | $ 5.37 | $ 1.32 | $  - | $ 1.32 |
| 4 Connect five (5) private wells outside of WVBA to COP municipal system | Module K | 2026 | Based on quarterly sentinel well monitoring results | $ 0.07 | $  - | $ 0.07 | $ 0.02 | $  - | $ 0.02 |
| 5 Replace RID-114 with a new UAU production well at different location | Module G | 2019 | Imminent change in end use to potable and water quality not fit for intended use at that time | $ 1.23 | $  - | $ 1.23 | $ 0.79 | $  - | $ 0.79 |
| 6 Continue operating two (2) plume core extraction wells at 1,000 gpm each | Module E (2 @ 1,000 gpm) | 2026-2044 | If deemed necessary based on post-2025 plume conditions and cost-benefit analysis | $  - | $44.90 | $44.90 | $  - | $ 7.03 | $ 7.03 |
| 6a Reinject 2,000 gpm treated water | Module C (2,000 gpm) | 2026-2044 | | $11.96 | $ 5.06 | $17.02 | $ 4.17 | $ 0.79 | $ 4.96 |

Cost in Millions; Capped at 30yrs