G. Van Velsor Wolf Jr. (#07530)
Michael K. Foy (#032736)
**SALMON, LEWIS, & WELDON, P.L.C.**
2850 East Camelback Road, Suite 200
Phoenix, Arizona 85016
Telephone: 602-801-9075
Facsimile: 602-801-9070
Email: vvw@slwplc.com

*Attorneys for Defendant Air Liquide
America Specialty Gases, L.L.C.*

Mitchell J. Klein (#007430)
**SNELL & WILMER LLP**
One Arizona Center
400 East Van Buren Street, Suite
1900 Phoenix, Arizona 85004-2202
Telephone: 602-382-6000
Facsimile: 602-382-6070
Email: mjklein@swlaw.com
Email: mderstine@swlaw.com
Email: tsabo@swlaw.com

*Attorneys for Defendants Arizona
Public Service Company, Dolphin
Incorporated, and ITT Corporation*

Christopher D. Thomas (#010482)
Matthew L. Rojas (#025030)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
Email: CThomas@perkinscoie.com
Email: MLRojas@perkinscoie.com

*Attorneys for Defendant City of Phoenix*

(Additional counsel listed on next pages)

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Roosevelt Irrigation District, a political subdivision of the State of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>Salt River Project Agricultural Improvement and Power District, et al.,<br><br>Defendants. | No. 2:10-CV-00290-PHX-DAE-BGM<br><br><br>**DEFENDANTS' CONTROVERTING STATEMENT OF FACTS IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT RE: NCP COMPLIANCE** |

| | |
|---|---|
| Stephen L. Wetherell (#015353)<br>Phoenix City Attorney's Office<br>Civil Division<br>200 W. Washington Street, Suite 1300<br>Phoenix, Arizona 85003-1611<br>Telephone: 602-262-6761<br>Facsimile: 602-534-2476<br>Email:<br>Stephen.wetherell@phoenix.gov<br><br>*Attorneys for Defendant City of Phoenix* | Shane R. Swindle (#011738) Michael P.<br>Berman (#005861)<br>P. Derek Petersen (#025683)<br>**PERKINS COIE LLP**<br>2901 North Central Avenue, Suite 2000<br>Phoenix, Arizona 85012-2788<br>Telephone: 602-351-8000<br>Facsimile: 602-648-7000<br>Email: SSwindle@perkinscoie.com<br>Email: MBerman@perkinscoie.com<br>Email: PDPetersen@perkinscoie.com<br><br>*Attorneys for Defendant Corning Incorporated* |
| Troy B. Froderman (#012717)<br>Jonathan G. Brinson (#025045)<br>**POLSINELLI PC**<br>One E. Washington Street, Suite 1200<br>Phoenix, Arizona 85004<br>Telephone: 602-650-2000<br>Facsimile: 602-264-7033<br>Email: tfroderman@polsinelli.com<br>Email: jbrinson@polsinelli.com<br><br>*Attorneys for Defendant Dolphin Incorporated* | John M. Barkett (FL #197548)<br>**SHOOK, HARDY & BACON LLP**<br>201 S. Biscayne Boulevard, Suite 3200<br>Miami, Florida 33131-4332<br>Telephone: 305-358-5171<br>Facsimile: 305-358-7470<br>Email: jbarkett@shb.com<br><br>*Attorneys for Defendant Freescale Semiconductor, Inc.* |
| Karen S. Gaylord (#010621)<br>**JENNINGS, HAUG & CUNNINGHAM LLP**<br>2800 N. Central Avenue, Suite 1800<br>Phoenix, Arizona 85004-1049<br>Telephone: 602-234-7800<br>Facsimile: 602-277-5595<br>Email: ksg@jhc-law.com<br><br>*Attorneys for Defendant Honeywell International Inc.* | Sean Morris *(Pro Hac Vice)*<br>Eric D. Mason *(Pro Hac Vice)*<br>Sean A. McCormick *(Pro Hac Vice)*<br>**ARNOLD & PORTER LLP**<br>777 South Figueroa Street, 44th Floor<br>Los Angeles, California 90017-5844<br>Telephone: 213-243-4000<br>Facsimile: 213-243-4199<br>Email: sean.morris@aporter.com<br>Email: eric.mason@aporter.com<br>Email: sean.mccormick@aporter.com<br><br>*Attorneys for Defendant Honeywell International Inc.* |

