IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona, | § § § § | NO. 2:10-CV-00290 DAE-BGM |
| Plaintiff, | § | |
| vs. | § § | |
| SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., | § § § § | |
| Defendants. | § § | |

_____

ORDER (1) GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT, AND (2) OVERRULING IN PART AND SUSTAINING IN PART PARTIES' OBJECTIONS

On November 3, 2016, the Court held a hearing on (1) Defendants Air Liquide America Specialty Gases, L.L.C. ("Air Liquide"), Arizona Public Service Company ("AZ Public Service"), ChemResearch Co., Inc. ("ChemResearch"), City of Phoenix, Corning Incorporated ("Corning"), Dolphin Incorporated ("Dolphin"), Freescale Semiconductor, Inc. ("Freescale"), Honeywell International, Inc. ("Honeywell"), ITT Corporation ("ITT"), Kinder Morgan Energy Partners, LP ("Kinder Morgan"), Maricopa County, Meritor, Inc. ("Meritor"), Nucor Corporation ("Nucor"), Prudential Overall Supply ("Prudential"), Reynolds Metals Company ("Reynolds"), Salt River Agricultural Improvement and Power District

("Salt River"), Textron, Inc. ("Textron"), Union Pacific Railroad Company

("Union Pacific"), Univar USA Inc. ("Univar"), and Milum Textile Services, Inc.'s

("Milum") (collectively, "Moving Defendants") Motion for Partial Summary

Judgment Regarding Plaintiff's Claimed Past Costs (Dkt. # 1110); (2) Moving

Defendants Objections to Plaintiff Roosevelt Irrigation District's ("RID")

Additional Fact Statements (Dkt. # 1143); and (3) Freescale's Objections to

Declaration of David P. Kimball and to RID's Additional Fact Statements (Dkt.

# 1144).

   At the hearing, Francis J. Balint, Jr., Esq., appeared at the hearing on

behalf of RID; David J. Armstrong, Stephen Wetherell, Christopher D. Thomas,

Scott Ames, Ann T. Uglietta, Michael P. Berman, Shane R. Swindle, P. Derek

Petersen, Jerry D. Worsham, III, G. Van Welsor Wolf, Jr., William W. Pearson,

Debra J. Carfora, Sergio E. Pagliery, Stanley B. Lutz, Emily J. Atherton, and Sean

Morris, Esqs., appeared at the hearing on behalf of Moving Defendants.

   After careful consideration of the memoranda in support of and in

opposition to the Motions, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **GRANTS** Moving Defendants' Motion for

Partial Summary Judgment (Dkt. # 1110), **OVERRULES IN PART** and

**SUSTAINS IN PART** Moving Defendants' Objections to RID's Additional Fact

Statements (Dkt. # 1143), and **OVERRULES** Freescale's Objections to

Declaration of David P. Kimball and to RID's Additional Fact Statements (Dkt. # 1144).

FACTUAL BACKGROUND

This is one of the largest and most complex environmental actions in the United States.  It is a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA") whereby RID seeks to recuperate the costs it has or will incur in responding to the contamination of its wells and to recover for damages to RID property.  RID is a political subdivision of the State of Arizona, and it owns multiple groundwater wells in the western portion of Maricopa County, Arizona, used to provide water to public and private entities and individuals.  ("TAC," Dkt. # 789 ¶¶ 7, 9, 38.)  RID currently pumps groundwater from its wells and transports it through a network of canals for agricultural, landscape watering, and municipal use on land located within the District.  (Id. ¶ 39.)

Over twenty of RID's groundwater wells have been impacted by hazardous substances known as chlorinated volatile organic compounds ("VOC Contaminants" or "VOCs").  (Id. ¶ 40.)  These VOCs include, but are not limited to, trichloroethene ("TCE"), also known as trichloroethylene; tetrachloroethene ("PCE"); 1, 1, 1-trichloroethane ("TCA"); 1,1-dichloroethane ("1,1-DCA"); 1,1-

3

dichoroethene ("1,1-DCE"); 1,2-dichloroethane ("1,2-DCA"); and cis-1,2-dichloroethene ("cis-1,2-DCE").[1]  (Id. ¶ 40.)  These VOC contaminants are designated as "hazardous substances" under CERCLA and are considered by the Environmental Protection Agency ("EPA") to be severely harmful to human health and the environment.  (Id. ¶ 41.)  Although not all of RID's groundwater wells have been impacted by the VOC Contaminants, RID contends they are threatened by the same substances.  (Id.)

RID did not release any of the VOC Contaminants into its groundwater wells.  Rather, the hazardous substances in and threatening RID's groundwater wells are the result of releases from facilities owned or operated by other parties; these releases flowed into and contaminated the groundwater supplying RID's wells.  (Id. ¶ 41.)

In 1986, the Arizona Legislature established the Arizona Department of Environmental Quality ("ADEQ") in response to growing concerns over groundwater quality.  (Id. ¶ 42.)  The ADEQ is the state regulatory agency charged with responsibility to investigate groundwater contamination and enforce Arizona's environmental laws.  After groundwater contamination was detected at a facility in west Phoenix, ADEQ began conducting a groundwater investigation that

---

[1] In the 1950s and '60s, extensive industrial usage of chlorinated organic solvents such as PCE and TCE was widespread until the use of these compounds raised human health and environmental concerns in the 1970s and '80s.

led to the establishment of the West Van Buren Area ("WVBA") Water Quality

Assurance Revolving Fund ("WQARF") Site ("WVBA WQARF Site").  (Id. ¶ 43.)

The contaminated groundwater wells owned and operated by RID (and the wells

threatened by the VOC Contaminants) are within the WVBA WQARF Site.  (Id.)

In August 2012, after years of extensive field and work analysis, the

ADEQ issued a final report entitled "Remedial Investigation Report, West Van

Buren WQARF Registry Site" (the "WVBA RI Report").  In the WVBA RI

Report, the ADEQ concluded that the groundwater contamination in the WVBA

(where RID's groundwater wells are located) "is the areal projection of the western

portion of a large commingled plume of contaminated groundwater in Phoenix,

Arizona," and that "[c]ontributors to this commingled plume include industrial

facilities and contaminated groundwater from the east, as regional groundwater

flow is generally westward."  (Id. ¶ 45.)

Specifically, the WVBA RI Report concluded that "[g]roundwater

contamination enters the WVBA from the east from the Motorola 52nd Street

Federal Superfund Site OU3 area."  (Id. ¶ 46.)   The Motorola 52nd Street

Superfund Site ("M-52 Site") was established by the EPA in 1989 after an

investigation revealed massive groundwater contamination originating from the

52nd Street Motorola Plant.  The EPA, in its findings of fact entered in connection

with the M-52 Site, found that "[g]roundwater contaminated with VOCs from the

5

Motorola and Honeywell Facilities, as well as other potential sources within OU1 and OU2 commingle and flow westward into OU3, where it commingles with contamination from sources within OU3." (Id. ¶ 46.)

The ADEQ also concluded in the WVBA RI Report that "[c]ontaminated groundwater also appears to enter the WVBA from the north in the central portion of the site from the West Osborn Complex (WOC) WQARF Registry Site." The West Osborn Complex WQARF Site ("WOC WQARF Site") is part of the West Central Phoenix Area WQARF Sites, which are located adjacent to and directly north of the WVBA. (Id. ¶ 47.)

RID alleges that the contamination and threatened contamination of RID's wells is associated with facilities located within three regional sites which have been identified under CERCLA, 42 U.S.C. §§ 9601 to 9675, or Arizona's WQARF program, A.R.S. §§ 49-281 to 49-298. (Id. ¶ 48.) The three regional sites are: (1) the Motorola 52nd Street Superfund Site, (2) the West Van Buren Area WQARF Site, and (3) the West Central Phoenix Area WQARF Sites. (Id.) Each of these regional sites is defined with boundaries.

