IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona, | § § § § | NO. 2:10-CV-00290 DAE-BGM |
| Plaintiff, | § | |
| vs. | § § | |
| SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., | § § § § | |
| Defendants. | § | |

_____

ORDER (1) GRANTING IN PART AND DENYING IN PART MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND (2) OVERRULING OBJECTIONS

On February 28, 2017, the Court held a hearing on (1) Defendants Air Liquide America Specialty Gases, L.L.C. ("Air Liquide"), Arizona Public Service Company ("AZ Public Service"), ChemResearch Co., Inc. ("ChemResearch"), City of Phoenix, Corning Incorporated ("Corning"), Dolphin Incorporated ("Dolphin"), Freescale Semiconductor, Inc. ("Freescale"), Honeywell International, Inc. ("Honeywell"), ITT Corporation ("ITT"), Kinder Morgan Energy Partners, LP ("Kinder Morgan"), Maricopa County, Meritor, Inc. ("Meritor"), Nucor Corporation ("Nucor"), Prudential Overall Supply ("Prudential"), Reynolds Metals Company ("Reynolds"), Salt River Agricultural Improvement and Power District

("Salt River"), Textron, Inc. ("Textron"), Union Pacific Railroad Company

("Union Pacific"), Univar USA Inc. ("Univar"), and Milum Textile Services, Inc.'s

("Milum") (collectively, "Defendants") Motion for Partial Summary Judgment

Regarding Plaintiff's Remaining Claimed Costs (Dkt. # 1315),[1] and (2) Defendants

Objections to Plaintiff Roosevelt Irrigation District's ("RID") Additional Fact

Statements (Dkt. # 1358).

> At the hearing, Francis J. Balint, Jr., Esq., appeared on behalf of RID;
David J. Armstrong, John M. Barkett, Stephen Wetherell, Christopher D. Thomas,
Michael L. Rojas, Scott Ames, Troy Froderman, Mitchell Klein, Ann T. Uglietta,
Michael P. Berman, Shane R. Swindle, P. Derek Petersen, Jerry D. Worsham, III,
M. Byron Lewis, Joshua N. Levine, William W. Pearson, Debra J. Carfora, Stanley
B. Lutz, and Sean Morris, Esqs., appeared on behalf of Defendants.

> After careful consideration of the memoranda in support of and in
opposition to the Motion, and in light of the parties' arguments at the hearing, the
Court, for the reasons that follow, (1) **GRANTS IN PART** and **DENIES IN
PART** Defendants' Motion for Partial Summary Judgment (Dkts. ## 1315, 1318),
and (2) **OVERRULES** Defendants' Objections to RID's Additional Fact
Statements (Dkt. # 1358).

---

[1] This motion was originally lodged under seal.  (Dkt. # 1315.)  However, RID
agreed that the motion need not be maintained under seal.  (See Dkts. ## 1359,
1367.)  Accordingly, the motion was re-docketed as an unsealed motion.  (See Dkt.
# 1318.)  The Court's citation to the motion hereinafter will be to Dkt. # 1318.

FACTUAL BACKGROUND

This is one of the largest and most complex environmental actions in the United States.  It is a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA") whereby RID seeks to recuperate the costs it has or will incur in responding to the contamination of its wells and to recover for damages to RID property.  RID is a political subdivision of the State of Arizona, and it owns multiple groundwater wells in the western portion of Maricopa County, Arizona, used to provide water to public and private entities and individuals.  ("TAC," Dkt. # 789 ¶¶ 7, 9, 38.)  RID currently pumps groundwater from its wells and transports it through a network of canals for agricultural, landscape watering, and municipal use on land located within its district.  (Id. ¶ 39.)

Over twenty of RID's groundwater wells have been impacted by hazardous substances known as chlorinated volatile organic compounds ("VOC Contaminants" or "VOCs").  (Id. ¶ 40.)  These VOCs include, but are not limited to, trichloroethene ("TCE"), also known as trichloroethylene; tetrachloroethene ("PCE"); 1, 1, 1-trichloroethane ("TCA"); 1,1-dichloroethane ("1,1-DCA"); 1,1-dichoroethene ("1,1-DCE"); 1,2-dichloroethane ("1,2-DCA"); and cis-1,2-

dichloroethene ("cis-1,2-DCE").[2]  (Id. ¶ 40.)  These VOC contaminants are designated as "hazardous substances" under CERCLA and are considered by the Environmental Protection Agency ("EPA") to be severely harmful to human health and the environment.  (Id. ¶ 41.)  Although not all of RID's groundwater wells have been impacted by the VOC Contaminants, RID contends they are threatened by the same substances.  (Id.)

RID did not release any of the VOC Contaminants into its groundwater wells.  Rather, the hazardous substances in and threatening RID's groundwater wells are the result of releases from facilities owned or operated by other parties; these releases flowed into and contaminated the groundwater supplying RID's wells.  (Id. ¶ 41.)

In 1986, the Arizona Legislature established the Arizona Department of Environmental Quality ("ADEQ") in response to growing concerns over groundwater quality.  (Id. ¶ 42.)  The ADEQ is the state regulatory agency charged with responsibility to investigate groundwater contamination and enforce Arizona's environmental laws.  After groundwater contamination was detected at a facility in west Phoenix, ADEQ began conducting a groundwater investigation that led to the establishment of the West Van Buren Area ("WVBA") Water Quality

---

[2] In the 1950s and '60s, extensive industrial usage of chlorinated organic solvents such as PCE and TCE was widespread until the use of these compounds raised human health and environmental concerns in the 1970s and '80s.

Assurance Revolving Fund ("WQARF") Site ("WVBA WQARF Site").  (Id. ¶ 43.)

