IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona, | § § § § | NO. 2:10-CV-00290 DAE-BGM |
| Plaintiff, | § | |
| vs. | § § | |
| SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., | § § § § | |
| Defendants. | § § | |
| _____ | § | |

ORDER: (1) DENYING MOTION FOR SUMMARY JUDGMENT RE: NCP COMPLIANCE, (2) GRANTING CROSS-MOTION FOR SUMMARY JUDGMENT RE: NCP COMPLIANCE; AND (3) OVERRULING OBJECTIONS TO ADDITIONAL FACT STATEMENTS

On February 28, 2017, the Court held a hearing on (1) Defendants Air Liquide America Specialty Gases, L.L.C. ("Air Liquide"), Arizona Public Service Company ("AZ Public Service"), City of Phoenix, ChemResearch Co., Inc. ("ChemResearch"), City of Phoenix, Corning Incorporated ("Corning"), Dolphin Incorporated ("Dolphin"), Freescale Semiconductor, Inc. ("Freescale"), Honeywell International, Inc. ("Honeywell"), ITT Corporation ("ITT"), Kinder Morgan Energy Partners, LP ("Kinder Morgan"), Maricopa County, Meritor, Inc. ("Meritor"), Nucor Corporation ("Nucor"), Prudential Overall Supply

("Prudential"), Reynolds Metals Company ("Reynolds"), Salt River Agricultural

Improvement and Power District ("Salt River"), Textron, Inc. ("Textron"), Union

Pacific Railroad Company ("Union Pacific"), and Univar USA Inc. ("Univar")

(collectively, "Moving Defendants") Motion for Partial Summary Judgment

Regarding NCP Compliance (Dkt. # 1320); (2) Plaintiff Roosevelt Irrigation

District's ("RID") Cross-Motion for Summary Judgment Regarding NCP

Compliance (Dkt. # 1330); and (3) Defendants' Objections to RID's Additional

Fact Statements Regarding NCP Compliance (Dkt. # 1361).

At the hearing, Francis J. Balint, Jr., Esq., appeared on behalf of RID;

David J. Armstrong, Stephen Wetherell, Christopher D. Thomas, Scott Ames, Ann

T. Uglietta, Michael P. Berman, Shane R. Swindle, P. Derek Petersen, Jerry D.

Worsham, III, G. Van Welsor Wolf, Jr., William W. Pearson, Debra J. Carfora,

Sergio E. Pagliery, Stanley B. Lutz, Emily J. Atherton, and Sean Morris, Esqs.,

appeared on behalf of Moving Defendants.

After careful consideration of the memoranda in support of and in

opposition to the motions, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **DENIES** Defendants' Motion for Partial

Summary Judgment Regarding NCP Compliance (Dkt. # 1320), **GRANTS** RID's

Cross-Motion for Summary Judgment Regarding NCP Compliance (Dkt. # 1330),

and **OVERRULES** Defendants' Objections to RID's Additional Fact Statements

Regarding NCP Compliance (Dkt. # 1361).

<u>FACTUAL BACKGROUND</u>

This is one of the largest and most complex environmental actions in

the United States.  It is a cost recovery action under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.

§§ 9601 et seq. ("CERCLA") whereby RID seeks to recuperate the costs it has or

will incur in responding to the contamination of its wells and to recover for

damages to RID property.  RID is a political subdivision of the State of Arizona,

and it owns multiple groundwater wells in the western portion of Maricopa

County, Arizona, used to provide water to public and private entities and

individuals.  (Third Amended Complaint "TAC," Dkt. # 789 ¶¶ 7, 9, 38.)  RID

currently pumps groundwater from its wells and transports it through a network of

canals for agricultural, landscape watering, and municipal use on land located

within the District.  (<u>Id.</u> ¶ 39.)

Over twenty of RID's groundwater wells have been impacted by

hazardous substances known as chlorinated volatile organic compounds ("VOC

Contaminants" or "VOCs").  (<u>Id.</u> ¶ 40.)  These VOCs include, but are not limited

to, trichloroethene ("TCE"), also known as trichloroethylene; tetrachloroethene

("PCE"); 1, 1, 1-trichloroethane ("TCA"); 1,1-dichloroethane ("1,1-DCA"); 1,1-

dichoroethene ("1,1-DCE"); 1,2-dichloroethane ("1,2-DCA"); and cis-1,2-dichloroethene ("cis-1,2-DCE").[1]  (Id. ¶ 40.)  These VOC contaminants are designated as "hazardous substances" under CERCLA and are considered by the Environmental Protection Agency ("EPA") to be severely harmful to human health and the environment.  (Id. ¶ 41.)  Although not all of RID's groundwater wells have been impacted by the VOC Contaminants, RID contends they are threatened by the same substances.  (Id.)

RID did not release any of the VOC Contaminants into its groundwater wells.  Rather, the hazardous substances in and threatening RID's groundwater wells are the result of releases from facilities owned or operated by other parties; these releases flowed into and contaminated the groundwater supplying RID's wells.  (Id. ¶ 41.)

In 1986, the Arizona Legislature established the Arizona Department of Environmental Quality ("ADEQ") in response to growing concerns over groundwater quality.  (Id. ¶ 42.)  The ADEQ is the state regulatory agency charged with the responsibility to investigate groundwater contamination and enforce Arizona's environmental laws.  After groundwater contamination was detected at a facility in west Phoenix, ADEQ began conducting a groundwater investigation that

---

[1] In the 1950s and '60s, extensive industrial usage of chlorinated organic solvents such as PCE and TCE was widespread until the use of these compounds raised human health and environmental concerns in the 1970s and '80s.

led to the establishment of the West Van Buren Area ("WVBA") Water Quality Assurance Revolving Fund ("WQARF") Site ("WVBA WQARF Site").  (Id. ¶ 43.) The contaminated groundwater wells owned and operated by RID (and the wells threatened by the VOC Contaminants) are within the WVBA WQARF Site.  (Id.)

In August 2012, after years of extensive field and work analysis, the ADEQ issued a final report entitled "Remedial Investigation Report, West Van Buren WQARF Registry Site" (the "WVBA RI Report").  In the WVBA RI Report, the ADEQ concluded that the groundwater contamination in the WVBA (where RID's groundwater wells are located) "is the areal projection of the western portion of a large commingled plume of contaminated groundwater in Phoenix, Arizona," and that "[c]ontributors to this commingled plume include industrial facilities and contaminated groundwater from the east, as regional groundwater flow is generally westward."  (Id. ¶ 45.)

Specifically, the WVBA RI Report concluded that "[g]roundwater contamination enters the WVBA from the east from the Motorola 52nd Street Federal Superfund Site OU3 area."  (Id. ¶ 46.)   The Motorola 52nd Street Superfund Site ("M-52 Site") was established by the EPA in 1989 after an investigation revealed massive groundwater contamination originating from the 52nd Street Motorola Plant.  The EPA, in its findings of fact entered in connection with the M-52 Site, found that "[g]roundwater contaminated with VOCs from the

Motorola and Honeywell Facilities, as well as other potential sources within OU1 and OU2 commingle and flow westward into OU3, where it commingles with contamination from sources within OU3." (Id. ¶ 46.)

