1

**UNITED STATES DISTRICT COURT**

2

**FOR THE DISTRICT OF ARIZONA**

3

_____

4

5     **Roosevelt Irrigation District,**
      **a political subdivision of**          )
      **the State of Arizona,**               )

6                                             )     No. **CV 10-0290-PHX-DAE-BGM**
                     Plaintiff,              )

7                                             )
              vs.                             )     Phoenix, Arizona

8                                             )     February 28, 2017
      **Salt River Project**                  )     9:35 a.m.

9     **Agricultural Improvement and**         )
      **Power District, et al.,**             )

10                                            )
                     Defendants.              )
11    _____)

12

**BEFORE:  THE HONORABLE DAVID A. EZRA, JUDGE**

13

14    **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15                    (**_Motion Hearing_**)

16

17

18

19

20

Official Court Reporter:

21    Laurie A. Adams, RMR, CRR
      Sandra Day O'Connor U.S. Courthouse, Suite 312

22    401 West Washington Street, Spc 43
      Phoenix, Arizona 85003-2151

23    (602) 322-7256

24    Proceedings Reported by Stenographic Court Reporter
      Transcript Prepared by Computer-Aided Transcription

25

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3            BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
              By:  Francis J. Balint, Jr., Esq.
 4            2325 E. Camelback Road, Suite 300
              Phoenix, Arizona 85016
 5
      For the Defendant Salt River Project:
 6            BALLARD SPAHR LLP - Phoenix
              By:  David J. Armstrong, Esq.
 7            1 E. Washington Street, Suite 2300
              Phoenix, AZ 85001-0400
 8
      For the Defendant Freescale Semiconductor:
 9            SHOOK HARDY & BACON LLP - Miami, FL
              By:  John M. Barkett, Esq.
10            2400 Miami Center
              201 S. Biscayne Blvd.
11            Miami, FL 33131

12    For the Defendant Corning:
              PERKINS COIE LLP - Phoenix, AZ
13            By:  Shane R. Swindle, Esq.
              By:  P. Derek Petersen, Esq.
14            By:  Michael P. Berman, Esq.
              P.O. Box 400
15            Phoenix, AZ 85001-0400

16    For the Defendant Honeywell International:
              ARNOLD & PORTER LLP
17            By:  Sean Morris, Esq.
              777 S. Figueroa Street, Suite 4400
18            Los Angeles, CA 90017

19    For the Defendant City of Phoenix:
              PHOENIX CITY ATTORNEY'S OFFICE
20            CIVIL DIVISION
              By:  Stephen Wetherell, Esq.
21            200 W. Washington Street, Suite 1300
              Phoenix, AZ 85003
22
              SQUIRE PATTON BOGGS
23            By:  Christopher D. Thomas, Esq.
              By:  Matthew L. Rojas, Esq.
24            1 E. Washington Street
              Suite 2700
25            Phoenix, AZ 85004
```

APPEARANCES (Cont'd):

For the Defendant Kinder Morgan:
          FENNEMORE CRAIG PC - Phoenix, AZ
          By:  **Scott Ames, Esq.**
          2394 E. Camelback Road
          Suite 600
          Phoenix, AZ 85016

For the Defendant Dolphin, Inc.:
          POLSINELLI PC - Phoenix, AZ
          By:  **Troy Froderman, Esq.**
          1 E. Washington Street
          Suite 1200
          Phoenix, AZ 85004

For the Defendant Arizona Public Service, Dolphin, ITT:
          SNELL & WILMER LLP - Phoenix, AZ
          By:  **Mitchell J. Klein, Esq.**
          1 Arizona Center
          400 E. Van Buren
          Phoenix, AZ 85004

For the Defendant Maricopa County:
          MARICOPA COUNTY ATTORNEY'S OFFICE
          By:  **Ann Uglietta, Esq.**
          222 N. Central Avenue, Suite 1100
          Phoenix, AZ 85004

For the Defendant Meritor, Inc.
          CAVANAGH LAW FIRM PA
          By:  **Jerry D. Worsham, II, Esq.**
          1850 N. Central Avenue, Suite 2400
          Phoenix, AZ 85004

For the Defendant Air Liquide and others:
          SALMON LEWIS & WELDON PLC
          By:  **M. Byron Lewis, Esq.**
          2850 E. Camelback Road
          Suite 200
          Phoenix, AZ 85016

For the Defendant Union Pacific Railroad:
          PEARSON LAW GROUP LLC
          By:  **William W. Pearson, Esq.**
          1221 E. Osborn Road
          Suite 101
          Phoenix, AZ 85014

```
1    APPEARANCES (Con'td):
2
     For the United States Department of Energy:
3              US DEPARTMENT OF JUSTICE
               By:  Debra J. Carfora, Esq.
4              601 D. Street NW
               Washington, DC 20011
5
     For the Defendant Prudential Overall Supply:
6              LEWIS ROCA ROTHGERBER LLP - Phoenix, AZ
               By:  Stanley B. Lutz, Esq.
7              201 E. Washington Street
               Suite 1200
8              Phoenix, AZ 85004

9    For the Defendant Textron, Inc.:
               BOOTH LLP
10             By:  Joshua N. Levine, Esq.
               1849 Sawtelle Blvd., Suite 500
11             Los Angeles, CA 90025

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2          THE COURTROOM DEPUTY:  Civil Case Number 10-290,
3   Roosevelt Irrigation District versus Salt River Project
4   Agricultural Improvement and Power District, et al., on for
5   motion hearing.                                              09:34AM
6          Counsel, please state your appearances for the record.
7          MR. BALINT:  Good morning, Your Honor.  Frank Balint,
8   Bonnett Fairbourn, on behalf of the plaintiff, Roosevelt
9   Irrigation District, also commonly referred to as RID.
10          MR. BARKETT:  John Barkett from the law firm of Steel,  09:34AM
11   Hector and Davis -- excuse me -- Shook Hardy & Bacon, on behalf
12   of Freescale Semiconductor.
13          THE COURT:  We're in bad shape if you don't remember
14   which law firm you're with.
15          MR. BARKETT:  I did this a few weeks ago.  Steel       09:34AM
16   Hector and Davis is a law firm I joined in 1976 and left in
17   1987, but it's S-H and the Shook Hardy is S-H.  And so. . .
18          THE COURT:  That's okay.
19          MR. SWINDLE:  Shane Swindle with Perkins Coie on
20   behalf of defendant Corning, Incorporated.                   09:35AM
21          Good morning, Your Honor.
22          THE COURT:  Good morning.
23          Anybody else want to make an appearance?  I see the
24   whole panoply of my old friends and colleagues for many years
25   back here.                                                   09:35AM
```

```
 1              All right.  Good morning to all of you.  Sorry we

 2    don't have better weather for those of you outside of Phoenix.

 3              All right.  We've got several motions this morning.  I

 4    think we should probably start with the Cross Motions For

 5    Summary Judgment on NCP Compliance, and that was really Salt      09:35AM

 6    River's -- well, not Salt River's.  We have so many motions

 7    it's hard to keep straight.  That was actually the defendants'

 8    motion and then RID's cross motion.  So we'll start with

 9    defendants.

10              Now, after all of these many motions in the years that  09:36AM

11    we have been involved together in this case, I think you can

12    fairly assume I understand who the players are and what the

13    background is.  So I would appreciate it if we didn't, and I

14    think we'll streamline things, go through the history of this

15    case yet again.  I don't mean to cut anybody off, but it just    09:36AM

16    isn't necessary.

17              So let's just get right to the legal issues you wish

18    to address.  And please remember that I have carefully reviewed

19    your memoranda and the objections and the replies, and so I

20    would appreciate it if you would simply respond to opposing      09:37AM

21    counsel or address those matters that you have not addressed

22    directly in your papers rather than simply reciting back to me

23    what I have already read and will read again, by the way.

24              All right.  You may proceed.

25              Any of you appear before the famous Carl Muecke?        09:37AM
```

1          MR. BALINT:  I have, Your Honor.

2          THE COURT:  Well, when I first started sitting here

3    Judge Muecke was very much active.  And I remember sitting in

4    the back of his courtroom one time in a summary judgment

5    hearing in a somewhat complex case I ended up taking over,                09:38AM

6    actually, involving the then governor and all kinds of crazy

7    stuff going on.  And the lawyers stood up, and Judge Muecke

8    said, "Well, have you got anything to say?"  And the lawyer

9    said, "Well, I'd like to start" --

10          "No.  I read your papers.  Anything else?  Sit down."      09:38AM

11          I'm not giving you that treatment.

12          MR. BARKETT:  Well, Your Honor, I clerked for a judge

13    a long time ago on the Court of Appeals Fifth Circuit, but when

14    he was on the District Court bench his standard practice -- he

15    had motion calendar every Friday but his standard practice was      09:38AM

16    to only hear from the person he was prepared to rule against.

17    He would say, "I have read the papers.  I'm not favoring your

18    position so I'm going to give you a chance to argue first."

19          THE COURT:  I have seen that.  I have had that

20    experience myself, actually.                                              09:39AM

21          MR. BARKETT:  I am -- in light of your preamble,

22    I'm --

23          THE COURT:  You have got a whole series of binders

24    there.  That's scary.

25          MR. BARKETT:  So what I was going to do, if this would      09:39AM

UNITED STATES DISTRICT COURT

```
 1    help you, you tell me.  I have here a copy of the National
 2    Contingency Plan highlighted, and I have a copy of the key
 3    exhibits.  And I was just going to walk you through the
 4    contrast between the NCP and what actually that -- the
 5    failings, because I think that's essential to our motion.  And      09:39AM
 6    it would be a very simple step-by-step process for you to see
 7    exactly where they fail to comply with the NCP.  So you have
 8    the regulation right in front of you.
 9           THE COURT:  Well, that's all in your papers, isn't it?
10           MR. BARKETT:  It's laid out, Your Honor, yes.  But          09:39AM
11    this would show it to you in very straightforward terms.
12    Visually, you would be able to follow quite simply.  I leave it
13    to you.  If you don't think that would be useful to you, I'm
14    happy to skip it.
15           THE COURT:  Look, you know, federal judges today            09:40AM
16    rarely hold oral argument.  In fact, where I'm sitting now in
17    the Western District of Texas, I believe I may be the only one
18    that regularly holds oral argument.  Is that right, Laura?
19           THE COURTROOM DEPUTY:  No, there are some that do.
20           THE COURT:  Here?                                           09:40AM
21           THE COURTROOM DEPUTY:  Yes.
22           THE COURT:  I know here.  I'm talking about Western
23    District, which is the second busiest district in the country,
24    where I'm sitting now.  I know there are a few here that do.
25           I do it for a reason, and that's because I do want to      09:40AM
```

