1            UNITED STATES DISTRICT COURT

2                DISTRICT OF ARIZONA

3

4  Roosevelt Irrigation District,  )
                                    )
5            Plaintiff,             )
                                    )
6  vs.                             )   CV-10-00290-PHX-DAE-BGM
                                    )
7  Salt River Project Agricultural )
   Improvement and Power District, )
8  et al.,                         )
                                    )   Tucson, Arizona
9            Defendants.            )   December 6, 2017
   _____ )   10:38 a.m.

10

11            TRANSCRIPT OF STATUS CONFERENCE
         BEFORE THE HONORABLE BRUCE G. MACDONALD
12              UNITED STATES MAGISTRATE JUDGE

13  For the Plaintiff:
         Mr. Andrew S. Friedman
14       Mr. William G. Fairbourn
         Mr. Van Bunch
15       Bonnett Fairbourn Friedman & Balint, PC – Phoenix, AZ
         2325 East Camelback Road, Suite 300
16       Phoenix, AZ  85016

17  For Defendant SRP:
         Mr. David J. Armstrong
18       Ballard Spahr, LLP – Phoenix, AZ
         1 East Washington Street, Suite 2300
19       Phoenix, AZ  85004

20       Mr. Michael O'Connor
         SRP General Counsel

21

22  Proceedings recorded by mechanical stenography, transcript
   produced by computer.

23
                    Aaron H. LaDuke, RMR, CRR
24              Federal Official Court Reporter
                    405 W. Congress St.
25               Tucson, Arizona  85701

```
 1  APPEARANCES CONTINUED:

 2  For Defendant Honeywell International, Inc:
         Ms. Karen S. Gaylord
 3       Jennings Haug & Cunningham, LLP
         2800 North Central Avenue, Suite 1800
 4       Phoenix, AZ  85004

 5       Mr. Sean A. McCormick
         Arnold & Porter Kaye Scholer, LLP – Los Angeles, CA
 6       777 South Figueroa Street, 44th Floor
         Los Angeles, CA  90017

 7
    For Defendant City of Phoenix:
 8       Mr. Christopher D. Thomas
         Perkins Coie, LLP – Phoenix, AZ
 9       P.O. Box 400
         Phoenix, AZ  85001

10
    For Defendant Univar USA, Inc.:
11       Mr. Gregory T. Hixson
         Veris Law Group, PLLC
12       1809 7th Avenue, Suite 1400
         Seattle, WA  98101

13
    For Defendants Kinder Morgan Energy Partners LP and Nucor
14  Corporation:
         Mr. Scott K. Ames
15       Fennemore Craig, PC – Phoenix, AZ
         2394 East Camelback Road, Suite 600
16       Phoenix, AZ  85016

17  For Defendants APS, Dolphin, Inc., and ITT Corporation:
         Mr. Mitchell J. Klein
18       Snell & Wilmer, LLP – Phoenix, AZ
         One Arizona Center
19       400 East Van Buren
         Phoenix, AZ  85004

20
    For Defendant County of Maricopa:
21       Ms. Ann T. Uglietta
         Mr. J. Kenneth Mangum
22       Maricopa County Attorney's Office
         222 North Central Avenue, Suite 1100
23       Phoenix, AZ  85004

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Corning, Inc.:
          Mr. Shane R. Swindle
 3        Perkins Cole, LLP
          P.O. Box 400
 4        Phoenix, AZ  85001

 5   For Defendant Meritor, Inc.:
          Mr. Jerry D. Worsham, II
 6        Cavanagh Law Firm, PA
          1850 North Central Avenue, Suite 2400
 7        Phoenix, AZ  85004

 8   For Defendant Milum Textile Services Company:
          Mr. Roger W. Strassburg, Jr.
 9        Resnick & Louis, PC
          8111 East Indian Bend Road
10        Scottsdale, AZ  85250

11   For Defendant Prudential Overall Supply:
          Mr. Stanley B. Lutz
12        Lewis Roca Rothgerber Christie, LLP – Phoenix Office
          201 East Washington Street, Suite 1200
13        Phoenix, AZ  85004

14   For Defendant Union Pacific Railroad Company:
          Mr. William W. Pearson
15        Pearson Law Group, LLC
          9375 East Shea Boulevard, Suite 100
16        Scottsdale, AZ  85260

17   For Defendant United States Department of Energy:
          Ms. Samara M. Spence
18        United States Department of Justice
          601 D Street NW
19        Washington, DC  20011

20   For Defendant Air Liquide America Specialty Gases, LLC:
          G. Van Velsor Wolf, Jr.
21        Mr. Michael K. Foy
          Salmon Lewis & Weldon, PLC
22        2850 East Camelback Road, Suite 200
          Phoenix, AZ  85016

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Textron, Inc.:
          Ms. Emily J. Atherton
 3        Booth, LLP
          1849 Sawtelle Boulevard, Suite 500
 4        Los Angeles, CA  90025

 5   For Defendant Freescale Semiconductor, Inc.:
          Mr. Sergio E. Pagliery
 6        Shook Hardy & Bacon, LLP - Miami, FL
          2400 Miami Center
 7        201 South Biscayne Boulevard
          Miami, FL  33131
 8
     For Defendant Reynolds Metals Company:
 9        Ms. Juliet Markowitz
          Tatro Tekosky Sadwick, LLP
10        333 South Grand Avenue, Suite 4270
          Los Angeles, CA  90071
11
12                          * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        P R O C E E D I N G S

2          THE CLERK:  Civil 10, Case No. 290, Roosevelt

3   Irrigation District versus Salt River Project, et al., is

4   before this Court for a status conference.

5       And do you want everyone to state their appearance?

6          THE COURT:  No.  That's good enough.

7          THE CLERK:  Okay.

8          THE COURT:  Good morning, everyone.  Welcome to

9   Tucson, Arizona.  We appreciate you coming down.

10      It's my understanding everyone has signed in, and if you

11  haven't signed in, please make sure that you do sign in.  And

12  we are here at a status conference following our conversation

13  with Judge Ezra awhile back in Phoenix.

14      What I thought I would do is -- I really appreciate the

15  joint status report, which I believe set forth all of the

16  pending issues pretty clearly, and what I would like to do is

17  just sort of go through the joint status report, discuss where

18  we're going.

19      And I know you all are very, very good at this, but just

20  remember when we're addressing you, if you speak, please

21  identify who you are, even though I know, and who you

22  represent so that Aaron, our court reporter, can get it down

23  properly.

24      So it's my understanding that there was an issue

25  initially as to whether or not the plaintiff, the Roosevelt

1    Irrigation District, was going to appeal the Court's September

2    30th, 2016 order denying Roosevelt Irrigation District's

3    motion for a protective order, and it's my understanding

4    there's been a decision that that will not be appealed and

5    that issue is no longer on the table.  Is that correct?

6         MR. FAIRBOURN:  Yes.  Greg Fairbourn for RID.  And

7    your understanding is correct.

8         THE COURT:  Okay.  Thank you.  And good morning, Mr.

9    Fairbourn.  Thank you.

10        The next issue has to do with discovery, and the first

11   discovery issue has to do with the privileged information.

12   And it's my understanding that the first thing we need to deal

13   with is the form, scope, and timing of the respective

14   privilege logs and then the parties' respective challenges, if

15   any, to any objections to disclosure based upon

16   attorney-client privilege or the work product doctrine.  And

17   the parties have proposed that briefing on that be filed by

18   December 20th.  I think the report said 2018.  I know you

19   meant 2017.

20        And it's my understanding that in all likelihood -- and I

21   just need to know how you intend to proceed with the briefing,

22   if the defendants are going to file a brief and then the

23   plaintiffs or it's going to be simultaneous briefing or just

24   however you want to do it.

25        Mr. Fairbourn, I'll hear from you first.

1          MR. FAIRBOURN:  Yes.  Greg Fairbourn for RID.  And we

2   would ask that it be simultaneous.

3          THE COURT:  Okay.  And I'll hear from the defendants.

4      And I don't know, Mr. Thomas, if you're taking the lead

5   here.

6          MR. THOMAS:  Chris Thomas for the City of Phoenix,

7   and I will take the lead until they boot me out.

8      I think simultaneous is fine, and I am cautiously

9   optimistic that we will reach agreement with counsel for RID

10  on the nature of the privilege logs to be disclosed.  I

11  suspect we'll thereafter have a dispute about whether they

12  have a compelling need to require work product to be

13  disclosed, but we can deal with that in phase two, I guess.

14         THE COURT:  Yeah.  I would figure that may be an

15  issue.

16     So then what we'll do is there will be simultaneous

17  briefing on the scope, timing of the -- form, scope, and

18  timing of the privileged information.  And the briefing as

19  you've described it is re content and deadline for privilege

20  log issues, document versus categorical, description of

21  categories, deadline for service of logs, et cetera.  I think

22  you all know what you're talking about.  So we're going to ask

23  that simultaneous briefing occur, as suggested by the parties,

24  on December 20th, 2017.

25     Is there anything else -- and please pipe in if I'm

1   forgetting anything.  Is there anything else on that issue

2   that we need to address?

3        MR. FAIRBOURN:  Yes.  Greg Fairbourn for RID.

4      We would suggest a response in I don't want to say five

5   days but maybe ten days.  Five days would be Christmas, and

6   I'm not going to work on Christmas.

7        THE COURT:  I'll leave it up to you guys.  I mean,

8   whatever you want.

9      Mr. Thomas, on behalf of the defendants, give us a

10  response time.

11       MR. THOMAS:  Chris Thomas.  Ten days sounds

12  reasonable to us as well.

13       THE COURT:  Okay.  That's fine.  So that is good.

14     Then we have some additional issues identified initially

15  by Mr. Fairbourn on behalf of the plaintiffs.  The first issue

16  is fact discovery related to the cross-claims, and what I'm

17  going to do on that issue is just let you make your record on

18  that to the extent you want to.

19     So let me hear -- Mr. Fairbourn, I don't know if you're

20  taking the lead on everything today, but I think the first

21  issue -- and once again, if I'm not doing this in the

22  chronological fashion that you would like, please tell me, but

23  I think that's the next thing is fact discovery related to the

24  cross-claims.