| | |
|---|---|
| John M. Pearce (#012300)<br>Scott K. Ames (#014943)<br>**FENNEMORE CRAIG PC**<br>2394 East Camelback Road, Suite 600<br>Phoenix, Arizona 85016-3429<br>Telephone: 602-916-5000<br>Facsimile: 602-916-5510<br>Email: jpearce@fclaw.com<br>Email: sames@fclaw.com<br><br>*Attorneys for Defendant Kinder*<br>*Morgan Energy Partners, LP* | J. Kenneth Mangum (#003077)<br>Ann Thompson Uglietta (#013696)<br>Deputy County Attorneys<br>Civil Services Division<br>Maricopa County Attorney's Office 222<br>North Central Avenue, Suite 1100<br>Phoenix, Arizona 85004<br>Telephone: 602-506-8541<br>Facsimile: 602-506-8567<br>Email: mangumk@mcao.maricopa.gov<br>Email: Uglietta@mcao.maricopa.gov<br><br>*Attorneys for Defendant Maricopa County* |
| Jerry D. Worsham II (#015594)<br>**THE CAVANAGH LAW FIRM, P.A.**<br>1850 N. Central Avenue, Suite 2400<br>Phoenix, Arizona 85004<br>Telephone: 602-322-4040<br>Facsimile: 602-322-4105<br>Email: jworsham@cavanaghlaw.com<br><br>*Attorneys for Defendant Meritor, Inc.* | Christopher L. Callahan (#009635)<br>Phillip F. Fargotstein (#006679)<br>Scott K. Ames (#014943)<br>**FENNEMORE CRAIG PC**<br>2394 East Camelback Road, Suite 600<br>Phoenix, Arizona 85016-3429<br>Telephone: 602-916-5000<br>Facsimile: 602-916-5510<br>Email: ccallaha@fclaw.com<br>Email: pfargots@fclaw.com<br>Email: sames@fclaw.com<br><br>*Attorneys for Defendant Nucor*<br>*Corporation* |
| Carla A. Consoli (#013798)<br>Stanley B. Lutz (#021195)<br>Marla Hudgens (#032295)<br>**LEWIS ROCA ROTHGERBER**<br>**CHRISTIE LLP**<br>201 East Washington Street, Suite 1200<br>Phoenix, Arizona 85004-2595<br>Telephone: 602-262-5311<br>Fax: 602-262-574 7<br>Email: cconsoli@lrrc.com<br>Email: sblutz@lrrc.com<br>Email: mhudgens@lrrc.com<br><br>*Attorneys for Defendant Prudential*<br>*Overall Supply* | Matthew G. Ball (CA #208881)<br>Jason N. Haycock (CA #278983)<br>**K&L GATES, LLP**<br>Four Embarcadero Center, Suite 1200<br>San Francisco, California 94111<br>Telephone: 415-882-8200<br>Facsimile: 415-882-8220<br>Email: Matthew.ball@klgates.com<br>Email: Jason.haycock@klgates.com<br><br>*Attorneys for Defendant Reynolds Metals*<br>*Company* |

| David J. Armstrong (#017111)<br>Craig C. Hoffman (#026017)<br>Lea A. Phillips (#029006)<br>**BALLARD SPAHR LLP**<br>1 East Washington Street, Suite 2300<br>Phoenix, Arizona 85004-2555<br>Telephone: 602.798.5400<br>Facsimile: 602.798.5595<br>Email: armstrongd@ballardspahr.com<br>Email: hoffmanc@ballardspahr.com<br>Email: phillipsla@ballardspahr.com<br><br>*Attorneys for Defendant Salt River Project Agricultural Improvement and Power District* | Joshua Levine (CA #171840)<br>**BOOTH LLP**<br>1849 Sawtelle Boulevard, Suite 500<br>Los Angeles, California 90025<br>Telephone: 310-641-1800<br>Facsimile: 310-641-1818<br>Email: JLevine@boothllp.com<br><br>*Attorneys for Defendant Textron, Inc.* |
| William W. Pearson (#012845)<br>**PEARSON LAW GROUP LLC**<br>1221 East Osborn Road, Suite 101<br>Phoenix, Arizona 85014<br>Telephone: 602-237-5405<br>Facsimile: 602-688-5488<br>Email: Wink@pearsonlg.com<br><br>*Attorneys for Defendant Union Pacific Railroad Company* | Michelle Ulick Rosenthal (WSBA #35439)<br>Gregory T. Hixson (WSBA #39223)<br>Denver R. Gant (WSBA #38552)<br>Attorneys *Pro Hac Vice*<br>**VERIS LAW GROUP PLLC**<br>1809 Seventh Avenue, Suite 1400<br>Seattle, Washington 98101<br>Telephone: 206-829-9590<br>Facsimile: 206-829-9245<br>Email: Michelle@verislawgroup.com<br>Email: Greg@verislawgroup.com<br>Email: Denver@verislawgroup.com<br><br>*Attorneys for Defendant Univar USA Inc.* |

Pursuant to LRCiv 56.1(b), Defendants submit this Controverting Statement of Facts in Support of Defendants' Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment re: NCP Compliance. [Dkt. 1330] Defendants' Objections and Reply to Plaintiff's Additional Fact Statements Re: NCP Compliance follow:

## I.   DEFENDANTS' CONTROVERTING STATEMENTS OF FACT

Plaintiff did not file a separate statement of material facts in support of its cross-motion. [Dkt. 1330 at 3:7-9] Because LRCiv 56.1(a) requires Plaintiff to provide a separate statement of facts "setting forth each material fact on which [Plaintiff] relies in support of the motion," Defendants assume that Plaintiff's cross-motion relies exclusively on the controverting facts identified in CSOF-3. [Dkt. 1329] Defendants' objections and replies to those additional facts are as follows:

80.    Defendants object to Paragraph 80 as it consists solely of Plaintiff's interpretation of, and legal conclusions regarding, the WQARF statutes and related ADEQ rules. The Arizona Administrative Code lists "no action" as a remedial strategy: "No action is a strategy that consists of no action at a site." A.A.C. R18-16-407(F)(6).