RID alleges that the VOC Contaminants impacting or threatening to impact RID's groundwater wells emanate from these three regional sites and have formed a commingled plume of VOC Contaminants. (Id. ¶ 50.) The studies conducted on these sites indicate that a wide range of industries operating in these

6

three areas used large quantities of chlorinated solvents such as PCE and TCE.

(Id.)  The use of chlorinated solvents and the waste management practices of these

facilities are responsible for the VOC contamination of soil and groundwater in the

area encompassed by the three regional sites.  (Id.)  RID alleges that prior to the

1980s, many of these facilities developed on-site waste disposal systems that

discharged waste directly to permeable subsurface sediments for disposal.  (Id.)

These wastes containing VOCs contaminated the groundwater through vertical

contaminant transport through the unsaturated zone into the groundwater.  (Id. ¶

51.)  According to the ADEQ's WVBA RI Report, once VOCs are released to the

soil, unsaturated flow is

> primarily downward until either a change in lithology or the
> groundwater table is encountered.  As a result of this primarily
> vertically downward migration, unsaturated flow occurs at or near the
> source area.  As vadose zone soils within the WVBA are generally
> permeable, unsaturated flow in the WVBA typically continues to the
> groundwater table.

(Id. ¶ 52.)

According to the ADEQ's WVBA RI Report, upon reaching the

groundwater table, the VOC Contaminants dissolve into the uppermost aquifer

where groundwater movement within the region is predominantly controlled by

RID's well-pumping.  (Id. ¶ 54.)  The contaminated groundwater in all three

regional sites is hydrologically connected to the groundwater pumped by RID.

(Id.)  Thus, the commingled plumes of contaminated groundwater underlying the

7

M-52 Site and the WCP Area Sites flow toward and enter the WVBA Site in response to RID's well-pumping from groundwater wells located in the WVBA Site. (Id.) According to RID, the WVBA WQARF Site and the adjacent WCP Area Sites and M-52 Site are all impacted by multiple VOC Contaminants forming a large, commingled plume that is "collectively one of the largest contaminant plumes in the country." (Id. ¶ 55.)

RID alleges that contaminated groundwater from the three regional sites has impacted more than twenty of RID's groundwater wells and threatens to impact a number of additional groundwater wells that are located along the southern and western plume margins. (Id. ¶ 56.) This contamination restricts RID's ability to utilize its developed groundwater resources for their reasonably foreseeable use as a municipal water supply. (Id.)

According to the WVBA RI Report, the following Defendants[2] are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the WVBA or that owned or operated facilities that released Contaminants under conditions evidencing that VOC Contaminants were released into the groundwater of the WVBA: Reynolds, Air Liquide, ChemResearch, Dolphin, Maricopa County, Prudential, Univar, and Kinder Morgan. (Id. ¶ 58.)

---

[2] For purposes of this Order, only the Moving Defendants are discussed.

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the M-52 Site, which commingled and flowed into the groundwater of the WVBA: Honeywell, City of Phoenix, Milum, ITT, Meritor, and Freescale.  (Id. ¶ 59.)

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater within the WCP Area, which commingled and flowed into the groundwater of the WVBA: Corning, Nucor, Textron, and Univar.  (Id. ¶ 60.)

To respond to the contamination and threatened contamination of RID's wells, RID voluntarily entered into an Agreement to Conduct Work between ADEQ and RID on October 8, 2009.  (Id. ¶ 64.)  The Agreement was to conduct an Early Response Action ("ERA") to address certain RID groundwater wells, and a Feasibility Study for the WVBA WQARF Site.  (Id.)  Pursuant to the Agreement, RID hired consultants to investigate, monitor, assess and evaluate the groundwater contamination and its sources and to design an ERA with the objective of removing those VOC Contaminants that are impacting eight of the most highly contaminated groundwater wells within the WVBA Site.

RID alleges that the ERA is authorized under Arizona Administrative Code ("A.A.C.") § R18-16-405 because it will provide a water supply by providing treatment at the most highly contaminated RID wells to remove VOCs in

9

groundwater within the WVBA Site, where RID's wells are located.  (Id. ¶ 67.) RID contends that the ERA is "necessary" not only because wells are currently impacted, but also because additional RID wells are "threatened" by VOC contamination.  (Id. ¶ 68.)

On February 4, 2010, RID submitted a revised ERA Work Plan to ADEQ.  (Id. ¶ 70.)   The revised ERA Work Plan was approved by the ADEQ on June 24, 2010.  (Id. ¶ 73.)  On September 2, 2011, ADEQ approved a voluntary RID proposal for development and implementation of a wellhead treatment systems pilot initiative, the "RID-95 Wellhead Pilot Treatment System Proposal," which was designed to pump and treat contaminated groundwater for four of the most highly contaminated RID wells.  (Id. ¶ 75.)  The RID-95 Wellhead Pilot Treatment System initiative was designed to (a) evaluate the effectiveness of liquid-phase granular activated carbon treatment technology in removing the mixture of VOCs present in the WVBA, (b) evaluate two types of liquid-phase granular activated carbon treatment for effectiveness and efficiency, (c) evaluate the feasibility and constraints of wellhead treatment in lieu of more expensive centralized treatment, and (d) refine the capital and operation and maintenance costs estimates with the ultimate intention of reducing ERA response costs.  (Id.)

On July 17, 2012, RID submitted a proposal to ADEQ to modify the ERA Work Plan and also submitted a Work Plan for implementation of the

10

Modified ERA on January 24, 2013.  The Modified ERA ("MERA") was approved by ADEQ on February 1, 2013, and reduces the capital and operation and maintenance costs of the ERA by as much as fifty percent.  (Id. ¶ 77.)

## PROCEDURAL BACKGROUND

On February 9, 2010, RID filed a CERCLA action in this Court, asserting a Section 107 cost-recovery claim to designate multiple Defendants as potentially responsible parties ("PRP") pursuant to CERCLA to recoup the costs incurred in responding to the contamination.  On May 6, 2014, RID filed its Third Amended Complaint.  (Dkt. # 789.)  On October 13, 2015, Moving Defendants filed the instant Motion for Partial Summary Judgment Regarding Plaintiff's Claimed Past Costs (Dkt. # 1110), along with a Statement of Facts ("SOF") in support of their motion (Dkt. # 1111).  RID filed a response in opposition on November 16, 2015 (Dkt. # 1131), along with a Separate SOF in Opposition to Moving Defendants' Motion for Partial Summary Judgment (Dkt. # 1132).  Moving Defendants filed a reply to their motion on December 4, 2015 (Dkt. # 1142), along with Objections to RID's Additional Fact Statements (Dkt. # 1143).  The same day, Freescale filed its own Objections to the Declaration of David P. Kimball ("Kimball Declaration") and to RID's Additional Fact Statements (Dkt.

# 1144); RID filed a response to Freescale's Objections on December 14, 2015

(Dkt. # 1149).  The pending matters are discussed below.[3]

## APPLICABLE LAW

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson, 477 U.S. at 248).  Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting Anderson, 477 U.S. at 250).

---

[3] The Court notes there have been numerous motions filed and resolved by the Court concerning conflicts of interest by and about various attorneys representing parties in this matter.

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered.  Orr v. Bank of Am., 285 F.3d 764, 773–74 (9th Cir. 2002).

## ANALYSIS

Moving Defendants move for partial summary judgment on RID's alleged past response costs.  (Dkt. # 1110.)  They contend that certain of RID's alleged response costs are not recoverable under CERCLA Section 107(a), because RID has not established that it has actually paid the approximately $16 million in alleged "past costs," or that it has any existing non-contingent obligation to pay

13

these costs.  (Id. at 8.)  Moving Defendants challenge six "Challenged Cost Categories" of RID's alleged response costs: (1) Claimed Gallagher & Kennedy ("G&K") Costs; (2) Claimed Spinnaker Holdings, LLC ("Spinnaker") Costs; (3) Claimed Synergy Environmental, LLC ("Synergy") Costs; (4) Claimed HDR Engineering, Inc. ("HDR") Costs; (5) Claimed Lawrence Moore & Associates ("LMA") Costs; and (6) Claimed Errol L. Montgomery & Associates ("Montgomery") Costs.[4]  (Id. at 9–10.)  Moving Defendants argue that RID has not actually "incurred" any of these costs to these parties under Section 107(a).  (Id. at 10.)