The contaminated groundwater wells owned and operated by RID (and the wells

threatened by the VOC Contaminants) are within the WVBA WQARF Site.  (Id.)

   In August 2012, after years of extensive field and work analysis, the

ADEQ issued a final report entitled "Remedial Investigation Report, West Van

Buren WQARF Registry Site" (the "WVBA RI Report").  In the WVBA RI

Report, the ADEQ concluded that the groundwater contamination in the WVBA

(where RID's groundwater wells are located) "is the areal projection of the western

portion of a large commingled plume of contaminated groundwater in Phoenix,

Arizona," and that "[c]ontributors to this commingled plume include industrial

facilities and contaminated groundwater from the east, as regional groundwater

flow is generally westward."  (Id. ¶ 45.)

   Specifically, the WVBA RI Report concluded that "[g]roundwater

contamination enters the WVBA from the east from the Motorola 52nd Street

Federal Superfund Site OU3 area."  (Id. ¶ 46.)   The Motorola 52nd Street

Superfund Site ("M-52 Site") was established by the EPA in 1989 after an

investigation revealed massive groundwater contamination originating from the

52nd Street Motorola Plant.  The EPA, in its findings of fact entered in connection

with the M-52 Site, found that "[g]roundwater contaminated with VOCs from the

Motorola and Honeywell Facilities, as well as other potential sources within OU1

5

and OU2 commingle and flow westward into OU3, where it commingles with contamination from sources within OU3." (Id. ¶ 46.)

The ADEQ also concluded in the WVBA RI Report that "[c]ontaminated groundwater also appears to enter the WVBA from the north in the central portion of the site from the West Osborn Complex (WOC) WQARF Registry Site." The West Osborn Complex WQARF Site ("WOC WQARF Site") is part of the West Central Phoenix Area WQARF Sites, which are located adjacent to and directly north of the WVBA. (Id. ¶ 47.)

RID alleges that the contamination and threatened contamination of RID's wells is associated with facilities located within three regional sites which have been identified under CERCLA, 42 U.S.C. §§ 9601 to 9675, or Arizona's WQARF program, A.R.S. §§ 49-281 to 49-298. (Id. ¶ 48.) The three regional sites are: (1) the Motorola 52nd Street Superfund Site, (2) the West Van Buren Area WQARF Site, and (3) the West Central Phoenix Area WQARF Sites. (Id.) Each of these regional sites is defined with boundaries.

RID alleges that the VOC Contaminants impacting or threatening to impact RID's groundwater wells emanate from these three regional sites and have formed a commingled plume of VOC Contaminants. (Id. ¶ 50.) The studies conducted on these sites indicate that a wide range of industries operating in these three areas used large quantities of chlorinated solvents such as PCE and TCE.

6

(Id.)  The use of chlorinated solvents and the waste management practices of these

facilities are responsible for the VOC contamination of soil and groundwater in the

area encompassed by the three regional sites.  (Id.)  RID alleges that prior to the

1980s, many of these facilities developed on-site waste disposal systems that

discharged waste directly to permeable subsurface sediments for disposal.  (Id.)

These wastes containing VOCs contaminated the groundwater through vertical

contaminant transport through the unsaturated zone into the groundwater.  (Id. ¶

51.)  According to the ADEQ's WVBA RI Report, once VOCs are released to the

soil, unsaturated flow is

> primarily downward until either a change in lithology or the
> groundwater table is encountered.  As a result of this primarily
> vertically downward migration, unsaturated flow occurs at or near the
> source area.  As vadose zone soils within the WVBA are generally
> permeable, unsaturated flow in the WVBA typically continues to the
> groundwater table.

(Id. ¶ 52.)

    According to the ADEQ's WVBA RI Report, upon reaching the

groundwater table, the VOC Contaminants dissolve into the uppermost aquifer

where groundwater movement within the region is predominantly controlled by

RID's well-pumping.  (Id. ¶ 54.)  The contaminated groundwater in all three

regional sites is hydrologically connected to the groundwater pumped by RID.

(Id.)  Thus, the commingled plumes of contaminated groundwater underlying the

M-52 Site and the WCP Area Sites flow toward and enter the WVBA Site in

response to RID's well-pumping from groundwater wells located in the WVBA Site.  (Id.)  According to RID, the WVBA WQARF Site and the adjacent WCP Area Sites and M-52 Site are all impacted by multiple VOC Contaminants forming a large, commingled plume that is "collectively one of the largest contaminant plumes in the country."  (Id. ¶ 55.)

RID alleges that contaminated groundwater from the three regional sites has impacted more than twenty of RID's groundwater wells and threatens to impact a number of additional groundwater wells that are located along the southern and western plume margins.  (Id. ¶ 56.)  This contamination restricts RID's ability to utilize its developed groundwater resources for their reasonably foreseeable use as a municipal water supply.  (Id.)

According to the WVBA RI Report, the following Defendants[3] are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the WVBA or that owned or operated facilities that released Contaminants under conditions evidencing that VOC Contaminants were released into the groundwater of the WVBA: Reynolds, Air Liquide, ChemResearch, Dolphin, Maricopa County, Prudential, Univar, and Kinder Morgan.  (Id. ¶ 58.)

---

[3] For purposes of this Order, only the movant Defendants are discussed.

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the M-52 Site, which commingled and flowed into the groundwater of the WVBA: Honeywell, City of Phoenix, Milum, ITT, Meritor, and Freescale.  (Id. ¶ 59.)

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater within the WCP Area, which commingled and flowed into the groundwater of the WVBA: Corning, Nucor, Textron, and Univar.  (Id. ¶ 60.)