The ADEQ also concluded in the WVBA RI Report that "[c]ontaminated groundwater also appears to enter the WVBA from the north in the central portion of the site from the West Osborn Complex (WOC) WQARF Registry Site." The West Osborn Complex WQARF Site ("WOC WQARF Site") is part of the West Central Phoenix Area WQARF Sites, which are located adjacent to and directly north of the WVBA. (Id. ¶ 47.)

RID alleges that the contamination and threatened contamination of RID's wells is associated with facilities located within three regional sites which have been identified under CERCLA, 42 U.S.C. §§ 9601 to 9675, or Arizona's WQARF program, A.R.S. §§ 49-281 to 49-298. (Id. ¶ 48.) The three regional sites are: (1) the Motorola 52nd Street Superfund Site, (2) the West Van Buren Area WQARF Site, and (3) the West Central Phoenix Area WQARF Sites. (Id.) Each of these regional sites is defined by boundaries.

RID alleges that the VOC Contaminants impacting or threatening to impact RID's groundwater wells emanate from these three regional sites and have formed a commingled plume of VOC Contaminants. (Id. ¶ 50.) The studies conducted on these sites indicate that a wide range of industries operating in these

6

three areas used large quantities of chlorinated solvents such as PCE and TCE.

(Id.)  The use of chlorinated solvents and the waste management practices of these

facilities are responsible for the VOC contamination of soil and groundwater in the

area encompassed by the three regional sites.  (Id.)  RID alleges that prior to the

1980s, many of these facilities developed on-site waste disposal systems that

discharged waste directly to permeable subsurface sediments for disposal.  (Id.)

These wastes containing VOCs contaminated the groundwater through vertical

contaminant transport through the unsaturated zone into the groundwater.  (Id. ¶

51.)  According to the ADEQ's WVBA RI Report, once VOCs are released to the

soil, unsaturated flow is

> primarily downward until either a change in lithology or the
> groundwater table is encountered.  As a result of this primarily
> vertically downward migration, unsaturated flow occurs at or near the
> source area.  As vadose zone soils within the WVBA are generally
> permeable, unsaturated flow in the WVBA typically continues to the
> groundwater table.

(Id. ¶ 52.)

   According to the ADEQ's WVBA RI Report, upon reaching the

groundwater table, the VOC Contaminants dissolve into the uppermost aquifer

where groundwater movement within the region is predominantly controlled by

RID's well-pumping.  (Id. ¶ 54.)  The contaminated groundwater in all three

regional sites is hydrologically connected to the groundwater pumped by RID.

(Id.)  Thus, the commingled plumes of contaminated groundwater underlying the

M-52 Site and the WCP Area Sites flow toward and enter the WVBA Site in response to RID's well-pumping from groundwater wells located in the WVBA Site.  (Id.)  According to RID, the WVBA WQARF Site and the adjacent WCP Area Sites and M-52 Site are all impacted by multiple VOC Contaminants forming a large, commingled plume that is "collectively one of the largest contaminant plumes in the country."  (Id. ¶ 55.)

RID alleges that contaminated groundwater from the three regional sites has impacted more than twenty of RID's groundwater wells and threatens to impact a number of additional groundwater wells that are located along the southern and western plume margins.  (Id. ¶ 56.)  This contamination restricts RID's ability to utilize its developed groundwater resources for their reasonably foreseeable use as a municipal water supply.  (Id.)

According to the WVBA RI Report, the following Defendants[2] are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the WVBA or that owned or operated facilities that released Contaminants under conditions evidencing that VOC Contaminants were released into the groundwater of the WVBA: Reynolds, Air Liquide, ChemResearch, Dolphin, Maricopa County, Prudential, Univar, and Kinder Morgan.  (Id. ¶ 58.)

---

[2] For purposes of this Order, only the Moving Defendants are discussed.

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the M-52 Site, which commingled and flowed into the groundwater of the WVBA: Honeywell, City of Phoenix, Milum, ITT, Meritor, and Freescale.  (Id. ¶ 59.)

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater within the WCP Area, which commingled and flowed into the groundwater of the WVBA: Corning, Nucor, Textron, and Univar.  (Id. ¶ 60.)

PROCEDURAL BACKGROUND

On February 9, 2010, RID filed a CERCLA action in this Court, asserting a Section 107 cost-recovery claim to designate multiple Defendants as potentially responsible parties ("PRPs") pursuant to CERCLA to recoup the costs incurred in responding to the contamination.  On May 6, 2014, RID filed its Third Amended Complaint.  (Dkt. # 789.)  On August 22, 2016, Defendants filed a Motion for Summary Judgment Regarding NCP Compliance.[3]  (Dkt. # 1320).  On October 11, 2016, RID filed a response in opposition to the motion (Dkt. # 1328), along with its own statement of controverting facts (Dkt. # 1329).  Defendants filed

---

[3] This is the third motion for partial summary judgment filed by Defendants.  (See Dkts. ## 1110, 1315.)  These motions were address in other orders.  (See Dkts. ## 1366, ___ (forthcoming order).)

a reply to the motion on November 21, 2016 (Dkt. # 1362), as well as Defendants'
objections to RID's statement of facts (Dkt. # 1361).

On October 11, 2016, RID filed its own Cross-Motion for Partial
Summary Judgment Regarding NCP Compliance.  (Dkt. # 1330.)  Defendants filed
a response in opposition on November 21, 2016 (Dkt. # 1363); RID filed a reply on
December 13, 2016 (Dkt. # 1368).  The pending matters are discussed below.[4]

## APPLICABLE LAW

Summary judgment is appropriate if the evidence, viewed in the light
most favorable to the nonmoving party, demonstrates "that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  Substantive law determines which facts are material
and "[o]nly disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A fact issue is
genuine 'if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th
Cir. 2002) (quoting Anderson, 477 U.S. at 248).  Thus, the nonmoving party must
show that the genuine factual issues "'can be resolved only by a finder of fact
because they may reasonably be resolved in favor of either party.'"  Cal.

_____

[4] Other pending matters in this case will be addressed in separate orders.

Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting Anderson, 477 U.S. at 250).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered. Orr v. Bank of Am., 285 F.3d 764, 773–74 (9th Cir. 2002).

I. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the ground that RID failed to comply with the National Contingency Plan ("NCP"), which is required for recovery in a CERCLA action. (Dkt. # 1320 at 8.) Specifically, Defendants

contend that RID has failed (1) to properly analyze alternative remedial actions, or the "no-action" alternative; (2) to identify and consider site-specific applicable or relevant and appropriate requirements ("ARARs"); and (3) to conduct a Human Health Risk Assessment.  (Id.)

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870 (9th Cir. 2001) (quoting 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990)). "To achieve that end, CERCLA 'authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation.'" Id.