```
 1    give you an opportunity to stress things that you think are
 2    important.  So I will give you some leeway to do that.  But
 3    let's not drag it out.
 4         MR. BARKETT:  I won't.  I will move through speedily,
 5    Your Honor.                                              09:40AM
 6         So as CERCLA cases go, Your Honor, this is not a
 7    particularly complicated matter.  Because what's happened here
 8    is that the plaintiff has essentially taken a process, a rule
 9    of procedures, and flipped it and reversed what you are
10    supposed to be doing under CERCLA.  You don't pick a remedy   09:41AM
11    first.  You go through a process.
12         And so what I have given you, the first document, is
13    Section 300.700 of 40 CFR, which is simply the provision of the
14    National Contingency Plan that outlines what a private
15    plaintiff is supposed to satisfy.  And it makes reference to   09:41AM
16    the second document I have given you.  And just to quickly walk
17    you through the provisions, I have highlighted the key
18    provisions for you.
19         It's not rocket science in the sense you do first a
20    remedial investigation to figure out what's wrong.  You look at   09:41AM
21    the area and extent of contamination.  And then once you
22    develop the information from the remedial investigation, you
23    then begin the process of doing a risk assessment so that you
24    can assess the risk from the data you have collected, and
25    that's set forth in the second highlighted provision on Page 69   09:42AM
```

1    of the excerpt from the regulations.

2            And then using the data from the risk assessment you

3    calculate risk ranges which might prompt a need for action.

4    And the actual numbers are set forth in the regulation.  And

5    then once that's completed you prepare what's called a          09:42AM

6    feasibility study.  You draft -- you identify alternatives that

7    may be candidates for fixing the problem you have identified

8    based on the risk assessment.  The provisions of the NCP

9    require that the no-action remedy shall be developed.  That's

10   at Subsection 6 of Paragraph E.  And then for remedial          09:42AM

11   alternatives where you are going to do something, you go

12   through a series of nine criteria and do a detailed analysis of

13   alternatives.  Once you have completed that process, then you

14   go through a remedy selection.  Following remedy selection you

15   go through a public participation, a meaningful public          09:43AM

16   participation process.  So that's the process that the NCP sets

17   forth.

18           If you take the notebook that's tabbed, Your Honor,

19   with the exhibits, I will just have you track what actually

20   occurred here.                                                  09:43AM

21           THE COURT:  Does RID's counsel have the same?

22           MR. BALINT:  He did not give me --

23           THE COURT:  So he's not able to follow on.

24           MR. BARKETT:  I apologize.

25           THE COURT:  We're not going through all these, are we?  09:43AM

1          MR. BARKETT:  Pardon me?

2          THE COURT:  We're not going through all --

3          MR. BARKETT:  We're going to zip through several

4    points so you can see them quickly.

5          So, Your Honor, if you go to Exhibit 5, this is an          09:43AM

6    implementation dated September 25th, 2009 implementation plan.

7    And --

8          THE COURT:  Just a minute.

9          MR. BARKETT:  -- this document is dated three years --

10         THE COURT:  Just a minute.  Let me get there.          09:44AM

11         MR. BARKETT:  -- three years before the remedial

12   investigation report is completed.

13         THE COURT:  Yeah.

14         MR. BARKETT:  And this document, Your Honor, if you

15   turn to Page -- Executive Summary Page 6, or of the main text          09:44AM

16   on Page 27, numbers in the upper right-hand corner, you will

17   see that the remedy was already selected in September of 2009

18   before a remedial investigation was even completed.  There's a

19   reference in this document, the middle of the page, alternative

20   remedies that rely solely on no action or monitoring as well as          09:44AM

21   remedies that rely on institutional controls but not achieve

22   the remedial objectives and, therefore, were not considered in

23   the evaluation.

24         So this is a point in time --

25         THE COURT:  Hold on one second.          09:44AM

1      MR. BARKETT:  My ears are still a little plugged, so

2  if you would speak up if you have a question, I would

3  appreciate it, from the airplane.  I have had the sinus

4  problems for about six weeks.  The flight here didn't help me

5  any.                                                          09:45AM

6      So what you have is a situation where they picked a

7  remedy first and then spent the next -- well, they spent now

8  eight years trying to market it.  And you know already the

9  history of the sale of water and the contingent fees, so you

10 have got all that.  You know why.  They had to have the remedy  09:45AM

11 to pump and treat because they needed to sell the water.  If

12 they didn't have this, they couldn't plan their little

13 business.

14     So to track going forward, what was the next event?

15 They submitted an Exhibit Number 9 -- excuse me -- Exhibit      09:45AM

16 Number 6.

17     THE COURT:  I need to clarify something in case

18 somebody got the --

19     MR. BARKETT:  I was worried you were going to ask me

20 to sit down because the bell had already rung.                 09:46AM

21     THE COURTROOM DEPUTY:  Excuse me, Judge.  Could I ask

22 everyone to turn cell phones off?  They can't be silenced.

23 They need to be off because they do interfere with the audio

24 system.

25     THE COURT:  I just got some really strange sounds and   09:46AM