25       MR. FAIRBOURN:  Yes.  Thank you, Your Honor.  Greg

1  Fairbourn.  And we're going to split it up, so you're not

2  going to have to deal with me all morning.

3        THE COURT:  I'm happy to hear from you,

4  Mr. Fairbourn.

5        MR. FAIRBOURN:  Regarding the cross-claims, we

6  believe that Judge Ezra has already spoken about that and that

7  that's a decision that's already been made.

8      As far as what we expect to do as we go forward with the

9  30(b)(6)s, our designations include asking questions that the

10  defendants believe may go to the cross-claims, but we believe

11  we're still entitled to ask those questions, such as what

12  evidence or information or facts -- let's say facts because

13  this is during the facts part of the schedule -- what facts

14  the defendants might have about another defendant.  And we

15  certainly are entitled to go into that.  That's just basic

16  when you have multi parties, so that should not be limited in

17  any way because of what Judge Ezra has already done.  Thank

18  you.

19        THE COURT:  Okay.  Thank you.

20      And Mr. Thomas or someone else.

21        MR. THOMAS:  Chris Thomas again, Your Honor.

22      I think both the cross-claim scope of discovery issue and

23  the settlement issue are intertwined, and given the filings by

24  Spinnaker and the Gallagher & Kennedy firm as a result of

25  Judge Ezra's issue on who incurred what costs, this case is

1   now worth I think $247,000 or so is the remaining amount in

2   controversy for past costs that can be incurred by RID.

3          There's also, of course, a claim for declaratory relief

4   with respect to future costs, but I think the record is that

5   RID is not going to be incurring any of those future costs.

6   Spinnaker or perhaps Gallagher & Kennedy will.

7          So really this is a $247,000 case involving I think 20

8   standing defendants now, and given that, we don't think it

9   makes sense to have the cross-claims actively litigated

10  against each other.  This is not an amount in controversy that

11  would normally justify dozens of depositions that you might

12  see in a normal CERCLA case.  That might be appropriate in the

13  other cases.  The complicating factor there, of course, is

14  that in the Gallagher & Kennedy case, there's an overlapping

15  but not identical set of defendants, and the parties with whom

16  Gallagher had a potential disqualification issue are not

17  parties to that case.  That also complicates the settlement

18  issue when we talk about that.  But we just don't think that

19  the time available or the level of effort, given the amount of

20  controversy, is appropriate to have everyone go full bore.

21         The other complicating factor, of course, is that in

22  addition to this only being a $247,000 case, that's the

23  maximum recovery before considering whether any defendant can

24  succeed in avoiding joint liability either because they can

25  demonstrate divisibility of harm or another basis for

1  apportioning harm.

2      Again, the unrecovered past costs, to the extent they

3  relate to treatment at individual RID wells, it's likely that

4  there will be expert testimony explaining whether it was

5  possible for contaminants, assuming there were some, from

6  individual facilities to go to any given well.  If not, I'm

7  sure that you'll hear that people think that they shouldn't be

8  required to pay for treatment costs in a well that they could

9  not possibly have impacted.

10     At a minimum, I suspect that you will hear from people

11  whose facility is located down gradient of any well for which

12  treatment RID claims is necessary shouldn't be held

13  accountable for that.

14     So we've got a very modest amount in controversy; we've

15  got additional issues regarding divisibility and apportionment

16  that will further reduce the amount in controversy for

17  individual parties; and given that, just full-blown litigation

18  of cross-claims doesn't seem like an appropriate issue in this

19  case.  If that's to take place, it would more appropriately

20  belong in one of the other two cases where the future remedy

21  costs will be in play.

22        MR. SWINDLE:  Your Honor, can I add just a point or

23  two?  Shane Swindle for Corning.

24     So the case has been phased from the very beginning, so

25  for the last five or six years, my client, for example, has

 1   done no work on that question.  And to ask us to now try to do

 2   all of that in 90 days seems unreasonable, frankly.  And then

 3   these are contribution cross-claims, and until someone's held

 4   liable, there's no need to pursue them.  So, just as a matter

 5   of efficiency and in accordance with Rule 1, we really

 6   shouldn't spend time or money on these until and unless it's

 7   necessary.

 8           MR. THOMAS:  Chris Thomas again, Your Honor.

 9      I forgot to mention, and I think this is in our status

10   report, but of course, under CERCLA, one is allowed to wait

11   until after judgment against it to pursue a contribution

12   counterclaim.  So, you know, we had sort of protective

13   contribution cross-claims filed in here, but there would be

14   nothing precluding the parties to wait until after this case

15   is over and pursue cross-claims with whatever vigor makes

16   sense given the amount in controversy or any judgment in favor

17   of RID.

18           THE COURT:  Okay.  Thank you.

19      Anyone else on behalf of the defendants?

20      Mr. Fairbourn.

21           MR. FAIRBOURN:  Yes, Your Honor, just briefly.

22   Number one, Judge Ezra clearly said the stay is lifted as to

23   the cross-claims.  If you look at page 23 through 26 of the

24   transcript of the last hearing in this matter, there wasn't

25   any doubt about, by the time we finished the hearing, that

1  that's what his order to these folks were.

2      The number two point I would like to make is, whether

3  there's a large claim or a small claim, a plaintiff is

4  entitled to find out what facts the defendant has, and this

5  would be no different than a common automobile accident where

6  there are multiple cars involved.  We would be entitled to

7  question one defendant about the conduct of another defendant.

8  And that's what we're trying to do or want to do in our

9  30(b)(6)s, where we've drawn a bunch of objections that are

10  probably still to be worked on, but that's the current status

11  of what we've heard from the defendants.

12      So we don't want the lack of their being able to file any

13  cross-claims to in any way limit our inquiry, yet that's the

14  position that's been taken in the correspondence that's been

15  exchanged.

16      Finally, regarding the other two cases, it was my

17  understanding -- I was not at the hearing the last time, but

18  I've read the transcript carefully, and it was my

19  understanding that those parties are going to be folded in and

20  that one of the tasks that was left to be completed is to

21  determine how they're folded in.  So they will all be part of

22  the discovery as we go forward at some point in time.

23      Last point, and that is that if there are to be

24  negotiations, and Mr. Friedman will speak about that a lot

25  more when we get to that point in your questions, we, RID

1  proposes that the other two cases be part of any of the

2  discussions regarding settlement.

3          THE COURT:  Thank you.

4          MR. FAIRBOURN:  If there's any other questions, I

5  would be happy to answer them.

6          THE COURT:  No, I don't think so.

7      Anything else, Mr. Thomas or Mr. Swindle?

8          MR. THOMAS:  No, Your Honor.

9          THE COURT:  Anyone else on behalf of defendants?

10     And I should have mentioned, which you all know, a formal

11 order will issue regarding today's status conference.

12     It seems to me that any information regarding the

13 cross-claims that's relevant to RID's claims are going to come

14 out, and so I'm going to deny the request.  And I understand

15 what Judge Ezra said, and he may disagree with this, but I'm

16 going to deny the fact discovery related to the cross-claims.

17 There's going to be no fact discovery related to the

18 cross-claims.

19     In terms of -- I think the next issue has to do with the

20 third-party claims as cross-claims, and it's my understanding

21 that because of the procedural nature that with the third --

22 with the amended complaints that the third-party claims were

23 turned into cross-claims.  They were deemed denied, but we

24 still were left with Reynolds Metals Company and American

25 Linen Supply, and I think we just need to clear up

1 procedurally that in fact they are now -- because it's my

2 understanding American Linen Supply was substituted for the

3 original defendant Alcoa and that -- or, excuse me, Reynolds

4 Metals was, and then we also have American Linen on behalf of

5 Alsco.  So it's my understanding that those are now going to

6 be cross-claims and denied as to those defendants, just so

7 it's clear.  I may have made that less clear.

8     But, Mr. Thomas, let me hear from you.  Is that -- why

9 don't you put that on the record, maybe perhaps more

10 articulately than I did.

11        MR. THOMAS:  I wouldn't count on that, Your Honor.

12        THE COURT:  Well --

13        MR. THOMAS:  But that's correct.  After the third

14 party and cross-claims were sort of superseded by the third

15 amended complaint, the issue arose with respect to Reynolds

16 and Alcoa, and also I think there were two American Linen

17 Supply Companies, so --

18        THE COURT:  Right.

19        MR. THOMAS:  -- the original one was the wrong one, I

20 guess.  I'm not sure they've actually been served or appeared.

21     But in any event, we just wanted to confirm for the

22 record that those late, stray parties were among those that

23 had cross-claims deemed filed and denied as well.

24        THE COURT:  Mr. Fairbourn or Mr. Friedman, do

25 plaintiffs agree with that?  I think it's just a procedural --

1   we need to correct it procedurally, but please go ahead.  And

2   if you need a moment, go ahead and chat.

3           MR. FAIRBOURN:  No, I don't think we have anything to

4   add on that point.

5           THE COURT:  Okay.  So that request will be granted as

6   set forth in the joint status report and as articulated by

7   Mr. Thomas.

8       The next issue has to do with the 30(b)(6) depositions

9   and how they're going to be taken, and so I want to hear --

10  I'll let each side go ahead and make their record on that.

11      So, Mr. Fairbourn, is that still your issue?

12          MR. FAIRBOURN:  Yes.

13          THE COURT:  Okay.  Please.

14          MR. FAIRBOURN:  And Greg Fairbourn for RID.

15      We're willing to accept their agreement that they've set

16  forth in the joint statement, that those 30(b)(6) depositions,

17  except for a few -- and I'll talk in a minute about -- be

18  taken by videoconferencing.