81.    Defendants object to this paragraph as it consists solely of Plaintiff's interpretation of the WQARF statutes, related ADEQ rules, and the Code of Federal Regulations. These paragraphs contain, or incorporate by reference, legal arguments or state legal conclusions rather than assertions of fact. Applicability of the NCP to actions by private parties is a question of law. The NCP requires that potential federal, state, and local ARARs are not only identified, but actually used to evaluate distinct remedial alternatives. [Dkt. 1320 at 11] This is also a mandatory obligation for private parties. [NCP Preamble, 55 Fed. Reg. at 8793]

82.    Defendants object to Paragraph 82 as it contains, or incorporates by reference, legal arguments or states legal conclusions rather than assertions of fact. To the extent that Paragraph 82 incorporates portions of Exhibit 34 to the PSOF-1 (Dkt. 1185-3, at 104-05), Defendants object based on the conclusory nature of the cited portions of Exhibit 34 (Dkt. 1185-3); lack of foundation; conjecture and speculation; and the best evidence rule. Moreover, as addressed in Defendants' Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment re: NCP Compliance ("Opposition") at 8-9, ADEQ proceedings are inadmissible as evidence of NCP Compliance.

83.    Defendants object to Paragraph 83 based on lack of foundation; conjecture and speculation; the best evidence rule; and also insofar as it purports to assert legal conclusions. Furthermore, ADEQ proceedings may not be used as evidence regarding NCP compliance. [*See* Opposition at 8-9 ]

84.    Defendants do not dispute that a subset of defendants completed the Feasibility Study Report, West Van Buren WQARF Site, Phoenix, Arizona (July 2014) ("WVB FS Report"). [Dkt. 1329-1, Ex. 1] That report states that it was prepared pursuant to WQARF, not CERCLA. [*Id.* at 8] The WVB FS Report did not consider a no-action

1    alternative because WQARF does not require consideration of one. Defendants object to

2    this paragraph based on; hearsay; the best evidence rule; and also insofar as it purports to

3    assert legal conclusions.  Furthermore, ADEQ proceedings may not be used as evidence

4    regarding NCP compliance. [*See* Opposition at 8-9 ]

5         85.    Defendants object to Paragraph 85 based on lack of foundation; conjecture,

6    and speculation; and the best evidence rule. Rather than a factual assertion, Paragraph 85

7    appears to offer a conclusory and vague opinion—Defendants object to Plaintiff's attempt

8    to introduce new testimony through the CSOF.

9         To the extent that Paragraph 85 incorporates portions of PSOF-1 ¶¶ 44, 52 (Dkt.

10   1178), Defendants dispute the accuracy of these paragraphs and object to these paragraphs

11   based on lack of foundation; conjecture, and speculation; and the best evidence rule.

12   Furthermore, ADEQ proceedings may not be used as evidence regarding NCP

13   compliance. [*See* Opposition at 8-9 ] To the extent PSOF-1 ¶¶ 44, 52 (Dkt. 1178)

14   incorporate portions of the Kimball Declaration (Dkt. 1132-3), Defendants dispute the

15   accuracy of that Declaration and its exhibits, and object based on lack of materiality; lack

16   of foundation or personal knowledge; hearsay; the best evidence rule; and also insofar as

17   that Declaration purports to assert any legal conclusions.

18        To the extent that Paragraph 85 incorporates Exhibit 34 to PSOF-1 [Dkt. 1185-3 at

19   §§ 7, 8], Defendants specifically object insofar as RID characterizes §§ 7, 8 of Dkt. 1185-

20   3 as supporting a factual dispute regarding whether RID properly analyzed risk under the

21   NCP. [Dkt. 1185-3 at 171-73, 176-79, 183-85, 188-90]

22        86.    Defendants object to Paragraph 86 insofar as it purports to assert a legal

23   conclusion.

24        87.    Defendants object to Paragraph 87 based on lack of foundation; conjecture

25   and speculation; the best evidence rule; and also insofar as it purports to assert legal

26   conclusions. Furthermore, ADEQ proceedings may not be used as evidence regarding

27   NCP compliance. [*See* Opposition at 8-9 ]

28

Plaintiff's statement in Paragraph 87 is both conclusory and vague; and offers nothing more than an opinion; Defendants object to Plaintiff's attempt to introduce new testimony through the CSOF and also insofar as Paragraph 87 purports to assert legal conclusions. Defendants object to the use of the phrase "response costs were incurred." As detailed in other papers (Dkt. 1110), Defendants have argued that the evidence refutes Plaintiff's assertion that it has incurred costs.

To the extent that Paragraph 87 incorporates PSOF-1 ¶¶ 41, 42 (Dkt. 1178) and Exhibits 28 and 29 (Dkts. 1184-2, 1184-3), Defendants dispute the accuracy of these paragraphs and exhibits, and object based on lack foundation; conjecture, and speculation; hearsay; and the best evidence rule.

## II. ADDITIONAL FACTS THAT ESTABLISH A GENUINE ISSUES OF MATERIAL FACT REGARDING PLAINTIFF'S FAILURE TO SUBSTANTIALLY COMPLY WITH THE NCP

1. The FS evaluated only four alternatives, each of which called for immediate treatment of groundwater pumped from certain RID wells to drinking water standards, regardless of its actual end use. [Dkt. 1178-9 at 193-205 (Section 9.0), Ex. 17] RID's FS evaluated only alternatives that involved pumping and treating RID's wells to drinking water standards, an approach that made it possible for RID to sell the pumped water for non-irrigation purposes.[1] [Dkt. 1231-1 at 104 (Deposition Transcript Excerpts of Joel Peterson ("Peterson Dep.") 964:10-23); Dkt. 1321-1 at 33 (Deposition Transcript Excerpts of Dennis Shirley ("Shirley Dep.") 852:10-17)]