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed."  Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870 (9th Cir. 2001) (quoting 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990)). "To achieve that end, CERCLA 'authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation.'"  Id.

---

[4] Moving Defendants do not, in this motion, challenge five other categories of Plaintiff's Claimed Costs, which total approximately $1,262,438.84.  (Dkt. # 1110 at 9.)  However, on August 19, 2016, Moving Defendants filed a motion for partial summary judgment on Plaintiff's remaining claimed costs.  (Dkt. # 1315.)  This motion is currently pending before the Court and a hearing will be scheduled at a later date.

14

To establish a prima facie case under § 9607(a), the plaintiff must show that (1) there is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan [("NCP")]"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).  42 U.S.C. § 9607; see Carson Harbor Vill. v. Cnty. of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006); Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989).

Moving Defendants challenge only the third element of Plaintiff's prima facie case under § 9607(a): whether the release or threatened release caused RID to *actually incur* necessary response costs consistent with the NCP.[5]  (Dkt. # 1110 at 11.)  See Carson Harbor, 433 F.3d at 1265.

Important to this dispute, CERCLA does not define "incur."  See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 961 (9th Cir. 2013); In re Dant & Russell, 951 F.2d 246, 250 (9th Cir. 1991) ("This case provides no occasion for defining what 'incurred' means—only what it does not

---

[5] Moving Defendants do not, in this motion, dispute whether the response costs were necessary or consistent with the NCP in this motion.  (See Dkt. # 1110 n.2.)  However, on August 22, 2016, Moving Defendants filed a motion for summary judgment regarding compliance with the NCP.  (Dkt. # 1320.)  On October 11, 2016, RID filed a cross-motion for summary judgment regarding NCP compliance.  (Dkt. # 1330).  These motions will be heard at a later date.

mean.").  Therefore, "[b]ecause the statute does not define 'incur,' and there is no controlling authority on the term in the CERCLA context, [the Court will] apply the ordinary meaning, which is '[t]o acquire or come into,' '[t]o become liable or subject to as a result of one's action,' to 'bring upon oneself.'"  Chubb Custom, 710 F.3d at 961 (quoting Am. Heritage Dictionary (4th ed. 2000)).  The term "incur," however, has been interpreted to reach beyond those who actually paid for response costs—"a finding that a cost has been 'incurred' may be based on an existing legal obligation" to pay, even if that existing legal obligation is later satisfied by a third party.  Trimble v. Asarco, Inc., 232 F.3d 946, 958 (8th Cir. 2000), overruled on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005).

Moving Defendants assert that RID did not actually incur all of its alleged past response costs under Section 107(a), and that it cannot recover on behalf of another party who paid the costs on a contingent basis.  (Dkt. # 1110 at 11.)  Based on this argument, Moving Defendants contend that RID itself has not actually incurred any of the response costs represented in the six Challenged Cost Categories listed above, totaled at approximately $16 million, and therefore RID must demonstrate that it has an existing, non-contingent legal obligation to pay those costs in order to recover them.  (Id. at 12.)  Moving Defendants assert that RID cannot demonstrate such an obligation because its fee arrangements with each

of the entities listed in the Challenged Cost Categories are only contingent on an uncertain possibility that an obligation to pay will arise in the future.  (Id. at 12–13.)

In response, RID admits that it did not actually pay for any of the claimed past costs pertaining to the six Challenged Cost Categories.  (Dkt. # 1131 at 3.)  Instead, RID asserts that G&K undertook to pay the costs as RID's agent and that it's claimed past costs are recoverable because of RID's assumption of a legal obligation to reimburse G&K pursuant to the Fee Agreement conveying its future right to sell remediated water.  (Id. at 9.)  The parties' arguments are addressed below.

I.      Claimed G&K Costs

As this Court has recognized on numerous occasions, RID entered into an arrangement with G&K, whereby G&K is to represent RID in all matters related to a "Proposed Water Project involving pursuing environmental contamination cost recovery claims and exploring the prospects of remediating certain RID water and delivering such water to customers . . . (as more particularly described . . . the 'Project')."  (G&K Confidential Fee Agreement ("the Agreement") at 1.)  The Agreement states that

> The Project, and G&K's representation of RID as proposed in this
> agreement, have the stated objective and benefit to RID of developing
> a remedial solution for RID water contaminated by VOCs, enhancing
> the existing RID wells system, providing a source of additional water

for the benefit of RID users and other customers (without adversely
affecting RID's current and future water demands for irrigation and
other nonpotable uses . . . served by RID in the ordinary course of
business), and saving RID from any cost or expense for the Project."

(Id. at 2 (emphasis added).)

Under the heading "Compensation," the Agreement provides that

"G&K is willing to represent RID in regard to the Project without any direct

payment obligation of RID."  (Id. at 3.)  The Agreement further states that G&K is

to be paid out of "Project Funds" which are

funds obtained on behalf of RID from various third parties, to the
extent lawful and permissible, including without limitation, PRPs,
governmental entities or other parties (including existing or
prospective RID customers who will benefit from the Project, or third-
party investors) by or on behalf of RID in regard to the Project
described above and proceeds from the sale of remediated water from
RID wells located in the WVBA WQARF Site, that are in excess of
the costs of treating and producing such water and any amounts which
RID is entitled from such sales, but excluding funds obtained by RID
from the sale of irrigation and Nonpotable Uses to lands and users
within RID in the ordinary course of business[.]

(Id.)  The Agreement also advises that "[b]ecause the Project will evolve and

develop over time, [G&K's] compensation may need to be revised by written

agreement of both parties; however, no compensation will be required to be paid to

G&K directly by RID."  (Id. at 4.)  The Agreement states that "[b]ecause RID is

not directly liable for G&K's compensation, [G&K's] compensation will be

characterized as a contingency or 'success' fee of all net profits and proceeds from

Project Funds."  (Id. (emphasis added).)  The Agreement goes on to state that

18

"G&K will be responsible to compensate any consultants [they] engage in regard to the Project from Project Funds."  (Id.)  The Agreement also informs RID that "[a]s you are aware, there are necessary allocations of such Project Funds and payments which G&K is undertaking at no cost to RID . . ."  (Id. at 5.)

Under the heading "Administration," the Agreement states that

> [e]ven though <u>RID will at no time be responsible to pay [G&K's] fees</u>, upon written request by RID, [G&K] will send or provide statements of [its] bills and monthly summaries describing [its] services.  G&K understands that if insufficient Project Funds exist, the compensation due to G&K will be deferred.  G&K will also bear the risk that if insufficient Project Funds are not obtained ultimately, the amounts due to G&K and consultants and other providing services for the approved remediation will not be paid . . . . <u>Because G&K has committed to this representation in regard to the Project on a pure 'contingency' basis</u>, it is imperative that G&K retain control over such Project Funds.

(G&K Fee Agreement at 5–6 (emphasis added).)  Additionally, under the heading "Miscellaneous," the Agreement provides that RID "may terminate G&K services at any time by notifying [it] of [RID's] intent to do so."  (Id. at 6.)  According to the Agreement, "G&K may resign from [its] representation if, after consultation with RID, it is determined that the prospects for success of the Project is low." (Id.)

Moving Defendants argue that the Agreement's language, quoted above, clearly establishes that G&K is working on a purely contingent basis and that any rights to future remediated water are uncertain.  (Dkt. # 1110 at 14.)