To respond to the contamination and threatened contamination of RID's wells, RID voluntarily entered into an Agreement to Conduct Work between ADEQ and RID on October 8, 2009 (the "Agreement").  (Id. ¶ 64.)  The Agreement was to conduct an Early Response Action ("ERA") to address certain RID groundwater wells, and a Feasibility Study for the WVBA WQARF Site. (Id.)  Pursuant to the Agreement, RID hired consultants to investigate, monitor, assess and evaluate the groundwater contamination and its sources and to design an ERA with the objective of removing those VOC Contaminants that are impacting eight of the most highly contaminated groundwater wells within the WVBA Site.

RID alleges that the ERA is authorized under Arizona Administrative Code ("A.A.C.") § R18-16-405 because it will provide a water supply by providing treatment at the most highly contaminated RID wells to remove VOCs in

9

groundwater within the WVBA Site, where RID's wells are located.  (Id. ¶ 67.)

RID contends that the ERA is "necessary" not only because wells are currently

impacted, but also because additional RID wells are "threatened" by VOC

contamination.  (Id. ¶ 68.)

On February 4, 2010, RID submitted a revised ERA Work Plan to

ADEQ.  (Id. ¶ 70.)   The revised ERA Work Plan was approved by the ADEQ on

June 24, 2010.  (Id. ¶ 73.)  On September 2, 2011, ADEQ approved a voluntary

RID proposal for development and implementation of a wellhead treatment

systems pilot initiative, the "RID-95 Wellhead Pilot Treatment System Proposal,"

which was designed to pump and treat contaminated groundwater for four of the

most highly contaminated RID wells.  (Id. ¶ 75.)  The RID-95 Wellhead Pilot

Treatment System initiative was designed to (a) evaluate the effectiveness of

liquid-phase granular activated carbon treatment technology in removing the

mixture of VOCs present in the WVBA, (b) evaluate two types of liquid-phase

granular activated carbon treatment for effectiveness and efficiency, (c) evaluate

the feasibility and constraints of wellhead treatment in lieu of more expensive

centralized treatment, and (d) refine the capital and operation and maintenance

costs estimates with the ultimate intention of reducing ERA response costs.  (Id.)

On July 17, 2012, RID submitted a proposal to ADEQ to modify the

ERA Work Plan and also submitted a Work Plan for implementation of the

10

Modified ERA on January 24, 2013.  The Modified ERA ("MERA") was approved

by ADEQ on February 1, 2013, and reduces the capital and operation and

maintenance costs of the ERA by as much as fifty percent.  (Id. ¶ 77.)

## PROCEDURAL BACKGROUND

On February 9, 2010, RID filed a CERCLA action in this Court,

asserting a Section 107 cost-recovery claim to designate multiple Defendants as

potentially responsible parties ("PRP") pursuant to CERCLA to recoup the costs

incurred in responding to the contamination.  On November 22, 2016, the Court

granted Defendants' Motion for Partial Summary Judgment Regarding Plaintiff's

Claimed Past Costs.  (Dkt. # 1366.)  The Court found that RID failed to

demonstrate that there is a genuine dispute of material fact as to whether it incurred

any response costs in regard to six challenged-cost categories.  (Id.)

On August 22, 2016, Defendants filed an additional motion for partial

summary judgment as to RID's remaining claimed costs that were not challenged

in Defendants' prior motion for partial summary judgment.  (Dkts. # # 1315,

1318.)  RID filed a response in opposition on October 11, 2016 (Dkt. # 1331);

Defendants filed a reply on November 21, 2016 (Dkt. # 1357).  Defendants also

filed objections to RID's Additional Fact Statements (Dkt. # 1332) on November

21, 2016.  (Dkt. # 1358.)

11

APPLICABLE LAW

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting Anderson, 477 U.S. at 250).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party cannot avoid summary judgment by relying

12

solely on conclusory allegations unsupported by facts.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered.  Orr v. Bank of Am., 285 F.3d 764, 773–74 (9th Cir. 2002).

ANALYSIS

Defendants move for summary judgment on the remaining portions of RID's claimed response costs, totaling approximately $1.17 million,[4] which were not included within the six challenged cost categories of Defendants' first motion for summary judgment (Dkt. # 1110).  (Dkt. # 1318 at 8.)  Defendants challenge the following: (1) ADEQ's "reimbursement" payments to RID, which Defendants claim should offset the remaining claimed costs by $624,094.75; (2) that RID did not incur $83,810.08 in "ADEQ Oversight Costs"; (3) RID's claimed $530,388.07

---

[4] RID's Statement of Facts ("SOF") in response to Defendants' motion withdraws an additional $299,492.49 of this amount.  (See Dkt. # 1332 at ¶ 74, 78, 80, 82, 98, 114, 133, 136.)  Therefore, RID's remaining claimed costs for purposes of this motion are reduced to $870,542.98.  (See id.; Dkt. # 1357 at 8.)

in "Task 2 Costs"; and (4) RID's claimed $485,376.77 in "District General Response Costs."  (Id.)

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed."  Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870 (9th Cir. 2001) (quoting 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990)). "To achieve that end, CERCLA 'authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation.'"  Id.

To establish a prima facie case under § 9607(a), the plaintiff must show that (1) there is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan [("NCP")]"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).  42 U.S.C. § 9607; see Carson Harbor Vill. v. Cnty. of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989).