To establish a prima facie case under § 9607(a), the plaintiff must show that (1) there is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan [("NCP")]"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a).  42 U.S.C. § 9607; see Carson Harbor Vill. v. Cnty. of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006); Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989).

Defendants challenge only part of the third element of Plaintiff's prima facie case under § 9607(a) in this motion: whether the release or threatened release caused RID to actually incur necessary response costs *consistent with the NCP*.[5] (Dkt. # 1320 at 11 (emphasis added).)  See Carson Harbor, 433 F.3d at 1265.

A.    Compliance with the NCP

A private party may not recover response costs under CERCLA unless the remedial actions generating those costs are consistent with the NCP.  42 U.S.C. § 9607(a)(4)(B); Carson Harbor, 433 F.3d at 1265.  The EPA promulgates the NCP, delineating specific steps a private party must take in selecting a remedial action plan and cleaning up hazardous waste.  See 40 C.F.R. Part 300.  It is "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment."  Wash. State Dep't of Transp. v. Wash. Nat. Gas. Co., 59 F.3d 793, 802 (9th Cir. 1995).

Under EPA regulations, private response action is "consistent with the NCP" if the action, evaluated as a whole, is in "substantial compliance" with certain procedural requirements, and results in a "CERCLA-quality cleanup."  See 40 C.F.R. §§ 300.700(c)(3)(i), 300.700(c)(4) ("immaterial or insubstantial deviations" will not render a response action inconsistent with the NCP).  The

---

[5] On November 22, 2016, the Court addressed whether RID *actually incurred* response costs.  (Dkt. # 1366.)

NCP's procedural requirements include, <u>inter alia</u>, that the party seeking response costs conduct a remedial site investigation, prepare a remedial investigation and feasibility study ("RI/Feasibility Study"), and provide an opportunity for public comment.  <u>Id.</u> §§ 300.700(c)(5)(vii), 300.700(c)(5)(viii), 300.700(c)(6).

A plaintiff must "conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment" when carrying out a remedial investigation ("RI").  40 C.F.R. § 300.430(d)(4).  During the feasibility study ("Feasibility Study"), the plaintiff must develop remedial alternatives reflecting the scope and complexity of the remedial action under consideration based on the site and establish acceptable exposure levels that are protective under the ARARs established by federal or state law.  Subsequently, these remediation alternatives must be screened in light of effectiveness, implementability and cost.  <u>Id.</u> §§ 300.430(e)(1), (e)(7)(i)–(iii).  The Feasibility Study should also include discussion of a "no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site," <u>id.</u> § 300.430(e)(6), as well as alternatives that protect human health and the environment, <u>id.</u> § 300.430(e)(2).  Further, remediation goals should "establish acceptable exposure levels that are protective of human health and the environment" by considering "[a]pplicable or relevant and appropriate

14

requirements [ARARs] under federal environmental or state environmental or facility siting laws." Id. § 300.430(e)(2)(i)(A).

Finally, in a Feasibility Study, a more "detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage." Id. § 300.430(e)(9). During this "detailed analysis" stage, the NCP instructs the remediating party to complete an analysis of the viable alternatives considering the following factors in descending order of importance: (1) overall protection of human health and the environment; (2) compliance with ARARs; (3) long-term effectiveness and performance; (4) reduction of toxicity, mobility, or volume through treatment; (5) short-term effectiveness; (6) implementability; (7) cost; (8) state acceptance; and (9) community acceptance. Id. § 300.430(e)(9)(iii).

B.     RID's Response to the Contamination

In 2008, RID contracted with the G&K law firm to serve, inter alia, as its project manager for RID's potential remedial action. (Dkt. # 1320 at 11.) According to RID, "it lacked the resources to fund the clean-up out of pocket," so it "agreed to transfer a share of its future drinking water sales proceeds to [G&K], who acted as RID's agent to develop and implement the remediation project." (Dkt. # 1328 at 10.) G&K hired two environmental consultants who drafted an "Implementation Plan, Roosevelt Irrigation District Groundwater Response

15

Action" ("Implementation Plan"), dated September 25, 2009.  (Id. at 12.)  The

Implementation Plan proposed an "early response action" to pump groundwater

from existing irrigation wells used by RID, convey the pumped groundwater in

existing canals, and treat it to drinking water standards at a central treatment plant.

(Id.; Dkt. # 1321-1 at 117.)  The Implementation Plan expressly states that

"[a]lternative remedies that rely solely on 'no action' or 'monitoring' strategies, as

well as remedies that rely on institutional controls as a primary remedial

measure . . . were not considered in this evaluation."  (Dkt. # 1321-1 at 134.)

        Thereafter, on October 8, 2009, RID voluntarily entered into an

Agreement to Conduct Work (the "Agreement") with ADEQ and RID.  (Dkt. # 789

¶ 64; Dkt. 1328 at 10.)  RID first developed an Early Response Action ("ERA"),

under Arizona state law, to address certain RID groundwater wells, and a

Feasibility Study for the WVBA WQARF Site.  (Id.)  According to RID, "[b]efore

its initial submission of the ERA to ADEQ, RID engaged in months of discussions,

correspondence, and meetings with ADEQ, EPA, PRPs and other stakeholders

(including several Defendants), including the municipalities in which RID's

residential, agricultural, and industrial users are located, regarding possible

remedial actions to address the contamination."  (Id.)

        RID alleges that the ERA was authorized under Arizona

Administrative Code ("A.A.C.") § R18-16-405 because it would provide a water

16

supply by providing treatment at the most highly contaminated RID wells to remove VOCs in groundwater within the WVBA Site, where RID's wells are located.  (Dkt. # 789 ¶ 67.)  RID contends that the ERA was "necessary" not only because wells are currently impacted, but also because additional RID wells were "threatened" by VOC contamination.  (Id. ¶ 68.)

On February 4, 2010, RID submitted a revised ERA Work Plan to ADEQ.  (Dkt. # 789 ¶ 70.)   The revised ERA Work Plan was conditionally approved by the ADEQ on June 24, 2010.  (Id. ¶ 73.)  ADEQ's conditional approval of the ERA notes that ADEQ had "carefully analyzed . . . comments received through the public participation process."  (Dkt. # 1328 at 10; "Neese Declaration" ¶ 17.)  ADEQ concluded that "[w]ithout treatment, these contaminants will continue to degrade the quality of the aquifer within the Site."  (Dkt. # 1328 at 10; "Neese Declaration" ¶ 17.)  Nevertheless, ADEQ expressly stated that it had "not reviewed whether the ERA Work Plan [was] consistent with any federal laws or regulations."  (Dkt. # 1178-3 at 160.)  Along with its conditional approval, the ADEQ attached a letter setting forth the conditions "that must be met within the time periods identified below" before full approval would be granted.  (Id. at 161.)  One of the conditions listed under the heading "Public Health Threat" states that "[t]he RID work plan states there is a current risk to the public health from exposure to VOCs (from both air and water) within the

[WVBA], however, specific documentation about the risks and how the risks will be mitigated during the ERA implementation has not yet been provided."  (Id.) The ADEQ gave RID thirty days after its approval to submit a risk analysis work plan detailing the risks and demonstrating how and when the ERA would mitigate these risks.  (Id.)