```
 1   I couldn't hear you as a result of it.  That's not fair to you.
 2        All right.  I want to make something clear that I hope
 3   my order adequately addressed, but in retrospect it may or may
 4   not have by leaving something unsaid.
 5        There is this arrangement between Gallagher & Kennedy      09:47AM
 6   and RID for the purchase of -- or the receipts of certain water
 7   sales and so forth.  And certainly it's unorthodox.  I don't
 8   know.  I guess I have been a lawyer for 45 years.  I have never
 9   seen a fee arrangement quite like it before.
10        MR. BARKETT:  I'm at 42, Your Honor.  I agree.            09:47AM
11        THE COURT:  But that having been said, that having
12   been said, I don't think there's anything inherently illegal or
13   unethical about it.  And I didn't want to leave that impression
14   that I thought that somehow this was untoward, illegal,
15   unethical, or something like that.  I certainly have no view of  09:47AM
16   that, and I did not want to leave that impression.  I mean, I
17   certainly took a position on it with respect to my order, which
18   I'm sure that RID was not thrilled with.  But that didn't mean
19   that I thought it was illegal or unethical.
20        MR. BARKETT:  I'm not here to argue anything             09:48AM
21   differently, Your Honor.
22        THE COURT:  That point in that order had something to
23   do with something entirely different.
24        MR. BARKETT:  The only reason that there's any
25   significance to that is it explains why they picked the remedy. 09:48AM
```

UNITED STATES DISTRICT COURT

1    THE COURT:  The gist of your papers, the underlying

2    gist of your papers, is that they did what they did for the

3    ulterior purpose of ginning up a result which would, if you

4    will, conclude with water sales versus the no-action

5    alternative.  That's one of your explanations for why they          09:48AM

6    didn't follow.

7    MR. BARKETT:  They had to get approval to pump water.

8    THE COURT:  I just wanted to make the point that

9    whether that's there or not, I don't have any evidence of it,

10   that's just your surmise.  You don't have any evidence of it.       09:49AM

11   There aren't any documents.

12   MR. BARKETT:  Your Honor, Exhibit 1 of Page 592 of Mr.

13   Shirley's deposition, he explained that their plan in 2008 was

14   to turn the irrigation water provider into a drinking water

15   provider.  And then they followed up with these various steps       09:49AM

16   that they took in order to advance that plan.

17   THE COURT:  Well, I know, but that's fine.  I mean,

18   Arizona needs drinking water, to say the least.  But --

19   specifically the city of Phoenix.  But that having been said, I

20   don't know that there are any documents where someone says          09:49AM

21   we're not going to pursue the no-action alternative because we

22   want to be sure we generate water sales so that we can fund our

23   contingency fee arrangement.

24   MR. BARKETT:  They are not that explicit.  That's

25   correct.  They simply say we're not considering --                  09:50AM

1    THE COURT:  In the many cases I have handled in the

2  nearly 30 years I have been a federal judge, I have seen

3  documents that explicit and worse.

4    MR. BARKETT:  And it doesn't matter really, Your

5  Honor, because under the NCP they are required to develop the          09:50AM

6  no action alternative.  Why they didn't do it doesn't really

7  matter.  But they didn't do it.  And that's what does matter.

8  And the NCP is explicit for a no action alternative you must

9  develop it.  For remedial alternatives you can eliminate those

10  that you don't think are going to be affected.          09:50AM

11    THE COURT:  Earlier on they did address a no action

12  alternative, early on.  There was a -- if I'm not mistaken from

13  my review and my recollection.

14    MR. BARKETT:  Two references to it, Your Honor.  The

15  one I just read to you in the implementation plan in 2009.          09:51AM

16    THE COURT:  Right.

17    MR. BARKETT:  And in the feasibility study they raised

18  it and said we're not going to consider it because it wouldn't

19  achieve our objectives, the remedial objectives.  But that's

20  still inconsistent with the NCP.  It's exactly the *Carson*          09:51AM

21  *Harbor* case.

22    THE COURT:  You know, there's a legal issue here that,

23  unfortunately, the Ninth Circuit hasn't addressed directly.

24  Probably will in this case, I assume, at some point down the

25  road -- maybe not -- as to whether that's fatal or it isn't          09:51AM

1    because there's some law from some other circuits that suggest

2    that it may not be.

3            MR. BARKETT:  Well, let me address those cases, Your

4    Honor.  First of all, within the Ninth Circuit, the issue on no

5    action alternative, the Ninth Circuit has already expressed its          09:51AM

6    views in the *Carson Harbor* case.

7            THE COURT:  Well, yes, but they -- I read the *Carson*

8    *Harbor* case.  I know all about it.  But that's not what I'm

9    saying.  There's -- they tried to distinguish, and they may be

10   successful in distinguishing the *Carson Harbor* case because          09:52AM

11   there are some significant differences.  I'm not disagreeing

12   with you, I'm just telling you.

13           MR. BARKETT:  I understand.

14           THE COURT:  It's not black and white.

15           MR. BARKETT:  Let me address *Carson Harbor*.          09:52AM

16           THE COURT:  We wouldn't be here if it was black and

17   white.

18           MR. BARKETT:  Yes.  Let me address *Carson Harbor*, Your

19   Honor, because there were two issues in the case.  One was the

20   participation of the meaningful public participation, and the          09:52AM

21   second was the failure to do a detailed analysis of remedial

22   alternatives including the no action alternative.  In the

23   conclusion of the opinion, as I read the opinion, either one of

24   those would have been enough to end that case, to affirm the

25   summary judgment order of the district court.  So in this case,          09:52AM

1    we have the latter.  There's really no dispute that there was

2    only one remedial alternative that's been discussed throughout.

3    They say there's three or four, but it was always pump and

4    treat.  And the only difference in the alternatives was whether

5    you did it by air stripping or whether you did it by carbon          09:53AM

6    treatment or whether you did it centralized at a plant whether

7    you did it at the wellhead.

8         THE COURT:  The Ninth Circuit, in their opinion,

9    criticized the process for a number of other reasons as well

10   that we don't know at present here.  So there were some other        09:53AM

11   factors involved.  It wasn't that clear.

12        MR. BARKETT:  Well, I'm happy to look at the opinion

13   with you, Your Honor.  The district court judge certainly went

14   through quite a number of other reasons.  But the Ninth Circuit

15   focused on two, which is the public participation issue and          09:53AM

16   detailed lack of --

17        THE COURT:  There was certainly public participation

18   here.  I'm not suggesting there wasn't public participation.

19        MR. BARKETT:  Well, and, Your Honor, so let's talk

20   about that in two respects.  Number one, what was the public         09:53AM

21   viewing?  The public was viewing a remedy that had been

22   proposed by RID from the get-go before this process even was

23   followed through.  And so the public was viewing a proposed

24   remedy to decide before a risk investigation, before a risk

25   assessment, before a feasibility study.  They were viewing what      09:54AM

1   RID was trying to sell.  The NCP anticipates, again, if you

2   look at Section F of the NCP of 300.430, it's after you have

3   done the RI, done the assessment, done the FS, then you put it

4   all out for the public to evaluate.  Here, the public never saw

5   any of those things.                                          09:54AM

6        And what the public did see in terms of risk was RID's

7   public health assessment that said there was no groundwater

8   risk.  There was no acute air risk.  What the public saw was

9   the Haley & Aldrich CERCLA compliant risk assessment that said

10  there's no risk from air or water, and that's a CERCLA         09:54AM

11  compliance risk assessment.  What the public saw was the

12  Arizona Department of Health Services health consultation --

13  again, these are all exhibits I would have walked you through

14  but I'm advancing this -- that says there is no risk from

15  groundwater contact.                                           09:55AM

16       And then when the two feasibility studies, Your Honor,

17  were actually presented -- and this is why, again, this case is

18  not a CERCLA case -- two feasibility studies competing, and

19  what does the ADEQ do?  It refers them to an independent

20  consultant who says evaluate them.  And if you turn to Exhibit  09:55AM

21  17 of the booklet I have given you, this is the Matrix Design

22  Group report retained by the ADEQ to evaluate the

23  administrative completeness of both feasibility studies.

24       If you take a look at Page 1 of 8, or the third page

25  of the exhibit, let's look to see what the independent          09:55AM

UNITED STATES DISTRICT COURT

1    reviewers said about the RID remedy.  Number one, remedial

2    action is on the left side you are looking at the WQARF

3    statute.

4            THE COURT:  Counsel, slow down.  Where are you?

5            MR. BARKETT:  I'm on Exhibit 17.                    09:56AM

6            THE COURT:  I know that, but where are you?

7            MR. BARKETT:  Third page of the exhibit.  You have got

8    to turn it -- that's right.  Now you are looking at it turned

9    landscape.  And if you look on the left-hand column in the

10   shaded area, remedial actions shall, one, assure the protection  09:56AM

11   of public health.  And then look to see what the technical

12   analysis is to the right.  Current risks are within acceptable

13   thresholds for present use.

14           Look down to Number 3, remedies are supposed to be

15   reasonable.  And what did Matrix conclude?  Remedial actions    09:56AM

16   are not required for current use, therefore, they are not

17   reasonable at this time.

18           To the left again, they're supposed to be necessary.

19   What does Matrix conclude about the RID remedy?  Not necessary

20   until such time as future use of the resources for potable      09:56AM

21   supply.  Under the statute under WQARF, now that's CERCLA under

22   WQARF, it's supposed to be cost effective.  And what does

23   Matrix do, in an independent review of RID's remedies, say?  At

24   the time the potable use is needed, this would be cost

25   effective.  Effectively, when it was actually presented at a    09:57AM

1    point in time in 2015, not in 2009 when they adopted the

2    remedy.  In 2012 when they implemented the remedy in February

3    of 2012, before there had been any approvals of this particular

4    water treatment there was conditional improvement by the DEQ

5    with respect to the early response action.  That's where they       09:57AM

6    were proposing centralized treatment of the water.  They then

7    moved to wellhead treatment, installed the wellhead units,

8    began operations in February of 2012.  It was in October of

9    2012 they submitted their modified early response action plan,

10   and then the remedy was already operating.  This turns, again,      09:57AM

11   turns CERCLA completely on its head.  They have never done a