19      We'll host anybody in Phoenix coming to our office, and

20  they're more than welcome to come and share the video feed

21  with us.  We'll pay the costs of the remote installation.  If

22  they want to avoid traveling to the deposition and they don't

23  take us up on coming over and having a cup of coffee with us,

24  they can -- I think Veritext, who we've consulted with, will

25  charge 125 or $150 a day for them to get the audio and video

1  feed, and that would be a cost for the defendants.

2      Now we would like to reserve the right to travel to some

3  of the defendants.  After we consult, we'll go and we'll take

4  those depositions in one location.  We don't want to travel

5  all over for one defendant, but we'll go to their corporate

6  offices and depose those, and we'll work something out with

7  whomever represents that defendant to let them know we intend

8  to come to their office and take them there.  The other

9  defendants can then choose if they want to attend remotely and

10 do their own thing remotely.

11      THE COURT:  That was going to be my question.  Okay.

12 Thank you, Mr. Fairbourn.

13      Anything further, Mr. Thomas or Mr. Swindle?

14      MR. THOMAS:  Mr. Swindle is going to handle this.

15      THE COURT:  Mr. Swindle, please go ahead.

16      MR. SWINDLE:  That sounds like we're just following

17 the rules, so that sounds fine.

18      THE COURT:  That sounds fine to me too.  And so it

19 sounds like the location and method for conducting the Rule

20 30(b)(6) depositions has been resolved as well.  We're making

21 great progress here.

22      In terms of the proposed schedule that you have all

23 proposed, and I understand it's a very tight schedule because

24 of the discussion we had with Judge Ezra, and I am fine with

25 all of those dates, and let me review them with you to make

 1  sure we've got them right.

 2       We've talked about the briefing on the privilege log

 3  issues of December 20th, 2017; the motion to compel regarding

 4  the privilege assertions, three weeks after the privilege logs

 5  are served; deadline for motions to compel on other discovery

 6  issues, January 29th, 2018; deadline for completion of fact

 7  discovery except for depositions of third-party technical

 8  consultants as fact witnesses, March 6, 2018; deadline for

 9  completion of depositions of third-party consultants as fact

10  witnesses, April 20th, 2018; plaintiff's initial expert

11  disclosures, April 20th, 2018 -- no.  I'm sorry.  Plaintiff's

12  initial expert disclosures, May 20th, 2018, excuse me;

13  defendant's initial expert disclosures, July 19th, 2018;

14  plaintiff's expert rebuttal disclosures, August 28th, 2018;

15  completion of expert depositions, October 12th, 2018.

16       I appreciate that.  I can't tell you how many cases we

17  have where the disclosure occurs after the completion of the

18  depositions.  I appreciate your timing on that.

19       Deadline for Daubert motions, November 12th, 2018;

20  deadline for summary judgment motions, 30 days after the

21  Daubert rulings; and pretrial conference and trial dates to be

22  determined by the Court as that schedule progresses.

23       So I'm fine with all of those dates.  I understand it's a

24  very compressed schedule because of Judge Ezra's optimism that

25  you can all get this done.

1      Mr. Fairbourn, is there anything further on the dates,

2  unless I misspoke on any of them?

3          MR. FAIRBOURN:  Just -- no, you did not misspeak upon

4  any of them, but I would like to say that in proposing this,

5  it's intended to be done with cooperation.  And so the only

6  thing that I would like to reserve is that if the cooperation

7  isn't forthcoming from either of us that be brought to

8  your attention so we can keep it on track.

9          THE COURT:  Absolutely.

10          MR. FAIRBOURN:  That also assumes, of course, that

11  the 30(b)(6) witnesses will be prepared when they show up for

12  their depositions.

13          THE COURT:  Okay.

14          MR. FAIRBOURN:  Thank you.

15          THE COURT:  Mr. Thomas, Mr. Swindle, anything?

16          MR. THOMAS:  Of course, Your Honor.

17          THE COURT:  You're okay.  Okay.

18      And we're going to talk more about some of the logistics.

19  I know it's difficult to get to Tucson, Arizona.  I know most

20  of you are in Phoenix or somewhere else, and we appreciate you

21  coming here, and we appreciate Judge Ezra asking you to be

22  here.  We'll work on some of that.  I just thought for this

23  initial status conference it was very important that you all

24  be here in person so that we can get all of this going as

25  scheduled.

1     The next issue on my list has to do with what's been

2   going on in terms of the regulatory situation, and the only

3   thing I was wondering, it's my understanding that there was a

4   meeting on June 21st, 2017 called by ADEQ, which included RID

5   and the defendants, and I was just wondering if anything has

6   happened since then.

7     And, Mr. Friedman, I know you can identify yourself.  I

8   was just wondering if you could provide me sort of an update

9   on that.

10     MR. FRIEDMAN:  Sure, Your Honor.  Andy Friedman on

11   behalf of RID.

12     There have been not only developments but important

13   recent developments that implicate settlement and really

14   impose a sense, a requirement of urgency on the parties here

15   if we're to reach the global settlement that Judge Ezra

16   directed us to attempt to achieve.

17     When ADEQ met with the stakeholders in June, the director

18   of ADEQ made clear that he expected a consensus remedial

19   action plan to be presented to ADEQ by the end of the year,

20   and he's made clear that if that does not occur by the end of

21   the year, ADEQ will relinquish jurisdiction over this matter

22   to the EPA.

23     More recently the ADEQ, in separate meetings with the

24   parties, has reemphasized -- I can't say how strongly they've

25   reemphasized -- that at the year end this matter is headed to

1  the EPA.  And when we talk about settlement, I would be happy

2  to explain what implications that has for settlement, but that

3  means that we have a very, very narrow window of opportunity

4  before the EPA steps in.

5       Thus far, we have shared with defendants, the PRPs, our

6  proposed consensus remedial plan.  We understand that the PRPs

7  have presented an alternative plan to ADEQ that has not been

8  shared with us.  So those regulatory proceedings are an

9  independent force that require us to deal with them

10 proactively.  And again, as I said, Your Honor, I don't want

11 to jump ahead too far, but I'm prepared to explain the

12 importance of those regulatory developments and their impact

13 on settlement discussions.

14      THE COURT:  Right.  And we're going to get there.  I

15 appreciate that.

16      MR. FRIEDMAN:  Thank you.

17      THE COURT:  And anyone on behalf of the defendants

18 want to bring any more information?

19      MS. SPENCE:  Your Honor, this is Samara Spence for

20 the Department of Energy.

21      THE COURT:  Thank you.

22      MS. SPENCE:  I would like to point out a few things

23 about the ADEQ process.  One, that's not really a part of this

24 case and not really relevant to what we have to resolve here.

25 At some point ADEQ either will or won't select a regional

1    remedy.  Right now they have not done that, and as far as we

2    are aware, RID is not part of a regional remedy.  Although

3    there have been proposals for them to be part of one, there

4    have also be proposals for a regional remedy that does not

5    involve the plaintiff in this case.  This case is really about

6    RID's claimed past costs that it says it incurred in order to

7    protect its own wells for one of its proposed remedies which

8    ADEQ has not adopted.

9         The other thing I would like to point out is that there

10   is no guarantee that EPA would accept jurisdiction over this

11   site if asked.  They have been asked in the past.  I would

12   like to be very clear that I do not represent EPA on this case

13   nor have I talked to them about it, but that is speculative at

14   this point, and our position is still that it has little to do

15   with whether or not settlement is possible in this case.

16              MR. SWINDLE:  And Shane Swindle for Corning.

17              THE COURT:  Please.

18              MR. SWINDLE:  Just so that the record is clear, Your

19   Honor, the meeting that you referred to in June with ADEQ

20   involved RID and some defendants --

21              THE COURT:  Right.

22              MR. SWINDLE:  -- but certainly not all of the

23   defendants.

24              THE COURT:  Right.  And I bring it up only because it

25   was in the joint status report as a point of discussion.  I

1    understand it's obviously the administrative proceeding.

2         And is there anything else on behalf of the plaintiffs?

3    Anything else you want to put on the record in that regard?

4              MR. THOMAS:  Your Honor, Chris Thomas.

5              THE COURT:  Okay.  Go ahead, Mr. Thomas.

6              MR. THOMAS:  I was actually at that June 21st

7    meeting.

8              THE COURT:  Right.

9              MR. THOMAS:  And as you know, there is a dispute

10   between RID and not only the defendants in this case but

11   others as well about whether and when treatment to drinking

12   water standards is a necessary component of any remedy.

13        What we're hearing from DEQ is that the director would

14   like the parties to reach agreement on that issue, which has

15   cost implications among other things.  If there is to be a

16   global remedy, it would involve some agreement between Salt

17   River Project and the U.S. Bureau of Reclamation and RID about

18   whether RID could continue pumping after its contractual

19   rights expire.  But again, as Ms. Spence pointed out, if there

20   is a regional remedy in the future, whatever it is picked to

21   be, it will not be funded by RID and RID will not be incurring

22   those future costs.

23        And I'll defer the rest of the discussion for the

24   settlement issue, but I think it's much easier for us to view

25   settlements of the past costs at issue in this case separate

1  from all those other greatly complicated issues.

2         THE COURT:  Okay.  Thank you.

3      Mr. Friedman, anything further from your standpoint?

4         MR. FRIEDMAN:  Not on the regulatory side.

5         THE COURT:  Okay.

6         MR. FRIEDMAN:  Your Honor, but we have a lot to say

7  with respect to the comments that just bled into the

8  settlement issues.

9         THE COURT:  Okay.  And I think, I believe we're now

10 at the final issue, which is the settlement issue.

11     Mr. Fairbourn or Mr. Friedman, anything further from the

12 plaintiffs other than the settlement issue, which I understand

13 is sort of a complicated issue?

14        MR. FRIEDMAN:  No, Your Honor.  There is one other

15 issue concerning other potential pretrial rulings on

16 settlement-related issues, but the settlement process issues,

17 we agree we're to that point.