2. WQARF is different from CERCLA. [Dkt. 1100 (9/30/2015 Order) at 16-19]

3. "ADEQ has not reviewed whether the Modified ERA Work Plan is consistent with any federal laws or regulations." [Dkt. 1321-1 at 220 (Feb. 1, 2013 letter from ADEQ to Donovan Neese)]

---

[1] The remedial action proposed in the FS would also, if adopted, provide direct financial benefits to its proponents, including G&K and Synergy. The same is true of the slightly different remedial action proposed in the MERA. [Dkt. 1321-1 at 105 (Peterson Dep. 965:21-966:1)]

4.      Synergy did not include a no-action alternative in its Feasibility Study. [Dkt. 1321-1 at 24 (Shirley Dep. 789:14-18)]

5.      On February 1, 2013, ADEQ issued a letter to the Roosevelt Irrigation District providing conditional approval for the Modified ERA Work Plan and quoting the September 16, 2011 Public Health Exposure Assessment and Mitigation Summary Report, prepared by Synergy Environmental, LLC: "there is not an imminent (acute) risk to public from the contamination being released from the RID water systems." [Dkt. 1321-1 at 219-20]

6.      On February 1, 2013, ADEQ issued a letter to the Roosevelt Irrigation District providing conditional approval for the Modified ERA Work Plan: "However, long-term effects are uncertain and data also shows that 'significant volatilization and transfer of contaminants, from the water into the air, is occurring and is ongoing.' Based on these statements, RID intends to implement measures to limit these exposures. ADEQ's conditional approval is contingent on RID's implementation of these measures." [Dkt. 1321-1 at 220]

7.      RID installed breather boxes to mitigate vapor inhalation risk at individual wells. [Dkt. 1321-1 at 70 (Peterson Dep. 735:7-11)]

8.      On August 12, 2013, Mr. Peterson wrote to ADEQ: "The exposure mitigation measures previously implemented at each of the treatment sites [*i.e.,* the carbon canisters on the 4 wellhead treatment systems] are in place and continue to serve to limit potential public exposure." [Ex. A (Aug. 12, 2013 email from Joel Peterson to ADEQ)]

9.      On July 5, 2013, Terry Blood reported to Joel Peterson that he had "replaced the carbon cannisters (sic) on the 4 discharge boxes with pipe plugs." [Ex. B (July 5, 2013 email from Terry Blood to Joel Peterson and Andrew MacHugh)]

10.     Mr. Peterson responded to Mr. Blood stating:

> RE the "breather canisters", good riddance.   Seemed like a good idea way back when but live and learn.  Note to AMH, we'll need to disappear references to these from the O&M Plan during the next revision.

[*Id.*]

11.     Dennis Shirley was unaware that the carbon canisters were removed as of July 8, 2013. [Ex. C (Shirley Dep. 485:11-14)]

12.     RID does not propose any action with regard to wells owned or operated by anyone other than RID, including current drinking water providers Phoenix and SRP. [Dkt. 1321-1 at 53, 94 (Peterson Dep. 799:8-12, 829:2-18); Dkt. 1321-1 at 18 (Shirley Dep. 610:23-611:1)]

13.     While proposing immediate treatment of its own irrigation wells to drinking water standards, RID proposes to do nothing if impacted Phoenix and SRP wells require future treatment to facilitate drinking water use. [Dkt. 1321-1 at 94 (Peterson Dep. 829:12-18)]

14.     Today, the City of Phoenix provides drinking water to approximately 1.4 million people; RID supplies drinking water to none. [Dkt. 1321-1 at 19 (Shirley Dep. 616:3-17)]

15.     RID's proposed remedial action is not designed to restore the aquifer. To the extent the remedial action may have that incidental effect over time, that would be true regardless of whether wellhead treatment is implemented. [Dkt. 1321-1 at 18, 33 (Shirley Dep. 612:17-19; 854:2-5); Dkt. 1321-1 at 74 (Peterson Dep. 749:4-16)] It does not include any "hot spot" remediation. [Dkt. 1321-1 at 34 (Shirley Dep. 855:3-4)]

16.     RID consultant Joel Peterson of Synergy, the principal engineer for the MERA remedy ultimately carried through to the feasibility study, confirmed that RID's FS was prepared pursuant to state law and not CERCLA or the NCP. [Dkt. 1321-1 at 47 (Peterson Dep. 503:1-6) ("This is my first feasibility study, and it is under WQARF.")]

17.     ADEQ's February 1, 2013 conditional approval letter states: "ADEQ's conditional approval also does not include an analysis or approval of the transport or final disposition and use of the treated water." [Dkt. 1321-1 at 220, Ex. 9 (Feb. 1, 2013 ADEQ conditional approval letter)]

18.     The MERA remedial action was described as a "voluntary early response action, pursuant to state law," and "prepared in accordance with the provisions specified in AAC R18-16-405." [Dkt. 1179-3, Ex. 22 (Oct. 22, 2012 Modified Early Response Action Work Plan at 1, 18)] While Synergy asserted—without support— that the MERA was consistent with the NCP, it stated this assertion is "not relevant for ADEQ review and approval." [*Id.* at 1]

19.     Mr. Shirley confirmed that RID had concluded by 2008 that it wanted to become a drinking water supplier. [Ex. C (Shirley Dep. 89:3-25; 98:9-18)]

20.     Synergy is at risk of not being compensated for all of its professional services if RID does not raise adequate "project funds" in the form of sales of drinking water or litigation recoveries. [Ex. C Shirley Dep. 78:4-14] If sales of drinking water do generate revenue in excess of costs, Synergy is entitled to a one-third of any such profits as additional compensation, with G&K entitled to the other third. [Ex. C (Shirley Dep. 176:4-24)] Drinking water is expected to be more valuable than irrigation water. [Ex. C (Shirley Dep. 87:3-12)]