Moving Defendants contend that the Agreement fails to establish RID's legal obligation to pay for the alleged past response costs that G&K, and not RID, incurred.  (Id.)  Because RID's fee arrangement with G&K is therefore contingent on either the success of the lawsuit or on the sale of its remediated water, Moving Defendants argue that RID cannot recover its claimed past costs.

        In response, RID asserts that its agreement with G&K establishes that it does, in fact, have an obligation to pay for the response costs and that even if G&K were to exercise their right to terminate its agreement with RID, RID would still be obligated to pay for services G&K already rendered under the contract. (Dkt. # 1131 at 10.)

        The Ninth Circuit has recognized that in order for a private plaintiff "to recover from a responsible party response costs it incurs itself in conducting cleanup pursuant to CERCLA[,] . . . [it] will spend some money responding to an environmental hazard."  In re Dant, 951 F.2d at 249.  In this case, however, it is undisputed that RID's attorneys, G&K, paid the response costs presently at issue. The Eighth Circuit, in Trimble v. Asarco, Inc., addressed a similar issue.  232 F.3d at 956.  The plaintiffs in Trimble, like RID, did not pay clean-up costs prior to filing suit; instead, the attorneys for the Trimble plaintiffs paid for all expenditures, in a manner similar to RID's fee agreement with G&K.  See id. at 957.  In such a situation, the Eighth Circuit determined that the Trimble plaintiffs did not incur a

definite legal obligation to pay clean-up costs, because their obligation to reimburse their attorneys was contingent upon the success of their claims.  Id. at 957–58.  The Court held that "the mere possibility, even the certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establishes that a cost may be incurred, or will be incurred." Id. at 958.  As the Eight Circuit recognized, plaintiffs may "incur" costs even if another entity actually pays for those costs, but the relevant inquiry is "who assumed a legal obligation to pay."  Wilson Road Dev. Corp. v. Fronabargar Concreters, Inc., 971 F. Supp. 2d 896, 910 (E.D. Mo. 2013) (citing Trimble, 232 F.3d at 958).  Because the attorneys of the Trimble plaintiffs assumed the legal obligation to pay, the Eighth Circuit held that the plaintiffs failed to assert a legally viable private cost-recovery claim under CERCLA.  Trimble, 232 F.3d at 958.

RID alleges that the facts in the instant case are different than Trimble, because RID has conveyed to G&K its expected revenues from the sale of remediated water.  (Dkt. # 1131 at 9.)  RID contends therefore that it is not a purely contingent fee arrangement as was the case in Trimble.  (Id.)  RID asserts that it has a legal obligation to pay G&K, regardless of the Agreement's language that G&K may resign from representation if sufficient Project Funds do not exist. (Id.)  RID argues that even if G&K resigned, it still has a lingering obligation to

pay for G&K's response costs pursuant to RID's conveyance of the remediated water rights.  (Id. at 9–10.)

The Court disagrees with RID.  RID has not provided sufficient evidence that it has an existing legal obligation to reimburse G&K for the response costs it allegedly incurred.  First, under the terms of the Agreement, no legal obligation will arise unless and until RID obtains a final judgment against the PRPs, and even then, the amount to be paid to G&K will be dependent on the extent of the judgment.  See Trimble, 232 F.3d at 957.  Second, the sale of remediated water is also a speculative venture, as RID's own evidence indicates that it "is yet to sell any remediated water as drinking water."[6]  (Dkt. # 1132-4 at 13.)  Despite RID's expert's opinion that a rising population will increase the demand for a supply of drinking water and will be of significant value (see id.), this too—like a final judgment against the PRPs—is not certain and has yet to come to fruition.

The cases on which RID relies to support its position are inapposite. In Quarles Petroleum Co. v. United States, the plaintiffs were allowed to recover costs they incurred under the Federal Water Pollution Control Act because "the plaintiffs' general manager negotiated assistance in cleaning up the spilled oil." 213 Ct. Cl. 15, 551 F.2d 1201, 1205 (1977).  Due to this arrangement, "the

---

[6] At the hearing, RID's counsel agreed that any remediation and sale of water had not yet occurred.  (Transcript of hearing at 51.)

plaintiffs were liable [themselves] to pay the persons and companies which had provided the goods and services in removing the spilled oil."  Id.  The Court held that plaintiffs "through their own actions were liable for the costs resulting from the clean up operations," even though "the plaintiffs' insurer paid out the total cost of the clean up operations."  Id.; cf. Basic Mgmt. Inc. v. United States, 569 F. Supp. 2d 1106, 1120 (D. Nev. 2008) (finding that plaintiffs did not directly incur costs because their insurer paid all vendors directly and was obligated to so in the future, and concluding that plaintiffs "have not incurred the specific costs directly paid by or reimbursable by the insurer").

Here, by contrast, there is no evidence that RID provided any assistance in paying, much less negotiating, the alleged response costs; instead, the evidence indicates that G&K was responsible for these tasks.  (See Fee Agreement at 2.)  The Fee Agreement states that "there are necessary allocations of such Project Funds and payments which G&K is undertaking at no cost to RID, including the satisfaction of certain reimbursements to ADEQ, the compensation of consultants (including Synergy) and others providing services for the approved remediation Project in regard to the contractual obligations associated with the design, installation, operation, maintenance and financing of certain remediation facilities and improvements for the Project."  (Id. at 5 (emphasis added).)  The Fee Agreement also indicates that "Project Funds will be paid into a G&K trust

23

account" and that "<u>G&K shall pay the amounts then due</u> to those individuals and entities which have incurred litigation and remediation costs."  (<u>Id.</u> at 5–6 (emphasis added).)  The Agreement also states that "it is imperative that <u>G&K retain control</u> over [the] Project Funds."  (<u>Id.</u> at 6 (emphasis added).)  Based on this language, it appears G&K had virtually complete control over the Project.

Similarly, in <u>Karras v. Teledyne Indus., Inc.</u>, the district court held that the plaintiff Trusts incurred response costs necessary to maintain an action under Section 113 of CERCLA (for contribution) because the Trusts contractually assumed the duty to clean a polluted site, and also performed actual clean-up, even though the Trusts were funded by an independent source.  191 F. Supp. 2d 1162, 1167 (S.D. Cal. 2002).  Again, as evidenced by the G&K Fee Agreement, RID neither contractually assumed a duty to clean a polluted site nor performed actual clean-up of such a site.

RID also cites <u>Bethlehem Iron Works, Inc. v. Lewis Indust., Inc.</u> in support of its position.  No. 94-0752, 1996 WL 557592 (E.D. Pa. Oct. 1, 1996).  In that case, a CERCLA defendant to a contribution action argued that the plaintiff had not incurred costs because it paid for remediation with "funds that were borrowed, loaned or otherwise given to it from its parent company" which was not a party to the suit.  <u>Id.</u> at *51.  The district court disagreed, finding that the costs the plaintiff incurred were paid with checks from the plaintiff and that CERCLA

jurisprudence did not require a court to trace the source of funds or deny recovery where a plaintiff borrowed money to pay response costs.  Id.; see also BCW Assocs., Ltd., v. Occidental Chem. Corp., No. 86-5947, 1988 WL 102641, at *13, 21, 23 (E.D. Pa. Sept. 29, 1988) (determining that plaintiff who "borrowed funds to pay for the clean-up costs it incurred" had actually "incurred" costs under CERCLA).  Here, while RID argues that, like the plaintiff in Bethlehem Iron, it was unable to pay for the response costs without borrowing money, RID has failed to produce evidence that it, like the plaintiff in Bethlehem Iron, was the entity who directly paid the initial response costs.[7]

Additionally, RID cites Wilson Road Dev. Corp. v. Fronabarger Concreters, Inc.  971 F. Supp. 2d at 896.  In that case, the district court held that a plaintiff may have actually incurred CERCLA response costs because invoices sent

---

[7] The Eighth Circuit has recognized the potential inequity in a party's inability to front response costs.  In Trimble, the Court noted

> Plaintiffs make the policy argument that a rule requiring a plaintiff to actually spend money or incur debt before having a CERCLA private-cost recovery claim will, in effect, deny those with the least financial resources access to CERCLA's benefits.  While we recognize a potential for inequality within the CERCLA private cost-recovery scheme, we believe our holding today interprets the statute correctly and also promotes prompt and efficient responses to environmental hazards.  Moreover, no one is entirely excluded from CERCLA's benefits because state and federal environmental agencies are also empowered to carry out its statutory goals.