A.    <u>ADEQ Payments to RID</u>

CERCLA codifies in a number of provisions a general principle of avoiding double recovery for response costs.  <u>See, e.g.</u>, 42 U.S.C. § 9607(f)(1) (prohibiting "double recovery under this chapter for natural resource damages"); <u>id.</u> § 9612(f) (prohibiting double recovery out of CERCLA's Superfund for any response costs); <u>id.</u> § 9613(f)(2) (reducing PRP liability for CERCLA response costs by dollar amount settlements paid on the same matter to the state or federal government).  Section 114(a) defines CERCLA's relationship to other law, including non-preemption of state tort or environmental law beyond the liability CERCLA imposes, and coordination with other federal laws.  Section 114(b), in turn, states that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter."  <u>Id.</u> § 9614(b).

Defendants point out, and RID concedes, that RID submitted applications to ADEQ seeking "reimbursement" for remedial action response costs under Arizona state law, A.R.S. § 49-282.E.11.[5]  (Dkt. # 1318 at 9–10; Dkt.

---

[5] This statute reads: "Monies from the water quality assurance revolving fund shall be used for the following purposes: . . . To reimburse a political subdivision of this state for its reasonable, necessary and cost-effective remedial action costs incurred in response to a release or threat of a release of a hazardous substance or pollutants that presents an immediate and substantial endangerment to the public health or the

# 1370.)  As a result, the ADEQ paid RID a reimbursement total of $624,094.75

from 2013 through 2015.  (Id.; Dkt. # 1316 at 7–8; Dkt. # 1370 at 2–4; Dkt.

# 1370-1 at 2, 7, 11.)  Defendants contend that this amount must be reduced from

RID's remaining claimed costs pursuant to CERCLA § 114(b).  (Id.)  Defendants

point to evidence wherein they assert that RID actually conceded in a previous

filing that "[a]ny monies RID has received from ADEQ would simply constitute an

setoff against the recoverable amount."  (Dkt. # 1318 at 10 (quoting RID's Motion

for Protective Order, Dkt. # 1171 at 9).)

   In response, RID argues that "the payments ADEQ made to RID are

conditional only, subject to reimbursement so that Arizona taxpayers are not

ultimately burdened with costs that CERCLA contemplates will be paid by the

PRPs responsible for the contamination."  (Dkt. # 1331 at 20.)  In other words,

RID argues that it is obligated to reimburse ADEQ to the extent RID is able to

recover response costs from PRPs.  (Id.)

   The Court finds that, pursuant to 42 U.S.C. § 9614(b), RID's

remaining claimed costs must be offset by the amount that ADEQ has paid to RID

---

environment.  The political subdivision is not eligible for reimbursement until it
has taken all reasonable efforts to obtain reimbursement from the responsible party
and the federal government.  No more than two hundred fifty thousand dollars may
be spent from the fund for this purpose in any fiscal year."  A.R.S. § 49-282.E.11.

under A.R.S. § 49-282.E.11.[6]  Contrary to RID's contention, it is speculative at this point as to whether RID must reimburse ADEQ for the payments RID has received.  RID has not provided sufficient evidence that it has an existing, or firm and definite, legal obligation to reimburse ADEQ for the $624,094.75,[7] nor has RID identified any timeline or other details regarding any reimbursement requirements it must make to ADEQ.  Additionally, despite receiving settlement payments from some PRPs, RID has not, at least not yet, made any reimbursement payments to ADEQ.  Instead, the record indicates this money went in to the Project Funds account.  (See Dkt. # 1370-1 at 4, 9, 13.)  And, as Defendants persuasively point out, the mere possibility that RID may reimburse ADEQ in the future is not a sufficient basis, without more, to overcome summary judgment on this issue. Accordingly, the Court grants Defendants' motion as to this issue, and RID's remaining claimed costs are reduced by the $624,094.75 that RID has recovered from ADEQ.

---

[6] Although briefly discussed by the parties, the Court makes no decision at this time regarding whether the settlement amounts RID has received to date from PRPs should be offset against its remaining claimed costs because it is not currently at issue in the instant motion.  (See Dkt. # 1318 at 20 n.9; Dkt. # 1331 at 20; Dkt. # 1357 at 9 n.1.)

[7] As discussed below, however, RID has presented some evidence that it may have an existing, non-contingent legal obligation to reimburse ADEQ for its Oversight Costs.

B.    ADEQ Oversight Costs

Defendants next move for summary judgment on RID's remaining claimed costs of $83,810.08 for "ADEQ Oversight Costs."[8]   (Dkt. # 1318 at 10; see Dkt. # 1332 at 3.)  Defendants assert that it is undisputed that G&K bore these costs, and that RID has not reimbursed G&K for this expenditure.  (Dkt. # 1318 at 10.)  Relying on the argument advanced in their First Motion for Partial Summary Judgment Regarding Claimed Past Costs (Dkt. # 1110) ("First MSJ"), which the Court found to be meritorious, Defendants argue that RID does not have an existing, non-contingent obligation to reimburse G&K for these costs, and any obligation that may exist is a pure contingency arrangement.  (Dkt. # 1318 at 10.)

RID's response also relies, in large part, on its opposition to the First MSJ: namely, that it incurred the "ADEQ Oversight Costs" based on its assignment of water sale rights to G&K, which the Court rejected in the First MSJ.  (Dkt. # 1331 at 9; Dkt. # 1366 at 26.)  The Court determined in its Order on the First MSJ that

> [W]hile RID's Fee Agreement with G&K does transfer RID's profit
> of future remediated water to G&K, this transfer does not create a

_____

[8] ADEQ "Oversight Costs" are different from the ADEQ "reimbursement" payments discussed in the previous section.  ADEQ Oversight Costs, as defined in RID's Agreement with ADEQ, are costs that ADEQ expends itself in "reviewing and overseeing" RID's remedial work, which include "salaries and benefits paid to state employees and other direct or indirect costs."  (Dkt. # 1178 at 98.)  The ADEQ "reimbursement" payments are payments made to RID for RID's (or in this case, to the extent applicable, G&K's) expenditure on remedial efforts.