In October 2010, ADEQ indicated that it would continue to oversee RID's response actions.  (Dkt. # 1328 at 10–11; Neese Declaration ¶ 18–24.)  RID contends thereafter that it submitted a long series of status reports and work plans to ADEQ.  (Dkt. # 1328 at 11.)

On September 2, 2011, ADEQ approved a voluntary RID proposal for development and implementation of a wellhead treatment systems pilot initiative, the "RID-95 Wellhead Pilot Treatment System Proposal," which was designed to pump and treat contaminated groundwater for four of the most highly contaminated RID wells.  (Id. ¶ 75.)  The RID-95 Wellhead Pilot Treatment System initiative was designed to: (a) evaluate the effectiveness of liquid-phase granular activated carbon treatment technology in removing the mixture of VOCs present in the WVBA, (b) evaluate two types of liquid-phase granular activated carbon ("GAC") treatment for effectiveness and efficiency, (c) evaluate the feasibility and constraints of wellhead treatment in lieu of more expensive

18

centralized treatment, and (d) refine the capital and operation and maintenance costs estimates with the ultimate intention of reducing ERA response costs. (Id.)

As for ADEQ's requirement that RID submit an analysis on human health risks, on September 16, 2011, RID's environmental consultants submitted a report entitled "Public Health Exposure Assessment and Mitigation Summary Report." (Dkt. # 1179-1.) According to Defendants, the environmental consultants who authored this report acknowledged that they were not experts in risk assessment or toxicology. (Dkt. # 1320 at 14.) The report further states that "this assessment does not constitute a quantitative risk assessment, but rather a screening-level assessment of potential exposure." (Dkt. # 1179-1 at 7 (emphasis in original).)

On July 17, 2012, RID submitted a proposal to ADEQ to modify the ERA Work Plan and also submitted a Work Plan for implementation of the Modified ERA on January 24, 2013. After another public vetting process, the Modified ERA ("MERA") was conditionally approved by ADEQ on February 1, 2013, and according to RID, reduced the capital and operation and maintenance costs of the ERA by as much as fifty percent. (Dkt. # 789 ¶ 77.) The MERA modified the original plan to centralize groundwater treatment at a facility using GAC; the new plan was to treat the groundwater at the wellhead site using GAC. (Dkt. # 1179-3.)

19

According to RID, ADEQ meanwhile generated a Final Remedial Investigation Report ("FRIR") in August 2012.  (Dkt. # 1328 at 11.)  RID also contends that it submitted a Draft Feasibility Work Plan in October 2012, a Final Feasibility study Work Plan in February 2013, and a revised Final Feasibility study Work Plan ("Revised FS Work Plan") in June 2013.  (Id.)  On July 16, 2013, ADEQ approved the Revised FS Work Plan "after considering the public comments and RID's response . . . based on the work plan's substantial compliance with Arizona Administrative Code (A.A.C.) R18-16-407, pursuant to A.A.C. R18-16-413(E)."  (Neese Declaration ¶ 30.)

In July 2014, RID submitted its draft Feasibility Study and a revised Feasibility Study responding to ADEQ's comments.  (Dkt. # 1328 at 12.)  According to RID, ADEQ then subjected the revised Feasibility Study to a public vetting process, in which Defendants participated.  (Id.)  RID asserts that Defendants submitted a competing feasibility study, abandoning the no-action alternative and stating "[b]ecause ADEQ has identified reasonably foreseeable future changes in water use and drinking water wells could be impaired in the future by plume migration that results from changes in pumping regimens, no action is inappropriate as a stand-alone strategy in the (WVBA Site)."  (Id.; Dkt. # 1329-1.)

On April 13, 2015, ADEQ approved RID's Feasibility Study, stating that the Feasibility Study met requirements under Arizona state law.  (Dkt. # 1328 at 12; Dkt. # 1321-2 at 32.)  According to RID, it "submitted no fewer than 47 specific work products to ADEQ, and engaged no fewer than 73 public meetings to communicate its proposed remedial actions to external project stakeholders."  (Id.)

C.    Analysis

Defendants argue that RID did not properly prepare a complete Feasibility Study before it initiated the remedial action.  (Dkt. # 1320 at 16.)  Defendants contend that RID instead prepared a Feasibility Study after it had already started its remediation action.  (Id.)  According to Defendants, RID's environmental consultants did not submit the draft Feasibility Study and revised Feasibility Study to ADEQ until well after it had already began its wellhead treatment.  (Id.)  Defendants further argue that neither Feasibility Study submitted by RID considered a no-action alternative, but rather considered four alternatives which each called for immediate treatment to drinking water standards of the affected groundwater.  (Id.)  Defendants also argue that one of RID's environmental consultants who prepared the Feasibility Study admitted that he was not familiar with the NCP, and that the Feasibility Study contains no analysis of ARARs.  (Id.)  Defendants also contend that both the ERA and MERA lack any discussion of site-specific ARARs.  (Id.)

21

1.  RID's General Defenses

In its response, RID asserts two general defenses to Defendants'
allegation that it was not in substantial compliance with the NCP.

a.  Response Actions vs. Costs

First, RID argues that Defendants erroneously focus on response
actions rather than response costs.  (Dkt. # 1328 at 12.)  RID contends that, under
§ 107 of CERCLA, only the "costs of response" must be consistent with the NCP.
(Id.)  According to RID, some costs, such as those relating to preliminary
investigations, need not be consistent with the NCP.  (Id. at 13.)  RID argues that
in such case, "[e]ven when a claimant's actions may be inconsistent with the
NCP . . . consistent response costs are still recoverable."  (Id. (emphasis in
original).)

The Court finds merit to this argument, although it is not dispositive
to the overall issue in Defendants' summary judgment motion.  While the Ninth
Circuit has not addressed this issue, both the Eighth and Tenth Circuits have held
that "'[t]he plain language of the statute speaks of costs rather than actions,' and
even where actions may be inconsistent with the NCP, consistent costs are
recoverable."  Pentair Thermal Mgmt., LLC v. Rowe Indus., Inc., Nos. 06-cv-
07164, 10-cv-01606, 2013 WL 1320422, at *20 (N.D. Cal. Mar. 31, 2013)

(quoting <u>United States v. Burlington N. R.R. Co.</u>, 200 F.3d 679, 695 (10th Cir. 1999)).

In <u>Minnesota v. Kalman W. Abrams Metals, Inc.</u>, the Eighth Circuit held that, even where the Minnesota Pollution Control Agency acted arbitrarily and capriciously by pursuing a remedy that was high-cost, failed to adequately study the remedy, and failed to monitor, it could still recover costs that were consistent with the NCP. 155 F.3d 1019, 1025 (8th Cir. 2015). The Tenth Circuit reached a similar conclusion in <u>Burlington N. R.R. Co.</u> when the EPA's failure to amend the record of decision and not seek public comment on a fundamental change to a remedy, which was specifically rejected during the remedy-selection phase, resulting in increased costs. 200 F.3d at 679. The Tenth Circuit held that the EPA could still recover the NCP-compliant costs it incurred. <u>Id.</u> at 694, 695.