12   risk assessment, mind you, but if they had, all the risk, all

13   the evidence shows there was no risk including, as you can read

14   right here, ADEQ's independent reviewer.  And then they get the

15   ADEQ conditional approval which, as the Court knows from our        09:58AM

16   papers, says we're not passing, we're not doing any analysis,

17   we're not approving what you are doing with the water.  Because

18   what they were doing with the water, and, of course, ADEQ knows

19   from reading our briefs, Your Honor, you know they didn't pass

20   on any -- complies with federal laws or federal regulations.        09:58AM

21   So the idea of public participation by virtue of ADEQ approval

22   to satisfy the NCP makes no sense, because the ADEQ didn't

23   pass, couldn't pass, on NCP consistency if it tried to.  Under

24   the *City of Tucson* case, there's no deference for interpreting

25   a federal regulation.  But they said specifically, we're not        09:58AM

1  considering federal law regulations here, and we're not

2  analyzing or approving what you are doing with the water.

3  Under CERCLA that would have to have occurred.  You could not

4  have had an NCP remedy consistent -- compliant remedy without

5  determining where the water is going.                          09:59AM

6          What were they doing with the water?  They were taking

7  the water, treating it to drinking water standards, mixing

8  it -- and still doing it, by the way -- mixing it with sewer

9  effluent water and sending it to the farm fields to apply to

10 crops which is, with all due respect, just crazy.              09:59AM

11         And if you take a look at the testimony, Your Honor,

12 we have quoted some of it, cited to some of it, the testimony

13 from Mr. Peterson and Mr. Shirley, they say, "Does it make any

14 difference to the aquifer whether you treat it or not?"

15         And the testimony is, "It doesn't make any            09:59AM

16 difference."

17         I'll give to you some of the quotes.  854, Mr.

18 Shirley:  "Is your remedy designed to restore the aquifer?"

19         "It's not an aquifer remediation or restoration

20 strategy."                                                     10:00AM

21         "Is there any risk-related reason why the untreated

22 water extracted by RID can't be used for irrigation purposes?"

23         "No."

24         That's Mr. Peterson at Page 783 of the prior

25 testimony.  It's 854 for Mr. Shirley.                          10:00AM

1          And, "Did you ever consider a remedy that didn't

2   involve treating wells?"

3          They said yes, early on they did but it was determined

4   actually determined to be a non-starter.

5          Mr. Shirley:  "Is a no-action alternative a                    10:00AM

6   requirement for a FS under WQARF?"

7          "No."

8          THE COURT:  When you read, you read very fast.

9          MR. BARKETT:  Page 789, Mr. Shirley:  "Is a no-action

10  alternative a requirement for a feasibility study under WQARF?"   10:00AM

11         "No."

12         "Is it a requirement under CERCLA?"

13         Answer, "I think it generally is, yes."

14         "Did your FS contain a no-action alternative?"

15         "No."                                                        10:01AM

16         And then, at Page 749, Mr. Peterson testifies, and

17  this is in Exhibit 2, "To the extent that the RID remedy may

18  some day restore the aquifer itself, that would be a case

19  whether there's wellhead treatment at extraction wells or not,

20  correct?"                                                          10:01AM

21         Mr. Hanson:  "Form, foundation."

22         The Witness:  "In that regard, that's correct."

23         "So it's true that there's nothing in the RID remedy

24  proposal that is designed to accelerate the restoration time

25  frame?                                                             10:01AM

1        Mr. Hanson:  Same objection.

2        The Witness:  "In that regard, that's a fair

3    statement."

4        They were accomplishing nothing with respect to

5    aquifer restoration or remediation by simply treating water to          10:01AM

6    apply it to crops.  It's, Your Honor, in the Motion For

7    Protected Order that Judge Macdonald denied, we cited to Judge

8    Macdonald the *In Re: Petroleum* from your circuit, Fifth

9    Circuit, it's a 1993 decision.  And that was a case where EPA

10   provided alternative water supplies for some folks and those          10:02AM

11   costs were challenged by the PRP, by the defendant in that

12   case.  And the Fifth Circuit held that it was -- if I may just

13   kind of read you the language, Your Honor.

14        "Amazingly, the Environmental Protection Agency made

15   no attempt to learn whether anyone was drinking the water or          10:02AM

16   whether anyone intended to utilize the alternative water

17   supplies until after it made its decision to construct the

18   alternative water supplies.  One would think that surely such

19   information was essential in order to reach an informed

20   rational decision as to whether an AWS was necessary and              10:03AM

21   whether it would reduce any significant threat to public

22   health.  Administrative record reveals that the chromium

23   contaminated wells in the area all serve commercial

24   establishments which the EPA prohibited from connecting to the

25   alternative water supplies.  Moreover, the EPA did not require        10:03AM

residents to connect to the system.  It did not prohibit them

from using contaminated water from their wells.  Thus, on the

basis of the administrative record, it appears that the AWS did

not even reduce, much less eliminate, any public health threat.

No technical expertise is necessary to discern that EPA's

10:03AM

implementation of the AWS was arbitrary and capricious as well

as a waste of money."

And it's no wonder that the ADEQ, in its conditional

approval, said we're not analyzing and we're not approving what

you are doing with the water because they realized that if RID

10:03AM

wanted to go spend money, or its contingent fee consultants

wanted to go spend money, because that's who was spending the

money, to treat this water so they could apply it to crops,

that's their prerogative.  But we're not passing on it.

So the idea of both public participation or

10:04AM

presumption of NCP consistency on these facts just turns CERCLA

completely on its head.  They picked a remedy from the get-go

before an RI was completed, before a risk assessment was

undertaken.  When they did their own public health assessment,

it showed there was no risk.  They then implemented the remedy,

10:04AM

submitted MERA after the remedy was already implemented.  ADEQ

then issued a second approval.  Again, I'm not going to repeat

what the letter says.  You know what it says.  And then they

prepared the feasibility study, and the feasibility study

eliminated no action.  It contains four pump alternatives,

10:04AM

1   really one alternative, Your Honor.  It's just pump and treat.

2   And the only question was, same remedy, the MERA remedy.  It's

3   in the exhibits.  You have seen the papers.  You know it's

4   exactly the same remedy.  The testimony is to that effect.

5   They were just going to add a couple wellhead treatments to two   10:05AM

6   other wells.  And more aggressive/less aggressive reference,

7   most aggressive was just a function of how many skids were

8   added to how many wells.  But it's just one remedy, pump and

9   treat.

10       So you have a feasibility study that then Matrix looks   10:05AM

11   at and reaches the conclusion I just read to you.  What's

12   happened since, Your Honor?  Both the working group and RID

13   submitted proposed remedial action plans under working

14   agreements that were signed with the ADEQ.  Both of those

15   perhaps have now been withdrawn by the parties at ADEQ's   10:05AM

16   request.  Their working agreements have been terminated, and

17   there's no activity from ADEQ's standpoint on the site, which,

18   again, tells you this is not a CERCLA NCP related matter.  This

19   is a WQARF matter.  And what they have tried to do is take a

20   round peg, probably a square peg, and tried to pound it into a   10:06AM

21   round hole, but it's impossible to do.

22       And the cases they cite, if I could just take a couple

23   minutes to address some of their case law, because it's

24   important for the Court to see.  The very first case they cite,

25   the *Burlington Northern -- United States versus Burlington*   10:06AM

1    *Northern*, actually, is very supportive of our position.  And I

2    have highlighted in the notebook for the Court the quote on the

3    role that the risk assessment plays.  The facts have nothing to

4    do with this case.  It involved an EPA change of remedy.

5         THE COURT:  I know what the facts are.                    10:06AM

6         MR. BARKETT:  And then in the *Pentair* and *AmeriPride*

7    cases, the reason why those are of mild interest, Your Honor,

8    is because in dicta both judges -- the facts have nothing to do

9    with this case.  Also there were remedial investigations, there

10   were feasibility, they did it right in terms of the process.   10:06AM

11   So both cases are easily distinguishable in that regard.

12        But the reason why they cite the cases is this concept

13   of action versus costs.  And that is a, if there is a red

14   herring, that is a red herring.  The Court, in AmeriPride, was

15   looking at cases that involved the difference in 107(a)(4)(A)  10:07AM

16   between a remedy or recovery by the government and then (B),

17   recovery by a private party.  Recovered by the government, the

18   statute reads you are entitled to response costs, removal or

19   remedial action costs not inconsistent with the NCP.  And for

20   private parties the language reads consistent with the NCP.    10:07AM

21        Some courts have interpreted the "not consistent with

22   NCP" to give the government sort of a leg up in terms of if

23   certain costs are not consistent, that doesn't mean you don't

24   get other costs.

25        THE COURT:  Counsel, you have far exceeded the time we    10:07AM

1   have allotted.  So I have to give --

2           MR. BARKETT:  Very good.  I will sit down for now.

3           THE COURT:  Otherwise none of these other lawyers are

4   going to get a chance to address any of the other motions.

5           MR. BARKETT:  Very good.                          10:07AM

6           THE COURT:  Thank you, counsel.

7           MR. BARKETT:  Thank you.

8           THE COURT:  You know, there's a concept I learned

9   about a long time ago as a judge that once you try to avoid,

10  but unfortunately some judges don't avoid it, and that's called   10:08AM

11  result-oriented juris prudence.  Do you know what that is?

12  That's where the judge puts his finger up in the air and

13  decides this one should win and then looks back and tries to

14  figure out how to make that happen.  And essentially what we

15  have here is the defendants accusing you of result-oriented    10:08AM

16  practices in the same fashion, in other words, reaching a

17  result quite early to dismiss the no-action alternative, and

18  then doing everything possible to try to justify the conclusion

19  which you came up with.

20          MR. BALINT:  Correct.                             10:09AM

21          THE COURT:  There's some evidence in the record to

22  support that.  So you tell me why that isn't right.

23          MR. BALINT:  Your Honor, RID still is the only entity

24  that's actually doing cleanup work at the site.  And this whole

25  play has unfolded on a stage which is the State's designation   10:09AM