18        THE COURT:  Okay.  Mr. Thomas, Mr. Swindle?

19        MR. THOMAS:  We agree, Your Honor.

20        THE COURT:  Okay.  And I know that there have been a

21 number of discussions with Judge Phillips.  It's my

22 understanding that not all of the defendants, just some of the

23 defendants were participating, and I was curious, just out of

24 my own curiosity, which defendants were participating and

25 which were not participating, number one, and, number two, if

1   there were any conditions or restrictions placed upon the

2   parties to the extent you can tell me.  I don't want to delve

3   into -- we're going to have to walk this fine line.  Judge

4   Ezra wanted me to discuss settlement negotiations.  I don't

5   want to know what they were or anything.  We're going to have

6   to talk more about that, but I guess my first question is, who

7   went in terms of the defendants?  Who was participating in the

8   settlement discussions?

9           MR. THOMAS:  Chris Thomas again, Your Honor.

10      Well, I went once.  And to be honest, I don't recall who

11  else participated.

12      This began as an effort launched by Judge Tuchi in the

13  water rights litigation among U.S. Bureau of Reclamation, Salt

14  River Project, and RID, and the CERCLA folks were invited to

15  join at some point with the belief that the water-related

16  disputes were nearing some resolution that would facilitate

17  discussion of the issues in this case.

18      It appears, at least in my humble opinion, that that

19  hasn't proven to be the case, and so the -- I think I've been

20  to two mediation sessions.  90 percent of the discussion has

21  been held separately between RID, SRP, and the Bureau of

22  Reclamation about the water rights issues, and the defendants

23  have sort of been waiting in a room for breakthroughs on those

24  issues to clear the decks for our discussion.  That's one

25  reason why we didn't think it made sense to order a bunch of

1   people to start negotiating these case issues until there is

2   or is not a deal on the water rights side.

3        The other complicating factor, of course, is that if we

4   try to order people -- obviously, in this case we have

5   jurisdiction only over the parties to this case.  There

6   are additional parties in the G&K case that are not involved

7   in this case.  And in addition to that, the parties that

8   previously got the disqualification order regarding G&K are,

9   of course, not defendants in the G&K case.

10       So if we try to wrap all three cases together in one

11  giant global settlement, you know, the structure between RID

12  and G&K with respect to divvying up the potential drinking

13  water sale profits essentially means that the settlement of

14  that part of the case is with Gallagher & Kennedy,

15  essentially.  I don't know how that can take place with

16  respect to parties with whom Judge Ezra decided G&K had a

17  conflict.

18       So nothing would please me personally more than to

19  resolve this case, now that it's a $247,000 case, 12,000 bucks

20  a head.  That's much more easily done than resolving the

21  issues that will be addressed in the other two cases if there

22  is no global settlement or a settlement of the water rights

23  issues.

24            THE COURT:  Okay.  Mr. Friedman -- anyone else on

25  behalf of the defendants?

1       Mr. Friedman, tell me what you -- and I do -- and I

2   understand the difficulty, and I think Judge Ezra certainly

3   intended, to the extent possible, that the case, the 16-4447

4   and 16-4448 be included to the extent possible in some type of

5   settlement, but I understand the difficulty with that.

6       And so let me hear, Mr. Friedman, from you on the

7   settlement issues, because frankly I'm still trying to get my

8   arms around what I'm supposed to be doing here in that regard.

9           MR. FRIEDMAN:  Thank you.  May I remain seated, Your

10  Honor?

11          THE COURT:  Yeah, please do.  And I should have told

12  you, you guys don't need to get up every time.

13          MR. FRIEDMAN:  Judge Ezra told us loudly and clearly

14  at the last status conference that the parties were to

15  participate, all parties, actively in the settlement process,

16  that they were to have representatives participate actively,

17  and the goal is to reach a global settlement.

18      There can be no global settlement unless all of the folks

19  who are involved in these cases participate.  The notion that

20  this is a $249,000 case stems from defendants' motion that

21  shifted tens of millions of dollars in what we think are

22  inarguably recoverable costs to the other cases.

23      The only way to approach a global settlement of this

24  matter is to have a global settlement involving the related

25  cases which are all now related before the same court, and you

1  and Judge Ezra have ample authority to order that global

2  mediation.  I can say with absolute confidence that Gallagher

3  & Kennedy will participate in that sort of mediation, that

4  Spinnaker and Synergy will as well.

5      It will be impossible to settle this case separately and

6  discretely when the issues have now been splintered across the

7  cases and you have tens of millions of dollars of costs that

8  are recoverable, past costs in the other case; you have the

9  remediation issues pending in this case; you have some past

10  costs in this case and a request for declaratory relief in

11  this case.

12      The notion that the water rights case should dictate --

13  which is not before this Court -- should dictate the timing of

14  mediation is simply wrong.  There was an effort to negotiate

15  the water rights issues initially, first because the initial

16  mediation was set up by SRP and RID, both of whom are parties

17  to the water rights case.  Those negotiations are proceeding,

18  and it will come to fruition or not.  If they come to

19  fruition, then there's no impediment to a truly global

20  settlement dialogue and mediation in all of these related

21  cases.  If those claims are not resolved by settlement, what

22  defendants are proposing is that there be no global mediation

23  in these CERCLA cases until the water rights cases are tried.

24  There is not even a trial date in the water rights cases.  So

25  it makes no sense and it's completely at odds with the

1    fundamental notion that Judge Ezra made clear, which is that

2    the parties in this case, all of them in their related cases,

3    are to roll up their sleeves and become involved in a

4    mediation.

5        With respect to the regulatory proceedings, I alluded to

6    this earlier, Your Honor:  The reason they have such an impact

7    on settlement negotiations and the need to advance and

8    accelerate the process is that, regardless of what the federal

9    government may say, we've been told by the Department of -- by

10   ADEQ that the matter will be referred over to EPA.  We've had

11   some indications from EPA that that is the case.

12       If that occurs and we're under the federal CERCLA regime,

13   that means that there will not be the ability to obtain

14   contribution for orphan shares from the State.  We're talking

15   about losing a significant source of funding for any global

16   settlement that may ultimately make the difference between

17   success and failure in that effort.

18       What we would -- the reason why we need to act

19   aggressively, in addition to this overhanging deadline, is

20   that Judge Phillips has been largely unavailable except

21   with -- for protracted periods.  Given his schedule, I think

22   we've had three mediation sessions over the course of the last

23   six to eight months.  He simply is not available.  He is a

24   very talented, respected mediator, but right now we need

25   somebody who can take the reins and drive this case either to

1   a global settlement or, if not, we're prepared to pursue

2   individual settlements with individual defendants.  That's not

3   Judge Ezra's preference.  That's not the way to conserve

4   judicial resources.

5       What we would propose and have proposed is that the Court

6   order all parties to participate in a mediation, that they be

7   ordered to have -- with the exception of the federal

8   defendants, for reasons explained in the joint status report,

9   that they be ordered to have representatives with settlement

10  authority attend.  We think that if Your Honor -- we have no

11  problem with Your Honor calling Judge Phillips to see about

12  his availability.  I can tell you with certainty that his

13  availability is extremely limited.

14      Given that, given the logistics of using a mediator, a

15  very high-priced mediator located in California, we think

16  there are plenty of very talented, qualified mediators here in

17  Arizona.  We think the parties should be given a firm deadline

18  to either agree upon a mediator -- we propose a week.  If the

19  parties can't agree upon an alternative mediator, then we

20  should submit one or two names, each side, to Your Honor.  You

21  can choose.  But we can't tolerate this continuing stasis

22  where nothing happens given the deadlines now in this schedule

23  and given the deadlines on the regulatory side.

24      So that's our proposal.  I'm happy to respond more

25  specifically to the notion that the Court should simply order

piecemeal mediations, but it doesn't make sense because I can

tell Your Honor that because the costs now are spread across

three different cases, any global resolution requires a global

mediation involving all parties.

Will there be difficulties?  Of course there will be.

That's what mediators deal with all of the time.  The fact

that a given defendant may not be a party in all cases is not

an obstacle to meaningful participation because the overlap is

substantial with respect to the defendants.  That's something

which can be dealt with and will be dealt with by a talented

mediator as part of the mediation process.

It's no different -- you have 20 defendants in this case.

Any mediator is going to have to deal with varying positions

among those defendants in coming up with some sort of

agreed-upon contribution schedule anyway.  It doesn't overly

complicate things to include everybody.  As I say, if the goal

is a global mediation -- a global resolution, that requires a

global mediation.

THE COURT:  What is the status with Judge Phillips?

Are you just sitting, waiting for a new date from him?  I

mean, what's going on with Judge Phillips?

MR. FRIEDMAN:  So the last state of play was that he

had indicated that he had a date potentially in early

December.  That now has passed.  We have not -- no mediation

sessions are scheduled with Judge Phillips, to my knowledge.

1   There have been no inquiries made about his availability for

2   the next mediation.  We've been told by his administrator that

3   basically it will take a month to two months to get before

4   Judge Phillips.

5       And my bigger concern or an equally large concern, Your

6   Honor, is not only the delay in getting before Judge Phillips,

7   it's his ability to follow through.  Any mediator who is going

8   to get their arms around the complications here and achieve a

9   global mediation is going to have to have nearly continuous

10  communications with various constituencies to have the

11  mediation succeed.  That requires a dedication of time and

12  effort that Judge Phillips simply does not have.

13          THE COURT:  Thank you.

14      Mr. Swindle.

15          MR. SWINDLE:  Shane Swindle for Corning.

16      Just it might be helpful if Mr. Friedman could explain

17  why the overlap is so important.  His firm is not involved in

18  the other cases.  His client, RID, is not involved in the

19  other cases.  We'd love to globally resolve all of them, but

20  they have all of these other complications whereas this one is

21  now positioned, it's very simple.  There isn't very much at

22  stake, and this is the only case that RID and Mr. Friedman's

23  firm is involved in.  So why don't we just drill down and

24  finish this one and then we can try to deal with the others?