21.     Although the Implementation Plan was described as a "preliminary evaluation," the plan described its proposed remedial action as the "preferred final remedy" for the WVB Site. [Dkt. 1321-1 at 121 (Sep. 25, 2009 Implementation Plan at ES-1-2)]

22.     Mr. Peterson's mistaken understanding was that WQARF mandates immediate treatment to drinking water standards of any water that might be put to drinking water use anytime within the next 100 years. [Dkt. 1321-1 at 83 (Peterson Dep. 786:7-23)]

23. Four of RID's irrigation wells, Wells 89, 92, 95, and 114, have had wellhead treatment systems installed since 2011. [Dkt. 1321-1 at 27 (Shirley Dep. 825:21-25)] Those same four wells have been part of RID's remedial action since its ERA. [Ex. C (Shirley Dep. 826:18-22)]

24. In RID's FS, what it characterizes as the "Less Aggressive Alternative," which is a WQARF term, included the addition of wellhead treatment at two additional wells (Nos. RID-106 and RID-109). [Dkt. 1321-1 at 32 (Shirley Dep. 844:1-13)] RID does not intend to install wellhead treatment at the additional wells unless and until it has additional funding. Nor does RID intend to continue treating treat the four wells that do have wellhead treatment units in place absent sufficient funds. ADEQ has expressed no concern about this. [Ex. C (Shirley Dep. 866:12-23)]

25. Synergy estimated that the Less Aggressive alternative has a net present value of $63.67 million, based on initial capital costs of $9.445 million and annual operation and maintenance costs of $2,049,500. Synergy's cost calculations, which did not change between versions of the FS, are found in Table 7 of its original draft Feasibility Study report. [Dkt. 1321-2 at 17] The actual cost of treating to drinking water standards water pumped from the four MERA wells was approximately $1.9 million in 2014. [Dkt. 1321-1 at 53 (Peterson Dep. 798:11-13)]

26. Joel Peterson testified:

> Q . . .
>
> The cleanup goal selected by RID for its wells are drinking water standards; correct?
>
> A That's correct.
>
> Q And RID's position is that drinking water standard cleanup should occur immediately during a time of irrigation use; correct?
>
> A Yes.

Q      Do you have an understanding that the West Van Burren Working Group Feasibility Study also proposed drinking water standards as treatment goals for the RID wells?

A      Yes.

Q      Okay.   But that was contingent upon switch from irrigation use to drinking water use; correct?

A      Yes.

Q      From a layperson sense, is that something you find to be unreasonable?

MR. HANSON:  Form, foundation.

THE WITNESS:  No.

[Ex. D (Peterson Dep. 1004:6-24)]

**III.    ADDITIONAL FACTS THAT BAR RID FROM USING ADEQ OVERSIGHT AND APPROVAL AS EVIDENCE OF NCP COMPLIANCE**

27.    On September 21, 2010, RID's consultants and attorneys gave a presentation to contractors and suppliers regarding the remediation of RID's wells and the general strategy behind the remediation. The presentation was recorded and later transcribed ("Presentation Tr."). [Dkt. 664-2 at 3, 4]

28.    RID's wells have been pumping contaminated water, for irrigation purposes, for years. "Yes, their wells have been pumping the contamination for many years. Fortunately, it's always been used for irrigation." [Dkt. 664-2 at 5 (Presentation Tr. at 2:22-23)]

29.    RID wanted a remedy that was consistent with its business model:

So here we were faced, RID is faced with a public record showing that there is contamination. The ADEQ, not capable of doing anything, EPA saying they're prepared to move in but those of you who have worked in this area know that if EPA is engaged in an activity, one it takes four or five times longer than it should and it costs more, four or five times more than it should. So consequently, RID was faced with what other options do we have? We, we can wait back and have EPA come in and potentially make the wells which are effective as far as a regional remedy is concerned, become an indispensable part of the remedy and have EPA dictate how those wells will be pumped, irrespective of RID's business model.

-12-

[Dkt. 664-2 at 8 (Presentation Tr. at 5:1-10) (emphasis added)]

30.　　Plaintiff was determined to qualify for an authorized ERA that avoided an analysis of alternative remedies:

> The early response is a bit unique to Arizona. Now there is under federal superfund, a similar type of template where you can get an early response but in our State statute, under our State WQARF program, well operators are given, they're specifically given additional protections that are spelled out. And those protections include the ability to perform an early response action. But they are, an early response action is only authorized under certain criteria and the various criteria are any one of these criteria when you are instituting an early response action and it's necessary to achieve one of the following five criteria, then it can be authorized. So you first you have to have an authorized ERA, otherwise you don't get past ADEQ [inaudible]. The first issue if you need a, if you are engaging in an early response action, in order to address the current risk to public health welfare and the environment, that would be a basis to go ahead and get quick approval to implement an early response. Second, if your early response was intended to protect a water supply. Third, if you are providing a water supply, that could justify an early response action. Fourth, if your early response action was intended to control contamination so that you're effectively going to reduce the scope and cost of the ultimate remedy, obviously we want to encourage an early response. Don't wait for a feasibility study that has to look at all the alternatives and have something approved a year or so down the road.