Trimble, 232 F.3d at 958 n.15.

for environmental investigation were addressed to that plaintiff.  Id. at 910.  The court recognized that the invoices demonstrated that, prior to filing suit, the plaintiff may have assumed the legal obligation to pay for response costs.  Id.  By contrast, RID has not provided sufficient evidence that any invoices, reports, or other matters related to its alleged response costs were addressed to it.  In fact, the Agreement to Conduct Work between ADEQ and RID indicates that "[a]ll deliverables, materials, plans, reports, test results, notices and other items ("Submittals") . . . to the RID under this Agreement shall be sent to" David P. Kimball, III, as legal counsel for G&K.  (Dkt. # 1132-2 at 18.)  Further, the Agreement to Conduct Work is signed by Mr. Kimball, who appears to be acting on behalf of RID.  (Id. at 19.)  Thus, there is no evidence that any correspondence regarding the remediation was sent directly to RID.

The Court also finds that while RID's Fee Agreement with G&K does transfer RID's profit of future remediated water to G&K, this transfer does not create a sufficient legal obligation on RID to pay for these costs.  While the potential profit derived from the sale of remediated water may act as an incentive to G&K to continue funding the response costs both now and in the future, there is no evidence that any sale of remediated water has occurred or is certain to occur. In fact, the Agreement clearly contemplates that G&K may never receive any compensation for the response costs it has incurred.  The Fee Agreement states in

26

no uncertain terms that "G&K will also bear the risk that if sufficient Project Funds are not obtained ultimately, the amounts due to G&K and consultants and others providing services for the approved remediation Project will not be paid."  (Fee Agreement at 5 (emphasis added).)  Cf. United States Virgin Islands Dep't of Planning & Nat. Res. v. St. Croix Renaissance Grp., L.L.L.P., 527 F. App'x 212, 215 (3rd Cir. June 5, 2013) (deciding that a fact issue existed as to whether plaintiff incurred response costs in plaintiff's contract with attorneys who advanced CERCLA response fees because "[a] reasonable jury could certainly conclude that, under the terms of the [fee agreement], [plaintiff] was obligated to reimburse the advanced costs, irrespective of whether funds have been appropriated").  Further, the Agreement provides (1) that it is "saving RID from any cost or expense for the Project"; (2) it "is willing to represent RID in regard to the Project without any direct payment obligation of RID"; (3) that "no compensation will be required to be paid to G&K directly by RID"; (4) G&K's "compensation will be characterized as a contingency or 'success' fee of all net profits and proceeds from Project Funds"; (5) that "there are necessary allocations of such Project Funds and payments which G&K is undertaking at no cost to RID"; (6) that "G&K has committed to this representation on a pure 'contingency' basis"; and (7) that "G&K may resign from [its] representation if, after consultation with RID, it is determined that the prospects for success of the Project is low," including

27

if "there is a lack of demand for the remediated water from the Project." (Fee Agreement at 2–9.) These terms do not contemplate RID's firm legal obligation or commitment to reimburse G&K for its expenditures in response to the environmental remediation. See Trimble, 232 F.3d at 958 ("Under CERCLA's scheme for private action, response costs may not be recovered when there has been no commitment of resources for meeting these costs. Section 9607(a)(4)(B) permits an action for response costs 'incurred'—not [response costs] 'to be incurred.'").

Under the terms of the Agreement, the Court concludes that RID has not presented sufficient evidence to overcome summary judgment regarding whether it has incurred all of the Claimed G&K Costs or has a non-contingent legal obligation to reimburse G&K for the response costs that G&K has incurred. Summary judgment is therefore granted in favor of the Moving Defendants for the Claimed G&K Costs.

II.     Claimed Spinnaker Costs

Moving Defendants next challenge RID's contract with Spinnaker, arguing that there is no evidence that RID has incurred or paid any of the Claimed Spinnaker costs. (Dkt. # 1110 at 14.) Specifically, Moving Defendants assert that RID "has not produced or disclosed any cancelled checks, wire-transfer

documentation, or other proof of any payments" for any or all portions of the Claimed Spinnaker Costs.  (Dkt. # 1111 at 9.)

RID was a party to two contracts with Spinnaker.  First, the parties signed an "Agreement Between Owner and Design/Builder on the Basis of Cost-Plus" ("Cost-Plus Agreement").  (Dkt. # 1111-3 at 2.)  According to the relevant terms of the Cost-Plus Agreement, the parties agreed to a "Payment Contingency" whereby

> Notwithstanding any provisions in the Contract or other Contract Documents to the contrary, [Spinnaker] acknowledges and agrees that [RID] shall not be obligated to make such payments to [Spinnaker], nor otherwise liable for compensation in regard to the Work, unless and until, and to the extent, sufficient proceeds have been collected by (or on behalf of) [RID] and designated as "cost recovery of remediation," "recovery of response action costs" or "cost recovery of response action costs" (or words to this effect) from one or more potentially responsible persons ("PRPs") involved in [the] pending litigation identified as ROOSEVELT IRRIGATION DISTRICT v. SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., CV-10-0290-PHX-MHM (USDC AZ) ("Lawsuit"), and after the related monetary obligations, if any, owed to Arizona Department of Environmental Quality ("ADEQ") by [RID] in regard to the Lawsuit or the remediation of the contaminants as are the subject of the Lawsuit. Similarly, notwithstanding any provisions in the Contract or other Contract Documents to the contrary, the amount of interest on any deferred payment to [Spinnaker] shall also be subject to the review and approval [of] the Court in the Lawsuit, and included as part of the "cost recovery of remediation" amount. In addition, the proceeds available after satisfaction by [RID] of the amounts owed to ADEQ shall be shared between [Spinnaker], [RID] (for its out of pocket costs) and Gallagher & Kennedy, PA, legal counsel to [RID], on a basis proportionate to the amounts due to each, but limited to the amounts approved by the Court in the Lawsuit. [RID] cannot guaranty the collection of any proceeds . . . . Upon

29

collection of sufficient proceeds, then the Contract Price shall be remitted to [Spinnaker] in accordance with the terms of this Contract. . . . The obligation of [RID] to pay the Contract Price and any other sums due to [Spinnaker] are limited to the proceeds collected by or on behalf of [RID] from the Lawsuit. No other assets or property of [RID] shall be attached or assessed in any collection action on behalf of [Spinnaker].

(Dkt. # 1111-3 at 6–7 (emphasis added).)  The Cost-Plus Agreement is signed by

G&K's legal counsel, David Kimball, on behalf of RID.  (Id. at 13.)

Second, RID and Spinnaker entered into an "Agreement to Provide

Operations and Maintenance Services" (the "Operations Agreement").  (Dkt.

# 1111-4 at 2.)  Similar to the Cost-Plus Agreement, payment under the Operations

Agreement provides that

To the extent [RID] has received funds as a recovery for operations and maintenance from PRPs from the Lawsuit . . ., then [RID] shall pay [Spinnaker's] invoice within thirty (30) days of receipt (subject to [RID's] withholding rights and the balance of this Article), pay [Spinnaker] for Standard Services and approved Additional Services for such Month a Fixed Fee for Services based on the Schedule of Fees . . . .