18

sufficient legal obligation on RID to pay for these costs.  While the potential profit derived from the sale of remediated water may act as an incentive to G&K to continue funding the response costs both now and in the future, there is no evidence that any sale of remediated water has occurred or is certain to occur.  In fact, the Agreement clearly contemplates that G&K may never receive any compensation for the response costs it has incurred.  The Fee Agreement states in no uncertain terms that "G&K will also bear the risk that if sufficient Project Funds are not obtained ultimately, the amounts due to G&K and consultants and others providing services for the approved remediation Project <u>will not be paid</u>."  (Fee Agreement at 5 (emphasis added).)

(Dkt. # 1366 at 26–27.)  To the extent RID again relies on this argument to survive summary judgment on its claimed ADEQ Oversight Costs, this argument fails for the same reasons as the First MSJ.

Nevertheless, at the hearing on the motion, RID cited to its Agreement with ADEQ and argued that, pursuant to the Agreement, RID has an existing, non-contingent legal obligation to reimburse ADEQ for the Oversight Costs. (Transcript of Hearing at 45–46.)  RID referenced the Agreement wherein it states under the heading "Oversight Costs":

Pursuant to A.R.S. § 49-282.05, the RID shall reimburse ADEQ for the reasonable and necessary costs incurred in reviewing and overseeing the Work, including costs consisting of salaries and benefits paid to state employees and other direct or indirect costs ("Oversight Costs"). Reimbursement for Oversight Costs shall be deferred until ADEQ has incurred at least $100,000.00 in Oversight Costs or when 2 years has passed from the effective date of this Agreement, whichever occurs first . . . .

(Dkt. # 1178-10 at 98–99.)

19

The Court finds that the language in the Agreement pertaining to Oversight Costs provides some evidence that RID had a non-contingent obligation to reimburse ADEQ for the $83,810.08 in Oversight Costs.  Unlike the costs in the First MSJ, RID's evidence here indicates that even if its fee arrangement with G&K was terminated, RID would have still been obligated to reimburse ADEQ for its Oversight Costs pursuant to its Agreement.  (Cf. Dkt. # 1366 at 28.)

Still, in their reply brief, Defendants cite evidence that RID's Agreement with ADEQ was terminated on or near February 12, 2016.  (Dkt. # 1357 at 10–11 n.3.)  Defendants, however, have not provided sufficient evidence that, despite the language in the Agreement, RID would have no obligation to reimburse ADEQ for its Oversight Costs even if the Agreement is now terminated, or if it had been terminated before the Oversight Costs were paid to ADEQ by G&K.  Instead, it appears that RID would still be liable to ADEQ for these costs. In any event, as Defendants point out, the Oversight Costs have been paid; the Court finds that it is of little consequence that the Oversight Costs were paid by G&K on behalf of RID because RID has presented evidence that it had an existing, non-contingent legal obligation to reimburse ADEQ for these costs outside of any agreement with G&K.  (Cf. Dkt. # 1366 at 28 (holding there was not sufficient evidence of an existing, non-contingent obligation on RID's Claimed G&K costs).)

20

Accordingly, the Court denies Defendants' motion as to this issue; RID has produced evidence which creates a genuine issue of material fact as to whether it incurred ADEQ Oversight Costs separate from RID's fee agreement with G&K—these costs appear to be an existing, non-contingent legal obligation RID must pay even if G&K refused to pay, and even if the Agreement with ADEQ is now terminated.

C.   Task 2 Costs

Defendants next move for summary judgment on RID's claimed response cost of $530,388.07 for "costs associated with Task 2 well investigations" or "Task 2 Costs." (Dkt. # 1318 at 12.) Defendants quote RID's counsel, wherein he states that "Task 2 costs are associated with [RID's] installation of RID Well 111-R to replace RID Well 111." (Id.) According to Defendants, RID's installation of Well 111-R is not closely tied to any actual cleanup, in violation of CERCLA's requirement that any cost of recovery be closely tied to actual cleanup. (Id.) Defendants argue that RID is therefore "improperly using CERCLA as a device for requiring defendants to share the expense of improving, not remediating, its property." (Id. (quoting Sealy Conn., Inc. v. Litton Indus., Inc., 93 F. Supp. 2d 177, 188 (D. Conn. 2000).)

Under CERCLA, costs are "necessary" if they are incurred in response to a threat to human health or the environment and they are necessary to

21

address that threat.  G.J. Leasing Co. v. Union Elec. Co., 854 F. Supp. 539, 562

(S.D. Ill. 1994), aff'd 54 F.3d 379 (7th Cir. 1995).  CERCLA was not designed to

permit property owners to clean up their property unnecessarily for business

reasons, and then shift the costs to prior owners.  G.J. Leasing Co. v. Union Elec.

Co., 54 F.3d 379, 386 (7th Cir. 1995).

   In support of their position that installation of Well 111-R was not

closely tied to clean-up, Defendants provide the testimony of Mr. Neese, who

testified that "[RID] sometimes ha[s] to redrill a well," and that it is "just part of

normal operations . . . because you've got a certain level of demand and you need

to keep the water supply up, and if you have wells that go down or go out of

service, you may have to drill a new one."  (Dkt. # 1319-2 at 5.)  Defendants assert

that this was the case with Well 111-R—RID's former Superintendent, Stan

Ashby, testified that the original Well 111 "collapsed" in 2003, or "it just died of

old age."  (Id. at 36.)

   According to Defendants, Well 111 was replaced in 2012 with Well

111-R, which "provides 3,000 gallons/minute of additional water, which RID sells

to its irrigation customers."  (Dkt. # 1319 at 10.)  However, according to Mr.