Accordingly, the Court finds that any proof that RID's remedial actions were inconsistent with the NCP "is not a complete defense to liability for the cost of remediating a site." <u>Burlington N. R.R. Co.</u>, 200 F.3d at 695. The Tenth Circuit analogized the difference between actions and costs to "the difference between breach and damage under tort law." <u>Id.</u> Where a party proves "a breach of a duty to follow proper administrative procedures," it "must further prove that the breach resulted in damages." <u>Id.</u> "Damages in this case are costs that are inconsistent with the [NCP]." <u>Id.</u> (emphasis in original). Additionally,

courts have recognized that "consistency with the NCP is not an element of CERCLA liability, but rather, a factual issue [a]ffecting which response costs Plaintiffs may recover." Basic Mgmt. Inc. v. United States, 569 F. Supp. 2d 1106, 1121 (D. Nev. 2008) (citing Amoco Oil v. Borden, 889 F.2d 664, 668 (5th Cir. 1989)).

Accordingly, even if the Court finds that RID cannot overcome summary judgment and raise a fact issue as to whether RID's *actions* were in substantial compliance with the NCP, Defendants must further demonstrate that RID's noncompliance resulted in *costs* that would not have been incurred had its actions substantially complied with the NCP.  Because Defendants have not put forth any argument as to specific costs that were not in compliance with the NCP, summary judgment on this basis is denied.  The Court, however, will consider Defendants' arguments regarding whether RID's actions substantially complied with the NCP because of their relation to the underlying issue of cost-compliance.

### b.  Presumption of Consistency with NCP

As its second general defense to Defendants' motion, RID contends that its response costs are presumptively consistent with the NCP.  (Dkt. # 1328 at 14.)  RID argues that "[b]ecause courts presume actions undertaken by the government to be consistent with the NCP, one way of establishing private party consistency with NCP is by showing the response was conducted under the

24

monitoring, and with the ultimate approval, of the state environmental agency."
(Id. (quotation marks omitted).)  RID asserts that ADEQ's substantial involvement
and oversight in its publicly-vetted process entitles RID to the presumption of
consistency with the NCP afforded to governmental agencies.  (Id. at 15.)

        In response, Defendants assert that RID is estopped from relying on
ADEQ's oversight to prove compliance with the NCP.  (Dkt. # 1362 at 9.)
Defendants contend that in a hearing before the Court, on January 22, 2015, RID's
counsel stated that "RID will not use the ADEQ proceedings to prove its
substantial compliance with the NCP process," and that "ADEQ will not decide
whether RID has substantially complied with the NCP."[6]  (Id.; Dkt. # 919 at 44–
45, 47.)

        There is some support in case law from other circuits for RID's
assertion that ADEQ's involvement in its remediation efforts may satisfy the
requirement for substantial compliance with the NCP.  See, e.g., Niagara Mohawk

---

[6] Although this matter was not addressed by RID in any surreply to Defendants'
motion, RID further clarified its position in its reply to its own cross-motion for
summary judgment on the issue of NCP compliance, as discussed below.  (Dkt.
# 1368.)  In the reply, RID attempts to clarify that it is not relying on any specific
ADEQ finding that RID complied with the NCP, but is instead relying on ADEQ's
general oversight and public vetting process which renders RID's response costs
"presumptively compliant" with the NCP under CERCLA case law.  (Dkt. # 1368
at 11–19.)  RID contends that, as its counsel represented at the January 22, 2015
hearing, it intends to prove NCP compliance "by pointing out its preparation of the
feasibility study, its proposed selection of a remedy in the feasibility study, and its
participation in the public process, the notice and comment period."  (Id.)

Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 137 (2d Cir. 2010); Caldwell

Trucking PRP v. Rexon Tech. Corp., 421 F.3d 234, 246–47 (3d Cir. 2005);

NutraSweet Co. v. X–L Eng'g Co., 227 F.3d 776, 791 (7th Cir. 2000).

Nevertheless, the Ninth Circuit has noted that "[o]ur circuit has not decided if

significant agency involvement can satisfy" certain NCP compliance requirements.

Carson Harbor, 433 F.3d at 1266 (considering agency involvement in public

participation requirement of the NCP); cf. United Alloys, Inc. v. Baker, 797 F.

Supp.2d 974, 996 (C.D. Cal. 2011) ("Indeed, there has been substantial

participation and oversight from public agencies during the site investigation of the

Property, which supports the Court's conclusion that the investigation methods and

activities are legitimate").  The Court so declines to decide here.  Instead, the Court

will consider ADEQ's oversight, in addition to RID's evidence that it substantially

complied with the NCP, as it may relate to each of the issues raised by Defendants

in the instant motion.

2.  Whether RID failed to properly analyze alternative remedial
actions, or the "no-action" alternative

Relying on the Ninth Circuit's opinion in Carson Harbor, Defendants

argue that RID's environmental consultants failed to evaluate the no-action

alternative required for a Feasibility Study, and therefore also required for

compliance with the NCP.  (Dkt. # 1320 at 20–23.)  Defendants assert that the

Feasibility Study, submitted after remedial work had already started, simply states

that a no-action alternative was not being considered at all.[7]  (Id. at 22.)

Defendants contend, that in addition to RID's failure to properly consider the no-action alternative in the Feasibility Study, it also failed to discuss the no-action alternative in the ERA or the MERA. (Id. at 22.)  Finally, Defendants argue that of the remedial alternatives that were considered, RID's environmental consultants admit they were merely "conceptual" evaluations and did not contain a detailed analysis of each alternative.  (Id. at 23.)

　　　　　In Carson Harbor, the Ninth Circuit determined that the plaintiff's remedial investigation substantially complied with the NCP.  433 F.3d at 1268.  However, the Court held that the plaintiff's feasibility study did not substantially comply with the NCP.  Id.  In its finding, the Ninth Circuit noted that the plaintiff's feasibility study considered only "a single remediation alternative," which the Court found insufficient to establish substantial compliance with the NCP.  Id.  The Court stated that "[o]ne of the hallmarks of the feasibility study requirement is assessing a variety of possible alternatives and providing analysis of the costs, implementability, and effectiveness of each, and choosing the best alternative for

---

[7] Defendants assert a theory as to why RID expressly failed to consider the no-action alternative: "RID and its lawyers and consultants had no interest in a no-action alternative because it would not result in remediated drinking water under its control that could then be sold at a significant profit."  (Dkt. # 1320 at 23.)  In response, RID contends that an "ulterior motive" has no bearing on whether a response is consistent with the NCP.  (Dkt. # 1328 at 23.)  In any case, RID argues that it "quite appropriately used the prospect of its future drinking water sales as a means to fund the clean-up to the requisite drinking water standard."  (Id.)

the site at issue." Id.  The Court found that a single declaration stating that other alternatives were considered, without any records or other evidence in support, was insufficient to comply with the feasibility requirement of the NCP.  Id.  The Court also rejected the plaintiff's argument that its chosen remediation was the only viable remediation alternative, and it was therefore not required to consider other alternatives.  Id. (citing Wash. State Dep't of Transp. v. Wash. Nat. Gas Co., 59 F.3d 793, 800 (9th Cir. 1995)).