```
 1   of the site as a Superfund site and the State's
 2   determination --
 3            THE COURT:  More than one, I think.  Isn't there more
 4   than one Superfund site?
 5            MR. BALINT:  There are, but I'm talking specifically    10:09AM
 6   of the West Van Buren one, the one that encompasses RID's well
 7   feeds.
 8            THE COURT:  The one I drove by today.
 9            MR. BALINT:  And it's ADEQ that made the remedial
10   investigation.  It's the ADEQ that determined the remedial      10:09AM
11   objections.
12            THE COURT:  Right.
13            MR. BALINT:  So RID operated with the presumption
14   that, yes, ADEQ is going to require us to restore this water to
15   drinking water quality standards, because that's consistent     10:09AM
16   with Arizona law.  And if what defense is saying is true, then
17   at any point along the process, Your Honor, the public, the
18   defendants, in fact, they participated in this process, the
19   ADEQ could have said wait.  That's not a cost-effective remedy
20   or wait, it doesn't make sense to do this early response        10:10AM
21   action, or wait, it doesn't make sense to do this modified
22   early response action.  Anywhere along the way, it could have
23   been determined that this was not cost-effective, this was,
24   like you say, an after-the-fact determination, an intent to
25   justify.                                                        10:10AM
```

1    But that's not what happened.  What happened was the

2  proposal that RID made, and it was not the only proposal that

3  they made.  And, in fact, the no-action alternative was

4  considered all along the line.  It was vigorously advocated for

5  the defendants for a while, and even they withdrew that.  And

6  it's expressly referenced in a feasibility study that was

7  finally entered.  So this notion that the no-action alternative

8  wasn't considered is just wrong.  It was considered but

9  rejected early on because everyone realized that what was

10 needed there was a cleanup.

11   So the feasibility study, this is it.  I won't burden

12 the Court with more paper on it, but it's at Document 1185-3 in

13 the record.  This is the culmination of the process.  And the

14 significant point we tried to bring out in our papers is that

15 RID went through the process.  The defendants had an

16 opportunity to challenge its actions, it's early response

17 actions and its later actions and even the feasibility study,

18 and they submitted their own feasibility study.  So the public

19 had an opportunity.

20   I guess my point is, Your Honor, there's a thorough

21 vetting of what they say is an after-the-fact plan.  And Your

22 Honor has recognized earlier on, and I think the Ninth Circuit

23 made this very clear, that even if there was an alternative

24 motivation that's not relevant to the CERCLA cleanup.  The

25 point is if you achieve the cleanup and you achieve what is

10:10AM

10:11AM

10:11AM

10:11AM

10:12AM

1  called a CERCLA quality cleanup, that's the standard which we

2  sort of lost sight of here.  The standard is only to be

3  consistent with the NCP, it only has to achieve a CERCLA

4  quality cleanup.  That means the remedy is protective of human

5  health and the environment.  It utilizes permanent solutions          10:12AM

6  and alternative treatment technologies or research recovery

7  technologies.  RID's plan did that.  It's cost-effective.

8         Defendants oppose our cross motion by saying

9  cost-effectiveness was somehow never considered.  Your Honor, I

10 respectfully submit that in the feasibility study, in those            10:12AM

11 documents the defendants just handed up to you as exhibits you

12 will see consistent assessments of what's a cost-effective

13 remedy.  And you will see a change over time.  The original ERA

14 proposed a centralized treatment.  The modified ERA later

15 proposed a more cost-effective approach that the ADEQ reviewed         10:12AM

16 and approved and was vetted.  And each of these steps followed

17 over six years of a vigorous and dynamic public participation

18 process.

19        I got off my course because that's the last element,

20 under *Carson Harbor*, the last element of a CERCLA quality            10:13AM

21 cleanup is meaningful public participation.  And the notion

22 that defense counsel just suggested that somehow this was the

23 only -- this was presented to the public as just our result and

24 we're not considering any other is just inconsistent with the

25 record.  They presented their alternatives.  RID itself                10:13AM

1    presented alternatives.  In the final feasibility study, RID

2    proposed -- assessed four different alternatives and ultimately

3    recommended the less aggressive of the more cost-effective

4    remedy, which is what the ADEQ approved.

5        So, Your Honor, I hear their argument that look, RID        10:13AM

6    was hoping finance this whole thing with the sale of potable

7    water down the road, and it used that in order to accomplish

8    the cleanup.  But that's exactly what CERCLA contemplates, is

9    that if a party goes ahead and takes the initiative and invests

10   in the cleanup, and those costs are consistent with the NCP,    10:14AM

11   then they should be recoverable under Section 107.

12       And our distinction, Your Honor, between costs --

13   challenging a specific cost as being inconsistent with NCP and

14   challenging the overall action as being inconsistent with NCP,

15   is not a red herring.  It's a very important distinction.        10:14AM

16   Because, for example, there are some costs that were incurred

17   early on in investigating the cleanup and so forth that RID has

18   sought to recover that need not comply with the standards

19   applicable to the final feasibility study at the end of the

20   day.                                                             10:14AM

21       So there are two courts, both California cases, both

22   within the Ninth Circuit, both of them have specifically

23   recognized that the focus is supposed to be on the costs.

24   Because there are some costs that, even though you might at the

25   end of the day, if the ADEQ had said, we're rejecting your       10:15AM

1   feasibility study, those early on costs were still reasonably

2   incurred and consistent with a process of moving toward an

3   overall NCP compliant plan.  So that's why -- and I will pull

4   the two cases for Your Honor.  *Pentair Thermal* and *AmeriPride*

5   *Services*, both cases from -- first *Pentair* is Northern District      10:15AM

6   of California; *AmeriPride,* Eastern District of California.

7        In *Pentair*, the Court said, "The plain language of the

8   statute speaks of costs rather than actions.  And even where

9   actions may be inconsistent with the NCP, consistent costs are

10  recoverable."  *AmeriPride,* the question is whether any                 10:16AM

11  particular cost is consistent with a National Contingency Plan,

12  not whether the plaintiff has uniformly adhered to the plan.

13       So that's why we say, Judge, the defendants not have

14  identified any particular cost they say is inconsistent with

15  the plan.  What they have done is challenge the overall action,        10:16AM

16  the overall thing that was publicly vetted and repeated the

17  same arguments they may to ADEQ, same arguments they made

18  through that public vetting process.  They repeated it now to

19  Your Honor to try to convince you that all of the RID's costs

20  are somehow inconsistent with the NCP.  That's just not the way       10:16AM

21  the analysis is supposed to go under the Ninth Circuit.

22       Costs like investigation, we cited the *MPM* case,

23  *Wickland Oil* and so forth.  Those early investigation response

24  costs are recoverable.  And, Your Honor, if I may, I have just

25  one little tiny hand-up.                                              10:17AM

1          THE COURT:  Have you provided it to --

2          MR. BALINT:  I will.

3          I actually prepared this for use on the other motion,

4     Your Honor, which focuses on the remaining costs.  But what I

5     did was I took the defendants' statement of facts and          10:17AM

6     identified with color coding those costs that remain after

7     their first summary -- Partial Motion For Summary Judgment.

8     The ones that are color coded green remain and are challenged

9     by defendants in their Second Motion For Partial Summary

10    Judgment.                                                       10:17AM

11         On Page A2 in red is the Task 2 cost, that is

12    challenged.  And on Page A6, the ADEQ oversight costs and the

13    general -- district general response costs, those are also

14    challenged.  And we'll address those in connection with the

15    other motion.  But the reason I brought it up at this point,   10:18AM

16    Your Honor, is these unchallenged costs, for example, RID's

17    water quality monitoring costs, defendants don't even try to

18    contend those are inconsistent with the NCP.  Those were

19    incurred in 2010 and 11 and 12 and so forth as it was monitored

20    as to what was happening out there.                            10:18AM

21         So it underscores, Your Honor, the significance of our

22    point that the analysis be appropriately focused on the actual

23    costs and not just some sort of overall assessment of the

24    program.  But if even if you do do an overall assessment of the

25    program, this is where we cite the many cases to say if you     10:18AM

1    conduct the program with public participation and with

2    oversight by the government, then you are entitled to a

3    presumption of consistency with the NCP.

4         And the defendants -- we have cited three cases,

5    *Allied Waste*, *Valbruna Slater*, and *Norfolk Southern*, three      10:19AM

6    cases in which the courts granted summary judgment on precisely

7    that ground, those grounds, that unless the defendants come

8    forward and somehow challenge the agency's actions as arbitrary

9    and capricious then the agency and the private party working

10   with the agency are entitled to presumption of compliance with   10:19AM

11   the a NCP.

12        I agree with Your Honor that *Carson Harbor* is a very

13   different situation there.  The Court -- the argument was that

14   we don't need public participation because we have government

15   oversight.  And the Court said, well, you don't have enough   10:19AM

16   government oversight to substitute for public participation

17   here.  But here, we have both government oversight and public

18   participation.  So our case is clearly distinguishable from

19   *Carson Harbor*.  It's clearly distinguishable from the

20   *Washington Department of Transportation* case.  Same situation   10:20AM

21   there which there was utterly no public participation, no

22   public vetting of these alternatives.  Our case is very much

23   more, I think, Your Honor like the *Sealy* case.  And in the

24   *Sealy* case the Court recognized, well, they didn't do a

25   feasibility study but they substantially complied with the NCP   10:20AM

1     because of the public participation and the government

2     oversight and so forth.  And that's what we have, although we

3     also have the feasibility study that was submitted and which

4     vetted all the alternatives.

5          THE COURT:  All right.  Counsel, I think I understand          10:20AM

6     your argument.  Is there anything else?

7          MR. BALINT:  If I could, Your Honor, one last point,

8     and that is that we, you know, we also challenge -- the

9     defendants attack comes down to challenges that there are, I

10    will call it nitpicking, at least potshots taken at our          10:20AM

11    feasibility study that it didn't consider the no-action

12    alternative, that it didn't consider the site-specific ARARs or

13    that it didn't -- and it didn't -- I'm drawing a -- oh, and

14    that it didn't -- that there was no risk assessment done.

15         But again, Your Honor, we have pointed out in the          10:21AM

16    record that the feasibility study can't be examined in

17    isolation of the entire process that went on, that, in fact in

18    the feasibility study and leading to the feasibility study,

19    no-action alternative was considered, rejected, and a no-action

20    alternative was referenced on Page 104 of the feasibility          10:21AM

21    study.  The assessment was made by the ADEQ they have remedial

22    investigation to determine that there's a problem that needs to

23    be addressed out there and they are the ones that determined

24    the remedial objectives we were trying to meet, everyone was

25    trying to meet.          10:22AM

1         And finally, the same way with the ARARs.  I mean,

2    that's not defined in the CERCLA statute, as Your Honor knows,

3    but it basically refers to site-specific state laws that could

4    affect the proposed remedial project.  And again, as defendants

5    emphasized, this entire process was undertaken with a                    10:22AM

6    particular eye towards the requirements of -- all the

7    requirements of the applicable Arizona law.

8         So none of those specific potshots are material

9    deviations from the NCP even if the Court were to focus on

10   them.                                                                     10:22AM

11        THE COURT:  All right.  Thank you very much, counsel.

12        MR. BALINT:  Thank you, Your Honor.

13        THE COURT:  No rebuttal.  I know exactly what you are

14   going to say.  It's not necessary.  It's in the papers.  I know

15   what you are going to say, counsel.  Put your papers down.              10:22AM

16   Relax.  We just don't have the time because we're just going to

17   go back and forth.  It's going to become a tennis match.  I

18   understand your arguments and I understand his arguments.  It's

19   all in the papers.  Everything that's been argued today has

20   been in the papers.                                                      10:23AM

21        So I will carefully review the papers again, and I am

22   going to look at the case law again, and I will issue a written

23   decision.

24        MR. BARKETT:  Your Honor, Mr. Thomas on behalf of the

25   City has handed me a note saying he would like to make one             10:23AM

1    comment.  Will you permit that?

2            THE COURT:  Okay.  Do you have any objection?

3            MR. BALINT:  No.  There's no objection.  I don't see

4    the point, but. . .

5            THE COURT:  All right.  Mr. Thomas.                    10:23AM

6            MR. THOMAS:  Thank you, Your Honor.  Chris Thomas.

7            THE COURT:  Very briefly.

8            MR. THOMAS:  Of course.  Chris Thomas from Perkins

9    Coie on behalf of the City.

10           And since you mentioned drinking water supply in       10:23AM

11   Phoenix, and in particular, I wanted to reference the fact that

12   the proposed RID remedy proposes it to do absolutely nothing to

13   address City of Phoenix wells that also have been impacted by

14   this regional plume including wells we shut down that did

15   supply actual drinking water at the time.  That's true for what 10:24AM

16   they propose to do in the future, which is why Phoenix is among

17   the parties supporting the alternative proposal that will treat

18   all impacted wells, including RID wells, Phoenix wells, SRP

19   wells, to drinking water standards when and if those wells are

20   actually switched to that use.                                 10:24AM

21           THE COURT:  I think my comment was City of Phoenix has

22   an interest in having clean water as does the State of Arizona.

23   I don't think you would disagree with that, would you?

24           MR. THOMAS:  No.  Not at all, Your Honor.  The other

25   factor here, of course, is that RID's plan would export a large 10:24AM