25          THE COURT:  Because it's not the only case Judge Ezra

1   is involved in.  I mean, that's the simple answer to that

2   question, frankly.  I understand your position.

3        Mr. Thomas.

4        MR. THOMAS:  Your Honor, Chris Thomas for the City of

5   Phoenix.

6        And let me say a couple things.  First, you know, I have

7   participated on behalf of the City in the mediation convened

8   by Judge Phillips.

9        THE COURT:  And I still have a question about were

10  there conditions.  I mean, I'm just wondering.

11       MR. THOMAS:  Oh, I'm sorry.  Yes, we all had to sign

12  a nondisclosure agreement that prohibited public discussion

13  with nonsignatories to the discussions in the mediation.

14       THE COURT:  Okay.

15       MR. THOMAS:  I think I can say, though, that probably

16  less than an hour of total time was spent addressing the

17  CERCLA issues in the two sessions that I was in because most

18  of the time was spent fighting about the water rights

19  litigation in another room.

20       So, you know, echoing Mr. Swindle's question, the

21  overlap -- Mr. Friedman is basically asking that, for

22  settlement purposes, the parties to this case and those to the

23  other two cases be required to negotiate a global settlement.

24  A global settlement is not possible unless and until some

25  rulings come down in the water rights litigation or SRP and

1  RID otherwise reach an agreement on RID's right to pump in the

2  future.

3      As we explained in our briefings on the motion for

4  protective order, RID's proposed regional remedy basically is

5  to use existing irrigation infrastructure, put some well head

6  treatment on a few of the wells, and call that the superfund

7  remedy.  That has a net present value I think of about $64

8  million.

9      A group of defendants, including the City of Phoenix and

10 others, did a competing feasibility study that basically said

11 why don't we defer the cost of treating impaired groundwater

12 to drinking water standards until the day when it actually

13 needs to be used for that purpose.  That I think is about a

14 $2-million-per-year cost.  It's the vast majority of the

15 potential future costs at issue.

16     So the delta between their proposed $64 million remedy

17 and the ultimate remedy is about $40 million.  It's obviously

18 much more difficult to settle a $40 million remedy dispute

19 plus a dispute about whether RID can get into the water sales

20 business than it is to settle a $247,000 past cost dispute.

21 You know, the amount in controversy that remains in this case

22 is so modest that I think it could be settled despite lack of

23 progress or delay in progress in the other cases.

24     But, you know, Mr. Friedman is proposing a global

25 settlement discussion, but that can only make progress when

1    there's clear direction about the legality of RID's proposed

2    remedy given the Arizona water law overlay.

3          Finally, I don't think we should underestimate the

4    complications caused by Gallagher & Kennedy's position as the

5    plaintiff in the other case.  As you may recall from the

6    protective order discussions, you know, Gallagher & Kennedy

7    has been doing its legal work on a contingent basis.  The same

8    is true of Synergy, so they have claims for their professional

9    service time.  Under the arrangement with Gallagher & Kennedy

10   and RID, G&K was fronting all of those professional services

11   in exchange for the right to enjoy potential profits from

12   selling drinking water in the future.  The cost of that that

13   Gallagher & Kennedy was estimating was I think about $1,000 an

14   acre foot.  The residual due to RID is $100.

15         So, you know, Gallagher & Kennedy and Synergy and to some

16   extent Bonnett Fairbourn have a 90-percent stake in the

17   outcome of the future remedy.  In practice, that means that

18   the future remedy agreement, if one can be reached,

19   essentially needs to be reached with Gallagher & Kennedy as

20   the largest shareholder in this endeavor.  I don't know how

21   that can take place given that Freescale, as successor to

22   Motorola and various and sundry other defendants, may not be

23   able to participate in direct discussions with Gallagher &

24   Kennedy.

25               THE COURT:  Well, let me ask you this:  In terms of

```
 1    the logistics of Judge Phillips, what about this case and, I
 2    mean, it seems to me that 16-4448, all the same parties go to
 3    a settlement conference in this case without Judge Phillips,
 4    perhaps with somebody else.  That's not my decision.  Frankly,
 5    I was thinking you all ought to go, everybody ought to go, and
 6    then if you can't make it, if someone shouldn't be there, then
 7    at least you've showed up once and you've had a discussion.
 8    But I'm willing to think about this.
 9         But what about -- let's just take it one at a time.  What
10    about -- I understand and I have dealt with in the past as a
11    lawyer the difficulties of trying to get in to some of these
12    mediators -- just maybe punting on Judge Phillips for this
13    case and perhaps the case of the Spinnaker case and picking a
14    mediator and get to that mediator within X number of days?  I
15    know we're running into the holidays, and 30 days may be very
16    optimistic, but what about that as a possibility?  Although I
17    do think Judge Ezra intended that everybody in each of the
18    cases that are assigned to him go to this, but let me just
19    start with this case and the Spinnaker case.
20         I mean, Mr. Thomas, what about something like that?
21              MR. THOMAS:  Your Honor, I think the -- actually,
22    that's a good idea.  The difficulty -- you know, the parties'
23    issue is difficult, but really the great unknown is what the
24    nature of any future remedy will be when we reach agreement on
25    that, and that's just -- there's too much uncertainty there
```

1   now for a settlement to occur until some of the water rights

2   issues are resolved.

3        On the other hand, if you -- Mr. Friedman can correct me

4   if I'm wrong, but I don't think, under the current

5   arrangements, that RID will be incurring any future costs.  It

6   seems to me that should obviate the need to litigate in this

7   case the necessity issue and other things that remain

8   unresolved.  I believe the same is true of Spinnaker.  I'm not

9   sure about Synergy.  Synergy is likely to continue doing

10  technical consulting work, arguably thereby incurring costs.

11          THE COURT:  And I meant to use the term "Spinnaker"

12  as the Spinnaker case, so I meant to include the case.

13          MR. THOMAS:  Yeah.  So Synergy and Spinnaker are the

14  two co-plaintiffs in the case.

15          THE COURT:  Right.

16          MR. THOMAS:  If the settlement discussions regarding

17  this case and the Spinnaker Synergy case are limited to costs

18  incurred as of the date of the filing, that's probably

19  something that we could have a reasonable settlement

20  discussion about, because it's a discrete number.  We can

21  argue about, you know, whether those costs were properly

22  incurred or not, but that wouldn't impose on us the burden of

23  also having this $40 million, uncertain future amount in

24  controversy in the same mess.

25          THE COURT:  Okay.  Thank you.

1      Do any of the -- I see some nervousness in the back

2   there.  If you want to come on up and just make sure you

3   identify who you are and who you represent.  Thank you.

4          MR. LUTZ:  Your Honor, Stan Lutz on behalf of

5   Prudential Overall Supply.

6      I'm sure the defendants are wincing as I come up here,

7   but very quickly I just wanted to make a fundamental point

8   that comes from Mr. Swindle's point and understanding what you

9   just said with regard to the Spinnaker case and potentially

10   limiting a ruling to the Spinnaker case as well as this

11   present case.

12      The complaints in the G&K case and the Spinnaker case

13   have just recently been served.  No one has yet appeared or

14   answered in those cases.  To the extent there are additional

15   defendants, I just want to point out, while I don't represent

16   any of those defendants, none of them have a notice or an

17   opportunity to be heard.  So to the extent that Mr. Friedman

18   and Bonnett Fairbourn is suggesting that those defendants be

19   ordered into something where they've done no discovery, have

20   not yet answered and/or moved to dismiss and have really no

21   basis for even understanding potential liability or their

22   defenses, that that is just simply premature, and I would say

23   it lacks the fundamental due process that those parties would

24   necessarily need to have.  So I just wanted to point that out

25   to the Court as well.

1          THE COURT:  Well, they're all defendants in this

2    case, right?

3          MR. SWINDLE:  That's only true for the Gallagher &

4    Kennedy case.

5          THE COURT:  Right.

6          MR. SWINDLE:  Right.  You're right that I think the

7    overlap in the Spinnaker and this case is 100 percent.

8          THE COURT:  Absolutely.

9          MR. LUTZ:  Exactly, Your Honor.  And I wanted to make

10   clear that I was not referencing the Spinnaker case, and I

11   apologize if I did not make that clear.

12         THE COURT:  Okay.  Thank you.

13         MR. THOMAS:  Your Honor, Chris Thomas again.

14      Just as a housekeeping note, if you do decide to order

15   clients to appear at a settlement proceeding, on behalf of the

16   City of Phoenix I wanted to mention that obviously the city

17   council has final authority to bless any settlement and we

18   can't, given the public meeting laws, have the entire council

19   present.  But like the county and perhaps the United States

20   government, we would have counsel present and a client

21   representative that would make a recommendation to the council

22   to act.

23         THE COURT:  And we appreciate that that's a

24   limitation with regard to public entities.  We'll reach that

25   bridge when we need to.

1     Please, did you want to make a record?

2         MR. WORSHAM:  Yes.  Your Honor, I'm Jerry Worsham.  I

3   represent Meritor, Inc.

4     But I'm here to confirm that there are parties who are

5   involved, as an example with the G&K case, that have no

6   knowledge about what's going on with this case and would be

7   prejudiced to be forced into mediations or anything else, so I

8   think it's appropriate for the Court to remember that.

9         THE COURT:  I think I was just reminded of that, but

10  please go ahead.

11        MR. WORSHAM:  Well, just he said he didn't represent

12  people too.  I've been addressed or approached by probably a

13  represented company that will be in that exact same position.

14        THE COURT:  Right.  Okay.  Thank you.

15    Please.

16        MR. PEARSON:  Good morning.

17        THE COURT:  Good morning.

18        MR. PEARSON:  I'm William Pearson.  I represent Union

19  Pacific Railroad.  I represent one of the parties that did not

20  participate in the negotiations, and there are reasons for

21  that.