[Dkt. 664-2 at 9 (Presentation Tr. at 6:15-7:8)]

31.　　RID's counsel, Mr. Kimball had drafted WQARF and was familiar with its strengths and weaknesses. RID intended to obtain approval for its selected remedy under WQARF, but seek its costs under federal law:

> Those in industry who drafted the State WQARF program to accomplish this kind of administrative nightmare for the state agencies that would be coming after Arizona business but it's not effective for a private party. The good news is there is a federal law and under federal law, quite different than the State law, all costs that are incurred in response to a release or a threatened release of a hazardous substance into the environment are recoverable against any PRP.

[Dkt. 664-2 at 13 (Presentation Tr. at 10:11-16)]

32.　　Counsel for RID anticipated an easy victory in CERCLA litigation:

> The PRPs have a response due on October 25th. Last, what the game, the terrific game plan here is not a real difficult legal process. For those of you there that have some understanding of the law, most people think, oh my gosh if we're going to be involved in litigation, this must be one of the most

massive never ending processes. And that's true if you were having to deal with allocating liability among responsible parties and you were one of them, because then you just fight forever on who is responsible for what. Particularly in a situation like this where the contamination here is from multiple, hundreds of PRPs regarding multiple substances at multiple sites over decades. There is no way you can figure out who contributed what, when, to come up with some kind of an allocation. So consequently, the good news for us is when you and of course this is what EPA does to all the poor defendants. If you have those minimal four elements, then you can go right to court and the CERCLA statute allows you the right to go in and seek a declaratory judgment which is like asking the court, please tell us whether or not the PRPs that we've identified as defendants are in fact liable jointly and severally for all of our costs incurred in implementing the ERA. And typically when you file a motion for summary judgment, you typically get an answer within four to six months. So what it does is it short circuits litigation because we're not involved in allocating the responsibility. We're basically saying judge, every one of these sixty can individually be held responsible for the entire cost. And consequently, when you have such an incredibly low burden of proof, we have very high confidence in the way we're strategically going to be working the litigation, we'll ensure that there will always be adequate resources to fund the overall cost of implementing the ERA. I think that's all. Who's next.

[Dkt. 664-2 at 16 (Presentation Tr. at 13:2-25)]

33.     As early as December 2012, counsel for RID had begun to take the position that selection of the remedy under WQARF was unrelated to the CERCLA cost recovery:

As you know well, decisions regarding the evaluation and eventual selection of the remedy for the West. Van Buren WQARF Site are not at issue in the cost recovery litigation, and never have been. To the extent the cost recovery litigation concerns any remedial actions, it is limited to the ERA.

Counsel for RID went on to say:

ADEQ's decisions in this process will result solely in agency action, and will have no subjective, adjudicative, or legal impact on the Working Group, the Five, or RID. Thus, there is no adversity between RID and the Working Group, much less the Five, on this issue.

[Dkt. 664-2 at 43-44]

34.     Counsel for RID, Gallagher & Kennedy ("G&K") represented RID before ADEQ and worked to obtain numerous ADEQ approvals:

These efforts focused on working with ADEQ to develop an approved Early Response Action ("ERA") under Arizona law, which eventually was changed by the approved Modified ERA. It also includes working with

-14-

ADEQ regarding a final groundwater contamination remedy for the West Van Buren Area ("WVBA") Water Quality Assurance Revolving Fund (WQARF) Site that addresses all RID wells impacted according to the applicable remedial objectives established by ADEQ and all other applicable state remedial action laws and regulations.

[Dkt. 664-1 at 46]

35.     As of September 2010, RID planned to use the WQARF program, but rely on the federal liability structure of CERCLA. [Dkt. 664-2 at 20 (Presentation Tr. at 17:18-20)]

36.     RID's lead attorney before ADEQ, David P. Kimball of G&K, explained how remedial activities before ADEQ were conducted such that costs could be recovered under CERCLA:

The last is the fourth element. You have to be sure your response costs are incurred consistent with the national contingency plan. What the court decisions have indicated is the way they establish compliance with this procedure, - imagine this as nothing more than a public participation process. The courts have indicated if you have a state-approved plan, then you have met consistency with the national contingency plan. So that's one of the reasons why RID went through the effort to go ahead and get ADEQ approval of the work plan so that we end up meeting the final element that we need to establish and meet the burden of proof to - move on. So what we did is not surprising. We went ahead and filed a CERCLA 107 cost recovery action so we would have the ability to recover our costs.

[Dkt. 664-2 at 15 (Presentation Tr. at 12:4-13 (emphasis added)]

37.     Despite Mr. Kimball's careful explanation of how RID was conducting remedial activities under WQARF in a way to maximize the chance of recovering those costs under CERCLA, G&K later wrote that the parallel efforts were not in fact designed to ensure that RID could recover its costs:

Finally, the fact that BFFB may use publicly available facts and information with respect to ADEQ's approval of RID's ERA, Modified ERA and Feasibility Study Work. Plan, and the processes related thereto, in the above-captioned action, to demonstrate that RID's response costs are recoverable under CERCLA does not change the non-adversarial, public nature of RID's activities before ADEQ. The two activities occur under completely separate and unrelated statutes, and have wholly distinct goals and legal requirements. Further, as noted, G&K has led RID through ADEQ's administrative process for the approval of the ERA, the Modified

ERA, and the Feasibility Study Work Plan, As ADEQ's conditional approval demonstrates, <u>this was not some litigation-created and driven process that G&K concocted to ensure RID's costs were recoverable under CERCLA.</u>

[Dkt. 664-1 at 48 (emphasis added)]