Deferral of Payments. Notwithstanding any provisions in this O&M Agreement to the contrary, [Spinnaker] acknowledges and agrees that [RID] shall not be obligated to make payments to [Spinnaker], . . . unless and until, and to the extent, sufficient proceeds have been collected by (or on behalf of) [RID] and designated as "cost recovery of remediation," "recovery of response action costs" or "cost recovery of response action costs" (or words to this effect) from one or more potentially responsible persons ("PRPs") involved in [the] pending litigation identified as ROOSEVELT IRRIGATION DISTRICT v. SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., CV-10-0290-PHX-MHM (USDC AZ) ("Lawsuit"), and after the . . . monetary obligations, if any, owed to

> Arizona Department of Environmental Quality ("ADEQ") by [RID] in
> regard to the Lawsuit or the remediation of the contaminants as are the
> subject of the Lawsuit. In addition, the proceeds available after
> satisfaction by [RID] of the amounts owed to ADEQ shall be shared
> between [Spinnaker], [RID] (for its out of pocket costs) and Gallagher
> & Kennedy, PA, legal counsel to [RID], on a basis proportionate to
> the amounts due to each. [RID] cannot guaranty the collection of any
> proceeds . . . . Upon collection of sufficient proceeds, then the
> payments for Services shall be remitted to [Spinnaker] in accordance
> with the terms of this O&M Agreement.

(Dkt. # 1111-4 at 8–10 (emphasis added).)  Again, like the Cost-Plus Agreement,

the Operations Agreement is signed by David Kimball, G&K's legal counsel, on

behalf of RID.  (Id. at 23.)

In responding to Moving Defendants' argument regarding the

Claimed Spinnaker Costs, RID concedes that "the Spinnaker contracts with RID

may be contingent on the successful outcome of this CERCLA action."  (Dkt.

# 1131 at 11.)  Nevertheless, RID contends that it is still entitled to recover past

response costs because "the payment of Spinnaker's charges for designing,

constructing, operating and maintaining the remediation system was to be made by

G&K out of project funds."  (Id.)  This argument is of no avail.

First, while both the Cost-Plus Agreement and the Operations

Agreement are between Spinnaker and RID, the language of both agreements, as

highlighted above, clearly indicates that Spinnaker's recovery from RID is

contingent on the success of this litigation.  Second, RID has not presented any

evidence that it has actually incurred any costs to Spinnaker.  In fact, RID admits

31

that G&K "paid Spinnaker $269,800.53 for its work on the well-head treatment system." (Dkt. # 1131 at 11.) RID also admits that it has only "indirectly" incurred the Spinnaker costs. (Id.) In such case, RID has failed to produce evidence it directly paid Spinnaker any response costs for the remediation.

Furthermore, RID cannot rely on and incorporate its Fee Agreement with G&K into either of the Spinnaker agreements in order to assert that it will nonetheless incur the Claimed Spinnaker Costs; the Court has already determined, as previously stated, that RID's Fee Agreement with G&K did not establish a legal obligation to reimburse G&K for the response costs G&K agreed to front for the remediation. The Court therefore finds that RID has not provided any evidence that it has either directly paid any response costs to Spinnaker or that it has a non-contingent obligation to pay Spinnaker for the alleged response costs that G&K has incurred on RID's behalf. Accordingly, summary judgment is granted in favor of Moving Defendants in regard to the Claimed Spinnaker Costs.

III.    Claimed Synergy, HDR, and LMA Costs

Moving Defendants next challenge the Claimed Synergy, HDR, and LMA Costs. (Dkt. # 1110 at 14.) Moving Defendants contend that there is no evidence that RID has paid any of the claimed past response costs to these entities nor is there any evidence of a non-contingent obligation to do so. (Id. at 14–15.)

In response, RID appears to concede that no costs were actually paid to HDR because it "was retained for a very short period as a consultant to prepare an engineering cost estimate, but was not paid anything for that truncated retention." (Dkt. # 1131 at 12.) As for Synergy and LMA, RID asserts that they are "the indirect, but very real beneficiaries of the RID-G&K Agreement" and that RID has therefore incurred the Synergy and LMA Costs pursuant to its Fee Agreement with G&K. (Id.)

RID's evidence in support of its position consists of the Kimball Declaration, G&K's legal counsel, who states that (1) "G&K made payments from the Project Funds, as an authorized agent of RID, to Synergy" (Dkt. # 1132-3 at 5), and (2) that under the G&K Fee Agreement, "RID authorized G&K to engage consultants [including LMA] to perform any services necessary" for the Project (id. at 4). This evidence, however, is not sufficient to demonstrate a fact issue as to whether RID incurred costs to either Synergy or LMA.

RID has not produced any evidence that it had a contract with Synergy or LMA; RID has also not produced any invoices, receipts, or other correspondence with Synergy or LMA that would evidence RID's obligation to pay. Additionally, as discussed above, RID cannot rely on its agreement with G&K to argue that it indirectly incurred costs to Synergy or LMA—RID's agreement with G&K fails to demonstrate that it has any definite legal obligation

33

to reimburse G&K for any costs expended in connection with the remediation of RID's wells, including engaging consultants to perform work on RID's behalf. Accordingly, summary judgment is granted in favor of Moving Defendants for the Claimed Synergy, HDR, and LMA Costs.

IV.    Claimed Montgomery Costs

Finally, Moving Defendants argue that RID has not incurred any costs to Montgomery, a consulting service hired as part of the remediation of RID's wells.  (Dkt. # 1110 at 15.)  Moving Defendants assert that the contract between Montgomery, RID, and G&K fails to establish that RID has any obligation to pay Montgomery for its services.  (Id.)  Moving Defendants also contend that Montgomery's two other contracts at issue are between Montgomery and Synergy, and that RID has no direct obligation to pay Montgomery under either of those contracts.  (Id. at 16.)  In response, RID contends that it paid for Montgomery's services "through the mechanism of the RID-G&K Agreement."  (Dkt. # 1131 at 12.)

Montgomery was a party to three contracts at issue in this case.  First, in March 2009, Montgomery entered into a contract with RID and G&K to perform consulting services ("Montgomery Consulting Agreement").  (Dkt. # 1111-5 at 20.)  In relevant part, the Montgomery Consulting Agreement provides that

34

Invoices for work performed by Consultant [("Montgomery")] shall
be submitted to G&K. Client [("RID")] shall permit payment to be
made by G&K from the funds collected from potentially responsible
parties (PRPs), investors, governmental entities or other parties
(including existing or prospective RID customers who will benefit
from the work) by or on behalf of RID for the Services ("Project
Funds"). [Montgomery] understands and agrees that payment of its
fees will not be the direct obligation of [RID], and specifically, the
funds for payment of the fees shall come solely from Project Funds.

. . .

All Project Funds will be paid directly into the G&K trust account.
G&K shall pay out of the Project Funds the amounts due to G&K,
[Montgomery] and [RID]. The Parties agree that all of
[Montgomery's] billing statements shall be sent to G&K, and G&K
will be responsible for payment out of the Project Funds to
[Montgomery] or for any other costs incurred in connection with
[Montgomery's] Services. . . . [Montgomery] bears the risk that if
insufficient Project Funds are not obtained ultimately, the amounts
due to [Montgomery] will not be paid.

(Dkt. # 1111-5 at 21 (emphasis added).)  Montgomery is a party to two other

contracts, between Montgomery and Synergy ("Montgomery-Synergy Contracts");

the two contracts are dated, respectively, June 1, 2011, and August 30, 2013.  (Id.

at 44, 65.)  The Montgomery-Synergy Contracts are both entitled "Subcontract"

and both contracts arrange for payment to be made to Montgomery by Synergy.

(Id. at 45, 65.)

Plaintiff cannot rely on either the Montgomery Consulting Agreement

or the Montgomery-Synergy Contracts to argue that it incurred any response costs.

First, the Montgomery Consulting Agreement, quoted above, clearly contains

language that it is a contingent agreement, as any payment to Montgomery is to come from Project Funds.  Furthermore, the contract also contemplates that if Project Funds are not sufficient, Montgomery may not receive any payment. Additionally, the Montgomery Consulting Agreement states that billing is to be directed to G&K, not RID, and that payment to Montgomery shall not be the responsibility of RID.