Neese, Well 111-R water is not treated as part of RID's remediation program, nor

was it "anticipated to be one of the wells subject to treatment . . . at the time of the

ERA or Modified ERA."  (Dkt. # 1319 at 9, 42.)  Based on this evidence,

Defendants maintain that the Task 2 Costs are therefore unnecessary to RID's remediation efforts and are not recoverable under CERCLA.

In response, RID contends that Well 111's inoperable status for eight years, without any water shortages or growth in the demand for water, contradicts Defendants' assertion that the well was necessary for any direct business purpose. (Dkt. # 1331 at 17.)  RID also argues that Task 2 Costs are recoverable because they were incurred in connection with ADEQ's directive that RID perform well investigation on all RID wells within the plume boundary, and be sufficient to ensure remediation pumping rates would not adversely affect groundwater quality and water levels.  (Id. at 18.)  Therefore, according to RID, the record confirms that RID did not need or contemplate drilling Well 111-R "until it was faced with the comprehensive well investigation process directed by ADEQ."  (Id.)

In further defense of its position, RID asserts that it wrote the ADEQ a letter in November 2010, explaining that Well 111's replacement with Well 111-R was necessary to enable RID to conduct the well investigation process during high water demand periods, including the summer months.  (Dkt. # 1331 at 18; Dkt. # 1337-2.)  ADEQ agreed with RID's approach in a letter dated July 7, 2011, approving the substitution of Well 111-R for Well 114 for testing purposes.[9]  (Dkt.

---

[9] RID explained that instead of its previous designation of Well 114 for investigation, RID planned on substituting Well 111-R for that purpose because it

23

# 1337 at 5.)   Accordingly, RID insists that construction of Well 111-R was necessary to complete the well investigation directed by the ADEQ.  (Dkt. # 1331 at 19.)

In reply, Defendants point to evidence that RID admitted that its goal is "to deliver the maximum amount of water at the least cost," and that in the summer months "demand for [RID's] water is larger than [RID] is able to deliver." (Dkt. # 1357-1 at 9, 14.)  Additionally, RID's Fee Agreement with G&K states that one of its objectives, in addition to providing a remedial solution for RID water contaminated by VOCs, is to "enhanc[e] the existing RID wells system" and "provid[e] a source of additional water for the benefit of RID users and other customers."  (Dkt. # 896 at 3.)  Defendants also assert that if RID truly had no business motivations in replacing Well 111 with Well 111-R, RID would have just turned the well off after it completed the required ADEQ investigation, noting that RID has never used Well 111-R to treat any groundwater contamination.  (Dkt. # 1357 at 12.)

Defendants point to further evidence that the ADEQ (1) authorized RID to suspend its well investigation work whenever RID needed all of its wells to meet production demands, (2) would "leave the exact timing of testing to RID's discretion," and (3) "understands the need for RID's flexibility concerning water

---

"would provide more reliable and representative groundwater data."  (Dkt. # 1331 at 18; Dkt. # 1332 at 28.)

supply demands." (Dkt. # 1319 at 11; Dkt. # 1319-2 at 45.) According to Defendants, RID eventually discontinued the remaining well investigation work during the low water demand period of winter 2011-2012, and did not resume its investigations until Well 111-R was constructed and came online, or sometime after May 2012. (Dkt. # 157 at 12.) Because RID carefully chose when to resume its well investigation after completion of Well 111-R, and did not utilize the low-demand periods when given freedom by ADEQ to do so, Defendants assert that RID's remediation cost claim for construction of Well 111-R is at best attenuated and not closely tied to any actual cleanup. (Id. at 13.)

The Ninth Circuit noted in Carson Harbor that the focus is on whether the CERCLA response action is addressed to human health or the environment. Carson Harbor Vill. Ltd. v. Unocal Corp., 270 F.3d 863, 870–71 (9th Cir. 2001) (en banc). A court should not focus on an "ulterior motive" theory, which would preclude recovery of cleanup costs as unnecessary if the cleanup activities were undertaken for reasons other than because of an actual or real public health threat. (Id. at 871–72.) The Ninth Circuit determined that it does not matter whether a party had a business motive or other motivation for cleanup, and that the focus should instead be on whether there was a threat to human health or the environment and whether the response action is addressed to that threat. Id. at 872. Accordingly, the fact that RID may have had reasons and motivations for

constructing Well 111-R other than for remediation does not by itself preclude RID's claim for Task 2 Costs. RID must also demonstrate that construction of Well 111-R in replacement of Well 111 was undertaken for the purpose of assisting in the remediation of VOCs from RID wells because of their known threat to human health and/or the environment.

Without weighing the evidence, the Court finds that RID has presented some evidence that it had a purpose beyond a business motivation in installing Well 111-R. The record is clear that Well 111 was inoperable and not in use prior to the ADEQ's requirement that RID undertake a comprehensive well investigation process. (Dkt. # 1332 at 27.) The ADEQ indicated that its approval was conditioned, inter alia, on RID's performance of a well investigation that was sufficient to ensure remediation pumping rates would not adversely affect groundwater quality and water levels. (Id. at 26; DKt. # 1337 at 3.) At that point, RID's evidence indicates that a logical result of the well investigation would be installation of a new well, Well 111-R, to assist with this process. That a secondary benefit was a business enhancement to RID is insufficient for the Court to grant summary judgment in favor of Defendants on that evidence alone. Accordingly, because RID has presented some evidence to create a genuine dispute of material fact that the Task 2 Costs were a response action to address a threat to human health or the environment, summary judgment is denied as to these costs.