Similar to Carson Harbor, Defendants here do not challenge RID's substantial compliance with the NCP in regard to its remedial investigation. Instead, as discussed earlier, Defendants take aim at the Feasibility Study's failure to consider a no-action alternative and its alleged lack of detail in discussing other remedial alternatives.  (Dkt. # 1320 at 20–23.)

RID's response indicates that it relied on ADEQ's remedial objectives for the contamination, and that the Arizona WQARF and related ADEQ rules do not require analysis of a no-action alternative in a feasibility study.  (Dkt. # 1328 at 17.)  RID also asserts that a strategy that relied on no action would not achieve the site-specific "reasonably foreseeable end uses" for the contaminated groundwater under Arizona WQARF statutes.  (Id.)  RID also argues that "Defendants themselves raised but then abandoned the no-action alternative in their competing [feasibility study]."  (Id.)

The Court notes at the outset that "the applicable yardstick is 'substantial compliance,'" thus "a private party's 'site evaluation does not have to comply strictly with the letter of the NCP, but only must be consistent with its requirements.'" Wilson Road Dev. Corp. v. Fronabarger Concreters, Inc., ___ F. Supp. 3d ___, 2016 WL 4944082, at *19 (E.D. Mo. Sept. 16, 2016) (quoting Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1420 (8th Cir. 1990), abrogated in part on other grounds by Key Tronic Corp. v. United States, 511 U.S. 809 (1994)). "It is not necessary that every factor mentioned by the NCP be dealt with explicitly; thus, for instance, a failure to consider explicitly the weather conditions factor is not fatal to an evaluation's consistency with the NCP." Gen. Elec., 920 F.2d at 1420.

Defendants' contention is correct that the draft revised Feasibility Study, and its prior versions, fails to consider a no-action alternative. (See Dkt. # 1321-2 at 14–29.) Nonetheless, Defendants' total reliance on Carson Harbor is misplaced. Unlike in Carson Harbor, the draft revised Feasibility Study in this case does consider more than one alternative despite its lack of a no-action alternative. (See id.) See also 40 C.F.R. § 300.430(e)(2) (requiring discussion of a no-action alternative "which may be no further action if some removal or remedial action has already occurred at the site"). The Court also notes that unlike Carson Harbor, Defendants here do not dispute that RID has complied with the "public

29

participation requirement."[8]  (See Dkt. # 1321.)  In Carson Harbor, the Ninth

Circuit determined that the plaintiff's lack of consideration of more than one

alternative was compounded by the fact that the plaintiff also failed to satisfy the

public participation requirement of the NCP.  See Carson Harbor, 433 F.3d at

1267.[9]

_____

[8] Although minimally briefed in their motion, Defendants raised the argument at
the hearing that although public participation occurred in this case, the public
viewed only one proposed remedy which was already chosen by RID.  (Transcript
of hearing at 17.)  However, RID's response at the hearing indicated that RID
operated under the presumption that ADEQ required it to restore the water to
drinking water quality because that was consistent with Arizona law; according to
RID then, that is the reason the proposed remedy was selected.  (Id. at 28.)  In any
case, RID countered Defendants' argument by asserting that at any point in the
process, the public and the participating defendants "could have said wait,"
"[t]hat's not a cost-effective remedy," or "it doesn't make sense to do this modified
early response action," but that neither the public or defendants ever did so despite
ample opportunities.  (Id. at 28–29.)

[9] At the hearing, Defendants also urged the Court to consider the facts in Channel
Master Satellite Sys., Inc. v. JFD Elecs. Corp., 748 F. Supp. 373 (E.D.N.C. 1990),
analogous to the facts in this case.  (Transcript of Hearing at 60.)  Upon review, the
Court determines that the facts are not as analogous as Defendants suggest; most
fatal to Defendants' reliance is the lack of almost any public vetting of the
remedial action in that case.  The court in Channel Master noted that "it is
undisputed that there were no public meetings, no public hearings, and no notice
was provided to the public."  Channel Master, 748 F. Supp. at 390.  The record in
this case is clear that extensive public and administrative review process occurred
and that even some of the Defendants themselves participated in this public
process.  Furthermore, the plaintiff in Channel Master failed to even prepare a
Remedial Investigation/Feasibility Study, much less consider a no-action
alternative.  Id. at 387 ("It is undisputed that Channel Master did not conduct an
RI/FS.")

Instead, the Court finds this case most analogous to <u>Sealy</u>

<u>Connecticut, Inc. v. Litton, Industries, Inc.</u>, 93 F. Supp.2d 177 (D. Conn. 2000).  In

<u>Sealy</u>, the Court found that, despite the plaintiff's admitted failure to prepare a

feasibility study and any discussion as to how or why the "no-action" alternative

was ultimately rejected, the plaintiffs had in fact met the other requirements for

substantial compliance with the NCP.  <u>Id.</u> at 187.  The court noted "from the record

[it is apparent] that Sealy reversed the proverbial cart and horse by selecting its

remedy before th[e] site was fully investigated and then used a post hoc supporting

rationale."  <u>Id.</u> at 185.  Nevertheless, the Court held that "with the exception of the

feasibility study, Sealy has otherwise complied" with other requirements, including

(1) "the requirement of opportunity for public comment"; (2) "consistently

provided Defendants with notice of each stage of its remedial efforts and on

occasion has modified or adjusted plans based on Defendants' comments"; and

(3) "presented aspects of its remediation plans . . . through a series of public

hearings."  <u>Id.</u> at 187.  The court further determined that "there was no evidence of

the existence of any other significantly more cost-effective permanent remedial

alternative that would have complied" with the applicable state remedial statute.

<u>Id.</u>  In determining that Sealy substantially complied with the NCP, the court stated

that "it was Congress' intent that CERCLA be construed liberally to accomplish

the statute's goals." Id. (quoting Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 163 (2d Cir. 1999)).

Here, the record indicates that, like in Sealy, RID's decision to proceed with a remediation decision, prior to its submission of an ERA, RI, or Feasibility Study to ADEQ, was likely "predominantly driven by factors other than [RID's] remedial investigation and plans." Sealy, 93 F. Supp.2d at 184. And, as Defendants point out, RID likely put the "proverbial" cart before the horse in selecting an initial remedy prior to a full investigation, and later proposing the remedy to ADEQ using "post hoc supporting rationale." See id. at 185. However, like the court found in Sealy, the Court here finds that RID has complied with the public comment requirements. See id. at 186 ("Notably, all of [the] cases where the courts have found the plaintiff's RI/FS non-compliance inconsistent with the NCP involved additional requirements as well, most typically the public comment requirement."). Nor do Defendants dispute that RID has kept them informed at each stage of the process and included them in the public vetting process; indeed, the record indicates that Defendants submitted a competing Feasibility Study, which specifically rejected a no-action alternative. (See Dkt. # 1329-1.)