```
1   volume of drinking water outside the Phoenix basin thereby

2   diminishing our own supply.

3           THE COURT:  All right.  I will let you reply, counsel,

4   very briefly.

5           MR. BALINT:  Your Honor, I don't -- that's the same        10:25AM

6   sort of argument that was made as part of the public vetting

7   process by the City of Phoenix.  And unlike the City of Phoenix

8   RID has actually stepped forward and done something to actually

9   ensure that drinking water supply.

10          THE COURT:  Well, they clearly didn't have any money.     10:25AM

11  RID didn't have any money.

12          MR. BALINT:  Correct.  And that's why then it took the

13  unusual agreement.

14          THE COURT:  Kind of astounds me, to be honest with

15  you, as to why the public entities here didn't step up more       10:25AM

16  forcefully on all bases to do something about what is

17  admittedly a very serious problem.  I don't think anybody

18  disagrees, or if they do, I don't know on what basis they could

19  possibly suggest that there aren't plumes of very deadly

20  carcinogenic chemicals floating around underneath the city of     10:26AM

21  Phoenix, Arizona.

22          And so why -- and that's not necessary part of this

23  case -- but why this wasn't addressed in a more forceful way

24  some time ago.

25          MR. BARKETT:  May I comment on that, Your Honor?          10:26AM
```

1    THE COURT:  As long as you don't start rearguing your

2    motion.

3    MR. BARKETT:  I won't.

4    The actual concentrations have dropped fairly

5    significantly.  And by the time you pump water, clean water          10:26AM

6    with the relatively lower levels of contamination now you are

7    essentially pumping clean water coming out of the system.  So

8    there's a reason why the ADEQ put this on the back burner.

9    There's really no immediate risk to anybody.

10    THE COURT:  Well, that's in dispute, I think.  I don't          10:26AM

11    know, heck, if we wait long enough we may not even have an EPA

12    anymore, the way things are going.  Who knows.  Or what's left

13    of the EPA.  We'll have some guy in a corner office somewhere

14    by himself.

15    All right.  I will take this matter under advisement.          10:27AM

16    As I said, I'm going to look very carefully.  You all submitted

17    very extensive briefing on this and very thorough briefing and

18    good briefing.  And so I did want to give you a chance to

19    address this orally.  I'm going to get a copy of today's record

20    to look at it again, your arguments today.  And I want to have          10:27AM

21    the opportunity to re-read some of the case law.  Sadly, we

22    don't have as much in terms of Ninth Circuit case law as one

23    would think we would on an issue like this.  There are some

24    cases from some other circuits, and that's not the Ninth

25    Circuit's fault.  They could only deal with cases that come to          10:28AM

```
 1    them.  We don't create cases.  And so you just don't have a

 2    definitive ruling.

 3            So I have to look at this, and I have to analogize in

 4    some instances and look at the law again.  And this isn't my

 5    first, as we say in San Antonio, Texas, rodeo with respect to      10:28AM

 6    environmental cases.  I have handled dozens of them, big ones,

 7    in Idaho, Hawaii, here, other places.  So I'm not unfamiliar

 8    with the area of the law.  So I will look again at it

 9    carefully.

10            All right.  Now, with respect to the motion to            10:28AM

11    supplement the record, I'm going to just rule on that.  I don't

12    need any argument on that.

13            There is another motion, and that has to do -- that is

14    a Motion For Partial Summary Judgment on the issue of the

15    remaining -- just a minute.  Let me get the exact wording        10:29AM

16    here -- relative recovery costs, claimed costs.  Yeah.  That

17    was the right wording.

18            All right.  Counsel, do you wish to address that?  For

19    some reason the word "claimed" is just --

20            MR. SWINDLE:  Your Honor, Shane Swindle.  Good            10:29AM

21    morning.

22            THE COURT:  Good morning.

23            MR. SWINDLE:  I have just one sheet that has some

24    numbers on it that are shifted a little bit but I think might

25    be useful.                                                        10:30AM
```

UNITED STATES DISTRICT COURT

1           THE COURT:  Sure.  Go ahead.

2           And I saw, for the record, that you provided counsel

3     with a copy of it.  Thanks.

4           MR. SWINDLE:  So defendants' first cost motion

5     challenged about $16 million of the $17 million that RID claims          10:30AM

6     to have incurred.  This motion was to challenge the rest of

7     RID's costs.  And when we filed it, that was about $1.17

8     million.  Since we filed it, two things have happened that have

9     changed the landscape a bit.

10           The first is that in response to the motion RID          10:30AM

11     withdrew just under $300,000 of the costs they have been

12     claiming in this category of district general response costs

13     that are in the top table of the sheet I just handed up to you.

14     So that reduces the amount that is at issue in this motion from

15     1.17 to $870,000.          10:31AM

16           The second change is, of course, the Court's November

17     22 order granting partial summary judgment on defendants' first

18     cost motion.  And part of the argument there had to do with --

19     there was first the roughly $15 million that nobody has paid

20     for, not RID or G&K or anybody else, and then, of course, there          10:31AM

21     was money in project funds which amounts to, I think, roughly

22     $732,000 under that first motion.

23           And the Court noted there that that, too, had not been

24     incurred by RID because the funds, the money that was in

25     project funds, came from third parties from the ADEQ through          10:32AM

1    reimbursements pursuant to state law and from settlements.

2          The Court also noted, however, that even if the money

3    in project funds was treated as belonging to RID, the result

4    would be exactly the same because RID cannot recover the same

5    response costs twice.  And that last point, the double recovery        10:32AM

6    point and the notion of -- the question of whether the funds,

7    the money in project funds belongs to RID has some application

8    here.

9          Because at the end of the day, there's going to be

10   some left over that we're not fighting about today.  If the           10:32AM

11   dollars in project funds founds are not treated as RID's money

12   then there's enough to offset what's left, and we're at zero.

13   If it's not treated as RID's money, which is one of the avenues

14   the Court followed in its November 22 order, then there will be

15   some left over.  So I wanted to make that clear at the outset.        10:33AM

16         Taking a look at the chart, I think this is all pretty

17   well set out in the papers so I'm going to move fairly quickly.

18   On the ADEQ oversight costs, that's the same argument we

19   already had on the first costs motion.  The only reason these

20   costs weren't included in that motion is we didn't have the           10:33AM

21   information yet.  So there's no difference.  This is, they were

22   not incurred by RID because they were not paid with RID's money

23   and RID has no non-contingent obligation to ever pay them.

24         With respect to the installation of replacement well

25   111, the argument there is that that well has been used from          10:33AM

1     the time it was drilled to supply irrigation water to RID's

2     customers.  It was used for a few days, or a week or two, to

3     supplement water while other wells were turned off during the

4     summer months.  But as the papers make clear, RID did not have

5     to use it at all.  It started the treatment or the testing          10:34AM

6     process of its well field that ADEQ required before it had ever

7     drilled replacement well 111-R, and then it decided to wait

8     more than a year to finish that process until it put in well

9     111-R.

10          And since it was drilled, it has been used exclusively        10:34AM

11    to provide water in the normal course of RID's business.  And

12    under the *Key Tronic* case and the *Santa Clara Valley* and *City*

13    *of Moses Lake* case cited in our papers, that sort of tangential

14    relationship to the remediation is insufficient.  These are

15    basically business costs, and they can't be passed off to the       10:34AM

16    defendants.

17          Finally, with respect to district general response

18    costs, on the paper I handed up I have given you a middle table

19    that breaks that down a little bit.  And this has been a moving

20    target and so it is a bit confusing.  But what it amounts to is     10:35AM

21    there's been double counting of some invoices that were

22    submitted by synergy.  We don't really think there's any

23    question about that.  It's in their Disclosure Statements and

24    the math doesn't work unless you include it twice.  And I don't

25    think -- I think that's just an inadvertent error, but it's an      10:35AM

 1    error nonetheless.

 2            Then there are all kinds of problems with the time

 3    records that were submitted to support the costs charged by law

 4    firms and a consulting firm.  Initially, those were mostly

 5    redacted and so when we deposed the superintendents they                10:35AM

 6    couldn't tell us what they were doing.  They have now been

 7    largely unredacted in response to this motion, but they are

 8    still exceptionally vague.  And RID chose to submit affidavits

 9    providing further explanation only with respect to $50,000.

10    The other $106,000 is still subject to all of the problems             10:36AM

11    pointed out in the papers.

12            So at the end of the day, you have that $50,000 where

13    they submitted affidavits where there probably is a fact

14    question we need to do some additional discovery.  And then you

15    have the $70,000 from the district capital costs and water            10:36AM

16    quality monitoring costs that we're not challenging at this

17    time.  So that's $120,000 that's left over.  But according to

18    the Kimball and Neese declarations submitted by RID, there's

19    $202,000 left in project funds.  So if that money belongs to

20    RID then RID has already recovered more than $150,000 that's          10:36AM

21    left.

22            Unless you have questions, Your Honor, I will reserve

23    the rest of my time for rebuttal.

24            THE COURT:  All right.

25            MR. BALINT:  Your Honor, I will go through the cost            10:37AM