22    I think we need to in the beginning here identify what we

23  mean by global settlement versus like a focused settlement or

24  focused mediation.  I think Judge Ezra had the sense that many

25  of the parties discussed that there might be an ability to

resolve five different matters at one time, which involved the

water rights litigation, the regulatory problem, the Gallagher

& Kennedy problem, the Spinnaker Synergy problem, and this

problem, this case.

My client did not participate because we're not party to

the water rights.  We're not party to the regulatory because

we settled with DEQ sometime ago.  We're not party to the G&K

case which is before this Court because of conflict issues,

that my client was not sued.  The Spinnaker Synergy case was

just served like a week ago.  And then this case has been

going on for a long time.

My client's position is this Court has no authority to

order my client to participate in a global settlement that

would include water rights litigation, the regulatory matter,

because that's not before the Court and we're not a party to

that.  This Court would have the authority to order us to

participate in some more limited mediation on the cases that

are before this Court, but we are not a party to the Gallagher

& Kennedy lawsuit, which is a major obstacle, from my client's

perspective, in even reaching a mediation in this case.

So I think the position that my client is taking now is

that, yes, there may be an opportunity to have a focused

mediation on a limited basis, recognizing that the Spinnaker

Synergy case has just gotten started and there are parties

there that may not be participating yet at this moment.  But

1  this is not the time, even though there's this dire

2  description of what's going on with the regulatory problem

3  with EPA, that there are many other parties, such as my

4  client, who are really more peripheral to the global

5  settlement than what's being described as possible by all the

6  parties that are involved in the water rights litigation.

7          THE COURT:  Thank you.

8          MR. PEARSON:  Thank you.

9          THE COURT:  Anyone else on behalf of the defendants?

10         MS. SPENCE:  Samara Spence for the Department of

11  Energy, Your Honor.

12         THE COURT:  Please.

13         MS. SPENCE:  I just want to add that the Department

14  of Energy does support settlement conferences to attempt to

15  resolve this case.  To the extent we're talking about the

16  other cases, I do represent the Department of Energy in the

17  Spinnaker case as well, and we would support settlement

18  conferences in those cases.

19      I second what Mr. Pearson said about there being a little

20  bit of confusion about what exactly what we're trying to

21  resolve, but it would be possible to resolve those cases

22  despite the fact that there are interrelated issues with the

23  other matters that many of these parties are not involved in.

24      And I would add that the Department of Energy also did

25  not participate in the mediation before Judge Phillips for the

1   same reasons that some of the other defendants have discussed,

2   that it's not part of this case.  The U.S. Attorney's Office

3   handled that for the Department of Interior, and they

4   participated and focused on the water rights issues, which we

5   think was appropriate for that mediation.

6           THE COURT:  Okay.  And let me address Mr. Pearson.

7      I mean, in terms of any order, I'm not going to order you

8   to do anything other than go to a mediation and you guys try

9   to resolve that, if that happens.  I mean, I understand

10  there's a lot of moving parts and there's cases and issues

11  that we do not have jurisdiction over.  My intent would be

12  just pick a mediator, go to a mediator, see if you can resolve

13  the cases, whether it be this case, the Spinnaker case, or all

14  of them.  So just, I mean, that would be my intent.  You're

15  all very experienced lawyers.  You can try to resolve it if

16  you can.

17          MR. PEARSON:  I appreciate that, Your Honor.  I think

18  the --

19          THE COURT:  You may need to get up to a microphone.

20  I'm sorry.  I addressed you and -- thank you.

21          MR. PEARSON:  Thank you.  I appreciate that.

22     I don't think there's any question that every party in

23  this room would like to have the whole matter settled and

24  there be a global settlement, and my client in particular

25  would feel that way as well.  The difficulty is the number of

1  parties and the different issues.

2      The mediation with Judge Phillips, there was a request

3  that you pay a portion of his fairly high mediation fee plus

4  have to go to California to have that participation, or at

5  least travel some, and the whole issue then is how much is

6  each client, each party going to pay to try to participate.

7  If there was a recommendation by this Court that the parties

8  meet in Phoenix with a mediator to see if they could make some

9  progress on a defined scope of issues, because global means --

10  you know, what's that mean?

11      THE COURT:  And those issues will be what you

12  resolve, not what I tell you to resolve, so I agree with that.

13      MR. PEARSON:  Okay.  So my client certainly would be

14  willing to participate in order to move it forward and to see

15  that the matter could, at least part of it, possibly be

16  settled.  I was just stating what I thought on a formal basis,

17  of obligating us to do something that at this point we're not

18  even legally liable or involved in, and that was my point.

19      THE COURT:  No.  And I appreciate that, and I want

20  everyone to have an opportunity to make any record like that,

21  and I appreciate that.  I didn't mean to indicate that.  I

22  appreciate what you're saying and I understand it, so thank

23  you very much.

24      MR. PEARSON:  Okay.  Well, thank you.

25      THE COURT:  Anyone else on behalf of the defendants?

 1          Well, Mr. Friedman, let me hear from you how we're going

 2     to resolve this issue.

 3          MR. FRIEDMAN:  Thank you, Your Honor.

 4          To me, what all of this says is that there needs to be an

 5     Arizona-based mediator, which is what we're proposing.

 6          THE COURT:  Well, let me stop you there.  I'm sorry.

 7     In terms of the 16-4447 case, I mean, the points are

 8     well-taken, that the case is relatively new; it was just

 9     reassigned to Judge Ezra; many of the defendants have

10     not appeared.  I mean, so I don't know to what extent we can

11     even conduct a meaningful mediation in that case, so I want to

12     hear on that issue.

13          MR. FRIEDMAN:  Okay.

14          THE COURT:  And then, depending upon what we decide

15     to do, if that case is not included, if it is just this case

16     and the 16-4448 case, what do we do?

17          MR. FRIEDMAN:  Your Honor, it seems to me that the

18     Court certainly has the authority to order all of the

19     defendants in this case to participate in a mediation.

20          THE COURT:  In this case.

21          MR. FRIEDMAN:  In this case.

22          THE COURT:  No question.

23          MR. FRIEDMAN:  The Court certainly has authority to

24     order all of the defendants that are in the Spinnaker case to

25     participate in the mediation.

1        THE COURT:  And I think the defendants agree maybe

2   not on the scope of the mediation, but I think they agree

3   theoretically to that.

4        MR. FRIEDMAN:  And the Court likewise would have the

5   authority at least to order those defendants -- once you do

6   that, to the extent those defendants also are parties to the

7   Gallagher & Kennedy case, they're in the mediation and they're

8   participating in the mediation.

9        THE COURT:  Yeah.

10       MR. FRIEDMAN:  And so Gallagher & Kennedy and

11  Spinnaker and Synergy are willing to participate in such a

12  mediation.  So the only real issue is how do you deal with

13  those additional parties who may have only recently been

14  joined.

15       I would suggest that we could put those aside for the

16  time being because there is a critical mass of 20 defendants

17  or so who are involved at least in this case and the Spinnaker

18  case, and I would say to Your Honor that the mediation before

19  Judge Phillips that has occurred thus far actually involved

20  all of the cases.  Gallagher & Kennedy participated in that

21  mediation, and there's no reason why you couldn't have the

22  defendants who are common to this case and to the Spinnaker

23  case and to Gallagher & Kennedy case participate in the

24  mediation.  If there are defendants who are in this case but

25  not in the Gallagher & Kennedy case, that's something that the

1  mediator can deal with on the ground.  It's not uncommon to

2  have multiple cases brought together for a single mediation.

3        THE COURT:  Right.

4        MR. FRIEDMAN:  To the extent the parties in this case

5  are involved in that mediation, they're more than adequately

6  informed to participate meaningfully.  There's no learning

7  curve and the issues are interrelated.  The same issues, legal

8  issues and to some extent factual issues, are involved in all

9  three cases.

10       With respect to the notion that the water rights case is

11  a necessary component of any settlement or precursor to any

12  meaningful mediation, I simply disagree.  If the EPA or ADEQ

13  orders, as ADEQ has, the parties to remediate, that is going

14  to happen regardless.  I don't want to get into an extended

15  legal argument here this morning, but even if RID did not have

16  the rights under its agreement with SRP to continue pumping,

17  we believe they have rights to obtain a pig whip permit in

18  order to continue pumping for the purposes of remediation.

19       As Mr. Thomas says, an issue is whether remediation

20  should occur to drinking water standards.  We think that as a

21  matter of Arizona law that's absolutely required.  That's an

22  issue that will be litigated in this case if it's not

23  resolved.  The issue of RID's -- the issue of divisibility is

24  going to be litigated in this case if it's not resolved.

25  Given the interrelated issues, it only makes sense to do a

1  mediation that includes those parties who can fairly

2  participate.

3       So I would urge Your Honor to require the parties to

4  confer and agree upon an alternative mediator.  Our last

5  inquiry with Judge Phillips, again just to give you some

6  understanding as to his limited availability, was that we had

7  only three days available in February for the first time and

8  two days available in March.  This is in a different case, but

9  we know about his limited availability.  So it's only getting

10 worse because his calendar fills up.

11          THE COURT:  Right.

12          MR. FRIEDMAN:  So I can say that if we do this in a

13 piecemeal fashion and only look at -- I understand why

14 defendants would want to mediate in this case separately,

15 because a lot of costs have been shifted over elsewhere, but

16 that's not going to reach the finality that people really need

17 to put this behind them, to reach the goal that Judge Ezra

18 made very clear.

19      If I'm negotiating with a defendant and defendants even

20 globally, generally speaking, what they want is global peace.

21 They want to be done with these CERCLA cases.  The only way

22 that's going to happen is if there's a settlement that

23 involves the plaintiffs in all of the cases coming to

24 an agreement of an overall resolution with ultimately either

25 all or some of the defendants.