38.     While WQARF and CERCLA involve similar issues, the two are distinct:

Whether that process will yield facts BFFB can use to demonstrate that the costs related to the development and implementation of RID's remedial actions are recoverable under CERCLA remains to be seen, as you noted. What is clear, however, is that nothing in the CERCLA action dictates or controls any activity before ADEQ, and *vice versa*. <u>The two activities are wholly distinct, even if they involve a similar type of issue.</u>

[Dkt. 664-1 at 48 (emphasis added)]

39.     Remedial actions under WQARF are independent of CERCLA, and vice versa:

Specifically, those efforts [the protection and restoration of RID's wells and water supply through an ADEQ-approved remedial action] have been taken under Arizona statutes and implementation rules that afford parties, such as RID, the right to protect their property from contamination by, among other remedial actions, an ERA. A.R.S. 49-281 *et seq.*; A.A.C. R18-16-201 *et seq.* Nothing in those governing statutes or rules, or any other law, compels RID to seek recovery of its costs under CERCLA, <u>or ties or binds the substance or process of developing a remedial action in any way to the recovery or costs under a completely separate statute,</u> including in the above-captioned action.

[Dkt. 664-1 at 46 (emphasis added)]

40.     ADEQ's review of the Modified ERA Work Plan was limited to state statutes and rules and did not extend to federal laws or regulations:

Thus contrary to the statements in your letter, G&K on behalf of RID only has sought (ad obtained) ADEQ's approval of the ERA (and Modified ERA), and the Feasibility Study[2] in accordance with the applicable state statutes and rules. This fact is demonstrated by ADEQ's explicit language in its approval of RID's Modified ERA that the approval was based on "compliance with applicable State statutes and rules" and that <u>"ADEQ has</u>

---

[2] ADEQ approved RID's Feasibility Study Work Plan, dated February 8, 2013, on July 16, 2013, which established the process for evaluating remedial options to address the groundwater contamination in the WVBA WQARF Site pursuant to all applicable legal requirements.

<u>not reviewed whether the Modified ERA Work Plan is consistent with any</u>
<u>federal laws or regulations."</u>

[Dkt. 664-1 at 47-48]

41.    The following exchange occurred during the July 29, 2014 hearing regarding complete disqualification of G&K:

<u>Judge Ezra</u>: Is "what's going on over there at ADEQ ultimately . . . going to be marched into this courtroom in one shape, form, or another?"

<u>RID's Counsel</u>:  "I don't know, frankly."

<u>Judge Ezra</u>:  "Isn't that a problem?"

[7/29/2014 Hr'g Tr. (Dkt. 843) 71-72]

42.    At the January 22, 2015 disqualification hearing, RID's counsel stated: "RID will not use the ADEQ proceedings to prove its substantial compliance with the NCP process," and "ADEQ will not decide whether RID has substantially complied with the NCP.  That issue will be decided in this forum." [1/22/2015 Hr'g Tr. (Dkt. 919) 44:11-12, 47:15-17]

43.    In his January 22, 2015 ruling, the Magistrate Judge found:

Moreover, Plaintiff has represented to this Court that "RID will not use the ADEQ proceedings to prove its substantial compliance with the NCP process."

[Dkt. 1000 at 8:12-14]

44.    Accepting the Magistrate Judge's reasoning, this Court wrote:

While parts of the Arizona WQARF process overlap with the requirements for showing that a response action is consistent with the NCP under 40 C.F.R. § 300.700(c)(3)(i), the ADEQ's final decision on RID's proposed remedial action plan will not determine or otherwise affect RID's ability to prove the NCP element of its CERCLA cost recovery action before this Court.

[Dkt. 1100 at 19]

45. In selecting the remedy, RID chose the "Cadillac" option, because it met the "general requirement of a failsafe treatment plant design that DEQ will have to basically agree with." [Dkt. 664-2 at 19 (Presentation Tr. at 16:16-19)]

46. RID now argues "ADEQ's extensive oversight and approval of RID's publicly-vetted responses to the VOC contamination entitles RID to the same presumption of consistency afforded to ADEQ." [Dkt. 1330 at 2; *see also* Dkt. 1329 ¶¶ 80-87]

1    Dated:  November 21, 2016

Respectfully submitted,

**PERKINS COIE LLP**

By: s/ Christopher D. Thomas
     Christopher D. Thomas
     Matthew L. Rojas
     2901 North Central Avenue, Suite 2000
     Phoenix, Arizona  85012-2788

     Stephen L. Wetherell
     Phoenix City Attorney's Office
     Civil Division
     200 West Washington Street, Suite 1300
     Phoenix, Arizona 85003-1611

*Attorneys for Defendant City of Phoenix*

**SALMON, LEWIS, & WELDON, P.L.C.**

By: s/ G. Van Velsor Wolf Jr.
     G. Van Velsor Wolf Jr.
     2850 East Camelback Road, Suite 200
     Phoenix, Arizona 85016

*Attorneys for Defendant Air Liquide America Specialty Gases, L.L.C.*

**SNELL & WILMER L.L.P.**

By: s/ Mitchell J. Klein
     Mitchell J. Klein
     400 East Van Buren Street, Suite 1900
     Phoenix, Arizona 85004

*Attorneys for Defendants Arizona Public Service Company, Dolphin Incorporated, and ITT Corporation*

**PERKINS COIE LLP**

By: s/ Michael P. Berman
     Shane R. Swindle
     Michael P. Berman
     P. Derek Petersen
     2901 North Central Avenue, Suite 2000
     Phoenix, Arizona  85012-2788