Second, the Montgomery-Synergy Contracts are clearly subcontracts and RID has no direct payment obligation to Montgomery under either contract. Instead, the only payment obligations under the Montgomery-Synergy Contracts are the responsibility of Synergy.  RID has not produced any evidence that it has any obligation to reimburse Synergy for these expenses.  Instead, it appears that G&K has contracted with Synergy, and it is therefore G&K's obligation to pay for Synergy's services, including its services under the subcontracts with Montgomery.  As previously discussed, RID cannot rely on its Agreement with G&K to argue that it has a legal obligation to ultimately pay G&K for any amounts it has paid to Synergy, or any other party, on behalf of the remediation of RID's wells.

V.    Alleged Past Response Costs Actually Paid

At the hearing, the parties distinguished approximately $1.23 million of RID's requested $16 million incurred past response costs.  RID conceded that,

36

of the $16 million it alleges it incurred in remediation efforts, only $1.23 million has actually been paid; the remaining $15 million has not been paid at all. (Transcript of hearing at 12, 34, 53, 74, 77; see also Dkt. # 1132 at 9–10.)  RID argued that the $1.23 million was actually incurred by RID because the money paid by G&K to the various entities was from Project Funds pursuant to the Fee Agreement.  (Transcript of hearing at 53.)  RID stated that "[a]nd to date something north of [a] million dollars has gone in from PRPs, settlements and so forth has gone into the project funds.  Those were settlements paid to RID.  RID contributed them to the project fund."  (Id. at 53.)

        The Court finds RID's attempt at distinction of the $1.23 million in alleged incurred costs without merit.  First, the Kimball declaration clearly states that it was "G&K [that] made payment[s] from the Project Funds to" the stated entities.  (Dkt. # 1132-3.)  There is no indication that the money that went into the Project Funds to pay the approximately $1.23 million in alleged past costs was money that came directly from RID.  RID has failed to produce any documentation or other evidence suggesting money was transferred directly from RID into the Project Funds, and that the money was then used by G&K to pay the various entities.  RID's evidence consists of a declaration that deposits were made into Project Funds as a result of settlements with various entities with RID, but does not clearly indicate that this was money received first by RID.  (See, e.g., Dkt. # 1132-

3 at 18.)  More importantly, there is no evidence that the settlement funds were ever intended to be paid directly to RID and not to G&K, acting as the agent of RID.  And, as already discussed, RID has not provided sufficient evidence that it has an existing legal obligation to reimburse G&K for any of its expenditures from the Project Funds on behalf of RID.

Even assuming, however, deposits were made into the Project Funds directly from RID as a result of RID's settlement with various entities or other third parties, the Court is not convinced that this would not amount to a prohibited double recovery for RID.  Cf. 42 U.S.C. § 114(b) (prohibiting double recovery for both CERCLA recovery and recovery under other State and Federal law); 43 C.F.R. § 11.15(d) ("There shall be no double recovery under this rule for damages or for assessment costs, that is, damages or assessment costs may only be recovered once, for the same . . . release and natural resource, as set forth in section 107(f)(1) of CERCLA); Lockheed Martin Corp. v. United States, 833 F.3d 225, 237 (D.C. Cir. 2016) ("No party may lawfully demand double recovery of the money it spent cleaning up hazardous waste.")[8]

---

[8] This is especially true for CERCLA contribution claims under section 113. "[C]ourts have invoked principles of equity under [CERCLA] section 113(f) to bar CERCLA relief where double recovery would otherwise result, even in circumstances in which further recovery is not barred by CERCLA section 114(b)." Lockheed, 833 F.3d at 237; see, e.g., Litgo New Jersey Inc. v. Comm'r of the N.J. Dep't of Envtl. Prot., 725 F.3d 369, 391 (3d Cir. 2013); Friedland v. TIC–The Indus. Co., 566 F.3d 1203, 1206–07 (10th Cir. 2009); Akzo Nobel Coatings,

Based on the foregoing, the Court finds that RID has failed to demonstrate that there is a genuine dispute as to any material fact as to whether they incurred any response costs in regard to the six Challenged Cost Categories. Accordingly, Moving Defendants are entitled to judgment as a matter of law for the six Challenged Cost Categories and their motion is **GRANTED**.

VI.   <u>Objections to RID's SOFs and Kimball Declaration, Motion to Strike</u>

In replying to RID's response to their Motion for Partial Summary Judgment, Moving Defendants filed objections to RID's SOFs.  (Dkt. # 1143.) Freescale filed its own objections to RID's SOFs (Dkt. # 1144), as well as a Motion to Strike RID's response to Freescale's objections (Dkt. # 1153).

A.   <u>Moving Defendants' Objections to RID's SOF</u>

Moving Defendants first object to RID's SOFs paragraphs numbered 13, 15, 19-20, 27-28, 34-37, 41-42, 46, and 48-49, on the basis that these paragraphs contain legal arguments as opposed to assertions of fact.  (Dkt. # 1143 at 5.)  This objection is **OVERRULED AS MOOT** in light of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above.

---

Inc. v. Aigner Corp., 197 F.3d 302, 307–08 (7th Cir. 1999); Yankee Gas Servs. Co. v. UGI Utils. Inc., 852 F.Supp.2d 229, 255–56 (D. Conn. 2012); Basic Mgmt., 569 F.Supp.2d at 1122–23.  It is well settled that "any level of double recovery is inequitable in CERCLA contribution actions."  NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 708 (7th Cir. 2014).

Moving Defendants next object to paragraphs 29-31 of RID's SOFs. (Dkt. # 1143 at 5.)  Moving Defendants object to the portions of these paragraphs that cite to the Kimball Declaration on the basis that (1) it lacks materiality, (2) lacks foundation or personal knowledge, (3) it is hearsay, (4) violates the best evidence rule, and (5) that is purports to assert legal conclusions.  (Id. at 5–6.)  The Court will address this objection below in response to Freescale's objections to the Kimball Declaration.

Moving Defendants object to paragraphs 26, 33, 40, and 48 on the basis that RID's responses either expressly or impliedly characterized RID's purported payment obligation as non-contingent, but is not supported by the evidence.  (Dkt. # 1143 at 6.)  This objection is **OVERRULED AS MOOT** in light of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above.

Moving Defendants object to paragraph 39 on the basis that it lacks materiality and that RID has not provided any evidence to suggest the existence of an "oral subcontract" between RID and LMA.  (Dkt. # 1143 at 6.)  This objection is **OVERRULED AS MOOT** in light of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above.

Moving Defendants object to paragraph 50, stating that RID was formed "after securing an agreement with SRP to obtain deeds that would allow

RID to pump and deliver water," on the basis that it lacks materiality, is hearsay, violates the best evidence rule, and purports to assert a legal conclusion.  (Dkt. # 1143, at 6; see Dkt. # 1132 at 6.)  Upon reviewing RID's evidence in support of this statement (see Dkt. # 1132-2 at 11), the Court **OVERRULES** Moving Defendants' objection to this paragraph.

Moving Defendants object to paragraph 51, asserting that RID's statement that its "agreement with SRP allows it to provide water for all beneficial uses" lacks materiality, is hearsay, violates the best evidence rule, and purports to assert a legal conclusion.  Upon reviewing RID's evidence in support of this statement (see Dkt. # 1132-2 at 11), the Court **OVERRULES** Moving Defendants' objection to this paragraph.

Moving Defendants object to paragraphs 52-56 on the basis that David Kimball purports to state what RID "recognized," as well as on the basis that the statements lack materiality, lack foundation or personal knowledge, are hearsay, or violate the best evidence rule.  (Dkt. # 1143 at 6.)  Upon reviewing RID's evidence in support of this statement (see Dkt. # 1132-2 at 11), the Court **OVERRULES** Moving Defendants' objection to this paragraph.