D.   <u>District General Response Costs</u>

Finally, Defendants move for summary judgment on $485,376.77[10] of RID's "District General Response Costs."  (Dkt. # 1318 at 14.)  Defendants assert four reasons why they contend RID should not be allowed to recover these claimed costs: (1) these costs include double-counted amounts; (2) RID has failed to present supporting documentation for certain claimed labor costs; (3) these costs include unrecoverable amounts related to litigation and marketing of drinking water; and (4) RID's failure to segregate and prove any particular amount of necessary costs of response prevents the Court from determining whether any of the "District General Response Costs" are recoverable.  (<u>Id.</u> at 14–17.)

1.   <u>Double-Counted Amounts</u>

Defendants assert that RID double-counted at least $29,349.62 paid to Synergy Environmental, LLC ("Synergy").  Defendants contend this amount was included as a claimed cost both in "RID Water Quality Monitoring Costs" under the heading "Activity 1," and as a "District General Response Cost" under the heading "Activity 5."  (Dkt. # 1318 at 14.)  In support, Defendants cite evidence where RID provided the same Synergy invoice (with different Bates-numbers) in

---

[10] At the hearing on the motion, RID withdrew a large amount of this claimed cost. (<u>See</u> Transcript of Hearing at 49–50.)  RID now claims only $185,884.28 in District General Response Costs.

support of each of these categories of response costs. (Id. at 14–15; Dkt. # 1319 at 11; Dkt. # 1319-2 at 86, 111, 169.)

In response, RID contends that it has only categorized and counted the $29,349.62 Synergy invoice as an "Activity One Water Quality Monitoring Cost" and never counted nor included it as an "Activity 5 District Response Cost." (Dkt. # 1331 at 12.) As for the two identical invoices, RID asserts that one invoice was produced on behalf of Synergy and one invoice was produced on behalf of RID, which is why they contain different Bates numbers. (Id.)

Given RID's concession that it does not seek the payment to Synergy as an Activity 5 District Response Cost, the Court finds that this issue is now moot. To the extent RID still seeks to recover this amount in the District General Response Costs, Defendants are entitled to summary judgment on this issue. RID may only count this amount once in seeking recovery for this response cost.

2.      Claimed Labor Costs

Defendants argue that RID may not recover for its request of $21,835.84 for time allegedly spent by RID's former Superintendent, Stan Ashby. (Dkt. # 1318 at 15.) Defendants contend that RID has failed to produce any time records or other supportive documentation in support of this amount. (Id.) According to Defendants, RID's attempt at supporting this amount by including

estimates of Mr. Ashby's time, after the fact, is unverifiable and fails to satisfy the burden of proof required by RID under CERCLA.  (Id.)

The EPA has provided guidance on documentation necessary to support cost recovery for both government response actions as well as private party actions.  See 40 C.F.R. §§ 300.160(a)(1), 300.700(c)(5)(ii).  Specifically, the EPA has stated that, "[d]uring all phases of response," the party seeking response costs "shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for recovery."  Id. § 300.160(a)(1).  Generally, "documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment."  Id.

Notably, "[t]his provision does not establish prescriptive standards for the content of cost documents."  United States v. W.R. Grace & Co.-Conn., 280 F. Supp. 2d 1149, 1179–80 (D. Mont. 2003).  In general, "a cost is inconsistent with the NCP only if the response action itself was inconsistent with the NCP."  Id. at 1180.  "40 C.F.R. § 300.160 does not impose any additional documentation requirements on the [party seeking costs], beyond what is sufficient to persuade the court that the costs have been proven by a preponderance of the evidence."  Id.

29

"Indeed, courts that have examined this provision of the NCP have recognized that it "does not contain any specific standards concerning the documentation of costs." Id. (quoting United States v. Chrysler Corp., 168 F. Supp. 2d 754, 769 (N.D. Ohio 2001); United States v. Findett Corp., 75 F. Supp. 2d 982, 991 (E.D. Mo. 1999), aff'd 220 F.3d 842 (8th Cir. 2000).  "The NCP requires only that 'in general' documentation be sufficient to provide an accurate accounting of costs incurred." W.R. Grace & Co., 280 F. Supp. 2d at 1180 (citing California v. Neville Chem. Co., 213 F.Supp.2d 1134, 1138 (C.D. Cal. 2002); Chrysler, 168 F. Supp. 2d at 769; Findett, 75 F. Supp. 2d at 991).  "Notably, the NCP does not define 'accurate accounting' or otherwise elaborate on what is meant by 'sufficient.'" Id.

Additionally, the Ninth Circuit has applied civil evidentiary standards to assess the adequacy of cost documentation used to support CERCLA claims. See United States v. Chapman, 146 F.3d 1166, 1171 (9th Cir. 1998).  In Chapman, the Ninth Circuit determined that in addition to written cost summaries, "extensive documentation of costs in the form of time sheets and payroll documents," as well as "declarations from EPA staff, attorneys, accountants, and supervisors attesting to the work they performed and the time spent," were adequate documentation of response costs incurred.  Id.

Here, in support of recovering the costs for Mr. Ashby's time spent on response-related activities, RID offers the following evidence.[11]  First, RID provides Mr. Ashby's declaration wherein he describes the various remedial activities in which he participated while Superintendent.  (Dkt. # 1331.)  Mr. Ashby attests that he spent two hours per work week from January 2009 through June 2010, performing various tasks related to RID's remediation efforts.  (Id. at 3.)  Beginning in early 2011, he began increasing the number of remediation activities in which he participated and spent about three hours per week on these efforts from July 2010 through June 2011.  (Id. at 3–4.)  Mr. Ashby states that he spent four hours per work week on remediation efforts from July 2011 until his retirement at the end of December 2011.  (Id. at 4.)