Furthermore, RID did more than the plaintiff in Sealy. RID actually prepared to ADEQ several drafts of a Feasibility Study that considered four differing alternatives. (See Dkt. # 1321-2 at 14.) The draft Revised Feasibility

Study includes alternatives that are more aggressive, as well as less aggressive,
than the referenced remedy thereby meeting requirements under the relevant
Arizona statute.  (See id.)  Several factors were also considered in the draft revised
Feasibility Study, including, inter alia, comparatives of cost and risk mitigation.
(See id.)  While the draft revised Feasibility Study did not include a no-action
alternative, it appears to have substantially complied with other requirements for a
Feasibility Study.  As to Defendants' argument that RID's proposed alternatives in
the draft revised Feasibility Study were "conceptual alternatives," like Sealy,
Defendants have not presented evidence of the existence of any other "significantly
more cost effective permanent remedial alternative."  Sealy, 93 F. Supp. 2d at 187.

Still, Defendants attempt to distinguish Sealy on the basis that the
Sealy plaintiff had in fact considered a no-action alternative in an initial
remediation plan.  (Dkt. # 1320 at 20.)  The Court finds this distinction without
merit—the plaintiff in Sealy did not submit a Feasibility Study at all, a clear
requirement for compliance with the NCP.  Additionally, the court criticized
Sealy's no-action alternative in its initial remediation plan on the basis that there
was no explanation as to how or why this alternative was ultimately rejected.
Sealy, 93 F. Supp. 2d at 184.  Finally, most detrimental to Defendants' argument,
like the Sealy plaintiff, RID did in fact consider a no-action alternative in its 2009

Implementation Plan, prior to the draft revised Feasibility Study.  (See Dkt. # 1321-1 at 134.)

  For these reasons, the Court will not grant summary judgment in favor of Defendants based on any failure to consider the no-action alternative or criticism of other alternatives in RID's Feasibility Study.

  3. <u>Whether RID failed to identify and consider site-specific ARARs</u>

  Defendants also move for summary judgment on the alleged failure of RID's environmental consultants to consider ARARs, as required by the NCP. (Dkt. # 1320 at 24.)  Defendants assert that "[a] cursory review of the ERA, MERA, and even the post-remedial-action [Feasibility Study], confirms that the acronym ARARs does not appear in those documents, and there is no discussion of ARARs or any reference to the requirements of the NCP and, specifically, the [Feasibility Study] requirements set forth in 40 C.F.R. § 300.430(e).  (Id.)

  As briefly discussed, section 9621(d) governs the extent of cleanup, which is required "at a minimum [to] assure[] protection of human health and the environment."  42 U.S.C. § 9621(d).  To attain that goal, the scope of a remedial action may be established by any "legally applicable or relevant and appropriate . . . requirement," or ARARs.  Id. § 9621(d)(2)(A).  ARARs include "any standard, requirement, criteria, or limitation under any Federal environmental law" or more stringent "State environmental or facility siting law."  Id.  "Applicable

34

requirements" are defined in the NCP as "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site." 40 C.F.R. § 300.5. "Relevant and appropriate" requirements are "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that, while not 'applicable' to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site." Id.

The record indicates that RID gave substantial thought and attention to compliance with site-specific Arizona law. Additionally, the record indicates that ADEQ gave significant oversight in the remediation process and approved the draft revised Feasibility Study, noting that "ADEQ has determined that the FS Report meets the requirements of Arizona Revised Statutes 49-287.03 and Arizona Administrative Code R18-16-407 and therefore ADEQ is approving RID's FS Report." (Dkt. # 1321-2 at 32.) Accordingly, ADEQ's significant involvement, with who RID consulted on a regular basis and invited public comment and vetting

on several occasions, is sufficient evidence to overcome summary judgment because it suggests that RID satisfied its obligations to meet ARARs.  See Franklin Co. Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 544 (6th Cir. 2001).  Summary judgment is denied to Defendants on this basis.

4.  Whether RID failed to conduct a Human Health Risk Assessment

Defendants also argue that RID's environmental consultants' admission that a human health risk assessment was never conducted is fatal to RID's claims.  (Dkt. # 1320 at 24.)  RID has provided sufficient evidence, however, to overcome summary judgment on this assertion.

First, RID points out that ADEQ, and not RID, conducted the remedial investigation ("ADEQ RI") into the VOC contamination at the WBVA Site, and Defendants have not challenged the sufficiency of the ADEQ RI.  (Dkt. # 1328 at 20; Dkt. # 1178-3 at 3.)  The 2012 ADEQ RI indicates that the Arizona Department of Health completed a health risk assessment associated with the WVBA in October 1992, which addressed a threat to a nearby drinking water source.  (Dkt. # 1178-3 at 13–14.)  The ADEQ RI concluded that significant health risks existed from drinking water from groundwater containing VOC concentrations similar to those found in the ADEQ monitoring wells.  (Dkt. # 1178-3.)

36

RID has also submitted evidence that RID supplemented the findings in ADEQ's RI when it publicly filed a Final Public Health Exposure Assessment and Mitigation Work Plan on June 17, 2011.  (Dkt. # 1132-3 at 16; see also Dkt. # 1179-1 at 2.)  ADEQ approved this assessment on June 23, 2011.  (Dkt. # 1132-3 at 16.)  According to RID, the assessment confirmed the presence of VOCs in all samples both in and around RID wells and water conveyance systems.  (Dkt. # 1328 at 20; see also Dkt. # 1179-1 at 32–33.)  RID has also submitted evidence that some Defendants, identified as the Working Group Defendants, themselves submitted a "CERCLA-compliant human health assessment" in July 2014.  (Dkt. # 1321-2 at 79–80.)

Accordingly, RID has produced sufficient evidence to overcome summary judgment as to whether it complied with the human health risk assessment requirements under 40 C.F.R. 300.430(d)(1)–(4). Summary judgment is therefore denied to Defendants on this basis.

### 5.  Conclusion

Having considered the relevant memoranda and evidence in support of and in opposition to Defendants' Motion for Summary Judgment regarding NCP Compliance (Dkt. # 1320), the Court **DENIES** the motion.