```
 1    challenges in basically the same order, because I think this
 2    hand-up from defense counsel essentially matches the remaining
 3    costs table I submitted to the Court.
 4            THE COURT:  I think it does actually, yeah.
 5            MR. BALINT:  Yes.  And the first challenged category      10:37AM
 6    of costs is the ADEQ costs.  These weren't included in the
 7    first Motion for Summary Judgment.  I think it's because they
 8    recognize that these are significantly different from the other
 9    costs that were challenged in the first summary judgment
10    motion.                                                          10:37AM
11            These are costs that ADEQ -- that RID agreed to pay
12    and the agreement to conduct work with ADEQ.  I have a copy of
13    the page if I could hand up.  Your Honor, this page is an
14    excerpt from the record.  It's Paragraph 8 from the Agreement
15    to Conduct Work.  And that's the paragraph in which RID agrees  10:38AM
16    to reimburse ADEQ for these costs and reviewing and overseeing
17    the work that's proposed by RID.  This is not reimbursement of
18    other expenses that ADEQ incurs generally trying to remediate
19    problems out there at the site.  This is specifically the work
20    proposed by RID.                                                10:38AM
21            And this is an obligation that RID took on that exists
22    whether or not you have a Gallagher & Kennedy agreement.  This
23    is an existing obligation.  There's nothing speculative or
24    conditional about this.  That's why it's different from the
25    costs that the Court looked at in the first instance.           10:38AM
```

1          This is -- I think the Court has acknowledged before

2    that the focus is properly -- is not on what's actually paid

3    but whether an existing obligation is incurred.  And that's

4    what was done by virtue of this agreement here.  Again, if

5    this -- the Gallagher & Kennedy would provide no defense were          10:39AM

6    ADEQ to come calling on this obligation.  So that's why it is

7    different from the first summary judgment motion.

8          And now, assuming the Court will grant the

9    supplemental the motion 453(e) motion.

10          THE COURT:  I am going to grant the motion to          10:39AM

11    supplement the record.

12          MR. BALINT:  Then the record is clear that these costs

13    were ultimately paid out of project funds that were contributed

14    by RID, either check or by direction.

15          THE COURT:  There's no surprise in any of those          10:39AM

16    documents.

17          MR. BALINT:  No.  And it was addressed in the hearing.

18          THE COURT:  That's right.

19          MR. BALINT:  But I think one thing has been getting

20    overlooked is that G&K did -- was acting as RID's agent          10:40AM

21    throughout the time, at the same time it signed this agreement

22    to conduct work and at the same time it made those payments out

23    of the trust fund for the -- to the ADEQ.

24          The next category of costs, I think this is very

25    clearly your classic issue for disputed fact issue precluding          10:40AM

 1    summary judgment, Your Honor.  This is the Task 2 costs

 2    incurred with respect to drilling well 111 R.  And Mr.

 3    Shirley's declaration in particular lays out the background on

 4    that.  It's called Task 2 because when the ADEQ approved RID's

 5    MERA -- I'm sorry, no, when he approved the ERA, early response    10:40AM

 6    action, it said it did so conditionally and it provided, in the

 7    approval letter, which was part of the record, specific tasks

 8    that it wanted accomplished.  And Number 2 task was a well

 9    investigation because ADEQ wanted to know how will this

10    proposed response action affect the water quality and the water    10:41AM

11    levels in the aquifer.

12         So it proposed -- so it, as a result of extensive

13    negotiations, and Mr. Shirley lays out between Synergy and ADEQ

14    and RID was a plan developed to conduct this well

15    investigation.  Mr. Shirley makes clear, the record is clear,    10:41AM

16    Your Honor, that prior to that condition being imposed by ADEQ

17    RID had no intentions or plans for drilling a replacement well

18    for 111.  But it also became clear that if you were going to do

19    this very intrusive well investigation, it had to have backups

20    because it could possibly affect its water supply to other    10:41AM

21    customers.

22         So in the end -- in the beginning well 111-R had sort

23    of a supporting role in the investigation but it was a role

24    nonetheless.  But the record also shows, Your Honor, that in

25    the end, well 111-R was actually selected by the ADEQ as one of    10:42AM

the wells to be tested in the well investigation.  So for the

defendants to say that we can't recover any of the costs for

well 111-R because it was not tied at all -- that's what they

said in their opening brief -- and later in their reply they

say well, only for a few days, is wrong.  It is, at a minimum,

a disputed fact issue.

THE COURT:  They say it was used but it wasn't

necessarily used.  I almost got the impression that they were

suggesting it was used solely for purposes of justifying its

existence.

MR. BALINT:  Yes, but the record shows, Your Honor,

when that happened it was proposed as part of the well

investigation because this is a very -- again, you will see

from the exhibit in Mr. Shirley's declaration it is a very

involved testing process they were talking about, this well

investigation.  And it was needed as a backup.  And I suppose

their argument is, well, this is sort of like needing part of

an investigation to build an access road somewhere and then

after it's built then you use the access road.

Well, that may be so, but that doesn't mean that the

access road itself wasn't built as part of the project.  And

especially when here, using the wells -- the analogy breaks

down -- but using the wells here, the well is actually

literally used as part of the testing of the well investigation

process because they wanted to see what would happen with a new

1    well.

2         So that is in the record in Mr. Shirley's declaration.

3    I don't know how the Court can summarily declare that well

4    111-R on this record was not tied to the investigation that was

5    being conducted as directed by the ADEQ in the second task to      10:43AM

6    their approval of ERA.

7         With respect to the general response costs, Your

8    Honor, one principal challenge is that Mr. Ashby, who was the

9    initial -- initially involved superintendent for RID, that he

10   did not keep contemporaneous time records of the time and        10:44AM

11   effort devoted to the response actions to the investigation and

12   so forth.  And that's true.  He didn't keep contemporaneous

13   time records.  So but we have proposed a reasonable way of

14   calculating that.  And it's not -- it would not be appropriate

15   to grant summary judgment by saying, well, because you don't      10:44AM

16   have contemporaneous time records there's no other evidence

17   that could be submitted.  Mr. Ashby himself testified in his

18   declaration about the time spent.  Ms. Young, the accountant,

19   in her declaration explains why that is.  And Mr. Shirley, in

20   his declaration, submits his records which corroborate what Mr.    10:44AM

21   Ashby is saying.  So I don't think it would be appropriate to

22   summarily say we can't recover any of Mr. Ashby's time just

23   because he does not have contemporaneous time records.

24         Your Honor, the next -- well, another challenge to the

25   general response costs are basically that they -- the            10:45AM

1    defendants find confusing our submission, our Disclosure

2    Statement submission of the costs that we were claiming.  And

3    what we tried to do is tally up all the costs and in subsequent

4    productions we provide background documentation for that.  And

5    I admit it's been a refining process and we have gone through          10:45AM

6    it in several supplemental disclosures and we have lined out,

7    taken items out and so forth, refined the point.  Now it's

8    refined, however, to the point where we have identified only

9    those that they have challenged.  We took all those out that

10   were irrelevant.  We mooted all that.  We focused on those that    10:45AM

11   were only specifically related and that we claim now to

12   recover.  And with respect to each of those, we have submitted

13   declaration testimony explaining what they are.

14         It's kind of been put in an odd situation because what

15   they have done is they have essentially taken some redacted       10:46AM

16   entries from the records that were submitted, the backup

17   declarations that were submitted and said, well, we don't

18   understand these, so Your Honor shouldn't allow any costs to be

19   recovered.  What we have done is focused on the ones that they

20   said they didn't understand.  To the extent they are still        10:46AM

21   claimed, we have explained those.

22         Remember, Your Honor, this is a context where we

23   haven't even completed fact discovery.  And they haven't

24   deposed anybody from either law firms to say, well, we don't

25   understand what your time entries are.  In fact, we went ahead     10:46AM

1    and provided them with unredacted copies of the time entries,

2    the lawyers' time entries, and to the extent there's any

3    remaining doubt on that can be fleshed out in discovery.

4           THE COURT:  Thank you very much, counsel.

5           MR. BALINT:  Can I make one remaining point?  With          10:46AM

6    respect to this contention somehow all this is offset by

7    receipts that RID has --

8           THE COURT:  I remember that argument.

9           MR. BALINT:  Yes.  And it's a serious one but it's a

10   premature one because the statute provides for only four          10:46AM

11   statutory defenses, and offset is not one of them.  So what

12   they are really talking about, and we brought up the cases in

13   the brief.  What they are really talking about are equitable

14   defenses that they are free to assert if and when we get to the

15   contribution stage and if and when the Court, at that time,       10:47AM

16   determines that it's willing to undertake some sort of

17   equitable allocation of those costs.

18          And finally, most important, too, with respect to

19   monies that ADEQ -- that RID has received from the ADEQ,

20   because those monies are explicitly made reimbursable to the      10:47AM

21   ADEQ to the extent that money for those same costs is recovered

22   from some third party.  So the point is, Your Honor, the

23   whole -- that whole system is structured in a way to prevent a

24   double recovery, to prevent any sort of windfall for RID and to

25   prevent the taxpayers from sheltering those costs, which are      10:47AM

1    more appropriately placed on the PRPs.

2            Unless the Court has any other questions.  Thank you.

3            THE COURT:  Thank you.

4            You reserved some time, counsel, just briefly.

5            MR. SWINDLE:  Your Honor, with respect to the sheet I          10:48AM

6    handed up, just to make sure I'm clear.

7            THE COURT:  Sure.

8            MR. SWINDLE:  The $70,000 for district capital costs

9    and water quality monitoring costs, we're not challenging those

10   further here, but we certainly do intend to challenge them.          10:48AM

11   And with respect to the affidavits that RID has submitted on

12   the district general costs, as I mentioned, those only cover

13   $50,000 of the time challenged.  So the challenges remain as to

14   everything else.

15           THE COURT:  Well, their point is that your challenge          10:48AM

16   to a substantial number of these costs is premature, that there

17   are genuine issues of material fact with respect to those

18   issues.  And that's -- even in environmental cases that remains

19   the gold standard for summary judgment.

20           MR. SWINDLE:  And as to the $50,000, we agree.  We            10:48AM

21   think more discovery will be needed in light of the affidavits.

22   But in light of the remaining support that they have provided,

23   we think summary judgment is appropriate now.  They haven't met

24   their burden of persuasion at this stage.

25           Let me turn quickly to the ADEQ costs.  First, if            10:49AM

1    you -- he reads to you that RID has undertaken an agreement to

2    pay this, but as he knows, Gallagher & Kennedy, in its

3    agreement with RID, explicitly agreed to cover these

4    reimbursement payments to ADEQ at no cost to RID.  And the fee

5    agreement, the relevant portion that's quoted by the Court at          10:49AM

6    Page 23 of the November 22 order, where it says there are

7    necessary allocations in such project funds and payments which

8    G&K is undertaking at no cost to RID including the satisfaction

9    of certain reimbursements to ADEQ.  Those are the

10   reimbursements that are at issue here.                                 10:50AM

11        Then in addition, on the ADEQ oversight costs, under

12   the *KFD Enterprises* case cited in our papers and also cited by

13   RID in its opposition to the NCP, in a 107 action like this,

14   RID cannot recover reimbursement payments that it makes to ADEQ

15   to cover ADEQ's response costs.  Those are not RID's response        10:50AM

16   costs and so they are not recoverable in any event.  And that's

17   independent of the incurred arguments with respect to project

18   funds.

19        I have talked about the district general response

20   costs, so let me just touch briefly on well 111-R.  In the           10:50AM

21   papers we quote explicitly from the back and forth with ADEQ,

22   and they make it clear that they are giving RID discretion to

23   conduct these tests in the winter months when demand is low and

24   when most of the wells are turned off.  RID decides, on its

25   own, it's not required, to finish those tests in the summer and      10:51AM

```
 1    use well 111-R for a brief period to enhance those tests.  But

 2    the point of the well investigation was to see if the pumping

 3    of RID's existing wells removed the plume.  So it's not logical

 4    to contend that drilling a new well was necessary to evaluate

 5    what would happen when the other wells were pumped.  And in any      10:51AM

 6    event, since they drilled it, they have used it as part of

 7    their normal business.  There's no dispute about that.  That's

 8    in the record.  And they have sold the water that they have

 9    pumped to their customers.

10              Under the Santa Clara Valley case cited in our papers,    10:51AM

11    if the Court has any question then there would be a fact issue

12    here about whether there's double counting because the

13    customers paid for that well and for the water from it.

14              So at bottom, there's a very tangential relationship

15    between well 111-R and the remediation.  And under the case law     10:52AM

16    in Key Tronic, that's not sufficient.  It's a business charge

17    and it shouldn't be treated as a response cost.