1        So what we would urge is that the parties be directed to

2    select an alternative mediator, that if they can't do that

3    pronto, we should submit recommendations to Your Honor and let

4    you choose -- quite frankly, the identity of the mediator is

5    less important than their qualifications and availability --

6    and that the parties who should participate should be the

7    defendants in this case.  And I will represent to the Court

8    that we will secure the participation of Gallagher & Kennedy,

9    Spinnaker and Synergy in that mediation.

10        With respect to those who are left behind at this

11    juncture, once the mediation is up and running, if it gains

12    momentum, we can deal with those folks at an appropriate time

13    through the auspices of the mediator.

14        THE COURT:  And I think in terms of Case No. 16-4447,

15    even if the defendants were not ordered to go to that

16    mediation because of the concerns expressed, if they are a

17    party and are actively dealing in the cases that have been

18    asked to go to mediation, they can always resolve that if they

19    want.

20        I think the issue is, number one, from the defendants'

21    standpoint, is there an agreement to try to reach some type of

22    alternative mediation in Arizona with a mediator, number one;

23    and number two, I think what it sounds like -- and do you have

24    any objection to Gallagher & Kennedy being invited to that

25    despite the fact that we may not be able to order all of the

1    parties because of the concerns expressed, which I agree with,

2    in Case No. 16-4447?  Any objection to politely inviting

3    Gallagher & Kennedy to attend?

4             MR. THOMAS:  Your Honor, Chris Thomas again.  Let

5    me -- a couple things.  First --

6             THE COURT:  And you all may need a little time to

7    think about this too.  So go ahead, please.

8             MR. THOMAS:  I never think before I talk.

9             THE COURT:  No, no.

10            MR. THOMAS:  Let me proceed.

11            THE COURT:  You're doing just fine, though.

12            MR. THOMAS:  Well, first off, with respect to who the

13   mediator will be, if there's to be a mediator, I don't think

14   that the defendants were proposing it was Judge Phillips or

15   bust.

16            THE COURT:  No.  I get that.

17            MR. THOMAS:  Yeah, agree with that.  I think the

18   trickier issue is just in terms of, I mean, we can

19   theoretically mediate again whether a global settlement can be

20   reached that involves how big and expensive the remedy is

21   going to be.  That again depends in part on resolution of some

22   of the issues in the water rights litigation.

23       I was delighted for Mr. Friedman to confirm what we had

24   been claiming from the outset of this case is that RID's

25   purported CERCLA remedy is something they came up with as a

1  hedge against losing on some of their water rights issues.

2  But nevertheless, this individual case is now small enough and

3  involves only past costs, so that should be easy to settle.

4      I don't think there's any hope of resolving the future

5  remedy issue unless and until the water rights issues are

6  further along.  I guess we can -- and that was, you know, we

7  had Francis McGovern worked extraordinarily hard as a mediator

8  not too long ago in pursuit of a global settlement, and he

9  finally gave up; and I think, if I recall correctly, we were

10  only the second instance where he failed to reach

11  an agreement, and it was the uncertainty about the costs and

12  nature of the future remedy that proved fatal.  That doesn't

13  need to be fatal to resolve past costs in the amount of

14  $247,000.  It may or may not be fatal to resolving the past

15  cost claims in the Spinnaker Synergy case, which are several

16  million dollars, but at least that's a quantifiable, known

17  number today.

18      With respect to the G&K issue, that was not something the

19  City pursued, so I would have to defer to the DQ'd parties on

20  that.

21          THE COURT:  As to whether they would have any

22  objection to Gallagher & Kennedy participating in the

23  mediation?  Is that --

24          MR. THOMAS:  I don't know if Freescale is represented

25  today.

1          THE COURT:  No.  I know.  Okay.

2          MR. SWINDLE:  Shane Swindle for Corning.  We were one

3   of the disqualification defendants.

4          THE COURT:  Right.

5          MR. SWINDLE:  And we worked out an arrangement to

6   participate in the mediation previously.  We could do that

7   again, I imagine.

8          THE COURT:  Yeah.

9          MR. SWINDLE:  What I hear Mr. Friedman saying and I

10  think the Court saying is, you know, let's get a mediator and

11  then we can talk about how we can scope it and so forth.  I

12  mean, you know, we would love to resolve it.  So if we can

13  start there, then that sounds like a reasonable place to

14  start.

15         THE COURT:  Well, and I understand this is a

16  complicated case, but, you know, the more and more I do

17  settlement conferences, I hear every day how hopeless it is

18  and it's never going to settle and it's so complicated and

19  blah, blah, blah, and the case settles.

20      So this is your opportunity to be creative and deal with

21  all of these issues.  So I understand it's a complicated case.

22  I understand there's a lot of moving parts, but it can't hurt

23  to talk.  And I understand the difficulty in getting into and

24  the frustration, I think, in trying to try to squeeze it into

25  Judge Phillips' calendar.

1    So what I would like -- and I don't want to delay this.

2    I have to go to a judges meeting at noon.  I mean, we can

3    resolve this quickly, but I've got a roomful of defendants

4    that probably want to talk, perhaps, about it.  But my thought

5    is that we consider that in this case, which is 10-290, as

6    well as Case No. 16-4448 and invite Gallagher & Kennedy to a

7    mediation in Arizona with an agreed-upon mediator.  If you

8    cannot agree on a mediator, then you can submit names to me

9    and I will select a mediator -- I hate to do that; I hope you

10   guys can agree, but if not, that's fine -- and that it be done

11   within X number of days.  Once again, you tell me what is

12   reasonable for you.

13       That's what I'm thinking, but I don't -- there's a

14   roomful of people that haven't had an opportunity necessarily,

15   although I know I'm presuming you've thought about it, haven't

16   had an opportunity to talk to each other about it.  But those

17   are my thoughts.  So we can either just agree to do that,

18   which I'm happy to do, or we can take a break and we can come

19   back at a little after 1:00, after everyone has an opportunity

20   to think about it, and then you can tell me what you want to

21   do.

22       Mr. Friedman.

23       MR. FRIEDMAN:  Well, that was my proposal, Your

24   Honor, so it's agreeable to us.

25       THE COURT:  Yeah.  I'm a legal genius, right?

1        Okay.  Mr. Thomas.

2            MR. THOMAS:  Your Honor, Chris Thomas.

3        I don't think anybody at counsel table objects to that.

4   If some party representing another defendant wants to be

5   heard, please come forward, but --

6            THE COURT:  Anybody have any problems?  Please come

7   on up.

8        And if you need time to think about it, tell me you need

9   time to think about it or speak to your clients or if you want

10  to do anything like that, please.

11           MR. PAGLIERY:  Judge, Sergio Pagliery for Freescale.

12       That's exactly what I was going to tell you.  I need time

13  to check with my client.

14           THE COURT:  And I appreciate that.

15           MR. PAGLIERY:  I need appropriate conditions for no

16  waivers, et cetera, but I do need to talk to them first.

17           THE COURT:  I agree.  And I don't think we're going

18  to resolve the scope and mechanism of the mediation, but I

19  mean the concept is -- and then I'm presuming you can all work

20  on the details, but I can appreciate you probably need to talk

21  to your clients about that.

22       So my suggestion would be if -- and I hate to do this,

23  but I've got to go to a meeting.  And so why don't we take a

24  break, come back at 1:15.  That will give everyone an

25  opportunity to -- and I know how much you love coming to

1  Tucson; I hate to prolong your stay in Tucson -- is come back

2  at 1:15, and then hopefully you can have an opportunity to

3  further discuss this.

4      But that is my thought as to how we proceed with the

5  settlement, and then we can talk about whether the mediator is

6  just supposed to let me know, you know, when the -- so that

7  I'm in the loop to the extent Judge Ezra wanted me in it, just

8  let me know when it's scheduled and that's about it, and I

9  think that's probably enough.

10         MR. PAGLIERY:  That's fine.  Thank you, Your Honor.

11         MR. SWINDLE:  Your Honor?

12         THE COURT:  Please.

13         MR. SWINDLE:  I think we're going to need more time

14  than that to get in touch with clients.  Could we just get

15  back to you in the next day or two after we talk to the

16  plaintiffs?  I mean, I think this will work out, but --

17         THE COURT:  Well, what if it doesn't?  I don't want

18  to have to bring you all back here in another week.

19         MR. SWINDLE:  Yeah.

20         THE COURT:  So why don't we do this.  Let's do this:

21  Let's just take a short break, come back at 1:15.  If you need

22  more time, you will have it, and then we're going to have to

23  figure out the mechanism to do that.

24      And then we're also going to talk about -- you know, I

25  want to do what Judge Ezra asked me to do, but I think in the

1  future we'll talk about whether everyone really needs to be

2  here in person.  I appreciate you coming down, but maybe we'll

3  talk about that a little bit as well.

4      So why don't we just take a break, so we'll reconvene --

5  we're going to stand at recess.  We'll reconvene at 1:15.

6          MR. SWINDLE:  Can we use the courtroom in the

7  meantime?

8          THE COURT:  Absolutely, yeah.  Of course you can.

9          MR. SWINDLE:  Thank you.

10         THE COURT:  Do you guys need a place to go?

11         MR. FRIEDMAN:  No, Your Honor.

12         THE COURT:  Okay.

13         MR. PEARSON:  Your Honor, is there any other issue

14  you're going to resolve today besides this one?

15         THE COURT:  Not unless it comes up.

16         MR. PEARSON:  So 1:15 we're going to address this and

17  then we'll be done?

18         THE COURT:  I hope so, unless there's any other

19  issues.  And that was Mr. Pearson on behalf of Union Pacific.

20      If there's anything else that comes up, I'm happy to

21  address it.  This was sort of a general to try to get

22  everything on the table and get things moving, okay?

23         MR. PEARSON:  Yep.

24         THE COURT:  Thank you very much.

25      (Court recessed from 11:55 a.m. to 1:15 p.m.)

1          THE CLERK:  Your Honor, we are back on the record in

2     Civil 10-290, Roosevelt Irrigation District versus Salt River

3     Project, et al., and it is a status conference.

4          THE COURT:  Thank you, Beth.

5          THE CLERK:  You're welcome.

6          THE COURT:  We are here after our recess to finalize

7     some issues with regard to the settlement conference.  I know

8     there is one other issue regarding some outstanding legal

9     issues as well which we will also discuss.  But in terms of

10    the mediation/settlement conference, does anyone want to make

11    anything on the record?

12        Here's what I'm going to propose -- so order -- is that

13    in Case No. CV-10-290, CV-16-4448, as well as Gallagher &

14    Kennedy in CV-16-4447, that the parties are to submit a list

15    of proposed mediators to the Court, in Phoenix, proposed

16    mediators in Arizona, with the idea that the mediation will

17    take place in Phoenix, Arizona, by Friday, December 15th,

18    2017.

19        If you cannot agree on a mediator, you're to submit a

20    list of the mediators to the Court by no later than Friday,

21    December 22nd, 2017.  I will select a mediator, and you're to

22    conduct the mediation within 60 days of the date of the

23    selection of the mediator.

24        The parties are to provide a report to the Court within

25    ten days after the mediation is completed, and within ten days

1  after that another status conference will be scheduled, and at

2  that status conference we are going to again ask everyone

3  to appear in person.

4      So that is my thought.  So if anyone wants to make a

5  record on that, please go ahead.

6      I'll start with you, Mr. Fairbourn or Mr. Friedman.

7          MR. FRIEDMAN:  No, Your Honor, we don't wish to make

8  any record on that.

9          THE COURT:  Okay.

10      Mr. Swindle.

11          MR. SWINDLE:  Judge, the timing -- excuse me -- all

12  sounds fine.  With respect to the participation of Gallagher &

13  Kennedy, I think with the exception of one party who is still

14  just trying to get in contact with the necessary people, we

15  can do that with the same sorts of waivers that we put in

16  place for the previous mediation so that there aren't waivers

17  of arguments and the like.

18      And the only other -- well, no.  I think that's

19  everything.  Thank you.

20          THE COURT:  Okay.  Does anyone else, any of the other

21  defendants wish to make a record?  And if you do, please come

22  up and once again please identify yourself for the record if

23  you would, please.

24          MR. PAGLIERY:  Judge, Sergio Pagliery for Freescale.

25      And before we broke, you said we were going to get back

1  together so I could tell you whether my client, Freescale,

2  would be willing to negotiate and mediate with Gallagher &

3  Kennedy.  As of this time, the answer is no, my client is not

4  willing to do that.

5          THE COURT:  And I appreciate that.  And if that

6  continues to be a concern, let me know and we may have to make

7  a decision as to whether the mediation moves forward without

8  Gallagher & Kennedy.

9          MR. PAGLIERY:  Okay.  Thank you.

10         THE COURT:  Thank you very much.  Appreciate that.

11      And please come up.  Thank you.

12         MR. ARMSTRONG:  Thank you, Judge Macdonald.  David

13  Armstrong on behalf of Salt River Project.

14      My client, Michael O'Connor, general counsel of Salt

15  River Project, is here.  He is the individual who has had

16  significant interactions with Judge Phillips on the water

17  rights side, and so he'd like a moment to be able to tell you

18  some of the issues with regard to coordinating with Judge

19  Phillips.

20         THE COURT:  Sure.

21         MR. ARMSTRONG:  If you don't mind.

22         THE COURT:  Of course.

23      Come on up, Mr. O'Connor.  Thank you.

24         MR. O'CONNOR:  Thank you.  First of all, Your Honor,

25  let me apologize for not having a jacket and tie.  I wasn't

```
 1   planning on being here, number one; and number two --
 2              THE COURT:  You're lucky Judge Ezra is not here.
 3              MR. O'CONNOR:  I do apologize with respect to that
 4   lack of protocol.
 5              THE COURT:  No.  That's fine.  Thank you.
 6              MR. O'CONNOR:  I think, as Mr. Armstrong indicated,
 7   I've been the one who has been coordinating with Judge
 8   Phillips in California, and I did -- I think I listened to
 9   what you indicated as far as your order with respect to trying
10   to complete something within 60 days, the proposed mediators.
11        In the discussions that we've had, ongoing discussions
12   with Judge Phillips, first, he does have some times in
13   February.  At least, he did as of last week, and I'll be in
14   communication with his office again.  I don't think from what
15   you intended, though, that precludes the possibility for using
16   Judge Phillips if necessary to either come back to Phoenix or
17   do it in Newport Beach; is that correct?
18              THE COURT:  If everyone can agree on that, that would
19   be great.
20              MR. O'CONNOR:  Yeah, because the one issue in this
21   case, as I'm sure you've seen so far, it's a big, complicated
22   mess, and having someone who's already familiar with a lot of
23   the issues and the players is helpful.  There's a significant
24   ramp-up time for anybody to really understand all these
25   issues.  So I do appreciate that we could at least work with
```

1   all the group here today as far as whether we can still

2   continue to use Judge Phillips with respect to that.

3            THE COURT:  Yeah.  My intent is to try to not get in

4   your way here, so I mean to the extent you can agree, that

5   would be great.

6            MR. O'CONNOR:  Okay.  And the other thing just to

7   represent to the Court, there have been a lot of ongoing

8   communications, particularly with respect to the water rights

9   case, which you do not have jurisdiction over, but that's with

10  Judge Tuchi.

11           THE COURT:  Right.

12           MR. O'CONNOR:  In fact, we had a meeting even

13  yesterday, most of the afternoon, just between Salt River

14  Project and RID.  We are making some progress.  We do

15  understand the time-sensitive nature of all this, and you can

16  be assured we're doing everything possible, given the

17  relationship between these cases, to continue to push forward.

18       So I think that, you know, I heard what you indicated as

19  far as getting some names and dates, and we'll continue to

20  push to the extent that this can go forward, and I'll continue

21  to coordinate through Mr. Armstrong and everyone else as far

22  as discussions we've had with Judge Phillips or how these

23  things interrelate as much as possible.

24       So I would be happy to answer any other questions that

25  you have other than you have our commitment to continue to

1   move forward and try to see what we can do towards resolution

2   of this matter.

3           THE COURT:  Great.  Thank you very much,

4   Mr. O'Connor.  I appreciate it.

5       Mr. Friedman, was there something else?

6           MR. FRIEDMAN:  Yes, Your Honor.

7       With respect to Freescale, I would simply suggest to the

8   Court that if that is a problem that Freescale have the option

9   to participate or not in the mediation.  If they're going to

10  object to Gallagher & Kennedy's participation while 19 other

11  parties agree, the only really official way to proceed is to

12  have the mediation go forward, and if Freescale chooses not to

13  participate, so be it.  I just wanted to make that

14  observation, Your Honor.

15          THE COURT:  And I'm hoping -- and I understand that,

16  and we'll deal with that if we have to.  I appreciate the

17  observation, though.

18      Come on up.

19          MR. McCORMICK:  Good afternoon, Your Honor.  Sean

20  McCormick for Honeywell.

21      We think it makes sense that if Freescale is not able to

22  participate because of G&K that we would take Freescale's side

23  and think it makes more sense to not allow G&K to participate,

24  if it comes to that.

25          THE COURT:  Okay.  Thank you.

1           MR. McCORMICK:  Thank you.

2           THE COURT:  Thank you.

3      Anything else on the settlement issue?

4      And there is one other issue, and that has to do with the

5  plaintiff's position, RID's position that the Court should

6  issue rulings on certain legal issues impacting settlement,

7  and those are listed on pages 20, 21 of the joint status

8  report, and then I did receive the defendants' position as

9  well on that.

10      And so, Mr. Friedman, why don't you go ahead on that

11  issue.  To the extent you need to make a record, please do.

12           MR. FRIEDMAN:  Your Honor, I think rather than taking

13  the Court's time up with those suggestions, which we felt were

14  a way to expedite proceedings, the importance of those issues

15  really looms large only if we can't reach a global settlement.

16      So what I would suggest is rather than spending Your

17  Honor's valuable time this afternoon, if and when we seek to

18  raise those issues, we'll do so by formal motion at an

19  appropriate time rather than asking the Court to deal with

20  them as preliminary stand-alone legal rulings.

21           THE COURT:  Okay.  Thank you.

22      Any defendants wish to be heard on that issue?

23      Are there any other issues that you need to bring to the

24  Court's attention at this time?

25      Once again, we really appreciate you traveling here to

1    Tucson, Arizona.  We appreciate how hard you are working

2    together on this case and all of the cooperation, given the

3    complexity, and there's a lot of moving parts that we

4    recognize in this case, so we really do appreciate that.

5         Are there any other issues that we need to address at

6    this point in time?

7              MR. SWINDLE:  Nothing here, Your Honor.  Thank you

8    for your time.

9              THE COURT:  We appreciate it.  Thank you.

10        Mr. Fairbourn, Mr. Friedman?

11             MR. FRIEDMAN:  No, Your Honor.  Thank you.

12             MR. FAIRBOURN:  We join in the thank you.

13             THE COURT:  Oh, it's my pleasure.

14        So all have a safe trip to everywhere you're going other

15   than Tucson, I know.  So we really appreciate you being here.

16   Thank you very much.

17        We'll stand at recess.  Thank you.

18        (Court recessed at 1:26 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, Aaron H. LaDuke, do hereby certify that I

4    reported the foregoing proceedings to the best of my skill

5    and ability, and that the same was transcribed by me via

6    computer-aided transcription, and that the foregoing pages

7    of typewritten matter are a true, correct, and complete

8    transcript of all the proceedings had, as set forth in the

9    title page hereto.

10             Dated this 8th day of December, 2017.

11

12

13                        _____s/Aaron H. LaDuke_____
                          Aaron H. LaDuke, RMR, CRR
14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25