*Attorneys for Defendant Corning Incorporated*

**POLSINELLI PC**

By: s/ Troy B. Froderman
    Troy B. Froderman
    Jonathan G. Brinson
    One East Washington Street, Suite 1200
    Phoenix, Arizona 85004

    Mitchell J. Klein
    **SNELL & WILMER L.L.P.**
    400 East Van Buren St., Suite 1900
    Phoenix, Arizona 85004

*Attorneys for Defendant Dolphin Incorporated*

**SHOOK, HARDY & BACON LLP**

By: s/ John M. Barkett
    John M. Barkett
    Suite 3200
    201 South Biscayne Boulevard
    Miami, Florida 33131-4332

*Attorneys for Defendant Freescale Semiconductor, Inc.*

**JENNINGS, HAUG & CUNNINGHAM LLP**

By: s/ Karen S. Gaylord
    Karen S. Gaylord
    2800 North Central Avenue, Suite 1800
    Phoenix, Arizona 85004-1049

    Sean Morris *(Pro Hac Vice)*
    Eric D. Mason *(Pro Hac Vice)*
    Sean A. McCormick *(Pro Hac Vice)*
    **ARNOLD & PORTER LLP**
    777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844

*Attorneys for  Defendant Honeywell*

1

**FENNEMORE CRAIG PC**

2

By: s/ Scott K. Ames
    John M. Pearce

3

    Scott K. Ames
    2394 East Camelback Road, Suite 600

4

    Phoenix, Arizona 85016-3429

5

*Attorneys for Defendant Kinder Morgan*

6

*Energy Partners, LP*

7

**WILLIAM G. MONTGOMERY**
**MARICOPA COUNTY ATTORNEY**

8

9

By: s/ Ann Thompson Uglietta
    Ann Thompson Uglietta

10

    J. Kenneth Mangum
    Deputy County Attorneys

11

    Civil Services Division
    222 North Central Avenue, Suite 1100

12

    Phoenix, Arizona 85004

13

*Attorneys for Defendant Maricopa County*

14

**THE CAVANAGH LAW FIRM, P.A.**

15

By: s/ Jerry D. Worsham II

16

    Jerry D. Worsham II
    1850 N. Central Avenue, Suite 2400

17

    Phoenix, Arizona 85004

18

*Attorneys for Defendant Meritor, Inc.*

19

**FENNEMORE CRAIG PC**

20

By: s/ Scott K. Ames

21

    Christopher L. Callahan
    Phillip F. Fargotstein

22

    Scott K. Ames
    2394 East Camelback Road, Suite 600

23

    Phoenix, Arizona 85016-3429

24

*Attorneys for Defendant Nucor Corporation*

25

26

27

28

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

By: s/ Stanley B. Lutz
    Carla A. Consoli
    Stanley B. Lutz
    Marla Hudgens
    201 East Washington Street, Suite 1200
    Phoenix, Arizona 85004-2595

*Attorneys for Defendant Prudential Overall Supply*

**K&L GATES, LLP**

By: s/ Matthew G. Ball
    Matthew G. Ball
    Jason N. Haycock
    Four Embarcadero Center, Suite 1200
    San Francisco, California 94111

*Attorneys for Defendant Reynolds Metals Company*

**BALLARD SPAHR LLP**

By: s/ David J. Armstrong
    David J. Armstrong
    Craig C. Hoffman
    Lea A. Phillips
    1 East Washington Street, Suite 2300
    Phoenix, Arizona 85004-2555

*Attorneys for Defendant Salt River Project Agricultural Improvement and Power District*

**BOOTH LLP**

By: s/ Joshua Levine
    Joshua Levine
    1849 Sawtelle Boulevard, Suite 500
    Los Angeles, California 90025

*Attorneys for Defendant Textron, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PEARSON LAW GROUP LLC**

By: s/ William W. Pearson
     William W. Pearson
     1221 East Osborn Road, Suite 101
     Phoenix, Arizona 85014

*Attorneys for Defendant Union Pacific Railroad Company*

**VERIS LAW GROUP PLLC**

By: s/ Michelle Rosenthal
     Michelle U. Rosenthal
     Gregory T. Hixson
     Denver R. Gant
     1809 Seventh Avenue, Suite 1400
     Seattle, Washington 98101

*Attorneys for Defendant Univar USA Inc.*

1  **CERTIFICATE OF SERVICE**

2  ☒      I hereby certify that on November 21, 2016, I electronically transmitted the

3  attached documents to the Clerk's Office and to the counsel of record who are CM/ECF

4  registrants using the CM/ECF System for filing and transmittal of a Notice of Electronic

5  Filing.

6  ☒      I hereby certify that on November 22, 2016, I served the attached document

7  via Fedex overnight delivery on:

8      Honorable David A. Ezra
       United States District Court
9      John H. Wood, Jr. United States Courthouse
10     655 East Cesar E. Chavez Blvd., 3rd Floor
       San Antonio, Texas  78206
11
       ☒      I hereby certify that on November 22, 2016, I served the attached document
12
13  by first class mail on the following, who are not registered participants of the CM/ECF

14  System:

15     **Walker Power Systems, Inc.**
       Attn:  Jeffrey R. Conover
16     1301 East Jackson Street
       Phoenix, Arizona  85034
17

18     *Pro Se*

19
                                              s/Marla Mercier
20                                            _____

21  133645223.

22

23

24

25

26

27

28