Moving Defendants object to paragraphs 60-65 on the basis that the paragraphs violate the best evidence rule and purport to assert legal conclusions.  (Dkt. # 1143 at 6–7.)  Because the entire G&K Fee Agreement was produced

subsequent to Moving Defendants' objection and because of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above, this objection is **OVERRULED AS MOOT**.

Moving Defendants object to paragraphs 66-70 on the basis that they lack materiality, violate the best evidence rule, and purport to assert legal conclusions, among other bases.  However, this objection is **OVERRULED AS MOOT** in light of the Court's ruling on Moving Defendants' motion for summary judgment.

Moving Defendants object to paragraph 71 on the basis that it lacks materiality, lacks foundation or personal knowledge, is hearsay, violates the best evidence rule, and purports to assert a legal conclusion, among other reasons.  This objection is **SUSTAINED IN PART** as to Moving Defendants' contention that RID's citation in the paragraph that the G&K Fee Agreement directly refutes RID's assertion that "[i]n authorizing G&K to make payments on its behalf, RID understood that it was obligated to compensate G&K from the Project Funds at the time G&K made payments to consultants in connection with remediation efforts." (See Dkt. # 1132 at 10.)  The Court ruled above that RID's evidence did not support its assertion that it had a legal obligation to compensate G&K for its expenditures.

42

Moving Defendants object to paragraph 72 on the basis of lack of materiality, lack of foundation or personal knowledge, hearsay, violation of the best evidence rule, and that it purports to assert a legal conclusion.  (Dkt. # 1143 at 7.)  Because the entire G&K Fee Agreement was produced subsequent to Moving Defendants' objection and because of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above, this objection is **OVERRULED AS MOOT**.

Moving Defendants object to paragraphs 73-74 on the basis that they lack materiality, lack foundation or personal knowledge, are hearsay, and violate the best evidence rule.  (Dkt. # 1143 at 8.)  The objection is **OVERRULED**.  The Kimball Declaration states that it is based on personal knowledge and provides the proper foundation for Mr. Kimball's representations as stated by RID in paragraphs 73-74 of its SOF.

Moving Defendants object to paragraphs 75-81 on the basis that portions of the paragraphs not containing selected quotations, lack materiality, are hearsay, violate the best evidence rule, and purport to assert legal conclusions.  (Dkt. # 1143 at 8.)  The objection is **OVERRULED**.  The Kimball Declaration states that it is based on personal knowledge and provides the proper foundation for the representations as stated by RID in paragraphs 75-81 of its SOF.

43

Moving Defendants object to paragraph 82 on the basis that it lacks materiality, lacks foundation or personal knowledge, is hearsay, and violates the best evidence rule. (Dkt. # 1143 at 8.) The objection is **OVERRULED**. The Kimball Declaration states that it is based on personal knowledge and provides the proper foundation for the representations as stated by RID in paragraph 82 of its SOF.

Last, Moving Defendants object to paragraphs 83-88 on the basis that they lack materiality, lack foundation or personal knowledge, are hearsay, are conjecture and speculative, violate the best evidence rule, that the Auffhammer declaration purports to assert legal conclusions, and because Dr. Auffhammer lacks qualifications to opine on the subjects addressed in the paragraphs. (Dkt. # 1143 at 8.) This objection is **OVERRULED AS MOOT** in light of the Court's ruling on Moving Defendants' motion for summary judgment, as discussed above.

B. <u>Freescale's Objections to Kimball Declaration and to RID's SOFs</u>

Freescale filed its own objections to the Kimball Declaration and to RID's SOFs. (Dkt. # 1144.) Specifically, Freescale asserts that it is filing the objections "to address the fact that Mr. Kimball has now appeared in this Court to testify against the interests of his former client,[9] to object to Plaintiff's statements of fact that rely on the Kimball Declaration, and to avoid any suggestion that

---

[9] Freescale is a former client of G&K and Mr. Kimball. (Dkt. # 1144 at 2.)

Freescale has waived its objection to Mr. Kimball or G&K presenting evidence or testimony against it or continuing to represent RID in this matter." (Id. at 2.)

Freescale argues that the Kimball Declaration is direct evidence that Mr. Kimball is appearing in court to testify against his former client, Freescale. (Dkt. # 1144 at 5.) Freescale asserts that "[a]s RID's lawyer, Mr. Kimball is obligated to advocate for his client from the witness stand, as he has done in his Declaration." (Id.) According to Freescale, "[t]his is a conflict that Mr. Kimball cannot resolve while maintaining his duties to his former clients." (Id.) Freescale also contends that the Kimball Declaration is direct proof that G&K are in collaboration with RID's counsel in this case, Bonnet, Fairborn, Friedman, and Balint, P.C. ("Bonnet") because the Declaration could not have been written or submitted without Mr. Kimball's direct communication and contact with Bonnet. (Id.) Freescale asserts that, for example, the Kimball Declaration is repeatedly cited in RID's SOFs. (Id.) Freescale asks that the Court not consider the Kimball declaration or paragraphs 53-82 of RID's SOFs, which rely on the Kimball declaration. (Id. at 7.)

In response, RID argues that Freescale's objections are its latest attempt to preclude G&K lawyers from being fact witnesses at the trial of this case, which the Court previously permitted. (Dkt. # 1149 at 1.) RID asserts that the objections amount therefore to a motion for a reconsideration of the Court's prior

45

order refusing to disqualify G&K attorneys from acting as factual witnesses in the dispute.  (Id. at 1–2.)  Because it is an attempt to reurge its prior argument concerning G&K's disqualification, RID asks the Court to overrule Freescale's objections.  (Id. at 4–5.)

The extent and scope of G&K's involvement in this lawsuit has been disputed on numerous occasions.  (See, e.g., Dkt. # 1100.)  The Court declines to recite the entire lengthy history of the dispute.  To the extent that Freescale reurges its motion to disqualify G&K and preclude G&K from even acting as a fact witness in this case, the motion is overruled.  To the extent Freescale's objections are not an attempt to urge the Court to reconsider its previous order on the matter, Freescale's arguments are likely moot in light of the Court's ruling on Moving Defendants' summary judgment motion addressed above.

In any case, the Court finds that the matters addressed in the Kimball Declaration do not appear to testify against any interests of Freescale.  While Freescale attempts to cast G&K's and Mr. Kimball's involvement with RID as an eventual attempt to "convince ADEQ to adopt RID's remedy, which would then be brought into this Court and used against Freescale in this litigation," (Dkt. # 1144 at 4) this matter is beyond the scope of the current pending motion for summary judgment, addressed above by the Court, and is also speculative at best.

The Court has already determined that "[w]hile G&K has a continuing duty to maintain its former clients' confidences, . . . the subject matter to which G&K is expected to testify—the actions taken by RID to remediate contaminated groundwater, and the costs incurred in doing so—appears unlikely to reveal Conflict Defendants' confidential information."  (Dkt. # 1100 at 24.)  In the instant matter, Freescale has not provided specific examples of information Mr. Kimball revealed in the declaration that is adverse to Freescale's interest or that is confidential information.  (See id.)  Accordingly, Freescale's objections to the Kimball Declaration and to RID's SOFs is **OVERRULED**.

CONCLUSION

Based on the foregoing, the Court **GRANTS** Moving Defendants' Motion for Partial Summary Judgment (Dkt. # 1110), **OVERRULES IN PART** and **SUSTAINS IN PART** Moving Defendants' Objections to RID's Additional Fact Statements (Dkt. # 1143), and **OVERRULES** Freescale's Objections to Declaration of David P. Kimball and to RID's Additional Fact Statements (Dkt. # 1144).

**IT IS SO ORDERED.**

**DATED**:  Phoenix, Arizona, November 22, 2016.

David Alan Ezra
Senior United States Distict Judge