RID also provides the Court with the documentation supporting Mr. Neese's time, who succeeded Mr. Ashby as RID's Superintendent.  (Dkt. # 1336; Dkt. # 1338.)  RID contends that Mr. Ashby spent even less time than Mr. Neese did in remedial efforts.  (Dkt. # 1332 at 9.)  RID has also provided the declaration of Kelly Young, RID's accountant, who declares that "[t]ogether with Donovan Neese and Stan Ashby, we developed a system for compiling and maintaining RID's response-related documentation."  (Dkt. # 1338 at 2.)  Ms. Young states that

---

[11] At the hearing, RID admitted that Mr. Ashby failed to keep contemporaneous time records, but contended that its supplemental evidence is sufficient to recover the time.  (See Transcript of Hearing at 49.)

she, Mr. Ashby, and Mr. Neese "met to discuss the best method for calculating Mr. Ashby's time spent on response-related activities" and "[f]rom that, we calculated a conservative figure for the amount of time Mr. Ashby spent on response-related activities." (Id.) Ms. Young also includes a spreadsheet as an exhibit to her declaration which breaks down in some detail the estimated time and activities that Mr. Ashby performed on remediation activities during his tenure as RID's Superintendent (Dkt. # 1338-1 at 1–15.)

"The plaintiff in a CERCLA cost recovery action has a range of options for proving up the amount of costs it has incurred. The nature of the documentation presented to support the cost claim will vary depending on the amount of response costs at issue, the type of documentation the plaintiff's accounting system maintains, and the extent and complexity of that documentation." W.R. Grace & Co., 280 F.Supp. 2d at 1181. Given that indirect costs must only be proven by a preponderance of the evidence, the Court finds that RID has presented sufficient evidence of Mr. Ashby's time and labor to overcome summary judgment on this issue. RID's documentation appears to be adequate to support the cost claim, or at least to create a dispute of material fact on the issue. Accordingly, summary judgment is denied on this issue.

### 3.  Amounts Related to Litigation and Marketing of Drinking Water

Defendants next challenge $29,349.62 of RID's claimed costs which Defendants contend are unrecoverable under CERCLA because they are for costs of litigation and marketing that are unrelated to this case.  (Dkt. # 1318 at 15–17.) In response, RID contends that this challenge "is largely moot because RID has eliminated each of the charges Defendants challenge from its CERCLA Section 107 damages claim as being unrelated to the remediation of the Defendants' contamination."  (Dkt. # 1331 at 14–15.)  In light of RID's response, the Court will deny as moot summary judgment to Defendants on the challenged costs which RID has withdrawn.  To the extent there are any costs that remain for which Defendants still challenge the costs as litigation and marketing unrelated to this action, the Court will deny without prejudice Defendants' summary judgment motion on this issue.

### 4.  Failure to Segregate and Prove Necessary Response Costs

Last, Defendants challenge all of RID's "District General Response Costs" on the basis that RID's documentation in support of these costs "constitutes a tangled mess that commingles indisputably unrecoverable amounts with other amounts for which the documentation is so incomplete, vague, and/or redacted as to prevent any recoverability determination."  (Dkt. # 1318 at 17–18.)  Defendants provide examples of RID's claimed "District General Response Costs" that

Defendants contend demonstrate RID's failure to segregate and prove these costs. (Id.)

In response, RID argues that Defendants have failed to cite any case in support of their position in which a court determined before trial that a plaintiff had failed to present persuasive evidence demonstrating costs were tied to remediation. (Dkt. # 1331 at 15.)   RID also contends that the declarations of Mr. Neese, Mr. Ashby, and Mr. Hendricks demonstrate that RID will be able to prove its incurred response costs at trial. (Id. at 16.)

Defendants rely heavily on a footnote from a federal district court in Connecticut, where the court determined that, although a plaintiff's invoices "reflected some potentially recoverable remediation work commingled with demolition related activities, [the plaintiff's] failure to itemize the fees . . . for these different activities makes it impossible for the Court to discern which activities might be reimbursable." Sealy, 93 F. Supp. 2d at 193 n.6. The court found that the plaintiff had failed to carry its burden of proof that the costs were tied to the remediation. Id.

As RID points out, in Sealy, the district court determined that the plaintiff failed to segregate the relevant costs at trial. See Sealy, 93 F. Supp. 2d at 180 ("This memorandum of decision contains the Court's findings of fact and conclusions of law based on the evidence presented at the Phase I bench trial.").

Here, no such trial has occurred.  While it may very well be that RID is unable at trial to segregate, itemize, or prove that it incurred the necessary response costs at issue here, the Court cannot say as a matter of law that RID has not provided any evidence that it incurred at least some of the "District General Response Costs." Instead, it will be RID's burden at trial to segregate, itemize, and prove that all of the remaining costs in this category, as discussed above, were tied to the remediation.  Accordingly, the Court will deny summary judgment to Defendants on this issue.

<u>OBJECTIONS to RID's ADDITIONAL SOFs</u>

Defendants filed objections to RID's Additional SOFs.  (Dkt. # 1358.) The Court has carefully considered each of the objections raised by Defendants in regard to RID's Additional SOFs, and its facts and evidence; the Court considered each objection when considering the evidence RID relied on in support of its position regarding the remaining claimed costs at issue in this motion.  In accordance with that review, the Court **OVERRULES** Defendants' objections to RID's Additional SOFs. (Dkt. # 1358.)

<u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Partial Summary Judgment (Dkts. ## 1315,

1318), and **OVERRULES** Defendants' Objections to RID's Additional Fact

Statements (Dkt. # 1358).

      **IT IS SO ORDERED.**

      **DATED**:  Phoenix, Arizona, March 14, 2017.

_____

David Alan Ezra
Senior United States Distict Judge