## II. RID's Cross-Motion for Summary Judgment

RID filed its own cross-motion for summary judgment as to NCP compliance, arguing that it is entitled to judgment as a matter of law on this issue. (Dkt. # 1330.)  RID contends that there is no genuine issue of material fact that it substantially complied with the NCP when it incurred response costs in connection with its remediation efforts under the public oversight of the ADEQ.  (Id. at 2.)  As it argued in its response to Defendants' summary judgment motion regarding NCP compliance, RID asserts that ADEQ's extensive oversight and approval of its publicly-vetted remediation response entitles RID to the same presumption of compliance that ADEQ would be entitled to enjoy.  (Id.)  However, as the Court discussed above, the Ninth Circuit has not yet ruled on whether agency oversight can prove NCP compliance.  See Carson Harbor, 433 F.3d at 1266.  Accordingly, the Court will not grant summary judgment to RID solely on this basis.

RID alternatively argues that the record presented to this Court, as discussed in Defendants' motion for summary judgment regarding NCP compliance, demonstrates that RID has substantially complied with the NCP. (Dkt. # 1330 at 2.)  In response, Defendants contend that RID cannot be granted the relief it requests because it has failed to comply with two other NCP criteria, namely cost-effectiveness and implementability, both of which RID fails to address in its cross-motion.  (Dkt. # 1363 at 8.)

A.   <u>Cost-Effectiveness</u>

The NCP "is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." <u>Carson Harbor</u>, 433 F.3d at 1265.  Defendants assert that RID has not considered any other remedial action other than immediate and active treatment of water pumped by its wells and brought to drinking-quality standards.  (Dkt. # 1363 at 9.)  Defendants also contend that RID failed to evaluate a cost-effective alternative by comparing the costs of its remedial action versus risk reduction. (<u>Id.</u>)

RID has produced evidence that it did, in fact, consider cost-effectiveness when considering remedial action.  RID has demonstrated that it engaged in an extensive public vetting process of its ERA and MERA proposals, and that Defendants themselves participated in this process.  (<u>See</u> Dkt. # 1178 at 14–23.)  Specifically, RID's MERA was "proposed in order to provide a more cost effective approach to protect the RID water supply by accomplishing the objectives of the RID ERA remedial action."  (Dkt. # 1178-2 at 7–8; Dkt. # 1178-5.)  The MERA expressly identifies actions to be taken to reduce capital, operation, and maintenance costs.  (Dkt. # 1178-8.)  Additionally, RID's draft revised Feasibility Study specifically chooses the remedial plan identified as the "less-aggressive remedy," in which the cost-effectiveness of that remedy was previously evaluated.

(Dkt. # 1178-9 at 215; 129 (discussing the GAC technique); 220–222.)  Defendants have not presented sufficient evidence to overcome summary judgment on cost-effectiveness.  Accordingly, on this record, the Court finds that RID's remedial method substantially complied with the cost-effectiveness component of the NCP. See 40 C.F.R. § 300.430(e)(7) and A.R.S. § 49-282.06(A)(3).

      B.    Implementability

      The NCP also requires that a remedial action be implementable. The implementability "criterion focuses on the technical feasibility and availability of the technologies each alternative would employ and the administrative feasibility of implementing the alternative."  40 C.F.R. § 300.430(e)(7)(ii). Defendants contend that RID failed to consider the long-term implementability of its plan, specifically its implementation after 2026 when there is a potential that RID could lose its ability to pump water.  (Dkt. # 1363 at 10.)  Defendants assert that certain ongoing litigation will determine the administrative implementability of RID's ability to pursue its remediation action, and there is a "possibility that continued operation of RID's remedial action will be unlawful long before it is completed."  (Id. at 11.)

      While Defendants' contention could be true that RID's long-term implementability of its remedial action may be in flux,[10] this is not a sufficient

_____

[10] This issue is not before this Court.

basis for this Court to find that RID did not consider the implementability

component of NCP compliance.  First, as RID points out, the statute's language

does not require RID to specifically consider any long-term implementation;

instead, the statute speaks only to "[a]lternatives that are technically or

administratively infeasible or that would requirement equipment, specialists, or

facilities that are not available within a reasonable period of time may be

eliminated from further consideration."  40 C.F.R. § 300.430(e)(7)(ii) (emphasis

added).  Defendants have pointed to no evidence that RID's remedial action would

present "reasonable period of time" obstacles.

   Additionally, RID has provided evidence that its draft revised

Feasibility Study addressed the implementability of its remedial action, as well as

discussing the challenges of its implementation.  (Dkt. # 1178-9 at 128–223.)  For

instance, under the "Practicability" section of RID's "Proposed Groundwater

Remedy," the Feasibility Study considers and compares the requirements for

implementation of each of the four alternative remedies.  (Id. at 211.)  The

Feasibility Study also discusses permitting requirements and other approvals that

would be necessary to implement each of the alternative remedies.  (Id. at 157–

158.)  It additionally describes "Uncertainties and Contingencies" that were of

concern for the "Less Aggressive groundwater alternative remedy," that was

chosen. (Id. at 158–160.) On this record, the Court finds that RID has substantially complied with the implementability requirement for NCP compliance.

C.   Conclusion

In conclusion, the Court recognizes that Defendants have raised some legitimate concerns over whether RID substantially complied with key components of the NCP, including whether RID considered the no-action alternative, ARARs, conducted a health risk assessment, as well as consideration of cost-effective remedies and their implementation. In considering RID's overall methods, however, the Court finds that "while certainly not in perfect compliance," RID did as a matter of law substantially comply with the applicable requirements set forth in the NCP. See Waste Mgmt. of Alameda Cty., Inc. v. East Bay Reg'l Park Dist., 135 F. Supp. 2d 1071, 1104 (N.D. Cal. 2001). Accordingly, the Court **GRANTS** summary judgment in favor of RID on this issue.

III. Defendants' Objections to RID's Additional Fact Statements

In replying to RID's response to their Motion for Summary Judgment Regarding NCP Compliance, Defendants filed objections to RID's Controverting Statement of Facts ("CSOF").[11] (Dkt. # 1361; Dkt. # 1329.) The Court has carefully considered each of the objections raised by Defendants in regard to RID's

---

[11] Defendants also filed a reply to RID's "contested" facts. (Dkt. # 1361 at 5; Dkt. # 1329.) However, since RID did not frame its contested facts as "objections," nor make any legal arguments regarding their inadmissibility, the Court will not enter a ruling on them.

CSOF and its facts and evidence; the Court considered each objection when considering the evidence RID relied on in support of its position that it substantially complied with the NCP.  In accordance with that review, the Court **OVERRULES** Defendants' objections to paragraphs 81–87 of the CSOF (Dkt. # 1329); the Court further **OVERRULES** Defendants' objections to paragraphs 4, 37, 39, 40, 41, 42, 43, 44, and 53 in RID's first Statements of Facts (Dkt. # 1178).

CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' Motion for Partial Summary Judgment Regarding NCP Compliance (Dkt. # 1320), **GRANTS** RID's Cross-Motion for Summary Judgment Regarding NCP Compliance (Dkt. # 1330), and **OVERRULES** Defendants' Objections to RID's Additional Fact Statements Regarding NCP Compliance (Dkt. # 1361).

**IT IS SO ORDERED.**

**DATED**:  Phoenix, Arizona, March 14, 2017.

_____

David Alan Ezra
Senior United States Distict Judge