18              I have nothing else unless you have questions.

19              THE COURT:  Thank you very much.  I think that is it

20    for today.  I will do my very best to get my rulings out           10:52AM

21    consistent with making sure that I am as correct as I can be

22    in as expeditious a fashion.  But I do want to go back and look

23    at the materials, and I think you would want me to go back and

24    look at the materials again in light of your arguments today,

25    and in light of some concerns I have.  I won't address which       10:52AM
```

1    concerns, but some concerns I have.

2         I think some of you have been before me.  I see one or

3    two of you in the audience that have been before me.  I have

4    sat here in Arizona for 27 or 28 years, in Phoenix and Tucson,

5    you know I get the stuff out as quickly as I can.  But I also          10:53AM

6    sit on the Ninth Circuit on a pretty regular basis, and I have

7    for 25 years and -- by designation.  I'm very privileged to be

8    able to do that.  And I have one of those sittings coming up,

9    actually, in Pasadena.  So that's going to take me out of the

10   box a little bit; not a lot but a little bit.  Although I have          10:53AM

11   got a humdinger of a case, I can tell you that, that I'm

12   responsible for.  Nothing to do with the environmental law.

13        I wanted to address something because it was asked of

14   me by a District of Arizona judge, and I won't mention which

15   one.  I was at a program, actually in Tucson about -- was it          10:54AM

16   about a month ago?  About a month ago.  And one of the judges

17   who is familiar with this case asked me whether the parties had

18   ever attempted mediation.  And to be honest with you, I didn't

19   have an answer to that.  Has mediation ever been attempted in

20   this case?                                                             10:54AM

21        MR. BARKETT:  It has, Your Honor.

22        MR. SWINDLE:  It has, Your Honor.

23        THE COURT:  Totally unsuccessful and without any

24   potential for restarting the process?

25        MR. BALINT:  Your Honor, I think there's always                   10:54AM

1    potential for restarting.  I think we did have some sessions.

2         THE COURT:  You are farther along.  There have been

3    some rulings.

4         MR. BALINT:  And we are farther along now so we would

5    be very willing to participate in something like that.          10:55AM

6         MR. SWINDLE:  We had a mediation earlier with

7    Professor McGovern, came in and assisted with it.  And I'm sure

8    if the plaintiffs are interested in speaking further the

9    defendants would be happy to talk.

10        THE COURT:  I mean, I don't know whether you want to     10:55AM

11   wait for me to make a ruling here or whether it doesn't -- it

12   isn't going to change the landscape one way or the other

13   because either you agree with what my rulings are or you don't.

14   I'd like to think everybody agrees, but they don't.

15        You know, as I was flying here from San Antonio, I was    10:55AM

16   thinking to myself, when, again, refreshing myself with these

17   papers, I never thought I would look back with nostalgia on the

18   *Pinal Creek* case, but unfortunately I am.  Because I think the

19   issues in that case, while they were difficult, were more

20   easily defined in some regards.  And we had a lot more law than   10:56AM

21   we do in some of the areas here.

22        And so this is one of those very difficult cases where

23   as a judge, you just have to make the best decision you can.

24   And then if somebody appeals it, they appeal it.  I mean,

25   that's the process, and I believe in that process.  I          10:56AM

```
 1    participate in that process very actively from the other side.

 2    So I certainly don't dissuade anybody from doing that.  But

 3    then this case could end up like Pinal Creek and go on for --

 4    how many years?  14 years?

 5              MR. SWINDLE:  You were on the case for 14 years, Your     10:57AM

 6    Honor.  It lasted for 19 years.

 7              THE COURT:  19 years.  Good grief.  I remember one of

 8    the lawyers saying to me, you know, Judge our kids grew up and

 9    went to college while we were working on this case, and they

10    did.                                                               10:57AM

11              MR. SWINDLE:  I can confirm that.

12              THE COURT:  And they actually went on to law school,

13    in my case, two of them.  And one got an MBA.  So what can you

14    say.

15              All right.  I will do my best to get this out as         10:57AM

16    quickly as I can.  Don't expect it next week, okay.  It isn't

17    going to happen.  But I will get it out as quickly as I can,

18    and I will make sure that it's a thorough written decision as I

19    try to do in all of my cases.  You are not going to get one of

20    these three-page the Court has reviewed the papers and here is     10:57AM

21    the result.  That's not fair.  You have put a lot of work into

22    this and you deserve to know why I'm ruling.  And, quite

23    frankly, if it goes up on appeal, if you are not able to

24    resolve it, the appeals court is entitled to know why I made a

25    ruling.  I mean, you know, there's a lot of judges who think       10:58AM
```

```
 1    that is a bad precedent because then it just gives the appeals

 2    court more opportunity to pick apart your reasoning.  And maybe

 3    there's some merit to that, but I have never believed in it.  I

 4    will never believe in it.  I think it's the right thing to do.

 5    And I never liked it when I was a trial lawyer and I had a big      10:58AM

 6    motion and I got a three-page -- even if I won -- a three or

 7    four-page ruling because I had to try to defend that on appeal.

 8    It's not easy.

 9            Anything else, counsel?

10            MS. CARFORA:  Your Honor, if I could have one minute.      10:58AM

11    Debra J. Carfora on behalf of the Department of Energy.

12    There's just one small procedural matter.  We thought it was

13    appropriate to bring to your attention that on December 16th

14    there were two cases that were related to these facts that had

15    been filed in the District of Arizona.  Both cases are             10:59AM

16    currently in front of Judge Tuchi and as my last review of the

17    docket, none of the defendants have been served.  But there's

18    some significant overlap and we just wanted to make sure you

19    were aware that was out there.

20            THE COURT:  Well, somebody's got to move to transfer       10:59AM

21    them to me.  And the judge may or may not agree.

22            MS. CARFORA:  Yes, Your Honor.

23            THE COURT:  You know, I don't know this judge,

24    actually.  Is this a new judge?

25            THE COURTROOM DEPUTY:  Fairly new.                         10:59AM
```

```
1              THE COURT:  How new is fairly new?

2              THE COURTROOM DEPUTY:  Maybe two years.

3              THE COURT:  Okay.  So I don't -- I am embarrassed to

4    tell you that I truly don't know him because I haven't been

5    sitting in Arizona as often as I did because they got their

6    judges so they don't need help.  And quite frankly, I'm

7    carrying a full caseload in San Antonio, which is the second

8    busiest district in the United States, civil and criminal, plus

9    a huge caseload in Austin, plus half the civil cases in Midland

10   Odessa, plus this, plus the Ninth Circuit.  So I didn't have a

11   lot of time to come and do sentencings and other things that I

12   did here in Arizona.  So I don't know him.  But I think

13   somebody would have to move to transfer the case, and then

14   there may be res judicata issues involved.  I don't know.

15             So it would seem -- now, I'm not asking for extra

16   work, believe me, but it would seem like that would make sense.

17   But there may be reasons why he wants to keep the cases.  And

18   it's not for me to tell him -- I mean, I can't issue a writ of

19   certiori and pull the case away from him.  Do you understand?

20             So if the party or parties believe the case should be

21   transferred here, they need to make that motion in front of

22   him.  He will then contact me and find out if I'm willing to

23   take it.  If it's carefully related to this case and it

24   overlaps the chances are very good that I would.

25             And then we'll go from there.  You can reflect that to
```

10:59AM

11:00AM

11:00AM

11:00AM

11:01AM

1    him in your motion.

2            MS. CARFORA:  Okay.  Thank you, Your Honor.

3            THE COURT:  All right.

4            Yes, sir.

5            MR. WORSHAM:  My name is Jerry Worsham.  I'm                    11:01AM

6    representing Meritor.

7            Your Honor, I wanted to point out one case of

8    supplemental authority that I happened to find in review of

9    some pleadings that were filed in the defendants' case for the

10   NCP compliance matter.  We cited two cases, *K.V.L. Corp versus*       11:01AM

11   *Holson Co.* and *Angus Chemical Company versus Mallinckrodt.*

12   That's on Page 19 of 20.

13           In review of those cases, there was a particular case

14   cited by both of those as it relates to the importance of the

15   baseline risk assessment and the no-action alternative, which I       11:01AM

16   think is very on point on this case.  The case cite is *Channel*

17   *Master Satellite.*

18           THE COURT:  Is it a district court case?

19           MR. WORSHAM:  Yes, sir, it's a district court case on

20   point.                                                                 11:02AM

21           THE COURT:  Do you know about this case?

22           MR. BALINT:  No, Your Honor.  He's referring to a case

23   referred to in some cases cited to the Court.  If you are going

24   to accept any supplemental case law, we would like an

25   opportunity to look at it and brief it.                               11:02AM

1              THE COURT:  Here's what I would suggest, counsel.  I

2    will give you the opportunity to cite the case to the Court,

3    just the citation.

4              MR. WORSHAM:  Yes, sir.

5              THE COURT:  And very brief reasoning why you think        11:02AM

6    it's important.

7              MR. WORSHAM:  Yes, sir.

8              THE COURT:  And I will give you, counsel, three days

9    within -- if he's only citing a case -- within which to respond

10   to that.                                                           11:02AM

11             MR. BALINT:  Thank you, Your Honor.

12             THE COURT:  All right.

13             MR. WORSHAM:  What would you like me to title that?

14   Supplemental Authority?

15             THE COURT:  Yeah.  That's fine.  I think we all know     11:02AM

16   what it is.  No secret here.

17             Anybody else?  Anything else?  We don't all get

18   together.  In fact, we don't even have everybody here but we

19   don't get together all that often.  If there's anything else

20   I'm more than happy to address it.                                 11:03AM

21             MR. BALINT:  I don't believe so.

22             MR. BARKETT:  Motion to Supplement the Record?

23             THE COURT:  I have already said I'm going to grant

24   that motion.  You are talking about the Motion to Supplement

25   Authority?  I'm granting that motion because there's no            11:03AM

```
 1   surprises here.  Everybody knows what those are.

 2            MR. BARKETT:  I didn't hear.

 3            THE COURT:  You didn't hear me?

 4            MR. BARKETT:  I didn't hear you earlier say you were

 5   granting it.                                               11:03AM

 6            THE COURT:  Believe me.  I have sinus problems.  I

 7   know how that is.  It's not fun.

 8            MR. BARKETT:  Thank you.

 9            THE COURT:  It's not fun.

10            Yes, sir?  I'm sorry.                             11:03AM

11            MR. BALINT:  No, Your Honor.  I believe we're done.

12            THE COURT:  We're done.  Okay.  I will let you get to

13   the plane.

14            Thank you very much.  Court stands in recess.

15            (Proceeding concluded at 11:03 a.m.)              11:03AM

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4                    C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 7th day of March,

15  2017.

16

17                              s/Laurie A. Adams

18                              _____
                                 Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT